EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
GEORGE S. CARDONA (Cal. Bar No. 135439)
Assistant United States Attorney
Chief, Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-8323
    Facsimile: (213) 894-6269
    E-mail:    george.s.cardona@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>SERGIO AMADOR,<br><br>        Defendant. | No. CR 15-629-JAK<br><br>PLEA AGREEMENT FOR DEFENDANT<br>SERGIO AMADOR |

    1.   This constitutes the plea agreement between Sergio Amador ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case. This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

<u>DEFENDANT'S OBLIGATIONS</u>

    2.   Defendant agrees to:

        a.   At the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to count six of the indictment in <u>United States v. SERGIO AMADOR, et al.</u>, CR No. 15-629-

JAK, which charges defendant with mail fraud in violation of 18 U.S.C. § 1341.

　　　　b.   Not contest facts agreed to in this agreement.

　　　　c.   Abide by all agreements regarding sentencing contained in this agreement.

　　　　d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

　　　　e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

　　　　f.   Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

　　　　g.   Pay the applicable special assessments at or before the time of sentencing unless defendant lacks the ability to pay and prior to sentencing submits a completed financial statement on a form to be provided by the USAO.

　　　　h.   Not seek the discharge of any restitution obligation, in whole or in part, in any present or future bankruptcy proceeding.

<u>THE USAO'S OBLIGATIONS</u>

3.   The USAO agrees to:

　　　　a.   Not contest facts agreed to in this agreement.

　　　　b.   Abide by all agreements regarding sentencing contained in this agreement.

　　　　c.   At the time of sentencing, move to dismiss the remaining counts of the indictment as against defendant.  Defendant agrees, however, that at the time of sentencing the Court may

consider any dismissed charges in determining the applicable
Sentencing Guidelines range, the propriety and extent of any
departure from that range, and the sentence to be imposed.

d.   At the time of sentencing, provided that defendant
demonstrates an acceptance of responsibility for the offense to which
defendant is pleading guilty up to and including the time of
sentencing, recommend a two-level reduction in the applicable
Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1,
and recommend and, if necessary, move for an additional one-level
reduction if available under that section.

e.   Recommend that defendant be sentenced to a term of
imprisonment no higher than the low end of the applicable Sentencing
Guidelines range, provided that the offense level used by the Court
to determine that range is 13 or higher.  For purposes of this
agreement, the low end of the Sentencing Guidelines range is that
defined by the Sentencing Table in U.S.S.G. Chapter 5, Part A,
without regard to reductions in the term of imprisonment that may be
permissible through the substitution of community confinement or home
detention as a result of the offense level falling within Zone B or
Zone C of the Sentencing Table.

<u>NATURE OF THE OFFENSE</u>

4.   Defendant understands that for defendant to be guilty of
the crime charged in count six of the indictment, that is, mail
fraud, in violation of 18 U.S.C. §  1341, the following must be true:
(a) defendant knowingly participated in a scheme or plan to defraud,
or a scheme or plan for obtaining money or property by means of false
or fraudulent pretenses, representations, or promises; (b) the
statements made or facts omitted as part of the scheme were material,

that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (c) defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and (d) defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme. For purposes of the fourth element above, a mailing is caused when one knows that the mails will be used in the ordinary course of business or when one can reasonably foresee such use; it does not matter whether the material mailed was itself false or deceptive so long as the mail was used as a part of the scheme, nor does it matter whether the scheme or plan was successful or that any money or property was obtained.

<u>PENALTIES AND RESTITUTION</u>

5.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of 18 U.S.C. § 1341 (mail fraud) is: 20 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

6.   Defendant understands that defendant will be required to pay full restitution to the victim of the offense to which defendant is pleading guilty.  Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victim of the offense to which defendant is pleading guilty and in amounts greater than those alleged in the count to which defendant is pleading guilty.  In particular, defendant agrees that the Court may order restitution to any victim of any of the following for any losses suffered by that

victim as a result: (a) any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the offense to which defendant is pleading guilty; and (b) any counts dismissed pursuant to this agreement as well as all relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with those counts. The parties currently believe that the applicable amount of restitution is approximately $201,000, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

7.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

8.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that once the court accepts defendant's guilty plea, it will be a federal felony for defendant to possess a firearm or ammunition. Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or

revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

9.   Defendant understands that, if defendant is not a United States citizen, the felony conviction in this case may subject defendant to: removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future.  The court cannot, and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony conviction in this case.  Defendant understands that unexpected immigration consequences will not serve as grounds to withdraw defendant's guilty plea.

FACTUAL BASIS

10.   Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts provided in attached Exhibit A and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 12 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

SENTENCING FACTORS

11.   Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set

forth in 18 U.S.C. § 3553(a).  Defendant understands that the
Sentencing Guidelines are advisory only, that defendant cannot have
any expectation of receiving a sentence within the calculated
Sentencing Guidelines range, and that after considering the
Sentencing Guidelines and the other § 3553(a) factors, the Court will
be free to exercise its discretion to impose any sentence it finds
appropriate up to the maximum set by statute for the crime of
conviction.

     12.   Defendant and the USAO agree to the following applicable
Sentencing Guidelines factors:

| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
|---|---|---|
| Specific Offense Characteristics: | | |
| Intended Loss > $250,000 but < $550,000 | +12 | U.S.S.G. § 2B1.1(b)(1)(G) |

Defendant and the USAO reserve the right to argue that additional
specific offense characteristics, adjustments, and departures under
the Sentencing Guidelines are appropriate.  In particular, the USAO
reserves the right to argue that a 2-level increase for sophisticated
means should apply under U.S.S.G. § 2B1.1(b)(10)(C), and that a 2 to
4-level increase for aggravating role should apply under U.S.S.G.
§ 3B1.1, while defendant reserves the right to argue that no
increases should be applied under these Sentencing Guidelines
sections.

     13.   Provided that defendant demonstrates an acceptance of
responsibility for the offense to which defendant is pleading guilty
up to and including the time of sentencing, then, taking into account
all of the factors listed in 18 U.S.C. § 3553(a)(1)-(7), and based on
a number of unique circumstances in this case, including but not

7

limited to defendant's early acceptance of responsibility as demonstrated by defendant making timely admissions regarding defendant's role in the crimes alleged in the indictment, both in an August 14, 2013 interview and signed affidavit and in a proffer to the USAO on March 3, 2016; the additional information provided by defendant during the March 3 proffer; the resources saved by the government and the Court due to this early disposition; and the unique nature of the offense and defendant's role in the offense, the USAO will further recommend that defendant's sentence be reduced from the advisory sentencing guideline range by the equivalent of 3 levels as a downward variance in accordance with United States v. Booker, 543 U.S. 220 (2005).

14.   Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

15.   Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

16.   Defendant understands that by pleading guilty, defendant gives up the following rights:

> a.   The right to persist in a plea of not guilty.

> b.   The right to a speedy and public trial by jury.

> c.   The right to be represented by counsel -- and if necessary have the court appoint counsel -- at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the court appoint counsel -- at every other stage of the proceeding.

8

d.    The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.    The right to confront and cross-examine witnesses against defendant.

f.    The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

## WAIVER OF APPEAL OF CONVICTION

17.    Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.

## LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

18.    Defendant agrees that, provided the Court imposes a total term of imprisonment on all counts of conviction of no more than 18 months, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the court, provided it is within the statutory maximum; (d) the amount and terms of any restitution order,

provided it requires payment of no more than $201,000; (e) the term
of probation or supervised release imposed by the Court, provided it
is within the statutory maximum; and (f) any of the following
conditions of probation or supervised release imposed by the Court:
the conditions set forth in General Orders 318, 01-05, and/or 05-02
of this Court; the drug testing conditions mandated by 18 U.S.C.
§§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions
authorized by 18 U.S.C. § 3563(b)(7).

19. The USAO agrees that, provided (a) all portions of the
sentence are at or below the statutory maximum specified above and
(b) the Court imposes a term of imprisonment of no less than 12
months, the USAO gives up its right to appeal any portion of the
sentence, with the exception that the USAO reserves the right to
appeal the amount of restitution ordered if that amount is less than
$201,000.

## RESULT OF WITHDRAWAL OF GUILTY PLEA

20. Defendant agrees that if, after entering a guilty plea
pursuant to this agreement, defendant seeks to withdraw and succeeds
in withdrawing defendant's guilty plea on any basis other than a
claim and finding that entry into this plea agreement was
involuntary, then (a) the USAO will be relieved of all of its
obligations under this agreement; and (b) should the USAO choose to
pursue any charge that was dismissed as a result of this agreement,
then (i) any applicable statute of limitations will be tolled between
the date of defendant's signing of this agreement and the filing
commencing any such action; and (ii) defendant waives and gives up
all defenses based on the statute of limitations, any claim of pre-
indictment delay, or any speedy trial claim with respect to any such

10

1  action, except to the extent that such defenses existed as of the

2  date of defendant's signing this agreement.

3                     EFFECTIVE DATE OF AGREEMENT

4       21.  This agreement is effective upon signature and execution of

5  all required certifications by defendant, defendant's counsel, and an

6  Assistant United States Attorney.

7                        BREACH OF AGREEMENT

8       22.  Defendant agrees that if defendant, at any time after the

9  effective date of this agreement and execution of all required

10  certifications by defendant, defendant's counsel, and an Assistant

11  United States Attorney, knowingly violates or fails to perform any of

12  defendant's obligations under this agreement ("a breach"), the USAO

13  may declare this agreement breached.  All of defendant's obligations

14  are material, a single breach of this agreement is sufficient for the

15  USAO to declare a breach, and defendant shall not be deemed to have

16  cured a breach without the express agreement of the USAO in writing.

17  If the USAO declares this agreement breached, and the Court finds

18  such a breach to have occurred, then: (a) if defendant has previously

19  entered a guilty plea pursuant to this agreement, defendant will not

20  be able to withdraw the guilty plea, and (b) the USAO will be

21  relieved of all its obligations under both this agreement and the

22  proffer letter dated March 3, 2016 executed by defendant, defendant's

23  counsel, and the USAO (the "Letter Agreement").

24       23.  Following the Court's finding of a knowing breach of this

25  agreement by defendant, should the USAO choose to pursue any charge

26  that was dismissed as a result of this agreement, then:

27

28

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.   Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement contained in Exhibit A to this agreement; (iii) any statements made by defendant pursuant to the Letter Agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

## COURT AND PROBATION OFFICE NOT PARTIES

24.   Defendant understands that the Court and the United States Probation Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

25.   Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court; (b) correct any

and all factual misstatements relating to the Court's Sentencing
Guidelines calculations and determination of sentence; and (c) argue
on appeal and collateral review that the Court's Sentencing
Guidelines calculations and the sentence it chooses to impose are not
error, although each party agrees to maintain its view that the
calculations in paragraph 12 are consistent with the facts of this
case.  While this paragraph permits both the USAO and defendant to
submit full and complete factual information to the United States
Probation Office and the Court, even if that factual information may
be viewed as inconsistent with the facts agreed to in this agreement,
this paragraph does not affect defendant's and the USAO's obligations
not to contest the facts agreed to in this agreement.

26.  Defendant understands that even if the Court ignores any
sentencing recommendation, finds facts or reaches conclusions
different from those agreed to, and/or imposes any sentence up to the
maximum established by statute, defendant cannot, for that reason,
withdraw defendant's guilty plea, and defendant will remain bound to
fulfill all defendant's obligations under this agreement.  Defendant
understands that no one -- not the prosecutor, defendant's attorney,
or the Court -- can make a binding prediction or promise regarding
the sentence defendant will receive, except that it will be within
the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

27.  Defendant understands that, except as set forth herein and
in the Letter Agreement, there are no promises, understandings, or
agreements between the USAO and defendant or defendant's attorney,
and that no additional promise, understanding, or agreement may be

13

1   entered into unless in a writing signed by all parties or on the

2   record in court.

3                PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

4        28.   The parties agree that this agreement will be considered

5   part of the record of defendant's guilty plea hearing as if the

6   entire agreement had been read into the record of the proceeding.

7   AGREED AND ACCEPTED

8   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
9   CALIFORNIA

10  EILEEN M. DECKER
    United States Attorney

11

12  _____          3/30/2016
                                        _____
13  GEORGE S. CARDONA                   Date
    Assistant United States Attorney

14  _____          _____
    SERGIO AMADOR                       Date
15  Defendant

16  _____          _____
    ERROL STAMBLER                      Date
17  Attorney for Defendant
    SERGIO AMADOR
18

19

20

21

22

23

24

25

26

27

28

                                14

1  entered into unless in a writing signed by all parties or on the

2  record in court.

3                PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

4       28.   The parties agree that this agreement will be considered

5  part of the record of defendant's guilty plea hearing as if the

6  entire agreement had been read into the record of the proceeding.

7  AGREED AND ACCEPTED

8  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF
9  CALIFORNIA

10 EILEEN M. DECKER
   United States Attorney

11

12

13 GEORGE S. CARDONA                    Date
   Assistant United States Attorney

14                                      3-26-16
   SERGIO AMADOR                        Date
15 Defendant

16                                      3/26/16
   ERROL STAMBLER                       Date
17 Attorney for Defendant
   SERGIO AMADOR

18

19

20

21

22

23

24

25

26

27

28

                              14

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement and the Letter Agreement referenced in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____                    3·26·16
SERGIO AMADOR                                       _____
Defendant                                           Date

## CERTIFICATION OF DEFENDANT'S ATTORNEY

I am SERGIO AMADOR's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client.  Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement and the Letter Agreement referenced in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty pleas pursuant to this agreement.

_____          3/26/16
ERROL STAMBLER                            Date
Attorney for Defendant
SERGIO AMADOR

Exhibit A: Factual Basis

1.    The International Longshore and Warehouse Union, formerly known as the International Longshoremen's and Warehousemen's Union ("ILWU"), together with various ILWU locals in different port locations, represents dock workers at ports on the West Coast of the United States, including at the ports of Los Angeles and Long Beach.

2.    The Pacific Maritime Association ("PMA") represents member organizations involved in the shipping industry and arranges on their behalf for the hiring of dock workers at ports on the West Coast of the United States, including at the ports of Los Angeles and Long Beach.

3.    The International Longshoremen's and Warehousemen's Union – Pacific Maritime Association Welfare Plan (the "ILWU-PMA Welfare Plan") is a benefit plan, established by agreement between the ILWU and PMA and affecting commerce, that provides a variety of benefits, including health care benefits, to eligible active and retired ILWU members and their qualified dependents and survivors.  Eligible recipients of health care benefits under the ILWU-PMA Welfare Plan have an annual choice to have those benefits provided through either a Health Maintenance Organization ("HMO") or a self-funded program that, effective July 1, 2000, was the ILWU-PMA Welfare Plan Self Funded Programs Coastwise Indemnity Plan (the "Plan").  The Plan is funded almost entirely by the PMA.

4.    The Plan reimburses providers of medical services, including physicians, chiropractors, and medical clinics (collectively "providers"), that treat patients covered by the Plan ("Plan members").  Each Plan member is issued a subscriber

1   identification card that identifies the Plan member by a unique

2   identification number ("Plan member ID Number").

3       5.   The Plan requires providers to submit claim forms in order

4   to receive reimbursement for medical services provided to

5   subscribers.  Among other information, providers are required to

6   include in the claim forms: (i) the Plan member's name and ID Number;

7   (ii) the type of service provided (identified by a standardized

8   procedure code number known as a "CPT Code"); (iii) the date the

9   service was provided; (iv) the charge for the service; (v) the

10  diagnosis (identified by a standardized diagnostic code number, the

11  "ICD-9 Diagnosis Code"); and (vi) the provider's name and/or

12  identification number.

13      6.   Effective July 1, 2000, the Plan was administered by the

14  ILWU-PMA Benefit Plans office, with claims processed and paid through

15  the ILWU-PMA Coastwise Claims Office ("Coastwise Claims").

16  Subsequently, the Plan shifted to using a third party administrator

17  ("TPA"), which, from 2008 until 2013, was CIGNA, but claims for

18  medical services provided to Plan members continued to be processed

19  and paid through Coastwise Claims.

20      7.   The Plan provides coverage for chiropractic services and

21  has a PPO for chiropractic services, which, effective as of July 1,

22  2009, was the Chiropractic Health Plan of California ("CHPC").  For

23  chiropractic services provided by a CHPC provider, the Plan covered

24  100% of CHPC charges, with no out-of-pocket cost to the Plan member

25  receiving the chiropractic services.  The chiropractic services

26  covered by the Plan included office visits, up to a maximum of 40

27  related to any particular "diagnosis," and up to a maximum of 18

28  related to "symptoms" in the absence of a "diagnosis."

8.    I, David Gomez, and C.R., are members of ILWU Local 13, which is based in Los Angeles County.

9.    On or about April 17, 2009, and April 9, 2010, respectively, using the services of R.M., I, David Gomez, and C.R. created corporations called "Port Medical Associates, Inc." and "Port Medical San Pedro Inc."  In or about early 2009 and early 2010, respectively, I, David Gomez, and C.R. opened two clinics, operating under the names "Port Medical" at 2530 Atlantic Boulevard, Suite A, Long Beach, California, and 407 North Harbor Boulevard, San Pedro, California.

10.    Both Port Medical clinics offered general medical and chiropractic care through medical providers I, David Gomez, and C.R. hired, including, in particular, K.M., who was a licensed chiropractor and member of the CHPC, who we hired to provide chiropractic services at the Port Medical clinic in Long Beach.

11.    In or about December 2008. March 2010, and September 2010, respectively, using the services of R.M., I, David Gomez, and C.R. created three medical management companies: DCS Medical Management LLC ("DCS"), Chosen Medical Management LLC ("Chosen"), and Ramport Medical Management LLC ("Ramport").  The "DCS" in DCS Medical Management stood for David, Chris, and Sergio.  On or about the following dates, using the services of R.M., I, David Gomez, and C.R. opened at J.P. Morgan Chase Bank the following accounts (each identified by the last four digits of the account number) for these medical management companies:

///

///

| Date | Company | Account |
|------|---------|---------|
| March 6, 2009 | DCS | ***3393 ("DCS 3393 Account") |
| March 29, 2010 | Chosen | ***6061 ("Chosen 6061 Account") |
| August 16, 2010 | Ramport | ***9842 ("Ramport 9842 Account") |
| January 12, 2011 | Ramport | ***6169 ("Ramport 6169 Account") |

12.   After opening the Port Medical clinic in Long Beach, I and David Gomez recruited Plan members to receive medical and chiropractic services at Port Medical, including by offering those Plan members incentives, including sponsorships of sports teams, cash payments, free massages and facials, and other gifts and services, in return for those Plan members receiving medical and chiropractic services at Port Medical and encouraging other Plan members to also receive medical and chiropractic services at Port Medical. Payments to Plan Members were usually made using the medical management accounts referenced above.

13.   For example, often times, I or David Gomez would be approached by, or would approach, Plan members to sponsor a sports team.  For a $1,000 sponsorship, I expected about 6 people to owe us 3-4 visits at Port Medical Long Beach.  The Plan members often would not come to all of the visits they owed us, but the clinic would bill the Plan for those visits anyway, resulting in billing the Plan for services that had not actually been rendered.  In addition, the bills submitted by Port Medical Long Beach did not disclose that I and David Gomez had paid or provided incentives for Plan members to receive services at the clinic.

14.   I was aware that patient files had to be created to make it look like Plan members were receiving treatment when they were not actually coming in for treatment.   To accomplish this, when Plan members who were being paid came in for treatment, the clinic staff would sometimes have them sign patient sign-in sheets for dates they did not actually come in.   On other occasions, both I and David Gomez went to Plan members to obtain signatures on sign-in sheets.   These extra signatures were used to create false chart entries that were used to support bills to the Plan for services that had not actually been rendered.

15.   There were also many occasions when I knew that Port Medical Long Beach was billing the Plan for more services than were actually received by Plan members on a given visit.   For example, on many occasions a Plan member would come in for a 15 minute massage and receive only that 15 minute massage without seeing the chiropractor, but the clinic would send the Plan a bill for multiple (15) increments of services that treated those services as if justified by seeing the chiropractor.   These bills also did not disclose that I and David Gomez had paid or provided incentives for Plan members to receive services at the clinic.

16.   One of the Plan members I paid to get him and his family members to receive services at Port Medical Long Beach was J.V., who had several children who were also Plan members.   On February 20, 2010, I wrote J.V. a check on the DCS account for $2,400 that indicated "plumbing" in the memo line.   I knew that J.V. was not a plumber, that this check was not for plumbing services, and that I wrote "plumbing" to conceal the fact that the check was actually a payment to J.V. for J.V. and his family members receiving services at

Port Medical Long Beach.  In return for this payment, I expected J.V. and his family members to make a certain number of visits to the clinic, and I knew that if they did not make those visits, we would bill the Plan for those visits in any event, resulting in bills to the Plan for services not actually rendered.

17.  On or about January 13, 2011, Port Medical Long Beach submitted to the Plan bills for chiropractic services purportedly rendered to J.V on or about November 2, 2010, November 9, 2010, and November 16, 2010.  In fact, J.V. had not received chiropractic services from Port Medical Long Beach on any of those days, and the bills were supported by fabricated chart entries prepared by clinic staff using signatures provided by J.V. to make it look as if J.V. had received services on those days.  As the result of this bill for services that had not actually been rendered, on or about February 1, 2011, the Plan mailed check number 7281549 in the amount of $736.11 to Port Medical Long Beach.

18.  As a result of the fraudulent scheme described above in which I and David Gomez participated, Port Medical billed the Plan at least $251,000 for medical and chiropractic services not actually rendered, and the Plan paid Port Medical at least $201,000 based on those bills.