1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                    - - - -

5


6
UNITED STATES OF AMERICA,        )
7                                )
                    PLAINTIFF,   )
8                                )
       vs.                       )    No. CR 15-629-RGK-2
9                                )
DAVID GOMEZ,                     )
10                               )
                    DEFENDANT.   )
11 _____)

12

13


14        REPORTER'S PARTIAL TRANSCRIPT OF JURY TRIAL

15        (TESTIMONY OF WITNESS SERGIO AMADOR)

16             (VOLUME 2, PAGES 17 - 83)

17             FRIDAY, OCTOBER 14, 2016

18                  8:31 A.M.

19            LOS ANGELES, CALIFORNIA

20

21

22    _____

23        *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
          *Official Reporter, U.S. District Court*
24             *255 East Temple Street*
               *Los Angeles, CA  90012*
25                 *213.894.5949*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFF, UNITED STATES OF AMERICA:

 4         OFFICE OF THE UNITED STATES ATTORNEY
           BY:  GEORGE S. CARDONA
 5              ASSISTANT UNITED STATES ATTORNEY
           312 NORTH SPRING STREET, SUITE 1100
 6         LOS ANGELES, CALIFORNIA  90012
           213.894.2434
 7

 8   FOR DEFENDANT, DAVID GOMEZ:

 9         ULTIMO LAW FIRM, PC
           BY:  PAUL J. ULTIMO
10              ATTORNEY AT LAW
           7700 IRVINE CENTER DRIVE, SUITE 800
11         IRVINE, CALIFORNIA  92618-3047
           949.851.0300
12

13   ALSO PRESENT:

14         SPECIAL AGENT MARCUS VALLE, DEPARTMENT OF LABOR,
           OFFICE OF THE INSPECTOR GENERAL
15

16         JEANNIE HENSCHEL

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

# I N D E X

*GOVERNMENT'S WITNESS:*                                    *PAGE*

*SERGIO AMADOR*

  DIRECT EXAMINATION (Continued) BY MR. CARDONA        20

  CROSS-EXAMINATION BY MR. ULTIMO                     43

  REDIRECT EXAMINATION BY MR. CARDONA                 76

  RECROSS-EXAMINATION BY MR. ULTIMO                   79

## T R I A L   E X H I B I T S

| EXHIBIT NUMBER | RECEIVED IN EVIDENCE | STRICKEN |
|---|---|---|
| 11 | 21 | -- |
| 71-1 | 76 | -- |
| 74, page 2 | 44 | -- |
| 87, pages 1, 2 | 80 | -- |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                 LOS ANGELES, CALIFORNIA; FRIDAY, OCTOBER 14, 2016

 2                               8:31 A.M.

 3                               -  -  -  -

 4       (In the presence of the jury:)

 5            THE COURT:  Okay.  You did it again.  I'm impressed.

 6   Still got the perfect record going.  Hopefully you had a good

 7   evening last night, didn't think about this case, you're ready

 8   to get in, do the work today.

 9        Record will reflect all the members of the jury are in

10   their respective seats in the jury box, the witness is on the

11   witness stand.

12        Remember, sir, you're still under oath.

13            THE WITNESS:  Yes.

14            THE COURT:  Counsel, you may inquire.

15            MR. CARDONA:  Thank you.

16       SERGIO AMADOR, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

17                    DIRECT EXAMINATION (Continued)

18   BY MR. CARDONA:

19   Q.   Mr. Amador, when we left off last night, we were talking

20   about the opening of Port Medical, and we were talking about

21   the management company called DCS Medical Management.  Do you

22   remember that?

23   A.   Yes.

24            MR. CARDONA:  I'd like to put up on the -- and offer,

25   Your Honor, Exhibit 11.
```

```
 1              MR. ULTIMO:  No objection, Your Honor.

 2              THE COURT:  Okay.  Be received.

 3          (Received in evidence, Trial Exhibit 11.)

 4   BY MR. CARDONA:

 5   Q.   Now, in connection with DCS Medical Management, did you

 6   also open a bank account at Chase Bank?

 7   A.   Yes.

 8   Q.   And were you, Mr. Gomez and Mr. Rice all signators on that

 9   account?

10   A.   Yes.

11   Q.   The DCS, what did that stand for?

12   A.   David, Chris, Sergio.

13   Q.   Now, we touched briefly on the staffing of Port Medical.

14   Do you remember a woman named Yolanda Sierra?

15   A.   Yes.

16   Q.   Was she hired at Port Medical?

17   A.   Yes.

18   Q.   How was she hired?

19   A.   She was a -- an employee of the restaurant Sixth Street

20   Bistro.  I believe when the restaurant closed, she was offered

21   a job to work at the clinic.

22   Q.   And what was her job at the clinic?

23   A.   I believe at the front desk.

24   Q.   Now, at some point did you become a partner in the bistro

25   restaurant with Mr. Gomez?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   A.   Yes.

2   Q.   Did you also become a partner with him in another medical

3   management company, DS Medical Management?

4   A.   Yes.

5   Q.   Did you and he also have a joint account together at

6   Chase?

7   A.   Yes.

8   Q.   Now, going back to Port Medical and its operations, when

9   it opened, were you involved in recruiting patients?

10  A.   Yes.

11  Q.   Was Mr. Gomez involved in recruiting patients?

12  A.   Yes.

13  Q.   What would you do to recruit patients?

14  A.   At that time we would ask our -- our work partners if they

15  would go and visit the clinic, basically, people that we knew

16  at the -- at work.

17  Q.   Were those members of the ILWU?

18  A.   Yes.

19  Q.   Were they people that had benefits under the ILWU

20  insurance plan?

21  A.   Yes.

22  Q.   Now, were there other medical clinics doing the same

23  thing?

24  A.   Yes.

25  Q.   Were there a large number of medical clinics recruiting
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    members of the ILWU to go to their clinics?

2    A.    Considerable, yes.

3    Q.    Were other clinics offering payments to longshoremen?

4    A.    Yes.

5    Q.    Now, when you say you were doing that, was Dave Gomez also

6    doing the same thing, recruiting patients from the

7    longshoremen?

8    A.    Yes.

9    Q.    Now, at first did you pay them?

10   A.    At first it was -- no, it was just word of mouth.  We

11   would ask them if they would show up at first.

12   Q.    At some point did Port Medical start making payments to

13   patients?

14   A.    Yes.

15   Q.    How did that come about?

16   A.    First we started sponsoring teams, basically, the softball

17   teams and basketball teams, soccer teams, and that's how it

18   started off.

19   Q.    And what was the purpose of sponsoring those teams?

20   A.    To have the patient go to -- or the -- the union member go

21   to our clinic.

22   Q.    Did that change at some point?

23   A.    Yes.

24   Q.    How did it change?

25   A.    Other patients started coming, asking for -- for favors,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    also.

2    Q.    What do you mean by "asking for favors"?

3    A.    During two-thousand-, I believe -eight or -nine, there was

4    a recession, so a lot of longshoremen weren't -- they weren't

5    working.  So they would ask us if we could help them out to

6    make their mortgage payment, the car payments and so forth.  So

7    we -- I would -- we would say yes, basically.

8    Q.    What would you -- when you say you would say yes, what

9    would that mean?

10   A.    If they would go and visit the clinic, we would help them

11   out.

12   Q.    And how would you help them out?

13   A.    By paying them.

14   Q.    How did you pay them?

15   A.    Cash.  We would -- it started off, they would go into the

16   clinic, and after that, I would -- I would pay them.

17   Q.    And did Mr. Gomez also do that?

18   A.    I never saw him, actually, give someone cash, but we -- he

19   pretty much knew.  He would call me up or -- or we would talk

20   daily, basically, of what we would do that day.

21   Q.    So did you discuss the various arrangements that each of

22   you had worked out with various patients?

23   A.    Yes.

24   Q.    How did you keep track of these arrangements?

25   A.    At first I -- I didn't have any way of keeping track of

1   the patients that needed the favor.  The sponsorships, the

2   actual manager would keep track of the patients that were

3   coming in, the baseball players or the basketball players.  The

4   other members that needed favors, to pay their car note or

5   their mortgage or their rent, I would ask them to keep their --

6   their EOBs, which is their -- their statements of benefits, and

7   with that I would go ahead and pay them.

8   Q.   Let me go back for a second and break this down a little

9   bit.  When you said for the sponsorships the manager would keep

10  track of who came in, was there an arrangement that when you

11  gave a sponsorship, you expected a certain number of visits or

12  a certain number of people to come in?

13  A.   Yes.

14  Q.   How did you figure that out?

15  A.   We pretty much had a basic -- or the minimum amount that

16  we knew that we could bill out for the visit, basically.  So if

17  we gave out a certain amount of money, we figured, for us to

18  get back our money, they had to come in a certain amount of

19  times.

20  Q.   Did you work out those arrangements with teams?

21  A.   Some of them, yes.

22  Q.   Did Mr. Gomez?

23  A.   We were there.  I -- I don't remember him actually telling

24  someone, but we were all there, yeah.

25  Q.   When you say "we were all there," what do you mean?

```
 1   A.   When it first started, it was our manager, and she's the
 2   one that pretty much knew how to do everything.  So she
 3   explained everything the way she was doing at her previous
 4   clinic.  So that's the way we -- we knew.
 5   Q.   And when you say she explained that, did she explain that
 6   to you?
 7   A.   To both of us, yeah.
 8   Q.   You and Dave Gomez?
 9   A.   Yes.
10   Q.   Was that Michelle Aragon?
11   A.   Yes, Michelle Aragon.
12   Q.   And when you said that your manager kept track of who came
13   in and whether they came in for the appropriate number of
14   visits, was that Michelle Aragon you were talking about?
15   A.   Yes, at that time.  And when a previous manager would come
16   in, we'd pretty much let them know how to do it or what to do.
17   Q.   I'll come back to that in a second.  Let me ask you about
18   a particular person.  Do you remember someone known as Joe
19   Vaifanua?
20   A.   Yes.
21   Q.   How do you know him?
22   A.   I believe he approached me from -- at work.
23   Q.   Was he a longshoreman?
24   A.   Yes.
25   Q.   What did he approach you at work for?
```

1    A.   He needed -- he needed help.

2    Q.   Did you agree to help him?

3    A.   Yes.

4    Q.   Was there an expectation on your part in return for that

5    help?

6    A.   Yes.

7    Q.   What was that?

8    A.   For him to take his family to -- to the clinic.

9    Q.   Did he actually go to the clinic?

10   A.   I was never there to see him physically go into the

11   clinic, so I -- I wouldn't -- no, I've not -- I wouldn't know.

12   Q.   You mentioned that you required the people who you did

13   favors for to show you their EOBs.

14   A.   Yes.

15   Q.   Did you require that of Joe Vaifanua?

16   A.   Yes.

17   Q.   How did that work?

18   A.   Well, at first when I would help him, we didn't know --

19   "we" meaning the clinic, didn't know if we were actually

20   getting paid after I would ask the manager if -- if Joe was

21   coming in or not.  So what I did, I asked Joe if he would

22   please just -- I came up with the idea that if he would show me

23   the Explanation of Benefits, and that's the way I would keep

24   track if he would come in or not.

25   Q.   And then did you pay him?

```
 1    A.    Yes.
 2    Q.    So I'd like to show you what's marked as Exhibit 273, page
 3    27.
 4          It's previously been admitted, Your Honor.
 5              THE COURT:  Yes.
 6    BY MR. CARDONA:
 7    Q.    Now, you see this is a check signed by you for $2400 to
 8    Joe Vaifanua; is that right?
 9    A.    Yes.
10    Q.    Is this one of the payments you made to Joe Vaifanua?
11    A.    Yes.
12    Q.    Was he a plumber?
13    A.    No.
14    Q.    Did he do any plumbing services for Port Medical?
15    A.    No.
16              MR. CARDONA:  Your Honor, I'd like to display
17    Exhibit 273, page 75.  It's previously been admitted as well.
18              THE COURT:  Okay.
19    BY MR. CARDONA:
20    Q.    You see this?  This is a $300 check to Joe Vaifanua with a
21    signature, David Gomez; is that right?
22    A.    Yes.
23    Q.    Was this another payment to Joe Vaifanua?
24    A.    It was paid to him, yes.
25    Q.    Was David Gomez aware of your arrangement with Joe
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Vaifanua?
 2   A.    Yes.
 3   Q.    Were there times when you would sign checks for David
 4   Gomez, his arrangements, and he would sign checks for your
 5   arrangements?
 6   A.    Yes.
 7   Q.    Did you sign David Gomez's name on this check?
 8   A.    No.
 9   Q.    Did you ever sign David Gomez's name on any checks?
10   A.    No.
11   Q.    Were both you and he signators on this account?
12   A.    Yes.
13   Q.    Now, were there times when you had arranged to do favors
14   for longshoremen and they were supposed to come in a number of
15   times, but they didn't actually come in?
16   A.    Yes.
17   Q.    How did the clinic deal with that?
18   A.    At first the players or the managers were bringing in
19   their patients, and after we would sponsor them, give them the
20   check, they -- they pretty much wouldn't show up.  So Michelle
21   thought it would be good if they would sign the sign-in sheet
22   so we would have already their signature on file, so if they
23   didn't make their appointment, she would go ahead and put it
24   down as the patient -- made it seem like he showed up to the --
25   to their chiropractor visit.
```

```
1   Q.   Even though they hadn't?

2   A.   Yes.

3   Q.   And were those then billed to the insurance company?

4   A.   Yes.

5   Q.   Did Michelle tell you about that?

6   A.   Yes.

7   Q.   Did she tell David Gomez about that?

8   A.   Yes.

9   Q.   Were you there when that happened?

10  A.   Yes.

11  Q.   Now, we saw those two checks to Joe Vaifanua, and you

12  mentioned that they were cash payments.  Were there also checks

13  written to other people who you had similar arrangements with?

14  A.   I'm sure if -- I'm sure there was, yes.

15  Q.   You remember any of the longshoremen with whom you had

16  similar arrangements?

17  A.   Pretty much, yes.

18  Q.   Who were some of them?

19  A.   I would have to see their -- a lot of people had

20  nicknames, so I would have to -- I would have to see a picture.

21  Q.   Does the name John Toavalu --

22  A.   I'm sure the -- yes.

23  Q.   Do you remember the specific names?

24  A.   No.  On some of them, but not -- not John.

25  Q.   Was there a time when there was a fear at Port Medical
```

1    that there was going to be an audit?

2    A.    Yes.

3    Q.    Do you recall when that was?

4    A.    Yes.   That was probably the first year we were open.   The

5    files were piling up, and we had a girl, she was an accountant,

6    to come in and do an internal -- internal audit.

7    Q.    Who was that?

8    A.    First name, her name was Toni.   I don't remember her last

9    name.

10    Q.    Is that Toni Moyer?

11    A.    Yes.

12    Q.    Did she ultimately start working for you as a biller?

13    A.    Yes.

14    Q.    So what happened in connection with that audit?

15    A.    She informed my partner and I that there was missing

16    paperwork, missing signatures, missing everything, pretty much.

17    It was just files with names and nothing there.

18    Q.    And when you say your partner, who do you mean?

19    A.    David.

20    Q.    Is that David Gomez?

21    A.    David Gomez, yeah.

22    Q.    So what did you do?

23    A.    We -- we were trying to get in contact with the patients,

24    for them to come back and see the doctor or sign whatever

25    paperwork they needed to get signed.

Q.   When you say you were in contact with them, who was "you"?
Was it you?

A.   It was pretty much the entire -- everyone at the clinic.
Making phone calls, or if we saw them at work, to let them
know, also.

Q.   And in connection with this, were there times when, rather
than them coming in, you simply had them sign stickers?

A.   Yes.

Q.   What did you do with those stickers?

A.   I give them to the manager, Michelle.

Q.   To do what?

A.   To put them on the -- on the chart, I'm assuming.

Q.   Even though the patients hadn't come in?

A.   Yes.  Some of the patients actually showed up, but some of
the patients didn't.  They never showed up.  So -- and I
wouldn't know unless Michelle -- she would -- she would
actually know which ones showed up and which ones wouldn't.

Q.   Now, during this mini audit, was David Gomez there?

A.   Yes.

Q.   Was he involved in this collecting -- making the calls and
collecting the stickers and giving them to Michelle?

A.   I never saw him do it, but we were all -- we were all
informed, basically, to bring them in and do what we need to do
to bring them -- to get the charts the way they're supposed to
be.

1    Q.    Did Michelle Aragon ultimately leave as the manager?

2    A.    Yes.

3    Q.    Do you recall when that was?

4    A.    No, I don't.

5    Q.    Were you concerned that she knew what you were doing at

6    the clinic?

7    A.    No.

8    Q.    Did you have a fear that she might tell others?

9    A.    No.

10   Q.    Now, you mentioned earlier that there was a number of

11   managers who came in after her; is that right?

12   A.    Yes.

13   Q.    Was one of those a woman named Nicole LaBeaud?

14   A.    Yes.

15   Q.    Did you and Mr. Gomez approach her about what Michelle

16   Aragon had been doing with respect to the billing?

17   A.    I'm sure we did, yes, but --

18   Q.    Did she agree to do it?

19   A.    So long ago.  If she was manager, I'm sure she agreed to

20   it, yes.

21   Q.    Did you ultimately fire her?

22   A.    Yes.

23   Q.    Is that because she wouldn't agree to do it?

24   A.    No.

25   Q.    Now, do you know a woman named Pandora Hall?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Yes.

2    Q.   Did she work at Port Medical?

3    A.   Yes.

4    Q.   What was her job at Port Medical initially?

5    A.   She started off as a massage therapist.

6    Q.   Ultimately, did she become a manager?

7    A.   Yes.

8    Q.   Was that after Nicole LaBeaud or at the same time?

9    A.   I believe it was after.

10   Q.   Now, at some point did Pandora Hall start signing the

11   sponsorship checks?

12   A.   Yes.

13        MR. CARDONA:  And Your Honor, at this time I'd ask to

14   display Exhibit 273, page 1.  It's previously been admitted.

15        THE COURT:  You may publish it.

16   BY MR. CARDONA:

17   Q.   So over on the left, do you see an entry with the date

18   May 5th, 2010, then the account, Chosen, and then going across,

19   shows that Pandora Hall signed that check?

20   A.   Yes.

21   Q.   And going down, does it appear that there are a number of

22   checks after that that are signed by Pandora Hall?

23   A.   Yes.

24   Q.   Many of which have comments that say "sponsorship"?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   What was Chosen Medical Management?

2    A.   A different management company was eventually made,

3    because we were told that we couldn't be managers of the -- of

4    the clinic because we were actual patients and also worked at

5    the docks.  So we came up with the different management

6    company.

7    Q.   When you say "we," who do you mean?

8    A.   Our -- David and myself.

9    Q.   How did you set up Chosen Medical Management?

10   A.   We had a gentleman by the name of Ramsey set everything

11   up, and he was going to be the owner of Chosen.

12   Q.   Who was Ramsey?

13   A.   Ramsey was someone I met at the Norwalk filing office.  He

14   was outside with his employee.

15   Q.   Is that Ramsey Muro?

16   A.   Yes.

17   Q.   Now, did both you and David Gomez work with Ramsey Muro to

18   set up Chosen Medical Management?

19   A.   Ramsey pretty much did everything on his own, but he would

20   let us know that everything was done, basically, so yes.

21   Q.   Did you also set up another medical management company

22   called Ramport Medical Management?

23   A.   Yes.

24   Q.   How was that set up?

25   A.   When the other clinic was opened, we had a different

1  medical management company to run that particular clinic.

2  Q.   And when you say the other clinic, is that Port Medical

3  San Pedro location?

4  A.   Yes.

5  Q.   Who set up Ramport Medical Management?

6  A.   Ramsey.

7  Q.   Were you and David Gomez both involved in setting that up?

8  A.   We both knew about it, yes.

9  Q.   So going back to Exhibit 273, which we still have up

10 there, a number of checks that Pandora Hall wrote out of Chosen

11 Medical Management.  Who directed her to do that?

12 A.   We did.  David and myself.

13 Q.   Now, when Pandora became a manager, did she take over

14 where Michelle had left off in terms of falsifying charts?

15 A.   Yes.

16 Q.   Did you know she was doing that?

17 A.   Yes.

18 Q.   Did David Gomez know she was doing that?

19 A.   Yes.

20 Q.   Did you have discussions with David Gomez about that?

21 A.   Not really, no.  We just -- we just knew.

22 Q.   How do you know he knew?

23 A.   We would talk about patients not coming in and -- and for

24 us to get paid, basically, we needed to go ahead and -- and

25 bill out.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Let's go to the San Pedro clinic.  Do you recall when that

2   opened?

3   A.   No.

4   Q.   How did it come about that you opened a second clinic in

5   San Pedro?

6   A.   We thought it would be a good idea.  Since most of the

7   longshoremen live in San Pedro, we -- we would open up

8   something in San Pedro.

9   Q.   Did you find a location?

10  A.   Yes.

11  Q.   How was San Pedro going to be set up?  Who was going to

12  staff it?

13  A.   At the time, Michelle was still our manager, so we were --

14  I was assuming she would help us staff it or she would staff

15  it.

16  Q.   Did she leave before you actually opened the clinic?

17  A.   Yes.

18  Q.   Did you run into financial difficulties when you were

19  opening the second clinic?

20  A.   Yes.

21  Q.   What were those?

22  A.   Inspector went ahead and stopped work at the clinic, so

23  we -- we had to rectify everything that he said that needed to

24  be done, so that's when everything -- we had to stop, and kept

25  paying the note on the property, the lease, and -- and fix

1   everything that -- that needed to get fixed on the property.

2   Q.   Now, in connection with that, did you get a new investor?

3   A.   Yes.

4   Q.   Who was that?

5   A.   Actually, it was -- that was Chris.

6   Q.   Chris Rice?

7   A.   Chris Rice was already on board.

8   Q.   So who was the new Chris?

9   A.   Viramontes.

10  Q.   Was he involved in the ILWU?

11  A.   Yes.

12  Q.   Did he have a position within the ILWU?

13  A.   Yes.

14  Q.   What was his position?

15  A.   At that time he was, I believe, a crane operator.

16  Q.   Did he also have a title within the union as a union

17  officer?

18  A.   He later became a secretary.

19  Q.   How did you arrange for Chris Viramontes to invest in

20  San Pedro?

21  A.   We didn't.  David, I guess, knew him personally, so we

22  asked, I believe, a hundred for him to go ahead and put up, and

23  that was --

24  Q.   Did he agree?

25  A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   So after you got the new investment, did you complete the

2    San Pedro clinic?

3    A.   Yes.

4    Q.   And was it after that that it opened?

5    A.   Yes.

6    Q.   Who ultimately moved over to manage the San Pedro clinic?

7    A.   At that time I believe it was Pandora.

8    Q.   Did you have a conversation with her and Dave Gomez before

9    she moved to San Pedro?

10   A.   We would -- we would talk, yes.

11   Q.   Was there a conversation where she told you that she

12   didn't want to do the false charting at San Pedro?

13   A.   Yes.

14   Q.   How did that come about?

15   A.   We were having dinner, and that's when she pretty much

16   said that she didn't feel comfortable and she didn't want to do

17   it there in San Pedro.

18   Q.   And who was at that dinner?

19   A.   David and myself.

20   Q.   Do you recall where it was?

21   A.   An Italian restaurant in San Pedro, but I don't remember

22   the name.

23   Q.   Do you remember a woman named Eva Razo?

24   A.   Yes.

25   Q.   Did she become involved at Port Medical?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.

2    Q.    How did that come about?

3    A.    At the time, we didn't know if we were making money, not

4    making money, and we didn't know where the funds were going, so

5    I asked -- I told David I was going to ask my tax accountant,

6    my tax lady, to come in and -- and to see where the money went.

7    Q.    Had Eva Razo been doing your taxes?

8    A.    Yes.

9    Q.    What was her position when she came in?

10   A.    Just as an advisor to come in and do like an audit, I

11   would assume, of the financial statements.

12   Q.    Now, at some point was Eva Razo put on as a signator on

13   various of your accounts?

14   A.    She became the manager, yes.

15   Q.    Which office did she become the manager of?

16   A.    First the Long Beach, and for a while she would oversee

17   the Long Beach and the San Pedro office.

18   Q.    Now, if I could, I'd like to go down to page 2 of Exhibit

19   273.  And over on the left, do you see there's a date,

20   September 17th, 2010?  Goes across, Chosen.  Then goes across,

21   comment regarding a sponsorship, and then over at the right,

22   Eva Razo.

23         Did Eva Razo start signing sponsorship checks?

24   A.    Yes.

25   Q.    Did she do that out of both the Chosen Medical Management

1    and Ramport Medical Management accounts?

2    A.   Yes.

3    Q.   Who directed her to do that?

4    A.   We did.

5    Q.   When you say "we," who do you mean?

6    A.   David and myself.

7    Q.   Did Eva Razo also participate in creating false charts?

8    A.   I never saw her, but I'm sure she -- she had to, yes.

9    Q.   Why do you say she had to?

10   A.   Because we knew patients weren't coming in, so -- and we

11   were still getting -- we were getting paid.

12   Q.   Did you and Eva Razo approach Pandora Hall when she was at

13   San Pedro and offer to pay her to continue to falsify charts?

14   A.   When she was in San Pedro?  No.

15   Q.   Did you approach her and ask her to falsify charts that

16   were in Long Beach?

17   A.   She -- she pretty much did it.  In Long Beach, yes.

18   Q.   Did she continue doing that when she moved to San Pedro?

19   A.   That, I -- I don't know.  Not in San Pedro I don't know.

20   Q.   Do you know if Eva continued to take charts to her from

21   Long Beach?

22   A.   That, I don't know.

23   Q.   At one point -- let me ask you this.  Do you have a

24   brother?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   What's his name?

2    A.   Arthur.  Arthur Amador.

3    Q.   Does he go by "Arturo" Amador?

4    A.   Arturo Amador.

5    Q.   Was he involved in Port Medical?

6    A.   He was involved because I asked David, my partner, if we

7    could put him as the manager, the owner of the management

8    companies, since we were paying Ramsey, and my brother needed

9    some money at that time, and we both agreed and we would put

10   him on the account.

11   Q.   So did he replace Ramsey Muro as the owner?

12   A.   Yes.

13   Q.   Now, do you recall, was there a search of the Port Medical

14   premises conducted by federal law enforcement?

15   A.   Yes.

16   Q.   Was that in approximately August of 2013?

17   A.   I don't recall the exact date, but yes.

18   Q.   Now, after that search warrant, did you have a

19   conversation with David Gomez about billing?

20   A.   After the search?  We would talk.  I -- I can't remember

21   specific, no.  I --

22   Q.   Were there still claims that hadn't been billed out?

23   A.   Yes.

24   Q.   Did you have a conversation with Mr. Gomez about that?

25   A.   I -- yeah, I wasn't being involved in -- in that part

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    of -- I wasn't involved.

 2    Q.   What do you mean you weren't involved?

 3    A.   I wasn't billing after the clinic was closed.

 4    Q.   Were there still bills that were sent?

 5    A.   Yes.

 6    Q.   Who sent them?

 7    A.   There was a company.  I imagined Mr. Gomez and the -- the

 8    biller we had at that time, they set up a small, little

 9    company, and they started billing out on their own.

10    Q.   Did you have a conversation with Mr. Gomez about that?

11    A.   Yes.

12    Q.   What was that conversation?

13    A.   One time he reached out.  He said he needed help, if I

14    knew a biller, and we sat down, basically, at dinner, and the

15    biller I introduced him to had said that she didn't want

16    anything to do with it.

17              MR. CARDONA:  Nothing further, Your Honor.

18              THE COURT:  Okay.  Cross.

19              MR. ULTIMO:  Yes.  Thank you, Your Honor.

20                        CROSS-EXAMINATION

21    BY MR. ULTIMO:

22    Q.   Good morning, Mr. Amador.

23    A.   Good morning.

24    Q.   Mr. Amador, were you the president of Ramport Medical

25    Management?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    We signed the paperwork.  Whatever the paperwork says,

2    yes.

3              MR. ULTIMO:  I'd like to introduce Exhibit 74, page 2.

4              THE COURT:  Okay.

5              MR. ULTIMO:  Thank you.

6         (Received in evidence, Trial Exhibit 74, page 2.)

7    BY MR. ULTIMO:

8    Q.    Have you seen this document, Mr. Amador?

9    A.    Yes, I see it.

10   Q.    Is that your signature on the bottom left?

11   A.    Yes, I -- yes, I -- I'm assuming it is, yeah.

12   Q.    Well, is this not a signature card from Chase Bank for the

13   Ramport Medical Management bank account?

14   A.    Yes.

15   Q.    Okay.  And did you open this account?

16   A.    I must have been a signee on the account, but --

17   Q.    Was it you --

18   A.    -- whoever --

19   Q.    I'm sorry.  Do you recognize this signature to be your

20   signature?

21   A.    Yes.

22   Q.    And the handwriting beneath it that says "president"?

23   A.    Yes.

24   Q.    You had an employee by the name of Pandora Hall, correct?

25   A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   Miss Hall worked at the front desk at Long Beach, true?

A.   Yes.

Q.   And who hired Pandora Hall?

A.   I don't recall who actually hired her.

Q.   At the time she was hired, was Miss Hall an independent contractor?

A.   She was a massage therapist, and I believe massage therapists were independent contractors, yes.

Q.   Were you hiring the massage therapists at that time?

A.   No.

Q.   So it would have been somebody else?

A.   Whoever was the manager, yes.

Q.   During the time that Miss Hall was employed at Port Medical Long Beach, who asked her to create false SOAP notes?

A.   Either myself, David, or Pandora, one of -- one of -- I don't recall the exact conversation, but I'm sure I knew about it and my partner knew about it.

          MR. ULTIMO:  Move to strike, speculation, conjecture.

          THE COURT:  The last part will be stricken.

BY MR. ULTIMO:

Q.   Who compensated Pandora Hall for creating false SOAP notes?

A.   She was on the account, so she would compensate herself.

Q.   Did you offer her money for each SOAP note she created?

A.   I don't recall a conversation, but I'm sure money was --

1   was mentioned, yes.

2   Q.   By you?

3   A.   By myself, yes.

4   Q.   And how long did Miss Hall work at Long Beach?

5   A.   I don't recall.

6   Q.   At any point in time did Miss Hall tell you she wanted to

7   stop falsifying SOAP notes?

8   A.   Yes.

9   Q.   When was that?

10  A.   I don't recall the exact date, but that's when she was

11  ready to go to San Pedro.

12  Q.   Did she tell you she wanted to leave Port Medical because

13  she no longer wanted to create SOAP notes?

14  A.   Yes.

15  Q.   And was that right before the San Pedro office opened,

16  opened up and --

17  A.   Yes.

18  Q.   Did Miss Hall tell you that she would accept the job at

19  San Pedro if she no longer had to falsify SOAP notes?

20  A.   That, I don't remember, no.  We probably offered her more

21  money, so that's -- that's when she accepted.

22  Q.   Well, when you say "we probably," do you, as you sit here

23  today -- is it your testimony that you offered her more money

24  to accept a position in San Pedro?

25  A.   I'm sure we did, yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Why did you want her to move to San Pedro when she was

2   already working in Long Beach?

3   A.   At that time she didn't get along with Eva.  Eva was the

4   accountant.  And she wanted to be closer to the house, I guess.

5   She lived in San Pedro, and she wanted to work close to home.

6   Q.   And you said that when this discussion occurred with

7   Pandora Hall, David Gomez was present when that discussion took

8   place between you and Pandora Hall; is that right?

9   A.   We were all there, yes.

10   Q.   Okay.  Did you hear David Gomez tell Pandora Hall that

11   there would no longer be fraud in San Pedro?

12   A.   Repeat the question.

13   Q.   Did you tell Pandora -- did you hear David Gomez tell

14   Pandora that there would be no fraud in San Pedro?

15   A.   Yes.  We both, we said that -- by this time, patients were

16   actually showing up, and the facility in San Pedro was -- it

17   was a beautiful facility, so we figured they would go on their

18   own because of the service now.

19   Q.   So you took a law office in San Pedro and built out a Port

20   Medical San Pedro?

21   A.   Yes.

22   Q.   And that's the construction work, that's the work that was

23   stopped by the inspector?

24   A.   Yes.

25   Q.   So you did hear David Gomez tell her there'd be no fraud

1    in San Pedro?

2    A.    Yes, we told her that.

3    Q.    But at some point you and Eva reapproached Pandora to

4    falsify SOAP notes once again; is that right?

5    A.    I never -- no.  Did Eva do it?  Prob- -- she -- she had to

6    get her charts straight, so whatever she did.  She was the

7    manager in Long Beach, so whatever she did, she did it.

8    Q.    And Eva Razo was on the bank accounts, too, right?

9    A.    On both, yes.

10   Q.    So Eva Razo had signing authority to withdraw cash,

11   correct?

12   A.    Yes.

13   Q.    And signing authority to write checks to herself, true?

14   A.    Yes.

15   Q.    As you sit here today, do you know whether or not Eva Razo

16   went and reapproached Pandora Hall to continue falsifying

17   notes, SOAP notes, after she left Long Beach and went to

18   San Pedro?

19   A.    No, I don't, I --

20   Q.    Did David Gomez -- well, let me back up.  Do you remember

21   last year you -- you were arrested, correct?

22   A.    Yes.

23   Q.    And you were taken to jail, correct?

24   A.    Yes.

25   Q.    And was there a point in time in the jail cell that you

```
1   came into contact with Dave Gomez?

2   A.   Yes.  We ended up in the same cell.

3   Q.   Did you make any statements to David Gomez?

4   A.   No.  It was just talking about being getting -- being

5   arrested.

6   Q.   Did you tell David Gomez that "I should have listened to

7   you"?

8   A.   No.

9   Q.   "We wouldn't be here.  You told me to stop."  Did you tell

10  David Gomez that --

11  A.   No.

12  Q.   -- when you were both in the jail cells?

13  A.   No.

14  Q.   Did David Gomez ever approach you in Long Beach or

15  San Pedro and asked you to stop falsifying patient charts at

16  Port Medical?

17  A.   We -- yes, we discussed that we -- we should have -- we

18  should stop, yes.  Because at that time patients started

19  showing up on their own, yes.

20  Q.   And he asked you, and he said, "You don't have to do this;

21  Long Beach is doing good," true?

22  A.   We're both owners, yes, so we -- we figured, okay,

23  that's -- that's a good idea, yes.

24  Q.   But what did you tell David when he asked you to stop?

25  A.   I said that's a good idea.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Did you tell him that you would stop?

2    A.    Yes.

3    Q.    Now, whose idea was it to falsify SOAP notes?

4    A.    Michelle, who -- Aragon.

5    Q.    And she was your first office manager in Long Beach?

6    A.    Yes.

7    Q.    Did David Gomez bring this fraud scheme to you when you

8    opened up Port Medical with him?

9    A.    We didn't know anything -- no.

10   Q.    Did David Gomez give you the idea to scheme the insurance

11   company?

12   A.    No.

13   Q.    When you sought an investor to start Port Medical, why did

14   you choose David Gomez?

15   A.    He owned a restaurant and gold exchange, and we got along

16   well working, so I approached him and I told him about the

17   idea, and he thought it would be a good idea.

18   Q.    And David Gomez is a likeable guy; is that true?

19   A.    Yes.

20   Q.    People like David Gomez; isn't that true?

21          MR. CARDONA:  Objection, Your Honor, relevance.

22          THE COURT:  Sustained.

23   BY MR. ULTIMO:

24   Q.    Did Kevin Malone get along with David Gomez?

25   A.    That, I don't -- yes, I --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   How would you describe your relationship with Dr. Kevin

2   Malone?

3   A.   Well, there was a period where, Mr. Malone, his charts

4   were piling up so high that I got on the phone and I told him

5   to -- I got upset, and I told him to do his job.  So he got

6   upset, and we -- I told him his license is on the line, to make

7   sure everything was being done right and --

8   Q.   When you told him to do his job, what specifically were

9   you referring to?  What part of his job?

10  A.   The SOAP notes, the seeing patients, the stay awake,

11  basically.

12  Q.   Stay what?

13  A.   Stay awake.

14  Q.   Did he have trouble staying awake?

15  A.   I caught him a couple times sleeping, so --

16  Q.   Was he a cigarette smoker?

17  A.   I don't recall, no.  I'm not sure.  I never saw him smoke.

18  Q.   Did he take long walks during the day that you recall?

19  A.   I -- I don't, no, recall.

20  Q.   Well, you said that his charts -- I don't want to misquote

21  you, but did you say his charts stacked up so high?  Is that

22  what I heard you say?

23  A.   Yes.  The patient charts.  They -- they were just stacking

24  up because he wouldn't complete them, basically.

25  Q.   He what?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    They weren't completed.

 2   Q.    Okay.  So when you say they weren't completed, are you

 3   saying that he wasn't charting or documenting his examinations

 4   of patients in the patient's file?

 5   A.    I'm not there.  I -- but I knew the charts weren't done.

 6   So if the patients walked in, I'm sure there had to have been

 7   some documentation that he had to fill out.

 8   Q.    He was seeing the patients?

 9   A.    I -- I'm not -- I wasn't there.  I don't --

10   Q.    Well, who created the charts that were stacked up so high

11   that weren't complete?

12   A.    Either him or the staff that was there, the manager,

13   the -- the massage therapists.

14   Q.    How did you determine that he wasn't doing his job as

15   opposed to these charts just being stacked up high because

16   somebody put them there?

17   A.    The biller.  The biller would tell us, "I can't bill out

18   because this chart is missing X, Y and Z."

19   Q.    So it was partially completed by Dr. Malone?

20   A.    Yes.

21   Q.    Okay.  And that's how you determined that he wasn't doing

22   his job, because you came to discover that the charts were

23   partially completed by Dr. Malone but not fully completed?

24   A.    Yes.

25   Q.    And when you told him -- am I talking too loud?  Is --
```

1    A.    No.

2    Q.    Sorry.  It's right by the mic.

3          THE COURT:  It's better to be too loud than not loud

4    enough, so she can get everything.

5          MR. ULTIMO:  Thank you, Your Honor.  Just want to make

6    sure I'm not too loud.

7          THE COURT:  Not a problem.

8    BY MR. ULTIMO:

9    Q.    You said that Dr. Malone got upset with you.  Can you

10   amplify on that?

11   A.    It was over the phone.  I -- I was the one that was

12   telling him to -- to do his job, so --

13   Q.    And did he tell you he would?

14   A.    Yes.  He said he would.

15   Q.    Would he come in -- well, do you know whether or not he

16   would come in in the evening and fill out his charts?

17   A.    I -- I don't know.

18   Q.    Did you have to fire Dr. Malone from Port Medical?

19   A.    Not that I recall, no.

20   Q.    Do you know who fired Dr. Malone?

21   A.    I -- I don't remember.

22   Q.    Was he fired?

23   A.    I believe so, yes.

24   Q.    Do you know -- do you have any personal knowledge as to

25   why he was fired?

1   A.   Because he wasn't doing his charts, most likely, yeah.

2   Q.   So is it your understanding that one of the office

3   managers would have fired him?

4   A.   Yes.

5   Q.   And who would that have been at that time?

6   A.   That time, most likely was Eva.

7   Q.   Mr. Amador, were you the medical director for Port

8   Medical?

9   A.   The medical director?

10  Q.   Yes.

11  A.   I'm not a doctor.  No.

12  Q.   Okay.  Why would you need a medical director for Port

13  Medical?

14  A.   To my understanding -- I'm not a doctor, but to my

15  understanding, to be a medical clinic, you need a doctor to be

16  the owner or the director of a clinic.

17  Q.   Was Dr. Malone the medical director for Port Medical or

18  the chiropractic director for Port Medical?

19  A.   The chiropractor, yes.

20  Q.   So he was the chiropractic director for the Port Medical

21  clinic?

22  A.   He worked under the -- whatever doctor we had at that

23  time.

24  Q.   Well, medical was separate from chiropractic, true?

25  A.   Yes, but everything was built out under the medical

1    practice, under the doctor, the M.D.'s license.  So he worked

2    under the M.D.

3    Q.   Well, is that your understanding or --

4    A.   That's my understanding.

5    Q.   Okay.  So if we -- did you -- during your time at Port

6    Medical, did you ever see the health insurance claim forms

7    submitted for billing chiropractic and massage services?

8    A.   I'm sorry?  What --

9    Q.   Did you ever see the health insurance claim forms that

10   said Kevin Malone's name on them for the chiropractic services

11   and massage therapy?

12   A.   I saw some, yes.

13   Q.   So you saw that they had Dr. Kevin Malone and they were

14   billed out under his name, correct?

15   A.   They were billed out under his services, yes, his name.

16   Q.   Okay.  And that was because he was the medical director

17   for chiropractic care, right?

18   A.   No.  No.

19   Q.   Is that because he was providing the services?  Is that

20   right?

21   A.   Yes.

22   Q.   Okay.  And Dr. Malone was providing services, chiropractic

23   services, in two-thousand- -- between 2009 and 2011?

24   A.   I don't know the exact date, but yes, he was there for --

25   Q.   That time?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.   I don't know the exact date, but he was there for a

2    while.

3    Q.    Okay.  Mr. Amador, I think you said that Joe -- patient

4    Joe Vaifanua was someone you recruited to go to Port Medical;

5    is that right?

6    A.    I don't recall if I actually went up to him.  I'm quite

7    sure he came up to me.

8    Q.    Right.  He came up asking for financial assistance to you?

9    A.    Yes.

10   Q.    And you hooked him up, right?

11   A.    Yes, we helped him out.

12   Q.    And put him in your system, right?

13   A.    Yes.

14   Q.    And by that, that meant that you told him that you'd pay

15   him $40 for each Explanation of Benefits insurance statement

16   that he brought to you, correct?

17   A.    Yes.

18   Q.    And you paid him, right?

19   A.    I'm sure I did, yes.

20   Q.    And you also paid him to get pain management shots at a

21   Southgate clinic, right?

22   A.    Yes.

23   Q.    That was three times you paid him?

24   A.    I don't recall how many times.

25   Q.    You remember telling the agents that you paid him three

```
 1   times to get pain injections?
 2   A.   No, I don't recall.  I don't know how many times he went.
 3   I --
 4   Q.   Do you remember, you paid him $500 per pain injection,
 5   right?
 6   A.   I don't recall the exact amount, it was so -- it was so
 7   long ago.  I don't remember.
 8   Q.   What's your best estimate as you sit here today how much
 9   you paid him to get the pain management shots at another
10   Southgate facility?
11   A.   I don't -- $300?  I don't remember the exact amount.
12   Q.   300 each, for each pain injection?
13   A.   I don't know how many pain injections he got.  I don't
14   recall.  But yes, I'm sure I -- if he went there, I'm sure I
15   took care of him.
16   Q.   When you spoke to the agents in this case, were you
17   truthful and accurate when you --
18   A.   I tried to be, yes.
19   Q.   So if -- and when you spoke to the agents, it was in 2013,
20   true?
21   A.   I don't remember the exact date, but yes, I spoke with
22   them.
23   Q.   In 2013, couple years ago?
24   A.   Yes, whatever date.
25   Q.   Okay.  And the events pertaining to Mr. Vaifanua and his
```

1  pain injections that you referred him for, they were fresh in

2  your mind in 2013, correct?

3  A.   Yes.

4  Q.   So if the agents testify that they -- that you told them

5  that you received -- that you paid Mr. Vaifanua $500 per pain

6  injection to go to Southgate, would that be accurate?

7       MR. CARDONA:  Your Honor, objection.

8       THE COURT:  Sustained.  Sustained.  Improper question.

9  BY MR. ULTIMO:

10  Q.   Okay.  Now, you also asked Mr. Vaifanua to sign multiple

11  sign-in stickers, true?

12  A.   The managers did, yes.

13  Q.   And did you tell the managers to obtain the multiple

14  sign-in stickers for Mr. Vaifanua?

15  A.   I'm sure I did, yes.

16  Q.   For himself and his children, correct?

17  A.   I -- I don't recall the kids, but I'm sure I asked.  I

18  didn't know how old the kids were, how many kids, but I knew he

19  had a large family and -- yes, I'm sure I did.

20  Q.   Are you familiar with David Gomez's signature?

21  A.   Yes, I -- I assume, yes.

22  Q.   Well, I don't want you to assume, but would you be able to

23  recognize it if you'd seen it?

24  A.   I think I would, yes.

25  Q.   Again, I don't want you to speculate, but how many times

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    had you seen David Gomez actually sign in front of you?  Over

2    the years.

3    A.   I don't -- I don't know.  Whatever time we went to the

4    bank to sign a signature note or something, but -- I don't

5    remember us comparing signatures or anything.  I don't -- I

6    don't --

7    Q.   So you don't really know?  You wouldn't be able to

8    recognize his signature from a signature that was not his?  Is

9    that what you're saying?

10        THE COURT:  The question was asked earlier, and he

11   says he thinks he might.

12        MR. ULTIMO:  Thinks he might.  I'll just explore on

13   that a little further.  I'm not sure.

14   Q.   You think you might, but do you think --

15        THE COURT:  That's the best you can do, is if he

16   thinks so.

17        MR. ULTIMO:  Okay.

18   Q.   Then I'd like to show you Exhibit 273, page 25.  It's

19   already been admitted into evidence.  I'll ask you if you

20   recognize -- can you tell me, based on your prior experiences

21   seeing David Gomez sign his name, whether or not that is David

22   Gomez's signature?  And if you can't, if you don't know for

23   sure, then just tell me you do not know for sure.

24   A.   I -- I wouldn't know for sure, no.  I'm --

25        THE COURT:  Okay.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ULTIMO:
 2   Q.   Okay.  So any answer would be a guess?
 3           MR. CARDONA:  Objection, Your Honor, asked and
 4   answered.
 5           THE COURT:  Sustained.
 6           MR. ULTIMO:  Withdrawn.
 7           THE COURT:  Sustained.
 8   BY MR. ULTIMO:
 9   Q.   Did you see Mr. Gomez sign that check?
10   A.   No.
11           MR. ULTIMO:  And that was Exhibit 273, page 25, I was
12   referring to.
13           THE COURT:  Thank you.
14   BY MR. ULTIMO:
15   Q.   Now, that check was typed up like on a computer printer of
16   some kind.  Was that -- Pandora prepared the checks using some
17   sort of a printer; is that right?
18   A.   I'm not sure who -- who printed them.
19   Q.   Did you ask Pandora Hall to make checks payable to Joe
20   Vaifanua?
21   A.   I don't recall, no.
22   Q.   Well, I think there was another exhibit of a check, a much
23   longer amount.  I think it was $2,000, and you testified that
24   you paid that to Joe Vaifanua.
25   A.   If my signature's on it, yes.
```

1    Q.    Yes.   So did you yourself make that check, or did you ask

2    one of the clerical staff to make that check on a type -- on a

3    computer at the time?

4    A.    I asked the -- whoever the manager was at that time to

5    make the check.

6    Q.    And the managers would have been?

7    A.    Whoever the manager was at that time.  I can't recall.

8    Q.    Did you give Exhibit 273 -- Exhibit 273, page 25, that

9    $300 check that has a signature that purports to be David

10   Gomez's, did you give that check to Mr. Vaifanua?

11   A.    I don't recall.  I -- we would sign it.  He would come in

12   and pick it up himself.  I -- whoever was there at the clinic

13   and needed something done, we did it.

14   Q.    And would you tell the person that you asked to type up

15   the check, would you ask them to leave it there, whether at the

16   front desk or in some office there, for the patient to come

17   pick it up?

18   A.    Yes, sometimes we did that, yes.

19   Q.    And who would you -- who did you tell that to?

20   A.    Whoever the manager was at that time.

21   Q.    Do you recall specifically whether it was Eva Razo or

22   Michelle Aragon?

23   A.    Eva, Michelle -- Michelle did everything on her own, so

24   she didn't need us.  Either Pandora, Eva, yeah, one of the two.

25   I don't recall which one.

1  Q.   So patients would pick up checks from Eva or Pandora; is

2  that right?

3  A.   Yes.

4  Q.   And sometimes you would meet Mr. Vaifanua outside the

5  parking lot of the union hall and pay him cash, true?

6  A.   No, not outside the union hall.

7  Q.   Not in the parking lot?

8  A.   Not outside the union hall.  Outside the clinic or at a

9  liquor store, but not outside the union hall.

10 Q.   Okay.  Now, you had told us earlier that Michelle Aragon

11 taught you and -- I think you said Michelle Aragon taught you

12 and David how to do this insurance scheme.

13 A.   She -- she brought -- yeah.  She brought her, I guess,

14 knowledge of how to run a clinic, and that's the way she was

15 running it where she was working at previous, yeah.

16 Q.   And is that how you learned about it?

17 A.   Pretty much, yes.

18 Q.   You didn't know about it beforehand?  You didn't know how

19 to do it before?

20 A.   Not specifically, but I knew of -- of -- it was -- it was

21 wide range.

22 Q.   And you knew -- you had been to chiropractors before who

23 had billed you for services that you had not received; is that

24 right?

25 A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And that's how you learned how to institute or begin this

2   insurance, medical insurance fraud scheme?

3   A.   No, not at that time.  I didn't think about it as being

4   a -- we were going to do it to be fraudulent, no.

5   Q.   You didn't think about it at that time?

6   A.   No.

7   Q.   Well, on August 20th, 2013, you gave a statement to

8   special agents in this case, right?

9   A.   Yes.

10  Q.   And the events surrounding Port Medical and your previous

11  history in learning how to do insurance fraud, you communicated

12  that to the agents in August of 2013, true?

13  A.   I told them how it came about, yes.

14  Q.   And those events were fresh in your mind in 2013, correct?

15  A.   Yes.

16  Q.   And you told them in 2013 that you went to see

17  Dr. Altamirano, correct?

18  A.   Yes.

19  Q.   And he was a chiropractic doctor, right?

20  A.   Yes.

21  Q.   And you went to see Dr. Altamirano because you had missed

22  two days at work, correct?

23  A.   No.  No.  It's -- I did need a doctor's note, so he was

24  going to provide it, yeah.

25  Q.   And he provided you with a doctor's note so you could get

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   your promotion as a longshoreman, right?

2   A.   As the next step, yes.

3   Q.   Because if you miss more than two days, you can't get the

4   promotion, right?

5   A.   No.

6   Q.   Correct?

7   A.   No.

8   Q.   Then why did you get the doctor's note?

9   A.   There's a certain procedure as a longshoreman, the way we

10  get elevated, and it was a 70 percent that we need, we have to

11  meet, and I believe during that time -- I don't know what part

12  we needed.  I needed some days.

13  Q.   But you needed the doctor's note for employment purposes?

14  A.   Yes.

15  Q.   And Dr. Altamirano charged you for that visit, right?

16  A.   Yes.

17  Q.   And that was the only time you'd seen Dr. Altamirano?

18  A.   Yes.

19  Q.   But then two months later, you received three more

20  Explanation of Benefit statements from Dr. Altamirano's office,

21  correct?

22  A.   Yes.

23  Q.   He billed you even though you never went to see him again,

24  correct?

25  A.   He billed my -- my family, yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And you called him.  You were upset, right?

2   A.   Yes.

3   Q.   And he told you that he could charge whatever he wanted

4   and the insurance company would pay for it, it's on them; is

5   that right?

6   A.   Yes.

7   Q.   And following that conversation, you asked Dr. Altamirano

8   if he wanted to go in business with you; isn't that right?

9   A.   Yes, I -- joking around, I told him, "Why don't we open

10  something up and do the right thing," yes.

11  Q.   A chiropractic clinic?

12  A.   Yes.

13  Q.   And he declined your offer?

14  A.   He said that he had enough patients and he didn't need a

15  partner.

16  Q.   That's when you found David Gomez to go into business

17  with, correct?

18  A.   Yes.

19  Q.   Now, again, during that August 20th, 2013 meeting with

20  federal agents, you answered questions truthfully, true?

21  A.   Yes.

22  Q.   And you told the agents in August of 2013 as much as you

23  could remember about the facts relating to Port Medical and the

24  insurance fraud that occurred there, correct?

25  A.   Pretty much, yes.

1   Q.   And you tried to give the agents the best information that
2   you could, true?
3   A.   Yes.
4   Q.   And those statements to the federal agents on August 20th,
5   2013, were true and accurate, correct?
6   A.   To my knowledge at that time, yes.
7   Q.   You told federal agents on August 20, 2013, that it was
8   you who brought in all the patients for Port Medical for the
9   first two years; isn't that right?
10  A.   I don't recall the exact words, but whatever I told him.
11  Q.   You told him that, "It's me, I brought in the patients,
12  yes, I did stuff at Port Medical in Long Beach for the first
13  two years," words to that effect, true?
14  A.   Whatever it's written down, yes, that's what I said.
15  Q.   And was that statement true and accurate then, or is it
16  now?
17  A.   Yes.  We brought in -- yeah, I brought in patients.
18  Q.   Mr. Amador, isn't it true that you're responsible for all
19  the fraudulent billing that occurred at Port Medical?
20  A.   I have never done the billing.  I don't know how to do
21  billing.
22  Q.   Well, when I refer to billing, I'm talking about the false
23  SOAP notes that were later used by the biller to bill out for
24  chiropractic services and massage treatments that were never
25  performed.  True?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1 A. No.

2 Q. So you're not responsible for that fraudulent billing that

3 occurred at Port Medical?  Is that what you're telling me?

4 A. What I'm trying to tell you is I -- I knew what to do, but

5 I didn't do it.  I wasn't there physically writing everything.

6 Am I responsible?  That's why I'm here.  Yeah, I --

7 Q. It was you who would pay the girls to continue to falsify

8 patient charts, true?

9 A. No.

10 Q. Then it was Pandora Hall that would write her own checks,

11 because she was on the account.  Is that what you're saying?

12 A. Whatever manager was on the account, she was the one that

13 was paying the employees and herself.

14 Q. You agreed to put Pandora Hall on the account, true?

15 A. We agreed, yes.

16 Q. You're saying that -- who's "we"?

17 A. My partner and I.  Whatever I did, he knew; whatever he

18 did, I knew.

19   THE COURT:  You talking about Mr. Gomez?

20   THE WITNESS:  Yes.

21 BY MR. ULTIMO:

22 Q. And so he agreed to put Pandora Hall on the account as a

23 signer?

24 A. Yes.

25 Q. And Eva Razo falsified patient SOAP notes, true?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    I'm -- I'm sure she did, yes.
2    Q.    Well, you're sure because she was a signer on your
3    personal checking account, correct?
4    A.    My personal checking account?  I -- I don't think so, no.
5    Q.    She withdrew cash from your personal checking account to
6    give to you, correct?
7    A.    My personal checking?
8    Q.    Yes.
9    A.    That, I don't -- I don't recall.
10   Q.    You gave her power of attorney to take to the bank, to use
11   that power of attorney to withdraw cash from your personal
12   account, correct?
13   A.    My -- we're going -- my personal account?
14   Q.    Yeah.
15   A.    I don't recall.
16   Q.    We'll come back to that.  Did you ever ask Eva Razo to
17   withdraw cash for you?
18   A.    I'm sure I did, yes.
19   Q.    And she was the managing -- the manager at -- she was
20   managing Port Medical Long Beach, correct?
21   A.    At one time, Port Medical Long Beach and San Pedro, yes.
22   Q.    And you instructed her to withdraw the cash for you so you
23   could pay patients to come to Port Medical?
24   A.    No.  It could have been anything.  Withdraw the cash
25   because we -- I needed to pay a bill or to pay a patient or we
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   were going out that weekend, something.

2   Q.   Did Pandora insist that she be put on bank signature cards

3   so she could write checks?

4   A.   No.

5   Q.   Do you recall which bank accounts she was a signer on?

6   A.   Whatever clinic she was managing.

7   Q.   Do you know if she was a signer on DCS Medical Management?

8   A.   DCS?  That was only around for a certain amount of months,

9   so I'm sure she wasn't.

10  Q.   Now, your brother, Arturo Amador, is the owner of Chosen

11  Medical Management, true?

12  A.   I'm sorry, once again?

13  Q.   Your brother, Arturo Amador, he was the owner of Chosen

14  Medical Management; is that true?

15  A.   Of both for a while, yes, Chosen and Ramport.

16  Q.   Of Chosen and -- and Port?

17  A.   I believe Ramport, yeah.

18  Q.   And Ramport.  Ramport Medical Management?

19  A.   Yes.

20  Q.   And Ramport Medical Management is also a medical

21  management company that was associated with Port Medical, true?

22  A.   Yes.

23  Q.   How much involvement did your brother Arturo Amador have,

24  or were you acting through him?

25  A.   He had none.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   So is it fair to say that you were the owner of the

2    management companies through the assistance of your brother

3    Arturo Amador?

4    A.   We were, yes.

5    Q.   "We" meaning who?

6    A.   My partner and I.

7    Q.   I'm asking about your brother Arturo and you.  So,

8    essentially, you acted through your brother Arturo Amador,

9    because you told me that Arturo was the owner of Ramport and

10   Chosen, correct?

11   A.   Yes.

12        MR. CARDONA:  Objection, argumentative and compound.

13        THE COURT:  Overruled.

14   But basically you're saying you were acting through your

15   brother, but you also said your partner was also; is that

16   correct?

17        THE WITNESS:  We were both, yes.

18        THE COURT:  Okay.  Go ahead, next question.

19   BY MR. ULTIMO:

20   Q.   Now, Mr. Amador, isn't it true that the only reason you

21   have implicated David Gomez is so you can hopefully obtain a

22   reduced prison sentence?

23   A.   No.

24   Q.   Was there ever a time in Port Medical when Port Medical

25   had to catch up on patient charting shortly after it opened?

```
1    A.    Yes.

2    Q.    Can you tell me what the circumstances of that was.

3    A.    The charts were piling up, and we had an internal audit,

4    and Toni -- we had Toni do the internal audit, and right away

5    she informed David and myself that the charts were incomplete.

6    Q.    And the internal audit wasn't something that occurred by

7    way of a government agency, was it?

8    A.    No.

9    Q.    The internal audit was just an internal review, and that

10   was something that you and Mr. Gomez decided to do, correct?

11   A.    Yes.

12   Q.    So something prompted you to hire Toni Moyer to review

13   what was going on at Port Medical at that time, correct?

14   A.    Yes.

15   Q.    And that was so things could be done right, correct?

16   A.    (No audible response.)

17   Q.    Is that a "yes" or a "no"?  I mean, why did you hire Toni

18   Moyer to have this internal review or internal audit of patient

19   files?  What was the reason?  It wasn't for some -- because the

20   federal government asked for an audit, or the IRS or the state

21   of California, correct?

22   A.    We were informed by either a massage therapist or the

23   biller that the files were piling up, the charts were piling

24   up, so that's -- we don't know anything about filling out

25   charts, my partner and I.  We didn't know anything about
```

```
 1  billing, so we asked the biller to come in and review.  Because
 2  we would ask the manager, and the manager at that time was
 3  Michelle.  She would say, "Don't worry, everything's fine,
 4  everything's fine."  So we -- we -- I don't -- I don't recall
 5  if David or myself found Toni and she came in and --
 6  Q.   You thought it was a good idea to have her review what was
 7  going on?
 8  A.   Yes.
 9  Q.   And she -- just to be clear and not repetitive, but whose
10  charts were backing up?  Massage therapists'?  Dr. Malone's?  I
11  me, whose charts?  They weren't your charts.  You don't see
12  patients, correct?
13  A.   I don't see patients.
14  Q.   They weren't David Gomez's charts.  He doesn't see
15  patients, correct?
16  A.   Right.
17  Q.   So whose charts were backed up, were piled up?
18  A.   I was -- I'm assuming the patients'.
19  Q.   Well, the patient doesn't create the chart, right?  Port
20  Medical creates the chart, correct?
21  A.   Correct.
22  Q.   A doctor or a massage therapist charts in the patient's
23  file, correct?
24  A.   A doctor, yes.
25  Q.   Okay.  So which doctor's patient chart was piling up?
```

1   A.   I'm assuming whatever chiropractor was there.  I believe

2   was Kevin Malone.

3   Q.   Now, do you know if anyone asked Dr. Malone to come in one

4   evening in order to complete patient charts?  Do you know?

5   A.   I don't recall.

6   Q.   Were you there one evening when people were catching up on

7   charting back when Port Medical first opened?

8   A.   I'm sure I was, yes.

9   Q.   Well, when you say -- I don't want you to guess.  When you

10  say you're sure you were, I mean, I'm sure you were there one

11  evening as well.  I take that for granted.  But what I'm asking

12  you specifically is, do you remember, as you sit here today,

13  being at Port Medical in the evening when Dr. Malone was asked

14  to catch up on patient charting?

15  A.   I don't recall, but I'm sure I -- I -- I was.

16          THE COURT:  So your answer is you don't recall.

17          THE WITNESS:  I don't recall.

18  BY MR. ULTIMO:

19  Q.   All right.  So you don't recall any such event?

20  A.   With Dr. Malone?  I don't recall.

21  Q.   Okay.  So you have no recollection, so -- that's fair to

22  say, of -- strike that.

23          Did you ever hear Mr. Gomez ask Dr. Malone to prepare

24  charts for patients?

25  A.   No.

```
 1   Q.   How did you get Pandora Hall to falsify chart notes for

 2   you?

 3   A.   We didn't.  We just told her what we were doing previous,

 4   and she took it from there.

 5   Q.   She took the ball and ran with it?

 6   A.   Yes.

 7   Q.   Did Dr. Kevin Malone know that false billing was occurring

 8   on his -- at Port Medical?

 9        MR. CARDONA:  Objection, calls for speculation,

10   Your Honor.

11        THE COURT:  Sustained.

12      Do you have any specific knowledge, in talking to him,

13   where he said he knew about it?

14        THE WITNESS:  Me talking to him?  No.

15        THE COURT:  Okay.

16   BY MR. ULTIMO:

17   Q.   Was any fraud done at San Pedro?

18   A.   Not to my knowledge, no.

19   Q.   It was all in Long Beach?

20   A.   Pretty much, the first years, yes.

21   Q.   Do you also go by the name Sergio Aras?  Aras?

22   A.   Yes.

23   Q.   And what is your true name?

24   A.   Sergio Amador.

25   Q.   So your true identity as an individual in the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    United States is Sergio Amador?

2    A.    Yes.

3    Q.    Not Sergio Aras?

4    A.    No.

5    Q.    Why are you also known as Sergio Aras?

6    A.    Well, at the time my -- I had a step-dad, and we -- we had

7    a falling out, basically, so I -- I thought I'll change.

8    Q.    But do you have a separate Social Security number under

9    the name Sergio Aras?

10   A.    I'm sure I did, yes.

11   Q.    Why do you have two Social Security numbers?

12   A.    At the time when my mom, I guess, she -- she pulled the

13   social at that time, so --

14   Q.    Pulled two socials for you?

15   A.    At that time, yes.

16   Q.    Using your birth certificate?

17   A.    Yes, for Sergio Amador.  And Sergio Aras, she -- she did

18   it, I guess.  So she always had it there, and when I -- I had a

19   falling out with my dad, that's when I --

20   Q.    So you have two identities, legal identities?

21   A.    Yes.

22   Q.    Now, Mr. Amador, would it be a fair statement to say that

23   you were calling all the shots at Port Medical when it came to

24   the false billing?

25   A.    No.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Would it be a fair statement to say that you and Eva Razo

 2   were hiring and firing and running Port Medical Long Beach?

 3   A.   At the end, yes.  There was no money coming in.  There

 4   was --

 5            MR. ULTIMO:  No further questions.  Thank you.

 6            THE WITNESS:  Sure.

 7            THE COURT:  Redirect.

 8            MR. CARDONA:  Your Honor, I'd offer Exhibit 71-1, a

 9   signature card.

10            MR. ULTIMO:  What number was that?

11            MR. CARDONA:  71.

12            MR. ULTIMO:  No objection.

13            THE COURT:  Be received.

14       (Received in evidence, Trial Exhibit 71-1.)

15                      REDIRECT EXAMINATION

16   BY MR. CARDONA:

17   Q.   Mr. Amador, I've put up on the screen -- is this a

18   signature card for the account that was opened for Ramport

19   Medical Management?

20   A.   Yes.

21   Q.   And down here, who are identified as the signers?

22   A.   My brother Arthur and Eva.

23   Q.   And over here are signatures.  Did you sign that or did

24   your brother?

25   A.   I -- my brother had to, but it looks -- looks like my
```

1  signature, but my brother had to be there, yeah.

2  Q.   And is this when you set up this company to have Arturo

3  Amador be the person who was running it?

4  A.   Yes.

5  Q.   Was that done with David Gomez's knowledge?

6  A.   Yes.

7  Q.   Did he agree to do that?

8  A.   Yes.

9  Q.   Now, you were asked some questions on cross about a

10  conversation where you talked about that you should stop the

11  fraud at Port Medical.  Do you remember that?

12  A.   Yes.  It was mentioned, yes.

13  Q.   Did the fraud stop?

14  A.   It was already going.  So, no, it didn't.

15  Q.   Was Mr. Gomez aware that it didn't stop?

16  A.   Yes.

17  Q.   Did you continue to discuss what you were doing with him?

18  A.   On a daily basis, yes.

19  Q.   Did he continue to discuss with you what he was doing?

20  A.   Yes.

21  Q.   Now, you were asked about an interview that you gave to

22  law enforcement.  Was the actual date of that interview August

23  14th, the date that the search was performed?  Do you remember

24  the date?

25  A.   I don't recall the date, no.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Was it the same date that the search of Port Medical was

2    done?

3    A.   I believe it was.  I --

4    Q.   Did it take place at a coffee house in Long Beach?

5    A.   Yes.

6    Q.   The It's a Grind coffee house?

7    A.   Don't recall the actual name, but it was -- yes, it was a

8    coffee shop.

9    Q.   Now, on cross you were asked some questions suggesting

10   that you said that you alone did the fraud.  Were you also

11   asked questions as to whether other people were involved in

12   that fraud?

13   A.   Like, I recall him saying you don't -- you don't have to

14   take the blame yourself.  And I kept saying, well, you know,

15   I -- basically, I -- I was doing what I was doing, basically.

16   Q.   Did you tell them during that interview that Chris

17   Viramontes didn't know anything about the fraudulent billing?

18   A.   Yes.

19   Q.   Did you tell them that Chris Rice was unaware of the

20   fraudulent billing?

21   A.   Yes.

22   Q.   But did you tell them that David Gomez was aware of the

23   fraudulent billing?

24   A.   That, I don't recall.

25   Q.   Now, during your testimony on cross, you said, in response
```

1    to one question, "I knew what he did and he knew what I did."

2    Do you remember that?

3    A.    Yes.

4    Q.    Talking about Mr. Gomez?

5    A.    Yes.

6    Q.    Why was that?  Why did you guys keep up on what each of

7    you were doing?

8    A.    It was just --

9              MR. ULTIMO:  Calls for speculation, Your Honor.

10             THE COURT:  Overruled.

11             THE WITNESS:  We just would call each other up

12    every -- we would see each other or call each other every day

13    to inform each other, basically, what we were doing.

14    BY MR. CARDONA:

15    Q.    Why?

16    A.    As partners, I -- that's what I -- that's what I -- I

17    would think.  But we -- we just did.  We would call each other.

18             MR. CARDONA:  No further, Your Honor.

19             THE COURT:  Okay.  Redirect?  Or excuse me, recross?

20             MR. ULTIMO:  Yes, Your Honor.

21                        **RECROSS-EXAMINATION**

22    BY MR. ULTIMO:

23    Q.    Mr. Amador, a few minutes ago I asked you if Eva Razo was

24    a power of attorney on your personal account.  Do you recall

25    that?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    I'd like to show you Exhibit 87, pages 1 and 2.

 3          THE COURT:  Any objection?

 4          MR. CARDONA:  No, Your Honor, but I will advise the

 5    Court, if we go into this, I may ask to also show Exhibit 86.

 6          THE COURT:  Counsel, 87, 1 and 2, will be received.

 7          MR. ULTIMO:  Thank you.

 8       (Received in evidence, Trial Exhibit 87, pages 1 and 2.)

 9    BY MR. ULTIMO:

10    Q.    Mr. Amador, do you see Exhibit 87, page 1, in front of

11    you?

12    A.    Yes.

13    Q.    And do you recognize the signature down at the bottom

14    where it says Eva Razo?

15    A.    Yes.

16    Q.    Do you recall this document that says "Durable Power of

17    Attorney for Deposit Accounts" at the top?

18    A.    I don't recall.

19    Q.    Okay.  I'm going to show you page 2 of this document.

20    Exhibit 87, page 2.  At the top, again, "Durable Power of

21    Attorney for Deposit Accounts."  Says, "Principal name:  Sergio

22    Amador, Long Beach.  Agent name:  Eva Razo, Long Beach."

23          Do you now recall that you placed Eva Razo on your deposit

24    account, your personal account, as your power of attorney to

25    sign and withdraw money on that account?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes, I -- I don't remember, but yes, if it was done.

 2    Q.    This your handwriting?

 3    A.    No.

 4    Q.    Is that your signature?

 5    A.    Yes.

 6    Q.    And that's Eva Razo's signature above it?

 7    A.    Yes.

 8              MR. ULTIMO:  No further questions.

 9              THE COURT:  You may step down.

10         May this witness be excused?

11              MR. CARDONA:  No objection, Your Honor.

12              THE COURT:  Okay.  You're free to go.  Thank you very

13    much for coming in.

14

15              (Further proceedings were held, reported;

16              not transcribed herein.)

17

18                          --oOo--

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          *CERTIFICATE*

2

3          *I hereby certify that pursuant to Section 753, Title 28,*

4     *United States Code, the foregoing is a true and correct partial*

5     *transcript of the stenographically reported proceedings held in*

6     *the above-entitled matter and that the transcript page format*

7     *is in conformance with the regulations of the*

8     *Judicial Conference of the United States.*

9

10    *Date:  NOVEMBER 23, 2016*

11

12

13

14                    */S/ SANDRA MACNEIL*

15                    *Sandra MacNeil, CSR No. 9013*

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA