1        UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3        HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                    – – – –

5

6

UNITED STATES OF AMERICA,        )

7                                 )

                    PLAINTIFF,    )

8                                 )

     vs.                          )     No. CR 15-629-RGK-2

9                                 )

DAVID GOMEZ,                      )

10                                )

                    DEFENDANT.    )

11   _____)

12

13

14        REPORTER'S PARTIAL TRANSCRIPT OF JURY TRIAL

15             (TESTIMONY OF DAVID GOMEZ)

16             FRIDAY, OCTOBER 14, 2016

17                  10:29 A.M.

18             LOS ANGELES, CALIFORNIA

19

20

21

22   _____

23        *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
          *Official Reporter, U.S. District Court*
24             *255 East Temple Street*
               *Los Angeles, CA  90012*
25                  *213.894.5949*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  **APPEARANCES OF COUNSEL:**

2

3  **FOR PLAINTIFF, UNITED STATES OF AMERICA:**

4          OFFICE OF THE UNITED STATES ATTORNEY
          BY:  GEORGE S. CARDONA
5              ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET, SUITE 1100
6          LOS ANGELES, CALIFORNIA  90012
          213.894.2434

7

8  **FOR DEFENDANT, DAVID GOMEZ:**

9          ULTIMO LAW FIRM, PC
          BY:  PAUL J. ULTIMO
10              ATTORNEY AT LAW
          7700 IRVINE CENTER DRIVE, SUITE 800
11          IRVINE, CALIFORNIA  92618-3047
          949.851.0300

12

13  **ALSO PRESENT:**

14          SPECIAL AGENT MARCUS VALLE, DEPARTMENT OF LABOR,
          OFFICE OF THE INSPECTOR GENERAL

15

16          JEANNIE HENSCHEL

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

# I N D E X

*DEFENSE WITNESS:*                                            *PAGE*

*DAVID GOMEZ*
  DIRECT EXAMINATION BY MR. ULTIMO                       4
  CROSS-EXAMINATION BY MR. CARDONA                   42, 52
  REDIRECT EXAMINATION BY MR. ULTIMO                    72


# T R I A L   E X H I B I T S

| EXHIBIT NUMBER | RECEIVED IN EVIDENCE |
|---|---|
| 12, page 167 | 29 |
| 12, page 221 | 31 |
| 12, page 173 | 31 |
| 12, page 1346 | 32 |
| 12, page 1432 | 33 |
| 12, page 30 | 33 |
| 12, page 111 | 55 |
| 12, page 855 | 55 |
| 12, page 918 | 56 |
| 12, page 608 | 57 |
| 23, page 200 | 53 |
| 23, page 228 | 54 |
| 177 | 65 |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, OCTOBER 14, 2016

 2                            10:29 A.M.

 3                            - - - -

 4       (Prior proceedings were held in this matter,

 5       not transcribed herein.)

 6       (In the presence of the jury:)

 7            THE COURT:  Okay.  Next witness.

 8            MR. ULTIMO:  The defense calls David Gomez.

 9            THE COURT:  Okay.

10            THE CLERK:  Right here to be sworn, please.  Please

11   raise your right hand.

12       Do you solemnly swear the testimony that you are about to

13   give in the matter now before the Court shall be the truth, the

14   whole truth, and nothing but the truth, so help you God?

15            THE WITNESS:  I do.

16            THE CLERK:  Thank you.  You may be seated.

17       May I please ask that you state your full name for the

18   record and spell your last name.

19            THE WITNESS:  David Gomez, G-o-m-e-z.

20            THE CLERK:  Thank you.

21            THE COURT:  You may inquire.

22   DAVID GOMEZ, THE DEFENDANT HEREIN, CALLED ON HIS OWN BEHALF,

23                       DIRECT EXAMINATION

24   BY MR. ULTIMO:

25   Q.   Good morning, Mr. Gomez.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Good morning.

 2   Q.   Are you nervous?

 3   A.   A little bit.

 4   Q.   Have you ever testified before?

 5   A.   No, I haven't.

 6   Q.   How old are you?

 7   A.   52.

 8   Q.   In 52 years, have you ever been in trouble?

 9   A.   No, I haven't.

10   Q.   Now, I want to ask you some questions, because I think

11   it's important that the jury hear from you.  You understand?

12   A.   Yes.

13   Q.   Okay.  Do your best to think about the questions, answer

14   them truthfully, correct?

15   A.   Yes.

16   Q.   Are you married?

17   A.   Yes.

18   Q.   How long have you been -- how long have you been married?

19   A.   20 years now.

20   Q.   Is your wife present in the audience today?

21   A.   Yes, she is.

22   Q.   With your mother?

23   A.   Yes, she is.

24   Q.   Do you have any children?

25   A.   Yes, I do.
```

```
1   Q.   How many children do you have, and what are their names

2   and ages?

3   A.   I have three children.  Vanessa Gomez, she's 19 years old.

4   I have Sophia Gomez, she's 14.  And I have David, Jr.  He's 10.

5   Q.   Are you employed?

6   A.   Yes, I am.

7   Q.   Where are you employed?

8   A.   One of my jobs is I'm a longshoreman.

9   Q.   How long have you been a longshoreman?

10  A.   Just over, full-time, 11 years now.

11  Q.   And do you work full-time longshoring?

12  A.   Yes, I do.

13  Q.   Do you also own another business?

14  A.   Yes, I do.

15  Q.   And what business is that?

16  A.   It's a little store.  I buy and sell gold.

17  Q.   Is that in Los Angeles?

18  A.   Yes, it is.

19  Q.   What's the name of that store?

20  A.   It's called The Gold Return.

21  Q.   Gold Return.  Do you keep hours at The Gold Return?

22  A.   Yeah.  We're -- we're open Monday through Saturday.  10:00

23  o'clock to 4:00 o'clock Monday through Friday, and 10:00 to

24  2:00 on Saturday.  But I have somebody there working for me.

25  Q.   So you don't spend all that time there, because you're
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    longshoring on ships in the port, correct?

2    A.    Yes.

3    Q.    So you split your time between longshoring and some time

4    at The Gold Return?

5    A.    Yes.

6    Q.    Did you own that business in 2009?

7    A.    Yes, I did.

8    Q.    And you've owned it continuously from 2009 till today?

9    A.    Yes.

10   Q.    Do you have any partners in The Gold Return?

11   A.    Yes.

12   Q.    Is one of the partners Sergio Amador?

13   A.    No, he's not.

14   Q.    Now, at some point you also owned a Sixth Street Bistro in

15   San Pedro; is that right?

16   A.    Yes.

17   Q.    Do you still own that business?

18   A.    No.  No, I don't.

19   Q.    Now, did you own the bistro in 2009?

20   A.    Yes, I did.

21   Q.    So in 2009, would it be fair to say that you split your

22   time between the bistro, longshoring and The Gold Return and

23   Port Medical?

24   A.    Yes.

25   Q.    Okay.  So what time of day would you go to Port Medical,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   approximately?

2   A.   Any chance I could.   During my lunch break at -- when I

3   was longshoring, whatever site I was at.   We worked at

4   different berths in Long Beach or San Pedro, so if I was on the

5   other side in Long Beach and I had a lunch break, I would stop

6   in the one in Long Beach.

7   Q.   Did you go to Port Medical every day?

8   A.   No.

9   Q.   What days would you go to Port Medical?

10   A.   It would -- it would vary.

11   Q.   Do you have an estimate?   Or what's your best estimate as

12   to the number of days per week --

13   A.   Oh, number per week?   I would say twice a week, roughly.

14   Maybe three times at the most.

15   Q.   Like every other day, essentially?

16   A.   Yes.

17   Q.   Okay.   And was that -- in 2009, was that a fair estimate

18   of --

19   A.   Yes.   More that time, because it was getting off its feet,

20   yeah.

21   Q.   Oh, so you went to Port Medical more frequently in 2009

22   because it was a start-up company?

23   A.   Yes.

24   Q.   In 2010 and 2011, approximately every other day each week?

25   A.   Not Long Beach as much, because I think 2010's when we

1    started San Pedro, so I was more in San Pedro.

2    Q.    So when did San Pedro open?

3    A.    I believe 2010.  That -- that's what I been hearing.

4    Q.    Does August 2010 sound accurate?

5    A.    I believe so, yes.

6    Q.    And so what happened in August of 2010 when San Pedro

7    opened?  Would you still go to Long Beach or --

8    A.    No, I would spend -- I would -- I would not really go to

9    Long Beach that more -- that often, no.

10   Q.    Did you and Sergio have an office that was specific to

11   you, or he, or you, or how did that work?

12   A.    No, we didn't have offices in locations.

13   Q.    I meant locations.  In other words, did you both attend to

14   each office, or was San Pedro your office and Long Beach his,

15   or how did that work?

16   A.    It was -- it was -- it was told -- we had a mutual

17   agreement that he would overlook Long Beach, because he lived

18   in Downey, and I would overlook San Pedro, because I live in

19   San Pedro.

20   Q.    Okay.  And is that what occurred beginning in August 2010

21   when San Pedro opened?

22   A.    Yes.

23   Q.    And you would go to Port Medical San Pedro every other day

24   in 2010 and 2011; is that fair?

25   A.    When I could, yeah.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    When you were there, what would you do?

2    A.    Wasn't really much for me to do.  I was just -- actually,

3    a lot of times I would go there just to work out.

4    Q.    Work out.

5    A.    They had a treadmill there.

6    Q.    Okay.  Well, what -- you said -- you mentioned lunch

7    breaks.  What kind of a lunch break does a longshoreman get?

8    A.    I was -- earlier stage, I was a lasher.  I was one of

9    those -- I had a job where I would go in in the morning and we

10   would catch up on the lash, which is the type of job that they

11   had containers up on the ship and we would have to -- we would

12   be the ones that would tie the containers onto the other

13   containers as they stacked them.

14         THE COURT:  I believe the question was just when was

15   your lunch breaks.

16         THE WITNESS:  It would vary.

17         THE COURT:  I'm sorry?

18         THE WITNESS:  The lunch breaks would vary.  It could

19   range anywhere from 9:00 o'clock in the morning to 3:00 o'clock

20   in the afternoon.

21         THE COURT:  Okay.  Next question.

22   BY MR. ULTIMO:

23   Q.    Okay.  So lunch didn't last from 9:00 to 3:00, did it?

24   A.    We would call it our lunch breaks, but that would be our

25   break sometimes.  We would have breaks in between a day's -- it

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  could be a four-hour break in between a day and then come back

2  and finish up the day.

3  Q.   Okay.  So whenever you got lunch breaks, you would go to

4  Port Medical?

5  A.   Yeah.  Or I would go to my Gold Return.

6  Q.   And when you were at Port Medical, you didn't work out the

7  whole time?

8  A.   No.

9  Q.   What were some of the things that you did?

10 A.   I would -- I would ask them how's the patient -- "How's

11 the patient list going?"

12      They would say, "Ah, we're doing good."

13      I would see if there's anything I could do, like empty out

14 the trash, or is there a light bulb out, or anything that I

15 could help out with to make the girls' day easier, you know,

16 the front desk girl, either the manager or the girl at the

17 front desk.

18 Q.   Who cleaned the restroom?

19 A.   Sometimes it would be me.

20 Q.   Why?

21 A.   Because it was kind of like a dirty job, and I didn't

22 have -- we didn't have a janitor.

23 Q.   So you were sort of the handyman for Port Medical?

24 A.   Yeah.  Yeah, I guess.

25 Q.   Was that one of your roles?

```
 1   A.   Yeah.

 2   Q.   You did more than just that, but that was one of the roles

 3   that you would do?

 4   A.   Yes.

 5   Q.   Would you falsify SOAP notes?

 6   A.   Absolute- -- no.

 7   Q.   Would you submit any false billings for patients?

 8   A.   No.

 9   Q.   How about for patients that were not seen?

10   A.   No.

11   Q.   Did you prepare any false paperwork at Port Medical?

12   A.   No.

13   Q.   Do you have any medical or chiropractic training?

14   A.   No.

15   Q.   Have you ever been to medical or chiropractic school?

16   A.   No.

17   Q.   Have you ever prepared patient medical records?

18   A.   No.

19   Q.   Have you ever made entries in patient medical records?

20   A.   No.

21   Q.   Have you ever owned a medical facility prior to you

22   investing in Port Medical?

23   A.   No.

24   Q.   Did you use Port Medical for chiropractic care and

25   treatment for yourself?
```

```
 1    A.    Yes.

 2    Q.    Why?

 3    A.    'Cause I needed it.

 4    Q.    Did you see the chiropractor at Port Medical?

 5    A.    Yes.

 6    Q.    And was it -- was that Dr. Malone?

 7    A.    Yes, it was.

 8    Q.    Why were you seeking chiropractic care and treatment?

 9    A.    Because he was a good adjuster, and I needed my back

10    adjusted.

11    Q.    And did he perform those adjustments to your back?

12    A.    Yes, he did.

13    Q.    To your neck?

14    A.    Yeah, he did.  I didn't like to get my neck cracked, but

15    he did, he cracked it, yes.

16    Q.    Did he refer you for massage therapy?

17    A.    Yes, but I -- I never had the time to get a massage.

18    Q.    Did you go -- so you did not go for any massage therapy at

19    Port Medical?

20    A.    I -- I -- one time they convinced me to get a massage one

21    time in San Pedro, yes.

22    Q.    And that one time, was it -- the massage was actually

23    performed on you?

24    A.    Yeah.  I was a guinea pig, they call it.

25    Q.    A guinea pig?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Well, Yolanda was getting trained to be a massage

2   therapist, and Anna was teaching her how to be -- giving a

3   massage, and I was the guinea pig.  She was showing her how to

4   start a massage, and Anna's a massage therapist, and Yolanda

5   was in the room.

6   Q.   Were you aware that Port Medical was billing your

7   insurance company for massage therapy for you?

8   A.   No, I wasn't.

9   Q.   You get EOBs in the mail, correct?

10  A.   Yes, I do.

11  Q.   Explanation of Benefits from your health insurance

12  company?

13  A.   Yes, we do.

14  Q.   What do you do with them when you get them?

15  A.   I'm sorry to say, like everybody else, I wouldn't -- I

16  wouldn't open them.

17  Q.   Why not?

18  A.   I have the same answer.  We weren't responsible for any of

19  the -- any -- any of the billing.  I wouldn't even have to -- I

20  wouldn't have to pay anything out, so it was no reason for me

21  to open them.

22  Q.   Did you do any of the clerical work in Port Medical,

23  either in the front office or the office area?

24  A.   No, I didn't.

25  Q.   Did you open any of the mail at Port Medical?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    No, I didn't.

2    Q.    When you sought and received chiropractic care and

3    treatment from Dr. Malone at Port Medical, did you go more than

4    once to see him?

5    A.    Yes, I did.

6    Q.    How frequently would you see Dr. Malone?

7    A.    I can't remember.  I -- I'd see him in Long Beach and I'd

8    see him in San Pedro, too.  I can't remember how many times I

9    went.

10   Q.    You have an estimate on how many visits you made with him?

11   A.    Out of the three years, I really can't.

12   Q.    Okay.  So was it -- and did you actually receive care and

13   treatment from Dr. Malone?

14   A.    Yes, I did.

15   Q.    Okay.

16   A.    There was -- we had another chiropractor in Long Beach,

17   too.  I received treatment from him, too.

18   Q.    And were those treatments necessary?

19   A.    Yes, they were.

20   Q.    Why were they necessary?

21   A.    Because I had lower back problems from lashing, from my

22   job.

23   Q.    What does lashing involve, briefly?  Does it have to do

24   with --

25   A.    Physical labor.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   -- cables?

2    A.   Yeah.  Physical labor, lifting up bars, 40 to 50-pound

3    bars.

4    Q.   Is that a physical job?

5    A.   Yes, it is.

6    Q.   You have to climb to do that job?

7    A.   Not climb, but just a lot of lifting and a lot of bending

8    over.

9    Q.   Steel cables that are thick and fat and heavy?

10   A.   They're -- yeah, they're bars and cables.

11   Q.   Did that cause your back to cause -- did that cause pain

12   symptoms to your back?

13   A.   Yes.  That, and being a little bit overweight doesn't

14   help, either.

15   Q.   Okay.  Is that why you went to see a chiropractor?

16   A.   Yes.

17   Q.   And was it your understanding that chiropractic services

18   was a benefit under your health insurance plan?

19   A.   Yes.

20   Q.   And that plan was provided to you through your employment?

21   Was that your understanding?

22   A.   Yes.

23   Q.   The massage, you only received one.  Did that help

24   alleviate your symptom of back pain?

25   A.   That massage, no, not really.

1    Q.   So your use of health insurance benefits for chiropractic

2    services was not false; is that right?

3    A.   No, it wasn't.

4    Q.   How about your wife Griselle, who's present in the

5    audience today?  Did she receive chiropractic services and

6    massages at Port Medical?

7    A.   Yes, she did.

8    Q.   To your knowledge, were those chiropractic services and

9    massages to your wife prescribed by the doctor?

10   A.   Yes, they were.

11   Q.   So those chiropractic services and massages were not

12   falsified; is that right?

13   A.   No, they weren't.

14   Q.   She actually received massages?

15   A.   Oh, yes.  She enjoyed the clinic.

16   Q.   And she saw the chiropractor?

17   A.   Yes.

18   Q.   What about your daughter, Sophie?

19   A.   She loved the clinic.

20   Q.   Did she see the chiropractor?

21   A.   Yes.

22   Q.   And what did she see the chiropractor for, to your

23   knowledge, if you know?

24   A.   I know.  I don't know if -- she went to a private school,

25   and she was eight years old, and I don't know if you -- I'm

1    sure you guys know; they used to carry around 50-pound

2    backpacks with, like, four or five books, and they were pretty

3    heavy.  And I complained to the school about that, but she

4    always complained of her back being sore.

5    Q.   Okay.  And so she sought the chiropractic care and

6    treatment for that?

7    A.   Yes.  Not -- and also she enjoyed it.

8    Q.   Okay.  When you say she enjoyed it, did the chiropractor

9    prescribe massage therapy for her?

10   A.   Yes.  Well, that's the part that she enjoyed, the massage.

11   Q.   Okay.  And so she went for massage therapy?

12   A.   Yes.

13   Q.   To your knowledge, do you know whether she actually

14   received those massages?

15   A.   Oh, yes.

16   Q.   Do you know who the massage therapist was?

17   A.   I can't recall.

18   Q.   Did she go frequently for massages?

19   A.   Yes.  She's still going now, as -- as up to now.

20   Q.   Not at Port Medical?

21   A.   No.  Other places, other facilities.

22   Q.   Yesterday Kevin Malone said there was a day when you

23   handed him five or so charts.  You heard that testimony,

24   correct?

25   A.   Yes, I did.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   Why did you hand Kevin Malone five or so patient charts
that day?
A.   This goes back to when we had -- they're calling it an
audit of the office, when Michelle Aragon -- when we first
opened up and Michelle Aragon was overwhelmed.  He mentioned
that the files were stacked up over her head.  And we had -- we
closed down for two days.  I didn't think -- we didn't even
close down for two days.  I think we did it within a day.  But
we had some people to come in to overlook the files.

     Now, I wasn't there to actually overlook the files,
because I can't read SOAP notes, but that day we had Toni Moyer
come in to help us.  She's a biller.  She's not an accountant;
she's a biller.  And she helped us look at the files, and she
said the files weren't complete, and if someone wants to come
in -- I don't know how she -- what she put -- I don't know how
she put it, but --
Q.   Mr. Gomez, could you talk a little slower.
A.   Oh.  Toni Moyer, she said that if someone wants to come in
and look at those files, you would be shut down, because these
files are improper and they're uncompleted.  So we decided to
close down for a couple of days and complete the files.  To my
understanding, these files were people that came in, but they
were just uncompleted.  So that night we called some people in
to come help us to look at the files and make sure that we can
complete the files, cross the T's and dot the I's.  That's the

1   way I put it.  So Toni helped us.  Who was there was

2   Michelle --

3          THE COURT:  Counsel, next question.  This is turning

4   into a narrative.

5   BY MR. ULTIMO:

6   Q.   Okay.  Did you know any of the patients reflected in those

7   five or so charts that you handed Kevin Malone?

8   A.   No.  I was just told to hand over these files to Kevin.

9   Because I had the better relationship with Kevin.  I didn't

10  know those people.  I was the chosen one --

11  Q.   That's fine.  When you've answered the question, stop.  I

12  appreciate you --

13  A.   Oh.

14  Q.   -- filling in the gaps --

15  A.   No, I did not know those people.

16  Q.   Okay.  Thank you.

17       Did you know that they were longshoremen?

18  A.   No.

19  Q.   How many longshoremen, to your knowledge, are there in and

20  around Los Angeles, Port of Los Angeles and Long Beach area?

21  A.   There's around 10,000 Local 13 longshoremen.  There's

22  another 5,000 Local 63.

23  Q.   That's all around the Port of Los Angeles and Port of Long

24  Beach?

25  A.   Yes.

1    Q.   And South Bay?

2    A.   Yes.   And that's just my count.   I mean, might be more

3    now.

4    Q.   Do you know all of them?

5    A.   No.

6    Q.   When you handed Dr. Malone the five or so patient charts

7    that day, did you have any knowledge whether Kevin Malone had

8    seen those patients?

9    A.   No, I didn't.

10   Q.   Was that the only time that you asked Kevin Malone to sign

11   or complete patient charts?

12   A.   Yes.

13   Q.   Had you ever done that before?

14   A.   No.

15   Q.   Did you instruct Dr. Malone to falsify notes in those

16   charts?

17   A.   No.

18   Q.   Did you tell Dr. Malone that longshoremen were allowing

19   Port Medical to bill for visits that had not actually occurred?

20   A.   No.

21   Q.   Were the patients that were reflected in those charts your

22   friends?

23   A.   I never seen who was actually on those charts.

24   Q.   And Toni Moyer asked you to give those to Dr. Malone?

25   A.   I can't -- I can't remember who gave me those charts to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    give to Kevin.

2    Q.    Now, Pandora Hall, she said -- she testified about a

3    conversation or a meeting, and she said that you made a comment

4    to the effect that "We'll just blame it on Michelle Aragon

5    because she taught us everything."  Do you remember hearing

6    that in court?

7    A.    I don't remember hearing that.

8    Q.    In court, you remember hearing Pandora?

9    A.    Oh, I remember her saying that, yes.

10   Q.    Did you make that comment at a meeting to Pandora Hall?

11   A.    No, I didn't.

12   Q.    Can you explain that comment?  Have you ever heard

13   anything like that at a meeting at Port Medical?

14   A.    No.

15   Q.    Did you know Michelle Aragon?

16   A.    Yes.

17   Q.    Before Port Medical was opened?

18   A.    No, I didn't.

19   Q.    Did Michelle Aragon teach you a system or scheme to

20   defraud health insurance?

21   A.    No, she didn't.

22   Q.    Are you an insurance biller?

23   A.    No, I'm not.

24   Q.    Now, Nicole LaBeaud testified, and you were here in court.

25   She testified yesterday.  Do you know Nicole LaBeaud?

```
 1   A.   Yes, I do.

 2   Q.   You remember her from Port Medical?

 3   A.   Yes.

 4   Q.   And how was she -- what role did she play at Port Medical?

 5   Was she a massage therapist?  What was she?

 6   A.   I actually didn't really remember her until I seen her

 7   here in court, but it refresh -- it refreshed my memory.  She

 8   was a massage therapist.

 9   Q.   Did you promote Nicole LaBeaud from a massage therapist to

10   an office manager?

11   A.   Did I personally, or did the office?

12   Q.   No, you personally.

13   A.   I -- I don't -- I don't think so.

14   Q.   Do you have any -- well, let me ask you this.  Did you run

15   Port Medical, or did the office managers and staff run Port

16   Medical?

17   A.   After we had the people that we hired in their -- in their

18   profession, in their -- after we hired the manager and we had

19   the doctor and we had the massage therapists and we had the

20   biller in their right position, there wasn't really a position

21   for us to run anything.  We weren't doctors.  We weren't

22   billers.  We weren't massage therapists.

23            THE COURT:  Okay.  Next question.

24   BY MR. ULTIMO:

25   Q.   Did you ever ask Nicole LaBeaud to falsify chart notes?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    No, I didn't.

2    Q.    So you personally didn't ask her to become an office

3    manager?

4    A.    No, I didn't.

5    Q.    Was she an office manager?  Do you have any recollection

6    of that?

7    A.    I believe she was.  I believe that she was.  I don't

8    recall, though.

9    Q.    Do you know Sergio Amador?

10   A.    Yes, I do.

11   Q.    How do you know Sergio Amador?

12   A.    I met him down at the waterfront.  Well, on the job.

13   Q.    And how long have you known him?

14   A.    Up to today?

15   Q.    Approximately, yeah.

16   A.    Maybe nine years.

17   Q.    You saw that you were the incorporator for Port Medical

18   Associates.  Why did you incorporate Port Medical?

19   A.    I'm -- I -- I was told to.  I don't know.

20   Q.    Whose idea was it to incorporate Port Medical?

21   A.    I can't remember.

22   Q.    Well, was it you who approached Sergio Amador to start

23   Port Medical, or he that approached you to start Port Medical?

24   A.    Oh, he had approached me.

25   Q.    Okay.  And did Sergio Amador tell you, "Hey, we have to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   start a corporation," or did you come up with that yourself?
 2   A.   I'm sure -- I'm sure -- I don't think it was even Sergio's
 3   idea.  I think we -- Michelle hired somebody that tell us we
 4   have to incorporate.
 5   Q.   And you paid someone to incorporate Port Medical?
 6   A.   Yes.
 7   Q.   And is that how your name got on the articles?
 8   A.   Yes.
 9   Q.   Did you invest in Port Medical?
10   A.   Yes, I did.
11   Q.   With your own money?
12   A.   Yes.
13   Q.   And how much of your own money did you invest in Port
14   Medical?
15   A.   I -- I think it was $60,000.
16   Q.   And did Sergio Amador invest 60,000 in the clinic?
17   A.   I believe so.
18   Q.   Did Kevin Malone pay Port Medical for the use of the
19   medical facility?
20   A.   No, he didn't.
21   Q.   He didn't pay -- did he -- he got the use of the facility
22   and the premises for free?
23   A.   Yes.
24   Q.   He was -- it was his practice, correct?
25   A.   Yes, it was.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   But you and Sergio were on the lease for the buildings?

2   A.   Right.

3   Q.   And then you paid -- or either Port Medical or Malone

4   Chiropractic paid one of the management companies so you could

5   pay rent on the buildings, correct?

6   A.   Correct.

7   Q.   So there's going to be -- who employed the massage

8   therapists?

9   A.   I believe the -- the manager.

10  Q.   And as far as you know, whose job was it to supervise the

11  massage therapists?

12  A.   The manager.

13  Q.   Or the doctor?

14  A.   Or the chiro.   Chiro.

15  Q.   Did you ever manage or give instructions to the massage

16  therapists?

17  A.   No.

18  Q.   Did you ever tell the massage therapists what to put in

19  their chart notes or SOAP notes?

20  A.   No.

21  Q.   As far as your understanding, what was your understanding

22  as to the agreement with Malone Chiropractic?   What was Malone

23  Chiropractic supposed to provide to Port Medical?

24  A.   His chiropractor service.

25  Q.   Did you ever assist any of the doctors or chiropractors

1    with patients?

2    A.    No.

3    Q.    Now, at some point when Port Medical opened up, it had no

4    patients, correct?

5    A.    Which -- which -- which one?

6    Q.    Well, the first one.  Start with Long Beach.  Because when

7    San Pedro opened up, did it have patients all the sudden?

8    A.    Yeah, San Pedro went really well right off the bat.  Yes.

9    Q.    Why?  Why did San Pedro go really well right off the bat?

10   A.    Because it was a very nice location.

11   Q.    Why was it a nice location?

12   A.    It was right on Harbor Boulevard, which was a really good

13   location for the longshoremen, and it was right across the

14   street from the cruise lines, and it was -- which was, you

15   know, like five minutes from a lot of places where we'd work,

16   and it was a nice facility.

17   Q.    So it was no need -- was there any need to advertise or

18   market for patients when you opened San Pedro?

19   A.    No, not really.

20   Q.    Well, when its predecessor -- actually, when the first

21   location opened up, Long Beach, it had no patients, correct?

22   A.    No.  We had to advertise for that place.

23   Q.    How did you advertise for patients to build what was to

24   become Port Medical?

25   A.    Well, when Michelle -- it was Michelle's idea to sponsor

1    softball teams.

2    Q.    Okay.  And did she do that?

3    A.    Yes, she did.

4    Q.    And was Michelle Aragon a signer on the checking accounts

5    for Port Medical?

6    A.    You know, all that stuff, I wasn't really -- I wasn't

7    really kept up with all that stuff.  I was kind of behind the

8    scenes.  I didn't really pay attention to all that stuff,

9    because I was really busy with everything else.  You guys

10   mentioned --

11            THE COURT:  Next question, Counsel.

12            THE WITNESS:  Yeah, I don't know.

13   BY MR. ULTIMO:

14   Q.    But as far as you know, Michelle Aragon was sponsoring

15   soccer teams, softball teams?

16   A.    Yes.

17   Q.    And do longshoremen have a lot of extracurricular

18   activities, teams and things like that?

19   A.    Oh, yes.

20   Q.    Quite a few?

21   A.    Yeah.  We had -- we had an annual tournament every --

22   every year.

23   Q.    And did Port Medical have a booth for that tournament?

24   A.    Yes.  We always contribute, yes.

25   Q.    Now, I'd like to show you -- because you said you weren't

 1    involved too much, you were in the back seat -- back scene.

 2    Like to show you a few checks.

 3    A.   Yes.

 4    Q.   First I'd like to show you Exhibit 12, page 167.

 5         I believe that's already been admitted, right?

 6              THE COURT:  Any objection?

 7              MR. CARDONA:  I have no objection.

 8              THE COURT:  It will be received.

 9         (Received in evidence, Trial Exhibit 12, page 167.)

10    BY MR. ULTIMO:

11    Q.   Do you recognize Exhibit 12, page 167?  Is that your

12    signature?

13    A.   No, it's not.

14    Q.   What I want to do is -- okay, I've got -- I now have

15    Exhibit 12, page 167, on the left side of the screen.  I want

16    to show you, beside it, Exhibit 11, page 1.

17         You know what Exhibit 11, page 1, is?

18    A.   Would it --

19    Q.   It's a bank signature card from Washington Mutual.

20    A.   Okay.

21    Q.   For DCS Medical Management.

22    A.   Okay.

23    Q.   That sound correct?

24    A.   Yes.

25    Q.   Now, is that your signature on the bottom left-hand

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  corner --

2  A.    Yes.

3  Q.    -- of Exhibit 11?

4  A.    Yes.

5  Q.    Okay.  Now, you see here I've placed the signature from

6  the Washington Mutual signature card, Exhibit 11, on the top.

7  I've zoomed in on it, and I've placed the signature on Exhibit

8  12, page 167, below it, zoomed in.

9        Looking at these two signatures, can you tell us -- first

10 of all, these signatures, are both of these signatures yours,

11 or which one is yours?

12 A.    The top one's my signature.

13 Q.    Do you know who signed your name on the check, Exhibit

14 12-167, beneath it?

15 A.    No, I don't.

16 Q.    Did you give anyone permission to sign your signature on

17 checks at DCS Medical Management?

18 A.    No, I didn't.

19 Q.    Now, I notice the "G" is different.  How do you make your

20 "G" when you sign your name?

21             THE COURT:  Well, I think the documents speak for

22 themselves, Counsel.

23             MR. ULTIMO:  Okay.  Thank you.

24 Q.    And the "z" is also different, correct, in "Gomez"?

25 A.    Yes.

1    Q.   And the "D," the first "D," capital "D," looks different.

2    A.   Yes.

3    Q.   The top one is looped at the bottom, and the signature

4    beneath it is kind of a straight line; is that right?

5         MR. CARDONA:  Objection, Your Honor, leading.

6         THE COURT:  Sustained.

7         THE WITNESS:  Yes.

8    BY MR. ULTIMO:

9    Q.   Want to show you Exhibit 12, page 221.

10         MR. CARDONA:  No objection.

11         THE COURT:  Okay.

12    *(Received in evidence, Trial Exhibit 12, page 221.)*

13    BY MR. ULTIMO:

14    Q.   Mr. Gomez, this appears to be a withdrawal slip from a

15    bank.  Is that your signature on this withdrawal slip?

16    A.   Yeah, it looks like my signature.

17    Q.   I want to show you Exhibit 12, page 173.

18         THE COURT:  You may publish it.

19         MR. ULTIMO:  Thank you, Your Honor.

20    *(Received in evidence, Trial Exhibit 12, page 173.)*

21    BY MR. ULTIMO:

22    Q.   Is that your signature?

23    A.   No, it's not.

24    Q.   I want to show you Exhibit 12, page 167.

25         MR. CARDONA:  No objection, Your Honor.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  You may show it.
 2   BY MR. ULTIMO:
 3   Q.   Is that your signature, Mr. Gomez?
 4   A.   No, it doesn't look like my signature.
 5   Q.   Did you sign that check?
 6   A.   No, I didn't.
 7   Q.   I want to show you two more, or actually, three more.
 8   Exhibit 12, page 1346.  Yeah, Exhibit 12, page 1346.
 9              THE COURT:  You may publish.
10              MR. CARDONA:  No objection.
11         (Received in evidence, Trial Exhibit 12, page 1346.)
12   BY MR. ULTIMO:
13   Q.   This is a check written by Sergio Amador from the same
14   account.  Do you see that?
15   A.   Yes, I do.
16   Q.   You recognize his signature?
17   A.   Yes.
18   Q.   The endorsement on the back, is that your signature?
19   A.   That looks like my signature, yes.
20   Q.   And the check is made out to you, correct?
21   A.   Yes.
22   Q.   And it's signed by Sergio?
23   A.   Yes.
24   Q.   You were a signer on this account.  Why do you -- do you
25   know why Sergio was giving you a check when you're a signer on
```

1  the same account?

2  A.   I'm not sure.  I don't remember.

3  Q.   Okay.  Two more.  Same exhibit, Exhibit 12, page 1432.

4       MR. CARDONA:  No objection, Your Honor.

5       THE COURT:  May be published.

6       *(Received in evidence, Trial Exhibit 12, page 1432.)*

7  BY MR. ULTIMO:

8  Q.   Same account.  Is that your signature?

9  A.   No, it's not.

10  Q.   And finally, Exhibit 12, page 1431.  Same account again.

11  Is that your signature?

12  A.   No, it's not.

13  Q.   You have any knowledge as to who was signing your name on

14  these checks that I showed you?

15  A.   No.  No, I don't.

16  Q.   I have a different -- I do have a check, one more check I

17  want to show you.  Exhibit 12, page 30.

18       THE COURT:  Okay.

19       MR. CARDONA:  No objection.

20       THE COURT:  It may be published.

21       *(Received in evidence, Trial Exhibit 12, page 30.)*

22  BY MR. ULTIMO:

23  Q.   This is from a different account.  This is from your Gold

24  Return store; is that right?

25  A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And you made this check payable to -- first of all, is

2    that your signature?

3    A.    Yes.

4    Q.    And that's because that's your account, correct?

5    A.    Yes.

6    Q.    And did you make a check to DCS Medical Management for

7    $5,000?

8    A.    I believe -- yes.

9    Q.    Yeah.  And it says -- what does it say in the memo

10   portion?

11   A.    It says "Loan to DCS."

12   Q.    Did you loan them money?

13   A.    Yes.

14   Q.    Now, last year, when -- at some point you were arrested,

15   correct?

16   A.    Yes, I was.

17   Q.    As part of this case?

18   A.    Yes.

19   Q.    Okay.  You were never arrested before in your life, right?

20   A.    No.

21   Q.    So when you were arrested, you were taken to a jail, I

22   take it?

23   A.    Yes, I was.

24   Q.    And did you come into contact with Sergio Amador at any

25   point?

```
1    A.   Yes, I did.

2    Q.   Did you or he have any -- did you have a discussion with

3    him, Sergio Amador?  Did you guys talk?

4    A.   Yes, we did.

5    Q.   Okay.  And what did he discuss with you?

6    A.   We sat in the jail, and he -- he -- Sergio always had a

7    strange look when he was, like, disappointed, and he sat down

8    and he looked at me and he said, like, "I should have -- I

9    should have took your advice, you know, I should have stopped."

10   And then -- and he -- after that, he didn't really say

11   anything, 'cause he gave me that look, like, look where we're

12   at now.

13            THE COURT:  Okay.  Next question.

14   BY MR. ULTIMO:

15   Q.   How did you respond?

16   A.   I -- I gave him that same -- I gave him that same look,

17   and I told him -- I actually made a joke after -- the way he

18   walked, he was tripping over his chains.  I told him to take

19   short steps.  Because we were both chained from ankle to ankle.

20            THE COURT:  Next question.

21   BY MR. ULTIMO:

22   Q.   What was your relationship, your interaction with

23   Dr. Malone?  Did you and he get along?

24   A.   Yeah, we got along great.

25   Q.   What was the relationship like between -- that you've
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   observed, between Dr. Malone and Sergio Amador?

2   A.   They were -- they were always bumping heads, because

3   Sergio always wanted to charge more, and Kevin didn't want to

4   charge that much.

5   Q.   How many employees did Port Medical have?  And you can

6   break it down any way you like, whether San Pedro and Long

7   Beach combined, or, if it's easier for you, how many employees

8   at Long Beach and how many in San Pedro.  But how many

9   employees did it have in 2009, 2010, 2011?  Break it down

10  whatever way it's comfortable for you.

11  A.   Oh, that I can remember -- do you want me to try to name

12  them or --

13  Q.   No, no, no, no, no.

14  A.   Positions?

15  Q.   Just give me a number.  An estimate.  Your best estimate

16  as to number of employees.

17  A.   Maybe at one time 20 to 25 employees in San Pedro, and 20

18  employees in Long Beach.

19  Q.   And was that concurrent?  In other words, is that 25 plus

20  20?

21  A.   Yes.

22  Q.   So, combined, both locations would be approximately 45

23  patients?  I'm sorry.

24  A.   Employees?

25  Q.   Strike that.  45 employees?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.  To my -- to my -- best of my knowledge.

 2    Q.    That's an estimate?

 3    A.    Yes.

 4    Q.    Is that your best estimate?

 5    A.    I -- I believe so.

 6    Q.    Now, whose job was it to pay these employees?

 7    A.    The manager.

 8    Q.    Now, at some point you were interviewed by law enforcement

 9    officers.  You were questioned before you were arrested,

10    correct?

11    A.    Yes.

12    Q.    What did you tell them that your role and/or job duties

13    were at Port Medical?

14    A.    When I was questioned by them, I didn't really -- I was --

15    I was there when I got -- when the San Pedro office got raided,

16    and I believe I didn't really tell them anything.  I was --

17    they were asking me if I was the owner, owner, owner, and I was

18    saying, no, no, no, because, directly, Kevin -- I mean

19    Dr. Soliman was the owner of Port Medical, and the owner of

20    Ramport was a management company.  I was -- I was -- they

21    weren't -- and I was just the investor.  Later on down the

22    line, during that same questioning, I told them I was David

23    Gomez, the investor.

24    Q.    Did you also tell them that you were David Gomez, the

25    marketer?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Yes, I believe so.

2    Q.   Tell me about marketing.   What would you -- what did you

3    do to market the clinic?

4    A.   Market?   My job was, since I was from -- well, I spent

5    most of my life in San Pedro.   I arrived there when I was three

6    years old, so --

7         THE COURT:   No, no.   Just listen to the question and

8    answer the question, otherwise we're going to be here for the

9    next two weeks.

10        Go ahead.

11        THE WITNESS:   How did I market?   On the job as a

12   longshoreman, I ran into fellow longshoremen, so I would market

13   as, whenever I heard that they had a backache or something like

14   that, I would mention the clinic.

15   BY MR. ULTIMO:

16   Q.   Did you pay patients or longshoremen to go to Port

17   Medical?

18   A.   No.

19   Q.   Did you know that Sergio was paying patients?

20   A.   At one time, yes, I found out he was.

21   Q.   And what action, if any, did you take when you discovered

22   that he was paying patients or longshoremen to go to Port

23   Medical?

24   A.   I told him to stop.

25   Q.   Were those your exact words?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   I told him -- I told him -- my exact words were --

2    Q.   To the best that you can remember.

3    A.   I tell him, "What are you doing?  What are you doing?  You

4    gotta stop."  I can't -- to my best of my knowledge, I can't

5    remember my exact words, but I know I told him to stop.

6    Q.   What did he say?

7    A.   I -- he said, "Yes, I will," or something like that.

8    Q.   Did you tell -- now, you've heard from Pandora Hall,

9    correct?

10   A.   Yes, I have.

11   Q.   She was falsifying quite a number of SOAP notes for

12   massage therapists, correct?

13   A.   Mm-hmm.

14   Q.   Did you know that?

15   A.   At one time, yes, I did know that.

16   Q.   And what action, if any, did you take to stop it?

17   A.   I told -- well, when I found out what Sergio was doing,

18   and my job -- after I -- the actions that I took is when I said

19   this ain't gonna happen in San Pedro, when I brought her over

20   to San Pedro.

21   Q.   Okay.  And what action, if any, did you take to stop it

22   and ensure that it wasn't happening again?

23   A.   I -- I -- that's when we -- that's when I hired Toni

24   Moyer, and I specifically told Toni Moyer, our biller, that she

25   has to oversee all our billing and to make sure that if there's

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    any -- there's no fraud going on in San Pedro.

 2    Q.    Okay.  Did you believe that the fraud had stopped?

 3    A.    There was no fraud in San Pedro to my knowledge.

 4    Q.    Did you believe that the fraud had stopped in Long Beach?

 5    A.    I -- I believed so, yes.

 6    Q.    Were you spending any time in Long Beach when -- after

 7    it -- after you had begun overseeing San Pedro?

 8    A.    Not as much, no.

 9    Q.    Was it your understanding that Sergio Amador had stopped

10    paying patients because he told you he would stop?

11    A.    Yes.

12    Q.    And just to be clear, what participation, if any, did you

13    have with the billing for chiropractic services and/or massage

14    services?

15    A.    I have -- I had no participation.

16    Q.    Who did -- who -- essentially, the bill would -- would the

17    bill -- do you have an understanding as to how the chart notes,

18    the SOAP notes, and the health insurance claim form would

19    proceed and turn into a bill?

20          THE COURT:  Counsel, we've gone over this many times.

21          MR. ULTIMO:  I'm just asking if he had any

22    understanding.

23          THE COURT:  Well, we've already gone over it with him.

24          MR. ULTIMO:  I'll withdraw the question.

25    Q.    Did you ever fire anyone at Port Medical?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    I don't think so.

2    Q.    Why not?

3    A.    I was the guy that -- I couldn't fire anybody.  I'm not

4    that type of person.

5    Q.    Did you have people that were supposed to do the firing?

6    A.    I'm sure the managers did the firing.

7    Q.    And who were the managers?

8    A.    We had several managers.  Would you like me to name them?

9    Q.    Well, certainly, yes.

10   A.    We had Michelle.  We had Pandora.  We had Eva.  I believe

11   we had Nicole.  We had one, I can't remember her name, but that

12   ended up at San Pedro at the very end.  I can't recall her

13   name, though.

14   Q.    Did you trust each of those managers?

15   A.    Yes, we did.  Yes, I did.

16   Q.    Now, I notice you didn't mention Eva Razo.

17   A.    Yes, I did.

18   Q.    You did?

19   A.    Yes.

20   Q.    I'm sorry, I didn't hear.  Did you trust Eva Razo?

21   A.    Yes, I did.

22         MR. ULTIMO:  No further questions.

23         THE COURT:  Okay.  Cross.

24   ///

25   ///

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          **CROSS—EXAMINATION**

2    BY MR. CARDONA:

3    Q.   Mr. Gomez, I'm correct, right, that the first facility

4    that opened was Port Medical Long Beach?  Is that right?

5    A.   Yes.

6    Q.   Now, you opened Port Medical Long Beach at or around the

7    same time you opened your medical management company, correct?

8    A.   I believe so, yes.

9    Q.   And that medical management company was DCS Medical

10   Management, correct?

11   A.   Yes.

12   Q.   And DCS stood for David, your name, Chris and Sergio,

13   correct?

14   A.   Yes.

15   Q.   Chris for Chris Rice?

16   A.   Yes.

17   Q.   And Sergio for Sergio Amador?

18   A.   Yes.

19   Q.   Now, you also opened, at the time that DCS Medical

20   Management was put in place, a bank account for DCS Medical

21   Management, correct?

22   A.   Excuse me?

23   Q.   You opened a bank account for DCS Medical Management.

24   A.   Yes.

25   Q.   And you were one of the signators on that account,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    correct?

2    A.    I can't -- I don't remember that, but if you want to show

3    me.

4    Q.    Sure.  Let me show you Exhibit 11.  Do you see up here at

5    the top?  I've blown it up.  This is the account for DCS

6    Medical Management, LLC, at Washington Mutual, a division of

7    JPMorgan Chase Bank; is that right?

8    A.    Okay, yes.

9    Q.    Down at the bottom --

10   A.    Oh, yes, okay.

11   Q.    -- three signatures?

12   A.    Yes.

13   Q.    And one of those is you, correct?

14   A.    Right, mm-hmm.

15   Q.    And DCS Medical Management was set up by you, Chris and

16   Sergio to manage Port Medical, correct?

17   A.    It was set up -- I -- from my understanding, it was set up

18   to pay out the employees.

19   Q.    It handled the money for the business, right?

20   A.    Correct.

21   Q.    And when money came in from the insurance company, it

22   didn't go straight into DCS Medical Management, did it?

23   A.    No, it didn't.

24   Q.    In fact, it went into one of two accounts, right?

25   A.    It went into that account, I believe.

1   Q.   Didn't it first go -- when you first started out, didn't

2   money from the insurance company go into an account maintained

3   by Kevin Malone called Malone Chiropractic?

4   A.   Yeah.  He was the owner, so it went to his account, and

5   then it went to distribute to DCS to pay out the bills.

6   Q.   So the money went from Malone Chiropractic to DCS Medical

7   Management account, and then DCS Medical Management used that

8   money to operate the clinic?

9   A.   Correct.

10  Q.   Now, at some point that changed, right?

11  A.   I be- -- yeah.  There were several management companies

12  after that.

13  Q.   Well, let me skip the medical management company, but at

14  some point didn't Port Medical start billing and having the

15  checks go to an account operated by Port Medical?

16  A.   I believe so.

17  Q.   And then the money would be transferred from that account,

18  not Kevin Malone's account, but Port Medical's account, to the

19  DCS Medical Management account, correct?

20  A.   You guys are giving me too much credit.  I don't -- I

21  don't know any of that stuff.  If -- if -- yes, if it's on

22  paperwork and that happened, I believe it did, yes.

23  Q.   Well, you were a signer on the DCS Medical Management

24  account, right?

25  A.   Yeah.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And money got deposited into that account, right?

2    A.    Yes.

3    Q.    And the bulk of that money came from Port Medical

4    Associates, an account that was set up to bill the insurance

5    companies, didn't it?

6    A.    The bulk of that money's from patients being seen, yes.

7    Q.    Now, you wrote checks on the DCS Medical Management

8    account, correct?

9    A.    I wrote some checks, yes.

10   Q.    In fact, you wrote a fairly large number, didn't you?

11   A.    I -- I don't know.

12   Q.    Did you write checks to employees?

13   A.    Can you -- can I see them?  I don't -- which checks did I

14   write the employees?

15   Q.    I'm asking you, do you remember writing checks to

16   employees?

17   A.    No.

18   Q.    You know Yoli Sierra, right?

19   A.    Yes.

20   Q.    She was an employee?

21   A.    Yes.

22   Q.    Now, had she worked for you before she started at Port

23   Medical?

24   A.    I believe she worked at the restaurant, yes.

25   Q.    She worked at the Sixth Street Bistro, right?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   And then you brought her over to Port Medical?

 3   A.   Yes.

 4   Q.   Now, when she came over to Port Medical, she worked at the

 5   front desk, right?

 6   A.   Yes.

 7   Q.   She wasn't a massage therapist?

 8   A.   No, she wasn't.

 9   Q.   She wasn't certified as a massage therapist?

10   A.   I believe she wasn't, no.

11   Q.   Did you write checks to Yoli?

12   A.   From what account?

13   Q.   From the DCS Medical Management account.

14   A.   I don't remember.

15   Q.   Now, in addition to DCS Medical Management, you were also

16   partners with Sergio on some other accounts, weren't you?

17   A.   I think so, yes.

18           MR. CARDONA:  I'm going to display Exhibit 21, page 1.

19           MR. ULTIMO:  No objection, Your Honor.

20           THE COURT:  Okay.

21   BY MR. CARDONA:

22   Q.   Do you see this is a signature card from Washington

23   Mutual, a division of JPMorgan Chase Bank, two customer names,

24   you and Sergio Amador?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Down below, two names, you and Sergio Amador?

 2   A.   Yes.

 3   Q.   Dated June 8, 2009; is that right?

 4   A.   Mm-hmm.

 5   Q.   Is that a "yes"?

 6   A.   Yes.

 7   Q.   Sorry, I have to ask you so the court reporter can write

 8   it down.

 9   A.   Yes.  Yes.

10   Q.   Now, this was right around the same time period that Port

11   Medical was getting up and running; is that right?

12   A.   Yes.

13   Q.   And at that point, in June of 2009, Port Medical had

14   already been up and running for four or five months?

15   A.   I believe so.

16   Q.   And you opened this separate account with Sergio Amador?

17   A.   I believe so.  What was the name of this account?  Just --

18   it was just an account?

19   Q.   I will show you at the top right.  It says "Individual

20   Joint Master Account Agreement."

21   A.   Okay.

22   Q.   Did you open a joint account with Sergio Amador?

23   A.   Yes.

24        MR. CARDONA:  Your Honor, I'd ask to display Exhibit

25   36, which has been admitted.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  Okay.

2              MR. ULTIMO:  No objection.

3              THE COURT:  It may be displayed.

4   BY MR. CARDONA:

5   Q.    I'm showing you another signature card, and this is a

6   signature card from Washington Mutual JPMorgan Chase Bank for

7   Sixth Street Bistro; is that right?

8   A.    Yes.

9   Q.    Now, that was the restaurant you owned before you met

10  Sergio, right?

11  A.    Well, I just didn't own it; there were other partners,

12  yes.

13  Q.    You had other partners, right?

14  A.    Yes.

15  Q.    But Sergio wasn't one of them originally?

16  A.    No.

17  Q.    Now, this account, you see down below there are three

18  signatures, Sergio, you, Joseph Giacco?

19  A.    Yes.

20  Q.    Now, was Joseph Giacco one of your former partners at

21  Sixth Street Bistro?

22  A.    Yes.

23  Q.    This is dated October 2nd, 2009; is that right?

24  A.    Yes.

25  Q.    Now, that was, what, ten months, nine months after Port
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Medical had opened?

2    A.    Yes.

3    Q.    And you took Sergio on as a partner in the Sixth Street

4    Bistro?

5    A.    Yes.

6    Q.    And opened this new account for the bistro?

7    A.    Yes.

8            MR. CARDONA:  Your Honor, I'd ask to display Exhibit

9    41, which has previously been admitted.

10   Q.    Now, this is a signature card for an account titled

11   "DS Medical Management"; is that right?

12   A.    Yes.

13   Q.    Down below, two names, you and Sergio Amador; is that

14   right?

15   A.    Yes.

16   Q.    Indicating that you were partners?

17   A.    Yes.

18   Q.    Were you partners with Sergio Amador in DS Medical

19   Management?

20   A.    Yes.

21   Q.    And over on the right, two signatures, you and Sergio

22   Amador; is that right?

23   A.    Yes.

24   Q.    This is December 26, 2009, correct?

25   A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   Roughly a year after Port Medical had opened?

2  A.   Yes.

3  Q.   You opened a new medical management account with Sergio

4  Amador?

5  A.   Yes.

6  Q.   And opened a new account?

7  A.   Yes.

8  Q.   Now, you wrote checks on these various accounts, didn't

9  you?

10  A.   I can't remember, but if you'd like to show them to me.

11  Q.   Are you saying you don't ever remember writing a check on

12  any of the accounts?

13  A.   No, really, I can't -- honestly, I can't remember, but if

14  you'd like to show them to me to refresh my memory.

15  Q.   The Sixth Street Bistro, you operated that business,

16  right?

17  A.   I operated -- I was one of the owners.  I shook people's

18  hand when they came in.  I wasn't the cook.  I had somebody

19  there managing the place.  I was just, like, the person, like,

20  "hey, he's the owner; hey, come on in."

21  Q.   And you didn't monitor the finances?

22  A.   No.  I had somebody work at -- doing that for me.

23  Q.   Did you care whether you got money out of it?

24  A.   Actually, it was -- no, I did care.  It was a loss.  We

25  were always taking money out of our pockets.  That didn't

1    really go very well for us.

2    Q.    And with Port Medical, I assume you went into it hoping to

3    make money?

4    A.    Yes, we did.

5    Q.    And you put money up, right?

6    A.    Yes, we did.

7          THE COURT:  We're going to break at this time, ladies

8    and gentlemen.  It's 11:30.  See you back in at 1:00 o'clock.

9          Remember the admonishment not to discuss the case among

10   yourselves or with anybody else or form or express any opinions

11   about the matter until it's submitted to you and you retire to

12   the jury room.

13         Have a pleasant lunch.  See you back in at 1:00 o'clock.

14   We'll finish up at 1:00.

15         THE CLERK:  All rise.

16         Court is in recess.

17         *(Lunch recess held from 11:31 a.m. to 1:02 p.m.)*

18         *(In the presence of the jury:)*

19         THE COURT:  Okay.  The record will reflect that all

20   the members of the jury are in their respective seats in the

21   jury box, the witness is on the witness stand, and we were in

22   cross-examination.

23         Counsel, you may inquire.

24         MR. CARDONA:  Thank you, Your Honor.

25   *///*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**CROSS-EXAMINATION (Continued)**

1  BY MR. CARDONA:

2  Q.   So, Mr. Gomez, before the break, we had talked about some

3  of the bank accounts that you and Sergio Amador had.  Do you

4  remember that?

5  A.   Yes.

6  Q.   And one of those was a joint account in which he and you

7  were the two signators?

8  A.   Yes.

9  Q.   Now, you transferred money in and out of that account,

10  right?

11  A.   You were telling me that, yes.

12  Q.   Well, you did that, right?

13  A.   I don't remember.

14  Q.   Let me show you a couple of items there.

15       Your Honor, I'd offer Exhibit 17, page 200.

16            MR. ULTIMO:  No objection, Your Honor.

17            THE COURT:  Okay.  It may be posted.

18            MR. CARDONA:  My apologies, Your Honor.  May I have

19  one second?  My apologies, Your Honor.  It should be Exhibit

20  23.

21            THE COURT:  Exhibit 17, page 23?

22            MR. CARDONA:  No.  Exhibit 23 --

23            THE COURT:  Oh, 23.

24            MR. CARDONA:  -- page 200.

```
1                    THE CLERK:  Thank you.

2                    THE COURT:  Okay.

3                    MR. CARDONA:  Hope --

4                    THE COURT:  Any objection?

5                    MR. ULTIMO:  No objection.

6                    THE COURT:  Okay, you may publish it.

7           (Received in evidence, Trial Exhibit 23, page 200.)

8    BY MR. CARDONA:

9    Q.   So this is a deposit into that joint account.  Do you see

10   that this is a check from Malone Chiropractic?

11   A.   Yes.

12   Q.   And was Malone Chiropractic the chiropractic entity that

13   Kevin Malone had?

14   A.   I believe so.

15   Q.   And this is a check to Sergio Amador?

16   A.   Yes.

17   Q.   And do you recognize that signature on the bottom right?

18   A.   I -- do I recognize it being Sergio's signature?

19   Q.   Was that Michelle Aragon's signature?

20   A.   Oh.  I can't tell or not, if that's that and him.  I don't

21   recognize Michelle's signature.

22   Q.   Even though she was the manager for you?

23   A.   I -- Michelle was the manager, yes, but I don't recognize

24   her signature.

25                   MR. CARDONA:  Your Honor, at this time I'd offer
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Exhibit 228, page 308.

 2              THE COURT:  228, 308.

 3              MR. CARDONA:  Sorry.  Sorry, Your Honor.  23, page

 4    228.  My apologies.  The numbering system is a bit odd.

 5              THE COURT:  Okay.  23, page 228?

 6              MR. CARDONA:  Yes, Your Honor.

 7              THE COURT:  Okay.  Any objection?

 8              MR. ULTIMO:  None, Your Honor.

 9              THE COURT:  Okay.  It will be received.

10         (Received in evidence, Trial Exhibit 23, page 228.)

11    BY MR. CARDONA:

12    Q.   Before I go there, on the previous document we were

13    looking at, the date was September 8th, 2009; is that right?

14    A.   Yes.

15    Q.   So this page is a check made out on the joint account that

16    you had with Mr. Amador?

17    A.   Yes.

18    Q.   Made out to The Gold Return; is that right?

19    A.   Yes.

20    Q.   And that was your business, right?

21    A.   Yes, it is.

22    Q.   And this is signed by you?

23    A.   Yes.

24    Q.   And that was six days after the deposit of the check from

25    Mr. Malone?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   Okay, yes.

 2    Q.   Now, in the DCS Medical Management account, you in fact

 3    wrote checks to employees, didn't you?

 4    A.   I'm not sure.

 5         MR. CARDONA:  Your Honor, may I display Exhibit 12,

 6    page 111?

 7         THE COURT:  Okay.

 8         MR. ULTIMO:  No objection.

 9         (Received in evidence, Trial Exhibit 12, page 111.)

10    BY MR. CARDONA:

11    Q.   This is a check signed by you, right?

12    A.   Yes.

13    Q.   Made out to Katie Ludvalla (phonetic)?

14    A.   Yes.

15    Q.   She was a Port Medical employee, wasn't she?

16    A.   I don't specifically remember her, but if she was an

17    employee, that is my signature.

18    Q.   And you wrote this check out of the DCS Medical Management

19    account to her?

20    A.   Yes.

21         MR. CARDONA:  Your Honor, I'd offer Exhibit 12, page

22    855.

23         MR. ULTIMO:  855?  No objection.

24         THE COURT:  Be received.

25         (Received in evidence, Trial Exhibit 12, page 855.)
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    BY MR. CARDONA:

 2    Q.   This is a check dated December 7th, 2009, to Magdalena

 3    Sroka.  Do you see that?

 4    A.   Yes.

 5    Q.   Now, she was an employee of Port Medical, wasn't she?

 6    A.   Oh, yes.

 7    Q.   She was the physician's assistant there?

 8    A.   Yes.

 9    Q.   And at the bottom, in the memo line, this says "Pay

10    period," correct?

11    A.   Yes.

12    Q.   And this was a check for her pay?

13    A.   Yes.

14    Q.   And it's signed by you?

15    A.   Yes.

16         MR. CARDONA:  Your Honor, I'd ask to display, offer

17    Exhibit 12, page 918.

18         THE COURT:  12, page 918.

19         MR. ULTIMO:  403.  Otherwise, no objection.

20         THE COURT:  Overruled.

21         (Received in evidence, Trial Exhibit 12, page 918.)

22    BY MR. CARDONA:

23    Q.   This is a check dated the next year, January 4th, 2010,

24    correct?

25    A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Made out to Griselle Garcia?

2   A.   Yes.

3   Q.   And she was an employee of Port Medical?

4   A.   Yes.

5   Q.   This is a check for her pay?

6   A.   Yes.

7   Q.   Signed by you?

8   A.   Yes.

9   Q.   Now, we had also referenced checks to Yoli Sierra.  You

10  wrote checks to her for her pay, correct?

11  A.   If the -- if I recognize the signature, yes.

12        MR. CARDONA:  My apologies, Your Honor.  I'm just

13  trying to find the page number in the exhibit.

14      So I'd offer Exhibit 12, page 608, Your Honor.

15        MR. ULTIMO:  403.

16        THE COURT:  Okay.  Overruled.

17      *(Received in evidence, Trial Exhibit 12, page 608.)*

18  BY MR. CARDONA:

19  Q.   So this is a check dated October 26, 2009, to Yolanda

20  Sierra, right?

21  A.   Yes.

22  Q.   And she was an employee, right?

23  A.   Yes.

24  Q.   And this is for a pay period of October 13th to October

25  26th?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    And you signed that?

 3    A.    That does not look like my signature.

 4    Q.    So you didn't sign this payroll check?

 5    A.    No.

 6    Q.    But you signed all the others?

 7    A.    Yes.

 8    Q.    Now, when you start -- when Port Medical started out, Port

 9    Medical Long Beach, I think you said you were doing marketing;

10    is that right?

11    A.    Yes.

12    Q.    And Port Medical Long Beach wasn't the only chiropractic

13    clinic that catered to longshoremen, was it?

14    A.    No.

15    Q.    There were a number of them?

16    A.    Several of them.

17    Q.    And Port Medical Long Beach was not that close to the

18    port, was it?

19    A.    No, it wasn't.

20    Q.    Was that one of the difficulties you had in getting

21    longshoremen to go there?

22    A.    Yes.

23    Q.    Now, a number of other chiropractic clinics were closer to

24    the ports, right?

25    A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And those other chiropractic clinics also were marketing,

2   right?

3   A.   Yes.

4   Q.   Competing with you for patients?

5   A.   Yes.

6   Q.   Competing with you for patients who were longshoremen and

7   had benefits under the ILWU's plan?

8   A.   Yes.

9   Q.   Now, some of those other clinics were paying patients,

10  weren't they?

11  A.   I believe so.

12  Q.   And you were competing with them?

13  A.   Yes.

14  Q.   Now, you marketed for Port Medical Long Beach.  Port

15  Medical Long Beach opened sometime in early 2009?

16  A.   You guys have all the documents.  I'm just going with what

17  you guys are saying.  I believe so.

18  Q.   Is that to the best of your memory?

19  A.   I be- -- yeah, best of my memory.

20  Q.   Now, you marketed for Port Medical Long Beach all the time

21  up until the federal agents came and did the searches of both

22  Long Beach and San Pedro, didn't you?

23  A.   I pretty much marketed for San Pedro after I had -- I went

24  to San Pedro, after San Pedro opened up.

25  Q.   Pretty much or totally?

1    A.    More -- I favored more San Pedro.

2    Q.    But you continued to market for Long Beach?

3    A.    Very little.

4    Q.    And then you also marketed for San Pedro, correct?

5    A.    Yes.

6    Q.    Now, you took money out of the medical management

7    companies, right?

8    A.    Oh, I got paid checks from both places, yes.

9    Q.    And you were paid for your marketing?

10   A.    Of course.

11   Q.    And you were paid for your return of your investment?

12   A.    Yes.

13   Q.    And you got a profit return?

14   A.    Yes.

15   Q.    How did you and Sergio work out who was going to do the

16   marketing?

17   A.    The idea came to us, marketing wise, from Michelle, as far

18   as sponsoring softball teams, and when we split up, he overseed

19   Long Beach and I overseed San Pedro.  When I came across a

20   longshoreman, I marketed San Pedro, and when he came across a

21   longshoreman, he marketed Long Beach.

22   Q.    Now, do you recall speaking to law enforcement officers on

23   August 14th, 2013?

24   A.    Exact date, no.

25   Q.    Was it the same date that the Port Medical Long Beach and

1    Port Medical San Pedro were searched?

2    A.   I don't know when Long Beach was searched, but I remember

3    San Pedro being searched.  I don't know what date it was, but I

4    was there.

5    Q.   You were there, right?

6    A.   Yes.

7    Q.   And you were interviewed right after the search was done?

8    A.   During the search.

9    Q.   And the agent who interviewed you, was that -- were there

10   two of them, a Department of Labor, Office of Inspector General

11   agent, Alfredo Nodal (phonetic)?

12   A.   I don't remember their names, but there was two of them.

13   Q.   Now, you told them, didn't you, that you were unsure who

14   originally authorized you to perform marketing services for

15   Port Medical?

16   A.   I'm not sure what I told them from the very beginning.

17   I -- I believe I told them that -- they were asking me who was

18   the owner.

19   Q.   Did you tell them that you were unsure who originally

20   authorized you to perform marketing services for Port Medical?

21   A.   I don't recall.

22   Q.   Do you think it would refresh your memory to look at the

23   interview report?

24   A.   I -- I know towards the end of the interview I told them I

25   was a marketer, if that helps.

1    Q.   So I'll ask again.  Do you think it would refresh your

2    memory to look at the interview report?

3    A.   No.  It won't.

4    Q.   Now, I think on direct you said that at some point you

5    spoke with Sergio Amador and -- let me go back for a second.

6         Am I correct that you said on direct that at some point

7    after you found out about the fraud that was going on, you

8    spoke with Sergio Amador?

9    A.   Yes.

10   Q.   Was that when you say you told him to stop?

11   A.   Yes.

12   Q.   When was that?

13   A.   That's -- that's what's cloudy in my mind.  I don't know

14   exactly when that was.

15   Q.   Was it before you moved to San Pedro or after?

16   A.   It was right around when we moved to San Pedro.

17   Q.   And when did San Pedro open?

18   A.   You guys -- August '10.  August 2010.

19   Q.   And that's based on what you've seen here in court?

20   A.   That's based what I've heard here in court, yes.

21   Q.   So you talked with Sergio after finding out that the fraud

22   had gone on, and you told him to stop?

23   A.   Yes.

24   Q.   And the fraud that you were telling him to stop was the

25   billing for services that hadn't been done?

1    A.    I'm not sure exactly what was -- what billing was being

2    done.  I just heard that it was hooking up guys.

3    Q.    And by "hooking up," you mean paying people and then

4    billing even though they didn't come in?

5    A.    Paying for their signatures on their massages, yes.

6    Q.    And paying for their signatures so they could bill even

7    though they hadn't come in?

8    A.    I believe so, yes.

9    Q.    And that's what you confronted Sergio about?

10   A.    Yes.

11   Q.    Now, when you were interviewed by law enforcement in

12   San Pedro after the search, that was after that conversation

13   with Sergio, right?

14   A.    Yes.

15   Q.    Didn't you tell the law enforcement agents who interviewed

16   you that you were not aware of Port Medical billing for

17   services not rendered?

18   A.    Yes.

19   Q.    Didn't you tell them that you had never heard any rumors

20   to that effect?

21   A.    Yes.

22   Q.    So that wasn't true?

23   A.    Well, I wasn't gonna tell anything without any

24   representative.

25   Q.    Okay.  But you talked to the agents?

1    A.    Out -- out of courtesy.

2    Q.    Without a representative?

3    A.    Well, I didn't really -- I mean, they were there.  They

4    were at the place.  I wasn't -- I didn't think I was in

5    trouble.

6    Q.    On direct, you talked about your daughter.  Is it Sophie

7    or Sophia?

8    A.    Sophia.

9    Q.    She went to Port Medical?

10   A.    Yes.

11   Q.    And she liked getting massaged?

12   A.    Yes.

13   Q.    About how many times did she go?

14   A.    Can't really tell you.  A lot of times when I went.  And

15   I'm not sure if her mother took her or not.

16   Q.    Any estimate as to how many times?

17   A.    I couldn't really tell ya.

18   Q.    Who did she get massaged by?

19   A.    I'm not sure.  Couldn't really tell ya.

20   Q.    Even when you went with her?

21   A.    I just told her -- she wasn't really particular who she

22   got a massage from.  I always went to the person who had the

23   less massages, out of courtesy for the girls.

24   Q.    Did Yoli Sierra massage her?

25   A.    I'm not really sure.  Yoli wasn't a massage therapist.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    I'm sure it wasn't Yoli.

2    Q.   And you didn't get massaged?

3    A.   No.  I really didn't have the time for a massage.  I would

4    like to, but I didn't have the time for the massage.

5    Q.   So you only went and got chiropractic adjustments?

6    A.   Yes.

7         MR. CARDONA:  Your Honor, I'd like to display

8    Exhibit 177, the first page, for the witness, Your Honor.  It's

9    a chiropractic chart.

10        THE COURT:  Yes.

11        MR. ULTIMO:  No objection.

12        *(Received in evidence, Trial Exhibit 177.)*

13   BY MR. CARDONA:

14   Q.   Mr. Gomez, do you recognize this as an example of the

15   charts that Port Medical kept?

16   A.   I believe so, yes.

17   Q.   And that's your name, right?

18   A.   Yes.

19   Q.   And your date of birth?

20   A.   Yes.

21   Q.   Going to go to page 4.

22        MR. ULTIMO:  No objection.

23        MR. CARDONA:  Well, it's already in evidence, Counsel.

24        THE COURT:  Okay.

25   *///*

1    BY MR. CARDONA:

2    Q.   See this is a form in which you're acknowledging privacy

3    rights?

4    A.   Yes.

5    Q.   And down below, is that your signature?

6    A.   Yes.

7    Q.   And this was paperwork that you filled out at Port

8    Medical?

9    A.   Yes.

10   Q.   And over here again, that's your date of birth?

11   A.   Yes, it is.

12   Q.   And over here you provided a copy of your PMA card?

13   A.   Yes.

14   Q.   That's the card your employer gives you to get access to

15   the docks?

16   A.   Yes.

17   Q.   And down here, your insurance card, correct?

18   A.   Yes.

19   Q.   You were insured by the ILWU PPO plan?

20   A.   Yes.

21   Q.   Now, I'd like to take you over to, I believe, page 19.

22   See this is an entry for August 22nd, 2012?

23   A.   Yes.

24   Q.   That's your signature on the sticker?

25   A.   I can't see.  It looks like my signature, yes.  The bottom

1   part of it, it's missing, but yes.

2   Q.   And up above there, there are some initials.  Do you see

3   that?

4   A.   I can't make them out.  "W.B." at the end?

5   Q.   Ann-Marie Barry was a massage therapist, wasn't she?

6   A.   Ann-Marie Barry.  Anna?

7   Q.   Anna.

8   A.   Okay.  Yes.

9   Q.   Was she Pandora Hall's mother?

10  A.   I don't think so.

11  Q.   Now, she wasn't a chiropractor?

12  A.   No.

13  Q.   So this is for a massage?

14  A.   Okay.

15  Q.   Is that "yes"?

16  A.   I'm not sure.  I can't -- I don't read documents.

17  Q.   She's not a chiropractor?

18  A.   Right.

19  Q.   Okay.

20  A.   I don't know how that got -- I don't know how that sticker

21  got there.

22          MR. ULTIMO:  No question pending.  Move to strike.

23          THE COURT:  It'll be stricken.

24  BY MR. CARDONA:

25  Q.   Are you saying you have no idea how that got there?

1    A.   No, I never looked at -- I mean, that's my signature.  I

2    have never seen that file before.

3    Q.   And you never got a massage at Port Medical except for the

4    one time you described with Yoli Sierra?

5    A.   Yes.

6    Q.   Let's go to page 21.  Up at the top, an entry, March 31,

7    2011.  Is that your signature on the sticker on the right?

8    A.   Yes.

9    Q.   You see the initials "E.A.C."?

10   A.   Yes.

11   Q.   Evelyn Cahue (phonetic) was a massage therapist, wasn't

12   she?

13   A.   Evelyn.  Yes.

14   Q.   Massage therapist at Port Medical?

15   A.   Yes.

16   Q.   Not a chiropractor?

17   A.   Right.

18   Q.   So this again would be for a massage?

19   A.   Yes.

20   Q.   Any idea how this got in your chart?

21   A.   No.

22   Q.   March 5th, 2011, another entry.  Is that your signature on

23   the right?

24   A.   Yes.

25   Q.   "E.C.," the initials.  Evelyn -- Emma Cornejo, later Emma

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Cornejo-Roddy.  Also a massage therapist?

2   A.   Yes.

3   Q.   Not a chiropractor?

4   A.   No.

5   Q.   So this would be for a massage?

6   A.   I believe so.

7   Q.   No idea how that got in your chart?

8   A.   No idea.  Are these out of -- based out of Long Beach?

9        THE COURT:  Excuse me.  There's no question pending.

10       THE WITNESS:  Sorry.

11       THE COURT:  Counsel.

12  BY MR. CARDONA:

13  Q.   Next page, page 22, entry for June 3rd, 2011.  Is that

14  your signature on the right?

15  A.   Yes.

16  Q.   Brenna Esparza.  Another massage therapist?

17  A.   Yes.

18  Q.   Not a chiropractor?

19  A.   No.

20  Q.   So this too would be for a massage?

21  A.   Yes.

22  Q.   No idea how this got in your chart?

23  A.   No.

24  Q.   Let me turn to page 24.

25  A.   Can you go back to that page right there?  19's not my

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  signature, 3 is not my signature, and 9 does not look like my

2  signature, either.

3  Q.   Thank you for that.

4  A.   Okay.

5  Q.   Back on page 24 of your chart, full series of entries.

6  See this?

7  A.   Uh-huh.

8  Q.   Full series of signatures.  Those yours?

9  A.   Yes.

10 Q.   But you weren't massaged by Yoli Sierra?

11 A.   No, I wasn't.

12 Q.   Any idea how these got in your chart?

13 A.   No, I don't.

14 Q.   Now, the stickers that you signed in on, those were on a

15 sheet where they could be pulled off, right?

16 A.   Yes.

17 Q.   And then stuck in the chart?

18 A.   Yes.

19 Q.   Page 23.  On the right, see there's a sticker --

20 A.   Yes.

21 Q.   -- on the top?

22      Down below that, not stickers, just signatures.

23 A.   Those look like my signatures.

24 Q.   Any idea how those got in the chart?

25 A.   Those look like copies from the -- that had my previous

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   signatures.

2   Q.   Now, you said on direct that you never checked your EOBs.

3   A.   No, I didn't.

4   Q.   Now, unlike many of the longshoremen, you were running a

5   chiropractic clinic.

6   A.   Yes, I was.

7   Q.   And you had confronted Sergio about potential fraud at the

8   clinic?

9   A.   Yes, I did.

10  Q.   But you never checked your EOBs?

11  A.   No, I didn't.

12  Q.   After DCS Medical Management was closed, you and Sergio

13  set up two additional management companies, correct?

14  A.   Yes.

15  Q.   Chosen?

16  A.   Yes.

17  Q.   And Ramport?

18  A.   Yes.

19  Q.   And I think you said Chosen was responsible for Long

20  Beach?

21  A.   Yes, it was.

22  Q.   And Ramport was responsible for San Pedro?

23  A.   Yes.

24  Q.   And you were primarily in San Pedro?

25  A.   Yes.

1   Q.   Didn't you get paid out of both of those management

2   companies?

3   A.   Yes, I did.

4   Q.   And both those management companies collected money that

5   came from the ILWU insurance plan?

6   A.   Yes, they did.

7   Q.   And over the period 2009 to 2012, isn't it correct that

8   Port Medical collected, through the medical management

9   companies, more than $3,700,000 from the ILWU insurance plan?

10  A.   I know we look -- haven't looked at the finances, but if

11  that's what it shows, yes.  We did collect a lot.  We had a lot

12  of overhead, too.

13  Q.   And a lot of money went out to you, right?

14  A.   I -- I only -- like how much?  I received like $5,000 a

15  month.

16  Q.   Didn't you take out a total of about $400,000?

17  A.   I don't think so, no.

18          MR. CARDONA:  Nothing further, Your Honor.

19          THE COURT:  Redirect.

20                    **REDIRECT EXAMINATION**

21  BY MR. ULTIMO:

22  Q.   Mr. Gomez.

23  A.   Yes.

24  Q.   You were shown a sign-in sheet with -- two sign-in sheets.

25  One had stickers on it, one appeared to have one sticker, and

```
 1   no stickers at the bottom.  Let me show it to you.
 2        Exhibit 177, page 23.  You see your signatures?  Said all
 3   of these were your signatures, correct?
 4   A.   Yes.
 5   Q.   Okay.  Do you know whether these signatures on Exhibit
 6   177, page 23, were from massages or for chiropractic services
 7   that you went and saw the chiropractor for?
 8   A.   I'm not -- those -- those signatures --
 9   Q.   I'm not asking you to guess.  I'm just saying, do you know
10   whether this sign-in sheet was for both chiropractic and
11   massage therapy, or one or the other?
12             THE COURT:  If you know.
13             THE WITNESS:  No.  Every time I signed in, it was for
14   chiropractor.
15   BY MR. ULTIMO:
16   Q.   Now, you said that on Exhibit 177, page 22, it contained
17   stickers that were not your signature.  Can you tell us again
18   which of these stickers are not your signature.
19   A.   Three doesn't look like my signature.  19 doesn't look
20   like my signature.
21   Q.   Do you have any idea how those two signature stickers that
22   are not your signature got on this SOAP note?
23   A.   No, I don't.
24   Q.   Do you -- was it your -- did you ever, while you were at
25   Port Medical, review any chart notes for any patients,
```

```
 1    including yourself, such as the one depicted in Exhibit 177,

 2    page 22?

 3    A.   No, I didn't.

 4    Q.   Whose job was that?

 5    A.   To review the charts?

 6    Q.   Well, to -- to review the patient charts, obviously, if

 7    someone had that job.

 8    A.   Before they went to billing, I believe it was the manager.

 9    Q.   The manager would review the patient chart --

10    A.   Before they went to billing.

11    Q.   And what would they review the patient chart for?

12    A.   Just to make sure everything was completed.

13    Q.   Okay.  Did anyone at Port Medical ever ask you to sign

14    more than one sticker at a time?

15    A.   I think when I went to San Pedro, I did sign a couple of

16    times.

17    Q.   And do you have an understanding as to why they asked you

18    to sign a couple of times -- a couple stickers at one sign-in?

19              MR. CARDONA:  Objection, calls for speculation.

20              THE COURT:  Overruled.

21              THE WITNESS:  Do I answer?

22              THE COURT:  If you know, yes.

23              THE WITNESS:  Yeah.  We had multiple -- in San Pedro

24    we had a doctor, we had a physical therapist, we had a

25    nutritionist, we had acupuncturist.  So you would sign multiple
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   times and -- because our names would go in different files.

2   BY MR. ULTIMO:

3   Q.  So can you amplify on that a little bit more without me

4   putting words in your mouth?

5        THE COURT:  That's calling for a narrative.

6        MR. ULTIMO:  I'm sorry?

7        THE COURT:  That's calling for a narrative.  Keep it

8   question/answer.

9        MR. ULTIMO:  I could try.  Thank you, Your Honor.

10  Q.  Mr. Gomez, what I'm asking is, you said acupuncture,

11  physical therapy, nutritionist, medical and chiropractic,

12  right?

13  A.  So at one particular day I would see an acupuncturist and

14  I would sign a sticker, and I would see a chiropractor to get

15  adjusted, and I would sign a sticker on that.

16  Q.  You would see the chiropractor and acupuncturist the same

17  day?

18  A.  Yes.

19  Q.  So they would have you sign two stickers that same day?

20  A.  Yes.

21  Q.  That was my question.

22       All right, no further questions.  Thank you.

23       THE COURT:  Recross.

24       MR. CARDONA:  Very briefly, Your Honor.  And I promise

25  it will be.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          Actually, Your Honor, I don't have any questions.

2              THE COURT:  Okay.  You may step down.

3              THE WITNESS:  Thank you.

4              THE COURT:  Next witness.

5

6          *(Further proceedings were held in this matter,*

7          *not transcribed herein.)*

8

9

10                              *--o0o--*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                       *CERTIFICATE*

2

3      *I hereby certify that pursuant to Section 753, Title 28,*

4 *United States Code, the foregoing is a true and correct partial*

5 *transcript of the stenographically reported proceedings held in*

6 *the above-entitled matter and that the transcript page format*

7 *is in conformance with the regulations of the*

8 *Judicial Conference of the United States.*

9

10 *Date:  DECEMBER 8, 2016*

11

12

13

14                    */S/ SANDRA MACNEIL*

15                   *Sandra MacNeil, CSR No. 9013*

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA