1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3       HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                    - - - -

5


6
UNITED STATES OF AMERICA,          )
7                                   )
                    PLAINTIFF,      )
8                                   )
     vs.                            )    No. CR 15-629-RGK-2
9                                   )
DAVID GOMEZ,                        )
10                                  )
                    DEFENDANT.      )
11 _____)

12

13


14       REPORTER'S PARTIAL TRANSCRIPT OF JURY TRIAL

15              DAY 1; PAGES 1 – 17

16              (OPENING STATEMENT)

17          TUESDAY, OCTOBER 11, 2016

18                  3:30 P.M.

19          LOS ANGELES, CALIFORNIA

20

21

22    _____

23       *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
         *Official Reporter, U.S. District Court*
24              *255 East Temple Street*
                *Los Angeles, CA  90012*
25                  *213.894.5949*

```
1    APPEARANCES OF COUNSEL:

2


3    FOR PLAINTIFF, UNITED STATES OF AMERICA:

4         OFFICE OF THE UNITED STATES ATTORNEY
          BY:  GEORGE S. CARDONA
5              ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET, SUITE 1100
6         LOS ANGELES, CALIFORNIA  90012
          213.894.2434
7


8    FOR DEFENDANT, DAVID GOMEZ:

9         ULTIMO LAW FIRM, PC
          BY:  PAUL J. ULTIMO
10             ATTORNEY AT LAW
          7700 IRVINE CENTER DRIVE, SUITE 800
11        IRVINE, CALIFORNIA  92618-3047
          949.851.0300
12


13   ALSO PRESENT:

14        SPECIAL AGENT MARCUS VALLE, DEPARTMENT OF LABOR,
          OFFICE OF THE INSPECTOR GENERAL
15

16        JEANNIE HENSCHEL

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                          **I N D E X**

2

3      ***PROCEEDINGS:***                                   ***PAGE:***

4         Government's opening statement .............     4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 1 | LOS ANGELES, CALIFORNIA; TUESDAY, OCTOBER 11, 2016 |
| 2 | 3:30 P.M. |
| 3 | – – – – |
| 4 | *(Prior proceedings were held and reported;* |
| 5 | *not transcribed herein.)* |
| 6 | *(In the presence of the jury:)* |
| 7 | THE COURT:  The first phase of the trial will begin |
| 8 | now. |
| 9 | First, each side will be able to make an opening |
| 10 | statement.  An opening statement is not evidence.  It is simply |
| 11 | an outline to help you understand what the party expects the |
| 12 | evidence will show.  A party is not required to make an opening |
| 13 | statement. |
| 14 | The government will then present their evidence, and |
| 15 | counsel for the defendant may cross-examine.  Then, if the |
| 16 | government chooses to offer any evidence, counsel for the |
| 17 | government may then cross-examine. |
| 18 | After the evidence has been presented, I will instruct you |
| 19 | on the law that applies to this case, and the attorneys will |
| 20 | make closing arguments.  After that, you'll go to the jury room |
| 21 | to deliberate for your verdict. |
| 22 | You ready to start? |
| 23 | MULTIPLE JURORS:  Yes. |
| 24 | THE COURT:  Okay.  Would you like to make an opening |
| 25 | statement? |

```
 1              MR. CARDONA:  Yes, Your Honor.  Thank you.

 2         Ladies and gentlemen, in October of 2009, Josiah Vaifanua

 3    was four years old.  He was about to turn five.  His birthday

 4    was in November.  He was the son of a longshoreman, Joe

 5    Vaifanua, who got his health insurance through the union

 6    healthcare plan, the healthcare plan for the International

 7    Longshore and Warehouse Union.  Over the next 13 months, that

 8    insurance plan was billed by Port Medical, a clinic that

 9    provided services in Long Beach and San Pedro through two

10    branches.  Among the services they provided were chiropractic

11    and massage services.  And over the next 13 months, from

12    October 2009 to November 2010, that insurance plan, the union

13    insurance plan, was billed by Port Medical for more than 20

14    massages for Josiah Vaifanua.  It was billed for more than 23

15    massages for Laloifi, who was seven years old.  And it was

16    billed for more than 23 massages for Faith Vaifanua, their

17    sister, who was nine years old.  Those total billings for those

18    three children for that 13 months for that number of massages,

19    all of which were asserted to be medically necessary in the

20    billing, totaled more than $15,000.

21         So were these massages necessary?  Were they really given?

22    What was going on?

23         Well, the evidence in this case is going to show you that,

24    in fact, Port Medical, a clinic that was founded by the

25    defendant, David Gomez, and another longshoreman, Sergio
```

1    Amador, was in fact engaged in a fraud, that they were

2    fabricating their records to show that they had provided

3    services that they hadn't really provided and to bill for

4    massages that really hadn't ever been given.

5         Now, you're going to hear from Joe Vaifanua.  He's going

6    to be in here and he's going to testify.  He is the father of

7    Josiah, Laloifi, Faith, and two other children, Hazey and

8    Dazey.  He's going to be testifying pursuant to a grant of

9    immunity pursuant to court order, and he's going to tell you,

10   in fact, that he was paid by Port Medical in return for

11   allowing them to use his information and the information about

12   his kids to bill for services that they never received.

13        He took his kids in a few times, primarily to sign them up

14   at Port Medical, get their information on file, but after that,

15   what he would do, pursuant to an agreement that he had reached,

16   was he would collect his Explanation of Benefit forms, the

17   forms that were mailed back to him when the insurance company,

18   when the insurance plan was billed, he would collect those,

19   take them back, show them to Sergio Amador to prove that, in

20   fact, Port Medical had collected for the fabricated billings,

21   and then get paid.

22        Now, you're going to see he was primarily paid in cash.

23   He'll testify to that.  But he also received two checks, and

24   you'll see those two checks.  They both came from a medical

25   management company, a medical management company that was named

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  DCS Medical Management.  That medical management company was

2  set up by the defendant, David Gomez, the "D" in DCS, one of

3  their investors, Chris Rice, the "C" in DCS, and Sergio Amador,

4  the "S" in DCS.  And you'll see these checks that came out to

5  him.  One of them was in January of 2010 for $300, and it bears

6  David Gomez's name as the signator.  The other came in February

7  of 2010, and it was for $2400, and it bears Sergio Amador's

8  name as the signator.  That $2400 check has a comment line

9  where it says "plumbing."  Now, you will hear from Joe.  He's

10  not a plumber.  He didn't provide any plumbing services for

11  Port Medical.  And in fact, that "plumbing" was written to

12  conceal the fact that this was a payment to Joe for allowing

13  his information to be used to falsely bill the insurance

14  company.

15      Now, there are two other medical management companies that

16  you're going to hear in this case, Chosen Medical Management

17  and Ramport Medical Management.  Those, too, are companies that

18  were set up by the defendant, David Gomez, and Sergio Amador,

19  using an incorporator, Ramsey Muro, to set up those companies.

20  And you're going to see financial records that show in

21  particular a large number of checks written out of all three of

22  those companies, DCS Management, Chosen Management, Ramport

23  Management, a large number of checks written to people who were

24  purportedly patients of Port Medical.

25      Now, I mention that there were two offices of Port

1    Medical.   The first was in Long Beach.   In about 2010, they

2    opened their second office, in San Pedro.

3         You're going to hear from a number of other longshoremen,

4    members of the longshoremen's union, longshoremen and

5    longshorewomen, who went to Port Medical either in Long Beach

6    or San Pedro or both.   You'll hear that they, too, when they

7    are shown their charts, their medical charts from Port Medical,

8    when they look at those charts, there are a number of entries

9    in there that they will identify as entries for times that they

10   didn't go, and those entries nevertheless were billed to the

11   insurance company.

12        Now, in some instances, these other longshoremen also were

13   paid.   They got money.   So, for example, you're going to hear

14   from a longshoreman named Leonard Linares.   He will come in and

15   he's going to tell you that he and his teammates on a softball

16   team, a softball team called Fat Kids, negotiated a

17   sponsorship, a sponsorship by Port Medical, and they received

18   several checks out for use of their softball team.   And the

19   quid pro quo, what they had to do in return, was agree that

20   they, the softball team members, would in fact go to Port

21   Medical and receive those medical services.   And you'll see

22   that for at least two of those players, Leonard Linares and

23   Jesse Martinez, who were on that team and who received checks,

24   their charts in fact reflect entries for times that they didn't

25   go but that nevertheless were billed to the insurance company.

1          Now, in addition to the union members, as you look at

2    those charts, you're going to see a number of entries by two

3    particular Port Medical employees:  Pandora Hall, whose current

4    name is Pandora Fistonich, but at the time her name was Pandora

5    Hall, and Yolanda Sierra, who went by "Yoli."  Several of the

6    union members who testified are going to look at those entries

7    and explain that, in fact, they were never massaged by either

8    Pandora Hall or Yoli Sierra.  Nevertheless, bills were

9    submitted for those massages that weren't given.

10         Now, you're going to hear from Pandora Hall.  She's going

11   to come in as a witness.  She'll be testifying pursuant to a

12   cooperation agreement with the government under which we've

13   agreed not to prosecute her.  She's going to explain that she

14   started at Port Medical's Long Beach office as a massage

15   therapist originally, and then after some period of time she

16   became a manager of the office.  She's going to tell you that

17   once she became an office manager, she fabricated the charts,

18   she made false entries in the charts.

19         Now, in that connection, you're going to see a document, a

20   document that you'll see in this case.  It will be up on the

21   screen.  It's going to be marked as Exhibit 203.  And that

22   document is a document that was pulled off of Port Medical's

23   computer system when law enforcement did a search of their

24   offices in August of 2013.  And you're going to see on that

25   document, at the top, that it says dated June 7th to 20th,

1  2010, and that it has three columns:  "Patients," "Dates

2  Billed," "Total Billed."

3      Now, Pandora Hall didn't create that document, but she's

4  going to look at it and she's going to tell you that the names

5  in the "Patients" column, those names listed in the "Patients"

6  column are in fact people for whom she fabricated chart

7  entries.  And the dates, we'll look at the charts and you'll

8  see that those dates next to those names corresponds to entries

9  in the charts that Pandora Hall will tell you she fabricated,

10  and they will coincide with the union members telling you that,

11  in fact, they weren't massaged by Pandora Hall on those dates.

12  Nevertheless, those were billed for to the insurance company.

13      Now, Pandora Hall will also tell you she started work in

14  Long Beach.  Later the San Pedro office was opened.  She was

15  approached to manage the San Pedro office, to move to the San

16  Pedro office, to manage that office.  She'll tell you that

17  before she accepted that job, she was concerned about the fraud

18  that was going on and went and confronted Sergio Amador and the

19  defendant, David Gomez, about the fraud at Port Medical, and

20  she asked for assurance that if she was going to take over San

21  Pedro, that they would no longer engage in the fraud there.

22      Now, the defendant provided those assurances, and Hall

23  then moved and took over the San Pedro office, took over

24  managing the San Pedro office.  But as you'll see, the fraud

25  did not, in fact, end.  After Pandora Hall moved to San Pedro,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    she was approached again by Sergio Amador and Eva Razo, a woman

2    who had taken over managing the Long Beach office.  This time

3    they approached her and they said, "We'd like you to fabricate

4    charts again," and they offered to pay her on a per-chart

5    basis, $20 for each false entry that she would put in the

6    chart.  She agreed.  And you'll see the results of that, a

7    number of other entries in charts from Pandora Hall for

8    massages that were not given, union members who will testify

9    that they didn't get those massages, and nevertheless, those

10   continued to be billed to the insurance company.

11        Those false entries, the bills were generated by Port

12   Medical and submitted to the insurance company, and you'll hear

13   that the insurance company, when they got those bills,

14   generated checks, paper checks.  Hard to believe, now that

15   we're in the electronic age, but they still generated paper

16   checks.  Those paper checks were then mailed back to Port

17   Medical, and those mailings of the checks are the 20 mail fraud

18   counts with which the defendant is charged, those checks that

19   were mailed to pay for the bills for those fabricated entries

20   in the charts.

21        Now, Pandora Hall is not the only Port Medical employee

22   you're going to hear from.  You're going to hear from a number

23   of others.

24        You're going to hear from Yolanda Sierra, and, like

25   Pandora Hall, she will confirm that she did not give many of

1   the massages that are reflected in the chart entries under her

2   name.

3       You're going to hear from Sergio Amador.  Sergio Amador

4   has pled guilty.  He'll be testifying pursuant to a cooperation

5   agreement with the government, and he will explain that after

6   starting Port Medical, he and the defendant, David Gomez, did

7   the marketing, recruiting union members by, among other things,

8   offering sponsorships to get them to come to Port Medical and

9   to bring others from their teams and their other friends and

10  associates to Port Medical.  He'll also explain that Port

11  Medical, in fact, fabricated chart entries and billed the

12  insurance company based on those fabricated chart entries.

13      You're also going to hear from a woman named Nicole

14  LaBeaud.  Nicole LaBeaud started at Port Medical as a massage

15  therapist, and she, too, like Pandora Hall, ultimately became a

16  manager.  She, too, like Pandora Hall, after she became a

17  manager, was approached about fabricating charts.  She'll

18  describe a meeting that she had with the defendant and Sergio

19  Amador in which they came to her and asked her to use patients'

20  insurance information to generate bills to the insurance

21  company even though they hadn't been at Port Medical for those

22  services.  Now, you'll hear Nicole LaBeaud say that, unlike

23  Pandora Hall, she refused, and a short time later she was

24  fired.

25      You're also going to hear from Kevin Malone.  Kevin Malone

1   was the chiropractor at Port Medical.  He worked for some time

2   at the Long Beach office; he worked for some time at the

3   San Pedro office.  He's going to testify to a couple of things.

4   He's going to explain that a short time after Port Medical

5   opened, some months after they opened, they had a backlog of

6   charts, and in fact, Port Medical shut down for one or two days

7   to try and deal with the backup of the paperwork.  Well, Kevin

8   Malone was called in and asked to complete some chart

9   paperwork.  And he came in, went to Port Medical, there were a

10  number of rooms in the back, went into a room and started to go

11  through the charts that he was being asked to complete.  As he

12  went through those, he noticed that he was being asked to

13  complete chart entries for things that had been billed for the

14  insurance for patients he hadn't seen.  He paused, he

15  confronted the defendant, Dave Gomez, in a room in the back of

16  Port Medical, and asked Dave Gomez, "I haven't seen these

17  patients."  Dave Gomez's response was to confirm to Mr. Malone

18  that he hadn't seen the patients, but that they were friends

19  and that he should go ahead and complete the charts.  You'll

20  hear from Kevin Malone that he went ahead and did that, went

21  ahead and completed those fabricated charts.

22      Now, you're also going to hear about a later conversation

23  that Kevin Malone had with defendant David Gomez, and this was

24  after law enforcement came in and searched the Port Medical

25  offices in August of 2013.  Kevin Malone was there shortly

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    after the search, saw some of the FBI agents come in and do the
 2    search.  He'll testify about a conversation that he had with
 3    the defendant shortly after that search.  He arranged to meet
 4    with the defendant at a Starbucks over in San Pedro.  They met.
 5    Kevin Malone, who was still concerned about the prior time when
 6    he had fabricated the charts, talked to the defendant and
 7    essentially said, "Look, we were the only two in that room.  I
 8    don't want to know everything you were doing, but I'll keep
 9    quiet if you'll keep quiet."  And you'll hear that the
10    defendant, David Gomez, agreed to that.
11         That's some of the evidence you will hear.  The evidence
12    will show you that the defendant participated and profited from
13    Port Medical's fraudulent billings, and on that basis, at the
14    end of the trial, we'll ask you to return a guilty verdict on
15    each of the 20 counts of mail fraud.
16         Thank you.
17         THE COURT:  Thank you, Counsel.
18         Counsel, do you want to make opening statement or reserve
19    it?
20         MR. ULTIMO:  Reserve, Your Honor.  Defendant would
21    like to reserve.
22         THE COURT:  Okay.
23         And then, Counsel, as far as the first witness goes, how
24    long will that be?
25         MR. CARDONA:  I expect it will take much longer than
```

```
 1    15 minutes, Your Honor.
 2              THE COURT:  Okay.  This is an exception, because we
 3    got started late, et cetera.  We're going to be breaking at
 4    this time.  From here on in, we'll work it all the way up to
 5    4:00 o'clock every day, but because of the scheduling, going to
 6    break at this time.
 7         We'll have you come back in tomorrow morning at?
 8              MULTIPLE JURORS:  8:30.
 9              JUROR NO. 8:  8:15.
10              THE COURT:  Well, some of you were listening.  I'm
11    impressed.  Yes, do come in at 8:15, because there are often
12    traffic problems, and if one person isn't here, say, for a half
13    hour, then we have 12 people that are inconvenienced for --
14    that's six hours.  It just really disrupts everything, and it's
15    going to make your trial much, much longer.  So come in a few
16    minutes early, and we'll get started right at 8:30 and we'll
17    move this case along.
18         Remember the admonishment not to discuss the case among
19    yourselves or with anybody else or form or express any opinions
20    about the matter until it's submitted to you and you retire to
21    the jury room.
22         With that admonition, have a pleasant evening.  Hopefully,
23    the Dodgers won't lose again to Montreal.  My understanding
24    is --
25              THE CLERK:  They're ahead.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          THE COURT:  Who's "they"?

2          THE CLERK:  Dodgers.

3          THE COURT:  And for those of you who aren't interested

4   in baseball, ignore me, but we'll see you back in tomorrow

5   morning at 8:15.

6      Thank you very much.

7          THE CLERK:  All rise.

8

9              *(Proceedings adjourned at 3:49 p.m.)*

10

11                     *--oOo--*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1

*CERTIFICATE*

2

3       *I hereby certify that pursuant to Section 753, Title 28,*

4   *United States Code, the foregoing is a true and correct partial*

5   *transcript of the stenographically reported proceedings held in*

6   *the above-entitled matter and that the transcript page format*

7   *is in conformance with the regulations of the*

8   *Judicial Conference of the United States.*

9

10  *Date:  NOVEMBER 20, 2016*

11

12

13

14                      */S/ SANDRA MACNEIL*

15                   *Sandra MacNeil, CSR No. 9013*

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA