1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                  - - - -

5

6

UNITED STATES OF AMERICA,        )

7                                 )

                  PLAINTIFF,      )

8                                 )

     vs.                          )    No. CR 15-629-RGK-2

9                                 )

DAVID GOMEZ,                      )

10                                )

                  DEFENDANT.      )

11  _____)

12

13

14        REPORTER'S TRANSCRIPT OF JURY TRIAL

15            DAY 2; PAGES 18 - 270

16        WEDNESDAY, OCTOBER 12, 2016

17              8:29 A.M.

18        LOS ANGELES, CALIFORNIA

19

20

21

22  _____

23     *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
       *Official Reporter, U.S. District Court*
24          *255 East Temple Street*
            *Los Angeles, CA  90012*
25              *213.894.5949*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**APPEARANCES OF COUNSEL:**


**FOR PLAINTIFF, UNITED STATES OF AMERICA:**

    OFFICE OF THE UNITED STATES ATTORNEY
    BY:  GEORGE S. CARDONA
       ASSISTANT UNITED STATES ATTORNEY
    312 NORTH SPRING STREET, SUITE 1100
    LOS ANGELES, CALIFORNIA  90012
    213.894.2434


**FOR DEFENDANT, DAVID GOMEZ:**

    ULTIMO LAW FIRM, PC
    BY:  PAUL J. ULTIMO
       ATTORNEY AT LAW
    7700 IRVINE CENTER DRIVE, SUITE 800
    IRVINE, CALIFORNIA  92618-3047
    949.851.0300


**ALSO PRESENT:**

    SPECIAL AGENT MARCUS VALLE, DEPARTMENT OF LABOR,
    OFFICE OF THE INSPECTOR GENERAL


    JEANNIE HENSCHEL

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

# I N D E X

**_GOVERNMENT'S WITNESSES:_**                                   **_PAGE_**

**_JOE VAIFANUA_**
   DIRECT EXAMINATION BY MR. CARDONA                    24
   CROSS-EXAMINATION BY MR. ULTIMO                      57
   REDIRECT EXAMINATION BY MR. CARDONA                  97

**_DANIEL BROWN_**
   DIRECT EXAMINATION BY MR. CARDONA                   102
   CROSS-EXAMINATION BY MR. ULTIMO              126, 143
   REDIRECT EXAMINATION BY MR. CARDONA                 149
   RECROSS-EXAMINATION BY MR. ULTIMO                   150

**_RONALD CATALDO_**
   DIRECT EXAMINATION BY MR. CARDONA                   152
   CROSS-EXAMINATION BY MR. ULTIMO                     159

**_PANDORA FISTONICH_**
   DIRECT EXAMINATION BY MR. CARDONA                   165
   CROSS-EXAMINATION BY MR. ULTIMO                     219
   REDIRECT EXAMINATION BY MR. CARDONA                 257

## T R I A L   E X H I B I T S

**_EXHIBIT NUMBER_**                    **_RECEIVED IN EVIDENCE_**

   27                                   189

   30                                   203

   52                                   188

   54                                   201

   61                                   202

   62                                   203

   75, page 222                         236

   92, page 25                          106

   92, page 28                          108

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

|     | *T R I A L   E X H I B I T S* (Continued) | |
| --- | --- | --- |
|     | **EXHIBIT NUMBER** | **RECEIVED IN EVIDENCE** |
| 1   | | |
| 2   | | |
| 3   | 92, page 29 | 108 |
| 4   | 92, page 35 | 110 |
| 5   | 92, page 36 | 110 |
| 6   | 92, page 49 | 111 |
| 7   | 92, page 53 | 112 |
| 8   | 92, page 81 | 113 |
| 9   | 92, page 82 | 114 |
| 10  | 93, pages 1, 2 | 136 |
| 11  | 96, pages 1, 2, 3 | 133 |
| 12  | 96 (all) | 154 |
| 13  | 97 | 156 |
| 14  | 117 | 44 |
| 15  | 122 | 40 |
| 16  | 124 | 51 |
| 17  | 126 | 51 |
| 18  | 127 | 51 |
| 19  | 128 | 51 |
| 20  | 129 | 48 |
| 21  | 130 | 212 |
| 22  | 135 | 213 |
| 23  | 141 | 218 |
| 24  | 147 | 194 |
| 25  | 201 | 207 |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

*T R I A L   E X H I B I T S (Continued)*

| EXHIBIT NUMBER | RECEIVED IN EVIDENCE |
|---|---|
| 202 | 210 |
| 203 | 192 |
| 211 | 31 |
| 217 | 168 |
| 218 | 47 |
| 219 | 200 |
| 220 | 45 |
| 259 | 25 |
| 262 | 149 |
| 263, page 1 | 145 |
| 273, page 25 | 36 |
| 273, page 27 | 38 |
| 273, page 50 | 196 |
| 273, page 45 | 197 |
| 322, page 2 | 119 |
| 322, page 3 | 124 |
| 322, page 4 | 126 |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 12, 2016

 2                                  8:29 A.M.

 3                                  - - - -

 4        (In the presence of the jury:)

 5             THE COURT:  Okay.  The record will reflect that all

 6    the members of the jury are in their respective seats in the

 7    jury box, including the alternate.

 8             Ladies and gentlemen, you're golden today, right on time.

 9    We got a record going here, so hopefully we can keep it up.

10    Thank you very much for being on time.  This is going to make

11    us be much more efficient as far as trying the case and getting

12    it to you sooner.

13             Ready to go?

14             MULTIPLE JURORS:  Yes.

15             THE COURT:  Okay.  Now, we've gotten to the point now

16    where we're presenting the evidence, witnesses, et cetera.

17    This is the evidence that you are to use to decide what the

18    facts of the case are.  So from here on in, it's all evidence

19    that's going to be coming in.

20             Counsel, you ready to proceed?

21             MR. CARDONA:  Yes, Your Honor.

22             MR. ULTIMO:  Yes, Your Honor.

23             THE COURT:  Thank you.

24        You may inquire, Counsel.

25             MR. CARDONA:  Your Honor, we call Joe Vaifanua to the
```

```
 1    stand.

 2            THE COURT:  Okay.

 3            THE CLERK:  Right here to be sworn.  That's fine.  Can

 4    you please raise your right hand.

 5        You do solemnly swear the testimony that you are about to

 6    give in the matter now before the Court shall be the truth, the

 7    whole truth, and nothing but the truth, so help you God?

 8            THE WITNESS:  Yes.

 9            THE CLERK:  Thank you.  You may be seated.  You can

10    adjust the microphone as you need to.

11        May I please ask that you state your full name for the

12    record and spell your last name.

13            THE WITNESS:  Full name is Joe Vaifanua.  Last name V,

14    like Victor, a-i-f, like Frank -- -a-n-u-a.

15            THE CLERK:  Thank you.

16            THE COURT:  Thank you.

17        Counsel, you may inquire.

18            MR. CARDONA:  Thank you.

19                    JOE VAIFANUA, GOVERNMENT'S WITNESS,

20                           DIRECT EXAMINATION

21    BY MR. CARDONA:

22    Q.   Mr. Vaifanua, what do you do for a living?

23    A.   I'm a longshoreman.

24    Q.   And how long have you been a longshoreman?

25    A.   A little over 16 years.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Where do you live?

2   A.   Torrance, California.

3   Q.   And where do you work as a longshoreman?

4   A.   The L.A. and Long Beach ports.

5   Q.   Do you have kids?

6   A.   Yes, I do.

7   Q.   How many?

8   A.   I have six.

9   Q.   What are their names?

10   A.   My oldest is Hazey.  Hazey, Dazey, Faith, Laloifi and

11   Josiah.

12   Q.   Now, are you testifying here today pursuant to a court

13   order granting you immunity?

14   A.   Yes, I am.

15        MR. CARDONA:  And Your Honor, I would offer

16   Exhibit 259.

17        THE COURT:  Okay.  No objection, it will be received.

18        MR. CARDONA:  May I display it?

19        MR. ULTIMO:  One moment.  259?  No objection.

20        THE COURT:  Okay.  It may be received, Counsel.

21     (Received in evidence, Trial Exhibit 259.)

22   BY MR. CARDONA:

23   Q.   Mr. Vaifanua, I've put up there on the stand Exhibit 259.

24   Is that the court order that was issued granting you immunity?

25   A.   Yes, it is.

1    Q.   And did you have a chance to discuss this with your

2    counsel?

3    A.   Yes, I did.

4    Q.   Do you understand the terms of this order?

5    A.   Yes, I do.

6    Q.   Do you understand that under this order, basically says

7    you have to testify?

8    A.   Yes.

9    Q.   With the understanding that your testimony can't be used

10   against you in any criminal prosecution?

11   A.   Yes.

12   Q.   But do you understand that it can still be used to

13   prosecute you for perjury or for false statements?

14   A.   Yes.

15   Q.   Now, let's go back to your time as a longshoreman.  As a

16   longshoreman working in Long Beach and Los Angeles ports, did

17   you know someone named Sergio Amador?

18   A.   Yes, I did.

19   Q.   How did you know him?

20   A.   From work.  From work.

21   Q.   Had you worked with him?

22   A.   Yes.

23   Q.   What local are you a member of?

24   A.   Local 13.

25   Q.   And what does that local cover?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    I'm not sure of the question, what they cover.

 2   Q.    What kind of longshoremen are in Local 13?

 3   A.    Your -- your laborers.

 4   Q.    Was Mr. Amador also a member of that local?

 5   A.    Yes.

 6   Q.    Did you also know David Gomez?

 7   A.    Yes.

 8   Q.    How did you know him?

 9   A.    We worked together on occasions.

10   Q.    Was he also a member of Local 13?

11   A.    Yes.

12   Q.    Did you also know someone named Chris Rice?

13   A.    Yes.

14   Q.    How did you know him?

15   A.    He's one of the foremens down there at the docks.

16   Q.    Is there a different local for foremen?

17   A.    Yes, there is.

18   Q.    What's that local?

19   A.    Local 94.

20   Q.    Do you see Mr. Gomez here in court today?

21   A.    Yes, I do.

22   Q.    Can you point him out and tell us an article of clothing

23   he's wearing?

24   A.    It's David at the end right there.

25         THE COURT:  Indicating the defendant, Counsel.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. CARDONA:   Thank you.
 2   Q.   Now, through your union -- and was that the International
 3   Longshore and Warehouse Union you were a member of?
 4   A.   Yes, it is.
 5   Q.   Now, through that union, did you receive health insurance?
 6   A.   Yes, I did.
 7   Q.   What kind of health insurance did you have?
 8   A.   We had a Coastwise Indemnity Plan.
 9   Q.   Was it an HMO or a PPO?
10   A.   It was a PPO.
11   Q.   And did that mean that you could choose where to go?
12   A.   Yes.
13   Q.   Did you have to contribute anything to get your health
14   insurance benefits?
15   A.   No.
16   Q.   Who paid for it?
17   A.   The employer.
18   Q.   And who was the employer?
19   A.   Pacific Maritime Association.
20   Q.   And what's that?
21   A.   That's our employer.  It's commonly known as PMA.
22   Q.   Now, were your kids also covered by your union insurance?
23   A.   Yes.
24   Q.   Did your insurance cover chiropractic?
25   A.   Yes, it did.
```

```
1    Q.   Was there any limit on your chiropractic coverage?

2    A.   Any women?

3    Q.   Sorry.  Were there any specific number of visits that you

4    were allowed under your contract?

5    A.   I believe it's 40 a year.

6    Q.   Did you have to pay anything for those visits, any co-pay

7    or any deductible?

8    A.   No.

9    Q.   Were they all covered by your insurance?

10   A.   Yes.

11   Q.   Now, at some point while you were working as a

12   longshoreman, did you learn about a clinic in Long Beach called

13   Port Medical?

14   A.   Yes, I did.

15   Q.   Do you remember when that was?

16   A.   I can't be sure of the year, but yeah, I remember where.

17   Q.   We'll come to some documents about that in a second, but

18   how did you learn about Port Medical?

19   A.   Through Sergio.

20   Q.   That's Sergio Amador?

21   A.   Yes.

22   Q.   What happened?

23   A.   He just approached me at the hall, dispatch hall, said he

24   had a clinic, and if I needed anything, to come, come through

25   and set up an appointment with them.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Did he tell you whether you'd get anything in return for

2    going for visits?

3    A.   He mentioned that he can -- he'll hook it up.

4    Q.   Were those the words he used?

5    A.   I believe so, yes.

6    Q.   What did you understand that to mean?

7    A.   Some compensation for visiting or going through his

8    clinic.

9    Q.   Were you familiar with that, receiving compensation for

10   going to various medical facilities?

11   A.   Not personally, but through rumors and, in the union, at

12   work.  I knew what it -- I knew what it was.

13   Q.   Putting aside Port Medical for a second, have you been

14   paid to go get other medical services?

15   A.   Yes.

16   Q.   What types of things have you been paid to go do?

17   A.   Endoscopy, sleep apnea test, hand surgery, podiatry.

18   Q.   Now, did that happen before or after you went to Port

19   Medical for the first time?

20   A.   It happened after.

21   Q.   Now, did you agree to go to Port Medical?

22   A.   Yes.

23   Q.   And did you in fact go?

24   A.   Yes, I did.

25              MR. CARDONA:  Your Honor, I'd offer Exhibit 211 into

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    evidence.

2              MR. ULTIMO:  Just one moment.

3              THE COURT:  Counsel, the next break you could indicate

4    which exhibits you wish to enter so we don't have to wait

5    around and defense counsel will have a chance to know what

6    you're going to be introducing.

7              MR. ULTIMO:  No objection.

8              MR. CARDONA:  May I display it, Your Honor?

9              THE COURT:  Sorry?

10             MR. CARDONA:  May I display it?

11             THE COURT:  Yes.  It may be received.

12         (Received in evidence, Trial Exhibit 211.)

13   BY MR. CARDONA:

14   Q.   Do you recognize this photograph, Exhibit 211?

15   A.   Yes, I do.

16   Q.   What is it?

17   A.   The Port Medical office in Long Beach.

18   Q.   Is that where you went?

19   A.   Yes.

20   Q.   Now, the first time you went there, what happened?

21   A.   First time I went there, it was a -- just your regular

22   orientation, I would say.  Filled out some papers and -- and I

23   believe I just did like a routine checkup through their --

24   their facility.

25   Q.   Did you see a chiropractor?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes, I did.

 2    Q.    Was that what you got there, chiropractic services?

 3    A.    That and a few massages.

 4    Q.    Did you take your kids with you the first time you went?

 5    A.    No, not the first time.

 6    Q.    Did you ever take your kids there after that?

 7    A.    Yes.

 8    Q.    Why?

 9    A.    I was asked, you know, if I wanted to bring my kids

10    through, too, then I can do so, and so I did.

11    Q.    If you could bring your kids through for what?

12    A.    For massages and just treatment there, basic chiropractor

13    treatment.

14    Q.    Did you speak to somebody about bringing your kids in?

15    A.    Yeah.

16    Q.    Who?

17    A.    Sergio.

18    Q.    And what did he tell you about your kids' visits?

19    A.    He said yeah, bring them through.

20    Q.    Did he offer to hook you up for them as well?

21    A.    Yes.

22    Q.    And what did you understand that to mean?

23    A.    Compensation for bringing them through their clinic.

24    Q.    When you went to Port Medical, did you have to sign in?

25    A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Can you describe the inside of Port Medical?

2   A.   Small clinic office.

3   Q.   Was there a reception room?

4   A.   Not a reception room.  I guess the little lobby had the

5   reception's office right there at the desk.

6   Q.   And was there a sign-in sheet?

7   A.   Yes, there was.

8   Q.   Was it a typical medical office sign-in sheet that had

9   stickers you signed in on?

10  A.   Yeah.  Yeah.

11  Q.   Did you sign in?

12  A.   Yes, I did.

13  Q.   Were there occasions when you signed more than once?

14  A.   Yes.

15  Q.   How did that happen?

16  A.   I was approached by Sergio, and he said, "If you don't

17  mind, would you just sign in the sheet, so every time you come

18  in, you don't have to do it?"

19  Q.   Now, did you also sign stickers for times that you

20  actually didn't go?

21  A.   Yes, I did.

22  Q.   Did you sign stickers for your kids?

23  A.   Yes.

24  Q.   Did you sign stickers for times that your kids didn't go?

25  A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Did you know that that was going to be used to bill the

2   insurance?

3   A.   Yes, I did.

4   Q.   Even though you hadn't gone?

5   A.   Yes.

6   Q.   How did you get paid?

7   A.   You talking about what kind of cash?

8   Q.   How did you get paid in return for signing the stickers

9   and letting them bill using your information?

10  A.   I got paid cash.

11  Q.   Who paid you?

12  A.   Sergio.

13  Q.   Where did you get paid?

14  A.   It would either be at a parking lot at the hall or at a

15  place called The Bistro in San Pedro.

16  Q.   What was The Bistro in San Pedro?

17  A.   A bistro, little cafe kind of restaurant.

18  Q.   Did you know who owned and controlled The Bistro?

19  A.   To my knowledge, I knew that Sergio and Dave were

20  co-owners.

21  Q.   Is that Dave Gomez?

22  A.   Yes, it is.

23  Q.   Did Dave Gomez have any connection to Port Medical?

24  A.   I -- yes.

25  Q.   How did you find that out?

```
 1    A.    Through Sergio.

 2    Q.    What did he tell you?

 3    A.    He's partners with Dave.

 4    Q.    Did you ever see Dave at Port Medical, Dave Gomez?

 5    A.    Yes, once.

 6    Q.    Did you talk to him?

 7    A.    Yes, I did.

 8    Q.    What did he tell you?

 9    A.    I only seen Dave at Port Medical one time, and that was to

10    receive a check from him.

11    Q.    So you mentioned that you got paid in cash.  Were there

12    occasions when you also got paid with checks?

13    A.    I believe there were two occasions where I got paid with

14    checks.

15          MR. CARDONA:  And Your Honor, if I may show counsel

16    the exhibit.

17          THE COURT:  Yes.

18          MR. ULTIMO:  No objection.

19          MR. CARDONA:  Your Honor, I'd offer Exhibit 273, page

20    25.

21          THE COURT:  273, page 25?

22          MR. CARDONA:  Yes.

23          MR. ULTIMO:  No objection, Your Honor.

24          THE COURT:  May be received.

25          MR. CARDONA:  May I display it?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Yes.

 2          (Received in evidence, Trial Exhibit 273, page 25.)

 3   BY MR. CARDONA:

 4   Q.   So I'm going to go ahead and blow up the check portion of

 5   this so we can see it.

 6          So Mr. Vaifanua, looking at -- sorry, wrong -- my

 7   apologies.

 8          Your Honor, I mis- -- I believe I misspoke.  It should

 9   have been 273, page 25.

10              THE COURT:  Okay.

11              MR. ULTIMO:  There's no objection.  I believe that's

12   what he said.

13              THE COURT:  Okay.  Thank you, Counsel.

14              MR. CARDONA:  I missed a button, Your Honor.  My

15   apologies.

16   Q.   So, Mr. Vaifanua, can you see that on the screen in front

17   of you?

18   A.   Yes.

19   Q.   Is this one of the checks you received in payment?

20   A.   Yes.

21   Q.   You see it says "Pay to the order of Joe Vafianua."  Does

22   that appear to be a misspelling of your name?

23   A.   Yes, it is.

24   Q.   How did you get this check?

25   A.   I received it from Dave.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   How did it come about that you received it from Dave --
 2              THE COURT:  Dave is Mr. Gomez, the defendant?
 3              THE WITNESS:  Yes, it is.
 4              THE COURT:  Okay.
 5   BY MR. CARDONA:
 6   Q.   How did it come about that you received it from David
 7   Gomez instead of Sergio Amador?
 8   A.   Sergio wasn't available.
 9   Q.   Did you talk with Sergio to arrange that?
10   A.   Yes.
11   Q.   What did he tell you?
12   A.   He said, "I can't make it, but David will meet you and
13   will give you the check."
14   Q.   And what was this check in payment for?
15   A.   For visits.  To the clinic.
16   Q.   It was for visits that didn't really occur?
17   A.   It could have been, yes.
18   Q.   How did you keep track of what you should be paid?
19   A.   Through my EOB.
20   Q.   What's an EOB?
21   A.   The bill statements.
22   Q.   How did you get those?
23   A.   The insurance company sent them to me.
24   Q.   And what would you do when you got those EOBs?
25   A.   Take them to Sergio, and he'd pay me for the EOBs that
```

```
 1    they charged.
 2    Q.   And for some of those EOBs, were they for visits that
 3    hadn't really happened?
 4    A.   Yes.
 5    Q.   Was that for both you and your kids?
 6    A.   Yes.
 7    Q.   Now, was there another occasion when you also got paid by
 8    check?
 9    A.   Yes, there was.
10         MR. CARDONA:  Your Honor, I'd offer Exhibit 273, page
11    27.
12         MR. ULTIMO:  No objection.
13         THE COURT:  It will be received.
14       (Received in evidence, Trial Exhibit 273, page 27.)
15         MR. CARDONA:  Going to again blow up the check
16    portion.
17    Q.   Is Exhibit 273, page 27, another check that you received
18    from Port Medical?
19    A.   Yes.
20    Q.   Now, you'll see that the check is actually from a company
21    called DCS Medical Management.  Do you recognize that name?
22    A.   No, I don't.
23    Q.   How did you get this check?
24    A.   From Sergio.
25    Q.   Where did you pick it up?
```

```
 1    A.    At the office, the Long Beach clinic.

 2    Q.    Now, down here in the bottom left, I'm going to highlight

 3    it for you, you see the word "plumbing"?

 4    A.    Yes.

 5    Q.    Were you a plumber?

 6    A.    No, I wasn't.

 7    Q.    Did you provide any plumbing services to DCS Medical

 8    Management or Port Medical?

 9    A.    No, I did not.

10    Q.    Did you ask for that to be written on the check?

11    A.    No.

12    Q.    Now, you mentioned that you were also paid in cash.  About

13    how much did you receive in cash?

14    A.    25- to 3,000 in cash, aside from the checks.

15    Q.    Now, how long did you get paid for having signed the

16    sign-in stickers and allowing them to bill using your

17    information?

18    A.    About a little over a year.  About a year.

19    Q.    Why did you stop?

20    A.    I just stopped.  Just stopped.

21    Q.    What I'd like to do is show you your chart from Port

22    Medical.

23          And Counsel, if I could, I'd like to offer Exhibit 122,

24    which is his Port Medical chart.

25               MR. ULTIMO:  The whole chart?  No objection.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Be received.

 2          (Received in evidence, Trial Exhibit 122.)

 3              MR. CARDONA:  If I may, Your Honor, may I display

 4   various pages from that?

 5              THE COURT:  Yes, you may.

 6   BY MR. CARDONA:

 7   Q.   Mr. Vaifanua, I'm showing you the first page of Exhibit

 8   122, and do you see your name down at the bottom?

 9   A.   Yes, I do.

10   Q.   Is that misspelled the same way as it was on the checks?

11   A.   Yes.

12   Q.   And is that your birth date next to it?

13   A.   Yes.

14   Q.   Going to show you page 7.  Trying to blow up a portion.

15   It's titled "Chiropractic Benefit Claim Form."

16   A.   Yes.

17   Q.   And down at the bottom, is that your signature?

18   A.   Yes.

19   Q.   Now, you see there the date, October 6, 2009?

20   A.   Yes.

21   Q.   Do you recall, was that the date you first went in?

22   A.   I can't recall that's the exact date, but -- I mean, it's

23   been a long time.

24   Q.   You remember if this is some of the paperwork you filled

25   out when you first went in, or do you just not recall?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  A.   Yes, that's some of the paperwork, yes.

2  Q.   Going to show you page 12, blow up this portion.  Is that

3  your driver's license?

4  A.   Yes.

5  Q.   Were you asked to give that to them to photocopy?

6  A.   Yes.

7  Q.   And what's this portion of that page?

8  A.   That's my worker's ID, employee ID.

9  Q.   And were you asked to give them a copy of this as well?

10  A.   Yes.

11  Q.   Finally, down here at the bottom, what's this?

12  A.   That's a --

13  Q.   Realize it's kind of hard to read --

14  A.   Yeah.

15  Q.   -- and faded, but --

16  A.   Looks like my insurance card.

17  Q.   Did you have a card that you got from your insurance plan?

18  A.   Yes.

19  Q.   And were you insured by the ILWU-PMA plan, self-funded

20  plan?

21  A.   Yes.

22  Q.   You see below that there's a reference to ILWU-PMA

23  Coastwise Indemnity Plan.  Earlier you mentioned Coastwise.

24  Was that what you understood to be your insurance?

25  A.   Yes.

1    Q.   On page 9 of the exhibit, there's a document entitled

2    "Informed Consent to Chiropractic Treatment."  Down at the

3    bottom, is that your signature?

4    A.   Yes.

5    Q.   Was this another of the forms you were asked to fill out?

6    A.   Yes.

7    Q.   So I'd like to turn back to page 16.  And we'll blow up

8    certain portions of this, but before I do that, Mr. Vaifanua,

9    when you were going to Port Medical, did you see your chart?

10   A.   My medical chart or my sign-in chart?

11   Q.   Your medical chart.  Did they show it to you?

12   A.   No.

13   Q.   Did you see what they were filling out in your chart?

14   A.   No, I didn't.

15   Q.   Over on the right, I'm going to try and blow this up a

16   little, you see all those signatures?

17   A.   Yes, I do.

18   Q.   Are those stickers that you signed?

19   A.   Yes.

20   Q.   Now, if you look at sticker 14 and sticker 1, they're very

21   different.

22   A.   Yes.

23   Q.   Did you write both of those?

24   A.   Yes, I did.

25   Q.   Is one printing and the other your signature?

1   A.   Yes.

2   Q.   Now, this shows a total of -- over on the left, seems to

3   show a total of 21 visits.  Did you go to Port Medical 21

4   times?

5   A.   No, I didn't.

6   Q.   About how many times do you think you went?

7          MR. ULTIMO:  Speculation, Your Honor.  Excuse me.

8   Speculation.

9          THE COURT:  You can give us an estimate.  You don't

10  know the exact number of times, do you?

11         THE WITNESS:  No, I don't know the exact.

12         THE COURT:  You can give us an estimate.

13         THE WITNESS:  Say about five, six times.

14  BY MR. CARDONA:

15  Q.   So are the rest of these signatures signatures that you

16  provided to Mr. Amador?

17  A.   Yes.

18  Q.   For times that you didn't go?

19  A.   Yes.

20         MR. CARDONA:  Your Honor, at this time I would offer

21  Exhibit 117, which is the appointment book from Port Medical.

22         THE COURT:  117?

23         MR. CARDONA:  Yes, Your Honor.

24         MR. ULTIMO:  The entire book?

25         MR. CARDONA:  Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ULTIMO:  No objection.

 2              THE COURT:  Be received.

 3         (Received in evidence, Trial Exhibit 117.)

 4              MR. CARDONA:  If I could, Your Honor, I'd like to pull

 5    up page 67 and display that for the witness.

 6              THE COURT:  Okay.

 7    BY MR. CARDONA:

 8    Q.   So from page 67 of Exhibit 117, going to blow up an entry

 9    at the top left:  Kevin.  Do you recognize that name?

10    A.   No.

11    Q.   Was there a chiropractor at Port Medical?

12    A.   Yes, there was.

13    Q.   Does the name Kevin Malone ring a bell?

14              THE COURT:  If it does.

15              THE WITNESS:  Not really.

16              THE COURT:  Okay.

17    BY MR. CARDONA:

18    Q.   Now, under "Kevin" in this column, there's a list of

19    names.  Do you see those highlighted?

20    A.   Yes.

21    Q.   Dazey, Hazey, Faith, Laloifi, Josiah.  Are those the names

22    of five of your kids?

23    A.   Yes.

24    Q.   Up at the top there's a date, Tuesday, October 6th.  Do

25    you remember, did you take your kids in on Tuesday, October
```

1   6th?

2   A.   I don't remember.

3   Q.   Now, turning to the next page, Exhibit 117, page 68, see

4   at the top there's the same date, Tuesday, October 6th?

5   A.   Yes.

6   Q.   And over on the right there's a series of entries under

7   the word "Yoli."  Do you see that?

8   A.   Yes, I do.

9   Q.   And again, are those your kids' names?

10   A.   Yes, they are.

11   Q.   And is the last name there David Gomez?

12   A.   Yes, it is.

13           MR. CARDONA:  Your Honor, at this time I'd offer

14   Exhibit 220, a photograph.

15           MR. ULTIMO:  No objection, Your Honor.

16           THE COURT:  Be received.

17           MR. CARDONA:  I'm going to pull that up on the left,

18   assuming I can figure this out.

19       (Received in evidence, Trial Exhibit 220.)

20   BY MR. CARDONA:

21   Q.   Looking at Exhibit 220, do you recognize that photograph?

22   A.   No, I don't.

23   Q.   Did she ever give you a massage?

24   A.   No.  I don't remember her face.

25   Q.   To your knowledge, did she ever give your kids a massage?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   A.   No, I couldn't answer that.  I don't remember even seeing
2   that person.
3   Q.   How many times did you take your kids to Port Medical?
4   A.   Maybe twice.  Twice.  Maybe three times, but twice for
5   sure.
6   Q.   Why do you remember twice for sure?
7   A.   Because I remember them liking the foot massage and the --
8   the little lobby area.
9   Q.   What do you mean by that?  What happened when you took
10  your kids?
11  A.   They were given little treats while they were waiting, and
12  they had little -- you soak your feet in, so they were given
13  little foot massages in there.
14  Q.   Did they ever get full massages?
15  A.   I don't believe so.
16  Q.   Why not?
17  A.   Because I'm particular on that.
18  Q.   What do you mean?
19  A.   I don't like people touching my kids.
20  Q.   Let me go back to your chart.  Pulled up page 15 of your
21  chart, and do you see here there's an additional two entries?
22  A.   Yes.
23  Q.   And are those again your signatures on the right?
24  A.   Yes.
25  Q.   I'm going to go up one page, to page 14 of your chart.  Do
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   you see that here there appear to be five entries?

2   A.   Yes.

3   Q.   And again, those signatures on the right, are those yours?

4   A.   Yes.

5   Q.   I'm just going to pick one of these and blow it up.  This

6   appears to be an entry for the date June 7th, 2010, and do you

7   see over there on the right the initials --

8   A.   Yes.

9   Q.   -- "P.H."?

10   A.   Yes.

11   Q.   Were you ever massaged by a person named Pandora Hall?

12   A.   Pandora.  Not that I recall.

13          MR. CARDONA:  Your Honor, I'd offer Exhibit 218,

14   another photograph.

15          MR. ULTIMO:  No objection, Your Honor.

16          THE COURT:  Be received.

17          (Received in evidence, Trial Exhibit 218.)

18   BY MR. CARDONA:

19   Q.   Looking at Exhibit 218, do you recognize that photograph?

20   A.   No, I don't.

21   Q.   Do you recall ever being massaged by that woman?

22   A.   No, I don't.

23   Q.   So going back to your chart, going up one more page, to

24   page 13, I'll pick another one of these to blow up.  Does this

25   again appear to have five more entries?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Yes, it is.

2    Q.   And again, those signatures on the right, do those appear

3    to be your signatures?

4    A.   Yes.

5    Q.   So I've blown up an entry dated November 23rd, 2010, and

6    again, do you see the initials "P.H."?

7    A.   Yes, I do.

8    Q.   And again, were you ever massaged, to your memory, by

9    Pandora Hall?

10   A.   To my memory, no.

11   Q.   Now, adding up the entries I've shown you, 21 on the first

12   page, two on the second, five on the third, five on the fourth,

13   that seems to add up to 33.  Did you go to Port Medical 33

14   times?

15   A.   No, I didn't.

16   Q.   I'd like to turn to examining one of the charts of one of

17   your children for a second.

18        And Your Honor, I'd offer Exhibit 129, a chart for Josiah

19   Vaifanua.

20             MR. ULTIMO:  No objection, Your Honor.

21             THE COURT:  Be received.

22        (Received in evidence, Trial Exhibit 129.)

23   BY MR. CARDONA:

24   Q.   Looking at page 1, at the bottom, is that the name of one

25   of your children?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.

2    Q.    And to the right of that, is that his birthday?

3    A.    Yes.

4    Q.    November 16th, 2004?

5    A.    Yes.

6    Q.    Going to go to page 4 of this exhibit.  Look again at the

7    Chiropractic Benefit Claim Form in this file.  Do you see here

8    the portion I've blown out where it has the patient's name

9    blank, but it's filled in the patient's date of birth?  Is that

10   Josiah's birthday?

11   A.    Yes, it is.

12   Q.    Down at the bottom, is that your signature?

13   A.    Yes, it is.

14   Q.    Did you fill this paperwork out as well when you went to

15   Port Medical?

16   A.    Yes.

17   Q.    Did you fill this type of paperwork out for all your

18   children when you went to Port Medical?

19   A.    I believe so.

20   Q.    Going to go back to page 14 of this exhibit.  Over on the

21   right, I'm going to blow up a series of signatures.  Is that

22   all your writing?

23   A.    Yes, it is.

24   Q.    Are these all stickers that you signed for your child at

25   Port Medical?

```
 1    A.    Yes.

 2    Q.    Did he go to Port Medical that many times?

 3    A.    No, he didn't.

 4    Q.    Over on the left, do you see it appears to total 19?

 5    A.    Yes.

 6    Q.    Do you know what that red dot to the left of the entries

 7    means?

 8    A.    No, I don't.

 9    Q.    I'd like to go up one page.  Do you see there's another

10    series of five entries?

11    A.    Yes.

12    Q.    And the stickers on the right, is that your writing on all

13    of those?

14    A.    Yes, it is.

15    Q.    Going to blow up one of these in the middle.  Again, on

16    the entry that's June 14th, 2010, you see the initials "P.H."?

17    A.    Yes.

18    Q.    To your knowledge, was your son ever massaged by Pandora

19    Hall?

20    A.    No, he wasn't.

21    Q.    Going to go up one more page, and again, on the right

22    you'll see a series of signature stickers.  Is that your

23    writing on those?

24    A.    Yes.

25    Q.    Going to blow up the one in the middle, November 23rd,
```

1   2010.  Does that again have the initials "P.H."?

2   A.   Yes.

3   Q.   So again, totaling up the entries I've shown you, 19 on

4   one page, five on the second, three on the third, that totals

5   up to 27.  Did your son go to Port Medical 27 times?

6   A.   No, he didn't.

7   Q.   Did he receive massages 27 times?

8   A.   No, he didn't.

9        MR. CARDONA:  Your Honor, at this time I'd offer

10  Exhibits 124, chart for Laloifi Vaifanua; 126, the chart for

11  Faith Vaifanua; 128, the chart for Dazey Vaifanua; and 127, the

12  chart for Hazey Vaifanua.

13       MR. ULTIMO:  No objection, Your Honor.

14       THE COURT:  They'll be received.

15       *(Received in evidence, Trial Exhibits 124, 126,*

16       *127 and 128.)*

17  BY MR. CARDONA:

18  Q.   Pulling up Exhibit 124, page 1, is that the name of one of

19  your children?

20  A.   Yes.

21  Q.   And is that -- is that his or her?

22  A.   That's a "him."

23  Q.   Okay.  Is that his birth date?

24  A.   Yes, it is.

25  Q.   I'd like to turn over to page 13.  On the right, a series

1    of signature stickers.  Is that all your writing?

2    A.    Yes.

3    Q.    Did you sign those for your child?

4    A.    Yes.

5    Q.    On the left, a series of entries.  There appear to be 19

6    entries; is that correct?

7    A.    Yes.

8    Q.    Going up one page, does that reflect entries for another

9    five visits?

10   A.    Yes.

11   Q.    And again is that your writing in the signature stickers

12   on the right?

13   A.    Yes, it is.

14   Q.    Going up one more page, does that indicate another four

15   visits?

16   A.    Yes.

17   Q.    Is that your writing on the right?

18   A.    Yes.

19   Q.    I'll blow up one.  Again, for November 16th, do you see

20   the initials "P.H."?

21   A.    Yes.

22   Q.    Was Laloifi Vaifanua, to your knowledge, ever massaged by

23   Pandora Hall?

24   A.    No.

25   Q.    So totaling that up, 19 plus five plus four, that appears

```
 1   to be 28 visits.  Did Laloifi Vaifanufa -- Vaifanua, my
 2   apologies, go to Port Medical 28 times?
 3   A.    No, he didn't.
 4   Q.    Did he receive 28 massages there?
 5   A.    No.
 6   Q.    Turning to Exhibit 126, Faith Vaifanua, is that the name
 7   of one of your daughters?
 8   A.    Yes.
 9   Q.    And is that her birth date, April 11th, 2000?
10   A.    Yes.
11   Q.    Turning to page 11, on the right, there are a series of
12   signature stickers.  Is that all your writing?
13   A.    Yes.
14   Q.    On the left, there are entries for what appear to be a
15   total of 18 visits; is that right?
16   A.    Yes.
17   Q.    Moving up one page, does this appear to be entries for
18   another five visits?
19   A.    Yes.
20   Q.    And again, is that your writing on the right?
21   A.    Yes.
22   Q.    Now, this is Faith's chart.  Up at the top right, do you
23   see that sticker?
24   A.    Yes.
25   Q.    Does that say Dazey Vaifanua?
```

1    A.    Yes.

2    Q.    And is that your writing as well?

3    A.    Yes.

4    Q.    Moving up one more page, series of three entries.  Is that

5    your writing in the stickers on the right?

6    A.    Yes.

7    Q.    Going to blow one up, an entry for November 23rd, 2010.

8    Do you see the initials "P.H."?

9    A.    Yes.

10   Q.    Was Faith Vaifanua ever massaged by Pandora Hall?

11   A.    No.

12   Q.    Again, adding up the visits, we've seen 18 plus five plus

13   three.  That appears to be 26.  Did Faith Vaifanua visit Port

14   Medical 26 times?

15   A.    No.

16   Q.    Did she receive 26 massages?

17   A.    No.

18   Q.    Turning to Dazey Vaifanua's chart, is that her name at the

19   bottom?

20   A.    Yes.

21   Q.    Do you see there's no birth date on this entry?

22   A.    Yes.

23   Q.    Turning to page 2 of the chart, you see a form titled

24   "Consent to Treatment of Minor Child"?

25   A.    Yes.

1    Q.   Turning over to page 4, there is a form titled

2    "Chiropractic Registration and History," and here there's an

3    entry.  Is that Dazey's birth date?

4    A.   Yes.

5    Q.   Turning over to page 12, series of signature stickers on

6    the right.  Is that your handwriting?

7    A.   Yes.

8    Q.   And on the left, what appears to be entries for a total of

9    19, less two, is 17 visits.  Do you see that?

10   A.   Yes.

11   Q.   Going up one page, does that appear to be another --

12   entries for another five visits?

13   A.   Yes.

14   Q.   Is that your writing on the stickers on the right?

15   A.   Yes.

16   Q.   Going up one more page, does that appear to be entries for

17   another three visits?

18   A.   Yes.

19   Q.   And is that your writing in the stickers on the right?

20   A.   Yes.

21   Q.   Going to blow up one of the entries on this page, page 10,

22   again an entry for November 23rd, 2010.  Do you see the

23   initials "P.H."?

24   A.   Yes.

25   Q.   Was Dazey Vaifanua ever massaged by Pandora Hall?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   No.

2   Q.   So totaling that up, 17 from the first page, five from the

3   second, three from the third, totals 25.  Did Dazey Vaifanua go

4   to Port Medical 25 times?

5   A.   No.

6   Q.   Did she receive 25 massages?

7   A.   No.

8   Q.   Finally, I'm going to turn to Hazey Vaifanua's chart,

9   Exhibit 127.  Is that her birth date at the bottom, 5/23/98?

10   A.   Yes.

11   Q.   Turning back to page 15, the handwriting in the signature

12   stickers on the right, is that yours?

13   A.   Yes.

14   Q.   And on the left, there appear to be entries for 19 visits.

15   A.   Yes.

16   Q.   Going up one page, do there appear to be entries for

17   another five visits?

18   A.   Yes.

19   Q.   And is that your writing in the signature stickers on the

20   right?

21   A.   Yes.

22   Q.   Going up one more page, to page 13, do there appear to be

23   another two completed entries for two visits?

24   A.   Yes.

25   Q.   And are there three signature stickers on the right?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   A.   Yes.

2   Q.   Is that your handwriting on all of those?

3   A.   Yes.

4   Q.   Going to blow up the bottom entry for November 30th.  Do

5   you again see the initials "P.H."?

6   A.   Yes.

7   Q.   Was Hazey Vaifanua ever massaged by Pandora Hall?

8   A.   No.

9   Q.   Totaling up those visits, 19 on the first page, five on

10  the second, two here, that totals 26.  Did Hazey Vaifanua make

11  26 visits to Port Medical?

12  A.   No.

13  Q.   Did she receive 26 massages from Port Medical?

14  A.   No.

15       MR. CARDONA:  Nothing further, Your Honor.

16       THE COURT:  Okay.

17  Cross-examination.

18       MR. ULTIMO:  Yes.  Thank you, Your Honor.

19                     CROSS-EXAMINATION

20  BY MR. ULTIMO:

21  Q.   Good morning, Mr. Vaifanua.  I hope I pronounced that

22  correctly.

23  A.   You did.

24  Q.   Okay.  Mr. Vaifanua, you brought your children to Port

25  Medical, true?
```

```
1    A.    Yes.

2    Q.    And you brought each one of them there, Dazey, Hazey,

3    Laloifi, Faith and Josiah, true?

4    A.    Yes.

5    Q.    Did I miss any of them?

6    A.    No.

7    Q.    And you've been a longshoreman since -- actually, strike

8    that.

9          When you took your children to Port Medical, did they

10   initially see Dr. Kevin Malone, the chiropractor?

11   A.    No, I don't remember them initially seeing him.

12   Q.    At some point did they see Dr. Malone, the chiropractor?

13   A.    Yes.

14   Q.    And they were examined by Dr. Malone?

15   A.    I don't know if it was Dr. Malone, but it was a

16   chiropractor that worked at the office.

17   Q.    All right.  And you saw the chiropractor when you took

18   your children there, true?

19   A.    Yeah.

20   Q.    And you spoke to federal agents and described the

21   chiropractor as a white male with a New York accent; is that

22   true?

23   A.    Yes.

24   Q.    But you don't remember his name?

25   A.    But I don't remember his name, no.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Did the chiropractor that saw your children, did he ever

2    refuse treatment of your children because they were too young?

3    A.   No.

4    Q.   Were you in the examination room when the chiropractor

5    examined your children?

6    A.   Yes.

7    Q.   Now, you've been a longshoreman since 1999, true?

8    A.   Yes.

9    Q.   And so up until the time you first began going to Port

10   Medical, you were a longshoreman for about ten years up to that

11   point in time, true?

12   A.   I believe so, yeah.

13   Q.   And you learned about Port Medical when Sergio Amador

14   approached you at the dispatch hall --

15   A.   Yes.

16   Q.   -- and asked you if you needed any chiropractic services,

17   true?

18   A.   Yes.

19   Q.   And Sergio Amador told you he had a new place opening up

20   and to come by, true?

21   A.   Yes.

22   Q.   He told you he would hook you up if you went to Port

23   Medical, true?

24   A.   Yes.

25   Q.   And you understood that term "hook up" meant receiving

```
 1   money after healthcare appointments, true?
 2   A.   Yes.
 3   Q.   And during your first visit to Port Medical, did you
 4   personally see a chiropractor yourself?
 5   A.   Yes, I did.
 6   Q.   And the chiropractor examined you, true?
 7   A.   Yes.
 8   Q.   And you complained to the chiropractor of neck and
 9   shoulder pain, true?
10   A.   Yes.
11   Q.   You went to Port Medical in Long Beach, correct?
12   A.   Yes.
13   Q.   When you went for -- you were referred by the chiropractor
14   for massages, true?  For your neck and shoulder pain that you
15   were experiencing at that time, true?
16   A.   Yes.
17   Q.   Did the massages help with your neck and shoulder pain?
18   A.   No.
19   Q.   How long had you been receiving -- you went for about --
20   strike that.
21        You went to Port Medical for two years, true?
22   A.   I can't remember if it was two years.  My recollection was
23   like maybe a little over a year.  I can't be sure of the time
24   frame that I been going there.
25   Q.   You told agents that you went to Port Medical for two
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    years, true?

2    A.   I can't remember what I told agents.  Like I said, it's

3    been a long time.  My recollection is -- I know it was over a

4    year, so I don't know if it was close to two years or over a

5    year and a half, but it was definitely over a span of a year.

6    Q.   Over a span -- I couldn't hear you.  You said it was over

7    a span of a year?

8    A.   Yeah.

9            THE COURT:  He said it was at least over a span of a

10   year.

11           THE WITNESS:  At least a year.

12   BY MR. ULTIMO:

13   Q.   But you told agents that you went to Port Medical for two

14   years and had conversations with Sergio around 20 to 30 times a

15   year, correct?

16   A.   20 to 30 times, conversation with Sergio?

17   Q.   That's what you told federal agents, true?

18   A.   If that's what I told them, that's what I told them, but

19   it's been a long time since I been questioned, and it's -- this

20   whole ordeal is new and it's scary, so if that's what I told

21   them at the time, then I would have to say yes, if that's what

22   they have on record.

23   Q.   And during that two-year period you went to Port Medical,

24   you continued to get massages, correct?

25   A.   Yes.

Q.    And you believe through your longshoreman's health

insurance plan with the Pacific Maritime Association that

you're permitted up to approximately 42 chiropractic visits per

year, true?

A.    Yes.

Q.    And that's the same benefit that your dependent children

receive under your health insurance plan through employment of

the union, true?

A.    Yes.

Q.    Now, at some point Sergio Amador told you that if you

brought your children to Port Medical, he would hook you up; is

that right?

A.    Yes.

Q.    And you understood from that discussion that he would pay

you even if your children did not visit the clinic, correct?

A.    Yes.

Q.    And you did it?

A.    Yes.

Q.    And you did it for money?

A.    Yes.

Q.    And that's because you're a single parent, true?

A.    Yes.

Q.    And you have six children, but five of them were living

with you between 2009 and 2011, true?

A.    Yes.

1  Q.   And you needed money, you needed financial assistance in

2  paying for the fees associated with your children's sports,

3  true?

4  A.   Yes.

5  Q.   And they, all of your children, your five children, they

6  were all enrolled in sports, correct?

7  A.   Yes.

8  Q.   And at some point Sergio Amador presented you with the

9  signed stickers and asked you to sign them, true?

10 A.   Yes.

11 Q.   And that was sign-in stickers, well, for your visits and

12 each of your five children, true?

13 A.   Yes.

14 Q.   And you signed them?

15 A.   Yes.

16 Q.   You knew the sign-in stickers would be used to bill your

17 health insurance company for your children, true?

18 A.   Yes.

19 Q.   And you told special agents that Sergio paid you $40 for

20 every insurance company Explanation of Benefits statement you

21 received in the mail, true?

22 A.   Yes.

23 Q.   So Sergio Amador was paying you based on the number of

24 EOBs or benefit statements you received in the mail, true?

25 A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.    You would wait for the Explanation of Benefit statements,

2  the EOBs, statements, to come in the mail, and then you'd take

3  them to Sergio Amador, true?

4  A.    True, yes.

5  Q.    You saved your EOBs, the Explanation of Benefits

6  statements, and when you were ready to get paid, you would text

7  or call Sergio, true?

8  A.    Yes.

9  Q.    Sergio Amador gave you a check that counsel showed,

10 Exhibit 273, page 27, in the amount of 2,400, true?

11 A.    Yes.

12 Q.    And that check, Exhibit 273, page 27, in the amount of

13 $2,400, was payment for 60 EOB statements, true?

14 A.    Yes.

15 Q.    Were those 60 EOBs EOBs for you and your children, or just

16 you, or just your children?  Do you know?

17 A.    I can't remember if they were mixed or just mine alone.

18 Q.    I'm going to show you once again Exhibit 273, page 27, the

19 check in the amount of $2,400.  That was signed by Sergio

20 Amador, true?  Do you need to see it?

21 A.    I don't see it.

22        *(Exhibit 273, page 27, was displayed on the screen.)*

23        THE WITNESS:  Yes.

24 BY MR. ULTIMO:

25 Q.    Sergio Amador, correct?

1   A.   Yes.

2   Q.   Now, you also received a check in the amount of $300,

3   true?

4   A.   True, yes.

5   Q.   And that check, I'll show it to you.  You see that check

6   I'm showing on the overhead projector?

7   A.   Yes.

8   Q.   Who gave you this check, Exhibit 273, page 25?

9   A.   David.

10          THE COURT:  And again, for the record, you're talking

11   about David Gomez?

12          THE WITNESS:  Gomez, yes.

13   BY MR. ULTIMO:

14   Q.   In looking at Exhibit 273, page 25, I see a signature that

15   appears to be -- appears to say David Gomez; is that correct?

16   A.   Yes.

17   Q.   And did you see David Gomez sign this check?

18   A.   No, I did not.

19   Q.   How did you get this check?

20   A.   I received it at the office when I met with David.

21   Q.   Mr. Vaifanua, you spoke to federal agents in this case

22   four times, correct?

23   A.   I can't remember how many times I spoke to them, but --

24   Q.   You spoke to them in 2013, correct?

25   A.   I don't remember the year, but I do remember them coming

```
 1    to my home, yes.
 2    Q.   You spoke to them in 2015, correct?
 3    A.   Like I said, I can't remember the dates, what -- the year.
 4    Q.   And you spoke to them twice this year, correct?
 5    A.   Yes.
 6    Q.   Four times.
 7    A.   This year, I spoke to them twice this year.
 8    Q.   Okay.  That is not what you told federal agents
 9    previously, that David Gomez gave you that check; isn't that
10    right?
11    A.   I believe I told them that David gave me that check
12    because Sergio wasn't available.
13    Q.   Mr. Vaifanua, you remember being questioned by federal
14    agents, true?
15    A.   Yes.
16    Q.   You gave a statement to federal agents on October 23rd,
17    2013, correct?
18    A.   Like I said, I don't know exactly the dates that they
19    came.
20    Q.   But you did talk to them in 2013, the first time they came
21    to your house, true?
22    A.   First time they came to my house, yes, I did speak with
23    them.
24    Q.   And you told the federal agents, when they came to your
25    house, that this check, Exhibit 273, page 25, for $300, was
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   given to you by Sergio Amador, true?

 2   A.   I don't remember if it was this check or the other check,

 3   but I do remember the big check was from Sergio.

 4   Q.   But you told the agents that this check --

 5            THE COURT:  Let me ask, do you remember saying that to

 6   the agents?

 7            THE WITNESS:  No, I don't remember saying that.

 8            THE COURT:  Okay.

 9   BY MR. ULTIMO:

10   Q.   You don't remember saying that?

11   A.   Like I said, it's been -- it's been a long time ago, you

12   know.  It's not like every day I get the feds knocking on my

13   door.

14            THE COURT:  Okay, but you don't remember?

15            THE WITNESS:  Yeah, no.

16            THE COURT:  Okay.

17   BY MR. ULTIMO:

18   Q.   Mr. Vaifanua, when you talked to them, initially you

19   talked to Special Agent Marcus Valle and FBI Special Agent Jill

20   Mansfield.  Two of them spoke to you at your home in 2013,

21   correct?

22   A.   Yes.

23   Q.   And when you were questioned, you initially told both of

24   those federal agents that you knew Sergio Amador from work and

25   he encouraged you to bring your children to Port Medical, as
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    well as other buddies, true?

2    A.    Yes.

3    Q.    And you went on to tell the two federal agents that you

4    worked with Amador for several years, true?

5    A.    Yes.

6    Q.    And you then tell them -- you then told them that you were

7    never paid to go to Port Medical; isn't that right?

8    A.    Originally, yes, I did tell them that.

9    Q.    But that was a lie, true?

10   A.    Originally when I was questioned, yes, it was a lie.

11   Q.    And you also told the federal agents during that interview

12   that you heard about pain management shots at a Southgate

13   clinic not associated with Port Medical directly.  You heard

14   about that Southgate clinic from friends of yours, correct?

15   A.    Yes.

16   Q.    And you told them that you were not paid for receiving

17   shots or pain management injections at Southgate, correct?

18   A.    Yes, originally I told them that.

19   Q.    And that was a lie?

20   A.    Yeah.  When I was questioned by the feds at the first,

21   yes.  I was trying to get out of -- of all this.

22   Q.    Okay.  And then the agents confronted you and they told

23   you you were being deceptive and it was a federal crime --

24   A.    Yes, they did.

25   Q.    -- to lie and be untruthful to federal agents, correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.

2    Q.    And they told you it was best to tell the truth, correct?

3    A.    Yes.

4    Q.    And at that point you looked over to Special Agent Jill

5    Mansfield and you said to her, you asked her, "Okay, are you

6    ready to write?"  Correct?

7    A.    Yes.

8    Q.    So then you went on to tell her --

9    A.    Yeah.

10   Q.    -- the truth, true?

11   A.    I think I said, "Yeah, shit, you got me," you know.  "You

12   ready to write?"

13   Q.    So you went on.  You knew they got you.  You knew that

14   they knew --

15   A.    When he explained that it was a federal -- it was a crime

16   to lie to a federal agent, yes, that's when I said I might as

17   well come clean.

18   Q.    And you understood that they knew you were lying or being

19   deceptive, correct?

20   A.    I didn't understand if they knew if I was lying or not.

21   Q.    But when you asked Agent Mansfield whether she was ready

22   to write, you intended to tell the truth at that point,

23   correct?

24   A.    Yes, I did.

25   Q.    And the first thing you said to her afterwards was the
```

1    check made payable to you for $300 was given to you by Amador

2    in exchange for bringing yourself and your children to Port

3    Medical clinic, true?

4    A.   Yes.

5    Q.   You also told the agents that the check for $2,400 was

6    given to you by Amador, correct?

7    A.   Yes, Sergio, yes.

8    Q.   And that you had asked Sergio Amador for help, for

9    financial assistance paying for your children's sports,

10   correct?

11   A.   Yes.

12   Q.   You also told the agents that the Southgate clinic, that

13   Sergio Amador paid you cash, $500 cash for each pain management

14   injection that you would voluntarily get for yourself, correct?

15   A.   Yes.

16   Q.   And you went to Southgate, to a Southgate clinic that

17   Sergio Amador told you about, correct?

18   A.   Yes.

19   Q.   And you went ahead and got pain management shots, correct?

20   A.   Yes.

21   Q.   And that was for your knee, right?  You have a right knee

22   problem?

23   A.   Left knee.

24   Q.   Left knee?

25   A.   Yes.

1   Q.   An injured or painful left knee, correct?

2   A.   Yeah.

3   Q.   So you went and got three pain management shots at some

4   Southgate facility, and Sergio Amador paid you $500 cash each

5   time, correct?

6   A.   Yes.

7   Q.   Where did you meet Sergio to get the $500?

8   A.   At The Bistro.

9   Q.   Did you get the $500 afterwards?

10  A.   Yes.

11  Q.   But you told special agents that you met -- when the

12  agents, Special Agent Marcus Valle and FBI Special Agent Jill

13  Mansfield, came to your home in 2013, you told them that you

14  received check or cash from Amador in the parking lot at the

15  ILWU casual union hall, true?

16  A.   True.

17  Q.   And you also told them that you never dealt with David

18  Gomez, you always dealt with Amador, Sergio Amador, correct?

19  A.   Correct.

20  Q.   Your statement to the federal agents at that point was

21  true and accurate, correct?

22  A.   To my belief, yes.

23  Q.   You didn't lie at that point when you answered questions

24  put to you by the federal agents, right?

25  A.   Not after I was told it was a federal crime, no.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   And you repeated those same statements to the federal

2    agents when they next spoke with you on May 6th, 2015, correct?

3    A.   Correct.

4    Q.   You again told them that you were approached by Sergio

5    Amador at the dispatch hall when he asked you if you needed a

6    doctor or a chiropractor, true?

7    A.   True.

8    Q.   You told the agents -- in fact, when you met with the

9    agents in 2015, you met them in a proffer session with your

10   attorney, correct?

11   A.   Correct.

12   Q.   So you weren't alone.  You were at the United States

13   Attorney's Office here, couple doors away, downtown L.A.,

14   correct?

15   A.   Yes.

16   Q.   And you were there with your lawyer, correct?

17   A.   Yes.

18   Q.   And you were there with the United States attorney, the

19   assistant U.S. attorney, correct?

20   A.   Yes.

21   Q.   And you were there with several special agents, Special

22   Agent Jill Mansfield, Laura Trong, and Cathy Ostiller, and your

23   attorney, John Robertson, and Marcus Valle, correct?

24   A.   Yes.

25   Q.   And you told them at that meeting that you were never
```

1  approached by any other longshoremen on the port other than

2  Sergio Amador, correct?

3  A.   Yes.

4  Q.   You told them that the only individual that you saw at

5  Port Medical was Sergio.  That's what you told them in 2015

6  with your attorney present, correct?

7  A.   Yes.

8  Q.   And you told them that it was Sergio that said he could

9  hook up your kids, too, correct?

10 A.   Correct.

11 Q.   And at some point -- you told them also that at some point

12 you had a conversation with Sergio Amador about falsifying or

13 allowing yourself and your children's health insurance benefits

14 to be used and billed without you being present, correct?

15 A.   Yes.

16 Q.   And that was an agreement that you and Sergio came to on

17 your own, correct?

18 A.   Yes.

19 Q.   You never made that agreement with the defendant, David

20 Gomez, correct?

21 A.   No.

22 Q.   True?

23 A.   True.

24 Q.   Now, a few days ago -- well, actually, you talked to the

25 federal agents again twice this year, correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    I believe so.

2    Q.    And that was because you found out that you were going to

3    be needed or called to be a witness at a trial in this case,

4    correct?

5    A.    Yes.

6    Q.    So the United States attorney and the federal agents

7    reached out to you and questioned you again, correct?

8    A.    Yes.

9    Q.    And on September 28th, 2016, couple weeks ago, correct,

10   you spoke to them, correct?

11   A.    Yes.

12   Q.    And at that point they asked you again if you knew David.

13   They asked you if you knew David Gomez, and you told them that

14   you knew him from work as a longshoreman, correct?

15   A.    Yes.

16   Q.    And you told them that you actually worked with Mr. Gomez

17   at the port, correct?

18   A.    Yes.

19   Q.    And you saw him a couple weeks ago at the port, correct?

20   A.    Yes.

21   Q.    And you reiterated all of these statements that you made

22   to officers previously about not having dealt with David Gomez,

23   correct?

24   A.    Yes.

25   Q.    However, this time you told the federal agents that you

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1  might have dealt with the defendant David Gomez because Sergio

 2  Amador was not available.  Is that what you told them on

 3  September 28th, 2016?

 4  A.    Yes.

 5  Q.    And that's different than what you told them in 2015 and

 6  2013, isn't it?

 7  A.    It may have been.

 8  Q.    May have been, sir?

 9  A.    I just know I dealt with Dave one time, and that was to

10  receive a check because Sergio wasn't around.

11  Q.    But that's not what you told the agents when they came to

12  your home in 2013, correct?

13         MR. CARDONA:  Objection, Your Honor, asked and

14  answered.

15         THE COURT:  Sustained.

16  BY MR. ULTIMO:

17  Q.    Okay.  You said to agents two weeks ago that you might

18  have dealt with the defendant, David Gomez.  So you weren't

19  100 -- you cannot be 100-percent certain that you might have

20  met with David Gomez as you sit here today, correct?

21  A.    I was certain that I received the check, and that was due

22  because Sergio wasn't around.

23  Q.    You are certain today, as you sit here today, or were you

24  certain in 2013 and 2015, Mr. Vaifanua?  When were you certain?

25         MR. CARDONA:  Objection, Your Honor, argumentative.
```

```
 1              THE COURT:  Sustained.

 2        He's already answered the question, that he's certain as

 3   of today.  If your question is was he certain back then, that's

 4   a new question.

 5   BY MR. ULTIMO:

 6   Q.   Mr. Vaifanua, were you certain in 2013, when you spoke to

 7   Special Agent Marcus Valle and Jill Mansfield in your home,

 8   were you certain then -- when you told them, "Okay, are you

 9   ready to write," were you certain then, when you told them that

10   you never dealt with David Gomez, you only dealt with Sergio

11   Amador?

12   A.   When I say I only dealt, that's the person that I did all

13   the business with, was Sergio.

14   Q.   And you told them that you never dealt with anyone -- you

15   never dealt with David Gomez.  That's what you told them in

16   2013.  Were you certain then?

17              MR. CARDONA:  Objection, Your Honor, asked and

18   answered.

19              THE COURT:  Sustained.

20   BY MR. ULTIMO:

21   Q.   Now, Mr. Vaifanua, you also spoke to federal agents

22   yesterday, true?

23   A.   Yes.

24   Q.   And you told the federal agents yesterday that you were

25   also -- you also went to two other medical clinics and were
```

1  paid, true?

2  A.   True.

3  Q.   You told them that you went to get a nerve study in

4  Hawthorne, correct?

5  A.   Correct.

6  Q.   And what facility was that in Hawthorne?

7  A.   I don't remember the name, I just remember the location,

8  and I don't remember the address to it.

9  Q.   Okay.  And you received the nerve study there?

10  A.   Yes, I did.

11  Q.   And who paid you to get a nerve study?

12  A.   I can't remember the lady's name.  It was the -- she

13  worked the reception's office right there, the desk.

14  Q.   She worked at the front desk of the doctor's office?

15  A.   Of the -- the office that I went into, yes.

16  Q.   But that office wasn't Port Medical, correct?

17  A.   No, it wasn't.

18  Q.   And to your knowledge, is Port Medical open at this point?

19  A.   Not -- I don't know anything about Port Medical.

20  Q.   So the office in Hawthorne was not Port Medical, correct?

21  A.   No, it wasn't.

22  Q.   And how much did you get paid for getting that nerve study

23  done by the office person at the doctor's office?

24  A.   Like 300.

25  Q.   Cash?

```
1    A.   Yes.

2    Q.   And then they referred you to another clinic, in Venice,

3    true?

4    A.   Yes.

5    Q.   And you were paid to go to that clinic in Venice, correct?

6    A.   Yes.

7    Q.   And that was to receive an endoscopy, correct?

8    A.   Yes.

9    Q.   How much were you paid to get the endoscopy?

10   A.   I believe about 300 as well.

11   Q.   And who paid you to get the endoscopy?

12   A.   The same lady at the nerve test, the office.

13   Q.   The lady, what's her name?

14   A.   I can't remember her name.

15   Q.   It's not Gomez, is it?

16   A.   No, it isn't.

17   Q.   Now, what year was it that this occurred?  What year did

18   you go to Hawthorne and get the nerve study?

19   A.   I can't remember the year.

20   Q.   Well, do you know what year it is this year?

21   A.   Yes, it's 2016.

22   Q.   Okay.  Do you know what year you went to Port Medical?

23   A.   2009?

24   Q.   And do you know what year you went to Hawthorne to get the

25   nerve study done?
```

```
 1   A.   I just said I don't remember the year.
 2            THE COURT:  Was it before or after 2009, if you know?
 3            THE WITNESS:  It was after 2009.
 4   BY MR. ULTIMO:
 5   Q.   Can you give me an estimate of what year it was?
 6   A.   No, I can't give you an estimate what year it was.
 7   Q.   Do you remember how many years ago it was?
 8   A.   No, I don't know how many years ago it was.
 9   Q.   If I asked you for your best estimate, what would the
10   answer be?
11   A.   A few years.
12   Q.   Few.  Few meaning a couple, like two?
13   A.   A few meaning four or five, something like that.  Like I
14   said, I don't remember what year it was.
15   Q.   So that would be -- four or five years, that would be
16   2011, 2012, correct?
17   A.   I'm not going to say correct, because I just told you I
18   don't remember what year it was.
19   Q.   And that would be the same for the endoscopy in Venice,
20   correct?
21   A.   Yes.
22   Q.   Now, you also went to the Beverly Hills Surgery Center and
23   received an endoscopy procedure, true?
24   A.   Yes.
25   Q.   And that was for your sleep apnea, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.  That was for acid reflux, in fact.

2    Q.    Okay.  But you do have sleep apnea, correct?

3    A.    Yes, I do.

4    Q.    And Sergio Amador paid you to go get an endoscopy at

5    Beverly Hills Medical Center, correct?

6    A.    No.

7    Q.    That's not what you -- he did not?

8    A.    No, he did not.

9    Q.    Who paid you to go to the Beverly Hills Surgery Center to

10   get an endoscopy?

11   A.    The owner of the Beverly Hills center.

12   Q.    What was his name?

13   A.    His name was Boris.

14   Q.    Boris.  Was he a doctor?  A front office worker?

15   A.    He was the owner of the medical center, I guess.

16   Q.    How much did he pay you?

17   A.    300.

18   Q.    So, Mr. Vaifanua, you shop for money to receive medical

19   care, true?

20   A.    I what?

21   Q.    You shop for doctors.

22   A.    I wouldn't say I shop for doctors.  I just receive the

23   payment for my procedures.

24   Q.    So -- but you have insurance to pay for these procedures.

25   A.    Yes, I do.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   But you want something in return for getting medical care and treatment, true?

A.   When they would give me compensation, yes.

Q.   So are you saying that all of these people offered you money or asked you if you wanted money to get an endoscopy, to get a nerve study, to get pain management injections in your left knee?  They offered it to you?  You didn't ask for it?

A.   I didn't ask for it, no.

Q.   But that's not what you told federal agents.  You told them that you asked Sergio Amador for financial assistance because your children were in sports and you needed money to help pay for those fees.

A.   No.  He offered.  He offered.  That's where he says, "I could hook you up."  So I took that as, yeah, there was going to be some compensation for the services over there.

Q.   Now, I'd like to go over your medical chart with you and show you -- you were examined by the chiropractor.  We talked about that.  Correct?

A.   Yes.

Q.   At Port Medical.

A.   Yes.

Q.   And I'm going to show you what's already been admitted into evidence as Exhibit 122, page 24.  Now, this is a chart that bears your name at the top of it.  You see that?

A.   Yes.

```
1    Q.   Joe Vaifanua?

2    A.   Yes.

3    Q.   And down here it says that you were diagnosed with muscle

4    spasm, pain, and sub something, having to do with a muscle,

5    correct?  Subluxation?

6    A.   Yes.

7    Q.   And there are some markings on your back, 1, 2, 8.  Do you

8    know what those markings would be for?

9    A.   I guess they would be for the pain area of the body.

10   Q.   Right, the International Pain Scale, right?  1 to 10, 10

11   being really painful, and 1 being mild; is that right?

12   A.   Yes.

13   Q.   So 8 would mean that you had moderately serious or severe

14   pain, correct?

15   A.   Yes.

16   Q.   And that would be along your thoracic spine and your

17   cervical spine and your lumbar spine, correct?

18   A.   Correct.

19   Q.   Where the 8s are at the top and in the middle, right

20   there, right there, highlighting in yellow on the overhead

21   projector, you see that?

22   A.   Mm-hmm, yes.

23   Q.   Okay.  So, now, looking at the following page, next page,

24   122, page 25, doctor -- the chiropractor indicated, in the

25   bottom left-hand corner, this exhibit, "Constant pain,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    lashing."  Can you tell the ladies and gentlemen of the jury

2    what lashing is.

3             THE COURT:  Let me ask you, is that your writing,

4    "lashing"?  Did you write that in there?

5             MR. ULTIMO:  No, he did not.

6             THE WITNESS:  No, that's not my writing.

7             THE COURT:  Okay, then.

8    BY MR. ULTIMO:

9    Q.   You're a longshoreman, correct, Mr. Vaifanua?

10   A.   Yes.

11   Q.   And lashing refers to your job, correct?

12   A.   Lashing is one of the category, one of the job categories

13   down there at the docks, yes.

14   Q.   Lashing is strapping down steel cables to the containers

15   on large marine --

16   A.   Container ships.

17   Q.   -- vessels, correct?

18   A.   Yes.

19   Q.   And so lashing is strenuous for your upper shoulder, upper

20   back, and back and arms, correct?

21   A.   Correct.

22   Q.   And that's why you went for chiropractic care, to treat

23   your neck and shoulder pain, correct?

24   A.   Yes.

25   Q.   You attribute some or all of that to your lashing as a

1  longshoreman?

2  A.   No, not all of it to the lashing.

3  Q.   But some of it?

4  A.   Some of it.

5  Q.   The next page, Exhibit 122, page 26, these are the history

6  notes in your chart -- excuse me, from the chiropractor's

7  chart, and they say, "Constant moderate cervical spine pain,

8  mid back pain, no radiation" --

9       You see that?

10 A.   Yes.

11 Q.   "Radiation" meaning radiation of symptoms, pain symptoms,

12 correct?

13 A.   Yes.

14 Q.   -- "to the arms and fingers from the spinal cord,"

15 correct?

16 A.   Yes.

17 Q.   So you had constant moderate pain to your cervical spine

18 and mid back pain, correct?

19 A.   Correct.

20 Q.   And that's why you went for chiropractic care, true?

21 A.   Yes.

22 Q.   Okay.  Next page will be Exhibit 122, page 3.  It's

23 already been admitted into evidence.  And you had an ultrasound

24 done by the chiropractor for trigger point manual therapy.  Do

25 you remember something like that?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   I don't remember ultrasound.

2    Q.   But the doctor examined you somehow, correct?

3    A.   Yes.

4    Q.   Okay.  And this says "Joe Vaifanua" at the top, and this,

5    where you were experiencing your pain, where it's indicated

6    here in, looks like a brown color along, your neck and

7    shoulders and --

8    A.   Yes.

9    Q.   -- spine.

10   A.   Yes.

11   Q.   And your left knee --

12   A.   Yes.

13   Q.   -- surgery.

14   A.   Yes.

15   Q.   2007, correct?

16   A.   Yes.

17   Q.   And finally, page 27 of Exhibit 122, and the doctor made

18   an ICD-9 code diagnosis.  That means a diagnosis of your -- of

19   your pathology, of your condition, your pain condition,

20   correct?

21        MR. CARDONA:  Objection, Your Honor, no

22   qualifications.

23        THE COURT:  Sustained.

24   BY MR. ULTIMO:

25   Q.   Did the doctor tell you what was wrong with you?

1   A.    No.   I was told -- I told him what was wrong with me.

2   Q.    Did he tell you you had cervical segmental dysfunction?

3   A.    Not that I recall.

4   Q.    He tell you cervical spondylosis with myelopathy?

5   A.    Not that I recall.

6   Q.    But you see your name on this chart here in front of you,

7   "Joe Vaifanua," correct?

8   A.    I see my name on there, but I doubt that's my writing,

9   because I don't misspell my last name.

10  Q.    Right.   But this is the chiropractor's chart I told you

11  about.

12  A.    Yes.

13  Q.    Okay.   Okay.   Now, I'd like to look briefly at your

14  children's charts, Exhibit 124, page 4.   It's already admitted.

15  This is the chart for Lo- -- how do you pronounce her -- his or

16  her name?

17  A.    Laloifi.

18  Q.    Laloifi.   It's a nice name.   And this is that same

19  physical therapy illustration we see on the chiropractor's

20  chart for Laloifi, and we see some purple indications along the

21  thoracic spine and the musculature on the upper right shoulder.

22  You see that?

23  A.    Yes.

24  Q.    And the next page, 124, page 20, we see an examination

25  from the chiropractor for Laloifi, and again, the chiropractor

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    examined Laloifi and has indicated -- on the upper left-hand

2    corner of the blowup I was showing you here on this exhibit,

3    says "palpation."  Do you know what palpation is?

4    A.    No, I don't.

5    Q.    Palpation is when a doctor touches or -- the muscles --

6          MR. CARDONA:  Objection, Your Honor.

7          THE COURT:  Sustained.

8    BY MR. ULTIMO:

9    Q.    Do you see the numbers, 13, 24, 13, 24, on the shoulder

10   here?

11   A.    Yes.

12   Q.    Okay.  Did Laloifi -- did you take Laloifi to see the

13   chiropractor because she (sic) was experiencing neck stiffness,

14   pain in the shoulder or spine?

15   A.    No.  I just took him for a routine checkup.

16   Q.    Exhibit 124, page 21.  Actually, next page, page 22.  122,

17   page 22.  These are chart notes for Laloifi, and we see "P" for

18   "plan," a SOAP note, and it says "T1, C3."  So these are

19   references to the massages that Laloifi was getting; is that

20   right?

21   A.    He never got massages.

22   Q.    Never?

23   A.    No.

24   Q.    Okay.  Now, but she (sic) did see the chiropractor, you

25   told us that, correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   Yes, he did.

 2    Q.   Okay.  And the chiropractor, to your knowledge, did the

 3    chiropractor refer her (sic) for massages for her (sic)

 4    symptoms?

 5    A.   I don't remember if he was referred to any massages or

 6    anything.

 7    Q.   Okay.  Looking at Josiah's medical chart, Exhibit 129,

 8    page 2, Josiah saw the chiropractor, and is this -- do you

 9    remember Josiah experiencing any spine pain?

10    A.   No.

11    Q.   That's not why you took Josiah to Port Medical?

12    A.   No, that's not why.

13    Q.   You took Josiah there to get money?

14    A.   No.  I took him there to get through -- a routine checkup

15    through their services.

16    Q.   A checkup?

17    A.   Yeah.

18    Q.   A chiropractic checkup?

19    A.   Yes.

20    Q.   Why?

21    A.   Because it was just to get them into the system.

22    Q.   What system?

23    A.   Sergio's system.

24    Q.   And for what purpose did you want to get them into

25    Sergio's system?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   To get them a checkup and to receive any compensation that

2    he offered.

3    Q.   Looking at, again, Josiah's chart, Exhibit 129, page 16.

4    Actually -- okay.  And you said you were in the room when your

5    children were seen by the chiropractor.  You remember that

6    testimony?

7    A.   Yes.

8    Q.   Okay.  So you remember, you have some recollection of

9    Josiah's examination or at least being in the room with the

10   chiropractor, true?

11   A.   Yes.

12   Q.   Okay.  And do you remember the chiropractor performing a

13   physical examination of Josiah?

14   A.   Not a physical examination.

15   Q.   Do you remember the doctor looking at Josiah's musculature

16   or musculoskeletal system?

17   A.   I remember him get adjustment, is what they call it.

18   Q.   Spinal adjustment?

19   A.   Yeah.  Just cracking his back and things like that.

20   Q.   Okay.

21        THE COURT:  Okay.  Ladies and gentlemen, it's 10:00

22   o'clock, so we're going to be taking our morning recess.  Be

23   about 15 minutes.  We'll see you back in 15 minutes, take it up

24   at that time.

25        Remember the admonishment not to discuss the case among

1    yourselves or with anybody else or form or express any opinions

2    about the matter until it's submitted to you and you retire

3    into the jury room.

4        See you back in 15 minutes.

5        THE CLERK:  All rise.

6        Court is in recess.

7        *(Recess held from 10:02 a.m. to 10:19 a.m.)*

8        *(In the presence of the jury:)*

9        THE COURT:  Okay.  The record will reflect that all

10   the members of the jury are in their respective seats in the

11   jury box, including the alternates, and we were on

12   cross-examination.

13       Counsel, you may continue.

14       MR. ULTIMO:  Thank you, Your Honor.

15   Q.   Mr. Vaifanua, good morning once again.  Before I finish up

16   with the patient charts, I'd like to just clean up, ask you a

17   few questions.

18       You told us earlier you went to Hawthorne, a medical

19   facility in Hawthorne, for a nerve study, correct?  Remember

20   that?

21   A.   Yes.

22   Q.   Okay.  Just to be clear, no one from Port Medical referred

23   you to get the nerve study in Hawthorne, correct?

24   A.   Correct, no.

25   Q.   And then Hawthorne, as I understand it, referred you to a

1    surgery center in Venice, correct?

2    A.    Yes.

3    Q.    And that was that Boris doctor, or the owner, correct?

4    A.    No.  Boris was the Beverly Hills.

5    Q.    Okay.  So Hawthorne referred you to the place in Venice

6    where you received an endoscopy, right?

7    A.    Yes.

8    Q.    And so it wasn't anyone from Port Medical that referred

9    you to Venice, correct?

10   A.    Correct.

11   Q.    Okay.  And as far as Beverly Hills, Boris, Boris isn't

12   affiliated with Port Medical, correct?

13   A.    Correct.

14   Q.    So no one from Port Medical referred you to Beverly Hills;

15   is that right?

16   A.    Correct.

17   Q.    Okay.  Now, when you were receiving the cash money from

18   Sergio and the checks that you received, that was -- was that

19   something that you wanted to keep on the hush?

20   A.    Yes.

21   Q.    Confidential?

22   A.    Yes.

23   Q.    And was that the same with your conversations with Sergio

24   Amador discussing the money that he would give you for your EOB

25   statements?

1    A.   Yes.

2    Q.   Was that also on the hush?

3    A.   Yes.

4    Q.   Something you wanted to keep confidential?

5    A.   Yes.

6    Q.   You didn't want anybody at the port knowing your business?

7    A.   No.

8    Q.   Is that a "yes"?

9    A.   Yes.  Yes.

10   Q.   Okay.  I mean correct, right?  Correct?

11   A.   Yeah, correct, yes.

12        THE COURT:  That's the problem with asking questions

13   in the negative.

14        Go ahead, Counsel.

15        MR. ULTIMO:  Thank you.  Yes.

16   Q.   So whenever you received the cash or the checks, there

17   were no other witnesses, right?

18   A.   No.

19   Q.   Was that correct?  Were there any other witnesses?

20   A.   No witnesses.

21   Q.   There were no witnesses --

22   A.   No.

23   Q.   -- when you received the cash or checks, correct?

24   A.   Correct.

25        THE COURT:  There you go, that's good.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ULTIMO:
 2   Q.   Okay.  Like I say, on the down low.  Like to keep things
 3   on the down low, right?
 4   A.   Yes.
 5   Q.   Is that what you were doing?
 6   A.   Yes.
 7   Q.   Now, the check that you say you received from David Gomez,
 8   was that in an envelope when you received it?
 9   A.   No, it wasn't.
10   Q.   It was not in an envelope?
11   A.   No.
12   Q.   Okay.  Now, is it possible that when you received that
13   check, that you may have seen David Gomez in the Port Medical
14   office but actually picked up the check from one of the girls
15   at the front desk?
16   A.   Say that again.
17   Q.   Is it possible that when you received the check that --
18   for $300, where David Gomez's name is on the check, is it
19   possible that you perhaps saw David Gomez in Port Medical at
20   the time, in the office, and picked up the check from one of
21   the girls in the front desk or in the back office somewhere?
22   A.   No.
23   Q.   That's not possible?
24   A.   No.
25   Q.   You didn't actually pick up the check from -- in an
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    envelope from a girl at the front desk?

2    A.    No.

3    Q.    All right.  Okay.  Let me go back to -- just like to

4    finish up with the patient charts, and then I will pass to

5    counsel.

6          Looking once again at Josiah's medical patient chart,

7    Exhibit 129, page 17.  I'm going to try to move through these a

8    little quicker.  A doctor noted in Josiah's chart, "Mid back,

9    muscle spasm."  Do you see that?

10   A.    Yes.

11   Q.    And you were present for that chiropractic exam, you told

12   us, correct?

13   A.    Yes.

14   Q.    And Exhibit 129, page 21, finally, the doctor's history

15   form says again, "Mid back tight, muscle spasm, tender to

16   palpation," or tender to touch.  You see that?

17   A.    Yes.

18   Q.    Okay.  And that's Josiah's chart.

19         Going to Faith's chart, Exhibit 126, page 2, which has

20   already been admitted into evidence, Faith had a physical

21   examination like her brothers and sisters, correct?

22   A.    Yes.

23   Q.    And we see here some trigger point or tender areas to

24   palpation marked in what looks like a purple color along the

25   cervical spine.  You see that?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yeah.  If I could go back, you said a physical
 2   examination.  They saw the chiropractor.  I don't -- I don't
 3   personally see that as a physical examination like you would
 4   from a doctor.  It's a chiropractor.
 5   Q.   Well, the doctor examined her, right?
 6   A.   Yes.
 7   Q.   Okay.  Looking at page 12 of the same exhibit, the
 8   doctor's chart note, "Standard Examination" at the top, we see
 9   here muscle spasm on the left-hand side, "MS," spasm, pain.  It
10   looks like -- I'll have to learn that word -- "subluxation."
11   And on the right, looks like the numbers 1, 2, 1, 2, and 2,
12   probably indicating pain in those areas.
13        THE COURT:  And Counsel, I am going to stop you,
14   because this is not a doctor testifying to what the records
15   mean.  The records speak for themselves.  He's not qualified to
16   testify to what they say.
17        MR. ULTIMO:  Right.
18        THE COURT:  Okay.  Go ahead.
19   BY MR. ULTIMO:
20   Q.   Page 18 of that patient's chart, Faith, we see the
21   doctor's chart note that indicates mid back tightness, constant
22   moderate pain.
23        You were present at this examination of Faith, correct?
24   A.   Yes.
25   Q.   Okay.  And finish up with Dazey and then Hazey.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

96

```
 1        Dazey is Exhibit 128, page 3.  Again, we see in the upper
 2   right-hand corner, "Dazey," and an examination of her upper --
 3   upper shoulder and back.
 4        You were there for Dazey's examination, correct?
 5   A.   Correct.
 6   Q.   And page 13 of the same exhibit, similar muscle spasm and
 7   pain.
 8        Do you remember being in the room during the examination
 9   of Dazey Vaifanua?
10   A.   Yes.
11   Q.   Okay.  And the last page of Dazey, page 19 of Exhibit 128,
12   the doctor's chart note, "Mid back, upper trap muscle spasm,
13   pain on palpation, denies trauma."
14        Do you remember the doctor asking whether or not Dazey had
15   any injury from a car accident or trauma?  Do you remember
16   hearing that from the doctor?
17   A.   No, I don't.
18   Q.   And finally, Hazey, Exhibit 127, already admitted into
19   evidence, page 5, we see a similar trigger point examination of
20   Hazey Vaifanua.
21        Do you remember being present during Hazey's examination
22   by the chiropractor?
23   A.   Yes.
24   Q.   Page 17 of Exhibit 127, for Hazey again, we see a chart
25   note for palpation of the back and shoulders, muscle spasm,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    pain, subluxation, and the -- on the right-hand side, the pain

 2    trigger points.

 3         Do you remember any discussion about pain in or on Hazey's

 4    back?

 5    A.   No.

 6    Q.   Page 17 of that same exhibit.  Excuse me, page 23 of

 7    Exhibit 127, and this would be -- did you ever see this

 8    document, the ICD-9 diagnosis sheet --

 9    A.   No.

10    Q.   -- for Hazey?

11    A.   No.

12    Q.   Okay.  Now, when you were getting chiropractic treatment

13    from the chiropractor at Port Medical, did you get adjustments?

14    A.   Yes.

15    Q.   And was that related to the work stiffness that you

16    complained of along your spine and back?

17    A.   It was -- part of it was from work, part of it was from

18    old sports injury.

19            MR. ULTIMO:  Okay.  No further questions.  Thank you.

20            THE COURT:  Redirect.

21                       REDIRECT EXAMINATION

22    BY MR. CARDONA:

23    Q.   Mr. Vaifanua, you were asked a number of questions about

24    other times that you've been paid for medical procedures.  Do

25    you remember that?
```

```
 1    A.    Yes.
 2    Q.    Am I correct, do doctors and surgical centers and medical
 3    clinics come to recruit longshoremen to undergo medical
 4    benefits?
 5    A.    I wouldn't say they come to the dispatch hall, but word
 6    certainly gets around, yeah.
 7    Q.    So word goes around the dispatch hall about places that
 8    are willing to pay for medical procedures?
 9    A.    Yes.
10    Q.    Is that because your insurance is good insurance?
11    A.    Yes.  I would believe so, yeah.
12    Q.    Doesn't require you or the other longshoremen to pay any
13    co-payment or any deductibles?  It's fully funded?
14    A.    Yes.
15    Q.    Now, just to clarify, your arrangement to get paid, that
16    was made with Sergio Amador; is that right?
17    A.    Yes.
18    Q.    That was not made with David Gomez?
19    A.    No.
20    Q.    And when you would arrange to make -- get the particular
21    payments, both the cash and the checks, was that with Sergio
22    Amador?
23    A.    Yes.
24    Q.    And those arrangements were not made with David Gomez,
25    right?
```

```
 1    A.    No.

 2    Q.    But on this one time when you got the $300 check, was it

 3    from David Gomez who picked it up -- you picked it up from?

 4    A.    Yes.

 5    Q.    But you had made the arrangements for that pickup with

 6    Sergio Amador, right?

 7    A.    Yes.

 8    Q.    Now, just to confirm.  I'm correct, am I not, you're not a

 9    chiropractor?

10    A.    No, I'm not.

11    Q.    Did you complete any of those entries?  Did you fill out

12    any of those chart entries in the chiropractic charts that you

13    were shown by the defense?

14    A.    No.

15    Q.    Did you see them at the time that they were completed?

16    A.    No, I didn't.

17    Q.    Now, I notice that many of them seem to say exactly the

18    same thing:  Muscle spasm, pain, sublimation (sic).  Did you

19    write those?

20    A.    No.

21    Q.    We saw those entries in the charts for the chiropractic

22    exam.  Did that happen, did each of those happen on one of the

23    first times you took your kids?

24              THE COURT:  If you know.

25
```

1    BY MR. CARDONA:

2    Q.   If you know.

3    A.   Say -- say that again.

4    Q.   Let me go back.  I think in response to a question from

5    the defense, you said that you took the kids because you needed

6    to do the paperwork to get them into Sergio Amador's system; is

7    that right?

8    A.   Correct.

9    Q.   And what was Sergio Amador's system?

10   A.   Was just getting the -- a file on each kid, as well as

11   myself.

12   Q.   And then after that, was it after that, after they created

13   the files, that you then signed the multiple stickers?

14   A.   Yes.

15   Q.   And as we saw from the chart entries, were those multiple

16   stickers used to bill for visits that neither you nor your kids

17   ever attended?

18   A.   Yes.

19   Q.   Did you go to the chiropractor 26 times?

20   A.   No, I did not.

21   Q.   Did any of your kids go to the chiropractor multiple

22   times?

23   A.   No.

24   Q.   When you say you went to Port Medical for two years, was

25   that two years the period in which you went to pick up payments

1    from Sergio Amador?

2    A.   Yes, within that time frame.

3            MR. CARDONA:  Nothing further, Your Honor.

4            THE COURT:  Any redirect in that area?

5            MR. ULTIMO:  No redirect, Your Honor.

6            THE COURT:  Okay.  You may step down.

7        Any reason why this witness cannot be excused?

8            MR. CARDONA:  No, Your Honor.

9            THE COURT:  Okay.

10           MR. ULTIMO:  No, Your Honor.

11           THE COURT:  Okay.  You're free to go.  Thank you very

12   much for coming in, sir.

13       Next witness.

14           MR. CARDONA:  Government calls Daniel Brown.

15           THE CLERK:  Good morning, Mr. Brown.  Right here to be

16   sworn.  Can you please raise your right hand?

17       Do you solemnly swear the testimony that you are about to

18   give in the matter now before the Court shall be the truth, the

19   whole truth, and nothing but the truth, so help you God?

20           THE WITNESS:  I do.

21           THE CLERK:  Thank you.  You may be seated.

22       May I please ask that you state your full name for the

23   record and spell your last name.

24           THE WITNESS:  Certainly.  It's Daniel Brown,

25   B-r-o-w-n.

```
 1              THE CLERK:  Thank you.

 2              THE COURT:  Okay.  Counsel, you may inquire.

 3              MR. CARDONA:  Thank you.
```

**DANIEL BROWN, GOVERNMENT'S WITNESS,**

**DIRECT EXAMINATION**

```
    BY MR. CARDONA:

 7  Q.   Mr. Brown, where do you work?

 8  A.   I work for CIGNA HealthCare.

 9  Q.   And what do you do there now?

10  A.   Currently, I'm a project manager for CIGNA.

11  Q.   And what does that mean?

12  A.   I work with a team that supports projects within the

13  organization, and kind of, as needed, we'll go and work with

14  different -- different organizations or different groups that

15  are asking for our support as they're trying to reorganize or

16  improve certain parts of their operation.

17  Q.   And what is CIGNA?

18  A.   CIGNA is a -- is a health services company.

19  Q.   How long have you been there?

20  A.   I have been with CIGNA for about 16 years.

21  Q.   Prior to January 2011, what were you doing at CIGNA?

22  A.   Prior to January 2011, I had held several different roles,

23  mostly in and around the financial operations part of the

24  company.  I started there, actually, as an intern while I was

25  still -- still working on my degree, and so then I graduated,
```

1  took a full-time position, and had roles up to the point of I

2  was a controller in December of 2010.

3  Q.   And in January of 2011, did you take a different job at

4  CIGNA?

5  A.   I did.

6  Q.   What was that job?

7  A.   I took a job as a claims manager, where my

8  responsibilities were to run the operation in San Francisco

9  known as the Coastwise Claims Office.

10 Q.   And what did the Coastwise Claims Office do?

11 A.   The Coastwise Claims Office was a dedicated operation that

12 was set up to provide administration for the ILWU-PMA plan.

13 Q.   And what was the ILWU-PMA plan?

14 A.   Our -- primarily it was responsible for the PPO medical

15 benefits for the International Longshore Warehouse Union along

16 with the Pacific Maritime Association.  So those two entities

17 combined to form the ILWU-PMA Benefit Welfare Plan, is what

18 they called it, and that's what we administered.

19 Q.   And when you say you administered it, what do you mean?

20 A.   We were responsible for their -- I'll call it "claims

21 administration."  So it was an operation where claims would --

22 would come to our office in San Francisco.  We would handle the

23 incoming mail.  We would, you know, take those claims, sort

24 them, process them, issue payments, issue -- issue denials.

25      We had a customer service component, so phone calls from

1    doctors or from -- from members would come into the operation

2    as well, along with some of what I'll call the "ancillary

3    operations," things like quality audit, eligibility services,

4    provider, data maintenance person, some mailroom staff.  Things

5    like that were also present at the -- at the San Francisco

6    office.

7    Q.    And before I forget, you used a term, "PPO."  What is a

8    PPO?

9    A.    It's a -- think of it as an indemnity plan or a preferred

10   provider organization.  It's a type of health insurance,

11   different than an HMO.  They're kind of the two primary benefit

12   structures for -- for a benefit plan.

13   Q.    And under a PPO plan, do beneficiaries or the people who

14   are receiving the benefits have the ability to choose their

15   doctors?

16   A.    They do.  Yes, they do.

17   Q.    Now, as a result of being the administrator for the plan,

18   did you become familiar with the plan and what it provided for?

19   A.    Yes.  They -- the plan gave us the set of benefits, you

20   know, the benefit structure that we were to administer on

21   behalf of the -- on behalf of their members, and we were

22   responsible for processing claims in accordance with those,

23   with those benefits.

24   Q.    And was there a -- what was termed as a "supplemental

25   summary plan description," that described the Coastwise

1  Indemnity Plan?

2  A.   There would be the supplemental plans.  So we had our

3  summary plan description, which was kind of a -- I'll call it

4  the standing, you know, set of rules and benefit descriptions.

5  The supplemental statements would be issued usually every

6  fiscal year to kind of fine-tune some of the benefits, cover

7  what allowable amounts may be, you know, giving just some

8  refinements to the overall plan description itself.

9  Q.   What did you use those documents for?

10  A.   The supplemental documents you're -- we would use those

11  documents to refine within the system itself.  So we had a --

12  you know, we had all the benefits loaded into a claims system,

13  claim engine, and when we would receive those supplemental

14  statements, we would go in and tweak or fine-tune the benefits

15  in accordance with direction from the plan.

16  Q.   And that was then, when you used to process claims as they

17  came in?

18  A.   Correct.  Correct.  So once the system was configured, the

19  claims processors would be able to -- you know, we had a team

20  of claims processors, but they -- that was kind of the source

21  of truth, if you will, for the processors who were handling the

22  claims that would come through.

23        MR. CARDONA:  Your Honor, at this time I'd offer

24  Exhibit 92, starting at page 25.

25        MR. ULTIMO:  Your Honor, Exhibit 92 is --

```
 1              THE COURT:  What is Exhibit 92?

 2              MR. ULTIMO:  It's 119 pages.  It's a welfare plan

 3     benefit.

 4              THE COURT:  Which pages are we going to be

 5     introducing, Counsel?

 6              MR. CARDONA:  Starting from page 25 through, I

 7     believe, the end.

 8              THE COURT:  And how many pages is the document?

 9              MR. ULTIMO:  119, I believe.

10              THE COURT:  I don't think so, Counsel.  Counsel,

11     anything that's relevant that you're going to be asking

12     questions on.  I don't want the whole document in.

13              MR. CARDONA:  Very well.  Your Honor, I'll go -- if I

14     may, I'll offer as I go through --

15              THE COURT:  Sure.  Sure.  Yeah.

16              MR. CARDONA:  -- individual pages, and we'll see where

17     we end up.

18          So if I may, offer Exhibit 92, page 25.

19              THE COURT:  Okay.

20              MR. ULTIMO:  No objection to that page, Your Honor.

21              THE COURT:  Be received.

22          (Received in evidence, Trial Exhibit 92, page 25.)

23     BY MR. CARDONA:

24     Q.   Do you recognize this?

25     A.   I do.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   What is it?

2  A.   This would be the cover of the actual summary plan booklet

3  itself.

4  Q.   And was this what you were referring to as the

5  supplemental summary plan description that CIGNA would receive

6  in order to tweak its claims processing approach?

7  A.   Yeah, I -- I believe so, yeah.  This says supplemental,

8  but they were -- without seeing everything that was behind it,

9  I can't say specifically what this would contain, but yeah,

10 this -- this would be a -- this would be the cover page of what

11 we would use to define the benefits for processing.

12 Q.   And it says there, "ILWU-PMA Coastwise Indemnity Plan."

13 Was that the plan that CIGNA was administering?

14 A.   That is correct.

15 Q.   And you started in January of 2011 in that process?

16 A.   That is correct.

17 Q.   Had CIGNA been doing that before?

18 A.   CIGNA had been doing it for -- for some period before.

19 CIGNA actually acquired a company known as Great West.  Great

20 West had been the administrator of the plan for some period of

21 time, and my understanding is that Great West had acquired the

22 parent company prior to that.  So the operation had been in

23 place for some time.  It was the parent company's name was what

24 had been swapped out a couple of times.

25 Q.   And the processing office, was that Coastwise Claims?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   It was known as Coastwise Claims Office, yes.

 2         MR. CARDONA:  Your Honor, I'm going to move to page

 3    92 -- Exhibit 92, page 28.

 4         THE COURT:  28.

 5         MR. ULTIMO:  No objection to page 28, Your Honor.

 6         THE COURT:  Be received.

 7      (Received in evidence, Trial Exhibit 92, page 28.)

 8    BY MR. CARDONA:

 9    Q.   I've highlighted a portion there of the book.  It says the

10    claims office is called the ILWU-PMA Coastwise Claims Office.

11    Is that what you've been referring to as Coastwise Claims?

12    A.   That's correct.

13    Q.   And above that, there's a line that says, "Claims are paid

14    by an insurance company under an Administrative Services Only,

15    ASO, agreement with the trustees of the ILWU-PMA Welfare Plan."

16         Was that the role that CIGNA played?

17    A.   That's -- that's correct.  So CIGNA was the administrator

18    for the plan.

19         MR. CARDONA:  Going to go to the next page, page 29.

20         MR. ULTIMO:  No objection to page 29, Your Honor.

21         THE COURT:  Okay.

22      (Received in evidence, Trial Exhibit 92, page 29.)

23    BY MR. CARDONA:

24    Q.   You see there's an indication on this page.  On the left,

25    union trustees, and on the right, employer trustees.  What's
```

1    that referring to?

2    A.    The union trustees would be the group that represented the

3    ILWU.    The employer trustees would have come from the PMA.

4    Q.    And what was the role of the trustees in relation to the

5    plan?

6    A.    The trustees were the group that would have created and

7    established the -- approved and endorse all of the actual plan

8    itself and the level of benefits, services.    Basically, all the

9    ins and outs and the details that we were set to administer,

10   that direction would have been provided by -- by the plan and

11   upon approval of the trustees.

12   Q.    Did you ever meet with the trustees?

13   A.    I did on occasion.

14   Q.    What types of things did you meet with them about?

15   A.    I would classify them as, kind of overall, just

16   operational reviews.    You know, there would often be a topic

17   that we would want to discuss.    I can remember one meeting

18   where how and -- how we were evaluating and determining medical

19   necessity on claims, and so we were -- we were present, along

20   with another agency that they had contracted with to do some of

21   those medical necessity reviews, and so that was kind of the

22   context of that meeting, but it was overall just around the --

23   how the operation was going, some of the details, and just

24   making sure that everyone was on the same page.

25           MR. CARDONA:    Going to go to page 35, Your Honor.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.

 2              MR. ULTIMO:  No objection, Your Honor.

 3              THE COURT:  Thank you.

 4         (Received in evidence, Trial Exhibit 92, page 35.)

 5    BY MR. CARDONA:

 6    Q.   Page 35 is titled "Coastwise Indemnity Plan Eligibility."

 7    Do you see that?

 8    A.   I do.

 9    Q.   Was eligibility one of the issues that CIGNA looked at in

10    processing claims?

11    A.   It was.  Yeah, if someone would need to be -- we would

12    need to confirm that they were an eligible member in order to

13    receive benefits.

14    Q.   And in general, did the plan extend to both active

15    longshoremen and their dependents?

16    A.   That's correct.

17              MR. CARDONA:  Going to go to page 36, Your Honor.

18              THE COURT:  36.

19              MR. ULTIMO:  No objection, Your Honor.

20              THE COURT:  Be received.

21         (Received in evidence, Trial Exhibit 92, page 36.)

22    BY MR. CARDONA:

23    Q.   There is a section here titled "Dual Choice."  Were you

24    familiar with that?

25    A.   I -- I am familiar with it.
```

1    Q.    What is it?

2    A.    It -- it's kind of a -- a hybrid, if you will, to where

3    someone could have -- could have HMO coverage with -- with also

4    the, you know, access to the PPO coverage as well.

5    Q.    There's a reference down here to plan year, July 1st to

6    June 30th.  Do you know what that's referring to?

7    A.    That is the -- call it the -- the plan year.  So benefits

8    that had, for example, an annual maximum, would have -- would

9    have run from June -- excuse -- July 1 through June 30.  So

10   anything that was tied to a particular -- a maximum for a year

11   would have followed that, that window of time.

12   Q.    So that was, instead of the normal calendar year, they ran

13   on this plan year?

14   A.    That's correct.

15        MR. CARDONA:  Going to go to page 49, Your Honor.

16        THE COURT:  49.

17        MR. ULTIMO:  No objection.

18        THE COURT:  Be received.

19   *(Received in evidence, Trial Exhibit 92, page 49.)*

20   BY MR. CARDONA:

21   Q.    This is the section titled "Basic Hospital Medical

22   Surgical Benefits for Non-MediCare Eligibles."  Did CIGNA look

23   to this for guidance?

24   A.    We did.

25   Q.    What guidance did CIGNA get from this section?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Again, kind of in the same vein as -- it was just -- this
 2   was our -- these -- this laid out the benefits, you know, the
 3   rules, et cetera, that we would use when administering,
 4   administering the claims operation and what claims would be
 5   eligible for reimbursement and processing.
 6           MR. CARDONA:  I'm going to turn to page 53.
 7           MR. ULTIMO:  No objection.
 8           THE COURT:  Okay.
 9       (Received in evidence, Trial Exhibit 92, page 53.)
10   BY MR. CARDONA:
11   Q.   I'm going to blow up a section here in the middle.  There
12   is a section titled "Chiropractic Treatment."  Was chiropractic
13   treatment covered under the plan?
14   A.   It was.
15   Q.   And it says here, "limited to 40 visits per plan year."
16   Was that an example of one of the annual limits that you were
17   referring to?
18   A.   That's absolutely correct.
19   Q.   And was this, in fact, the limit for chiropractic during
20   the time that you administered the plan?
21   A.   That is correct.
22   Q.   Now, there's a reference there to "except where the
23   welfare plan chiropractic consultant decides additional visits
24   are medically necessary."  What was that referring to?
25   A.   I'll characterize that as the exception process.  So if
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    there was -- if there was a member who felt they needed more

2    than the 40 visits, this was the process that they could go

3    through to seek additional treatment or additional coverage

4    under the plan.

5    Q.   And there's a reference there to chiropractic consultant,

6    the welfare plan chiropractic consultant.  Do you know who that

7    was?

8    A.   I don't recall the name.

9            MR. CARDONA:  Going to go to page 81, Your Honor.

10           THE COURT:  Okay.  And Counsel, just to speed it up a

11   little bit, the entire document would have been received if you

12   had offered it, but it's not all relevant.  So I want you to

13   designate what parts are going to be going into evidence.  If

14   there's no objection voiced, I'm going to assume it's

15   admissible.  So if there's something out of the ordinary, let

16   me know, but otherwise it will be admissible.

17           MR. CARDONA:  Thank you, Your Honor.

18           THE COURT:  Thank you.  Go ahead.  What page?

19           MR. CARDONA:  Page 81.

20           THE COURT:  Okay.

21      (Received in evidence, Trial Exhibit 92, page 81.)

22   BY MR. CARDONA:

23   Q.   There's a section here titled "General Exclusions and

24   Claims Review Procedures."  What are general exclusions?

25   A.   This again would have just provided the instructions and

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  how we were to go about administering the plan.  So again, just

2  more -- more details on the benefits.

3          MR. CARDONA:  And moving to the next page, page 82.

4          MR. ULTIMO:  No objection.

5          THE COURT:  Okay.

6      *(Received in evidence, Trial Exhibit 92, page 82.)*

7  BY MR. CARDONA:

8  Q.   I've blown up, under a section of general exclusions, a

9  section that says "Services which are not medically necessary

10 to treat an illness or injury or which are customarily

11 furnished without charge."

12         Now, as a general exclusion, how would that apply?

13 A.   The way we would apply this is, all services would need to

14 be medically necessary in order to be reimbursed.  And so

15 that -- that was kind of the -- our primary exclusion that we

16 would look for.

17 Q.   And did that include chiropractic services?

18 A.   In the event that chiro services were not medically

19 necessary, then it would have included those, yes.

20 Q.   So non-medically necessary chiropractic services would

21 have been excluded from coverage?

22 A.   That's correct.

23 Q.   Now, applying these guidelines, how did CIGNA process

24 claims?  Can you walk us through that process, how they came

25 in, what CIGNA did with them.

A.    Certainly.  So claims would be received at our -- at

our -- at our office.  We were what I would refer to as a paper

claim shop.  So we actually received paper claim forms.  It was

UB's, things like that.  Those claims would arrive, they would

be opened, they would be sorted and counted, and then they

would be bundled up and made available for a processor to go

and evaluate them for adjudication.

Q.    What would the adjudication process involve?

A.    So the processor would look at, you know, who the services

were for, ensure, as we kind of walk through in the book, you

know, that it was in fact for an eligible member, what services

were being billed, were those services -- could we ensure that

they were medically necessary and that they fell within

the overall parameters of the plan, so they were for a covered

benefit.

      Once we reached that determination it was for an eligible

member and it was a covered service, then they would go about

pricing the claim, or determining what the reimbursement amount

should be.  So they would look at who the rendering provider

was, ensure that they were a -- they were a real provider, a

licensed provider.  There are -- you know, in the booklet there

were -- it gets into providers of service and what requirements

they need to have.  And then from there, go about the process

of issuing -- determining the reimbursement amount.  So again,

this gets into, is there a contract for that provider in the

1    name of chiro, you know, are there -- is there a threshold, a

2    dollar amount that the services would be reimbursed at, and

3    then they would go through the process of finalizing the claim,

4    which would start the process of a check being issued and a

5    check being cut.

6    Q.   So if a claim was -- let's take denied first.  What would

7    happen if they denied a claim?

8    A.   If a claim was denied, the processor would use a code to

9    indicate the reason for the denial, and instead of a check

10   being cut, we would issue an EOB, or Explanation of Benefits,

11   and that Explanation of Benefit would be sent to the doctor,

12   and also to the member, with those codes and the explanation

13   associated with those codes.  The processor would use a

14   two-letter code, but that would tie to a sentence or a phrase

15   to give some reasoning for the denial and offer an explanation

16   as to why no payment had been issued.

17   Q.   And could that then be challenged?

18   A.   It could, yeah.  In the event that it was, you know,

19   denied because we didn't have the appropriate documentation or

20   something was incomplete on the claim form, it could be

21   resubmitted, and it would be -- it would be re-evaluated for

22   processing again.

23   Q.   Now let's take the flip side.  If a claim was approved for

24   payment, what would happen then?

25   A.   So if a claim was finalized in the system and approved for

```
 1   payment, a paper check would be -- would be cut, so that -- we
 2   had a distribution facility in West Virginia, and checks ran
 3   every night, and checks were -- would be printed.  Included
 4   with the check would be another Explanation of Benefits to
 5   say -- we're saying these are the services that are included,
 6   you know, for this member, for this date of service, totaling,
 7   you know, the amount of the payment.  The check and the EOB
 8   would go to the -- would go to the provider, and a copy of the
 9   EOB would also be sent to the member.
10   Q.   And how were those sent to the provider and the member?
11   A.   They were sent via USPS, postal mail.
12   Q.   And was that from the facility in West Virginia?
13   A.   It was.
14   Q.   What would happen after the checks were sent out and the
15   claim was finally done?
16   A.   On our side of things, we would take any of the
17   documentation, claim forms, any -- any material we had, and we
18   would -- we would scan it into a -- just to create an elec- --
19   we had an image repository.  So, again, I mentioned we had a
20   customer service component.  So they would be able to call up,
21   you know, a certain claim for a certain member and see the
22   documentation that we had on file, if there were any inquiries
23   or anything about it.  And then from there, the paper was --
24   was boxed up and sent to an off-site, secure storage facility.
25   Q.   Now, this process of processing the paper claims that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  you've described, was that already in place when you got there?

2  A.   It was.  That operation had been -- had been in place for

3  some time.  I stepped into that.

4  Q.   How long had it been in place?

5  A.   I -- I can't say for certain, but it was -- you know,

6  based on some of the feedback and conversations I had with

7  employees who had been there for 10, 15, 20 years, it had been

8  in place for quite some time.

9  Q.   Had it changed significantly over that time period?

10  A.   The only significant change that I'm aware of is the --

11  the scanning process on the back end that I just described.  We

12  went to electronic scanning --

13         THE COURT:  You're more than answering the question.

14  If the question's asked, just answer the question.  If they

15  want to expand on it, that's fine, but there's no need to get

16  into explanations that we don't need for this trial.

17         THE WITNESS:  Understand.

18         THE COURT:  So go ahead, Counsel.

19  BY MR. CARDONA:

20  Q.   So you described one change.  What did that change

21  involve?

22  A.   We started scanning claims instead of converting them to

23  microfiche.

24  Q.   So other than that, this process had been in place for

25  roughly 10 to 15 years?

```
 1   A.   Correct.

 2   Q.   Now, was this paper claims process unusual at CIGNA?

 3   A.   Very unusual.

 4   Q.   Why was that?

 5   A.   Most CIGNA operations would now use what I'll call

 6   electronic claims.  So we receive the claim information

 7   electronically, and anything that does come in paper is scanned

 8   up-front, so by the time it reaches a processor, it's already

 9   in the system; they're not physically touching the claim form.

10            MR. CARDONA:  Your Honor, at this time I'd offer

11   Exhibit 322, page 2.

12            MR. ULTIMO:  No objection.

13            THE COURT:  Be received.

14       (Received in evidence, Trial Exhibit 322, page 2.)

15   BY MR. CARDONA:

16   Q.   So, as an example, I've put up on the screen what's marked

17   as Exhibit 322, page 2.  Are you familiar with this type of

18   form?

19   A.   Yes, I am.

20   Q.   You had earlier referred -- earlier referred to a "HIC"

21   form.  Is this an example of that?

22   A.   This is -- a HICFA is kind of an acronym or an

23   abbreviation we would use in the industry.  And yes, this is a

24   HICFA form.

25   Q.   I've blown up the top.  Is HICFA short for health
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    insurance claim form?

2    A.    Correct.

3    Q.    Is this the type of form that CIGNA used to process claims

4    from the ILWU-PMA plan?

5    A.    It is.

6    Q.    I want to walk you through -- if you could just explain to

7    us the bottom half of the form.

8    A.    Certainly.  So the bottom half would really pertain to

9    the -- to the services that are being billed or the services

10   that have been rendered, starting with information about, you

11   know, when an illness would have occurred, what the diagnosis

12   codes would be.  You see that in line 21.  Then in 24 it gets

13   into the actual procedures that are being billed and the

14   charges associated with each of those procedures.

15   Q.    So let me see if I can get this a little bigger so we can

16   talk about some specific parts.

17   A.    Okay.

18   Q.    In line 14 there's an entry, "Date of current illness,

19   injury, pregnancy," and then here they've typed in "illness"

20   afterwards.  What would that refer to?

21   A.    That would simply be kind of the first point of a -- of

22   need for treatment.

23   Q.    Then you referred, on line 21, to diagnosis codes.  Was

24   there a standard set of diagnosis codes that were used?

25   A.    There is.

```
1    Q.   And what are those?

2    A.   I'm sorry, could you repeat the --

3    Q.   What are those diagnosis codes?  Do they have a name?

4    A.   Yeah.  It's -- I knew it as ICD.  I don't know exactly

5    what the acronym stands for, but it's a industry -- really,

6    medical industry standard.  So doctors' offices, hospitals,

7    insurance companies all use the same set of ICD codes, and

8    that's what -- that's what you would see here.

9    Q.   And what was the importance, in terms of processing, of

10   the diagnosis codes?

11   A.   The diagnosis code would be used -- that would be kind of

12   our first, you know, this is -- this is what we are treating,

13   and so that would help us to understand the symptoms or the

14   issue for treatment.

15        As you move further into the form, it'll get into what we

16   call procedure codes, and so --

17   Q.   Let me go there right now.

18   A.   Yep.  So this --

19   Q.   Down here, in these lines marked 1, 2, 3, 4, 5, under an

20   entry named "CPT," are those what you're referring to as the

21   procedure codes?

22   A.   Correct.  Similarly, CPT codes are industry standard, and

23   the CPT codes would be the actual services that were rendered

24   or billed against the particular diagnosis.  So it was really

25   looking to understand the relationship between the diagnosis
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    and the treatment.

2    Q.   And would that weigh into CIGNA's assessment as to whether

3    the procedures were medically necessary for what were the

4    diagnosis?

5    A.   Exactly.

6    Q.   Now, over here on the left, we see a date, 11/23/2010.

7    What would that be, correspond to?

8    A.   That would be -- that would be the date of service.

9    Q.   Now, there's an entry here stamped in, "Issue check to

10   clinic, not provider of service."

11   A.   Correct.

12   Q.   What would that tell CIGNA?

13   A.   Just instructions on where -- where to -- where to issue

14   any payment.

15   Q.   So if you saw that note, would the check have been mailed

16   to the clinic as opposed to the provider?

17   A.   That's correct.

18   Q.   Down here on the bottom left, in box 31, there's a space

19   for signature of physician or supplier, including degrees or

20   credentials.  Do you see that?

21   A.   I do.

22   Q.   What was the importance of that box for processing?

23   A.   So, one, it was to authenticate that the services were --

24   were rendered.  It would also give us an indication of who --

25   who the rendering provider was.  Again, going back to some of

1    the exclusions, there were certain providers that would -- that

2    were not authorized to receive payments from the -- from the

3    plan, and so this would -- this is how we could ensure that we

4    were issuing -- that the benefits would apply to a particular

5    claim.

6    Q.    And up above that, in box 25, there's an entry for federal

7    tax I.D. number.  Was that required?

8    A.    It was.

9    Q.    Why?

10   A.    Part of what we would do as the administrator was, we

11   would -- we would prepare tax filing to -- for -- you know, for

12   the plan, to say here's the payments that were issued against

13   these tax I.D.s over the course of a -- over the course of

14   time.

15   Q.    Finally, over here, in boxes 32 and I think it's 33, under

16   that stamp --

17   A.    Mm-hmm.

18   Q.    -- it indicates Port Medical Long Beach.

19         What do these boxes call for?

20   A.    This would be actually where we would -- so 32 is -- is

21   where the services were -- were rendered.  So the facility

22   address itself.  And then 33 would be the billing, the billing

23   address, or the billing location, where to issue any payments

24   to.

25   Q.    And we see here again a stamp that says, "Make check to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Port Medical, not provider of service."
 2    A.    Correct.
 3    Q.    Would CIGNA follow that instruction and make the check out
 4    to Port Medical as opposed to the provider who was shown in the
 5    other box?
 6    A.    We would.
 7    Q.    So in this instance, for this, would the check have been
 8    mailed by CIGNA to the address shown in box 33?
 9    A.    That is correct.
10    Q.    Now, up here in the middle, we see what appears to be a
11    received date.  How did that get on the forms?
12    A.    When the mail room staff at the Coastwise office, at my
13    operation, as they would open the mail every day, they would
14    stamp it with a date of receipt, and this is what that stamp
15    looked like.
16          MR. CARDONA:  So, Your Honor, I'm going to move to
17    Exhibit 322, page 3, and offer that as well.
18          MR. ULTIMO:  No objection, Your Honor.
19          (Received in evidence, Trial Exhibit 322, page 3.)
20    BY MR. CARDONA:
21    Q.    Now, this is a second HIC form; is that correct?
22    A.    That is correct.
23    Q.    And it's for a different date of service down at the
24    bottom; is that correct?  November 30th as opposed to November
25    23rd?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    That is correct.

2    Q.    But otherwise, same patient, same provider, same clinic?

3    A.    That appears to be the case, yes.

4    Q.    And this one, too, has a received date.  Do you see that,

5    January 20th?

6    A.    I do.

7    Q.    So does it appear these two forms were received at the

8    same time?

9    A.    It does.

10   Q.    In terms of claims processing and issuing checks, were

11   there instances where CIGNA would get multiple claim forms at

12   the same time and group those and then issue one check?

13   A.    I'm not sure I understand the question.

14   Q.    Were there instances when a clinic would submit multiple

15   claim forms, all of which came in at the same time?  Did CIGNA

16   always cut one check per claim form, or were there times when

17   they would cut one check to cover multiple claim forms?

18   A.    The latter.  So in the instance where we would process

19   multiple claims for a particular provider on the same day,

20   those claims would be -- would be bundled onto a single check.

21   The EOB that would accompany that check would delineate which

22   claims, you know, which member, which members, which dates,

23   et cetera, were included for the payments, so they had kind of

24   that form of remittance.

25              MR. CARDONA:  And I'd like to move to page 4 of
```

```
 1    Exhibit 322, and I'd offer that as well.

 2              THE COURT:  Okay.

 3              MR. ULTIMO:  No objection, Your Honor.

 4              THE COURT:  Be received.

 5         (Received in evidence, Trial Exhibit 322, page 4.)

 6    BY MR. CARDONA:

 7    Q.   And I'm going to blow up a portion of this.  Do you

 8    recognize this as an example?

 9    A.   Yes.

10    Q.   What is this an example of?

11    A.   This is a check that would have been mailed out to a -- in

12    this instance, to Port Medical Long Beach, as a result of

13    claims, claims payment.

14    Q.   And is this what the checks that were used by CIGNA to pay

15    the claims, or Coastwise Claims to pay the claims, looked like?

16    A.   That's correct.

17              MR. CARDONA:  Nothing further, Your Honor.

18              THE COURT:  Okay.

19         Cross-examination.

20              MR. ULTIMO:  Yes.  Thank you, Your Honor.

21                         CROSS-EXAMINATION

22    BY MR. ULTIMO:

23    Q.   Good afternoon, Mr. Brown.

24    A.   Good morning.

25    Q.   You and I have never met; is that correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   That is correct.

 2    Q.   Okay.  Well, it's a pleasure.  Let me ask you a few

 3    questions.

 4         I think -- help me to understand.  You're from the

 5    benefits payment office, correct?

 6    A.   I am from -- I'm from CIGNA, who was the -- the

 7    administrator for the plan.

 8    Q.   Was the administrator.  So the -- is that the same thing

 9    as the third-party administrator?  Correct?

10    A.   Correct.

11    Q.   Okay.  Third-party administrator reviews the health

12    insurance claim forms, correct?

13    A.   That is correct.

14    Q.   And what do they review those health insurance claim forms

15    for?

16    A.   We --

17    Q.   Fraud and abuse?

18    A.   I'm sorry?

19    Q.   Fraud and abuse?

20    A.   If there's an instance of fraud and abuse, yes, that'd be

21    something we'd look for.

22    Q.   Medical necessity?

23    A.   Absolutely.

24    Q.   Is that generally, in a nutshell, what it is what you do?

25    A.   In addition to all the other pieces that we would need to
```

1    look at, eligibility and so forth.

2    Q.   Yes.   Much of that is assumed, I mean, you know, for

3    purposes of my question.

4    A.   Yes.   Yes.

5    Q.   All right.   Then you were shown Exhibit 92, page 82, and

6    that had to do with the exclusions during the claims review

7    procedures.   In other words, the -- you said primarily what you

8    would look for would be services that were not medically

9    necessary, correct?

10   A.   That was our -- that -- that was probably the most

11   prevalent exclusion that we would look for.

12   Q.   Right.   Because it was pretty much easy to determine

13   whether or not the claim form came from a patient that was a

14   member subscriber, correct?

15   A.   That is correct.

16   Q.   That was a pretty perfunctory duty that was done rather

17   administratively, correct?

18   A.   That is correct.

19   Q.   So you're reviewing the CPT codes, right?   And you're

20   reviewing the ICD-9 codes for the pathology of the patients,

21   right?

22   A.   Correct.

23   Q.   So how would you -- just briefly, how would you review the

24   ICD-9 code to determine that the pathology was something

25   covered?

1    A.    So we had a group of claims processors who would be

2    evaluating that, and if they were able to -- if -- if they were

3    to able understand that this was the service, the pathology and

4    the services that were being rendered, and those were covered

5    under the plan, it would proceed.  If the processors had any

6    question or there was anything that stood out to them, there

7    was a process where they could escalate it to determine medical

8    necessity.

9    Q.    Okay.  So, but generally speaking, there were ICD-9 codes

10   that you were familiar with or your office was familiar with,

11   right?

12   A.    That is correct.

13   Q.    And how does -- as the third-party administrator, in

14   reviewing these health insurance claim forms, are you doing

15   both medical and chiropractic, or your division did

16   chiropractic?

17   A.    We did medical and chiropractic.

18   Q.    Okay.  So you were familiar with both ICD-9 medically and

19   ICD-9 for chiropractic?

20   A.    That is correct.

21   Q.    So when we talk about pathology, there is -- can you give

22   me an example of what pathology you may be familiar with in an

23   ICD-9 code that dealt with a chiropractic illness?

24   A.    I don't have any off the top of my head.

25   Q.    Okay.  I think we have an exhibit that shows some of

```
 1   those.  We can get to that in a minute.
 2       CIGNA's no longer the third-party administrator, right?
 3   Is that TC3?
 4   A.   CIGNA is no longer the administrator, that is correct.
 5   Q.   Do you know who it is now, presently?
 6   A.   I believe it's Zenith American.
 7   Q.   Yeah, I think.  Okay.  It may have went to TC3 now.  Have
 8   you heard that?
 9   A.   I have not.
10   Q.   Now, is the supplemental -- is the ILWU-PMA Coastwise
11   Indemnity Plan Supplemental Summary Plan Description -- that's
12   a long title.  You with me on that?
13   A.   I am.
14   Q.   Okay.  Is that basically CIGNA's road map to administering
15   the ILWU-PMA health and benefits insurance plan?
16   A.   You could say that, yes.
17   Q.   Okay.  Did you tell that to federal agents?
18   A.   I may have used those words.
19   Q.   Okay.  So that's you saying that, not me, right?
20   A.   Correct.
21   Q.   Okay.  Now, and did you also tell federal agents that in
22   your regular training and meetings regarding operational
23   updates with the trustees, you have meetings to do -- to
24   determine how you're going to interpret the insurance plan's
25   benefits?  Right?  Including medical necessity, right?
```

1    A.   That's correct.

2    Q.   Okay.  And that's something that goes on couple times a

3    year?

4    A.   Yeah, I -- I believe so.

5    Q.   Okay.  And, I mean, you attended those meetings, right?

6    A.   I attended several during my time, yes.

7    Q.   Okay.  So, and medical necessity came up in those

8    meetings, right?

9    A.   That was -- that would be a topic, yes.

10   Q.   Interpretation and what's covered and what's -- what to

11   look for, right?

12   A.   Correct.

13   Q.   Okay.  Now, did you tell federal agents that there was no

14   definition in the ILWU-PMA benefit plan of medical necessity?

15   A.   I don't recall saying that.

16   Q.   Does that make any sense to you?

17   A.   Could you repeat that, repeat the phrase?  I'm sorry.

18   Q.   There was no definition in the ILWU-PMA insurance plan of

19   medical necessity.

20   A.   There is the statement that says services must made --

21   must meet medical necessity requirements.

22   Q.   Right.  That, I'm sure, is quite frequent in the

23   documents, right?

24   A.   Correct.

25   Q.   But I'm asking you now, is there -- yes or no.  I mean, to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    your knowledge, is there a definition in the insurance plan of

2    what medical necessity or how medical necessity is defined as

3    far as the ILWU-PMA plan goes?

4    A.   If there's a definition for medical necessity?

5    Q.   Yes.

6    A.   I don't believe there is one.

7    Q.   That's why I asked.

8    A.   Okay.

9    Q.   Okay.  I'm not -- it's not a trick question.

10   A.   No, I --

11   Q.   Just trying to find out where you stand on that issue.

12   And I think you're telling me that you don't think there is a

13   definition.

14   A.   The statement says it must be medically necessary.  Is

15   there a -- is there a statement that defines what that is or

16   gets into case by case?  I'm not aware of that.

17   Q.   Okay.  Would that have been CIGNA's -- well, I think you

18   said it was the primary thing that you would look for, is

19   medical necessity.  So these contracts -- I mean, the health

20   and benefit plan is a contract, right?

21   A.   Yes, you could say that.

22   Q.   It's a contract between the Pacific Maritime Association,

23   right, and insurance company, right?

24   A.   I don't know that it's a con- -- I'm not sure the exact --

25   the relationship in terms of the contract, but -- I'm not sure

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    where you're going with that.
 2            THE COURT:  Well, that would be a legal analysis,
 3    anyway.  Next question.
 4            MR. ULTIMO:  Sure.
 5    Q.  Well, if you look at Exhibit 96, there's a cover page, so
 6    on page 2, which is actually going to be page 1 of the
 7    document, and page 2 --
 8        I'd like to introduce Exhibit 96, pages 1, 2 and 3.
 9            MR. CARDONA:  Your Honor, no objection to the exhibit,
10    but it's not a contract involving CIGNA.
11            THE COURT:  Okay.  It'll be received, then.
12        (Received in evidence, Trial Exhibit 96,
13        pages 1, 2 and 3.)
14    BY MR. ULTIMO:
15    Q.  Counsel brings up a good point.  When you look for what is
16    or is not medical necessity from an insurance company's point
17    of view -- right?  And that's a big thing, is it not?
18    A.  It is.
19    Q.  What you may consider medically necessary and what an
20    insurance company may consider medically necessary could be
21    worlds apart, correct?
22    A.  You could say that.
23    Q.  Okay.  And that happens in reality, right?  There are
24    times when you deny claims because you see lack of medical
25    necessity in an insurance claim form, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

134

1   A.   That would happen, but I should clarify, we -- we did not

2   make any determinations internally that something was not

3   medically necessary.  If there was a -- if we were going to

4   deny for lack of medical necessity, it would have been sent out

5   to an external firm that had registered clinicians and medical

6   professionals to review it, and they would be the ones to go

7   ahead and say that it did not meet the medical necessity

8   requirements.

9   Q.   Okay.  Okay.  Thank you for that.  But you would be the --

10  let's call it the first line of defense, right?  You're the

11  first people to get the insurance claim form from the provider,

12  right?

13  A.   That is correct.

14  Q.   So that's the first time -- can I call you the insurance

15  company, CIGNA?  I mean --

16  A.   Yeah.  The administrator is, yeah, CIGNA.

17  Q.   For short, you're it, right?

18  A.   Sure CIGNA, yes.

19  Q.   That money's coming from you guys, correct?

20  A.   No, that is not correct.

21  Q.   Well, from the plan, but CIGNA has a division that reviews

22  the claims and decides whether or not to pay, right?

23  A.   That is correct.

24  Q.   Okay.  So the primary thing for your division to look for

25  is medical necessity, but if you had a problem with it, you

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    would send it out to somebody else, right?

2    A.   That is correct.

3    Q.   And somebody else would do an investigation?

4    A.   They would do their process to render a decision, yes.

5    Q.   What's that division called that you would send it out to?

6    Suspicious claims or something?  What would you call that

7    division?

8    A.   No.  It was a company that the plan had a contract with.

9    SHIPS was the acronym of the group that we worked with during

10   most of my time in the Coastwise office.

11   Q.   To your knowledge, I mean, have you reviewed the claims in

12   this case?  The 2009, 2010, 2011 claims that are the subject of

13   this trial?

14   A.   I have not, and -- extensively, no.

15   Q.   Okay.  So as you sit here today, you're not aware of

16   whether or not CIGNA sent any of those off to the -- to SHIPS

17   for investigation as to medical necessity or not?

18   A.   I -- I don't know.

19   Q.   Okay.  The Chiropractic Benefit Supplemental Summary Plan

20   Description, is that something that your division utilized in

21   reviewing the health insurance claim form, some chiropractic

22   providers?

23   A.   Yes, it is.

24   Q.   Okay.  So then -- and was that the -- essentially -- I

25   think you told me earlier it's essentially the road map for

1    interpret- -- basically a road map in administering the claims

2    that you receive.

3    A.   Correct.

4    Q.   And the claims came from who?

5    A.   The claims would have come from the rendering provider.

6    They could have been submitted by the member.  Most commonly,

7    they came from the provider.

8    Q.   Right.  So the claims, the HICs, the health insurance

9    claim forms that counsel just showed us on the overhead

10   projectors, those are -- they come -- in this case, they came,

11   the one you saw, came from a chiropractor, right?

12   A.   I believe so, yes.

13   Q.   Kevin Malone, Port Medical?

14   A.   Yes.

15   Q.   Okay.  Now, I'd like to show you the supplemental summary

16   plan description.  It's Exhibit 93, pages 1 and 2.

17        Any objection?

18        MR. CARDONA:  No objection, Your Honor.

19        THE COURT:  Be received.

20        (Received in evidence, Trial Exhibit 93, pages 1 and 2.)

21   BY MR. ULTIMO:

22   Q.   Okay.  On the over- -- can you see that --

23   A.   Yes.

24   Q.   -- Mr. Brown?

25   A.   Yes, I can.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Okay.  Is this the supplemental summary plan description

2    that we talked about?

3    A.   It is.

4    Q.   Okay.  And it deals -- this deals specifically with

5    chiropractic benefits, right?

6    A.   Correct.

7    Q.   And as far as chiropractic, do you -- when you look at CPT

8    codes, do you get claims that come from chiropractors' offices

9    that also deal with therapeutic massaging, massages?

10   A.   That may be one of the services that would have been

11   included.

12   Q.   Okay.  And looking at page 2 of this document, so that'll

13   be 93, page 2, Exhibit 93, page 2, the top portion, it says --

14   talks a little bit about a diagnosis.  Diagnosis is somewhat

15   synonymous with medical necessity, true?

16   A.   They're related.  You would -- you would use the diagnosis

17   to understand if it was -- if something would be medically

18   necessary.

19   Q.   Right.  So in this case, the claim forms that you saw said

20   "illness," correct?

21   A.   Correct.

22   Q.   And that would be a pathology, right, of some sort?

23   A.   Correct.

24   Q.   Okay.  With or without a diagnosis, "illness" would

25   indicate a pathology?

1    A.    Correct.

2    Q.    All right.  So the plan says here, in this document,

3    Exhibit 93, page 2, "Visits related to a diagnosis, up to a

4    maximum of 40."  So that would be 40 office visits for a

5    member, a longshoreman in this case?

6    A.    That is correct.

7    Q.    So they could -- the plan would cover up to a maximum of

8    40 visits by a longshoreman to a chiropractor's office with a

9    diagnosis, correct?

10   A.    That is correct.

11   Q.    And then below, number two, it says, "In the absence of a

12   diagnosis, visits related to symptoms with no diagnosis made by

13   a chiropractor or other provider, up to a maximum of 18 visits,

14   not more frequently than," and it goes on; is that correct?

15   A.    That is correct.

16   Q.    So essentially a longshoreman can go to a chiropractor

17   complaining of symptoms and they would be covered for up to 18

18   visits with the chiropractor.  Is that -- the way I interpret

19   that, is that correct?

20   A.    That is correct.

21   Q.    And if they were going to be covered for 40 visits, then

22   the chiropractor would actually have to make a clinical finding

23   of a diagnosis; that is, an injury or illness?

24   A.    That is correct.

25   Q.    That's something that your office looks for when they

1    review the health insurance claim forms, correct?

2    A.   We would look for it and -- and we would -- we would be

3    tracking that as well to ensure we followed the -- these claim

4    guidelines for processing.

5    Q.   Right.  Have you ever heard -- have you ever heard that

6    the plan wasn't effectively monitoring whether visits were

7    medically necessary?  Did you ever hear that?

8    A.   I -- I don't recall hearing that.

9    Q.   And the plan wasn't your office, it was -- it could have

10   been -- who would -- who would be the plan?

11   A.   The plan would be the ILWU-PMA welfare plan.

12   Q.   So there's the welfare plan itself, then there is CIGNA,

13   the third-party administrator.

14   A.   Correct.

15   Q.   All right.  You work at the Coastwise Claims Office,

16   right?

17   A.   I did, yes.

18   Q.   So essentially that's Coastwise slash CIGNA.  That's you

19   guys, your division.

20   A.   Correct.

21   Q.   And then there is the Chiropractic Health Plan of

22   California, CHPC; is that right?

23   A.   That is -- that was the network that they used, correct.

24   Q.   So the plan has this network, which is the California

25   Health Plan Of California, CHPC for short; is that right?

1   A.   Yeah, I -- I knew it as CHPC.  I don't know what it -- the

2   exact acronym for that.

3   Q.   You have a nickname for it, like HICs or something?

4   A.   No.  CHPC is good enough.

5   Q.   Okay.  So CHPC is essentially some organization that

6   reviews or scrutinizes chiropractors and says you're an

7   in-network provider for chiropractic services and you're not.

8   Is that essentially what CHPC does?

9   A.   That is my understanding.

10  Q.   Okay.

11  A.   They main- -- they maintain the network of chiropractors.

12  Q.   Okay.  So in this case, Dr. Kevin Malone, DC, doctor of

13  chiropractic medicine, he's an in-network chiropractor through

14  CHPC network of providers.  Is that your understanding, or do

15  you not know?

16  A.   I -- I don't know if he was in their network or not.

17  Q.   Okay.  But when you get a claim form, a HICs form, you

18  look for that, right?

19  A.   That's correct.

20  Q.   So if we look at Exhibit 322, page 2, we see in the bottom

21  left-hand corner the provider, right?

22  A.   Correct.

23  Q.   And who is the provider on this exhibit?

24  A.   Doctor -- Dr. Malone.

25  Q.   And he's a chiropractic doctor?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    And are they required to be licensed healthcare

 3    practitioners in order to submit an insurance claim form?

 4    A.    For chiropractic services, yes.

 5    Q.    And --

 6              THE COURT:  Okay.  Ladies and gentlemen, we're going

 7    to break at this time.  It is 12 -- or 11:30, and we're going

 8    to break for lunch.  We're going to have you come back in at

 9    1:00 o'clock sharp.  Right at 1:00 o'clock we'll get started

10    again and proceed with the trial.

11         Remember the admonishment not to discuss the case among

12    yourselves or with anyone else or form or express any opinions

13    about the matter until it's submitted to you and you retire to

14    the jury room.

15         I'm going to ask you to leave quietly, because I'm going

16    to be talking with the attorneys a little bit.

17              THE CLERK:  All rise.

18              THE COURT:  You may step down, also.

19         (Outside the presence of the jury:)

20              THE COURT:  Okay.  The record will reflect that all

21    the jurors have left the courtroom.

22         Counsel, you may have seats.  Just a heads-up on both

23    sides.  It really is -- and I think you realize it.  I don't

24    know if you do or not, if you're watching the jury.  It is

25    dragging.  You're losing the jury a lot on these cases.  This
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    is the type of case it's easy to lose a jury on.  There's been

2    a lot of questions that either have been really technically

3    irrelevant, repetitious, argumentative, really doesn't go to

4    the focus of this case.

5         What we've heard so far in the first three hours, at least

6    a third of it could have been cut down and you wouldn't have

7    lost anything as far as your case, but it does cause you to

8    lose a jury when you do that.  Both sides are doing this.  So

9    I'm just going to suggest that you might want to tighten it up

10   to keep the jury involved in it.  If it gets too bad, I'll

11   probably come in and make some objections myself, but I'd

12   rather you guys do it yourselves.  So if you can tighten it up

13   a little bit, I think the jury would appreciate it and you'll

14   get a better case.

15        We'll be in recess.  We'll see you back in at 1:00

16   o'clock.

17            *(Lunch recess commenced at 11:32 a.m.)*

18

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 12, 2016

 2                                1:02 P.M.

 3                                 - - - -

 4       (In the presence of the jury:)

 5              THE COURT:  Okay.  The record will reflect that all

 6   the members of the jury are in their respective seats in the

 7   jury box, the witness is on the witness stand, and we were at

 8   cross-examination.

 9          Counsel, you may inquire.

10              MR. ULTIMO:  Thank you, Your Honor.

11                    CROSS-EXAMINATION (Continued)

12   BY MR. ULTIMO:

13   Q.   Good afternoon, Mr. Brown.

14   A.   Hello.

15   Q.   I'll try to be brief.

16          We were finishing up talking about Exhibit 93-1.  I'm

17   going to show that to you again, Exhibit 93, page 1, which has

18   already been admitted into evidence, and if you can look at

19   that.  You see that on the overhead?

20   A.   I do.

21   Q.   I want to ask you if this is a true statement here where

22   it says "Chiropractic Benefit."  I've just blown it up for you.

23   Would you like me to read that, or would you like to read that

24   to yourself?

25   A.   I'm reading it right now.
```

1         Okay.

2    Q.    Okay.  Is that a true statement?

3    A.    It is a true statement, yes.

4    Q.    Okay.  So the longshoremen, through their chiropractic

5    benefit under the health and benefit plan, would receive

6    100-percent payment of chiropractic services if they went to an

7    in-network provider for PPO charges?

8    A.    Yeah, there's -- there's a point of clarification on this

9    document.  So this particular supplemental plan description

10   would have been issued to individuals that had HMO coverage for

11   their medical.  So this -- the sheet we were describing is

12   specific to that, that group of individuals.

13   Q.    Well, when you say HMO, you're referring to Kaiser?

14   A.    Yes, for their medical.

15   Q.    But we're talking about the chiropractic benefit, not the

16   medical component.

17   A.    Under- -- understand.  This chiropractic benefit would

18   have been a carve-out just for those members that had their HMO

19   medical through Kaiser, and their -- their chiropractic

20   benefits would have been supplied -- would have been

21   administered by my office, using the terms and the descriptions

22   on this, on this supplemental description.

23   Q.    Let me see if I understand.  So if a longshoreman had a --

24   had -- did not have a HMO and had a PPO plan through the union,

25   right, and they went to a chiropractor for chiropractic

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   services -- we've already talked about how many visits they get

 2   and that kind of thing.  Does the coverage, does your review

 3   office, your benefit payment office, pay 100-percent of the PPO

 4   charges?

 5   A.    In that case, yes, we would pay the contracted rate.

 6   Q.    Okay.  And that would be no out-of-pocket costs, so

 7   there's no deductible and no co-pay for the longshoreman?

 8   A.    That is correct.

 9   Q.    Okay.  And looking at a couple of questions dealing with

10   the medical necessity again, just to be very clear.  The

11   government showed you the health insurance claim form, Exhibit

12   322-2.  I'd like to put that up again briefly.

13        I'd like to -- before I do that, I want to present Exhibit

14   263, page 1.  So it's a one-page document, the ICD-9 codes.

15              THE COURT:  Has that already been introduced?

16              MR. CARDONA:  No, Your Honor, but there's no

17   objection.

18              THE COURT:  Be received.

19              MR. ULTIMO:  Thank you.

20        (Received in evidence, Trial Exhibit 263, page 1.)

21   BY MR. ULTIMO:

22   Q.    Okay.  The first document I've just put on the overhead,

23   on the left, is Exhibit 322-2.  You recall that as the HIC

24   form, correct?

25   A.    Yes, that is correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   On the right side, I'm going to put up Exhibit 263-1.

2    Have you seen 263-1 before?

3    A.   I -- I don't recall.

4    Q.   Okay.  If I told you these are the ICD-9 codes --

5    essentially I think the acronym stands for clinical diagnosis

6    codes.

7    A.   Yes.

8    Q.   Or international --

9    A.   Yeah.

10   Q.   -- clinical diagnosis codes.

11   A.   Yes.

12   Q.   Right?

13        Can you tell us, those of us who do not know what that

14   means, what does that mean to you?  What is a clinical

15   diagnosis code?

16   A.   This is the industry-wide accepted list of different

17   medical diagnoses and the affiliated code, just so -- it really

18   comes down to kind of creating a common language and common

19   understanding, primarily for billing, so that you're not having

20   to continuously type "dislocation, lumbar separator."  You can

21   abbreviate it with 839-2.

22   Q.   So, in short, these are the illnesses.

23   A.   Yes.

24   Q.   The pathologies, correct?

25   A.   Correct.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Now, you would find these on the HIC form, correct?

2   A.   That is correct.

3   Q.   Okay.  And that's exhibit -- the one to the left, 322-2?

4   A.   Correct.

5   Q.   And you would find that in that area of the HIC form right

6   there, right?

7   A.   Yes.  In -- in box -- excuse me, box 21.

8   Q.   Box 21.  So in looking at the 719 -- I'll put it in

9   yellow.  Looking at 719.46, that would tell us the illness or

10  pathology that the patient had, according to the chiropractor

11  who --

12  A.   That is correct.

13  Q.   -- made that clinical finding?

14  A.   Yes.

15  Q.   Okay.  Same with 739.3, correct?

16  A.   Correct.

17  Q.   Okay.  And to find out -- you don't know off the top of

18  your head what those diagnoses stand for, do you?

19  A.   I don't.

20  Q.   So you would go to a book of some kind and pull up the

21  actual code book, right?  And look what -- look for 739.2 or

22  point 1 to find out what the diagnosis was, right?

23  A.   Correct.

24  Q.   And that's how you would determine medical necessity

25  whenever you received a health insurance claim form for review,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   correct?

2   A.   That would definitely be part of the process, yes.

3   Q.   Okay.  Now, in terms of -- in terms of how to pay, you'd

4   have to also look at the flip side of it, what the doctor did,

5   what his services were, correct?

6   A.   That is correct.

7   Q.   So I think you alluded to that.  The other side of the

8   process would be to look for the CPT codes, correct?

9   A.   That is correct.

10  Q.   That would be those codes right there?

11  A.   Correct.

12  Q.   On Exhibit 322-2?

13  A.   Correct.

14  Q.   These are the procedures -- clinical procedures

15  terminology, correct?

16  A.   Correct.

17  Q.   CPT?

18  A.   Correct.

19  Q.   So these numbers tell us what -- tell us what the doctor

20  did.

21  A.   That is correct.

22  Q.   Okay.  So let's look at Exhibit 262, the -- I don't recall

23  if that was admitted yet.

24        THE COURT:  I don't think it has been.

25        MR. CARDONA:  It wasn't, Your Honor, but there's no

```
 1    objection to it.

 2              THE COURT:  262, it will be received.

 3              MR. ULTIMO:  Thank you.

 4         (Received in evidence, Trial Exhibit 262.)

 5    BY MR. ULTIMO:

 6    Q.   Okay.  So looking at the overhead projector, CPT codes in

 7    Exhibit 262, these are the numbers on the left-hand side here

 8    that -- with the description of what services are identified

 9    for that particular CPT code, correct?

10    A.   That is correct.

11    Q.   And you review those CPT codes for payment?

12    A.   Correct.

13    Q.   Okay.  And that's what you would have done for Exhibit

14    322-2, the health insurance claim form I had up a minute ago?

15    A.   Correct.  Evaluate the procedures against the diagnoses is

16    all part of the process to ensure medical necessity.

17              MR. ULTIMO:  All right.  No further questions.  Thank

18    you.

19              THE COURT:  Redirect.

20              MR. CARDONA:  Very quickly.

21                         REDIRECT EXAMINATION

22    BY MR. CARDONA:

23    Q.   This Exhibit 93, the document you were looking at, that

24    only applied to longshoremen who had their medical coverage

25    through HMOs; is that right?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   The supplemental?

2   Q.   Yes.

3   A.   Yes, that is correct.

4   Q.   Now, did that document in any way override the underlying

5   requirement that procedures be medically necessary in order to

6   be billed?

7   A.   No, it did not.

8   Q.   And when you, when CIGNA, as the third-party

9   administrator, got these claim forms, did you necessarily know

10  whether or not the procedures that were alleged to have been

11  provided had actually been performed?

12  A.   No, we did not.

13       MR. CARDONA:  Nothing further, Your Honor.

14       THE COURT:  Recross in that area?

15       MR. ULTIMO:  Briefly, Your Honor.

16                   **RECROSS-EXAMINATION**

17  BY MR. ULTIMO:

18  Q.   Mr. Brown, I'm a little confused, because a moment ago we

19  went through the chiropractic benefit under the supplemental

20  summary plan description.  You remember that?

21  A.   I do.

22  Q.   And we had established earlier that that was essentially a

23  road map to reviewing claims submitted by providers or doctors,

24  correct?

25  A.   Correct.

```
 1   Q.   Okay.  So help me understand.  I thought I covered this
 2   with you.  If an in-network chiropractor submits a health
 3   insurance claim form for a participant that -- a member, a
 4   longshoreman, who's covered under the PPO option of his or her
 5   health insurance, what would the benefit be for chiropractic
 6   services?  80/20?  100 percent?  What would it be?
 7   A.   It would be covered -- if it was for -- if it was an
 8   in-network provider billing, services would be covered at 100
 9   percent, provided they were medically necessary.
10   Q.   Yeah, I wasn't asking about medical necessity.  That's --
11   that's -- you know, that's not the question.  The question is
12   the --
13           THE COURT:  He's answered 100 percent.
14           MR. ULTIMO:  Thank you.
15           MR. CARDONA:  Going to object on beyond the scope of
16   my redirect.
17           THE COURT:  Up till now, overruled.
18           MR. ULTIMO:  Thank you.
19           THE COURT:  Anything else of this witness?
20           MR. CARDONA:  No, Your Honor.
21           THE COURT:  You may step down.
22       May this witness be excused?
23           MR. CARDONA:  Yes, Your Honor.
24           MR. ULTIMO:  Yes, Your Honor.
25           THE COURT:  Okay.  Thank you for coming in, sir.
```

```
 1        Next witness.

 2              MR. CARDONA:  Government calls Ron Cataldo, Jr.

 3              THE CLERK:  Good afternoon.  Right here to be sworn,

 4   please.  Raise your right hand.

 5        Do you solemnly swear the testimony that you are about to

 6   give in the matter now before the Court shall be the truth, the

 7   whole truth, and nothing but the truth, so help you God?

 8              THE WITNESS:  Yes, I do.

 9              THE CLERK:  Thank you.  You may be seated.

10        May I please ask that you state your full name for the

11   record and spell your last name.

12              THE WITNESS:  Sure.  My name is Ronald Cataldo.  Last

13   name is spelled C-a-t-a-l-d-o.

14              THE CLERK:  Thank you.

15              THE COURT:  Okay.  Thank you.

16        You may inquire.

17              RONALD CATALDO, GOVERNMENT'S WITNESS,

18                        DIRECT EXAMINATION

19   BY MR. CARDONA:

20   Q.   Mr. Cataldo, where do you work?

21   A.   I work for Chiropractic Health Plan of California.

22   Q.   And what is which the Chiropractic Health Plan of

23   California?

24   A.   We're a chiropractic network in this situation.  We

25   provide contract and credentialed chiropractors to the ILWU-PMA
```

1  plan.

2  Q.   And how long you been doing that?

3  A.   Since 2009.

4  Q.   When you say you provide credentialed chiropractors, what

5  does that mean?

6  A.   We put the chiropractors through a screening process,

7  commonly referred to as NCQA credentialing.  It's a nationally

8  recognized industry standard for basic credentialing of

9  healthcare providers.

10  Q.   And for the ILWU-PMA plan, what does it mean to be a

11  chiropractor in that network?  Does that have an effect under

12  the plan?

13  A.   It does.  The plan covers only chiropractors who are in

14  network, so it -- it -- being part of the CHPC network makes

15  the doctors exclusively available to ILWU members.

16  Q.   Now, when you say they can only go to those, is that for

17  longshoremen who have the PPO plan?

18  A.   For the PPO plan, yes.

19  Q.   Is there a difference between -- with longshoremen who

20  have their medical under the HMO plan?

21  A.   Yes, there is.

22  Q.   What's the difference?

23  A.   I believe there is -- drawing a blank at the moment.  I

24  believe there is an 80-percent coverage for out-of-network

25  care.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   But PPO people had to go to the in-network providers?

2    A.   Yes.

3    Q.   And then they would get 100 percent of their coverage?

4    A.   Yes.

5    Q.   Now, did you have a contract with the ILWU-PMA plan?

6    A.   Yes.

7         MR. CARDONA:  Your Honor, at this time I'd offer

8    Exhibit 96.  I believe some pages were referred to previously,

9    but I'd simply offer it.  It's a nine-page document.

10        THE COURT:  Any objection?

11   Ninety-six?  Is that what you said, Counsel?

12        MR. CARDONA:  Yes, Your Honor.

13        THE COURT:  Yeah, that had been offered before, but

14   then it was not gone into, so it will be received.

15        MR. ULTIMO:  Yes.

16        MR. CARDONA:  Very well.

17        *(Received in evidence, Trial Exhibit 96.)*

18   BY MR. CARDONA:

19   Q.   Put page 2 of Exhibit 96 up on the screen.  Was this the

20   agreement that CHPC entered into with the ILWU-PMA plan to be

21   the network provider?

22   A.   Yes, it is.

23   Q.   Down below, at the bottom, in Article 1, "Definitions," is

24   there the start of a definition of medical necessity?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   And moving over to the next page, does that continue --
see if I can get this to move, sorry, over onto the next page.

     Have I blown up that definition?

A.   Yes, that's good.

Q.   Was this required to be applied by your in-network
providers?

A.   Actually, this is a contract between us and the plan.  We
do have a provider agreement that had -- that has a similar
medical necessity requirement.  So it's consistent across the
board.

Q.   So was this what the plan required you to use as medical
necessity as the network provider?

A.   Yes.

Q.   Are you also a chiropractor?

A.   I'm not.  We have a family-run company.  My father's a
chiropractor, so -- we have the same name, so sometimes we get
mixed up.

Q.   Now, this definition of medical necessity that was in your
contract, are you familiar with standards of medical necessity?

A.   Yes.

Q.   Was this out of the ordinary for a definition of medical
necessity?

A.   Absolutely not, no.  We -- we adopted terms of our -- from
our contract from other contracts that we have with other very
large payors.  It's sort of a industry standard.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

156

1   Q.   And going back for a second, when you contracted and

2   credentialed chiropractors to be part of your network, did you

3   require that they apply this standard?

4   A.   They signed a contract that said they would.

5          MR. CARDONA:  Your Honor, I'd like to turn to what's

6   marked as Exhibit 97, and I'd offer that.

7          MR. ULTIMO:  No objection, Your Honor.

8          THE COURT:  Be received.

9        *(Received in evidence, Trial Exhibit 97.)*

10  BY MR. CARDONA:

11  Q.   Got this up on the screen.  I'm going to blow it up, the

12  title.

13         Now, while CHPC, the California health plan -- the

14  Chiropractic Health Plan of California, was serving as the

15  chiropractic network, did it put together a code of conduct

16  for, specifically, chiropractors who were working for the

17  ILWU-PMA welfare benefit plan?

18  A.   Yes, we did.

19  Q.   What led CHPC to put together this code of conduct?

20  A.   We were aware of specific problems with this particular

21  group, with chiropractors doing things that were a little out

22  of the ordinary for the general practice of the profession, so

23  we tried to address those through the code of conduct and make

24  sure everybody understood that those things were not

25  acceptable.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Now, did this code of conduct establish new standards, or
2    was it a restatement of things that chiropractors should have
3    been doing even before it?
4    A.   For the most part, it was sort of a restatement of what
5    they should do and they should know they should do, but there
6    were a couple of things that were -- that were new.
7    Q.   Let's turn to a couple of the provisions.  Down here in
8    the middle of the page, do you see a section that's titled
9    "Advertising"?
10   A.   Yes.
11   Q.   And I've blown up Section 4 of that, which talks about
12   incentives offered to plan members.  Was this something that
13   was new and different, or was this something that everybody
14   should have known about?
15   A.   That is actually sort of a restatement of the law.  I
16   mean, we were just sort of pointing out that that's not an
17   acceptable practice, but it is illegal to offer incentives for
18   patients to receive care.
19   Q.   And this made that clear?
20   A.   As clear as we could make it here for these purposes.
21   Q.   Now, down below, there's a section headed "Treatment and
22   Billing."  Do you see that?
23   A.   Yes.
24   Q.   And then in there, there's a number of different sections.
25   Number 1, "Treatment provided to members shall be appropriate
```

1    for the patient's condition as documented in the patient

2    treatment record."

3    A.    Yes.

4    Q.    What was that intended to accomplish?

5    A.    Really that's just sort of restating standards of

6    practice.  It's -- it's common practice for a doctor to

7    document in his medical record exactly what he's doing in

8    his -- in his treatment, in order to bill.  It's -- not sure

9    if -- well, it is a legal requirement to an extent, but it's

10   also a requirement to get paid under many insurance plans.

11   Q.    And how about the second one, "Treatment provided to

12   members shall be medically necessary and only to address the

13   patient's specific conditions as diagnosed and documented in

14   the patient's history"?

15   A.    Yes, the same thing.

16   Q.    Now, the last one, "Adjunctive therapies and procedures

17   shall be used only to support and facilitate chiropractic

18   care."  What was the reference to adjunctive therapies?  What's

19   that?

20   A.    Well, in a chiropractic visit, chiropractors can do a

21   variety of different services.  The one everybody knows, of

22   course, is adjusting or spinal manipulation.  And adjunctive

23   care is anything outside of adjusting or spinal manipulation,

24   so it could be electrical stimulation, massage, a variety of

25   different things.

1   Q.   Now, are you familiar with Kevin Malone?

2   A.   I am.

3   Q.   Is he a member of the CHPC network?

4   A.   He is right now.  We have informed him that we have -- we

5   are terminating his contract.

6   Q.   Now, back in 2009, during the time period 2009 to 2012,

7   was he part of the CHPC network?

8   A.   Yes, he was.

9   Q.   Was he provided with a copy of the code of conduct?

10  A.   Yes.  He signed it.

11  Q.   And the contract that you mentioned, between the

12  California health -- Chiropractic Health Plan of California and

13  providers, had he signed such a contract?

14  A.   Yes.

15          MR. CARDONA:  Nothing further, Your Honor.

16          THE COURT:  Cross.

17          MR. ULTIMO:  Yes, Your Honor.

18                   **CROSS-EXAMINATION**

19  BY MR. ULTIMO:

20  Q.   Good afternoon, Mr. Cataldo.

21  A.   Okay.

22  Q.   For the record, you and I have never met, correct?

23  A.   Correct.

24  Q.   And you just testified that you gave notice to Dr. Kevin

25  Malone.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.

2    Q.    What was the notice you gave him?

3    A.    Termination without cause.

4    Q.    Okay.  Why?

5    A.    It's without cause.  Umm --

6    Q.    There's still a why, I would assume, right?

7    A.    We're not going to talk about that here.

8    Q.    Why not?

9             THE COURT:  It's not relevant.  Next question,

10   Counsel.

11   BY MR. ULTIMO:

12   Q.    Well, he was the doctor who submitted the claim forms for

13   Port Medical, true?

14   A.    He was, yes.

15   Q.    Okay.  And you've seen those claim forms, correct?

16   A.    I have seen some.  CHPC does not process claims, so I

17   don't generally get a chance to see claim forms.

18   Q.    Right, but you did review some of the insurance claim

19   forms submitted by Dr. Malone relevant to these proceedings,

20   correct?

21   A.    I have not.

22   Q.    You have not?

23   A.    No.

24   Q.    Okay.  Now, Dr. Malone is an in-network or -- is he still

25   an in-network provider for CHPC?
```

```
 1   A.    He is until the second week of December.
 2   Q.    Okay.  And he was an in-network provider for CHPC, your
 3   company, under the plan in 2009, 2010, 2011, true?
 4   A.    Correct.
 5   Q.    Okay.  And he would be referred to as a participating
 6   provider, correct?
 7   A.    Yes.
 8   Q.    And that's under the terms of your paperwork, your
 9   contract, and your plan and your code of conduct, right?
10   A.    Yes.
11   Q.    As a participating provider under the CHPC network of
12   doctors, is it his responsibility to determine medical
13   necessity by way of a diagnosis or make clinical findings in
14   that regard?
15   A.    He can do that, yes.  "Medical necessity" is a term that
16   can be used on -- on the provider side and on the paper side.
17   As you saw in the contract that we have with the plan, it does
18   have a medical necessity requirement, which is carried through
19   to our provider agreement, and our provider agreement gives the
20   plan the authority to determine medical necessity as well.
21   Q.    True.  But my question dealt exclusively with a doctor.
22   A.    Well, yeah, the first step, we would -- we would assume
23   that a doctor's going to do an exam and determine some sort of
24   reason for the visit, yes.
25   Q.    Correct.  And the doctor is the first line of defense.  In
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    other words, he sees the patient, he examines the patient, and

2    he makes clinical findings, true?

3    A.    Correct.

4    Q.    Okay.  And then he submits his health insurance claim form

5    with ICD-9 diagnosis codes, correct?

6    A.    Yes.

7    Q.    And those codes would support illness or injury, correct?

8    A.    It should, yes.

9    Q.    And then he would submit his CPT codes for clinical

10   procedures, services that he did do and wants to get paid for

11   under the terms of his agreement with you, true?

12   A.    That's correct.

13   Q.    So that would be his job, to document in the patient's

14   medical chart patient symptoms, true?

15   A.    Yes.

16   Q.    Patient pathologies, true?

17   A.    Yes.

18   Q.    And submit them to insurance to get paid, correct?

19   A.    That's correct.

20   Q.    And he has to be truthful and accurate at all times, true?

21   A.    Absolutely.

22   Q.    That's a requirement under your plan, your contract, and

23   your code of conduct, true?

24   A.    It is, and that's also the law.

25   Q.    I'm sorry?

1  A.   That is also the law.  Submitting a false claim would

2  be --

3  Q.   You're not testifying here as an expert in the law, are

4  you?

5  A.   No, I'm not.

6  Q.   Okay.

7          THE COURT:  Next question.

8          MR. ULTIMO:  Okay.  Not --

9          THE COURT:  Go ahead, next question.

10  BY MR. ULTIMO:

11  Q.   Okay.  So we can -- plenty of books on the law, okay.

12       So it's his requirement to document medical necessity and

13  the procedures that he performs on a patient in the medical

14  chart for the patient, true?

15  A.   That's correct.

16  Q.   Okay.  And he's also responsible to maintain that patient

17  chart for seven years or so, true?

18  A.   Yes.

19  Q.   And allow access to it, true?

20  A.   Yes.

21  Q.   Okay.  So if your company wants to see it, he's gotta make

22  his patient file available, provided he gets the HIPAA release

23  from the patient, true?

24  A.   That's correct.

25  Q.   Okay.  And if he wanted to -- strike that.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        If your company or CIGNA or some other third-party
 2   administrator wants to review the patient file, they can take
 3   steps to request the in-network provider, in this case,
 4   Dr. Malone, to produce the file for inspection, true?
 5   A.   Yes.
 6             MR. CARDONA:  Objection, Your Honor, beyond the scope.
 7   Outside the scope.
 8             THE COURT:  Up till now, overruled.
 9             MR. ULTIMO:  Thank you.  No further questions.
10             THE COURT:  Redirect?
11             MR. CARDONA:  No, Your Honor.
12             THE COURT:  You may step down.
13             THE WITNESS:  Thank you.
14             THE COURT:  Counsel, may this witness be excused?
15             MR. CARDONA:  No objection, Your Honor.
16             MR. ULTIMO:  No objection, Your Honor.
17             THE COURT:  Thank you very much for coming in, sir.
18             THE WITNESS:  Thank you.
19             MR. CARDONA:  Your Honor, we call Pandora Fistonich.
20             THE CLERK:  Good afternoon.  Right here to be sworn,
21   please.  Can you please raise your right hand.
22        Do you solemnly swear the testimony that you are about to
23   give in the matter now before the Court shall be the truth, the
24   whole truth, and nothing but the truth, so help you God?
25             THE WITNESS:  Yes, I do.
```

```
 1              THE CLERK:  Okay.  You may be seated.

 2        May I please ask that you state your full name for the

 3    record and spell your last name.

 4              THE WITNESS:  Pandora Fistonich, F-i-s-t-o-n-i-c-h.

 5              THE COURT:  Thank you.

 6        Counsel, you may inquire.

 7              PANDORA FISTONICH, GOVERNMENT'S WITNESS,

 8                        DIRECT EXAMINATION

 9    BY MR. CARDONA:

10    Q.   Miss Fistonich, is "Fistonich" your married name?

11    A.   Yes, it is.

12    Q.   What's your maiden name?

13    A.   Hall, H-a-l-l.

14    Q.   Have you previously been married?

15    A.   Yes.

16    Q.   And what was your prior married name?

17    A.   My ex-husband's last name was Gaitan (phonetic), but I

18    used my -- my name and his name, so Hall-Gaitan.  I hyphenated

19    it.

20    Q.   Now, are you testifying today pursuant to a cooperation

21    agreement with the government?

22    A.   Yes, I am.

23    Q.   And under that agreement, did the government agree not to

24    prosecute you for crimes arising out of your conduct while you

25    were at Port Medical?
```

```
 1    A.    Yes.

 2    Q.    Did we also agree not to prosecute you for making false

 3    statements during interviews conducted by federal law

 4    enforcement agents on July 9, 2013, and August 28, 2013?

 5    A.    Yes.

 6    Q.    And in return, was one of the conditions of the agreement

 7    that you cooperate with the government?

 8    A.    Yes.

 9    Q.    And did that include coming in to testify today?

10    A.    Yes, it does.

11    Q.    And so you are testifying under that agreement?

12    A.    Yes.

13    Q.    Now in September or October of 2009, did you start working

14    at Port Medical's clinic in Long Beach?

15    A.    Yes, I did.

16    Q.    What did you do there?

17    A.    At the time I was a massage therapist.

18    Q.    And how frequently were you working?

19    A.    I believe it was just one day a week.

20    Q.    How did you find out about Port Medical?

21    A.    Anthony Gomez, who was a long-time patient of mine and

22    also somebody I went to high school with, he told me about the

23    clinic.  He told me his uncle, David, had a clinic that he

24    owned in Long Beach and that they may need another massage

25    therapist.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.    And was his uncle David Gomez?

 2    A.    Yes, David Gomez.

 3    Q.    Is that the same David Gomez who's the defendant here at

 4    counsel table?

 5    A.    Yes.

 6    Q.    Had you known the Gomez family?

 7    A.    Yes, from being from San Pedro, and his mother lived next

 8    door to my mother.

 9          THE COURT:  When you say "his" mother, you mentioned

10    two.

11          THE WITNESS:  Oh, David Gomez's mother lived next door

12    to --

13          THE COURT:  Okay.

14          THE WITNESS:  I didn't know him on a personal level,

15    but I knew who he was at the time.

16          THE COURT:  That's okay.  It was his mother who lived

17    next door.

18          THE WITNESS:  Yes.

19    BY MR. CARDONA:

20    Q.    Now, after you found out about Port Medical from Anthony

21    Gomez, what did you do in terms of getting a job there?

22    A.    Well, Anthony said he would call his Uncle David to find

23    out about me coming in for an interview, and then Anthony told

24    me to call the office and set up an interview with Michelle

25    Aragon, which I did.  I went in and I interviewed with Michelle
```

```
 1   Aragon.
 2           MR. CARDONA:  Your Honor, I'd offer Exhibit 217 at
 3   this time, which is a photograph.
 4           MR. ULTIMO:  217 I think is the appointment book.
 5   217?
 6           MR. CARDONA:  Yeah.
 7           MR. ULTIMO:  No objection.
 8           THE COURT:  Okay.
 9       (Received in evidence, Trial Exhibit 217.)
10   BY MR. CARDONA:
11   Q.   Is Exhibit 217 that's up on the screen a photograph of
12   Michelle Aragon?
13   A.   Yes.
14   Q.   Is that who you interviewed with?
15   A.   Yes.
16   Q.   Did you interview with anybody else at Port Medical before
17   you began work?
18   A.   No.
19   Q.   Did she hire you?
20   A.   Yes, she did.
21   Q.   How were you paid?
22   A.   I was paid biweekly by check.
23   Q.   And did you get a salary, or were you paid per job or --
24   A.   I was hired as an independent contractor, so paid per
25   patient that I saw.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   I'd like to show you a page from Exhibit 117, which has

2    previously been admitted.  Going to show you what's marked as

3    page 61.  Do you recognize this book?

4    A.   Yes.  That's the appointment book at Long Beach.

5    Q.   And how was the appointment book used at Port Medical Long

6    Beach?

7    A.   The front desk would schedule patients, and they would put

8    in the time and the telephone number so they know what

9    therapist was seeing what patient that day.

10   Q.   So this entry up at the top, there's a date, Friday,

11   October 2nd.  Do you see that?

12   A.   Yes.

13   Q.   And then there's a column.  Is that your name at the top?

14   A.   Yes, it is.

15   Q.   So would this reflect an entry showing that you had

16   scheduled -- you were scheduled for certain patients on that

17   particular day?

18   A.   Yes.

19   Q.   Let me go to page 85 of this same document.  Do you see

20   that this is the entry for Friday, October 16th?

21   A.   Yes.

22   Q.   And there's a column on the right.  Let me try that again.

23   Does this similarly reflect entries for you purportedly doing

24   massages that day?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Now, there's a name down there, Leonard Linares, at the

2    bottom.  Do you recognize that name?

3    A.    Yes, I do.

4    Q.    Was that someone you massaged?

5    A.    Yes.

6    Q.    Did you later have a personal relationship with him?

7    A.    Yes.  I dated him at a later time.

8    Q.    We'll come back to that in a second, but going down one

9    page, on the next page, under October 16th as well, at the top

10   there's a name, Yoli.  Was there someone who worked at Port

11   Medical who went by Yoli?

12   A.    Yes.  There was actually two employees named Yoli.

13   Q.    And who were they?

14   A.    Yoli Sierra and Yoli Carr.

15   Q.    Were either of them massage therapists?

16   A.    No.  Not at that time.

17   Q.    What did Yoli Sierra do?

18   A.    She was front desk.

19   Q.    Did she massage patients?

20   A.    Not that I know of at that time.

21   Q.    Now, at some point did you observe people taking the

22   appointment books and doing things with them?

23   A.    Yes.  You mean them not being at the front desk when they

24   should have been?

25   Q.    Yes.

```
1   A.   Yes.

2   Q.   When was that and what did you observe?

3   A.   I couldn't tell you exactly when it was, but -- I guess I

4   don't really understand the question fully.

5   Q.   You mentioned that at some point the appointment books

6   were not where they should have been.

7   A.   Yes.  That was later on in San Pedro when Eva Razo was on

8   staff.  There were times when we couldn't find our appointment

9   books or the appointment -- I would call her, and the

10  appointment books were locked in a cupboard that I didn't have

11  keys to, or in a back office that I didn't have keys to, and

12  we needed the appointment books to run the office efficiently

13  and -- or they were out of the office; she had them with her.

14  So that was very frequently when we were in San Pedro.

15  Q.   And I'll come to San Pedro later.  How long did you work

16  at Port Medical's office in Long Beach?

17  A.   I couldn't tell you exactly, but it was just after the new

18  year of 2010.  I moved to San Pedro shortly after the new year.

19  Q.   So for now I want to talk about while you were at Long

20  Beach.

21  A.   Okay.

22  Q.   At some point while you were at Long Beach, did you see

23  Sergio Amador and David Gomez in the office?

24  A.   Yes, I did.

25  Q.   How frequently were they in the office?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Almost daily.

2    Q.   Did you see them together?  Separately?

3    A.   They usually came together, usually on their lunch breaks

4    or after work.

5    Q.   What was your understanding of the relationship that David

6    Gomez and Sergio Amador had to Port Medical Long Beach?

7    A.   That they were the owners.

8    Q.   Did you also meet someone named Chris Rice?

9    A.   Yes, I did.  A little bit later, maybe a couple of weeks.

10   Q.   Had you known him before?

11   A.   No.

12   Q.   How frequently was he there?

13   A.   Not as frequently.  Maybe once a month, once every couple

14   of months.

15   Q.   And what was your understanding as to his relationship

16   with Port Medical Long Beach?

17   A.   That he was also an owner.

18   Q.   How was Port Medical beach -- Port Medical Long Beach set

19   up?  Can you describe the interior of the office?

20   A.   Yes.  There was two separate entrances.  So the patient

21   entrance, you would enter, and waiting area was like a square,

22   waiting room with windows and -- and lined with chairs, and

23   then over to the left there was a cubicle cut-out, like a

24   window, and in -- you could see into behind the front desk.

25   And then there was a door which led into -- which was closed

1   until somebody took the patients back, but that led into the

2   hallways and the examination rooms.  And then there was a

3   separate entrance from around the side of the building, and

4   that's where the employees entered, and it would walk into the

5   back area, where the front desk was.

6   Q.   So back in the area back behind the kind of waiting room

7   reception area, how many rooms were there?

8   A.   I couldn't tell you exactly, and there was a time that

9   Port Medical Long Beach went through construction and the

10  layout changed, but approximately, I would say about seven.

11  And a break room that ran down the middle, so you could walk

12  through the break room from -- there was two hallways, and then

13  you could go down the back, and then there was a break room

14  that ran through the middle, towards the back, from one hallway

15  to the other.

16  Q.   And those rooms in back, was that where you provided

17  massages?

18  A.   The massage rooms were on the sides.

19  Q.   Now, the reception area you described with that cut-out,

20  was that where the front desk staff worked?

21  A.   Yes.

22  Q.   And when patients came into Port Medical, what did they

23  do?

24  A.   They would have to sign in at the front desk.  There was a

25  clipboard with sign-in stickers, and they would have to sign in

1    as they came in.

2    Q.    And where were the appointment books?

3    A.    Behind the front desk, sitting there.

4          Would you mind if I got some water?

5               THE COURT:  We'll get you some.

6          Sharon.

7               THE WITNESS:  Thank you.  Sorry.

8               THE COURT:  It's okay.

9          Go ahead, Counsel.

10   BY MR. CARDONA:

11   Q.    So once a patient came in and signed in, how would they

12   get back to you if you were doing the massage?

13   A.    The front desk would peel off the sticker.  The front desk

14   would have pulled the chart from the file cabinet, placed the

15   sign-in sticker on the SOAP note, which is then put inside the

16   patient's file --

17         *(Water given to witness.)*

18         Thank you.

19         -- and then they hand us -- there was usually, like,

20   little things on the wall, you know, that you slot files in,

21   and every patient -- every therapist had their name on it, and

22   the front desk would put the files in for the day for who we

23   saw, and either after every patient or at the end of the day

24   when we had time, we would then do the SOAP notes for that

25   patient.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   Now, you referred to SOAP notes.  What are SOAP notes?

A.   SOAP notes are notes that chiropractors do for patients.

SOAP is an acronym for subjective, objective, assessment, and

plan.  Basically, the -- the diagnostic treatment for that

patient, the assessment of what the problem is, which is done

by the doctor, and then the plan, the treatment plan.  So it's

basically the patient's chart.

Q.   Now, were you familiar with SOAP notes before you started

at Port Medical?

A.   Yes.  I had done them at other offices.

Q.   Doing what?

A.   Well, I had been a massage therapist for ten years prior,

so I had worked at other offices that did SOAP notes before.

Q.   So patient would come in, sign the sticker, it would get

put on the chart?

A.   Yes.

Q.   Then how would the patient get back to you?

A.   I would open the door and walk them back to the room, yes.

Q.   And when you did the massage, before you did the massage,

what did you do?

A.   I would ask them if they had any complaints or look at

their chart.  If I didn't see anything written in their chart

for their plan, I would ask the patient personally.  Then I

would escort them to the room and then wait outside to give

them a minute to unchange, and then go in and then give them

1  their massage.

2  Q.   And once the massage was complete, what would you do?

3  A.   I would let them know I'd meet them outside, give them

4  water, ask them if they'd like to reschedule, and then say

5  good-bye, and I would either do the SOAP notes at that time,

6  or, if I was booked back-to-back, I would do the SOAP notes at

7  a later time.

8  Q.   And at some point, where did you return the charts to in

9  order to get them processed?

10  A.   I think we had a place at the front desk that we put

11  completed SOAP notes.

12  Q.   Were you involved in billing?

13  A.   No.

14  Q.   Who did the billing when you started at Port Medical?

15  A.   In the very beginning, it was Michelle Aragon, and I

16  believe Toni Moyer -- yeah, Toni Moyer and Michelle Aragon, and

17  another lady named Libby would help, but I don't remember her

18  last name.

19  Q.   And when you filled out the charts, did you understand

20  that they would be used to do the billing?

21  A.   Yes.

22  Q.   Now, when you started doing massages, were there times

23  when you noticed that patients hadn't seen the chiropractor?

24  A.   Yes, sometimes I would notice.  If it, say, was a

25  patient's first time, there should have been an initial exam

1    done, and sometimes I saw that that wasn't done.

2    Q.   At some point, did you bring that up with Michelle Aragon?

3    A.   Yes.

4    Q.   What did you say to her and what did she say in return?

5    A.   Well, I asked why that they weren't seeing the

6    chiropractor before.  Because I've known from working at other

7    offices that it is the law that they have to see the

8    chiropractor for an assessment plan before they can have

9    treatment for medical necessity.  And I guess basically I was

10   given the answer that there isn't time for that sometimes.

11   Patients come in on their lunch break or they just don't have

12   time, or families would come in in big groups and the doctor

13   couldn't physically see that amount of people at one time.

14   Q.   Did you raise that issue with Sergio Amador?

15   A.   Yes.

16   Q.   What was your conversation with Mr. Amador?

17   A.   Pretty much the same as Michelle.  He gave me the same

18   reasons as Michelle did.

19   Q.   Did that cause you any concern?

20   A.   It did, yes.

21   Q.   Why?

22   A.   Because I felt that it wasn't -- I knew it -- I knew the

23   protocol from working in other offices, and I knew that there

24   was something not right about that, that they should be seeing

25   the chiropractor before they were given their treatments.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   Now, you mentioned large families.  Did you notice a large

number of large families coming to Port Medical?

A.   Not a large number, but there was quite a few.

Q.   Did Michelle Aragon do anything for those families?

A.   Yes.  She would have special days that they would come in

and they would have pizza and ice cream and, like, little

treats and toys for the kids, and they would all go into this

one room where there was a TV, and basically it was a big event

for these large families that day.

Q.   Did you treat children?

A.   Sometimes, yes.

Q.   How long would you massage children?

A.   Sometimes 30 minutes, sometimes an hour if I was told to.

Q.   Were there times when you billed for more than you

massaged them?

A.   If I charted for more than I -- I guess, yes.  I guess so,

yeah.  Maybe not at that time, but later on, yes.

Q.   How did that come about?

A.   Well, I think that would be fast-forwarding to when I was

in San Pedro.

Q.   So let's hold that for now.

A.   Yes.

Q.   Were there times when you saw Sergio Amador meeting with

patients?

A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Was this at Long Beach?

2    A.   Yes.  Both offices, but in the beginning, Long Beach.

3    Q.   So when you were at Long Beach, where did you see Sergio

4    Amador meeting with patients?

5    A.   He would take them back to the billing office.

6    Q.   Did you know what that was for?

7    A.   Not initially, but --

8    Q.   Did you come to learn what that was --

9    A.   I came to learn, yeah.  He was giving them checks.

10   Q.   How did you learn that?

11   A.   Well, it all kinda came out to -- came out in the open,

12   and he would ask me sometimes to pick him up cash or -- from

13   the bank to give to them, or sometimes he didn't have a long

14   enough break, so he would have me write a check and give the

15   patient the check.

16   Q.   And was this later during your time at Port Medical Long

17   Beach?

18   A.   Towards the end of my time in Long Beach, and -- and I saw

19   him doing it in Long Beach, but I didn't really meet with

20   patients myself when I was in -- I mean -- I'm sorry.  Towards

21   the end of the time when I was in Long Beach, but when we moved

22   to San Pedro, mostly him and Eva would meet with patients.  But

23   I already knew at that point what was going on.

24   Q.   So when was the first time that you learned that Sergio

25   Amador was paying patients, if you remember?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  A.   I couldn't tell you.  I mean, this is going back seven

2  years.  I couldn't tell you a first date specifically, month or

3  time, but it was very soon after I worked there, after I began

4  working there, yes.

5          THE COURT:  Before or after you went to San Pedro?

6          THE WITNESS:  Before, yes.  One mon- -- within a month

7  or so of working in Long Beach.

8  BY MR. CARDONA:

9  Q.   Now, at some point did you become an office manager in

10  Long Beach?

11  A.   Yes.

12  Q.   When was that, approximately?

13  A.   Around Christmastime 2009.  Sergio approached me.  Sergio

14  and David, actually, offered me the job for San Pedro office

15  manager.  They were -- said they were going to be opening a new

16  office in San Pedro, and so that was -- that was my job, was to

17  start preparing for San Pedro, but in the meantime, Michelle

18  Aragon had some kind of breakdown, and they moved her to

19  another office, basically, to get her out of the way, and I had

20  to take over her responsibilities in Long Beach as well.  So I

21  was kind of trying to run Long Beach and open up a second

22  office in San Pedro.

23  Q.   Now, let me go back before that.  Was there a time before

24  you started working as the office manager in Long Beach when

25  the Port Medical office shut down for one or two days?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.
2    Q.    Do you recall when that was in relationship to when you
3    became the office manager?
4    A.    It was before I actually became the office manager.  When
5    Michelle was still office manager.
6    Q.    And why did Port Medical shut down for those one to two
7    days?
8    A.    Well, at the time I was told that we were having an
9    internal audit from the tax, IRS, but towards the end of those
10   days, I -- I realized that wasn't the case.
11   Q.    So what happened during those days?
12   A.    Well, the office closed down, and the patients -- there
13   was no patients being scheduled, and Michelle Aragon and Toni
14   Moyer just -- it was complete chaos in the office, and they had
15   charts everywhere, and basically they had tons and tons of
16   charts with no SOAP notes that had been done, and many of them
17   didn't have patient signatures on them.  And Michelle Aragon
18   was saying that she had just not had the massage therapists do
19   the SOAP notes, but I think I pretty much figured out that
20   those patients had never been in.  So they -- Michelle Aragon
21   was pulling the billing codes off of the -- off of the computer
22   and writing them into the charts, and then they asked me and
23   some others to help with those SOAP notes and then instructed
24   somebody else to go out and get the signatures for those.
25   Q.    So let me break that down for a moment.
```

1   A.   Yes.

2   Q.   Michelle Aragon pulled billing codes off the computer?

3   A.   Yes, so the SOAP notes would match what she already had

4   billed for.

5   Q.   Now, you had mentioned that there were no signature

6   stickers.

7   A.   Yes.

8   Q.   Are those stickers that you're referring to from the

9   sign-in sheets?

10  A.   Yes.

11  Q.   Did you get signature stickers?

12  A.   I wasn't instructed to get the signatures.

13  Q.   So let me step back for one moment.  Who else was there

14  during that time in Port Medical when it was shut down for two

15  days?

16  A.   Well, it went on for, you know, a matter of days, so

17  people were in and out, but everybody I can remember being

18  there was myself, Toni Moyer, Michelle Aragon, David Gomez,

19  Sergio Amador, Kevin Malone, Yoli Sierra, and Griselle Garcia.

20  Q.   So we've talked about Yoli Sierra.  She was one of the

21  front desk staff?

22  A.   Yes.

23  Q.   What about Griselle Garcia?

24  A.   Griselle pretty much wasn't involved in what was going on

25  in the back.  She was just pulling charts from the front, what

```
 1   Michelle was asking her to pull from the front.  She was a
 2   front desk girl as well.
 3   Q.   So you mentioned that you completed some charts, some SOAP
 4   notes?
 5   A.   I did.  They asked me to help them, and I did.
 6   Q.   Who else did?
 7   A.   I believe Yoli Sierra did at that time as well.
 8   Q.   Now, you mentioned that they instructed someone to go get
 9   signatures.
10   A.   Yes.
11   Q.   Who was it who was instructed to go get signatures?
12   A.   Who went to get the signatures?  Yoli Sierra.
13   Q.   And who directed her?
14   A.   I believe it was David Gomez and Sergio Amador.
15   Q.   Did Yoli come back with signature stickers?
16   A.   Yes.
17   Q.   And what did you do with those, or what was done with
18   those?
19   A.   They were put in the charts.
20   Q.   You mentioned that this was chaos.  Did you talk with
21   anybody about what was going on?
22   A.   Yeah, it -- it was absolute chaos.  I mean, there was
23   alcohol there, and Michelle was taking medications, and there
24   was speak of the office being burned down.  Like, it was chaos.
25   All I did was help and just wanted to get in and out.  I think
```

```
1    I pretty much assumed this was more than a IRS scare.
2              MR. ULTIMO:  Move to strike, Your Honor, not
3    responsive.
4              THE COURT:  The last part will be stricken.
5    BY MR. CARDONA:
6    Q.   Did you ever hear anything after that about the audit
7    actually occurring?
8    A.   No.
9    Q.   Was there another instance where you observed Yoli filling
10   out SOAP notes?
11   A.   Yes.
12   Q.   When was that?
13   A.   I couldn't tell you, but we were still in Long Beach at
14   the time.
15   Q.   So you were still in Long Beach?
16   A.   Yes.
17   Q.   Was it before or after you became the office manager?
18   A.   I believe I was already office manager at that time.
19   Q.   And what did you observe Yoli, Yolanda Sierra, doing?
20   A.   Completing SOAP notes in the back office.
21   Q.   Did you talk to her about that?
22   A.   Yes, I did.
23   Q.   What did you say to her?
24   A.   I asked her what she was doing, and she said, "Dave is
25   having me fill out these charts."
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Did she mention whether Sergio Amador had also asked her

 2   to do that?

 3            MR. ULTIMO:  Move to strike.  Hearsay, Your Honor.

 4            THE COURT:  Sustained.

 5            MR. CARDONA:  Your Honor, co-conspirators.

 6            MR. ULTIMO:  Foundation, Your Honor.

 7            THE COURT:  Sustained, Counsel.  You talking about

 8   Sergio, right?

 9            MR. CARDONA:  Yes.

10            THE COURT:  Yeah, sustained.

11            MR. CARDONA:  Very well.

12            THE COURT:  He's on the witness list anyway, is he

13   not?

14            MR. CARDONA:  Yes, Your Honor.

15            THE COURT:  Okay.

16   BY MR. CARDONA:

17   Q.   Now, you mentioned that you were asked to manage Port

18   Medical San Pedro; is that correct?

19   A.   Yes.

20   Q.   Who talked to you about that?

21   A.   Sergio and David.

22   Q.   At the same time or on different occasions?

23   A.   Together.

24   Q.   Did you accept that offer?

25   A.   I did.
```

1   Q.   Before you accepted, did you talk to them about it?

2   A.   Yes, I did.  I talked about what had happened and what was

3   going on in Long Beach, and they presented San Pedro kind of

4   like a fresh start, that none of this would be going on, kind

5   of like a way to start over.

6   Q.   When you say --

7   A.   Without -- without the fraud.

8   Q.   Did you specifically discuss with them the falsification

9   of the charting?

10  A.   Yes.

11  Q.   And --

12  A.   I didn't say "the falsification of the charts," but I did

13  say, you know, we can't have any of this going on.  And David

14  was in agreement, and -- and pretty much David said he would

15  have control of San Pedro, and Sergio would have control of

16  Long Beach, and they assured me that none of it would be going

17  on in San Pedro.

18  Q.   Now, was there another investor in Port Medical San Pedro?

19  A.   Yes.  When we came to San Pedro, I found out that Chris

20  Viramontes was also an investor.

21  Q.   And who was Chris Viramontes?

22  A.   He at the time was president of Local 13 ILWU.

23  Q.   Was there a time when you were sent to pick up something

24  for Mr. Viramontes?

25  A.   Yes.  This is when I was still in San Pedro.  I mean,

```
 1   sorry, when I was still in Long Beach, before San Pedro office

 2   opened.  David had me go pick up -- he sent me to go pick up

 3   something from Chris Viramontes.

 4   Q.   And did you do that?

 5   A.   I did.  I went to San Pedro and I picked up a -- I was

 6   handed a brown paper bag, and I looked inside and there was

 7   cash.

 8   Q.   And what did you do with that?

 9   A.   I took it back to Long Beach office and --

10   Q.   What did you do with it when you got there?

11   A.   I put it in the cupboard in the -- behind the front desk.

12   Q.   Did you see who picked it up?

13   A.   No, I didn't.

14   Q.   Now, when you began work as the manager in Port Medical

15   Long Beach, were you put on certain of the bank accounts that

16   were used to manage the business as a signer?

17   A.   Yes, I was, because I was told that David and Sergio

18   couldn't have their names on the account, so I would have my

19   name on the accounts.

20   Q.   Who told you that?

21   A.   I can't remember exactly, but I think it was Michelle

22   Aragon.

23            MR. ULTIMO:  Move to strike, hearsay.

24            THE COURT:  Sustained.  It will be stricken.

25            MR. CARDONA:  Your Honor, at this time I'd offer
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Exhibit 52.

 2              THE COURT:  52?  Okay.

 3              MR. ULTIMO:  No objection.

 4              THE COURT:  Okay.  It will be received.

 5         (Received in evidence, Trial Exhibit 52.)

 6    BY MR. CARDONA:

 7    Q.   Got Exhibit 52 up here.  Want to ask you a couple of

 8    questions about this.  You see the address, business address,

 9    2530 Atlantic Avenue, Suite A, Long Beach?

10    A.   Yes.

11    Q.   Was that the address of Port Medical Long Beach?

12    A.   Yes.

13    Q.   And do you see the name, Chosen Medical Management?

14    A.   Yes.

15    Q.   Did you know what Chosen Medical Management was?

16    A.   Yes.  I knew that was the medical management company for

17    Port Medical.

18    Q.   Down below here, I'm going to blow up -- you see where it

19    says "Name of the signer to add"?  Was that your name at the

20    time?

21    A.   Yes.  My name with a spelling error, but it is my name.

22    Q.   And what's the spelling error?

23    A.   My last name.  Would you like me to -- it's supposed to be

24    -a-n, with a hyphen between Hall and Gaitan.

25    Q.   Were you the secretary treasurer of Chosen Medical
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Management?

2    A.    Not -- not that I was ever told, no.  Plus, I didn't -- I

3    don't think I even noticed that at the time.

4    Q.    And over on the right, is that your signature?

5    A.    Yes.

6    Q.    And the date, April 8th of 2010, do you see that?

7    A.    I do.

8    Q.    During that time, were you still at Long Beach, managing

9    the office there?

10   A.    I couldn't tell you exactly.  I'm not good with specific

11   dates, and like I said, it's been many years and a lot of

12   stress, but I -- I imagine I was if I was still dealing with

13   Chosen Medical Management stuff, because once I moved to San

14   Pedro, I didn't have anything to do with Long Beach anymore.

15           MR. CARDONA:  And Your Honor, I'd offer Exhibit 27.

16           MR. ULTIMO:  No objection, Your Honor.

17           THE COURT:  It will be received.

18       *(Received in evidence, Trial Exhibit 27.)*

19           THE CLERK:  Counsel, and I'm sorry, what was the

20   exhibit you just had up?

21           MR. CARDONA:  52.

22           THE CLERK:  52.  Thank you.

23   BY MR. CARDONA:

24   Q.    So Exhibit 27, which I've put up there, you see the

25   business name, Port Medical Associates?

1    A.    Yes.

2    Q.    And was this the same address for Port Medical Long Beach?

3    A.    Yes.

4    Q.    Down below in the section I'm pulling up, "Name of signer

5    to add:  Francisco Correa," do you recognize that name?

6    A.    I do.

7    Q.    Who was that?

8    A.    I didn't -- I had never met him at the time I was at Port

9    Medical, but he was the doctor that they hired to -- I don't

10   know what the term is, but to look as if he was the owner of

11   the place.

12         MR. ULTIMO:  Objection, lack of foundation.  Move to

13   strike.

14         THE COURT:  Overruled.  You may cross-examine later on

15   it.

16   BY MR. CARDONA:

17   Q.    Down below, do you see "Name of the signer to add," your

18   name with the same misspelling?

19   A.    Yes.

20   Q.    And here, as title, it simply says "authorized signer"; is

21   that right?

22   A.    Yes.

23   Q.    And as a result of this, did you get authority to sign

24   checks?

25   A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And similarly, did you get authority to sign checks on the

2   Chosen Medical Management account?

3   A.   Yes.

4   Q.   And over here we see -- is that your signature?

5   A.   Yes.

6   Q.   Dated May 11th, 2010?

7   A.   Yes.

8   Q.   Now, you mentioned Michelle Aragon, that she was moved to

9   another office; is that right?

10  A.   Yes.  Well -- yes, she was -- she was -- her position

11  changed.  She was now working with a surgery center that they

12  were involved with as well.  She was called a patient

13  coordinator at that time.

14  Q.   Now, at some point did she quit?

15  A.   I don't really know what happened.  I believe she was

16  fired, yes.  Yeah, I believe David said that they fired her.

17  Q.   And by David, do you mean David Gomez?

18  A.   Yes.

19  Q.   Now, at or around the time she was fired, did you overhear

20  a conversation between David Gomez and Sergio Amador about

21  Michelle Aragon?

22  A.   Yes.

23  Q.   What did you hear them talking about?

24  A.   Well, they were talking about Michelle, and just basically

25  that she's the problem of somebody else now, that she was moved

1    to the surgery center.  And I involved myself in the

2    conversation, and I asked them weren't they worried about

3    everything that she knew, and retaliation?  Because at the

4    time, she was -- looked like she was just completely volatile.

5    Q.    What did you mean by retaliation?

6    A.    Turning them in for what they were doing.

7    Q.    Did they respond to that?

8    A.    Yes.  David said, "Well, she's the one that taught us all

9    of this anyway, so we'll blame it on her."

10   Q.    Now, while you were managing the Long Beach office, did

11   you falsify some chart entries?

12   A.    Yes, I did.

13          MR. CARDONA:  Your Honor, I'd offer Exhibit 203.

14          MR. ULTIMO:  No objection.

15          THE COURT:  It will be received.  Thank you.

16       (Received in evidence, Trial Exhibit 203.)

17   BY MR. CARDONA:

18   Q.    So I'll turn to this in a second, but how did it come

19   about that you falsified chart entries?

20   A.    Well, initially Sergio had asked me to hire a therapist

21   that would do solely just this, to -- to -- somebody that he

22   could pay to falsify charts, basically.  But I wasn't willing

23   to do that to somebody else, so he asked me if I would do it,

24   and I agreed.

25   Q.    On this document, do you see the date at the top, June 7th

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    to 20th, 2010?

2    A.    Yes.

3    Q.    And then below there are a series of headings:  "Patient,"

4    "Dates Billed," "Total Billed."  Do you see that?

5    A.    Yes.

6    Q.    Now, did you create this document?

7    A.    No, I didn't.

8    Q.    Looking at the left-hand column, under "Patient," do you

9    recognize those names?

10   A.    Yes, I do.

11   Q.    What are those names?

12   A.    Those are names of patients that I falsified the charts

13   for.

14   Q.    And looking in the column titled "Dates Billed," do you

15   recognize those dates?  Or what do you understand those dates

16   to be?

17   A.    I understand those dates to be the dates that were

18   inputted as the dates they supposedly came into the office for

19   treatment.

20   Q.    And did you in fact create false chart entries for dates

21   for all of these patients?

22   A.    Yes, I did.

23           MR. CARDONA:  Your Honor, I'd offer Exhibit 147, which

24   is a patient chart.

25           THE COURT:  Okay.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ULTIMO:  No objection.

 2              THE COURT:  It will be received.

 3         (Received in evidence, Trial Exhibit 147.)

 4              THE COURT:  Next question, Counsel.

 5              MR. CARDONA:  Yes, Your Honor.  If I can have one

 6   second, I'm trying to pull up the other document, which appears

 7   to have been altered, okay.

 8   Q.   Do you recognize -- does this look like the charts that

 9   Port Medical used?

10   A.   Yes.

11   Q.   And do you see the name on this chart, Jeff Carmichael?

12   A.   Yes, I do.

13   Q.   And was that one of the names that was on Exhibit 203?

14   A.   I believe so.  I think so.

15   Q.   Let me pull back up Exhibit 203.

16   A.   Yes, I see it, yes.

17   Q.   See listed on the left?

18   A.   Yes.

19   Q.   Going back to his chart, going to page 41 of that chart,

20   do you see a series of entries?

21   A.   Yes.

22   Q.   Are these what you were referring to as SOAP notes?

23   A.   Yes.

24   Q.   Let me blow one of these up.  And let me try that again.

25   So do you see the date on the left?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   What's that date supposed to indicate?

 3   A.   The date the patient was supposedly in the office

 4   receiving treatment.

 5   Q.   And do you see the initials "P.H."?

 6   A.   Yes.

 7   Q.   What's supposed to be there?

 8   A.   My initials, Pandora Hall, the therapist initials.

 9   Q.   Is that the box where the therapist is supposed to put

10   their initials?

11   A.   Yes.

12   Q.   And over on the right, there's a sticker with the name

13   Jeff Carmichael.  Do you see that?

14   A.   Yes.

15   Q.   Where did you get -- first I'll ask you, is this one of

16   the chart entries that you fabricated?

17   A.   Yes, it is.

18   Q.   Where did you get the signature sticker to do that?

19   A.   Eva would bring them to me and leave them in my office, in

20   a manila envelope.

21   Q.   Now, when did Eva start work?

22   A.   I believe it was around August of 2010.  So I must have

23   been getting these from -- from Sergio at the time, because

24   before Eva came on board, I got them from Sergio.

25   Q.   Now, over on the left, you see there's a red dot.
```

```
 1    A.    Yes.

 2    Q.    Was that a standard marking that was used at Port Medical?

 3    A.    That meant that -- that was put there by the biller, and

 4    that meant that the -- it had been billed for.

 5    Q.    And was that a marking that the billers used to indicate

 6    on the charts what had been billed?

 7    A.    It was an indication that it was inputted, billed for and

 8    inputted in the computer, yes.

 9    Q.    Now, during this same time period when you were still

10    managing Long Beach, before you moved to San Pedro, were you

11    also signing checks on the accounts that you were a signer for?

12    A.    Yes, I had to sign all checks.

13          MR. CARDONA:  So if I could, I'd like to pull up

14    Exhibit 273, page 50, and I'd offer that, Your Honor.  273,

15    page 50.

16          THE COURT:  273, page 50.  Any objection?

17          MR. ULTIMO:  If I could have one more minute.

18          THE COURT:  Sure.

19          MR. ULTIMO:  Thirty seconds, Your Honor.

20    No objection, Your Honor.

21          THE COURT:  Okay.

22          (Received in evidence, Trial Exhibit 273, page 50.)

23    BY MR. CARDONA:

24    Q.    Going to blow it up so we can all see it.  Is this a check

25    to Jeff Carmichael?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Yes.

2    Q.   And is that your signature on the right?

3    A.   Yes.

4    Q.   Over on the left, there's a memo, "Basketball

5    sponsorship."

6    A.   Yes.  We would have blank -- blank checks at the office

7    with Chosen Medical Management, and then I would be told by

8    Sergio how much to write, what to put in the memo, and who to

9    give them to, and then I would have to sign them and print them

10   out from the computer.

11   Q.   So did you write this check to Jeff Carmichael?

12   A.   Yes, I did.

13   Q.   And the date on here is June 30th, 2010?

14   A.   Yes.

15   Q.   Let me go back for a second to Exhibit 203, and over on

16   the left, do you see an entry in the list of patients for Mike

17   Montoya?

18   A.   Yes.

19        MR. CARDONA:  And Your Honor, I'd offer Exhibit 273,

20   page 45.

21        MR. ULTIMO:  No objection, Your Honor.

22        THE COURT:  Be received.

23   *(Received in evidence, Trial Exhibit 273, page 45.)*

24   BY MR. CARDONA:

25   Q.   Is this a check that you wrote to Mike Montoya?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.

2    Q.    And did you again indicate "Sponsorship"?

3    A.    Yes.

4    Q.    And was that again at Sergio Amador's direction?

5    A.    Yes.  I was just working as directed.  Whatever I was told

6    to write, I put in the memo.

7    Q.    Now, did you also make cash withdrawals?

8    A.    Yes, I did.

9    Q.    Who directed you to do that?

10   A.    Sergio Amador.

11   Q.    And what did you do with the cash?

12   A.    I would meet with him and give it to him.

13   Q.    Do you know what he used that for?

14   A.    No, I don't.

15   Q.    At or around this time when you were writing these checks

16   to pay people and fabricating charts for those people, did you

17   have a conversation with Sergio Amador where you talked to him

18   about this?

19   A.    We talked about it all the time.  We -- we pleaded with

20   him to stop all the time.

21   Q.    Did he stop?

22   A.    No.  Not that I know of.  Not while I was there.

23   Q.    Was David Gomez present during any of those conversations?

24   A.    Yes.

25   Q.    Do you remember any of those in specific?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   No, nothing specific.

2   Q.   Was he there during any conversations where you discussed

3   explicitly with Mr. Amador paying patients and fabricating

4   charts?

5   A.   Yes.  I had conversations with David about that it needed

6   to stop and begging David to have Sergio stop, and --

7   Q.   And why did you talk to David about that?

8   A.   Because he was the more responsible, sound person to speak

9   to, and he seemed like he could talk sense into Sergio, and

10  Sergio was the one that seemed to be out of control, and we

11  thought if anyone was going to listen to us, it would have been

12  David.  We felt like we had potential to have a good, honest

13  office, and before it was all destroyed, we thought there would

14  still be a chance, until we all -- before we all lost our jobs,

15  and David was the one that we always spoke to.

16  Q.   Now, during those conversations, did David Gomez say

17  anything to you to indicate that he didn't know that was going

18  on?

19  A.   No.

20  Q.   And after you had those conversations, did it stop?

21  A.   No.

22  Q.   Now, after you left Port Medical Long Beach and took over

23  in San Pedro, who took over for you managing the Long Beach

24  office?

25  A.   There was a series of office managers.  I think at first

1    it may have been Nicole LaBeaud.  LaBeaud, I believe that was

2    her name.  And then maybe Griselle Garcia, and then Eva.  Eva

3    was running kind of both offices.  I didn't really go there.  I

4    kinda separated myself from it, so I'm not sure exactly, but

5    there was a lot of changes going on in Long Beach, it seemed.

6    Q.   Now, when you got to San Pedro, what were your duties?

7    A.   Hire of staff, keep a staff going, make sure patients were

8    happy, oversee the front desk, oversee the staff, continuing

9    with bringing together the furnishing.  Basically just

10   overseeing that everything was running smoothly.

11   Q.   Did you continue to do massages?

12   A.   No, not once in San Pedro.  Once in a great while, if we

13   were overbooked, I had to jump in, but that was maybe twice,

14   three times that I can remember.  Two times, maybe, but no.

15   Q.   So you didn't do multiple massages on --

16   A.   No, no.  I wasn't a massage therapist at -- at that time.

17   Q.   Now, I want to come back for a second to Eva Razo, and I'd

18   like to show you a photograph marked as Exhibit 219.

19        And I'd offer that, Your Honor.

20            MR. ULTIMO:  219?

21            MR. CARDONA:  219.

22            THE COURT:  219.

23            MR. ULTIMO:  No objection, Your Honor.

24            THE COURT:  Received.

25            *(Received in evidence, Trial Exhibit 219.)*

```
 1   BY MR. CARDONA:

 2   Q.   Is this a photograph of Eva Razo?

 3   A.   Yes.

 4   Q.   Now, when she took over in Long Beach and/or San Pedro,

 5   was she put on the bank accounts?

 6   A.   Yes.

 7           MR. CARDONA:  And Your Honor, I'd offer Exhibit 54.

 8           THE COURT:  Which is?

 9           MR. CARDONA:  Bank signature card.

10           THE COURT:  Okay.

11           MR. ULTIMO:  No objection.

12           THE COURT:  It will be received.

13        (Received in evidence, Trial Exhibit 54.)

14   BY MR. CARDONA:

15   Q.   Is this for Chosen Medical Management?

16   A.   Yes.

17   Q.   And is it adding Eva Razo?

18   A.   Yes.

19   Q.   Do you know, was she the vice president, finance?

20   A.   I don't know what her title was.  I believe they told me

21   at one point she was general manager of both offices.

22   Q.   When you say "they," who do you mean?

23   A.   Sergio and David.

24   Q.   Now, down below there, is that your signature?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.   Were you the secretary of Chosen Medical Management?

 2    A.   No.

 3    Q.   Now, was there another medical management company called

 4    Ramport Medical Management?

 5    A.   Yes.

 6    Q.   What was its function?

 7    A.   I don't really know.  I believe it was the same kind of

 8    thing.  I'm not sure if it was an earlier management company.

 9    I'm not a hundred percent sure, but it was something that they

10    had set up with Ramsey Muro.

11    Q.   Who was Ramsey Muro?

12    A.   I didn't really know what his title was, but somebody that

13    Sergio and David used to help them with setting up corporations

14    or -- setting up these management companies.  I believe that's

15    what he did.

16         MR. CARDONA:  Your Honor, I'd offer Exhibit 61,

17    another bank signature card.

18         MR. ULTIMO:  No objection.

19         THE COURT:  Be received.

20         (Received in evidence, Trial Exhibit 61.)

21    BY MR. CARDONA:

22    Q.   You see that this is for Ramport Medical Management?

23    A.   Yes.

24    Q.   Do you see the name Ramsey Muro?

25    A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Is that who you're referring to?

2    A.   Yes.

3    Q.   And it says "Member Managed" as his title.  Did you know

4    what that meant?

5    A.   No.

6    Q.   The date on the right, is that August 16th of 2010?

7    A.   Yes.

8    Q.   And below that, is that your name?

9    A.   Yes.

10   Q.   Again with the same misspelling?

11   A.   Yes.

12   Q.   And it has you as office manager.  Was that a correct

13   title?

14   A.   Yes.

15            MR. CARDONA:  Your Honor, I don't need to display them

16   at this time, but I offer Exhibit 62 and 30, additional bank

17   signature cards.

18            THE COURT:  Okay.

19            MR. ULTIMO:  No objection.

20            THE COURT:  Be received.

21      (Received in evidence, Trial Exhibits 62 and 30.)

22   BY MR. CARDONA:

23   Q.   Now, after Eva Razo took over as manager in Long Beach

24   while you were in San Pedro, did you have a meeting with her

25   and Sergio Amador?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   We had meetings all the time.

2   Q.   Was there a meeting where they discussed with you

3   additional fabrications of charts?

4   A.   Yes.

5   Q.   Do you recall when exactly that was?

6   A.   No, I'm sorry.

7   Q.   Where did it take place?

8   A.   Usually in the back billing office is where we met.

9   Q.   You remember this specific meeting, where it took place?

10  A.   I don't remember exactly, but that's where our meetings

11  took place generally.

12  Q.   And what did they discuss with you during this meeting?

13  A.   Well, Sergio wanted more charts fabricated.  He said that

14  some patients needed help.  Which is generally what he usually

15  said, that he wanted to help somebody out, someone going

16  through a divorce, somebody needed money, somebody was losing

17  their home, so -- and then there was a lot of expense from

18  building San Pedro, so asked if I would do more charts for

19  them.

20  Q.   Did you agree?

21  A.   I did.  I always felt like I was half away from losing my

22  job, and I felt like I had to keep him happy.

23  Q.   And in this instance, did you negotiate with him a

24  payment?

25  A.   Yes.  He -- we didn't negotiate, but he offered me $20 per

```
 1   person.
 2   Q.   And did you agree to do it for that?
 3   A.   Yes, I did.
 4   Q.   How did you get the charts to make false entries in?
 5   A.   They would be delivered by Eva.  They would be left in my
 6   office.  They -- she brought them from Long Beach.
 7   Q.   Were you fabricating chart entries for San Pedro charts or
 8   Long Beach charts?
 9   A.   Long Beach.
10   Q.   Why?  Why just Long Beach?
11   A.   I don't know.  I don't know what was going on over there.
12   But that wasn't -- none of the patients that came into San
13   Pedro, that I knew of, those kinds of things were going on.
14   Q.   So Eva Razo would bring the charts over.  What would you
15   do?
16   A.   I would falsify the SOAP notes like we went over before,
17   stamp the date stamp.  Sometimes I didn't even put a date on
18   it.  They would fill that out or she would fill that out.  And
19   put the sticker on.  Sometimes the stickers weren't available.
20   I would give them back without the sticker, and I would assume
21   she would put them on, and I would leave them for her in my
22   office, which, she had a key for everything at the time, and
23   she would pick them up whenever she came by.
24   Q.   Now, in addition to the conversation with Sergio and Eva
25   about falsifying charts, did you also have a conversation with
```

1  them about billing for massages and how they wanted massages

2  billed?

3  A.   Yes.  At a later time we were going to have an office

4  meeting with all the therapists about it, and they -- because

5  Eva was billing most of the time now.  Toni and her -- Toni

6  wasn't billing as much.  I think Toni even left for a while.

7  I'm not sure if -- no, she was still there at the time, but

8  yes, Eva wanted things billed a certain way, and Sergio wanted

9  things billed a certain way, yes.

10  Q.   What was that way that they told you that they wanted it

11  billed?

12  A.   The SOAP notes needed to be filled out so that they could

13  bill the maximum that they could for that massage, meaning the

14  most modalities done, or at least charted for, in that one-hour

15  session, so they could bill the maximum amount of billing

16  codes.

17  Q.   When you refer to "modalities," what's that?

18  A.   For example, say a person gets a heat pack.  That would be

19  a heat modality.  So there's a billing code that you bill for

20  for heat and they get a certain amount of money for.  Then,

21  say, if you bill for three units of therapeutic exercise, so

22  then that's 45 minutes of therapeutic exercise, which is like

23  general massage, so they bill three 15-minute increments on

24  each code, and they get a certain amount of money for each.  So

25  when they receive payment for a massage, it's made up of

1  different payments for each billing code, which is a modality,

2  which means each thing done during that one-hour session.  Does

3  that make sense?

4  Q.   Think so.

5  A.   Okay.

6  Q.   Let me ask you a question, and we'll look at some

7  documents that --

8  A.   Okay.

9  Q.   -- may make it clear.

10      At their request, did you prepare some documents to

11  circulate out to the massage therapists?

12  A.   Yes, I did.

13          MR. CARDONA:  Your Honor, I'd offer Exhibit 201.

14          MR. ULTIMO:  No objection, Your Honor.

15          THE COURT:  Be received.

16      (Received in evidence, Trial Exhibit 201.)

17  BY MR. CARDONA:

18  Q.   Is this one of the documents you prepared?

19  A.   Yes.  This is explaining what "SOAP" means.

20  Q.   And it's titled at the top, "SOAP Note Revisions."  Do you

21  see that?

22  A.   Yes.

23  Q.   And then it goes through the various parts of a SOAP note:

24  subjective, objective, assessment and plan.

25  A.   Yes.

1    Q.   Is that correct?

2    A.   Yes.

3    Q.   Now, on the second page of this document, moving down, do

4    you see there's a section titled "Key Guidelines"?

5    A.   Yes.

6    Q.   Going to blow up a portion of that.  Do you see the

7    section that says, "Never write 'no complaints.'  We are giving

8    medically necessary massages, and the insurance will not pay

9    claims where the patient had no complaints"?

10   A.   Yes.

11   Q.   Why did you include that?

12   A.   Because when you bill a medical insurance for a massage,

13   it has to be considered medically necessary.  So if the

14   insurance company requested a copy of the SOAP notes and they

15   saw that the patient had no complaints, then they wouldn't

16   redeem (sic) it medically necessary.  So I was instructed to

17   tell them to write "no complaints" so would always get

18   reimbursed if those SOAP notes were requested.

19   Q.   You mean not write "no complaints"?

20   A.   Yes, not write no com- -- no -- "no complaints."

21   Q.   Down below there, there's a second instruction, "Do not

22   copy/write SOAP note after SOAP note exactly the same each

23   time, change things up a little!!!"

24   A.   Yes.

25   Q.   Why did you include that?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

A.   Because a lot of the massage therapists were lazy with the SOAP notes, and they would just copy the same SOAP note over and over and over again, but what that looks like to an insurance company is that they are being treated and they're not getting better.  So it's best if you put in different diagnosises (sic), if that's a word.  So if the patient is saying that they have a neck pain for three months and -- and they're still getting a massage for three months, an insurance company could say we're not going to pay you anymore because this is not working for them.  So Eva, the biller at the time, said that we need to change up the diagnosis of the patient.  So sometimes they're getting billed for knee pain, sometimes they're getting billed for neck pain, and so forth.

THE COURT:  Okay.  Ladies and gentlemen, it is 2:30 at this time, so we're going to take our afternoon break.  We'll see you back in, in about 15 minutes, and you remember we will quit at 4:00 o'clock.

Remember the admonishment not to discuss the case among yourselves, with anybody else, or form or express any opinion about the matter until it's submitted to you and you retire to the jury room.

We'll be in recess.

THE CLERK:  All rise.

Court is in recess.

*(Recess held from 2:31 p.m. to 2:51 p.m.)*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        *(In the presence of the jury:)*

2               THE COURT:  Okay.  The record will reflect that all

3        the members of the jury are in their respective seats in the

4        jury box, witness is on the witness stand.

5               And you may continue, Counsel, direct.

6               MR. CARDONA:  Thank you, Your Honor.

7        Q.   Now, we looked at one of the sheets you prepared as

8        instructions to the massage therapists.  I'd like to show you a

9        second sheet, Exhibit 202.

10              Which I would offer at this time, Your Honor.

11              THE COURT:  Okay.

12              MR. ULTIMO:  No objection, Your Honor.

13              THE COURT:  Be received.

14       *(Received in evidence, Trial Exhibit 202.)*

15       BY MR. CARDONA:

16       Q.   You see that this document, Exhibit 202, is titled at the

17       top, "Revision of SOAP Notes"?

18       A.   Yes.

19       Q.   And was this another document that you prepared?

20       A.   Yes.

21       Q.   And this was again in response to your conversation with

22       Sergio and -- Sergio Amador and Eva Razo, where they wanted you

23       to prepare instructions for the massage therapists for creating

24       charts that could be used to bill?

25       A.   Yes.

1   Q.   Now, going to the second page of this document, do you see

2   this page?

3   A.   Yes.

4   Q.   What's contained on this page?

5   A.   This is an example of how to fill out a SOAP note

6   according to how Sergio wanted it.  It would give examples of

7   modalities to check off at the top, where the checkmarks are,

8   and then what to fill out on the S, O, A, P, basically what

9   muscles, et cetera.

10  Q.   Let me just blow up the bottom one for one second.  So the

11  boxes that you're referring to for modalities, are those these

12  boxes?

13  A.   Yes.

14  Q.   Attempting to highlight here.

15  A.   Yes.

16  Q.   And in "S," see where I've highlighted "Shooting, stabbing

17  feeling in butt and left leg"?

18  A.   Yes.

19  Q.   So is that an example of what you were referring to as

20  something you were instructing people to write to justify this

21  type of modality?

22  A.   Yes.  It was an example of -- of telling them to

23  elaborate.  So if they wrote "low back pain," don't just write

24  "low back pain," elaborate a little about what they're feeling,

25  what they're telling you they feel.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   Now, when you had this conversation with Sergio and Eva

and you prepared these instructions, did you voice any

objection to this?

A.   I don't believe I did.  Not until we had a meeting.  We

had a -- this was leading up to a meeting where we, all

employees were there, and during that time I voiced my opinion,

and so did others, yes.

Q.   And what opinion did you voice?

A.   I felt like it wasn't feasible.  It didn't -- there -- not

all of this could have been done in a 50-to-60-minute massage.

So it didn't seem -- it felt like it would be a red light -- a

red flag to the insurance company.

Q.   And was that your concern?

A.   Yes.

Q.   I'd like to turn to some patient charts, show them to you

and ask you about some of the entries.

     So first I'd like to offer Exhibit 130, Your Honor,

patient chart for a patient named Ernestine Rubio.

          MR. ULTIMO:  No objection, Your Honor.

          THE COURT:  I'm sorry, 130?

          MR. CARDONA:  Yes, Your Honor.

          THE COURT:  Got it.  Okay.

     (Received in evidence, Trial Exhibit 130.)

BY MR. CARDONA:

Q.   Here's the first page of that chart, and I'd like to go to

```
 1   page 19.  This is page 19 of the chart for Ernestine Rubio.
 2   Are these all entries that you prepared?
 3   A.   Yes.
 4   Q.   If you look over on the left-hand side, see that first
 5   date, November 16th, 2010?
 6   A.   Yes.
 7   Q.   And at that time were you an office manager in San Pedro?
 8   A.   Yes.
 9   Q.   Were you still performing massages?
10   A.   No.
11   Q.   Are the entries on this page all entries that you prepared
12   falsely for SOAP -- for charts?
13   A.   Yes.  I don't even know who that person is.
14        MR. CARDONA:  Offer Exhibit 135, Your Honor, a patient
15   chart for patient Desiree Villavisencio.
16        THE COURT:  135.
17        MR. ULTIMO:  No objection.
18        THE COURT:  Be received.
19        (Received in evidence, Trial Exhibit 135.)
20   BY MR. CARDONA:
21   Q.   So looking at the first page, is this the form of chart
22   that Port Medical used?
23   A.   Yes.
24   Q.   And does it have the name Desiree Villavisencio?
25   A.   Yes.
```

```
1    Q.   I'm going to move to page 5.  My apologies, going to move
2    to page 17, blow this up.  Now, do you see these two entries?
3    A.   Yes.
4    Q.   And over on the right, do you see the name Cierra
5    Villavisencio?
6    A.   Yes.
7    Q.   Now, that doesn't appear to match the name on the chart,
8    does it?
9    A.   No.
10   Q.   Do you know how these got into Cierra Villavisencio's
11   chart?
12   A.   I don't.  I mean, I believe that to be one of the siblings
13   or another family member, obviously, but I don't know if it was
14   myself that put the wrong sticker or that was put by somebody
15   else who -- as I said, sometimes I put the sticker, sometimes
16   somebody else did.
17   Q.   And these two dates on the left, December 20th, 2010, and
18   December 27th, 2010, at that time were you managing San Pedro?
19   A.   Yes.
20   Q.   Were you doing massages?
21   A.   No.
22   Q.   Are these entries that you fabricated?
23   A.   Yes.
24   Q.   Like to turn to page 18 of that same exhibit.
25        If I can have one second, Your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        Make that page -- this page, blow up a few entries.

2    Again, are these entries for Cierra Villavisencio with the

3    stickers?

4    A.   Yes.  Yes.

5    Q.   And these dates as well, November 16th, 27th, and 30th,

6    were you working at San Pedro?

7    A.   Yes.

8    Q.   Were you doing massages?

9    A.   No.

10   Q.   Are these entries that you fabricated in the chart?

11   A.   Yes.

12        MR. CARDONA:  Your Honor, Exhibit 122 has previously

13   been admitted.  I'd like to show the witness page 13 of that

14   chart.

15        THE COURT:  122?  Okay.

16        MR. CARDONA:  Joe Vaifanua's chart.

17        THE COURT:  Mm-hmm.

18   BY MR. CARDONA:

19   Q.   Just blow up a couple of the entries on this page.  See

20   the entries for November 2nd and November 9th?

21   A.   Yes.

22   Q.   Again, was this while you were managing San Pedro?

23   A.   Yes.

24   Q.   Were you doing massages at that time?

25   A.   No.

```
 1   Q.   Are these entries you fabricated?

 2   A.   Yes.

 3        MR. CARDONA:  Your Honor, Exhibit 127 has previously

 4   been admitted.  I'd like to show the witness page 13 of that.

 5        THE COURT:  Okay.

 6   BY MR. CARDONA:

 7   Q.   See the dates November 23rd, 2010, and November 30th,

 8   2010?

 9   A.   Yes.

10   Q.   Again, are those dates when you were working as the

11   manager at San Pedro?

12   A.   Yes.

13   Q.   Were you giving massages to Hazey Vaifanua?

14   A.   No.

15   Q.   Did you fabricate these entries?

16   A.   Yes, I did.

17        MR. CARDONA:  Your Honor, moving to Exhibit 128, which

18   has previously been admitted, page 10.

19   Q.   Is this the chart for Dazey Vaifanua?

20   A.   Yes.

21   Q.   And these dates, November 16th, November 23rd, were you

22   working as a manager in San Pedro?

23   A.   Yes.

24   Q.   Did you massage Dazey Vaifanua?

25   A.   No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Did you falsify these entries?

2    A.   I did.

3    Q.   Turning to Exhibit 129 --

4         Which has previously been admitted, Your Honor.

5         -- I'd like to turn to page 13.  Is this the chart for

6    Josiah Vaifanua?

7    A.   Yes.

8    Q.   That date, November 22nd, 2010, were you working as the

9    manager in San Pedro?

10   A.   Yes.

11   Q.   Did you massage Josiah Vaifanua?

12   A.   No.

13   Q.   Did you falsify this entry?

14   A.   Yes.

15   Q.   Turning to Exhibit 124, which has previously been

16   admitted, I'd like to turn to page 12.  Is this the chart for

17   Laloifi Vaifanua?

18   A.   Yes.

19   Q.   November 2nd, 2010.  Again, were you working as the

20   manager in San Pedro?

21   A.   Yes.

22   Q.   Did you massage Laloifi Vaifanua?

23   A.   No.

24   Q.   Did you falsify this entry?

25   A.   I did.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Turning to Exhibit 126, which I believe was previously

2   admitted, like to turn to page 10.  Same date, November 2nd,

3   2010.  Did you massage Faith Vaifanua on that date?

4   A.   I did not.

5   Q.   Is this an entry you fabricated?

6   A.   Yes, it is.

7        MR. CARDONA:  Your Honor, I'd offer Exhibit 141, a

8   chart for David Bumgarner.

9        MR. ULTIMO:  No objection, Your Honor.

10       THE COURT:  141.

11       *(Received in evidence, Trial Exhibit 141.)*

12   BY MR. CARDONA:

13   Q.   Like to turn to page 12, chart for David Bumgarner.  I've

14   blown up the entry for January 8, 2011.  Were you still working

15   at San Pedro as a manager on that date?

16   A.   Yes.

17   Q.   Whoops, my apologies.  I'd like to blow up the bottom

18   three entries, January 26th, February 2nd, February 9th.

19   Again, on those dates were you working as the manager in San

20   Pedro?

21   A.   Yes.

22   Q.   Did you massage David Bumgarner?

23   A.   No.

24   Q.   Are these all three entries that you fabricated?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. CARDONA:  Nothing further, Your Honor.

 2              THE COURT:  Okay.  Cross-examination.

 3              MR. ULTIMO:  Yes.  Thank you, Your Honor.

 4                        CROSS-EXAMINATION

 5   BY MR. ULTIMO:

 6   Q.   Good afternoon, Miss -- Sistonich, right?

 7   A.   Yes.

 8   Q.   Okay.  Nice to meet you.  Okay.  Got several questions for

 9   you, ma'am.

10        The massages that -- well, actually, you started out at

11   Port Medical as a massage therapist, true?

12   A.   Yes.

13   Q.   And are you a certified massage technician or a massage

14   therapist?  What credentials do you hold as far as -- vis-a-vis

15   massage therapy?

16   A.   Certified massage therapist.

17   Q.   Okay.  Certified massage therapist.  "CMT" for the

18   initials?

19   A.   Yes.

20   Q.   Okay.  And you had been a certified massage therapist for

21   ten years prior to coming to Port Medical?

22   A.   Yes.

23   Q.   So -- and you actually performed massages for those ten

24   years?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

220

1   Q.   So you're familiar with massages and completing chart

2   notes for patients?

3   A.   Yes, I am.

4   Q.   And your prior employment, before coming to Port Medical,

5   was with another chiropractic facility?

6   A.   Yes.

7   Q.   Okay.  So the massages at Port Medical, you did start out

8   performing some actual massages before you moved on to becoming

9   a phony document preparer, true?

10  A.   Yes.

11  Q.   Okay.  And the massages that you were creating these false

12  SOAP notes or false chart notes for, those massages were

13  supposed to be therapeutic in nature, correct?

14  A.   Yes.

15  Q.   Okay.  They were supposed to help the patient, right?

16  That's how they were documented?

17  A.   Yes.

18  Q.   And the massages ostensibly were part of the

19  chiropractic -- chiropractor's clinical plan for the patient,

20  correct?

21  A.   Yes.

22  Q.   So the chiropractor would formulate a clinical plan for

23  the patient after examination, true?

24  A.   That was what they were supposed to do.  I don't know if

25  that always happened, but yes.

```
 1    Q.    All right.  So when you say you don't -- well, actually,
 2    that was my question.  That's what I was getting at.  What was
 3    your interface with the chiropractor or chiropractors at Port
 4    Medical?  Were there more than one?
 5    A.    Yes.  Well, these patients and these charts were coming
 6    from Long Beach primarily.  I think 99 percent.  I'm not sure
 7    about the one with David Bumgarner.  But supposedly they were
 8    seeing the chiropractor over there.  There was many
 9    chiropractors in Long Beach.
10    Q.    Okay.  Can you name a few?  Or how many?  Have an estimate
11    of how many there were, or recollection?
12    A.    Two while I was there, and I don't know how many after I
13    left, and there was three in San Pedro.
14    Q.    Okay.  So did all of the chiropractors bill out through
15    Dr. Malone's federal tax I.D. number?  In other words,
16    Dr. Malone's health insurance claim forms?  Do you know?
17    A.    I don't know.  I didn't have anything to do with the
18    billing.
19    Q.    Okay.  So you would just falsify the chart notes, SOAP
20    notes for the massage therapy and then hand it off into the
21    patient's file for the biller to pick up?
22    A.    Yes.
23    Q.    Okay.  And when you say you don't know whether or not a
24    chiropractic examination always occurred, you did see, during
25    your time working there, chiropractors examining patients and
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   seeing patients in treatment rooms, correct?

2   A.   Yes.

3   Q.   Okay.  And you saw that often?

4   A.   In San Pedro, yes.

5   Q.   When you went to San Pedro, was David Gomez -- what was

6   your understanding of his function, duties or responsibilities

7   with respect to San Pedro?

8   A.   He was the owner.

9   Q.   Okay.  Did he primarily work -- well, San Pedro opened,

10   what, in August of 2010; is that right?

11   A.   I don't know the exact month, but around that time, yes.

12   Q.   And Long Beach was open prior to that?

13   A.   Yes.

14   Q.   Okay.  So when San Pedro opened, what's your

15   understanding?  Did David begin operation of San Pedro?

16   A.   Well, both Sergio and David were still very involved.

17   When we were in Long Beach, I was told that David would take

18   over Long -- San Pedro.  That would be his office.  And Sergio

19   would have Long Beach.  But I would see them both in San Pedro.

20   They were both still very heavily involved in both -- in San

21   Pedro.

22   Q.   Okay.  When you say "heavily involved," do you have -- is

23   that just a general reference, or is there more to that?

24   A.   When I say "heavily involved," I mean --

25   Q.   And please speak about each one as separate and as an

1    individual.  So what do you mean "heavily involved" as far

2    as --

3    A.    They were there almost every day.  They directed us what

4    to do.  They ran our meetings.  They gave us orders.  Yeah.

5    Anything that you would think that an owner of a company would

6    do.

7    Q.    Now, David Gomez was a longshoreman, correct?

8    A.    Yes.

9    Q.    And so he did work during the week as a longshoreman in

10   the ports of Los Angeles and Long Beach, correct?

11   A.    Yes.

12   Q.    So he wasn't at Port Medical when he was on a ship,

13   correct?

14   A.    No.

15   Q.    Okay.  And he worked -- as far as your understanding of

16   his work schedule, do you have an understanding to David

17   Gomez's work schedule while he was actually performing duties

18   as a longshoreman?

19   A.    I have an understanding of a longshoreman's schedule, and

20   I know that that can be different from day to day.  I know that

21   sometimes they can work four hours a day, sometimes they can

22   work eight hours a day.

23   Q.    And weekends, too, right?

24   A.    Yes.  If they choose to, yes.

25   Q.    Right.  And you know this because your son's father is

1    currently the president of Local 13, correct?

2    A.    Yes.  And my current husband is a longshoreman.

3    Q.    Right, and your -- yeah.

4    A.    And my ex-husband, my son's father -- actually, we were

5    not married, but my son's father is the ILWU Local 13

6    president, yes.

7    Q.    Currently?

8    A.    Currently.

9    Q.    Okay.  So what was your understanding of David Gomez's

10   work schedule as a longshoreman when he was not in Port

11   Medical?  Do you have -- you were the office manager, so you

12   had -- you said you saw him at Port Medical a lot.

13   A.    Yes.

14   Q.    So you must have some recollection of his schedule.

15   A.    Well, like I said, a longshoreman's schedule, including

16   David's, was different day to day.  You don't know what breaks

17   you're going to get, you don't know what time you're going to

18   finish.  So there wasn't a consistent schedule with David.  He

19   would pop in, he would pop out.  He would be there after work,

20   he would be there on his lunch break.  Sometimes he would be

21   there in the mornings, sometimes he would be there in the late

22   afternoon.  It was different.

23   Q.    Okay.  So when you said he was there all the time, that

24   didn't mean that he was --

25   A.    Oh, I didn't mean that he was there 9:00 to 5:00, no.

```
1    Q.    Thank you.  Okay.  And he also -- are you aware that
2    Mr. Gomez also owned a business in Los Angeles?
3    A.    Yes, I am.
4    Q.    Okay.  And he does spend some time there during the week?
5    A.    Yes.  Yes, he would call there sometimes to check in.
6    Q.    The jewelry store?
7    A.    Yes.
8    Q.    And he did own a bistro in San Pedro, too?
9    A.    Yes.  I believe by the time San Pedro had opened, it had
10   already closed down, or shortly after, but yes.
11   Q.    Okay.  So he had more than one business --
12   A.    Oh, yes.
13   Q.    -- and he was in different places at different times?
14   A.    Yes.
15   Q.    So as for involvement, Sergio -- let me strike that.
16         Let me ask you this.  Did David Gomez ask you to fabricate
17   or falsify chart notes for patients?
18   A.    No.
19   Q.    Did you ever see David Gomez create any false chart notes
20   for patients?
21   A.    No, I didn't.
22   Q.    Did you ever see David Gomez pay any patients?
23   A.    No, I didn't.  Can I clarify?
24   Q.    Certainly.
25   A.    David did a lot of things as far as ordering tee shirts,
```

1    promotional things.  At times he would pay people for things

2    like that, but it was usually when people came to drop off,

3    say, tee shirt he had ordered through a friend, or hats or

4    things like that.  So to clarify, yes, I did see him pay people

5    for those, and maybe one of them could have been a patient over

6    the years, but if we're referring to what Sergio was doing, no,

7    I didn't see that.

8    Q.   Well, thank you for the clarification.

9         As far as the sign-in stickers, I think as an office

10   manager, you were in and around the front desk all the time,

11   right?

12   A.   Yes.  Not all the time.  I was in the back office at

13   times, yes.

14   Q.   But you had to cross that need from time to time?

15   A.   Yes, I spent time at the front desk, yes.

16   Q.   And there were girls that worked the front desk, correct?

17   A.   Yes.

18   Q.   And on patient intake, were there times that patients were

19   asked by any of the girls, or you, or any of the girls at the

20   front, for patient sign-in, to sign more than one sign-in

21   sticker?  Start with that.

22   A.   Were the patients ever asked?  Is that what --

23   Q.   Yes.

24   A.   Yes.

25   Q.   Okay.  And did anyone ever ask you, like, for example, the

1  biller, like Toni Moyer or anyone like that, to have the

2  patient sign three stickers?  For example, one for -- one in

3  case they saw the chiropractor, one in case they saw the

4  acupuncturist, that kind of thing?

5  A.   Well, if they saw the acupuncturist and the chiropractor,

6  yes, they would need two different stickers, because it would

7  be two separate charts.  If they saw a massage therapist and a

8  chiropractor, it was usually one sticker, because it was the

9  same chart.

10  Q.   Right.  And if they saw a doctor -- because at some point

11  Port Medical had some doctors there.

12  A.   Yes.

13  Q.   Physicians, correct?

14  A.   Yes.

15  Q.   That would be a third sticker?

16  A.   Correct, yes.

17  Q.   And then someone at Port Medical, someone at the front

18  desk, you or the clerical girls, right, they would peel the

19  stickers off at sign-in and then stick them on a chart?

20  A.   Yes.

21  Q.   Whether it was a chiro chart or an acupuncture chart or a

22  medical chart, correct?

23  A.   Yes.

24  Q.   And you said David was more of a responsible person than

25  Sergio, correct?

```
 1   A.   In my opinion.

 2   Q.   Did you ever hear David tell Sergio to stop?

 3   A.   No.

 4   Q.   Did you ever hear anyone -- did anyone ever tell you that

 5   Sergio told him to stop?

 6   A.   No.

 7            MR. CARDONA:  Objection, Your Honor, hearsay.

 8            THE COURT:  It would be hearsay.

 9   BY MR. ULTIMO:

10   Q.   Now, did you ever tell David -- I'm sorry, did you ever

11   tell Sergio Amador to stop?

12   A.   Yes.

13   Q.   You told him repeatedly to stop?

14   A.   On multiple occasions I asked him to please stop.

15   Q.   Now, when you went from Long Beach and went over and

16   accepted the role as office manager in San Pedro, was it your

17   understanding that Sergio, at least conceptually, was left to

18   head up Long Beach pretty much with Eva Razo?

19   A.   Yes.  Well --

20   Q.   Conceptually.

21   A.   Yes.

22   Q.   Okay.  Then --

23   A.   I was told that that would be his office, and David would

24   have most control over San Pedro.

25   Q.   Okay.  And then -- and then -- and did you feel better
```

1   about that?

2   A.   I did, but then I began to see Sergio in San Pedro all the

3   time.

4   Q.   I was going to go there.

5   A.   Yes.

6   Q.   So when you went to San Pedro, you were reapproached by

7   Sergio and Eva Razo, true?

8   A.   Yes.

9   Q.   And both, it was both of them, right?

10  A.   Yeah, well, there was more than one occasion.

11  Q.   Right.  Oh, in other words --

12  A.   But at one point, yes, it was.

13  Q.   So Sergio essentially reapproached you to continue to

14  falsify charts for patients?

15  A.   Yes.

16  Q.   And Eva Razo also did the same?

17  A.   They were together, yes.

18  Q.   They were together.

19  A.   Mm-hmm.

20  Q.   So Sergio Amador and Eva Razo were together when they

21  asked you that?

22  A.   Yes.  It was like they were always a team, always had

23  their ideas, and they were presented together as a team all the

24  time.

25  Q.   Right.  And were you -- did you know that Eva Razo had

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   power of attorney on Sergio Amador's checking account?
 2   A.   No.  He told me she had some kind of control over some
 3   payments that she made for him for children in a different
 4   country, but that -- but I don't know the details of that.
 5   Q.   But you knew that Eva Razo signed a lot of checks?
 6   A.   Yes.
 7   Q.   She signed a lot of checks for -- well, you tell me.  Was
 8   it Port Medical or Malone Chiropractic?
 9   A.   She seemed to do -- be doing everything.  I don't really
10   know.
11   Q.   She had a lot of power and control over all of the
12   entities that --
13   A.   Yes.
14   Q.   -- had a piece of --
15   A.   She seemed like she had control over everything, yes.
16   Q.   Right.  So -- and she would also get cash out of checking
17   accounts for Sergio Amador, true?
18   A.   I don't know.
19   Q.   Now, Sergio Amador and Eva Razo, they both asked you to
20   falsify SOAP notes or chart notes for patients?
21   A.   Yes.
22   Q.   And in fact, Eva Razo would bring charts from Long Beach
23   over to San Pedro for you to falsify, right?
24   A.   Yes, because I didn't go to Long Beach anymore.
25   Q.   Right.  And then you would do the SOAP notes?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    Mm-hmm.

 2   Q.    Make them, create them, right?

 3   A.    Mm-hmm.

 4   Q.    And then you would put them in a back office in San Pedro.

 5   A.    Yes.  And then she would pick them up, yes.

 6   Q.    And the next day you would come in, they'd be gone?

 7   A.    Yes, or a couple of days later, whenever she -- she was in

 8   the office frequently, but it may not be on a daily basis that

 9   they were picked up and gone, but --

10   Q.    And your understanding was, she brought them back to Long

11   Beach for the billers in Long Beach to bill out?

12   A.    Yes, because she was billing in Long Beach at that time,

13   and Toni was in San Pedro.

14   Q.    Toni --

15   A.    Moyer.

16   Q.    Toni Moyer.  I'm wondering -- well, actually, Sergio

17   Amador bought you a Coach handbag, true?

18   A.    He gave Griselle and I a Coach purse for Christmas.

19   Q.    Oh, for Christmas?

20   A.    Yes.

21   Q.    He was paying you basically by piecework, essentially.  He

22   was paying you for each entry, or each false entry, in a SOAP

23   note, true?

24   A.    Per patient that I -- per entry, yes, exactly.

25   Q.    In fact, that's interesting.  I was thinking about that.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Counsel showed you -- showed quite a -- quite a -- quite a few
 2   SOAP notes, and on each page there's four entries, right?
 3   A.   Mm-hmm.
 4   Q.   So that was typically for one patient, right?
 5   A.   Yes.
 6   Q.   A page?
 7   A.   Yes.
 8   Q.   But it represented four potential dates of treatment?
 9   A.   Yes.
10   Q.   And of course, in this case, when you made the false
11   entries, there were no -- the patient didn't appear?
12   A.   I'm sorry, can you repeat?
13   Q.   The patient -- those were all false entries?
14   A.   Yes.  I never saw the patient.
15   Q.   So did you get paid from Sergio -- did you also get paid
16   from Eva Razo?
17   A.   Well, Eva Razo gave me my paychecks.  She had control over
18   payroll, so I was receiving my checks from Eva.
19   Q.   Right.  And the additional money for the false entries --
20   A.   Oh, Eva gave me the check for that as well.
21   Q.   Right.  That was on top of your salary?
22   A.   Yes.  Yes, that was separately.
23   Q.   You were making pretty good money there, right?  Your
24   salary was like --
25   A.   Yes, I was at that time.
```

```
1    Q.   -- about 1500 a week?

2    A.   I don't remember.  11- to 15-.  I had a raise somewhere in

3    between that, yes.

4    Q.   Right.  Approximately 1100, 1200, 1500 a week?

5    A.   Yes.

6    Q.   And then the money for the false entries was in addition

7    to that?

8    A.   Yes, it was.

9    Q.   And who would pay you that additional money?

10   A.   I don't know where the money came from, but Eva would give

11   me a check.

12   Q.   Okay.  And there's going to be several names, but you

13   already mentioned them all.  Michelle Aragon was Eva Razo's

14   predecessor, right?

15   A.   Well, Michelle Aragon was office manager when I very first

16   began, and she left after, yes.

17   Q.   And then Eva took her place, more or less?

18   A.   I guess so.  I don't know.  No, I don't know.  The -- no,

19   because Eva kinda oversaw everything.  Billing, accounting,

20   both offices.  Michelle was the office manager, and I was the

21   office manager, and she left, and then Eva took control of

22   everything.

23   Q.   What I'm getting at is, Michelle Aragon, she also

24   falsified patient SOAP notes?

25   A.   I believe so, because, like I said, David told me that
```

1   that's who they learned it from.

2   Q.   David told you -- David told you --

3   A.   David Gomez told me that Michelle Aragon had taught them

4   how to do this and presented this to them as an idea to do

5   within the business.

6   Q.   David, not Sergio?

7   A.   We were all having a conversation, and it came out of

8   David's mouth.  The three of us were having a conversation, and

9   it came from David's mouth.

10  Q.   Okay.  But you never personally saw David falsify SOAP

11  notes?

12  A.   No, I didn't.

13  Q.   And he never asked you to falsify SOAP notes?

14  A.   No, he didn't.

15  Q.   And you never saw him pay patients to come to Port

16  Medical, is what you told us, right?

17  A.   No, I didn't.

18  Q.   But you did note Eva was doing that and Sergio was doing

19  that?

20  A.   Yes.

21  Q.   Now, you were the signer on a lot of these bank accounts.

22  A.   Yes.

23  Q.   Right?  You were the signer on Port Medical's bank

24  account, right?

25  A.   I was the signer on anything they told me I needed to be a

1   signer on, so they -- I went to the bank and I got put on all

2   of the accounts.

3   Q.   Okay.  Well, there were several bank accounts.

4   A.   Yes.

5   Q.   Let's take them one at a time.  You were not on Malone

6   Chiropractic's account, true?

7   A.   No, I don't -- no.  No.

8   Q.   And Malone Chiropractic -- okay.  But you were on Port

9   Medical's account?

10   A.   I believe so, yes.

11   Q.   Okay.  And you were on Chosen Medical Management's

12   account?

13   A.   Yes.

14   Q.   And you were on Ramport Medical Management's account,

15   true?

16   A.   Yes.  Separately.

17   Q.   They had two accounts, Ramport.  Were you aware of that?

18   A.   No.

19   Q.   Were you a signer of both of Ramport's accounts?

20   A.   I'm unsure.  There may --

21   Q.   But you were a signer on a Ramport bank account?

22   A.   I believe so.  To me, I was just going with the flow.

23   Whatever they told me I needed to sign, I signed.

24   Q.   And who is Brenna Esparza?

25   A.   She was a massage therapist.

```
1    Q.   And you would pay Brenna Esparza a check, right?

2    A.   For her -- for her payroll?

3    Q.   Well, let me show you the check.

4    A.   Okay.

5    Q.   Exhibit 75, page 222.

6              THE COURT:  75, 222?

7              MR. CARDONA:  Right.

8              MR. ULTIMO:  Right.

9              MR. CARDONA:  No objection, Your Honor.

10             THE COURT:  Okay.

11        (Received in evidence, Trial Exhibit 75, page 222.)

12   BY MR. ULTIMO:

13   Q.   Okay.  Have a moment, take a look at that exhibit, please.

14   Is that your signature?

15   A.   Yes, it is.  This is for her payroll.

16   Q.   Just a moment.

17   A.   The massage therapists were independent contractors, so

18   they were paid with a handwritten check like that.

19   Q.   Okay.  I'm going to --

20   A.   Not through a payroll company.

21   Q.   I'm sorry.  You said this was her payroll, correct?

22   A.   Yes.  They were independent contractors, so they were paid

23   with a handwritten check, not through a payroll company that

24   took taxes.

25   Q.   Okay.  So she's an independent contractor because she's a
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   certified massage --

 2   A.   Yes.  All the massage therapists were independent

 3   contractors.

 4   Q.   So when it says in the memo portion, 20 treatments --

 5   A.   She saw 20 patients during that payroll period.

 6   Q.   And you paid her for that?

 7   A.   Well, I signed the check, yes.

 8   Q.   And that was typical.  You signed a lot of checks,

 9   correct?

10   A.   Yes, I had to sign all the checks.

11   Q.   Okay.  But now, you said that you were not a signer on DCS

12   Medical Management, true?

13   A.   I don't know.  I believe they weren't using DCS Medical

14   Management by the time I came on board.  I could be wrong.  I

15   don't remember a hundred percent.  They -- they changed medical

16   management companies a few times.

17             MR. ULTIMO:  Just one moment, Your Honor.

18             THE COURT:  Yes.

19   BY MR. ULTIMO:

20   Q.   So you were not a signer on DCS Medical Management?

21   A.   I'm unsure, to be honest.

22   Q.   Now, you got the cash withdrawals for Sergio, true?

23   A.   Yes, when he instructed me to.

24   Q.   And did he tell you what those cash withdrawals were for?

25   A.   No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And did you know that David pleaded with Sergio to stop

2   the fraud in Long Beach?

3   A.   No.

4   Q.   You testified David told you there would be no fraud in

5   San Pedro, true?

6   A.   Yeah, that was the agreement before we moved to San Pedro.

7   Q.   Did you ever sign David's name on checks from DCS Medical

8   Management?

9   A.   I don't know from DCS Medical Management, but I believe at

10  some point I was instructed by them to sign their signature if

11  they couldn't get there to do it, from what I recall.  But I'm

12  not a hundred percent clear on that.

13  Q.   You're not -- oh, so you're not a hundred percent sure

14  whether or not you signed David's name?

15  A.   Yeah, I'm not hundred percent sure.  I think that was

16  asked of me before.  If you can help me remember or show me

17  something, it might help me remember, but I believe --

18         THE COURT:  That's okay.  If you don't remember,

19  that's --

20         THE WITNESS:  No, I don't remember a hundred percent,

21  so I can't --

22         THE COURT:  You can say "yes," "no," or "I don't

23  remember."  They're all valid answers, whatever is true.

24         THE WITNESS:  I don't remember.

25         THE COURT:  Okay.

BY MR. ULTIMO:

Q.   Now, you taught other massage therapists how to create false SOAP notes, true?

A.   Well, I guess if you consider what we just went through, those, SOAP notes.  They weren't false SOAP notes, they're just SOAP notes that are telling -- yes, I guess, because they're -- SOAP notes for patients that were actually being seen, but SOAP notes that needed to be written out to the full extent that they could be written out for billing purposes.

Q.   So you're saying that you taught other massage therapists to write SOAP notes, but when they actually saw patients.  Is that what you're saying?

A.   Yes.  What we went over previously about those SOAP notes and in the meeting that we had about checking the modalities, those were all for patients that were actually being seen.  As far as falsifying SOAP notes, I was just doing that, as far as I knew.

Q.   Now, you said that you saw Sergio Amador and Eva Razo meet with patients, correct?

A.   Yes.

Q.   What did you believe they were meeting with patients for?  You have any personal knowledge as to why they were meeting with patients?

A.   To give them payment or to discuss, you know, some kind of agreement about paying them for their visits.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Now, let me go a little bit -- you spoke several times to

2    federal agents in this case, correct?

3    A.   Yes, I did.

4    Q.   And you were first interviewed back in 2013, correct?

5    A.   Yes.

6    Q.   And that was at their offices in West Covina, correct?

7    A.   I don't remember the location.  I believe it was the -- it

8    was with -- I don't remember their name.

9    Q.   Marcus Valle?

10   A.   Yeah, at the Labor Department.  That was the first time

11   that I met with anybody.

12   Q.   In West Covina?

13   A.   Okay, yes, West Covina.

14   Q.   And then you met a month later in August of 2013, again

15   with Special Agent Valle, correct?

16   A.   Yes.

17   Q.   And that was at a Starbucks in Los Angeles, correct?

18   A.   Yes.  In San Pedro.

19   Q.   And you were interviewed, right?

20   A.   Yes.

21   Q.   And there were two agents present at those interviews,

22   correct?

23   A.   Yes.

24   Q.   And you made false statements that day to Special Agent

25   Valle, correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    I did, yes.

 2              THE COURT:  Talking about the first date, Counsel?

 3              MR. ULTIMO:  Actually -- thank you, Your Honor.

 4    Q.    On July -- in July 2013 when you went to the Office of

 5    Inspector General, Department of Labor, in West Covina and met

 6    with Agent Valle, you made false statements that day, correct?

 7    A.    Yes, I did.

 8    Q.    And you denied ever forging patients' names on Port

 9    Medical's sign-in sheets, true?

10    A.    I -- I believe so.  I couldn't tell you specifically, but

11    I do know that I minimized and I wasn't telling a hundred

12    percent the truth.

13    Q.    But you did deny forging patient names to Agent Valle,

14    true?

15    A.    If he says I did, then I believe that I did.

16    Q.    Well, what's your recollection?  We can have him testify.

17    A.    Well, can I --

18              THE COURT:  Excuse me.

19              THE WITNESS:  Sorry.

20              THE COURT:  She really has answered the question.

21              MR. ULTIMO:  Okay.

22              THE COURT:  You asked her if she said it.  She

23    believed she did.

24              MR. ULTIMO:  Okay.

25              THE WITNESS:  It's all been somewhat of a stressful
```

```
 1    blur, this whole thing.
 2            THE COURT:  Wait for the next question, okay.
 3    BY MR. ULTIMO:
 4    Q.   You also denied ever seeing anyone at Port Medical forge
 5    patient sign-in sheets, true?
 6    A.   I don't know the -- I don't know the specifics of what I
 7    said.  If you can read me my statement, I will tell you if
 8    that's correct or not.
 9            THE COURT:  Let me help you out.  As a witness, all
10    you have to do is answer the question.  If they want you to
11    embellish more on it, they'll ask you further.
12            THE WITNESS:  Okay.
13            THE COURT:  All you have to do is --
14            THE WITNESS:  So if I really don't remember, I say I
15    don't remember?
16            THE COURT:  Exactly.
17            THE WITNESS:  Okay.
18    BY MR. ULTIMO:
19    Q.   But you do remember being untruthful?
20    A.   I -- I was untruthful, yes.
21    Q.   More than once?
22    A.   Yes.
23    Q.   That day, during that visit in July 2013?
24    A.   Most likely, yes.
25    Q.   You also told Special Agent Valle that you believe that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Eva Razo was attempting to commit fraud without the knowledge

2    of David Gomez, true?

3    A.   Yes.

4    Q.   Miss Sistonich, were you truthful and accurate when you

5    testified -- when you made that statement to Special Agent

6    Valle?

7    A.   Yes, because towards the end I felt, when things were

8    getting out of control, Sergio and Dave -- I'm sorry, excuse

9    me, Sergio and Eva had a whole thing going on on their own.  I

10   don't know if it was the truth or not, but they were taking

11   trips out of state, I believe, to Texas, is what I overheard,

12   and I felt like things were going on that David didn't know,

13   and I believe I may have shared this with David at one point.

14           THE COURT:  Okay.  Let me try it again.  Just answer

15   the question that's asked, and you don't have to expand on --

16           THE WITNESS:  Don't have to elaborate, okay.

17           THE COURT:  Unless they ask you to, yeah.

18       Okay, go ahead, Counsel.

19   BY MR. ULTIMO:

20   Q.   And you wrote the SOAP notes at Sergio Amador's direction,

21   true?

22   A.   He asked me to, yes.

23   Q.   And that's what you told Special Agent Valle at the third

24   meeting.  You had a third meeting with them, true?

25   A.   Yes.  I believe so.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   And that was in September 2013?

2    A.   I don't remember the date.

3    Q.   Well, you might remember, you -- that meeting was at the

4    United States Attorney's Office, and you had an attorney

5    present, true?

6    A.   Yes.

7    Q.   So you had that meeting with the agents, and at that time

8    you told the special agents and the U.S. attorney that you

9    wrote the SOAP notes at Sergio Amador's direction, true?

10   A.   Yes.

11   Q.   And you told them that you assisted Michelle Aragon in

12   backdating SOAP notes and patient charts at the Long Beach

13   office, true?

14   A.   Yes.

15   Q.   And you told them that you completed SOAP notes for six to

16   seven patients on two occasions for Aragon, Michelle Aragon,

17   true?

18   A.   Yes.

19   Q.   And then you admitted to Special Agent Valle that you

20   never saw the patients that you completed the SOAP notes for,

21   correct?

22   A.   Yes.

23   Q.   And you also told Special Agent Valle and Special Agent

24   Hayden that you believed Dr. Malone was aware of the backdating

25   of the SOAP notes, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   Yes.

 2    Q.   You may have told me this, but how much were you getting

 3    paid for each patient SOAP note you created?

 4    A.   $20 per entry.

 5    Q.   Is that for all four on a page?

 6    A.   No.  $20 per date of when they came in.

 7    Q.   For treatment?

 8    A.   So, for example, if I filled four different dates, that

 9    would be $20 each:  20, 40, 60, 80 dollars.

10    Q.   So one standard piece of paper would be $80?

11    A.   Yes.

12    Q.   So $80 a page if you filled out all four sections?

13              THE COURT:  I'm sorry.

14              MR. CARDONA:  Objection, Your Honor.

15              THE COURT:  That's not what she said.

16              MR. CARDONA:  Misstates the testimony.

17              THE COURT:  She said for each entry.  She had four

18    entries on a page, then it would have been four times that.

19              MR. ULTIMO:  Right.

20              THE COURT:  If she had two entries, it would have been

21    two times.

22              MR. ULTIMO:  Gotcha.  Thank you.

23    Q.   Now, when you became an office manager in San Pedro, that

24    was when -- was that when Amador began instructing you to make

25    checks payable to various individuals?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   That was before, in Long Beach as well.

2   Q.   And Sergio Amador would instruct you to leave the checks

3   at the front desk for pickup?

4   A.   He would either come by and pick them up, or he would say

5   a patient was coming by and I was to hand them to the patient,

6   or he would -- I would leave them somewhere for him in the

7   office.  It was different at different times.

8   Q.   Okay.  Now, a moment ago you told us that David Gomez said

9   in a meeting that it was Michelle Aragon who taught them how to

10  overbill health insurance, true?  That's what you said here a

11  few minutes ago, right?

12  A.   His words were, "Michelle taught us how to do this, so we

13  will blame it all on her."

14  Q.   But isn't it true, Miss Sistonich, that not one, but on

15  two occasions when you met with Special Agent Valle and the

16  other agents, that you told them that Michelle Aragon -- that

17  Michelle Aragon taught Sergio Amador how to overbill the union

18  health plan?  Isn't that true?

19  A.   I don't remember.

20  Q.   But if that is what the agents' notes say, that --

21       MR. CARDONA:  Objection, Your Honor.

22       MR. ULTIMO:  I'll withdraw that.

23       THE COURT:  Okay.

24  BY MR. ULTIMO:

25  Q.   Now, you admitted earlier that the first time you spoke to

1    Agent Valle in July 2013, you were untruthful, correct?

2    A.   Yes.

3    Q.   And what about the second time, when you met them at

4    Starbucks in August of 2013?  You were untruthful at that time,

5    too?

6              MR. CARDONA:  Your Honor, asked and answered.

7              THE COURT:  Yeah, and we keep repeating what she's

8    already testified.  The jury has heard what she's testified to.

9    We don't have to repeat it again and again, so --

10             MR. ULTIMO:  Well, I'm trying to refresh the witness's

11   recollection, Your Honor.

12             THE COURT:  Counsel, you said you've already testified

13   to something.  Well, of course if she's already testified to

14   it, the jury's already heard it.  We don't have to repeat again

15   and ask her if she's already testified to it.  It's improper to

16   ask if she's testified to it.  That's something the jury's

17   already heard.

18             THE WITNESS:  Can I get a little water?

19             THE COURT:  Yes.

20        If you give us just a second, Counsel, so we can get some

21   water here.

22             MR. ULTIMO:  Sure.

23        (Water spills.)

24             THE COURT:  That's okay.  Leave it where it is.

25        Okay, let's try it again.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ULTIMO:  Okay.
 2              THE COURT:  And Counsel, just to come back where we
 3    were, she had testified earlier about the first one, and you
 4    asked her about the second one, if she testified truthfully
 5    about the second one.
 6              MR. ULTIMO:  Thank you, Your Honor.
 7    Q.   On September 17, 2013, when you met with your attorney at
 8    the offices of the United States Attorney's Office with the
 9    agents present, you told the agents in the U.S. Attorney's
10    Office that Michelle Aragon taught Sergio Amador how to
11    overbill the union health plan, correct?
12    A.   I don't remember.
13    Q.   It wasn't David Gomez, correct?
14    A.   I don't remember.
15    Q.   Were you truthful when you spoke to the agents in
16    September 2013 at the U.S. Attorney's Office?
17    A.   Is that the time that I had a different attorney?
18    Q.   Well, no.  This was the first meeting with your first
19    attorney at the U.S. Attorney's Office with Agent Valle.
20    A.   I -- I honestly couldn't tell you.  I didn't feel
21    comfortable and supported until I had my attorney, Tony Rafael
22    (phonetic), with me.  Until then, I felt like I was being
23    thrown to the wolves in every direction, with my employees,
24    with the government.  I don't know.
25              THE COURT:  So you -- okay.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE WITNESS:  It wasn't until I had Tony that --
 2    sorry.
 3              THE COURT:  Excuse me.  There's no question pending.
 4              THE WITNESS:  Okay.
 5              THE COURT:  All he asked you is do you remember, and
 6    you said you don't know.
 7              THE WITNESS:  Okay.
 8              THE COURT:  Next question.
 9    BY MR. ULTIMO:
10    Q.   You told the special agents in September 2013 that you
11    falsified SOAP notes, again, at Amador's direction.  That was
12    the third time -- that was the third meeting but the second
13    time you told them that, true?
14    A.   Sorry, repeat that again.
15    Q.   In September 2013, when you met with the special agents at
16    the U.S. Attorney's Office with your first attorney, you told
17    them that you falsified SOAP notes at Amador's direction,
18    Sergio Amador's direction, correct?
19    A.   Yes, most likely.
20    Q.   And that was a true statement when you made it?
21    A.   Yes.
22    Q.   And before you resigned, Sergio Amador asked you if you
23    could find a massage therapist who was willing to dummy up the
24    files, true?
25    A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   And that statement was true when you made it to Agent

2  Valle in September 2013, true?

3  A.   Yes.

4  Q.   Sergio Amador informed you that he was willing to pay the

5  therapist on a per-patient basis for each file they falsified,

6  true?

7  A.   I can't remember if he told me that exactly.

8  Q.   He asked you if you knew one or could get a massage

9  therapist to do it.

10 A.   Yes.

11 Q.   Correct?  And he informed you that he was willing to pay

12 them the same way, the same way --

13 A.   I don't remember that part.

14 Q.   You don't remember that part?

15 A.   Yeah, I don't remember if he said that specifically.

16 Q.   Was it your understanding that he was going to -- that he

17 was going to pay them the same way he was going to pay --

18 A.   It was my understanding, yes.

19 Q.   You told Special Agent Valle that you tried to leave Port

20 Medical a number of times, but was always convinced to stay by

21 Sergio Amador by receiving a pay raise or a bonus; is that

22 true?

23 A.   It was usually I was convinced to stay by David.  Maybe

24 both of them at times, but David usually convinced me to stay.

25 Q.   But the question is, you were convinced to stay, is what

1    you told the agents, that you were convinced to stay by Sergio

2    Amador by receiving a pay raise or a bonus.  Is that true?  Was

3    that truthful?

4    A.   I did receive a pay raise, yes, so that I would stay.

5    Q.   And the statement that you made to the agents, was it true

6    that you were convinced with a pay raise by Sergio Amador to

7    stay?

8    A.   Maybe it was by Sergio that time that we discussed, but I

9    tried to quit on many occasions.  In my memory, it was David.

10   And here today, it is my memory it was David that mostly

11   convinced me to stay, but I'm sure there was times that Sergio

12   did, too.

13   Q.   Are you saying that David offered you a pay raise?  But my

14   question -- is that what you're saying?

15   A.   Yes, David offered me a pay raise, yes.

16   Q.   Okay.  But my question most specifically is, when you made

17   a statement to Agent Valle, you told Agent Valle that you tried

18   to leave, but you were convinced by Sergio Amador, because he

19   tried to make you want to stay by giving you a pay raise or a

20   bonus.  Is that true?

21            MR. CARDONA:  Objection, Your Honor, improper --

22            THE COURT:  It's been asked and answered many times,

23   but let me try to help you on it, Counsel.

24       Do you remember making that statement as he just --

25            THE WITNESS:  I don't remember making that statement,

```
 1   no.
 2          THE COURT:  Okay.  Next question.
 3       What you're saying is, he could have or he might not have?
 4          THE WITNESS:  Yeah, most likely he could have, but --
 5          THE COURT:  Next statement, or next question.
 6          MR. ULTIMO:  Thank you, Your Honor.
 7          THE WITNESS:  Or basically just told me I had to stay,
 8   but --
 9          THE COURT:  Next question.
10   BY MR. ULTIMO:
11   Q.   You also -- you told Agent Valle that you left Port
12   Medical when you realized that you were being used by Sergio
13   Amador, true?
14   A.   That was one of the reasons, not the only reason.
15   Q.   And you told Special Agent Valle at the meeting in
16   September 2013 that David Gomez never paid any patients; is
17   that right?
18   A.   I honestly don't remember what I told him in that meeting.
19   Q.   Okay.
20   A.   But I've --
21          THE COURT:  That's all he's asking.
22          THE WITNESS:  Yeah.
23          THE COURT:  Is it true, what you remember saying at
24   that meeting, and if --
25          THE WITNESS:  I don't remember.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.
 2   BY MR. ULTIMO:
 3   Q.  Now, you told agents that Sergio Amador wanted everyone
 4   who visited Port Medical to get a massage; is that right?
 5   A.  Yes.
 6         Okay, can I just please say something without it being a
 7   "yes" and "no" answer?
 8              THE COURT:  Excuse me.  Only if it has -- you have to
 9   understand, in a trial, it's done by question and answer.  The
10   attorneys know what they want to elicit.
11              THE WITNESS:  Okay.
12              THE COURT:  It's not what you want to get over to the
13   jury; it's what the attorneys want to get over to the jury.
14              THE WITNESS:  I just don't remember exactly what I
15   told the agent.
16              THE COURT:  That's fine.
17              THE WITNESS:  But I know what I know happened.  So if
18   I know it happened, then I most likely said it, so yes.
19              THE COURT:  Okay.  That's fine.
20   BY MR. ULTIMO:
21   Q.  Do you know as you sit here today how many patients you
22   falsified SOAP notes for?
23   A.  I have no idea.
24   Q.  You have an estimate?
25   A.  No.
```

1   Q.   More than 50?

2   A.   I have no idea.

3        MR. ULTIMO:  Just a moment, Your Honor, if the Court

4   would please.  Thank you.

5   Q.   Do you recall David Gomez telling you not to give Sergio

6   Amador any more money?

7   A.   Yes.

8   Q.   Do you recall telling the special agents that Amador hired

9   telemarketers to make cold calls to union members to market

10  Port Medical?

11  A.   Yes.

12  Q.   Miss Sistonich, it wasn't David Gomez who taught the

13  massage therapists how to write SOAP notes, correct?

14  A.   No.

15  Q.   The SOAP note revision sheet that counsel showed you that

16  you had prepared with examples, you remember that document?

17  A.   Yes.

18  Q.   That was prepared by you at the direction of Eva Razo,

19  true?

20  A.   Yes.

21  Q.   And you told -- you recall telling special agents that Eva

22  Razo and Sergio Amador instructed you to prepare the example

23  SOAP note language for staff to use?

24  A.   Yes, they both did.

25  Q.   Do you remember David Gomez telling you that he would pay

```
 1  you to get training?
 2  A.   Yes, in the very beginning, because I didn't have any
 3  management experience.
 4  Q.   Okay.  So he wanted you to get office management
 5  experience?
 6  A.   He wanted me to be a good manager.
 7  Q.   Okay.  Was it your impression that Sergio Amador would not
 8  listen to David Gomez?
 9  A.   Yes.
10  Q.   And that Sergio Amador just continued to do what he wanted
11  to do?
12  A.   Yes.
13  Q.   Did Eva Razo have the keys to the San Pedro office?
14  A.   Yes, she did.
15  Q.   And you provided Eva Razo with a list of the charts that
16  you falsified in order for -- or so Razo could pay you the
17  additional money for falsifying the charts, true?
18  A.   Yes.  I would leave a note on top of the charts.
19  Q.   And it was Sergio Amador and Eva Razo that instructed you
20  to check off specific modalities and write corresponding SOAP
21  notes for every patient receiving a massage, correct?
22  A.   Yes.
23          MR. CARDONA:  Your Honor, asked and answered.
24          THE COURT:  It has been asked and answered.
25          Next question.
```

```
1              MR. ULTIMO:  Last -- last question.

2              THE COURT:  That's always an oxymoron with an

3     attorney, Counsel.

4              MR. ULTIMO:  Yes, but I will -- I only get one shot at

5     this.

6              THE COURT:  Okay.

7     BY MR. ULTIMO:

8     Q.   I'm going to show you, ma'am, Exhibit 202-2.  It's already

9     been admitted into evidence.  This is the example SOAP note

10    that counsel showed you, and you told us you created it,

11    correct?

12    A.   Yes.  Yes.

13    Q.   I'm wondering -- going to make this a little larger.  This

14    area right here, in all of your SOAP notes, you would always

15    indicate "P.H." for the therapist, right?  Pandora Hall, right?

16    A.   Yes.

17    Q.   As the individual who ostensibly performed the massage

18    therapy on the patient, correct?

19    A.   Yes.

20    Q.   Why, on the example, did you put "P. Hall"?  Why did you

21    do that?

22    A.   There was no specific reason.

23    Q.   I mean, you did testify that you were concerned and you

24    knew this was wrong.  Why would you put your last name instead

25    of the abbreviations "P.H." like you did on all of the other
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    phony entries?

2            THE COURT:  Counsel, she's already answered the

3    question.

4            THE WITNESS:  Well --

5            THE COURT:  No.  Excuse me.

6        Asking exactly the same question again.

7            MR. ULTIMO:  I'm just asking why, Your Honor.

8            THE COURT:  You did ask her why.  She said she didn't

9    know.  No particular reason is what she said, and so you asked

10   it again.

11           MR. ULTIMO:  Okay.  No further questions.

12           THE COURT:  Redirect?

13           MR. CARDONA:  Yes, Your Honor.

14                       **REDIRECT EXAMINATION**

15   BY MR. CARDONA:

16   Q.   Just going back for a second, when you moved from Long

17   Beach to San Pedro, was that when you had the conversation with

18   Sergio Amador and David Gomez about whether the fraud would

19   continue at San Pedro?

20   A.   It was before we left, when I was offered the job.

21   Q.   And you reached an agreement, and they assured you that

22   the fraud wouldn't continue at San Pedro?

23   A.   Yes.

24   Q.   Now, after that, the fraud in fact continued, didn't it?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   And you've said that you viewed Mr. Gomez as the reliable

2  one.

3  A.   Yes.

4  Q.   Did you go and talk to David Gomez about the fact that the

5  agreement hadn't been kept and that the fraud was continuing?

6  A.   Yes, I talked to him many occasions about --

7  Q.   What was his response?

8  A.   He would say, "I know, I know, I'll talk to him, it'll

9  stop."

10  Q.   Did it stop?

11  A.   No.

12  Q.   Now, in terms of who you took direction from, you remember

13  a conversation -- well, do you remember someone called Anthony

14  Holmes?

15  A.   Yes.

16  Q.   Who was Anthony Holmes?

17  A.   He was a friend of mine.

18  Q.   Did you ever date him?

19  A.   Yes.

20       THE COURT:  Counsel, I'm not too sure that's within

21  the purview of the cross-examination.

22       MR. CARDONA:  Your Honor, I'll make clear why it is in

23  a second.

24       THE COURT:  Okay, let's do it.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    BY MR. CARDONA:

 2    Q.   Did you have a conversation with him on July 8th, 2013,

 3    that you later discovered was recorded?

 4    A.   I had no idea that he recorded any of my conversations,

 5    no.

 6    Q.   Did you later find out that it was?

 7    A.   It wasn't until my lawyer just mentioned it in the hallway

 8    right now.

 9    Q.   Did you have a conversation with Mr. Holmes on July 8th?

10    A.   I don't remember the dates, but being his friend, we've

11    had many conversations.

12    Q.   And did you have a conversation where you discussed with

13    him what was going on at Port Medical?

14    A.   We did have conversations about it, yes.

15    Q.   Would you recognize his voice in a recording?

16    A.   Most likely.

17    Q.   Would you recognize your voice in a recording?

18    A.   Yes.

19         MR. CARDONA:  Your Honor, I have a recording that I'd

20    like to play for the witness and offer.

21         THE COURT:  Have you shown it to defense counsel yet?

22         (Mr. Ultimo reviews document.)

23         MR. CARDONA:  So, Your Honor, I have two excerpts.

24    I'd offer the first one as Exhibit 1001B.

25         THE COURT:  Okay.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. ULTIMO:  May I be heard for a moment, Your Honor?
 2            THE COURT:  Yes.
 3            MR. ULTIMO:  Your Honor, I don't know how long it's
 4   going to take, but I know the Court's promising to get us out
 5   by 4:00.
 6            THE COURT:  What's the second one you want to
 7   introduce, Counsel?
 8            MR. CARDONA:  The second one would be an excerpt from
 9   the same conversation that I'd ask be marked 1001C.
10            THE COURT:  1B and 1C, is that what you said?
11            MR. CARDONA:  1001B and 1001C.
12            THE COURT:  Okay.  Is there an objection, Counsel?
13   You're probably correct, we won't play it today because it will
14   take too long.  I just want to know if there's an objection on
15   it.
16            MR. ULTIMO:  No objection, Your Honor.
17            THE COURT:  Okay.  And Counsel, we got -- you got
18   three minutes.  I don't know how long it's going to take.
19            MR. CARDONA:  The first one won't take that long, Your
20   Honor.
21            THE COURT:  Play the first one.
22            MR. CARDONA:  I may get to the second one as well.
23   They're short.
24            THE COURT:  Go ahead, but at 4:00 o'clock we're
25   breaking.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. CARDONA:  I understand.

 2         (Audio played, unintelligible.)

 3              THE COURT:  Counsel, we are going to break a couple

 4    minutes early.  Obviously, you're not going to be able to hear

 5    it the way it's coming out now, so they can work on that and

 6    get that set for you in the morning.

 7              MR. CARDONA:  Apologize for the technical

 8    difficulties.

 9              THE COURT:  That's okay.

10         In this matter, we're going to break at this time and

11    we're going to have you come back in tomorrow morning.  What

12    time?

13              MULTIPLE JURORS:  8:15.

14              THE COURT:  8:15, that's perfect, and we'll get back

15    into this.  Today has been kind of slow, as you know, and

16    detailed and everything else.  I think you're going to see it

17    pick up tomorrow.  They have to lay the foundation on the first

18    day and everyone has to get into it, but I'm assuming it's

19    going to pick up a little bit.  So it will be a little bit more

20    lively and more interesting tomorrow, but one way or the other,

21    don't think about this case.  During the evening, go home,

22    enjoy yourself, watch TV, whatever you want to do, but don't

23    think about the case or form or express any opinions about the

24    matter until it's submitted to you and you retire to the jury

25    room.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Thank you very much, and thank you for being on time

2    today, and let's see if we can keep it up tomorrow.  I'm going

3    to excuse you at this time and I'm going to be talking to the

4    attorneys.

5         THE CLERK:  All rise.

6      *(Outside the presence of the jury:)*

7         THE COURT:  You may step down, also.  You have to be

8    back tomorrow morning by 8:30.

9         THE WITNESS:  Okay.

10        THE COURT:  You may have seats, Counsel.  The record

11   will reflect that the jury has left the courtroom.

12        Again, talking about what we talked about at lunchtime,

13   I'm assuming -- we went through four witnesses today.  The

14   indication was that there's 23 witnesses.  If they go at the

15   same pace they did today -- and I'm assuming they won't go the

16   same, but you know I'm going to get more involved if they go at

17   the same pace they did today.  The first witnesses, like I told

18   the jury, I'm sure you're laying the foundation.  You gotta go

19   thoroughly through these witness.  Particularly the last

20   witness you have to go through thoroughly, and

21   cross-examination you gotta go through thoroughly on it.  You

22   have another witness that's going to be coming up that I'm

23   assuming you're also going to have to go fairly thoroughly

24   through, and that's Mr. Amador.  You know, there's some cases,

25   people you have to go through.

1        I don't know, Counsel.  It's your case.  I don't know what

2   you anticipate as far as the length of the case now goes.

3            MR. CARDONA:  Well, Your Honor, we did go much slower

4   than I expected today.  I do expect that --

5            THE COURT:  And much slower than I expected, but go

6   ahead.

7            MR. CARDONA:  Many of the witnesses should be shorter.

8   In particular, many of the witnesses who are coming up are

9   people like Joe Vaifanua, who are simply going to be testifying

10  about not receiving massages.  I do expect that will go more

11  quickly.  I hope.  At least from my side it will go more

12  quickly.

13           THE COURT:  Okay.  Well, I gotta tell you, in

14  hearing --

15      I'm sorry, Counsel.  You want to be heard?

16           MR. ULTIMO:  I did want to be heard, but didn't want

17  to interrupt.

18           THE COURT:  Oh, no, go ahead.  Your turn.

19           MR. ULTIMO:  Certainly.  I appreciate the Court's

20  comments about understanding that the defense does have to get

21  into the examination.  I really appreciate that.  It's not my

22  intention to be any longer than I have to be.  I do -- would

23  like to -- I would like to interpose a belated objection to

24  Exhibits 1001B and 1001C, if I may be heard.

25           THE COURT:  Sure, go ahead.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. ULTIMO:  Not only is this beyond the scope of

2    cross-examination, but these are out-of-court statements.  This

3    is a surreptitious recording.  Miss Sistonich, the last witness

4    who testified, she was not under oath when she answered on a

5    wire, on a surreptitious tape-recording, and it just -- it

6    just -- it's just 403, undue consumption of time, and it's

7    beyond the scope of cross.

8          THE COURT:  Counsel, why don't you give me an offer of

9    proof, because I don't know what the tape says.  Offer of proof

10   on it.

11         MR. CARDONA:  Sure, Your Honor.  It's an offer of

12   proof.  If you remember, the cross focused primarily on the

13   fact that -- an effort to show that David Gomez didn't direct

14   her, and elicited a number of prior statements in which she

15   blamed it all on Sergio Amador.  In fact, this was a recorded

16   statement made at the time when she had no similar motive to

17   fabricate, no motive at all to lie, and is being offered as a

18   prior consistent statement under the current rules of evidence,

19   which makes that admissible.  And in fact, one of the

20   excerpts --

21         THE COURT:  It's not being offered for impeachment of

22   the witness?

23         MR. CARDONA:  It's being offered not to impeach but as

24   a prior consistent statement to rebut the offered impeachment

25   by the defense, which is a permissible basis for offering a

1    prior consistent statement.

2            THE COURT:  What impeachment has he given at this

3    time?  She has testified to what she did and what she said.

4    You're not impeaching that testimony.  I'm assuming you want

5    that testimony to stand.  He hasn't impeached that testimony

6    yet.  He has asked questions about it, but he hasn't impeached

7    it.  If he brings in some witness to say she didn't do

8    something, then you can bring it in.

9            MR. CARDONA:  Well, Your Honor, he did impeach her by

10   asking her repeatedly about prior statements.

11           THE COURT:  Sure, he did.

12           MR. CARDONA:  Prior inconsistent statements.  Once he

13   asks about prior inconsistent statements, I am permitted to

14   then introduce evidence of prior consistent statements to rebut

15   the claim that in fact she's lying because she made

16   inconsistent statements.

17      This is a prior statement that was made consistent with

18   the fact that she was directed by David Gomez as well as Sergio

19   Amador, which is precisely what he asked her about, supposedly

20   inconsistent statements she had made.

21           THE COURT:  Okay.  Counsel, the inconsistent

22   statements I thought were related to the first and second

23   examination --

24           MR. ULTIMO:  That is correct.

25           THE COURT:  -- when she said she was telling a lie and

1  then she said this is what the truth is.

2          MR. ULTIMO:  Right.  And she's got the cooperation

3  agreement with the government that she wouldn't be prosecuted

4  because of her false statements on those two.

5          THE COURT:  She's testified that she made statements

6  and that they were false, and now she's made other statements.

7  That's what her testimony was here.

8          MR. CARDONA:  Correct, Your Honor, but --

9          THE COURT:  You can't introduce testimony to show that

10  the part she said was a lie really wasn't a lie.

11          MR. CARDONA:  No, Your Honor, that's not what I'm

12  introducing them for.  Their entire cross-examination has been

13  focused on eliciting from her, or seeking to elicit from her --

14  her testimony here on direct was that at times she received

15  direction from David Gomez.  They've asked her about

16  inconsistent statements, that they allege are inconsistent, in

17  which she said that she was directed just by Sergio Amador.

18          THE COURT:  At a prior time.

19          MR. CARDONA:  At a prior -- they've asked her about

20  statements she made at a prior time, prior statements in which

21  she said she was just directed by Sergio Amador.  I am now

22  allowed to rehabilitate her by introducing a consistent

23  statement.  And if Your Honor wishes, I can present you with

24  the rule in the morning.

25          THE COURT:  You can present me with the rule -- you

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    can present me with the rule in the morning, Counsel.  I don't

2    see anything that has come in to impeach her testimony as of

3    this time, and I don't see any reason to rehabilitate her,

4    because I don't see anything that's come in -- he's questioned

5    her.  He can do that.  That's not impeachment.  The evidence is

6    evidence, and impeachment has to have some evidence that shows

7    she was not saying anything correct here on --

8              MR. CARDONA:  Your Honor --

9              THE COURT:  So you can submit it to me in the morning.

10   I think you got an uphill battle on it, but go ahead and submit

11   it in the morning by 8:00 o'clock.  I'll take a look at it.

12   I'll let you know at 8:30 whether or not it can be presented or

13   not.

14             MR. CARDONA:  That's fine, Your Honor.

15             THE COURT:  Okay.  I may get into it.  This entire

16   proceeding -- on both sides, Counsel.  I'm not blaming one side

17   or the other, but we've been asking repetitive questions.

18   We've been asking questions that really aren't that relevant.

19   We've been putting the jury to sleep on this thing.  I've got a

20   feeling and I don't have much confidence that it is going to

21   change.  If it doesn't change, I'm going to get into it and I'm

22   going to have to be making comments like I made today about

23   you've already asked that question, you're repeating questions,

24   whatever it is, from both sides.  I'd like to get both of you

25   more focused on this case, and I think you can do that, so I'll

1    leave it to you.

2            MR. ULTIMO:  Right.  Well, yes, I agree with the Court

3    completely, but I do have to sometimes explore, and my

4    questions are not always the cleanest, but --

5            THE COURT:  Counsel, I'm expecting you to do what you

6    have to do.  You're representing your client.  And I've gotta

7    do what I've gotta do as a judge, and I may very well step on

8    it.  I'm not saying don't try; just saying I've gotta make

9    rulings on it, and they may not be --

10           MR. ULTIMO:  Oftentimes witnesses will testify they

11   don't remember when in fact they really do.  With a little bit

12   of questioning, they have more of a recollection than they

13   portend to be --

14           THE COURT:  You do what you've gotta do, and I'll do

15   what I've gotta do.

16           MR. ULTIMO:  Thank you.

17        Your Honor, final question.  I did want to bring this up,

18   but in the interest of time and judicial time, the government

19   has a right to, but they have husband and wife testifying

20   essentially to the same thing, on the witness list.  They have

21   David Bumgarner as a witness and then Diana Bumgarner.  I think

22   all of it relates to their children.  I have to go back.

23   There's so many witnesses.  But it may relate to their

24   children, and there's only one set of children.  Might not be a

25   need for both husband and wife to testify.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      THE COURT:  You guys work out anything you want to do.

2  He can do it.  And Counsel, if it's dragging like this, I may

3  very well step in and say that's a repetitive witness, you

4  can't call them.

5      MR. ULTIMO:  Okay.

6      THE COURT:  You figure out what you want to do on the

7  case, and I'll just have to do what I have to do as far as

8  controlling the case.

9      MR. ULTIMO:  I just want the Court to know that

10  there's husband and wife twice.  Ernestine Rubio and Roy

11  Villavisencio are married, so -- all right.  Thank you.

12      THE COURT:  8:30 tomorrow morning.

13      MR. ULTIMO:  Yes.

14      THE COURT:  Okay.  Thank you very much.

15      THE CLERK:  All rise.

16

17          *(Proceedings adjourned at 4:09 p.m.)*

18

19                  *--o0o--*

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

*CERTIFICATE*

*I hereby certify that pursuant to Section 753, Title 28,*

*United States Code, the foregoing is a true and correct*

*transcript of the stenographically reported proceedings held in*

*the above-entitled matter and that the transcript page format*

*is in conformance with the regulations of the*

*Judicial Conference of the United States.*

*Date:  NOVEMBER 20, 2016*


                         */S/ SANDRA MACNEIL*

                    *Sandra MacNeil, CSR No. 9013*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA