1           UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                    - - - -

5


6
UNITED STATES OF AMERICA,        )
7                                )
                    PLAINTIFF,   )
8                                )
        vs.                      )     No. CR 15-629-RGK-2
9                                )
DAVID GOMEZ,                     )
10                               )
                    DEFENDANT.   )
11 _____)

12


13


14        REPORTER'S TRANSCRIPT OF JURY TRIAL

15           DAY 3; PAGES 271 - 518

16         THURSDAY, OCTOBER 13, 2016

17                 8:18 A.M.

18         LOS ANGELES, CALIFORNIA

19


20


21


22   _____

23      *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
        *Official Reporter, U.S. District Court*
24           *255 East Temple Street*
             *Los Angeles, CA  90012*
25               *213.894.5949*


UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

272

**APPEARANCES OF COUNSEL:**


**FOR PLAINTIFF, UNITED STATES OF AMERICA:**

        OFFICE OF THE UNITED STATES ATTORNEY
        BY:  GEORGE S. CARDONA
            ASSISTANT UNITED STATES ATTORNEY
        312 NORTH SPRING STREET, SUITE 1100
        LOS ANGELES, CALIFORNIA  90012
        213.894.2434


**FOR DEFENDANT, DAVID GOMEZ:**

        ULTIMO LAW FIRM, PC
        BY:  PAUL J. ULTIMO
            ATTORNEY AT LAW
        7700 IRVINE CENTER DRIVE, SUITE 800
        IRVINE, CALIFORNIA  92618-3047
        949.851.0300


**ALSO PRESENT:**

        SPECIAL AGENT MARCUS VALLE, DEPARTMENT OF LABOR,
        OFFICE OF THE INSPECTOR GENERAL


        JEANNIE HENSCHEL

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                        I N D E X

 2   GOVERNMENT'S WITNESSES:                         PAGE

 3   PANDORA FISTONICH
        REDIRECT EXAMINATION (Continued) BY MR. CARDONA   278
 4      RECROSS-EXAMINATION BY MR. ULTIMO              282

 5   ROY VILLAVISENCIO
        DIRECT EXAMINATION BY MR. CARDONA             291
 6      CROSS-EXAMINATION BY MR. ULTIMO               309

 7   DAVID BUMGARNER
        DIRECT EXAMINATION BY MR. CARDONA             322
 8      CROSS-EXAMINATION BY MR. ULTIMO               332

 9   YOLANDA SIERRA
        DIRECT EXAMINATION BY MR. CARDONA             335
10

11   ERNESTINE RUBIO
        DIRECT EXAMINATION BY MR. CARDONA             357
12      CROSS-EXAMINATION BY MR. ULTIMO               366

13   NICOLE LaBEAUD
        DIRECT EXAMINATION BY MR. CARDONA             368
14      CROSS-EXAMINATION BY MR. ULTIMO               375
        REDIRECT EXAMINATION BY MR. CARDONA           381
        RECROSS-EXAMINATION BY MR. ULTIMO             382
15

16   MARCUS VALLE
        DIRECT EXAMINATION BY MR. CARDONA        383, 399
17      CROSS-EXAMINATION BY MR. ULTIMO               406
        REDIRECT EXAMINATION BY MR. CARDONA           407
18
     LEONARD LINARES
        DIRECT EXAMINATION BY MR. CARDONA             409
19      CROSS-EXAMINATION BY MR. ULTIMO               423

20   KEVIN MALONE
        DIRECT EXAMINATION BY MR. CARDONA             426
21      CROSS-EXAMINATION BY MR. ULTIMO               443
        REDIRECT EXAMINATION BY MR. CARDONA           480
22
     ROBERT ZALAMEDA
23      DIRECT EXAMINATION BY MR. CARDONA             487
        CROSS-EXAMINATION BY MR. ULTIMO               503
24
     SERGIO AMADOR
25   DIRECT EXAMINATION BY MR. CARDONA                505
```

1                        *T R I A L   E X H I B I T S*

2    *EXHIBIT NUMBER*            *RECEIVED IN EVIDENCE*        *STRICKEN*

3          1                            514                      --

4          2                            430                      --

5         133                           305                      --

6         137                           298                      --

7         151                           416                      --

8         177                           353                      --

9         179                           354                      --

10        212                           324                      --

11        271                           385                      --

12        272                           387                      --

13        273, page 82                  298                      335

14        273                           405                      --

15        282                           391                      --

16        283                           393                      --

17        284                           394                      --

18        285                           394                      --

19        286                           395                      --

20        287                           395                      --

21        288                           396                      --

22        290                           489                      --

23        291                           490                      --

24        292                           497                      --

25        293                           497                      --

```
 1              T R I A L   E X H I B I T S (Continued)

 2    EXHIBIT NUMBER           RECEIVED IN EVIDENCE       STRICKEN

 3       294                         497                    --

 4       295                         499                    --

 5       296                         499                    --

 6       297                         500                    --

 7       298                         500                    --

 8       299                         501                    --

 9       311 to 321                  402                    --

10       323 to 330                  402                    --

11       1001B                       282                    --

12       1001C                       282                    --

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, OCTOBER 13, 2016

 2                            8:18 A.M.

 3                            -  -  -  -

 4        (Outside the presence of the jury:)

 5              THE COURT:  Okay.  The record will reflect that

 6    counsel's present, but the jurors are not present.

 7         I wanted to go ahead and rule on this now so we could

 8    start right at 8:30 when the jury comes in.

 9         Counsel, I was under the impression, and I don't see it in

10    the papers here, as to when the statement that you wish to put

11    in was -- I thought this was a recent statement after the

12    first -- when was it in relation to the first interview, the

13    second interview and the third interview?

14              MR. CARDONA:  It was prior to all of those, Your

15    Honor.

16              THE COURT:  It was prior to even the first interview

17    where she denied it?

18              MR. CARDONA:  Correct.

19              THE COURT:  Okay.  Okay.  I was under the impression

20    it was after the second interview that you wanted to put it in.

21              MR. CARDONA:  No, Your Honor.

22              THE COURT:  Okay.  So it's a prior inconsistent

23    statement is really what you're introducing it as.

24              MR. CARDONA:  Yeah.

25              THE COURT:  Okay.  The Court has reviewed -- I don't
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  know, is there anything further from either side?

2           MR. ULTIMO:  No, Your Honor.

3           THE COURT:  Okay.  In this matter, you're going to be

4  allowed to play the tape, Counsel.

5           MR. CARDONA:  Thank you, Your Honor.

6           THE COURT:  The person on the tape is not going to be

7  a witness?

8           MR. CARDONA:  No, Your Honor.

9           THE COURT:  Okay.  And it's not law enforcement?

10          MR. CARDONA:  Correct.  I will elicit from her that it

11 was Anthony Holmes, a friend.

12          THE COURT:  Okay.  Okay.  Thank you, Counsel.  We'll

13 get started right at 8:30.

14          MR. ULTIMO:  Thank you, Your Honor.

15          THE CLERK:  All rise.

16     (Recess held from 8:20 a.m. to 8:31 a.m.)

17     (In the presence of the jury:)

18          THE COURT:  Okay.  The record will reflect that all

19 the members of the jury are in their respective seats in the

20 jury box, including the alternate.

21      You guys are still perfect.  I'm waiting for the first one

22 that gets in late, but right now you guys are perfect.  And

23 really appreciate it.  We can get started right on time.

24      The witness is on the witness stand, and Counsel, you may

25 inquire.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. CARDONA:  Thank you.
 2              THE CLERK:  If I can just remind the witness real
 3  quickly, you're still under oath.  Thank you.
 4              THE COURT:  You had a tape you were going to play.
 5  Did you want to do that first or --
 6              MR. CARDONA:  Your Honor, I just had two questions to
 7  lead into that.
 8              THE COURT:  Okay.  Go ahead.
 9      PANDORA SISTONICH, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,
10                  REDIRECT EXAMINATION (Continued)
11  BY MR. CARDONA:
12  Q.   Miss Sistonich, yesterday on cross-examination, do you
13  recall you were asked a number of questions about prior
14  statements that you gave to law enforcement officers?
15  A.   Yes.
16  Q.   And in particular, the first two of those statements were
17  on July 9th and August 28th, the ones that were referred to at
18  Agent Valle's office in West Covina and the one at the
19  Starbucks.  Do you remember that?
20  A.   Yes.
21  Q.   When you were giving those initial statements, were you
22  reluctant to tell law enforcement everything that you had done?
23  A.   Yes, I was.
24  Q.   Why?
25  A.   Because I was afraid, afraid of everything.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   Have you done your best here today to tell us what you

2  remember to the best of your ability?

3  A.   Yes, definitely.

4  Q.   Now, I ended yesterday asking you a question about someone

5  named Anthony Holmes.  Who is Anthony Holmes?

6  A.   He was a friend.

7  Q.   Was he a law enforcement officer?

8  A.   No.  He was a long -- a longshoreman, actually, and

9  somebody I knew from growing up in San Pedro.

10        MR. CARDONA:  And Your Honor, at this point I'd ask to

11  play the two excerpts, 1001B and 1001C.

12        THE COURT:  They may be played.  Hopefully we --

13        *(The audio recording played in open court was*

14        *reported by the court reporter as follows,*

15        *speaker identifications having been provided:)*

16        "P.H:  I did do some illegal stuff, though.  I

17        did sign off on charts that I wasn't supposed to.

18        "A.H.:  They were telling you to do that.  Who

19        was telling you?

20        "P.H.:  This is what they do.  They would

21        have -- I was a massage therapist as well, so I

22        could legally do SOAP notes.

23        "A.H.:  Yeah.

24        "P.H.:  So they would pay out people.

25        "A.H.:  But you weren't collecting -- you

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1          (unintelligible) making a little extra money for

2        collecting any money for nobody.

3            "P.H.:  No.

4            "A.H.:  So you (unintelligible).

5            "P.H.:  But I was pretending (unintelligible).

6            "A.H.:  But who gave you direction to do that?

7        Chris or --

8            "P.H.:  (Unintelligible.)"

9    BY MR. CARDONA:

10   Q.   Now, in this first excerpt, do you recognize the voice

11   where it's indicated "P.H."?  Is that you?

12   A.   Yes, that's me.

13   Q.   And where it's indicated "C.W.," is that Anthony Holmes?

14   A.   Yes, it is.

15   Q.   Now the date stamp on the video is July 8th, 2013, so

16   would that have been before your first interview with law

17   enforcement?

18   A.   Yes.

19           MR. CARDONA:  And Your Honor, at this time I'd play

20   1001C.

21           THE COURT:  Okay.

22       (The audio recording played in open court was

23       reported by the court reporter as follows,

24       speaker identifications having been provided:)

25           "P.H.:  I've had -- I've been dumb.  I've texted
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        back and forth about the situation.  They know I
 2        know everything.
 3            "A.H.:  Do you have those old texts, texts?
 4            "P.H.:  No, I don't keep my texts.
 5            "A.H.:  But do you know the content of what they
 6        say or --
 7            "P.H.:  Yeah, I know that I've talked to other
 8        people that have worked there that knew what was
 9        going on, just how they're going to go down and
10        it's crooked and I can't be in that place anymore,
11        but I've also backdated when they were telling me
12        to do stuff.
13            "A.H.:  That's it.  There you go.  Who was
14        giving you direction?
15            "P.H.:  Right.
16            "A.H.:  Who gave you direction?  Was it the
17        secretary?  Was it Chris?  That's it.
18            "P.H.:  Yeah, it wasn't Chris.  It was mostly
19        Sergio and David.  Chris was always silent."
20  BY MR. CARDONA:
21  Q.   And again, on this excerpt, the voice that's indicated as
22  "P.H.," is that you?
23  A.   Yes, it is.
24  Q.   And the voice that's indicated as "C.W.," is that Anthony
25  Holmes?
```

1    A.   Yes, it is.

2    Q.   Now, were you aware that Mr. Holmes was recording that

3    conversation?

4    A.   No, I wasn't.

5    Q.   Were you aware that he'd been asked to do that at the

6    direction of law enforcement?

7    A.   No, I wasn't.

8    Q.   And that last clause, when you referred to Sergio, who

9    were you referring to?

10   A.   Sergio Amador.

11   Q.   And when you referred to David, who are you referring to?

12   A.   David Gomez.

13        MR. CARDONA:  Your Honor, I'd offer Exhibits 1001B and

14   1001C.

15        THE COURT:  They'll be received.

16        *(Received in evidence, Trial Exhibits 1001B and 1001C.)*

17        MR. CARDONA:  Nothing further.

18        THE COURT:  Okay.  Recross.

19        MR. ULTIMO:  Thank you, Your Honor.

20                    **RECROSS-EXAMINATION**

21   BY MR. ULTIMO:

22   Q.   Good morning, Miss Sistonich.

23   A.   Good morning.

24   Q.   We just heard that tape-recording with your voice on

25   there, correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.
 2   Q.   Now, a few minutes ago you told counsel that on your first
 3   two meetings with law enforcement, you were reluctant to tell
 4   law enforcement everything.  That was on July 9th, 2013, the
 5   first time you were interviewed, correct?
 6   A.   Yes.
 7   Q.   And again you were untruthful a month later when they
 8   interviewed you on August 28th, 2013, true?
 9   A.   Yes.
10   Q.   So you were reluctant to tell law enforcement everything
11   on those two -- at the time of those two interviews, correct?
12   A.   Yes.  I didn't have counsel at the time.
13   Q.   You went ahead and spoke with law enforcement on three
14   additional occasions, correct?
15   A.   I can't remember the exact number.
16   Q.   Well, you had a proffer with law enforcement at the U.S.
17   Attorney's Office on September 17, 2013.  Remember that?  With
18   your first attorney?
19   A.   Okay.  Yes.
20   Q.   Your attorney was present, correct?
21   A.   Yes.
22   Q.   Then you had a second proffer session at the U.S.
23   Attorney's Office with law enforcement with your second
24   attorney on March 12, 2015, true?
25   A.   Okay.  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   Okay.  And then two months ago, on August 15, this year,

2  you signed a cooperation agreement with the United States

3  Attorney's Office, correct?

4  A.   Yes, I did.

5  Q.   Where you'd be given immunity for the false statements you

6  made to law enforcement in 2013?

7  A.   Yes.

8  Q.   And as part of that cooperation agreement, you signed a

9  seven-page typewritten declaration, correct?

10  A.   Yes, I did.

11  Q.   And you were no longer reluctant to tell law enforcement

12  everything that you did and everything -- and all of the facts

13  and details relating to why you did it and at whose direction

14  you did it, true?

15  A.   Yes.

16  Q.   You were no longer reluctant two months ago?

17  A.   I was not reluctant to tell the truth.

18  Q.   So in that seven-page declaration which you signed on

19  page 7 -- you remember signing it on August 15?

20  A.   Yes.

21  Q.   2016?

22  A.   Yes.

23  Q.   Okay.  You said, "In or around late 2009 or early 2010,

24  Sergio Amador asked me if I would accept the position of office

25  manager at new Port Medical location in San Pedro."  True?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   Yes.

 2    Q.   You said, "I told Amador and Gomez that if I was going to

 3    run the San Pedro location, I wanted it to be legitimate."

 4    True?

 5    A.   Yes.

 6    Q.   And then you said, "Gomez assured me that the fraud was

 7    over and would not happen at San Pedro."  True?

 8    A.   Yes.

 9    Q.   And, "Gomez also told me that he would pay for me to get

10    some training."  True?

11    A.   Yes.

12    Q.   On paragraph 12 on page 4 of the declaration that you

13    signed, you said in or about August '10, August 2010, Port

14    Medical hired Eva Razo.  You went on to say that, "I was at the

15    San Pedro location when I was approached by Sergio Amador and

16    Razo and asked to fabricate SOAP notes and patient charts for

17    patient visits that had not occurred."  True?

18    A.   Yes.

19    Q.   You didn't say anywhere in paragraph 12 or anywhere in the

20    seven pages that David Gomez asked you to fabricate SOAP notes,

21    did you?

22    A.   No, I didn't.

23         MR. CARDONA:  Objection, Your Honor, mischaracterizes

24    the declaration.

25         THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    BY MR. ULTIMO:
 2    Q.   Paragraph 12, you go on to say that, "This time Sergio
 3    Amador offered me -- offered to pay me $20 per fabricated SOAP
 4    note.  I agreed."  True?
 5    A.   Yes.
 6    Q.   When you say "this time," you're referring to at
 7    San Pedro?
 8    A.   Yes.
 9    Q.   Okay.  So then you said, "After we reached this agreement,
10    Eva Razo would bring the charts for which I was to fabricate
11    SOAP notes to San Pedro."  True?
12    A.   Yes.
13    Q.   "I would then fabricate the SOAP notes, and either I would
14    give the falsified patient charts to Eva Razo for her to take
15    back to Long Beach, or I would leave the falsified charts in
16    the back office in San Pedro for Eva Razo, who had the keys to
17    the San Pedro facility, to pick them up," true?
18    A.   Yes.
19    Q.   And finally, in paragraph 12 you said, "I provided Eva
20    Razo with a list of the charts I had falsified in order for
21    Razo to pay me the additional money for falsifying the charts."
22    A.   Yes.
23    Q.   Nowhere in paragraph 12 does it say that David Gomez paid
24    you, instructed you, or had given you charts to falsify, true?
25    A.   True.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   And you were no longer reluctant at that time to tell law

2    enforcement everything, true?

3    A.   True.

4    Q.   In fact, it wasn't you who typed up the declaration, was

5    it?

6    A.   No.

7    Q.   Was United States Attorney's Office, true?

8    A.   True.

9    Q.   And that was because this is what you told them?

10   A.   Yes.

11   Q.   And it was the truth?

12   A.   Yes, it was.

13   Q.   At last.

14   A.   At last.

15   Q.   Then you said, in paragraph 13, "In addition to paying you

16   for fabricating SOAP notes for patient visits that had not

17   occurred, in or about August 2010, Sergio Amador and Eva Razo

18   instructed me" --

19            THE COURT:  I'm sorry, Counsel, I'm going to interrupt

20   you.  We've covered this so many times.  You can go into it,

21   but be careful.  It has to be in cross-exam- -- recross

22   examination on it.  And we've gone over it so many times, so

23   I'm going to ask you to -- if you could be more efficient as

24   far as using your time.  So go ahead.

25            MR. ULTIMO:  I will try to do that, Your Honor.  It's

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    not too many more entries left.

2              THE COURT:  Okay.

3              MR. ULTIMO:  Bear with me.  Thank you.

4    Q.   You said, "Sergio Amador and Eva Razo instructed me and

5    other staff at San Pedro to check off the specific modalities

6    so that you could bill for the maximum for each massage."

7    True?

8    A.   Yes.

9    Q.   And again, in that same paragraph, paragraph 13, you said

10   again, "At the request of Eva Razo and Sergio Amador, I

11   prepared instructions for massage therapists to follow in

12   preparing SOAP notes and example SOAP note language for staff

13   to use to support modalities that was supposed to be billed

14   for."  True?

15   A.   True.

16   Q.   Now, you also told -- at least in your declaration and

17   your testimony, you said you told Sergio Amador and David

18   Gomez, you know, "If I'm going to be the manager at San Pedro,

19   I want it to be legitimate.  I want there to be no fraud."  Is

20   that right?

21   A.   I did, yes.

22   Q.   But that didn't happen, right?

23   A.   No.

24             THE COURT:  Counsel, I'm sorry, this is outside

25   redirect.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. ULTIMO:  Okay.

2          THE COURT:  And it has been covered.

3   BY MR. ULTIMO:

4   Q.  Finally, paragraph 15 on page 6 of the declaration, you

5   said, "I prepared the example SOAP note language at the

6   direction of Eva Razo and Sergio Amador."  True?

7   A.  True.

8          MR. ULTIMO:  Your Honor, I would like to offer the

9   seven-page declaration, Exhibit 243, page 12 through page 18,

10  into evidence.

11         THE COURT:  Any objection?

12         MR. CARDONA:  Your Honor, I'd simply ask, if we're

13  going to offer that, that we also offer the agreement to which

14  it's attached, because that agreement has language that limits

15  the declaration.

16         THE COURT:  Any objection?

17         MR. ULTIMO:  I don't believe that the entire agreement

18  is necessary.  It's long.  It's got attachments.  It's --

19         THE COURT:  Okay.  The request to offer it into

20  evidence will be denied.

21      Next question.

22      Counsel, again, all we're doing is consuming time in front

23  of the jury.  If you have a document, that is fine, but there's

24  no use to have a document, have the jury read the document,

25  have somebody testify to what the document says.  The jury's

```
 1   not stupid.  They can read a document and know what it says.
 2   You don't have to question people as to what that document
 3   says.  We're wasting time doing it that way.  So you've already
 4   got the testimony in.  The entry on the document, the request
 5   to enter the document will be denied.
 6       Next question.
 7           MR. ULTIMO:  Thank you.  That's it for the cross, Your
 8   Honor.
 9           THE COURT:  Okay.  You may step down.
10           MR. CARDONA:  Your Honor, may I just ask two questions
11   to clarify something that was misleading about that
12   questioning?
13           THE COURT:  We're already through cross and recross on
14   it.
15       You may step down at this time.
16       Okay.  Next witness.
17           MR. CARDONA:  Your Honor, the government calls Roy
18   Villavisencio.
19           THE CLERK:  Good morning.  Right here to be sworn,
20   please.  That's fine.  Please raise your right hand.
21       Do you solemnly swear the testimony that you are about to
22   give in the matter now before the Court shall be the truth, the
23   whole truth, and nothing but the truth, so help you God?
24           THE WITNESS:  Yes.
25           THE CLERK:  Thank you.  You may be seated.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        And may I please ask that you state your full name for the
 2   record and spell your last name.
 3             THE WITNESS:  Roy Villavisencio,
 4   V-i-l-l-a-v-i-s-e-n-c-i-o.
 5             THE CLERK:  Thank you.
 6             THE COURT:  You may inquire, Counsel.
 7              ROY VILLAVISENCIO, GOVERNMENT'S WITNESS,
 8                        DIRECT EXAMINATION
 9   BY MR. CARDONA:
10   Q.    Mr. Villavisencio, how are you employed?
11   A.    I work for Pacific Maritime Association.
12   Q.    What do you do?
13   A.    I'm a clerk.
14   Q.    Are you a member of any union?
15   A.    Yeah.  Local 63.
16   Q.    Which union?
17   A.    The ILWU.
18   Q.    Is that the International Longshore and Warehouse Union?
19   A.    Yes.
20   Q.    When did you become a clerk?
21   A.    About a year ago.
22   Q.    And prior to that, what did you do?
23   A.    I was with Local 13.
24   Q.    And what's Local 13 cover?
25   A.    Longshore.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   And what kind of work did you do as a longshoreman?

 2   A.   Lash.  I was a lasher.

 3   Q.   Now, how long had you been a longshoreman?

 4   A.   About 12 years.

 5   Q.   Now, when you worked as a longshoreman, did you know

 6   someone named Sergio Amador?

 7   A.   From work, yes.

 8   Q.   And how about somebody named David Gomez?

 9   A.   Yes.  From work, also.

10   Q.   And do you see him here in court today?

11   A.   Yes, I do.

12   Q.   Is he sitting here at counsel table right next to me?

13   A.   Yes.

14        MR. CARDONA:  Your Honor, may the record reflect he's

15   identified the defendant.

16        THE COURT:  Indicating the defendant.

17   BY MR. CARDONA:

18   Q.   Did you know him from work as well?

19   A.   Yes.

20   Q.   Did you work together with Amador and Gomez?

21   A.   No.  Rarely.  Mainly I'd see them at the hall, pretty

22   much.  That's it.

23   Q.   And what's "the hall"?

24   A.   Our dispatch hall.

25   Q.   Is there something that's known as check-in partners?
```

1    A.   Yes, there is.

2    Q.   What's that?

3    A.   Well, at our dispatch hall, we're there and we get our job

4    and we go to work, and if you got a check-in partner, you can

5    get yours and your partner's job and go to work.

6    Q.   Did Amador and Gomez have that relationship?

7    A.   I can't say.  I'm not sure.

8    Q.   Now, did you also know someone named Chris Rice?

9    A.   Yes, I know who Chris Rice is.

10   Q.   Is he a longshoreman?

11   A.   He's a foreman.

12   Q.   Is that a different local?

13   A.   Yeah.  Local 94.

14   Q.   Were you insured through the longshoremen's union?

15   A.   Yes.

16   Q.   Did you have your health insurance through it?

17   A.   Yes.

18   Q.   What type of insurance did you have?

19   A.   PPO.

20   Q.   So it wasn't an HMO?

21   A.   No, wasn't HMO.

22   Q.   Now, back in 2009 to 2011, were you married?

23   A.   Yes, I was.

24   Q.   Who was your wife?

25   A.   Ernestine Rubio.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And did you have some kids with her?

2    A.    Yes.  I have two kids with her.

3    Q.    Who are they?

4    A.    Desiree Villavisencio and Cierra Villavisencio.

5    Q.    Now, did you also have a child from before you were

6    married to her?

7    A.    Yes.  Angelique Villavisencio.

8    Q.    And did she have a child from before she was married to

9    you?

10   A.    Yes.  Alexandria Pech.

11   Q.    Were your wife and your kids also covered by your

12   longshoreman's insurance?

13   A.    Yes.

14   Q.    Did your longshoreman's insurance cover chiropractic

15   services like massages?

16   A.    Yes, it does.

17   Q.    Was there a limit on that?

18   A.    I'm not sure, to be honest with you.

19   Q.    Did you have to pay anything?

20   A.    No.

21   Q.    Now, at some point while you were working as a

22   longshoreman back in the 2009 to 2010 time period, did you

23   learn about a clinic in Long Beach called Port Medical?

24   A.    Yes, I did.

25   Q.    How did you learn about it?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   A.   Sergio mentioned it to me.

2   Q.   What did he tell you?

3   A.   Just that he's going to be opening up a clinic.

4   Q.   Did he say whether anybody else was involved in it?

5   A.   No.  I didn't even ask.  No, he didn't.

6   Q.   Did he tell you whether David Gomez was involved in it?

7   A.   No.

8   Q.   Did he tell you whether Chris Rice was involved in it?

9   A.   No.

10  Q.   Did you visit?

11  A.   Yes, I did.

12  Q.   Did you see a chiropractor?

13  A.   Yes, I did.

14  Q.   And what did you have the chiropractor do?

15  A.   Just adjustments or whatever it is they do.

16  Q.   Do you remember what they did?

17  A.   I know he cracked my back a couple times, yeah.

18  Q.   Did you get massages there as well?

19  A.   Yes, I did.

20  Q.   Did you have any massage therapists who you regularly got

21  massages from?

22  A.   I remember two names, yes.

23  Q.   What are they?

24  A.   Well, I think one was a "Kiko" or something like that, and

25  then Evelyn.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

296

```
1    Q.   Did you get acupuncture there?

2    A.   I might have tried it once or twice, yeah.

3    Q.   No more times?

4    A.   No.

5    Q.   Why not?

6    A.   I didn't get nothing out of it.

7    Q.   Did you take your kids to Port Medical?

8    A.   Yes, I did.

9    Q.   What did you have done for them?

10   A.   They also got adjusted and massages and stuff like that.

11   Q.   Did your kids like going?

12   A.   Yeah, they did.  They liked it there.

13   Q.   Why?

14   A.   'Cause they made it inviting to them.  They enjoyed going

15   there.

16   Q.   How was it made inviting to them?

17   A.   Just giving them, like, you know, little bowls of fruit

18   and champagne glasses with, like, apple juice and stuff like

19   that.

20   Q.   Did your kids have any medical problems or injuries?

21   A.   No.

22   Q.   Did they have any problems with their bones?

23   A.   No.

24   Q.   With their spines?

25   A.   No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   With their muscles?

2    A.   No, they didn't.

3    Q.   Now, when you went into Port Medical, did you sign in?

4    A.   Yes.

5    Q.   How did you sign in when you went to Port Medical?

6    A.   Just at the front desk.

7    Q.   Was there a sheet?

8    A.   Yeah.

9    Q.   Did it have stickers on it?

10   A.   Yeah, it did.

11   Q.   Did you sign those stickers?

12   A.   Yes.

13   Q.   Were there times when you signed sheets of stickers in

14   advance?

15   A.   Yes.

16   Q.   How many stickers would you sign?

17   A.   Maybe 10, 15, or something like that.

18   Q.   Did you also sign stickers with your kids' names?

19   A.   A few times I believe, yes, I did.

20   Q.   And again, did you sign sheets of stickers with your kids'

21   names in advance?

22   A.   Yes.

23        MR. CARDONA:  Your Honor, I'd like to -- I'd offer

24   Exhibit 273, page 82.  It's a check.

25        MR. ULTIMO:  No objection.
```

```
1              THE COURT:  273 will be admitted.

2         (Received in evidence, Trial Exhibit 273, page 82.)

3    BY MR. CARDONA:

4    Q.   Going to blow this up so we can all see it.  And

5    Mr. Villavisencio, this is a check dated March 16th, 2012, to

6    you, for $800, from a company called Chosen Medical Management.

7    Did you receive this check?

8    A.   I don't recall that check, no.

9    Q.   Says in the bottom left, "Sponsorship."  Do you see that?

10   A.   Yes.

11   Q.   Did you ever receive a sponsorship from Port Medical?

12   A.   No.

13   Q.   Were you on any sports team that was sponsored by Port

14   Medical?

15   A.   No.

16   Q.   Did you play on any softball or other sponsored team?

17   A.   No, I didn't.

18            MR. CARDONA:  Your Honor, I'd offer Exhibit 137.  It's

19   a patient chart for Mr. Villavisencio.

20            MR. ULTIMO:  No objection, Your Honor.

21            THE COURT:  Be received.

22         (Received in evidence, Trial Exhibit 137.)

23   BY MR. CARDONA:

24   Q.   Mr. Villavisencio, on the first page of this chart, has

25   your name, and is that your birth date?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.
 2   Q.   On the second page, it again has your name, and again, is
 3   that your birth date?
 4   A.   Yes, that is.
 5   Q.   Below that, it says "PPO Coastwise."  Was that your
 6   insurance?
 7   A.   Yes, it is.
 8   Q.   Below that, do you see there's a couple of slashes, 10/40
 9   and 12/40?  Was there a limit on your chiropractic benefits to
10   40 visits a year?
11   A.   I'm not sure.  I never seen that piece of paper.  I don't
12   know what that is.
13   Q.   Let me just confirm.  Did you ever see your chart when you
14   were at Port Medical?
15   A.   No.
16   Q.   So other than the paperwork that you actually filled out,
17   did you see what they were putting in your chart entries?
18   A.   No.
19   Q.   Let me go to page 6.  What I've blown up there, is that a
20   copy of your insurance card?
21   A.   Yes.
22   Q.   Did you provide that to Port Medical when you first went
23   there?
24   A.   I'm sure I did, yes.
25   Q.   Were you asked to?
```

```
1   A.   I'm pretty sure, yeah.

2   Q.   And then below that, did you also provide a copy of your

3   driver's license?

4   A.   Yes.

5   Q.   Going to page 10.  There's a form here, says, "I have read

6   the privacy notice and understand my rights.  By way of my

7   signature, I provide David Rivera, Chiropractic, Inc., with my

8   authorization."

9        Do you know what David Rivera Chiropractic, Inc. was?

10  A.   No.  I didn't read that part, to be honest.

11  Q.   Now, down below that, there's your signature; is that

12  right?

13  A.   Yeah, that is my signature.

14  Q.   And there's a date there, March 24th of 2009.  Do you

15  recall, was that the first date that you went to Port Medical?

16  A.   I don't remember that far back.

17  Q.   Did you sign some paperwork the first time you went?

18  A.   Yes, I'm sure I did.

19  Q.   And over here, under "Patient signature," that's your

20  signature?

21  A.   Yeah, I would say that's mine.

22  Q.   Let's go to page 12.  This is a form titled "Chiropractic

23  Benefits Claim Form."  Do you see that?

24  A.   Yes.

25  Q.   Down at the bottom, there's two signatures, both dated
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    March 24th, 2009.  Are those your signatures?

2    A.    Those are my signatures, yes.

3    Q.    Do you recall filling out this paperwork?

4    A.    I don't know about that date, but everything else is mine.

5    Q.    So I'd like to take you through some pages in your chart.

6    In particular, I'd like to go to page 70.  On page 70, do you

7    see there's entries for what appear to be a total of roughly 20

8    to 21 visits?  Over in the left-hand column?

9    A.    Yeah, I see that.

10   Q.    And over on the right, there appear to be some signature

11   stickers.  And so we can see them, I'm going to blow them up,

12   some at a time.  See all those signatures?

13   A.    Yes.

14   Q.    Did you sign all of those?

15   A.    That 3, the number 3 doesn't look like my writing.

16   Q.    Okay.  The rest do?

17   A.    Yeah.

18   Q.    And down below that, how about the rest of those?

19   A.    Yeah, I would say those are all mine, too.

20   Q.    Let's go up one page, to page 69.  Here there are entries

21   for what appear to be a total of 18 visits.  I'd like to go

22   down the signatures at the right.  Are those yours?

23   A.    I would say 11 and 9 are not mine.

24   Q.    And let's take the other half.  How about those?

25   A.    The top four I believe are not mine.  That 12 may be.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And how about the ones below that?

2    A.    Yeah, I would say those are mine.

3    Q.    Now, for those that you don't think are your signature, do

4    you know how those got in the chart?

5    A.    I have no idea.

6    Q.    On the column to your left of your signature -- let me try

7    that again.  See there's a column with some initials in it?

8    A.    Next to the numbers?

9    Q.    Yeah, just to the left of the numbers on the signature

10   stickers.

11   A.    Yeah, I see that.

12   Q.    And some of those, do those appear to be the initials

13   "Y.S."?

14   A.    I -- I can't say what that is.

15   Q.    Were you ever massaged by a massage therapist named

16   Yolanda Sierra?

17   A.    I don't remember that name, no.

18   Q.    Let me show you a picture.

19         Your Honor, I'm going to put up Exhibit 220, which I

20   believe is already in evidence.

21              THE COURT:  Okay.

22   BY MR. CARDONA:

23   Q.    You ever massaged by her?

24   A.    I don't remember that face, no.

25   Q.    Let me go to another page of your chart.  This is page 65.

1    Let me blow up the top two entries.  Those signatures yours?

2    A.   Yeah, I would say they're mine.

3    Q.   Now, to the left of that, there are some initials, "P.H."

4    You see those?

5    A.   Yes, I do.

6    Q.   Were you ever massaged by a woman named Pandora Hall?

7    A.   I don't remember being massaged by her, no.

8    Q.   Let me show you a picture.

9         Put up Exhibit 218, which is previously in evidence,

10   Your Honor.

11            THE COURT:  Okay.

12   BY MR. CARDONA:

13   Q.   Were you ever massaged by this woman?

14   A.   No, I can't say I was, no.

15   Q.   Now, if I were to tell you that, going through your chart,

16   it reflects a total of 85 different visits, did you go to Port

17   Medical that often?

18   A.   No.

19   Q.   I'd like to go back to your children for a second.  You

20   mentioned Cierra and Desiree.  Did you take them to Port

21   Medical?

22   A.   On occasion, yes.

23   Q.   Did they ever go by themselves?

24   A.   No.  They weren't able to get there on their own.

25   Q.   Where did you live at the time?

```
 1   A.    In Wilmington.

 2   Q.    And Port Medical was in Long Beach?

 3   A.    Yes.

 4   Q.    Is that walking distance?

 5   A.    No, it's not walking distance.

 6   Q.    Did you ever take Angelique Villavisencio, your daughter

 7   before you married Ernestine Rubio, to get massages --

 8   A.    I don't recall ever taking Angelique over there, no.

 9   Q.    Did you take her at one point in 2011 for some skin

10   treatments?

11   A.    I -- I don't remember that.

12   Q.    Did you ever take her for massages or chiropractic?

13   A.    I don't remember ever taking her, no.

14          THE COURT:  Didn't you just testify you never took

15   her?

16          THE WITNESS:  Yeah.

17          THE COURT:  Okay.  Already been testified to.

18          MR. CARDONA:  Very well.

19   Q.    Would your wife, Ernestine Rubio, have taken Angelique

20   Villavisencio for massages or chiropractic?

21   A.    No, she wouldn't have.

22   Q.    Why not?

23   A.    Well, I didn't get along with her, so -- that's my kid.

24          MR. CARDONA:  Your Honor, I'd offer Exhibit 133, the

25   patient chart for Cierra Villavisencio.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ULTIMO:  No objection, Your Honor.

 2              THE COURT:  133?  It will be admitted.

 3         (Received in evidence, Trial Exhibit 133.)

 4   BY MR. CARDONA:

 5   Q.    On the first page of the chart, your daughter's name.  Is

 6   that her birth date?

 7   A.    Yes, it is.

 8   Q.    On page 3 there is a form titled "Consent to Treatment,

 9   Minor Child."  Do you see that?

10   A.    Yes, I do.

11   Q.    Down below, it lists, "Daughter, Justine Cierra."  Was

12   that her name?

13   A.    Justine's her middle name.

14   Q.    And down below, there's a signature.  Do you recognize

15   that signature?

16   A.    Could be my ex-wife's, yes.

17   Q.    And that's your ex-wife's name?

18   A.    Yes.

19   Q.    Moving to page 5, there's a form entitled "Informed

20   Consent to Chiropractic Treatment."  Do you see that?

21   A.    Yes, I do.

22   Q.    Now, down below, Cierra Villavisencio's name, and is that

23   your signature?

24   A.    Yes, that is.

25   Q.    So I'd like to turn to page -- closer towards the end of
```

1   this chart, page 23.  Chart page.  Over on the left, does it

2   appear to indicate approximately 21 visits?

3   A.   Yes, it does.

4   Q.   Over on the right, a bunch of signature stickers.  Do

5   these entries appear to be for Desiree Villavisencio?

6   A.   Are you asking if that's my signature or hers?

7   Q.   Well, first let me ask you.  It says Desiree, right, as

8   opposed to Cierra?

9   A.   On those stickers right there?

10  Q.   Yes.

11  A.   Some of them have my signature.

12  Q.   Okay.  Which ones are your signature?

13  A.   The 1, the 13, Desiree, that looks like my printing.  The

14  other ones are my signature.  That 4, I don't recognize that,

15  and that 10 is definitely wrong.

16  Q.   Why is that 10 definitely wrong?

17  A.   That's not my daughter's last name.

18  Q.   Expanding that a little, do you see that to the left of

19  the signature stickers there are again initials?

20  A.   Yes.

21  Q.   To your knowledge, was Desiree ever massaged by Yolanda

22  Sierra?

23  A.   I can't say.  I don't know who she was massaged by.

24  Q.   When you took her, did you ever see her massaged by Yoli

25  Sierra?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Was Yolanda that picture you showed me?

2   Q.   Yep.

3   A.   I don't recognize that face, no.

4   Q.   Let me go back up to -- well, let me just ask you this.

5   If the chart showed 48 visits for Desiree Villavisencio, did

6   she go that frequently?

7   A.   No.  I would have to say no.

8   Q.   For those signatures that weren't yours, do you know how

9   those got in there?

10   A.   No, I don't.

11          MR. CARDONA:  Your Honor, I'd offer Exhibit 135, which

12   is Desiree Villavisencio's chart.

13          MR. ULTIMO:  No objection, Your Honor.

14          THE COURT:  Be received.

15      *(Previously received in evidence, Trial Exhibit 135.)*

16   BY MR. CARDONA:

17   Q.   First page of the chart, your daughter's name.  Is that

18   her birth date?

19   A.   It's '97, if that's what that last number is.

20   Q.   So her birth date was May 3rd, 1997?

21   A.   Yes.

22   Q.   Going down a page, there's a form, Informed Consent to

23   Chiropractic Treatment.  Any of this writing yours?

24   A.   That signature's mine.

25   Q.   On the right?

1    A.    Yeah.  And then my name with the father, that's -- that's

2    also mine.

3    Q.    Okay.  Let me go to page 10, Informed Consent to

4    Chiropractic Treatment.  Down at the bottom, is that your

5    signature?

6    A.    Yes, it is.

7    Q.    Let me turn over to page 21.  On this page, what appear to

8    be entries for approximately 20 visits.  Let me take the top

9    half first, of your -- the signature stickers, and ask you, do

10   you recognize those as being your signature or not?

11   A.    No, I wouldn't -- I would have to say no.

12   Q.    So you don't think any of those are?

13   A.    It's kinda hard to tell, to be honest, but --

14   Q.    How about that one at the top, the first, number 11?

15   A.    Yeah, that's definitely wrong.  And that 3, I -- that's

16   not my writing, either.

17   Q.    And the rest, you're not sure about?

18   A.    I mean, sometimes I scribble like that, but that 18's not

19   me for sure, I know that.

20   Q.    And let's take the bottom half of the signature stickers.

21   How about those?

22   A.    Yeah, getting a better look, I'd have to say no, they're

23   not mine, but those bottom three, that -- that's looks like my

24   printing.

25   Q.    Now, in particular for the one at the top, number 11, that

1    has the wrong name, do you know how that got in your chart --

2    in her chart?

3    A.    No.

4    Q.    To your knowledge, was Cierra ever massaged -- Cierra

5    Villavisencio, ever massaged by Yolanda Sierra?

6    A.    Not -- not to my knowledge, no.

7    Q.    How about by Pandora Hall?

8    A.    I didn't see who massaged them.  I just -- as long as they

9    were females, that's all I cared about.

10   Q.    If the chart reflected 58 visits, did Cierra go that

11   frequently?

12   A.    No.

13   Q.    How many times in total did your daughters visit Port

14   Medical?

15   A.    Just -- just a handful, not too many.

16          MR. CARDONA:  Nothing further, Your Honor.

17          THE COURT:  Cross.

18          MR. ULTIMO:  Thank you, Your Honor.

19                    **CROSS-EXAMINATION**

20   BY MR. ULTIMO:

21   Q.    Good morning, Mr. Villavisencio.  Did I pronounce that

22   correct?

23   A.    Yes, you did.

24   Q.    Okay.  Nice to meet you.

25          You and I have never met; is that correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    No.

2    Q.    That's -- okay.  Got a couple, few questions for you.

3          You testified it was Sergio Amador who recommended that

4    you went -- that you go to Port Medical, correct?

5    A.    Yes.

6    Q.    And did David Gomez ask you to go to Port Medical?

7    A.    No, he didn't.

8    Q.    Did David Gomez ever pay you to go to Port Medical?

9    A.    No, he didn't.

10   Q.    Did David Gomez ever tell you to bring your daughters to

11   Port Medical?

12   A.    No.

13   Q.    It was Sergio Amador who asked you to bring your daughters

14   into Port Medical, true?

15   A.    Yeah.  He was kind of the guy recruiting everybody.

16   Q.    The guy who what?

17   A.    You know, like spreading the word, telling everybody to

18   go.

19   Q.    Okay.  You yourself went to Port Medical for a year or

20   two, correct?

21   A.    I believe so, yeah.

22   Q.    And you were -- that was because you were experiencing

23   back and shoulder pain due to work?

24   A.    Yeah.

25   Q.    And that was because you did a lot of lifting at work and

1    it was hard on your arms and shoulders?

2    A.   Yes.

3    Q.   Okay.  And the massages you received at Port Medical, that

4    helped to reduce the pain and tenderness, true?

5    A.   I believe they did, yes.

6    Q.   But you were never, ever massaged by Pandora Hall, or as

7    she goes by the name now, Pandora Sistonich, right?

8    A.   I don't recall being massaged by her, no.

9    Q.   That's right.  And I think counsel showed you a photograph

10   of her, and you didn't recall her.

11   A.   No.

12   Q.   So you went to Port Medical for both chiropractic care and

13   massages, true?

14   A.   Yes.

15   Q.   And that was -- the massages were something that the

16   chiropractor recommended, that you get massages in addition to

17   his adjustments?

18   A.   Well, I would just go with the massages because of the --

19   the job I did, just to get all the knots rubbed out.

20   Q.   But when you went to Port Medical, you saw the

21   chiropractor?

22   A.   I guess that's part of the process, yeah.  You see him

23   first, and then you get your massage.

24   Q.   Okay.  And you said he cracked your back?

25   A.   Yes, he did.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   Or he recommended or pushed you or asked you to do

massages?

A.   Yeah.

Q.   Now, your daughters, they're in swimming, right?

A.   They were in swimming, yes.

Q.   At the time, right?

A.   Yes.

Q.   And I think one or two or both of them are in softball,

too, as well?

A.   I mean, at the park, you know, yeah.

Q.   So they're in swimming and softball, correct?

A.   Yes.

Q.   That's both Cierra and Desiree, right?

A.   Yes.

Q.   And that was at the time they went to Port Medical?

A.   Yeah, it was.

Q.   Cierra and Desiree were also seen by the chiropractor,

true?

A.   Yes, they were.

Q.   I want to show you a few pages of their charts.  And I've

cut this down so I can get through quicker.

     With respect to Cierra, if I -- did Cierra ever complain

of mid back pain or soreness to her mid back?

A.   Not to me, no.

Q.   If the -- she never complained that to you.  Okay.

```
 1        Let me ask you this.  If that were in her chart, that --

 2   if that were charted by the chiropractor, do you believe, do

 3   you have any indication -- well, let me ask you -- let me

 4   strike that.

 5        Were you in the treatment room with Cierra when she saw

 6   the chiropractor?

 7   A.   I believe so, yes.

 8   Q.   Do you remember whether or not Cierra ever complained

 9   about mid back soreness to Dr. Malone or the chiropractor that

10   she saw?

11   A.   I can't say she did.  I don't remember her saying that.

12   Q.   Let me show you page 14 of Exhibit 133, which has already

13   been admitted into evidence.  This is a chart note from the

14   doctor, and I don't think you would have seen it, but I'm going

15   to blow up the top here.  Says -- now this -- before I ask this

16   question, this says Desiree, well, Villavisencio at the top,

17   but 133 is the chart for Cierra.

18   A.   Okay.

19   Q.   I believe you were asked that, shown that with counsel,

20   correct?

21   A.   Well, what was -- what was the question?

22   Q.   Well, Exhibit 133 is the chart for Cierra Villavisencio.

23   However, this history form says Desiree.  So let me do this.

24   Let me go to the following page and see if I can clarify it.

25   Page four- -- page 13.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Says Desiree on the bottom.

2    Q.   I'm going to go to -- yes, it -- this one also says

3    Desiree.  However, it's designated as Cierra's chart.  So let

4    me see page 31 of that chart, 133 dash -- okay.

5         This is page 31 of Exhibit 133, and this page says Cierra.

6    So either there was a mix-up with the first names of the

7    children or they put the chart notes in the wrong charts.

8              MR. CARDONA:  Objection, Your Honor.  Counsel is

9    testifying.

10             THE COURT:  Sustained.

11   BY MR. ULTIMO:

12   Q.   This chart note says, "Cierra Villavisencio, mid back a

13   little sore, right mid scapula" -- let me blow that up.

14             MR. CARDONA:  Objection, Your Honor.  Document speaks

15   for itself, lack of foundation.

16             THE COURT:  Overruled.

17             MR. ULTIMO:  Thank you, Your Honor.

18   Q.   "Mid back 'a little sore,'" in quotes, "right mid

19   scapular," and then it says "radiating to the CS," for cervical

20   spine.

21        So did Cierra ever complain of her arms -- arm pain,

22   fingers tingling, or soreness to her mid back?

23   A.   She would say she was a little sore from swimming, but I

24   don't know what that scapular or whatever that is.  I don't

25   know what that is.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   That is, I believe, one of the musculature of the

 2   shoulders, behind the back.

 3            MR. CARDONA:  Objection, Your Honor.  Counsel's

 4   testifying.

 5            THE COURT:  Sustained.

 6        She never made those statements to you?

 7            THE WITNESS:  She don't know what that means.  She may

 8   say she was sore from swimming, but --

 9            THE COURT:  If she made them and you know it, you can

10   say "yes."  If you don't know if she made them or not, just say

11   "I don't know."

12            THE WITNESS:  All right.

13   BY MR. ULTIMO:

14   Q.   Down here, under "Temporal, night versus day, days a

15   week," says, "Worse off at night, after school, movie (sic) or

16   less always there."  And then it says, "Severity, five out of

17   ten."  Did she complain after school or at night of any pain?

18   A.   Not to me, no.

19   Q.   Now, looking at -- I'll go to Exhibit 135, which has

20   already been admitted into evidence.  It purports to be

21   Desiree's chart.  Did Desiree ever complain of mid back pain to

22   you?

23   A.   No.

24   Q.   Let's look at page 27 of Exhibit 135.  Now, this does say

25   Desiree's name at the top, and the chart indicates, "Mid back,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    right paraspinal, mid scapular at the level of T4 to T7."  Did

 2    she complain of mid back pain?

 3    A.   Not to me, no.

 4    Q.   And it says, "Temporal, most days at school, toward

 5    afternoon."  Did she ever complain that she had pain at school?

 6    A.   No.

 7    Q.   And this pain level, six out of ten, five to six out of

 8    ten?

 9    A.   If it was that bad, she would have told me.

10    Q.   Okay.  I want to look briefly at page 29 of Exhibit 135,

11    also been admitted into evidence.  This is Desiree's chart.

12    Says it at the bottom, page 30 -- page 29.  It says Desiree

13    Villavisencio.  Under comments it says, "Slight deviation, TS,"

14    for thoracic spine.

15         MR. CARDONA:  Objection, Your Honor.  Counsel's

16    testifying.

17         THE COURT:  Sustained.

18      You can ask him if he ever heard that comment.

19    BY MR. ULTIMO:

20    Q.   Okay.  Then it says, "Pain on palpation."

21         THE COURT:  You can just ask him if he's ever heard

22    the comment there.

23      And ladies and gentlemen -- never mind.

24      Go ahead.

25         MR. ULTIMO:  I'll try to be brief, Your Honor.
```

1    Q.   When you were in the treatment room with Desiree, with the

2    chiropractor, did you see him palpate or feel her back, her

3    musculature in the back, along the spine, the right or left

4    side of her spine, up and down her spine?

5    A.   Yeah, I'm sure that's how he examined her, yes.

6    Q.   Okay.  This chart indicates pain on palpation, when the

7    chiropractor's feeling her musculature on her back, and muscle

8    spasm.  Did he --

9         THE COURT:  I'm sorry, Counsel.  He's not a doctor.

10   He can't testify to what the chart said.

11        MR. ULTIMO:  No, it's just foundation.  Just

12   foundation, Your Honor.

13        THE COURT:  Do you understand all those terms?

14        THE WITNESS:  Not at all.

15        THE COURT:  Okay.  Let's go on, then.

16   BY MR. ULTIMO:

17   Q.   Okay.  Did --

18   A.   But I'll say this.  I mean, she could have went with her

19   mom, too, so I don't know.

20   Q.   Okay.  Did Cierra and Desiree ever complain of pain from

21   sports, softball or swimming?

22   A.   Maybe soreness, you know, just tiredness, stuff like that,

23   but --

24   Q.   And some soreness maybe?

25   A.   Yeah.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   Did anyone pay you to take your daughters to Port Medical?

A.   No.

Q.   Did anyone pay you to take -- recommend or take your wife, your -- or your -- it's now your ex-wife, to go to Port Medical?

A.   No.

Q.   The check that counsel showed you, you said you didn't remember it.

A.   I don't recall that check, no.

Q.   Well, let's take a look at it again.  Exhibit 273, page 82.  This check, do you recognize the signature, who's the signer of that check?

A.   No, I don't.

Q.   Do you know who Eva Razo is?

A.   I believe she was a manager or someone over there, right?

Q.   Yes.

A.   Okay.

Q.   Okay.  Let's see.  When you sign the stickers, you sign more than one chart note sticker on sign-in for yourself and your daughters; is that what I heard?

A.   Yes.

Q.   Now, did you think anything of that when you signed more than one sticker?  Did you find that suspicious or -- for any reason?

A.   No.  Because, I mean, I been to other places, and they do

```
 1   the same thing.
 2   Q.   Now, did Sergio Amador ask you if you knew someone in
 3   construction?
 4   A.   Yes, he did.
 5   Q.   Did you refer him someone who did work on your home?
 6   A.   Yes.
 7   Q.   And who did you refer?
 8   A.   The guy's name is Ernesto.
 9   Q.   Does this check that we're looking at, Exhibit 273, page
10   82, on the overhead projector, is this connected in any way to
11   Ernesto?
12   A.   I don't remember that check.  That's the only thing I
13   could think of, that it would be for that.
14   Q.   So did Ernesto do work for Sergio?
15   A.   Yes, he did.
16   Q.   And did Sergio want to pay Ernesto?
17        MR. CARDONA:  Objection, calls for speculation.
18        THE COURT:  Sustained.  Sustained.
19   BY MR. ULTIMO:
20   Q.   Mr. Villavisencio, you testified at the grand jury,
21   correct?
22   A.   Yes, I did.
23   Q.   Okay.  And when you testified before the grand jury, did
24   you testify that Sergio Amador --
25        MR. CARDONA:  Objection, Your Honor, improper
```

```
 1   impeachment.

 2              THE COURT:  Sustained.

 3        You can ask a direct question.

 4              MR. ULTIMO:  Okay.  Thank you, Your Honor.

 5   Q.   Did Sergio Amador give you this check, Exhibit 273, page

 6   29 -- I'm sorry, page 82.  Did he give you this check as

 7   payment for Ernesto, the construction worker that you referred

 8   to him?

 9   A.   Sergio never gave me a check.

10   Q.   Was this check intended to be payment for Ernesto, the

11   construction worker?

12   A.   I've cashed a few checks for Ernesto because he's an

13   illegal, so that's the only thing I'm thinking of that this is,

14   but the check was never handed to me.

15              THE COURT:  Let me ask you this.  You said you don't

16   recognize the check.

17              THE WITNESS:  I don't recall a check.

18              THE COURT:  Okay.  And can you testify, do you know

19   right now what that check was for, or you just --

20              THE WITNESS:  No, I don't.

21              THE COURT:  Okay.  Then let's move on.

22   BY MR. ULTIMO:

23   Q.   But you did testify previously that this check --

24              THE COURT:  Counsel, let's move on.

25              MR. ULTIMO:  Yes, Your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

321

```
1              THE COURT:  It would be improper to go in that
2    direction.  Let's move on.  He doesn't know what it is.  He's
3    already said that.
4              MR. ULTIMO:  Fair enough.
5         No further questions.
6              THE COURT:  Okay.  And Counsel, I can tell both sides
7    I intend to strike this check unless it somehow or another
8    becomes relevant.  As of now, it's not relevant to anything.
9              MR. ULTIMO:  Fair enough, Your Honor.
10             THE COURT:  Okay.
11             MR. CARDONA:  No questions, Your Honor.
12             THE COURT:  You may step down.
13             THE WITNESS:  All right.  Thank you.
14             THE COURT:  Thank you, sir.  You're free to go.
15        Next witness.
16             MR. CARDONA:  Your Honor, the people call David
17   Bumgarner.
18             THE CLERK:  Good morning.  Right here to be sworn,
19   please.  Can you please raise your right hand.
20        Do you solemnly swear the testimony that you are about to
21   give in the matter now before the Court shall be the truth, the
22   whole truth, and nothing but the truth, so help you God?
23             THE WITNESS:  Yes.
24             THE CLERK:  Thank you.  You may be seated.
25         May I please ask that you state your full name for the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   record and spell your last name.

 2           THE WITNESS:  David Bumgarner, B-u-m-g-a-r-n-e-r.

 3           THE CLERK:  Thank you.

 4           THE COURT:  Okay.  You may inquire.

 5             DAVID BUMGARNER, GOVERNMENT'S WITNESS,

 6                     DIRECT EXAMINATION

 7   BY MR. CARDONA:

 8   Q.   Mr. Bumgarner, how are you employed?

 9   A.   Longshoreman.

10   Q.   How long have you been a longshoreman?

11   A.   17 years.

12   Q.   Where do you work as a longshoreman?

13   A.   Various docks, not just one.

14   Q.   But all in the Long Beach, Los Angeles area?

15   A.   Yes.

16   Q.   Where do you live?

17   A.   Carson.

18   Q.   Do you know another longshoreman named Sergio Amador?

19   A.   Yes.

20   Q.   How do you know him?

21   A.   From the hall.

22   Q.   And how about a longshoreman named David Gomez?

23   A.   Yes.

24   Q.   How do you know him?

25   A.   Same place, from the hall.
```

```
1   Q.   You see him here today?

2   A.   Yes.

3   Q.   Is he sitting here to my right?

4   A.   Yes.

5          THE COURT:  Indicating the defendant.

6   BY MR. CARDONA:

7   Q.   Did you also know Chris Rice?

8   A.   Yes.

9   Q.   Is he also a longshoreman?

10  A.   Yes.

11  Q.   Is he a foreman?

12  A.   Yes.

13  Q.   Now, did you get your insurance, your health insurance,

14  through the union health plan?

15  A.   Yes.

16  Q.   Are you married?

17  A.   Yes.

18  Q.   What's your wife's name?

19  A.   Diana Bumgarner.

20  Q.   You have kids?

21  A.   Yes.

22  Q.   What are your kids' names?

23  A.   David, Jr., Isaiah, Xavier, and Mariah.

24  Q.   And the order you gave them in, is that their age order?

25  A.   Yes.
```

1    Q.    So is Mariah the youngest?

2    A.    Yes.

3    Q.    Were your wife and kids also covered by your union

4    insurance?

5    A.    Yes.

6    Q.    Now, back in roughly 2011, did you learn about a clinic

7    called Port Medical?

8    A.    Yes.

9    Q.    How did you learn about it?

10   A.    It was right down the hill from -- well, before I lived in

11   Carson, I lived in San Pedro, so it was right down the hill

12   from where we used to live.

13          MR. CARDONA:  Your Honor, at this point I'd offer

14   Exhibit 212.  It's a photograph.

15          MR. ULTIMO:  No objection, Your Honor.

16          THE COURT:  212.

17      (Received in evidence, Trial Exhibit 212.)

18   BY MR. CARDONA:

19   Q.    Do you recognize this photograph?

20   A.    Yes.

21   Q.    What is it?

22   A.    It's the Port Medical in San Pedro.

23   Q.    And is that the office that you went to, the one in

24   San Pedro?

25   A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

325

```
1    Q.   Did you know whether this clinic had any connection to

2    Sergio Amador or David Gomez?

3    A.   Not when I first started going, no.

4    Q.   At some point did you learn that it had a connection?

5    A.   Yes.

6    Q.   How did you learn that?

7    A.   It's just people talking, saying that they were in charge

8    of the place.

9    Q.   Did you ever go to Port Medical's other facility, in Long

10   Beach?

11   A.   Yes, couple times.

12   Q.   Why?

13   A.   We were in the area.  My mom lives in Long Beach.  It's

14   close by there.  So we just stopped by there, make it easy for

15   ourselves.

16   Q.   What did you go to Port Medical for?

17   A.   Massage and chiropractor.

18   Q.   Did you see the chiropractor?

19   A.   Yes.

20   Q.   And what did the chiropractor do for you?

21   A.   Straighten you out, what regular chiropractors do.

22   Q.   And what was the reason you went to the chiropractor?

23   A.   I have a bad back.

24   Q.   And how about the massages?  What was the reason you got

25   the massages?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Same thing, for my back.

 2            MR. CARDONA:  Your Honor, I'd offer Exhibit 141,

 3    Mr. Bumgarner's patient chart.

 4            MR. ULTIMO:  No objection, Your Honor.

 5            THE COURT:  141, it will be received.

 6    BY MR. CARDONA:

 7    Q.    Mr. Bumgarner, on the first page, down at the bottom, is

 8    that your name and is that your birth date?

 9    A.    Yes.

10    Q.    Going over to page 3, there's a form titled

11    "Registration."  Did you complete this form?

12    A.    Yes.

13    Q.    And at the top, there's a date, August 18th, 2011.  Do you

14    recall whether that was the first day you went to Port Medical?

15    A.    Don't recall that.

16    Q.    First time you went, did they have you fill out any forms?

17    A.    Yes.

18    Q.    Was there a bunch of paperwork that you filled out the

19    first time?

20    A.    Yes.

21    Q.    Now, over on page 11 of your chart, is there a copy of

22    what appears to be a driver's license?  I apologize for the

23    poorness of the copy.  Did they ask you for your driver's

24    license when you went in?

25    A.    Yes.
```

Q.   And did they also ask you for your insurance card?

A.   Yes.

Q.   Down below, there's a copy of an insurance card for Kaiser Permanente.  Were you insured through the HMO portion of the union plan or the PPO portion?

A.   I don't recall when I changed over, 'cause when we started, we start with Kaiser, and then we change over to the PPO plan.  So I don't recall when I changed over.

Q.   As of 2011, how long had you been working as a longshoreman?

A.   Want to say for six, seven years.  Seven, eight years, yeah.

Q.   But you don't recall when you made the changeover?

A.   No.  I would have to ask them.  I don't recall when the change was made.

Q.   When you went in, were you asked to give your insurance card?

A.   Yes.  They required your insurance card.

Q.   So let me go to page 12 of your chart.  There appear to be five entries on this page, with signature stickers on the right.  Looking at those signature stickers, did you fill those out?

A.   Yes, some of them.  Some of them look like my writing.

Q.   Which ones look like your writing?

A.   I would say 1, 11, and 15.  20 maybe.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Difficult for you to tell?

2    A.   Yeah, it's hard for me to --

3    Q.   Would it help if I blow them up?

4    A.   That'd help a little bit.  Yeah, 1, 6 is mine.

5    Q.   Okay.  Difficult to tell?

6    A.   Yeah, it's -- it's hard to --

7    Q.   Let me ask you, then, about these bottom three.  You see

8    to the left of your signature sticker there's the initials

9    "P.H."?

10   A.   Yes.

11   Q.   Were you ever massaged by a woman named Pandora Hall?

12   A.   No.

13   Q.   Do you recognize that name?

14   A.   Yes.

15   Q.   How do you recognize that name?

16   A.   Just a unique name, Pandora, so --

17   Q.   Did you ever see her at Port Medical?

18   A.   Yes.

19   Q.   What was she doing there?

20   A.   She was in the front.

21   Q.   What do you mean by "the front"?

22   A.   Like a reception area.

23   Q.   But she didn't massage you?

24   A.   No.

25   Q.   Let me go to page 13.  Again, the top two entries, you see

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    the initials "P.H." again?

2    A.   Yes.

3    Q.   And again, you were never massaged by Pandora Hall?

4    A.   No.

5    Q.   Now, the bottom three entries here, do you see that to the

6    left of your signature stickers here are the initials "E.R."?

7    A.   Yes.

8    Q.   Were you ever massaged by a woman named Eva Razo?

9    A.   Can't recall.  I don't think so.

10   Q.   Let me show you a picture.

11        Your Honor, I'd offer Exhibit 219.  It's a photograph.

12        MR. ULTIMO:  No objection.

13        THE COURT:  Be received.

14   BY MR. CARDONA:

15   Q.   Looking at this photo, were you ever massaged by this

16   woman?

17   A.   No.

18   Q.   Did you and your wife take your kids to Port Medical?

19   A.   Yes.

20   Q.   What did they go for?

21   A.   Same thing.  Massage, chiropractor.

22   Q.   Let's start with David, Jr.  Did he have any medical

23   problems?

24   A.   No, not that I know of.

25   Q.   Did he have any bone issues?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   No.

2    Q.   Any issues with his back?

3    A.   Not that I know, no.

4    Q.   Any muscle issues?

5    A.   No.

6    Q.   Your son Isaiah, did he have any medical problems?

7    A.   He, yes.  'Cause he plays baseball, so he had sore

8    shoulders -- excuse me, sore shoulders and stuff like that,

9    sore arms.

10   Q.   And is that why he went to --

11   A.   Yes.

12   Q.   -- Port Medical?

13        How about Xavier?  Any medical problems?

14   A.   No.

15   Q.   Any back problems?

16   A.   No.

17   Q.   Any muscle problems?

18   A.   No.

19   Q.   Any complaints to you of serious pain?

20   A.   No.

21   Q.   How about your youngest daughter, Mariah Bumgarner?  Did

22   she have any medical problems?

23   A.   No.

24   Q.   Any back problems?

25   A.   No.

1    Q.   Any complaints of serious pain?

2    A.   No.

3    Q.   Now, in 2011, how old was Mariah?

4    A.   Four.

5    Q.   Did you take her in to get massaged when she was four

6    years old?

7    A.   Yes.

8    Q.   How many times?

9    A.   I don't recall.

10   Q.   Why did she get massages?

11   A.   She would -- she was four.  You know, she would complain

12   that her back was hurt.  Which we didn't think it hurt, but,

13   you know, it was covered by the insurance, so why not.

14   Q.   To your knowledge, were any of your children ever massaged

15   by this woman, Eva Razo?

16   A.   Not to my knowledge, no.

17   Q.   To your knowledge, were any of your children ever massaged

18   by Pandora Hall?

19   A.   Not to my knowledge, no.

20   Q.   Now, after you were at Port Medical, did you subsequently

21   get in the mail Explanations of Benefits?

22   A.   Yes.  We all get them.

23   Q.   Did you look at those?

24   A.   No.

25   Q.   Why not?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Just figured I -- you know, I wasn't paying anything, so I
2    never looked at them.  Just threw them in the junk pile.
3             MR. CARDONA:  Nothing further, Your Honor.
4             THE COURT:  Cross.
5             MR. ULTIMO:  Briefly, Your Honor.
6                      CROSS-EXAMINATION
7    BY MR. ULTIMO:
8    Q.    Good morning, Mr. Bumgarner.
9    A.    Good morning.
10   Q.    A few questions.  Mr. Bumgarner, was it Sergio Amador who
11   recommended that you go to Port Medical San Pedro?
12   A.    Nobody recommended that I go anywhere.
13   Q.    You -- nobody recommended?
14   A.    No.
15   Q.    How did you hear about Port Medical?
16   A.    It's right down the hill from my house.
17   Q.    In San Pedro?
18   A.    Yes.
19   Q.    Okay.  So the defendant, David Gomez, never asked you to
20   go to Port Medical, correct?
21   A.    No.
22   Q.    Am I correct in that?
23   A.    Yes, you're correct.
24   Q.    Okay.  So the defendant, David Gomez, never paid you to go
25   to Port Medical?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    No.

2    Q.    Never offered you any money or gifts to go to Port

3    Medical?

4    A.    No.

5    Q.    Correct?

6    A.    Correct.

7    Q.    And again, sorry for being repetitive, but the defendant,

8    David Gomez, never told you to bring your daughters or children

9    to Port Medical, correct?

10   A.    Correct.

11   Q.    You took your children to Port Medical on your own accord?

12   A.    Yes.

13   Q.    And counsel showed you Exhibit 219, the photograph of Eva

14   Razo; is that right?

15   A.    Yes.

16   Q.    Okay.  And you testified that you had not been massaged by

17   her, correct?

18   A.    Yes.

19   Q.    But you do recognize her, correct?

20   A.    Fair -- not -- not too much, yeah.  I don't -- so-so.

21   Q.    It was a long time ago.

22   A.    Yes, it was.

23   Q.    But you recognize Eva Razo, the person in that photograph,

24   Exhibit 219, as the person you saw at the front desk at Port

25   Medical when you signed in and waited for your massage
```

1    therapist, correct?

2    A.   Yes.

3    Q.   And she was at the front desk when you signed in?

4    A.   Yes.

5             MR. ULTIMO:  No further questions.

6             THE COURT:  Okay.  Any redirect?

7             MR. CARDONA:  No, Your Honor.

8             THE COURT:  Okay.  You may step down.  Thank you for

9    coming in.

10            THE WITNESS:  Thank you.

11            THE COURT:  Next witness.

12            MR. CARDONA:  Your Honor, the government calls Yolanda

13   Sierra.

14            THE CLERK:  Good morning.  Right here to be sworn,

15   please.

16            THE WITNESS:  Up here?

17            THE CLERK:  Right here's good.  Can you please raise

18   your right hand.

19       Do you solemnly swear the testimony that you are about to

20   give in the matter now before the Court shall be the truth, the

21   whole truth, and nothing but the truth, so help you God?

22            THE WITNESS:  Yes.

23            THE CLERK:  Thank you.  You may be seated.

24       May I please ask that you state your full name for the

25   record and spell your last name.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                THE WITNESS:  Yolanda Sierra, S-i-e-r-r-a.

 2                THE CLERK:  Thank you.

 3                THE COURT:  Thank you.  Before we start questioning on

 4    this witness, because we're getting into other witnesses'

 5    testimony now, let me get back to the $800 check that you were

 6    all shown, which was Exhibit 273, I believe.  You all familiar

 7    with what I'm talking about?  Okay.  That's been stricken,

 8    because there's been no identification of it.  You're not to

 9    speculate what it was, what it was for, whether it was one way

10    or -- it's just not in front of you anymore.  So until and

11    unless it is introduced later in trial, you're not to consider

12    it at all.  Okay?

13         (Trial Exhibit 273, page 82, stricken from evidence.)

14                THE COURT:  Go ahead, Counsel.

15                MR. CARDONA:  Thank you.

16                 YOLANDA SIERRA, GOVERNMENT'S WITNESS,

17                         DIRECT EXAMINATION

18    BY MR. CARDONA:

19    Q.   Miss Sierra, where do you live?

20    A.   In Wilmington.

21    Q.   And do you work?

22    A.   Yes, I do.

23    Q.   What do you do?

24    A.   I'm a casual longshoreman.

25    Q.   What is a casual longshoreman?
```

1   A.   It's a part-time job.  You're on call.  You don't have a

2   schedule.  You can work from any day, from one day to seven

3   days, day or night.  We don't know.

4   Q.   Are you a member of the longshoremen's union?

5   A.   I'm a casual, so I'm -- I'm not a member yet, because I'm

6   part-time.

7   Q.   Now, back sometime in 2009, did you work at a clinic

8   called Port Medical?

9   A.   Yes.

10   Q.   And was that Port Medical in Long Beach?

11   A.   Yes.

12   Q.   How did you get your job there?

13   A.   I was hired by the manager at the time.  Her name is --

14   forgot her name, it's been so long.  If you could --

15   Q.   Does the name Michelle Aragon --

16   A.   Michelle.

17   Q.   -- ring a bell?

18       And what was her position there?

19   A.   I said she was the manager.

20   Q.   How did it come about that you got hired?

21   A.   I saw her at a softball -- I was attending a softball

22   tournament they have every year.  Went to go see my brother

23   play softball, and my family members also attend, playing

24   softball.  So I ran into her, and she asked me if I wanted to

25   work a part-time job.  That's how I got hired.

Q.   And what was the part-time job that you took?

A.   Receptionist.

Q.   How were you paid?

A.   Hourly.

Q.   Was it -- how many hours a week did you work?

A.   I couldn't tell you.  Depending on how many days I worked at the port.

Q.   So at the time were you also working as a casual longshoreman?

A.   Yes.  I've been there 12 years.

Q.   Which job took priority?

A.   Longshoreman.

Q.   Why?

A.   That's my career.

Q.   Now, how long did you work at Port Medical?

A.   I don't remember.

Q.   Do you remember why you left?

A.   Yeah.  There was some changes in management, and since I was -- been there the longest, they didn't want to be flexible with my schedule.  So when I got hired, I told her that my priority was to work at the port, so whenever I was called there, I was to attend work.

Q.   And that changed later?

A.   Yeah, that -- that changed.

Q.   Do you remember what the change in management was, who

1   took over?

2   A.   I don't remember at the time.  I just remember them

3   telling me that they were not going to be very flexible with my

4   schedule.

5   Q.   Does the name Eva Razo sound familiar?

6   A.   Yeah.  She was one of the managers there.

7   Q.   She one of the managers when you started or at the end?

8   A.   The end.

9   Q.   Do you know David Gomez?

10  A.   Yes.

11  Q.   How do you know him?

12  A.   He's a good friend of my brother, and I know him from

13  work.

14  Q.   Is he a longshoreman as well?

15  A.   Yes.

16  Q.   What's your brother's name?

17  A.   Humberto Sierra.

18  Q.   Is he a longshoreman as well?

19  A.   Yes.

20  Q.   You know Sergio Amador?

21  A.   Yes.

22  Q.   How do you know him?

23  A.   Well, he was the -- also longshoreman.  He was also a part

24  of Port Medical.

25  Q.   Was David Gomez also part of Port Medical?

```
1    A.    Yes.

2    Q.    What were their positions at Port Medical?

3    A.    Well, I know mostly Sergio in Long Beach, because he was

4    the one who was around the most.  So they were both investors,

5    from what I was told.

6    Q.    Was David Gomez also there at the clinic?

7    A.    He was there, but it was -- he was not there as much as

8    Sergio was.

9    Q.    Did they do anything else in connection with the clinic?

10   A.    Not that I know of or that I can remember right now.

11   Q.    Did they do marketing for the clinic?

12   A.    I think they did.  What do you -- what do you mean,

13   "marketing"?  Like what --

14   Q.    Did they go out and pitch the clinic to other

15   longshoremen?

16   A.    Oh, I don't know.

17         MR. ULTIMO:  Speculation, Your Honor.

18         THE COURT:  She's already said she doesn't know, so it

19   would be speculation.  Sustained.

20   BY MR. CARDONA:

21   Q.    Did you know Chris Rice?

22   A.    Yeah.

23   Q.    Who was he?

24   A.    He's another longshoreman that I know.

25   Q.    Was he also related to the clinic?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   I think he -- yeah, it was Chris Rice.  Yeah.

 2   Q.   You know what his relationship to the clinic was?

 3   A.   He was also an investor.

 4   Q.   Now, as a receptionist at the clinic, what did you do?

 5   A.   I took patients back, made sure they signed in.  Filed

 6   paperwork.  Took them back to the chiropractor.  Make sure that

 7   the masseuse were on time with their appointment, make sure all

 8   the patients were where they're supposed to be the time -- they

 9   won't wait a long time.  That's what I can remember right now.

10   Q.   Were you a massage therapist?

11   A.   No, not in Long Beach.

12   Q.   Were you a licensed massage therapist?

13   A.   No, not in Long Beach.

14   Q.   You say not at Long Beach.  Were you at San Pedro?

15   A.   I was going to school in San Pedro when I was working in

16   San Pedro.

17   Q.   Going to school for what?

18   A.   Being -- to be a massage therapist.

19   Q.   Did you ever complete that school?

20   A.   No.  I didn't like to be -- I didn't like to massage.

21   When I started looking into it, it wasn't my -- wasn't my

22   thing.

23   Q.   And that was all when you were in San Pedro?

24   A.   Yeah.

25   Q.   Let me show --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Your Honor, I'd offer what's marked as Exhibit 261.

2         MR. ULTIMO:  401.  403.

3         MR. CARDONA:  Oh, Counsel, there's a stipulation as to

4    authenticity and admissibility.  This relates to her

5    qualifications or lack of qualifications as a massage

6    therapist.

7         THE COURT:  And you're saying -- well, you're saying

8    it's time-consuming and not relevant.

9         MR. ULTIMO:  401 mostly.

10        THE COURT:  Okay.  Sustained.

11   BY MR. CARDONA:

12   Q.   Did you ever get your massage therapist certificate?

13   A.   No.  I never wanted to.

14   Q.   Did you ever perform massages at Port Medical Long Beach?

15   A.   I performed massages, but I never got paid for them,

16   because I was practicing.

17   Q.   And who did you do massages on?

18   A.   My family.  I did one massage on Dave.  My brothers, my

19   cousins.  Can't remember who specifically.

20   Q.   But it was family members?

21   A.   Yeah, it was family members.

22   Q.   And that was for practice?

23   A.   Yeah.  Yeah.

24   Q.   And one on Dave Gomez?

25   A.   I did one massage on Dave Gomez that Emma, the massage

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  therapist, got paid for.

2  Q.   And why did you do one on Dave Gomez with Emma?

3  A.   Because Emma was teaching me how to massage.  Dave

4  happened just to be there that day.

5  Q.   And where was that?  Was that at San Pedro or Long Beach?

6  A.   San Pedro, but since I was unlicensed, I didn't finish

7  school, she got paid for it.

8  Q.   To your knowledge, were the massage therapists paid on a

9  per-massage basis?

10  A.   If the what?  I'm sorry.

11  Q.   How were the massage therapists at Port Medical paid, if

12  you know?

13  A.   I think, yeah, by massage.

14  Q.   And you, on the other hand, got an hourly wage?

15  A.   Yeah.  Yeah, I got hourly rate.

16        MR. CARDONA:  Your Honor, I'm going to display for the

17  witness some pages from Exhibit 117, which has already been

18  admitted in evidence.

19        THE COURT:  Okay.  You just indicate the page number,

20  Counsel, when you do them.

21        MR. CARDONA:  Yes, Your Honor.  I'm going to first go

22  to page 10.

23        THE COURT:  Okay.

24  BY MR. CARDONA:

25  Q.   So first let me ask you, do you recognize what this is a

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    page of?

2    A.    Yeah.  That's the -- our book we had in the reception.

3    Q.    And what was the book used for?

4    A.    To book appointments.

5    Q.    And was that something you did as a receptionist?

6    A.    Yeah, I did that.  Sometimes.

7    Q.    Now, in this page, at the top, it's dated September 2nd.

8    Do you see that?

9    A.    Yeah.  Yes.

10   Q.    And under there, there's a column with a heading, "Yoli."

11   Do you see that?

12   A.    Yeah.

13   Q.    And under -- in that column, there is a group of names.

14   Do you see that?

15   A.    Yes.

16   Q.    Did you massage these people --

17   A.    No.

18   Q.    -- on that date?

19   A.    No.

20   Q.    You know why those entries are in the appointment book?

21   A.    No.  I -- I didn't -- never came across those entries.

22   Q.    Did you write entries under your name in the appointment

23   book?

24   A.    Keep in mind, there's another Yoli in the office working.

25   Q.    Was she a massage therapist?

1    A.   She's a esthetician.

2    Q.   A --

3    A.   Esthetician.

4    Q.   Not a massage therapist?

5    A.   No.  But the esthetician and the massage therapist were in

6    the same book.

7    Q.   Understand.  But she wasn't a massage therapist?

8    A.   No.

9    Q.   Now, over on the right, do you see the name Michelle?

10   A.   Yes.  Yeah.

11   Q.   Was there a massage therapist named Michelle?

12   A.   She's another esthetician.

13   Q.   And what is an esthetician?

14   A.   They do complimentary facials.

15   Q.   And when you say "complimentary," what do you mean by

16   that?

17   A.   Well, they get a massage, and then they can do a facial if

18   they wanted to.

19   Q.   And that was complimentary?

20   A.   I think it was.

21   Q.   So you didn't bill the insurance for them?

22   A.   I wasn't the biller.  I don't know.

23        THE COURT:  Ladies and gentlemen, we're going to break

24   at this time, being 10:00 o'clock, for the morning recess.

25   We'll see you back in 15 minutes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Remember the admonishment not to discuss the case among

2   yourselves, with anybody else, or form or express any opinions

3   about the matter until it's submitted to you and you retire

4   back into the jury room.

5    See you back in 15 minutes.

6    THE CLERK:  All rise.

7    *(Recess held from 10:00 a.m to 10:19 a.m.)*

8    *(In the presence of the jury:)*

9    THE COURT:  Okay.  The record will reflect that all

10   the members of the jury are in their respective seats in the

11   jury box, the witness on the witness stand.

12    Counsel, you may inquire.

13    MR. CARDONA:  Thank you, Your Honor.

14    I'm going to put up another page from Exhibit 117, which

15   is page 139.

16    THE COURT:  Okay.

17   BY MR. CARDONA:

18   Q.   Miss Sierra, this is another page from the appointment

19   book; is that right?

20   A.   Yes.

21   Q.   And at the top, do you see the date November 17th?

22   A.   Yes.

23   Q.   Just blow up a section here.  Go down one page.  There we

24   go.  Sorry, page 140 of Exhibit 117.  And again you see at the

25   top of this page, there's the date, Tuesday, November 17th?

1    A.   Yes.

2    Q.   And over on the right, there's a column headed "Yoli"; is

3    that right?

4    A.   Yes.

5    Q.   Now, you went by "Yoli," right?

6    A.   I went by "Yolanda."

7    Q.   Didn't you use the name "Yoli"?

8    A.   They call me "Yoli."

9    Q.   And under that, there's a series of names.  Do you see

10   that?

11   A.   Yes.

12   Q.   Hazey Vaifanua, Faith Vaifanua, Josiah Vaifanua, Dazey

13   Vaifanua, Laloifi Vaifanua.  Did you ever massage them?

14   A.   No.

15   Q.   Below that, Sergio Amador, Humberto Sierra, Mario Cruz.

16   Did you massage Sergio Amador?

17   A.   No.

18   Q.   Did you massage Humberto Sierra?

19   A.   That's my brother.  No, I didn't massage him.

20   Q.   Did you massage Mario Cruz?

21   A.   No.

22   Q.   Now, do you recall speaking with Special Agent Valle on

23   June 27th, 2014, at your home?

24   A.   Is that him (*indicating*)?

25   Q.   Yes.

```
1    A.   I spoke to him a lot of times.

2    Q.   Do you remember him coming to your office -- coming to

3    your home with another investigator on June 27, 2014?

4    A.   Yeah.  Well, I don't remember the date, but I remember

5    him.

6    Q.   Did he show you this same entry?

7    A.   I think he did.

8    Q.   Didn't you tell him in response to questions at that point

9    that you had massaged Humberto, Mario Cruz, and Sergio?

10   A.   Never did I tell him that.  He's lying if he said that.

11   Q.   Okay.  So you're convinced as you sit here today that you

12   didn't massage them on this date?

13   A.   No.

14   Q.   How are you so sure?

15   A.   Because I know what I was doing.  I was never a massage

16   therapist at Long Beach Port Medical.

17   Q.   And you never massaged the Vaifanua children?

18   A.   No.

19   Q.   Did you ever massage Dave Gomez's wife?

20   A.   I never massaged anybody at Long Beach Port Medical.

21   Q.   How about at San Pedro?

22   A.   I massaged my family, and I massaged David one time.

23   Q.   Not his wife, Lucero Gomez?

24   A.   No.

25   Q.   How about his daughter, Sophie Gomez?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    No.

 2    Q.    Do you recall, when you spoke with Agent Valle on June

 3    27th, 2014, did you tell him that you had massaged Lucero

 4    Gomez?

 5    A.    No.

 6          MR. CARDONA:  Your Honor, I put up Exhibit 129, which

 7    has previously been admitted, and I'm going to turn to page 14

 8    of that.

 9          THE COURT:  Okay.

10    BY MR. CARDONA:

11    Q.    Do you recognize this page as a page from a Port Medical

12    chart?

13    A.    Yes.

14    Q.    And was this a sample of a type of page that was in those

15    charts?

16    A.    Yes.

17    Q.    You see at the top left there's the name Josiah Vaifanua?

18    A.    Yeah.

19    Q.    Now, over on the right, just going to blow up here, you

20    see to the left of the signature stickers there's a series of

21    entries that appear to be the initials "Y.S."?

22    A.    Mm-hmm.

23    Q.    Are those your initials?

24    A.    They're my initials.

25    Q.    Did you put them in this chart?
```

1    A.    No, not that I remember.

2    Q.    Did you massage Josiah Vaifanua?

3    A.    No.  Keep in mind that I initialed many things.  I am a

4    receptionist.

5    Q.    Would you have initialed this chart to show that you did

6    the massage?

7    A.    I didn't massage anyone.

8    Q.    So let me turn in particular to -- there's an entry in

9    this chart with the date November 17th, 2009, the date we just

10   looked at in the appointment book, and do you see over there on

11   the right, by the sticker, there's the initials "Y.S."?

12   A.    Yes.

13   Q.    And those are your initials?

14   A.    Those are my initials.  I don't remember initialing

15   that --

16   Q.    And you didn't --

17   A.    -- of course.

18   Q.    -- massage him on that date?

19   A.    No, because I didn't massage anyone in Long Beach.

20   Q.    Let me go down one page, to page 15.  There's a page

21   titled "Chart Note."  Do you see that?

22   A.    Yes.

23   Q.    This was also a type of page that was in the chart, in the

24   medical chart, in the chiropractic charts?

25   A.    I think it was.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Is this your handwriting?

2    A.    No.

3    Q.    Did you fill out chart notes?

4    A.    I don't remember.

5    Q.    Did you ever fill out charts to indicate that you had seen

6    patients that you hadn't seen?

7    A.    I don't remember.

8    Q.    Were you ever asked by Eva Razo and Sergio Amador to make

9    entries in patient charts?

10   A.    Make entries like -- what do you mean by that?

11   Q.    Make entries in patient charts to indicate that you had

12   done massages.

13   A.    No.  I don't remember.

14   Q.    Did you ever fill out patient charts at the request of

15   Sergio and Eva?

16   A.    I filled out charts like they would ask me to fill out, if

17   the patient came in or, you know, make sure you initial your

18   name to know that you check the chart.  That way, if there's

19   something wrong with billing, we know that you checked in.  If

20   you mis- -- you didn't do -- you know, check it right, then

21   we're going to go back to you.

22   Q.    Was that a special form?

23   A.    Yeah.  Like I told you, I haven't see it in the forms you

24   showed me.

25   Q.    So that's not the form that I just showed you?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    No.   Looks like it, but it's not quite.   Doesn't have all

2    this other -- stamps and -- you know.   It doesn't look like it.

3    I don't recall.

4    Q.    Now, when you spoke with Marcus Valle on June 27th, 2014,

5    did you tell him that there were occasions when Eva Razo and

6    Sergio Amador came to you with patient charts and asked you to

7    complete those charts?

8    A.    They asked me -- let me clarify that.   They asked me to

9    complete the charts, to check them.   Because I was a

10   receptionist, not a therapist.   So I had to initial, make sure

11   they were checked, that everything was right and ready to go

12   for billing.   That's what I did.

13   Q.    And that's not this form that's up on the page -- page --

14   Exhibit 129, page 14?

15   A.    Doesn't -- it doesn't look like it.   I don't recall.

16   Q.    Did they ever come to you and ask you to write chart

17   entries to indicate that massages had been given when those

18   patients hadn't really come in?

19   A.    No.   Like I said, I would check charts.   I would initial

20   my name, make sure that they know that I checked that chart,

21   give it -- give it back to Eva.   So that's pretty much what I

22   did.

23   Q.    And so on this page, page 14 of Exhibit 129, is that your

24   writing, those initials?

25   A.    Those are my initials, but that's not my writing.   I

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    didn't -- I don't recall doing that.  I don't remember.

2    Q.   Do you know how those would have gotten there if you

3    didn't write them?

4    A.   I don't know.  I mean, obviously, somebody must have wrote

5    them, right?  It wasn't me.  I don't remember writing them.

6    Q.   That's fine.

7         Let me turn to another exhibit, Your Honor, Exhibit 133,

8    which has already been admitted.

9              THE COURT:  Okay.

10             MR. CARDONA:  And I'm going to show page 23.

11   Q.   So this is a similar page from the chart, reflecting

12   entries for Desiree Villavisencio.  Do you see her name at the

13   top?

14   A.   Yes.

15   Q.   Did you ever massage her?

16   A.   No.

17   Q.   And over at the right, again, for a number of these

18   entries seem to be the initials "Y.S."  Did you write those?

19   A.   I don't remember.

20   Q.   Does that look like your writing?

21   A.   It looks like my writing, but I don't recall writing,

22   initialing that.

23   Q.   Did you, in fact, perform massages on the dates indicated

24   on this sheet?

25   A.   I never massaged at Long Beach Port Medical.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

353

```
 1              MR. CARDONA:  Your Honor, I'd offer Exhibit 177, which
 2    is a chart for David Gomez.
 3              THE COURT:  Okay.
 4              MR. ULTIMO:  No objection.
 5              THE COURT:  Be received.
 6         (Received in evidence, Trial Exhibit 177.)
 7    BY MR. CARDONA:
 8    Q.   I'm going to pull up page 23.  This is a similar page,
 9    with chart entries for David Gomez.
10    A.   Yes.
11    Q.   Over on the right, again, initials.  Do you see those?
12    A.   Yes.
13    Q.   Your initials?
14    A.   Looks like my initials.
15    Q.   Did you write those?
16    A.   No.  I don't remember.
17    Q.   Did you massage David Gomez this many times?
18    A.   No.
19    Q.   Take the bottom half.  Number of those your initials?
20    A.   Looks like the same.
21    Q.   Did you write those?
22    A.   No.
23    Q.   Did you massage David Gomez this many --
24    A.   No.
25    Q.   Now, there's one entry here that appears to have the
```

1    initials "L.M.C."  Do you recognize those initials?

2    A.   No.

3    Q.   Was there a massage therapist at Port Medical with the

4    initials "L.M.C."?

5    A.   I don't remember.

6            MR. CARDONA:  Have one second, Your Honor?

7            THE COURT:  Mm-hmm.

8    BY MR. CARDONA:

9    Q.   Was there a massage therapist there named Lacey Marie

10   Cain?

11   A.   Lacey.

12   Q.   And she was a massage therapist, right?

13   A.   Yes.

14           MR. CARDONA:  Your Honor, I'd offer Exhibit 179, which

15   is a chart for Sophia Gomez.

16           MR. ULTIMO:  No objection.

17           THE COURT:  Be received.

18       (Received in evidence, Trial Exhibit 179.)

19   BY MR. CARDONA:

20   Q.   I'm going to go to page 21.  Does this appear to be a

21   similar page from one of Port Medical's charts?

22   A.   I'm sorry, what was that?

23   Q.   Does this appear to be a similar page from one of Port

24   Medical's charts?

25   A.   Yeah.  It's the same page.

```
1    Q.   I'm going to blow up over on the right --

2    A.   Okay.

3    Q.   Are there two entries there that appear to have the

4    initials "Y.S."?

5    A.   Yes.

6    Q.   Did you write those?

7    A.   I don't remember.

8    Q.   Did you ever massage Sophia Gomez?

9    A.   No.

10   Q.   Going down, a number of other entries with the initials

11   "Y.S."  Do you see those?

12   A.   It looks like "Y.S.," but I can't really tell.

13   Q.   Did you write those?

14   A.   No.  I don't remember.

15   Q.   Did you ever massage Sophia Gomez?

16   A.   No.

17   Q.   Now, you see over here on the left, there's a series of

18   red dots?

19   A.   Yes.

20   Q.   Do you know what that indicates?

21   A.   Billing purposes.  It was billed.

22   Q.   Was that a method that they used to mark the charts?

23   A.   The billers did that.  I don't --

24   Q.   So you didn't do that?

25   A.   No, we didn't do that.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   But did you know what that meant?

2    A.   Yeah.  That's if it's been billed or not.

3    Q.   And what did the red dot mean?  Had it been billed or

4    hadn't it?

5    A.   I think it had.  I'm -- I don't remember.  It's been so

6    long.

7              MR. ULTIMO:  Move to strike, speculation.

8              THE COURT:  Sustained.

9              MR. CARDONA:  Fine, Your Honor.

10        Nothing further, Your Honor.

11             THE COURT:  Okay.  Any cross?

12             MR. ULTIMO:  No, Your Honor.

13             THE COURT:  You may step down.

14        Next witness.

15             MR. CARDONA:  Yes, Your Honor.  The government calls

16   Ernestine Rubio.

17        Apologize, Your Honor.  We're going one witness out of

18   order due to work schedule.

19             THE CLERK:  Good morning.  Right here to be sworn,

20   please.  Can you please raise your right hand.

21        Do you solemnly swear the testimony that you are about to

22   give in the matter now before the Court shall be the truth, the

23   whole truth, and nothing but truth, so help you God?

24             THE WITNESS:  Yep.

25             THE CLERK:  Thank you.  You may be seated.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        May I please ask that you state your full name for the
 2   record and spell your last name.
 3             THE WITNESS:  It's Ernestine Rubio, R-u-b-i-o.
 4             THE CLERK:  Thank you.
 5             THE COURT:  Okay.  Thank you.
 6        You may inquire, Counsel.
 7                 ERNESTINE RUBIO, GOVERNMENT'S WITNESS,
 8                           DIRECT EXAMINATION
 9   BY MR. CARDONA:
10   Q.   Good morning, Ms. Rubio.
11        How are you employed?
12   A.   I'm sorry?
13   Q.   How are you employed?
14   A.   I work for PMA.
15   Q.   What do you do for the PMA?
16   A.   I'm a longshorewoman.
17   Q.   And if you could, could you speak into the microphone so
18   the jury can hear?
19        So I'll repeat the question.  What do you do for the PMA?
20   A.   I'm a longshorewoman.
21   Q.   Are you a member of the ILWU?
22   A.   Yes.
23   Q.   And currently, do you receive health benefits through the
24   ILWU?
25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   Now, back in the time period 2009 to 2011, were you a

2  full-time longshoreman at that time?

3  A.   No.

4  Q.   What were you doing at that time?

5  A.   I was a casual.

6  Q.   And did you receive benefits as a casual?

7  A.   No.

8  Q.   Were you married at that time?

9  A.   Yes.

10  Q.   Who was your husband?

11  A.   Roy Villavisencio.

12  Q.   Was he also a longshoreman?

13  A.   Yes.

14  Q.   Did you receive health benefits through his union

15  insurance?

16  A.   Yes.

17  Q.   Did you have two children with him, Desiree and Cierra?

18  A.   Yes.

19  Q.   Did they also receive health benefits through the union

20  plan?

21  A.   Yes.

22  Q.   Now, did you go to a clinic called Port Medical?

23  A.   Yes.

24  Q.   How did you find out about Port Medical?

25  A.   Through my ex-husband.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   Is that Roy Villavisencio?

2   A.   Yes.

3   Q.   What did he tell you about the clinic?

4   A.   He just said his friend opened up a new clinic.

5   Q.   Did you know who those friends were?

6   A.   I just only met Sergio.  That was it.

7   Q.   Had you known Sergio Amador before that?

8   A.   I've seen him down on the waterfront.

9   Q.   How about David Gomez?

10  A.   No.

11  Q.   What did you go to Port Medical for?

12  A.   To get adjusted, massage, nutritionist.

13  Q.   Did you take your kids?

14  A.   Yeah, I took them like a couple times, but their dad

15  mainly took them.

16  Q.   Why did he make you take them?

17  A.   No.  He took them.

18  Q.   Ah.

19  A.   He took them all the time.

20  Q.   Now, when you went in, what happened when you went into

21  Port Medical?  What did you do first?

22  A.   Fill out paperwork and -- can't remember if I saw the

23  doctor first or got the massage first.  Can't remember.

24  Q.   And did you have a medical problem that was leading you to

25  go there?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yeah.  Back.

 2   Q.   Did you see the chiropractor?

 3   A.   Yes.

 4   Q.   Do you remember who that was?  Was it a man?

 5   A.   It was a man, yeah.

 6   Q.   And what did the chiropractor do for you?

 7   A.   Adjust me.  Sometimes I wouldn't get adjusted, because I

 8   really don't like to get adjusted.

 9   Q.   And did you also get massages?

10   A.   Yeah.

11   Q.   About how many massages?

12   A.   Just like a few.  I don't know, maybe five or six.

13        MR. CARDONA:  Your Honor, I'd offer Exhibit 130, which

14   is Ms. Rubio's patient chart from Port Medical.

15        MR. ULTIMO:  No objection, Your Honor.

16        THE COURT:  Be received.

17   BY MR. CARDONA:

18   Q.   Like to pull up page 4 of that document.  This is a page

19   entitled "Informed Consent to Chiropractic Treatment."  And

20   down at the bottom, is that your signature?

21   A.   Yes.

22   Q.   And the date, March 26, 2009, do you recall, was that the

23   first date you went?

24   A.   Probably, if that's the paperwork that I filled out.

25   That's just normally the paperwork you fill out on the first
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    day you go, so, yeah.
2    Q.   I'd like to go back to page 20 of the exhibit.  You see at
3    the top, your name?
4    A.   Yeah.
5    Q.   Over on the right, you see there's a number of signature
6    stickers?
7    A.   Yes.
8    Q.   Are those all your signatures?
9    A.   No.
10   Q.   Do you recognize any of those as being your signature?
11   A.   Yes.
12   Q.   Which ones?
13   A.   9, 2 and 5.
14   Q.   So the top three?
15   A.   Yes.
16   Q.   Do you recognize 11, 20 and 10, the next three?
17   A.   11, 20 and 10?
18   Q.   Yes.
19   A.   No.
20   Q.   How about the bottom three, 15, 19 and 13?
21   A.   Yes.
22   Q.   Is that your writing?
23   A.   No.
24   Q.   How do you recognize it?
25   A.   That's my ex-husband's signature.
```

1   Q.   Is that Roy Villavisencio?

2   A.   Yes.

3   Q.   Did you tell him that he could sign your name?

4   A.   No.

5   Q.   Did you know that he had signed your name?

6   A.   No.

7   Q.   I'm going to blow up the bottom entry here, one of the

8   ones that you've said appears to be Roy's writing.  Do you see

9   the initials "P.H."?

10  A.   Mm-hmm, yes.

11  Q.   Were you ever massaged by a woman named Pandora Hall?

12  A.   I don't remember her name.

13       MR. CARDONA:  Your Honor, I'd like to put up Exhibit

14  218, a photograph.

15       THE COURT:  Okay.

16       MR. ULTIMO:  No objection.

17  BY MR. CARDONA:

18  Q.   Were you ever massaged by this woman?

19  A.   No.  I -- I -- I'm not going to say no.  I just don't

20  remember.  There's -- I think there was different ladies.

21       THE COURT:  So you can't say for sure one way or the

22  other?

23       THE WITNESS:  Yeah, I --

24       THE COURT:  Okay.  Next question.

25       THE WITNESS:  Too long.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. CARDONA:
 2   Q.   Let me turn to page 18 of your chart, Exhibit 130.  And on
 3   this page, there appear to be five entries.  Let me blow up the
 4   top three signatures first.  Are those your signatures?
 5   A.   No.  No.
 6   Q.   Do you recognize the writing?
 7   A.   No.
 8   Q.   Let me blow up the bottom two.  Do you recognize those
 9   signatures?
10   A.   Yes.
11   Q.   Are those yours?
12   A.   No.
13   Q.   Whose writing do you recognize those as?
14   A.   My ex-husband.
15   Q.   Roy Villavisencio?
16   A.   Yes.
17   Q.   Did you go to Port Medical on these dates?
18   A.   Well, they're not my signatures, so I didn't go.
19   Q.   Let me go down one more page, page 19.  And again, on page
20   19, let me do the top three signatures first.  Did you sign
21   those?
22   A.   No.
23   Q.   You recognize the writing?
24   A.   Yes.
25   Q.   Whose writing does it appear to be?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    My ex-husband's.

 2    Q.    Bottom two on that page, do you recognize that writing?

 3    A.    Yeah.

 4    Q.    Whose does it appear to be?

 5    A.    My ex-husband's.

 6    Q.    Did you go to get massaged on these dates?

 7    A.    No.  It's not my signature, so I didn't go.

 8    Q.    Let's go to page 12 of your chart.  In this chart, there

 9    appear to be two signature stickers.  Blow up the top one

10    first.  Is that your writing?

11    A.    Yes.

12    Q.    Down at the bottom, is that your writing?

13    A.    Yes.

14    Q.    So on these occasions, you did go?

15    A.    Yes.

16    Q.    Then going up one page, if I can get that to work, to page

17    11, appears to be one signature sticker on this page.  Is that

18    your writing?

19    A.    Yes.

20    Q.    Did you go on this date?

21    A.    Yes.

22    Q.    And does the date for this entry appear to be February

23    20th, 2012?

24    A.    Yes.

25    Q.    Do you remember why you were going in 2012?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.

2    Q.    Why was that?

3    A.    Well, my ex-husband was having an affair, so he was going

4    a lot to the medical clinic, so I went during the time he had

5    hit me with divorce papers, so I was just doing my own little

6    investigation, seeing what was going on.

7    Q.    Did you have any physical ailments?

8    A.    Well, my back, but --

9    Q.    So did you get treated for your back on those occasions?

10   A.    Yeah.

11   Q.    Now, did your daughter Cierra go to Port Medical?

12   A.    Yeah.

13   Q.    How many times?

14   A.    He took them a lot.  I can't say how many, but I know they

15   went a lot.

16   Q.    Did your daughter Cierra like going?

17   A.    She didn't like going.  She didn't like to get adjusted.

18   Q.    Now, did you ever get Explanation of Benefit forms after

19   you went to Port Medical?

20   A.    Yes.

21   Q.    Did you ever look at them?

22   A.    No.

23   Q.    Why not?

24   A.    What for?  Trash.  Just --

25   Q.    You didn't check to see whether they reflected visits that

```
1    you hadn't gone for?

2    A.   No.

3    Q.   Why not?

4    A.   What for?  They're trash.  Just, if you knew you went,

5    you -- I don't look at them.  There's no purpose.  Just trash.

6            MR. CARDONA:  Nothing further, Your Honor.

7            THE COURT:  Cross.

8            MR. ULTIMO:  Brief, briefly, Your Honor.  Thank you.

9                      CROSS-EXAMINATION

10   BY MR. ULTIMO:

11   Q.   Good morning.  Ms. Rubio, correct?

12   A.   Yes.

13   Q.   Thank you.  Nice to meet you.

14        Okay.  Your husband Roy, he's friends with Sergio Amador,

15   true?

16   A.   Yes.

17   Q.   And your husband Roy asked you to go to Port Medical

18   because his friend Sergio Amador had recently opened Port

19   Medical, true?

20   A.   Yes.

21   Q.   You do not know the defendant, David Gomez, do you?

22   A.   No.

23   Q.   True?

24   A.   No.

25   Q.   Sorry about that.  True?  I mean, you do not know the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    defendant --

2    A.    True.  True.

3    Q.    -- David Gomez?

4          So the defendant, David Gomez, never offered you money or

5    gifts to go to Port Medical, true?

6    A.    No.  True.  Sorry.

7    Q.    Roy would take your children to Port Medical, correct?

8    A.    Yes.

9    Q.    And you yourself, you took your children to Port Medical,

10   your daughters or children, to Port Medical on occasion, true?

11   A.    A few times.

12   Q.    Few times.  And did the chiropractor ever refuse to treat

13   your children because they were too young?

14   A.    No.

15             MR. ULTIMO:  No further questions.  Thank you.

16             THE COURT:  Redirect?

17             MR. CARDONA:  Nothing further, Your Honor.

18             THE COURT:  You may step down.  Thank you very much

19   for coming in.

20        Next witness.

21             MR. CARDONA:  Your Honor, the government calls Nicole

22   LaBeaud.

23             THE CLERK:  Good morning.  Right here to be sworn,

24   please.  Can you please raise your right hand.

25        Do you solemnly swear the testimony that you are about to
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    give in the matter now before the Court shall be the truth, the

 2    whole truth, and nothing but the truth, so help you God?

 3            THE WITNESS:  I do.

 4            THE CLERK:  Thank you.  You may be seated.

 5        May I please ask that you state your full name for the

 6    record and spell your last name.

 7            THE WITNESS:  Nicole Riva LaBeaud.  L-a, capital

 8    B-e-a-u-d.

 9            THE CLERK:  Thank you.

10            THE COURT:  You may inquire.

11                NICOLE LaBEAUD, GOVERNMENT'S WITNESS,

12                         DIRECT EXAMINATION

13    BY MR. CARDONA:

14    Q.    Ms. LaBeaud, what do you currently do for a living?

15    A.    I'm a flight attendant.

16    Q.    How long have you been a flight attendant?

17    A.    About a year and a month.

18    Q.    Back in either late 2008 or early 2009, did you work at a

19    clinic called Port Medical?

20    A.    Yes.

21    Q.    Do you recall when exactly you started there?

22    A.    I believe it was fall 2009, around that time.

23    Q.    What did you do at Port Medical?

24    A.    I was a massage therapist.

25    Q.    How did you get the job there?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    A referral through another doctor's office that I was

2    working for, and -- another doctor I was working for, and they

3    said that Port Medical was hiring massage therapist.  Because

4    his office was closing, so it was an opportunity to just

5    transition over there.

6    Q.    Now, were you certified as a massage therapist?

7    A.    Yes.

8    Q.    Did you interview at Port Medical?

9    A.    Yes, I did.

10   Q.    Who interviewed you?

11   A.    Michelle.  I forgot her last --

12   Q.    Does the name Michelle Aragon ring a bell?

13   A.    Yes.

14   Q.    What was her position at Port Medical?

15   A.    At the time, she was the manager.

16   Q.    And where was Port Medical located when you started?

17   A.    On Atlantic Avenue in Long Beach.

18   Q.    When you started, did you work full-time?

19   A.    It was more part-time.

20   Q.    About how many days a week?

21   A.    I really don't remember.

22   Q.    And what did you do as a massage therapist?

23   A.    See patients for pain therapy.

24   Q.    How were you paid?

25   A.    Hourly.

1    Q.   Did you also get paid per massage, or was it just hourly?

2    A.   It was per massage.

3    Q.   So was it per massage or hourly?

4    A.   Per massage.

5    Q.   Did you know who owned Port Medical or who controlled it?

6    A.   To some degree.

7    Q.   What do you mean by "to some degree"?

8    A.   I met a few of the owners, but I don't know, you know, all

9    of the owners or how many owners there were.  I just knew who

10   was coming into the office.

11   Q.   Who did you meet?

12   A.   Dave and Sergio and Chris.

13   Q.   By Dave, do you mean Dave Gomez?

14   A.   Dave Gomez.

15   Q.   Is he sitting here to my right?

16   A.   Yes, sir.

17        MR. CARDONA:  May the record reflect the defendant,

18   Your Honor?

19        THE COURT:  Yes.

20   BY MR. CARDONA:

21   Q.   By Sergio, do you mean Sergio Amador?

22   A.   Yes.

23   Q.   And by Chris, do you mean Chris Rice?

24   A.   Yes.

25   Q.   What did you see them doing at Port Medical?  Let's start

1    with Sergio Amador.

2    A.    Can you repeat the question?

3    Q.    What did you see Sergio Amador doing at Port Medical while

4    you were there?

5          MR. ULTIMO:   Calls for a narrative, Your Honor.

6    Overly broad.   403.

7          THE COURT:   Sustained.

8    BY MR. CARDONA:

9    Q.    How often did Sergio Amador come into Port Medical?

10   A.    A few times a week.

11   Q.    How about David Gomez?

12   A.    Few times a week.

13   Q.    How about Chris Rice?

14   A.    Not too much.

15   Q.    Now, at some point did Michelle Aragon leave?

16   A.    Yes.

17   Q.    Do you recall when that was?

18   A.    No.

19   Q.    After Michelle Aragon left, did you change positions?

20   A.    After she left, I don't know how long it was or when, but

21   she recommended me as a manager.

22   Q.    And did you become a manager?

23   A.    Yes.

24   Q.    What were your duties as a manager?

25   A.    The day-to-day activities of keeping the staff organized

1    and managing the retention and attraction of patients and

2    marketing, that type of thing.

3    Q.   And in your position as manager, did you work with Sergio

4    Amador?

5    A.   No, not too much.

6    Q.   How about Dave Gomez?

7    A.   As far as working, what do you mean?

8    Q.   Did they direct you?

9    A.   Well, yeah.  We had meetings, like, you know, patient care

10   or doctor meetings.  So as a manager, you know, you had

11   meetings with the staff as well.

12   Q.   So was Sergio Amador at some of those meetings?

13   A.   Yes.

14   Q.   Was Dave Gomez at some of those meetings?

15   A.   Yes.

16   Q.   Was Chris Rice at any of those meetings?

17   A.   I don't remember.  I don't recall him being at any of

18   them, no.

19   Q.   How did you come to leave Port Medical?

20   A.   I was fired.

21   Q.   Before you were fired, did you have a conversation with

22   Sergio Amador and Dave Gomez?

23   A.   Yes.

24   Q.   What was that conversation?

25           MR. ULTIMO:  Hearsay, Your Honor.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  Overruled.

2              THE WITNESS:  Answer the question?

3              THE COURT:  Yes, that means you can answer.

4              THE WITNESS:  Oh.

5         Can you repeat the question?

6    BY MR. CARDONA:

7    Q.   What was that conversation that you had with them before

8    you got fired?

9    A.   We had a meeting about patients, and it was -- from, I

10   guess, my understanding of -- there were some patients that

11   approved that they use their Social Security numbers to bill

12   on.

13   Q.   What did they tell you?

14   A.   That pretty much that they got the permission from the

15   patients to do it.

16   Q.   Did they ask you to do anything?

17   A.   To participate in it, but I didn't want to.

18   Q.   And what do you mean by "to participate in it"?  What did

19   they ask you to do?

20             MR. ULTIMO:  Your Honor, vague.

21             THE COURT:  Well, let me inquire.  When you were

22   talking with them, were they both present at the same time?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  Okay.  As much as you can remember, who

25   said what?  You know, Dave said what or Sergio said what?  If
```

```
1    you're not sure, you can -- then, you know, tell us you're not

2    sure.

3              THE WITNESS:  Yeah, I'm not sure.

4              THE COURT:  Go ahead.

5    BY MR. CARDONA:

6    Q.   So what did they ask you to participate in?

7    A.   Billing on Social Security numbers.  The patients were not

8    coming into the office, but bill on their information.

9    Q.   And were they both there?

10   A.   Yes.

11   Q.   Although you don't remember specifically what each of them

12   said --

13   A.   No.

14   Q.   -- did each of them talk in the conversation?

15   A.   Yes.

16   Q.   And did each of them convey to you that they wanted you to

17   do that?

18   A.   Yes.

19   Q.   Did you agree to do it?

20   A.   No.

21   Q.   What did you tell them?

22   A.   I recall telling them we didn't have that to do, because

23   we were profiting in the usual practice of seeing patients,

24   about 80 patients daily.

25   Q.   How long after that conversation was it till you were
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    fired?

2    A.   I don't recall, but it was shortly after.

3    Q.   Short time?

4    A.   Yeah.

5         MR. CARDONA:  Nothing further, Your Honor.

6         THE COURT:  Okay.  Cross.

7         MR. ULTIMO:  Yes.  Thank you, Your Honor.

8                         **CROSS-EXAMINATION**

9    BY MR. ULTIMO:

10   Q.   Good morning, Ms. LaBeaud.

11   A.   Good morning.

12   Q.   You were a prior massage therapist before joining Port

13   Medical, correct?

14   A.   Yes.

15   Q.   And in fact, I think you said you were a certified massage

16   therapist, true?

17   A.   Correct.

18   Q.   And did you actually perform massages at Port Medical?

19   A.   Yes, I did.

20   Q.   At both locations, Long Beach and San Pedro, or just --

21   A.   Not San Pedro.

22   Q.   Long Beach?

23   A.   Yes.

24   Q.   So you knew Dr. Kevin Malone; is that right?

25   A.   Yes.

1   Q.   You work in the same office as Dr. Kevin Malone?

2   A.   Yes.

3   Q.   And in your -- was it your understanding -- well,

4   actually, you worked there.  Did Port Medical have good

5   chiropractors and doctors?

6   A.   Yes.

7   Q.   Now, this conversation that you were just testifying to a

8   moment ago, you said you could not -- you cannot recall which

9   one, meaning Sergio Amador or David Gomez, said what when you

10  had a discussion about using some patients' Social Security

11  numbers.

12  A.   Right.

13  Q.   Okay.  Let me ask you this.  The details of that

14  discussion, when you say use patients' Social Security numbers,

15  what are you referring to?

16  A.   Bill on a Social Security number.  Or use that person's --

17  I'm not a biller.  So the conversation was basically having a

18  permission -- having the permission of these patients to use

19  their medical insurance --

20  Q.   Correct.

21  A.   -- without them visiting the office.

22  Q.   Correct, you're not a biller, so what were you asked to

23  do?

24  A.   I guess be okay with it.

25  Q.   Why would they ask you to be okay with it?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   As the manager.

2    Q.   But you were a massage therapist, certified massage

3    therapist.  So are you saying that you accepted the position as

4    a manager?

5    A.   I accepted the position as a manager, correct.

6    Q.   Okay.

7    A.   Are you asking me if I was still doing massages?  I'm not

8    understanding your question.

9    Q.   I haven't asked one yet.

10   A.   Oh.

11   Q.   Now, you said that -- let me ask you this.  Would

12   Dr. Soliman -- was he one of the doctors at Port Medical?

13   A.   Yes.

14   Q.   And would Dr. Soliman bill for unnecessary treatment?

15   A.   I have no idea.

16   Q.   Would Dr. Soliman bill for services that were never

17   rendered by patients?

18        MR. CARDONA:  Objection, Your Honor, beyond the scope

19   of direct.

20        THE COURT:  Overruled.  Up to this time, overruled.

21   You don't know if he did or didn't?

22        THE WITNESS:  No, I didn't.

23        THE COURT:  Okay.

24   BY MR. ULTIMO:

25   Q.   You recall being interviewed by federal agents in this

```
 1   case, correct?

 2   A.    Yes.

 3   Q.    And you recall being interviewed recently by federal

 4   agents in August of this year, correct?

 5   A.    Yes.

 6   Q.    And were you truthful and honest when you spoke to the

 7   agents?

 8   A.    Yes, I was.

 9   Q.    Do you recall telling agents that Dr. Soliman was also in

10   on fraud to some degree?

11   A.    I don't recall that.

12   Q.    Well, you said you were truthful and accurate when you

13   made your statements to the agents.  Did you make that

14   statement to the agent?

15   A.    I don't recall if I made the statement.

16   Q.    You told the agents that Dr. Soliman would bill for

17   unnecessary treatments or for services that were never

18   rendered; isn't that true?

19   A.    No.

20   Q.    You did not make that statement to federal agents?

21   A.    Not that I recall, I don't, no.

22   Q.    So the federal agents, if they testified that you told

23   them that Dr. Soliman would bill for unnecessary treatments or

24   for services that were never rendered, they'd be untruthful?

25              THE COURT:  That would be --
```

1          MR. CARDONA:   Objection, Your Honor, improper

2     impeachment.

3          THE COURT:   That's an improper and argumentative

4     question.

5     BY MR. ULTIMO:

6     Q.   Now, during that same interview at law enforcement on

7     August 15, 2016, didn't you tell federal agents that Pandora

8     was the ringleader on the bad stuff that was going on at Port

9     Medical?   Isn't that what you told them?

10    A.   Yes, I did.

11    Q.   And didn't you tell the federal agents that Pandora went

12    behind your back and opened up bank accounts?

13    A.   I don't remember saying it that way, but --

14    Q.   Well, what do you remember about that?   Did Pandora open

15    up bank accounts?

16    A.   Pandora was a manager as well, and she came in a little

17    bit after I was manager, to do -- to work with the San Pedro

18    office.   She was a massage therapist in Long Beach at the time.

19    And then there was more activity given to her or delegated to

20    her for the Long Beach office, so I noticed that.   And

21    eventually, like I said, I was let go, but at the time when I

22    was there, my duties and her duties were supposed to be

23    separate, but then it was getting kind of cloudy who was doing

24    what, because Dave and Sergio was giving her more management

25    authority over Long Beach as well as San Pedro.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.  So what did you mean when you made a statement to the

2  effect that Pandora went behind your back and opened up other

3  bank accounts?  What did you mean by that?

4  A.  I don't recall saying that.  What I said was that Pandora

5  was on accounts with us.  She was pushing Dave and Sergio to be

6  on all the accounts.

7  Q.  She was pushing David, the --

8  A.  Or had conversations with them to put her on the accounts.

9  And eventually she was.

10 Q.  At her request?

11 A.  Yes.

12 Q.  Did you also tell the agents that Pandora and Lilibeth

13 joined -- when Pandora and Lilibeth joined Port Medical, things

14 started to change?

15      MR. CARDONA:  Objection, Your Honor.  This is improper

16 impeachment.  It's not inconsistent with her testimony on

17 direct.

18      THE COURT:  Sustained.

19 BY MR. ULTIMO:

20 Q.  Okay.  Did things start to change when Pandora -- when you

21 worked alongside Pandora as an office manager?

22 A.  Things like what?

23 Q.  Well, anything.

24 A.  Like I said, she was given more duties, management

25 decisions at the Long Beach office as well as San Pedro office.

```
1   Q.    Okay.  Well, did things go bad when Pandora was a manager

2   working alongside with you?

3   A.    What do you mean by "bad"?

4           MR. CARDONA:  Objection, Your Honor, outside the scope

5   of direct.

6           THE COURT:  Yeah, it really is, and you can re-call

7   her as your witness, Counsel, later.

8           MR. ULTIMO:  Certainly.

9           THE COURT:  It is outside the scope of direct.

10  BY MR. ULTIMO:

11  Q.    Did defendant David Gomez ever offer you any money?

12  A.    No.

13          MR. ULTIMO:  I have no further questions.

14          THE COURT:  Any redirect?

15                     REDIRECT EXAMINATION

16  BY MR. CARDONA:

17  Q.    Miss LaBeaud, any doubt that the conversations you've

18  described with Sergio Amador and David Gomez took place?

19  A.    No.

20  Q.    And were they both present during the entirety of that

21  conversation?

22  A.    Yes, sir.

23          MR. CARDONA:  Nothing further, Your Honor.

24          THE COURT:  Anything further?

25          MR. ULTIMO:  Yes, Your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE COURT:  Yes.

 2                      RECROSS-EXAMINATION

 3  BY MR. ULTIMO:

 4  Q.   But Miss LaBeaud, you did testify that you don't recall

 5  who said what specifically in that discussion, correct?

 6  A.   Correct.

 7            MR. ULTIMO:  Thank you.

 8            THE COURT:  Okay.  Thank you, Counsel.

 9       You may be excused.  Thank you very much for coming in.

10            THE WITNESS:  Thank you.

11            THE COURT:  Next witness.

12            MR. CARDONA:  Your Honor, I apologize.  We went much

13  more quickly than expected.  We have no witness here right now.

14  We do have witnesses coming this afternoon.  I understand we've

15  been trying to arrange around work schedules.  I apologize.

16            THE COURT:  Counsel, we have a half hour we're going

17  to be losing here.

18            MR. CARDONA:  I understand, Your Honor.  I apologize.

19            THE COURT:  You have your witness right here.  Is he

20  not going to testify?

21            MR. CARDONA:  Marcus Valle?

22            THE COURT:  Yeah.

23            MR. CARDONA:  He will be testifying, Your Honor.

24            THE COURT:  Okay.  Then put him on.

25            MR. CARDONA:  Very well.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE CLERK:  Right here to be sworn, please.
 2       Do you solemnly swear the testimony that you are about to
 3   give in the matter now before the Court shall be the truth, the
 4   whole truth, and nothing but the truth, so help you God?
 5            THE WITNESS:  I do.
 6            THE CLERK:  Thank you.  You may be seated.
 7       May I please ask that you state your full name for the
 8   record and spell your last name.
 9            THE WITNESS:  Marcus Valle, V, as in Victor, -a-l-l-e.
10            THE CLERK:  Thank you.
11            THE COURT:  Counsel, if you want to interrupt this
12   testimony when another witness comes in, feel free to do it at
13   that time.
14            MR. CARDONA:  That's fine, Your Honor.
15       Your Honor, may I approach to hand Agent Valle a witness
16   binder with certain of the exhibits I'm going to need him to
17   look at?
18            THE COURT:  Sure.  Through the clerk.
19       Okay.  You may inquire.
20            MR. CARDONA:  Thank you, Your Honor.
21            MARCUS VALLE, GOVERNMENT'S WITNESS,
22                    DIRECT EXAMINATION
23   BY MR. CARDONA:
24   Q.   Agent Valle, how are you employed?
25   A.   I'm a special agent with the United States Department of
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Labor, Office of Inspector General.

2    Q.   And how long have you been a special agent with the

3    Department of Labor, Office of Inspector General?

4    A.   Approximately three and a half years.

5         THE COURT:  Why don't you pull the mic a little closer

6    so we can -- yeah.

7    BY MR. CARDONA:

8    Q.   So can you repeat that?  How long have you been employed

9    as a special agent?

10   A.   Approximately three and a half years.

11   Q.   And did you conduct much of the investigation in this

12   case?

13   A.   I did.

14   Q.   Now, have you prepared certain summary exhibits that

15   summarize certain documents that were obtained in the course of

16   the investigation?

17   A.   Yes.

18   Q.   If you could, I'd like to turn first to Exhibit 271.  If

19   you could turn to that in your book.

20        You have Exhibit 271 in front of you?

21   A.   Yes.

22   Q.   Did you review certain corporate documents that had been

23   obtained from the California Secretary of State?

24   A.   Yes.

25   Q.   And in particular, did you review the corporate documents

1    that are marked as Exhibits 1 to 5?

2    A.   Yes.

3    Q.   And did you prepare this chart, Exhibit 271, to summarize

4    the information in those corporate documents?

5    A.   Yes.

6    Q.   Is the summary accurate?

7    A.   It is.

8              MR. CARDONA:  Your Honor, I would offer Exhibit 271.

9              MR. ULTIMO:  No objection, Your Honor.

10             THE COURT:  Be received.

11             MR. CARDONA:  May I display it?

12             THE COURT:  Yes.

13             *(Received in evidence, Trial Exhibit 271.)*

14   BY MR. CARDONA:

15   Q.   So, Agent Valle, taking the first column, under the

16   heading DCS Medical Management, LLC, do you see that?

17   A.   I do.

18   Q.   So, as an example, what did you put in here to reflect

19   what was in the document you examined?

20   A.   After reviewing the Secretary of State filings, indicated

21   that David Gomez was identified on that paperwork as the

22   organizer and agent for service.  That's how the forms,

23   Secretary of State, are labeled.

24   Q.   And did you make similar entries based on the

25   documentation you reviewed for the other corporations?

```
 1   A.    Yes.
 2   Q.    So, for example, you take the column "Chosen Medical
 3   Management," the information indicated there for the
 4   incorporator and the initial agent for service of process, was
 5   that too obtained from the forms you reviewed?
 6   A.    Yes.
 7   Q.    Could you open your book to Exhibit 272.
 8   A.    Okay.
 9   Q.    Did you also review signature card information and forms
10   reflecting the addition and removal of signators on various
11   bank accounts?
12   A.    Yes.
13   Q.    And in particular, did that include accounts for the
14   entities DCS Medical Management, a joint account; Port Medical
15   Associates; an account for Sixth Street Bistro; an account for
16   DS Medical Management; and an account for Chosen Medical
17   Management; and two accounts for Ramport Medical Management?
18   A.    Yes.
19   Q.    And are those signature cards and change of signature
20   cards also marked as exhibits?
21   A.    Yes.
22   Q.    Did you prepare this summary to reflect the information
23   from those documents?
24   A.    Yes.
25   Q.    Is it accurate?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   Yes.

 2    Q.   Does it reflect the information that was on those

 3    documents?

 4    A.   It does.

 5              MR. CARDONA:  Your Honor, I'd offer Exhibit 272.

 6              MR. ULTIMO:  No objection.

 7              THE COURT:  Be received.

 8         (Received in evidence, Trial Exhibit 272.)

 9              MR. CARDONA:  May I display it?

10              THE COURT:  Yes.

11    BY MR. CARDONA:

12    Q.   So again, starting in the first column as an example,

13    what's reflected in that first entry?

14    A.   The signature card for DCS Medical Management, it reflects

15    the signators that opened the account and were initially the

16    account holders.

17    Q.   Then, as a subsequent example, let's go to the column

18    under Chosen Medical Management, account ending with the four

19    digits 6061, where it indicates "add Eva Razo."  What does that

20    reflect?

21    A.   That reflects a change in the signers on the account.  So

22    in that instance, Eva Razo was added as a signer of that

23    specific bank account.

24    Q.   Now, in the top columns, as we look at that, you see that

25    it refers only to the last four digits of the account number?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    Was that intentional?

 3    A.    Yes.

 4    Q.    Why?

 5    A.    Primarily we don't put the full account number, because

 6    it's bank records, and should the account still be opened, we

 7    try to keep some confidentiality about people's account

 8    numbers.

 9    Q.    So if we refer to accounts by the last four digits, will

10    you understand that?

11    A.    I will.

12    Q.    If you could, could you turn to, in your book, what's

13    marked as Exhibit 282.

14    A.    Okay.

15    Q.    Did you prepare or assist in preparing Exhibit 282?

16    A.    I did.

17    Q.    And did you review it once it was prepared?

18    A.    Yes.

19    Q.    What information did you rely on in preparing or assisting

20    in preparing Exhibit 282?

21    A.    This chart was derived upon a master bill pay history that

22    was received from the insurance company that identified dates

23    of service that had been billed to them.  So I reviewed that

24    and was able to prepare this chart, or assist in preparing this

25    chart, which reflects various dates of service where Sergio
```

1    Amador, Marie Amador and Justin Amador visited the clinic and

2    were ultimately billed for.

3    Q.   And is the bill pay history that you reviewed marked as

4    Exhibit 106?

5         May I approach to hand the witness the binder with Exhibit

6    106?

7              THE COURT:  Yes.

8              THE CLERK:  I'm sorry, which binder?

9              MR. CARDONA:  Exhibit 106.

10   Q.   And is Exhibit 106 fairly voluminous?

11   A.   It is.

12   Q.   Can you hold that up so we can see how many pages it is.

13   A.   *(Indicating.)*

14   Q.   Is it most of that binder?

15   A.   Whole binder almost.

16   Q.   Did you review Exhibit 282 to determine that it accurately

17   reflected the information from Exhibit 106?

18   A.   Yes.

19   Q.   Is it accurate?

20   A.   Yes.

21             MR. CARDONA:  Your Honor, I'd offer Exhibit 282.

22             THE COURT:  That's an accurate summary of 106,

23   correct?

24             MR. CARDONA:  May I clarify that, Your Honor, before I

25   go on?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Yes.
 2   BY MR. CARDONA:
 3   Q.    Is Exhibit 282 an accurate summary of information in 106
 4   relating to certain, specific patients?  Certain specific
 5   individuals?
 6   A.    Yes, it is, to the best of my knowledge.  The bill pay
 7   history sometimes grouped instances where -- for instance, on
 8   the bill pay history it may say January 1st, 2010, $900 billed
 9   and paid.  That also could have been three days of service
10   grouped together.  So to the best of our ability, we tried to
11   actually, you know, identify if there was a broken down, but
12   sometimes it may be identified as one date of service, it could
13   have been three.  But it's the best -- to my best of my
14   ability, I reflected -- this chart reflects what's in the bill
15   pay history.
16   Q.    When you say you know that some of those entries might
17   have reflected multiple visits, is that based on your
18   examination of patient charts?
19   A.    Based on the patient charts and the HICFA 1500s which the
20   client received, which identifies what date of service is being
21   billed.
22   Q.    And did you also review certain of those HICFA forms?
23   A.    I did.
24   Q.    So let me come back for one second.  With respect to the
25   information in Exhibit 282, does that reflect what's contained
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    in 106, even though you know that some of the information in

2    106, for example, one entry may reflect multiple visits?

3    A.   Yes.

4             MR. CARDONA:  And with that, Your Honor, I'd offer

5    Exhibit 282.

6             MR. ULTIMO:  Your Honor, 401, and therefore, 403.

7             THE COURT:  I'm going to overrule the objection at

8    this time.

9         *(Received in evidence, Trial Exhibit 282.)*

10            MR. CARDONA:  Your Honor, may I display Exhibit 282?

11            THE COURT:  Yes.

12   BY MR. CARDONA:

13   Q.   So which individuals does this apply to?

14   A.   This applies to Sergio Amador, his wife Marie Amador, and

15   his son, Justin Amador.

16   Q.   And what's indicated in this first page, the summary

17   chart?

18   A.   Billed date of service and a "X" mark indicating what date

19   of service had applied to what family member.  Sometimes it

20   applies to all family members, but sometimes it only applies to

21   one.

22   Q.   So would the "X" in the first column, for April 24th,

23   2009, under Sergio Amador, reflect that there was an entry in

24   Exhibit 106 reflecting that there had been a bill paid for him

25   by the insurance company for service on or about that date?

```
1    A.   Yes.

2    Q.   And is that the same for the other "X"'s indicated in this

3    chart?

4    A.   Yes.

5             MR. ULTIMO:  401, Your Honor.

6             THE COURT:  Overruled.

7         That means you can answer.

8             THE WITNESS:  Yes.  Sorry.

9    BY MR. CARDONA:

10   Q.   Moving to the second page, same type of chart?

11   A.   Yes.

12   Q.   Third page, same?

13   A.   Yes.

14   Q.   And on the fourth page, at the bottom, what's reflected in

15   the last two rows?

16   A.   Total dates of service that were billed, and then the last

17   row indicates the total amount paid out.  Or, I'm sorry, it's

18   talking about billed out, reflecting those -- in the case of

19   the column number one, those 71 billed dates of service.

20   Q.   And again, is that information drawn from Exhibit 106?

21   A.   Yes, it is.

22   Q.   If you could take a look at Exhibits 283 through 288.  I

23   apologize.  Let me go first to Exhibit 283.  Is 283 a similar

24   summary that you prepared or assisted in preparing for members

25   of David Bumgarner's family?
```

```
1    A.    It is.

2    Q.    Did you prepare that the same way?

3    A.    Yes.

4    Q.    And does Exhibit 283 accurately reflect the information

5    from Exhibit 106 for the Bumgarner family?

6    A.    Yes.

7              MR. CARDONA:  Your Honor, I'd offer Exhibit 283.

8              THE COURT:  Same objection, Counsel?

9              MR. ULTIMO:  No objection to 283.

10             THE COURT:  There is no objection.  Okay.  It will be

11   received.

12        (Received in evidence, Trial Exhibit 283.)

13   BY MR. CARDONA:

14   Q.    If you could turn to Exhibit 284.  Is Exhibit 284 a

15   similar chart prepared for Jeffrey Carmichael?

16   A.    Yes.

17   Q.    Is that too based on information drawn from Exhibit 106?

18   A.    Yes.

19   Q.    Did you review that information?

20   A.    Yes.

21   Q.    And is Exhibit 283 -- sorry, 284 an accurate reflection of

22   the information in Exhibit 106 for Jeffrey Carmichael?

23   A.    Yes.

24             MR. CARDONA:  Your Honor, I'd offer Exhibit 284.

25             MR. ULTIMO:  No objection to 284.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Be received.
 2          (Received in evidence, Trial Exhibit 284.)
 3   BY MR. CARDONA:
 4   Q.   If you could turn to Exhibit 285.  Is Exhibit 285 a
 5   similar chart for members of David Gomez's family?
 6   A.   Yes.
 7   Q.   Was that prepared based on the information in Exhibit 106?
 8   A.   Yes.
 9   Q.   Is Exhibit 285 an accurate reflection of the information
10   in Exhibit 106 for members of the Gomez family?
11   A.   Yes.
12              MR. CARDONA:  Your Honor, I'd offer Exhibit 285.
13              MR. ULTIMO:  401.
14              THE COURT:  Okay.  Again it's going to be overruled.
15   Both of the two that have been overruled, Counsel, are subject
16   to a motion to strike if relevancy is not established.
17              MR. ULTIMO:  Thank you.
18          (Received in evidence, Trial Exhibit 285.)
19   BY MR. CARDONA:
20   Q.   Can you turn to Exhibit 286.  Is Exhibit 286 a similar
21   chart for an individual named Leonard Linares?
22   A.   Yes.
23   Q.   Was that prepared based on the information in Exhibit 106?
24   A.   Yes.
25   Q.   And does Exhibit 286 accurately reflect the information in
```

```
1    Exhibit 106 relating to Leonard Linares?

2    A.   Yes.

3              MR. CARDONA:  Your Honor, I'd offer Exhibit 286.

4              MR. ULTIMO:  No objection to 286.

5              THE COURT:  Be received.

6         (Received in evidence, Trial Exhibit 286.)

7    BY MR. CARDONA:

8    Q.   Can you turn to Exhibit 287.  Is Exhibit 287 a similar

9    chart prepared based on the information in Exhibit 106 for Roy

10   Villavisencio, Ernestine Rubio, and their children?

11   A.   Yes.

12   Q.   Does Exhibit 287 accurately reflect the bill pay history

13   drawn from Exhibit 106 for those individuals?

14   A.   Yes.

15             MR. CARDONA:  Your Honor, I'd offer Exhibit 287.

16             MR. ULTIMO:  No objection to 287.

17             THE COURT:  Be received.

18        (Received in evidence, Trial Exhibit 287.)

19   BY MR. CARDONA:

20   Q.   Can you turn to Exhibit 288.  Is Exhibit 288 a similar

21   chart prepared to reflect the information from Exhibit 106 for

22   Joe Vaifanua and five of his children?

23   A.   Yes.

24   Q.   Does it accurately reflect the information from Exhibit

25   106 relating to Joe Vaifanua and his children?
```

```
 1   A.   Yes.

 2            MR. CARDONA:  Your Honor, I'd offer Exhibit 288.

 3            MR. ULTIMO:  No objection to 288.

 4            THE COURT:  Be received.

 5       (Received in evidence, Trial Exhibit 288.)

 6            MR. CARDONA:  Could we have the binder with Exhibits

 7   311 to 330?

 8       And if you could, Agent Valle, I'd ask you to turn to

 9   Exhibit 322.

10       And Your Honor, I believe that's previously been admitted

11   into evidence.

12            THE COURT:  Okay.

13            MR. CARDONA:  Your Honor, I see only two pages were

14   admitted, so I'll ask some questions before I ask to display

15   it.

16            THE COURT:  Okay.

17   BY MR. CARDONA:

18   Q.   Agent Valle, looking at Exhibit 322, did you prepare this

19   exhibit?

20   A.   I did.

21   Q.   How did you prepare Exhibit 322?

22   A.   322 was -- I reviewed the bill pay history that was

23   received by the insurance company for instances that patients

24   were billed for.  I then went -- physically went through the

25   physical chiropractic chart and pulled the SOAP notes or the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   chiropractic notes that would have related to that date of

 2   service identified on that bill pay history, and then I went to

 3   the HICFA 1500 forms, the actual claim form that was sent to

 4   the insurance company, and found the date of service.  So they

 5   all match up, bill pay history, date of service, claim form,

 6   and then the corresponding notes in the chart.

 7   Q.   Now, are the HIC forms that you're referring to, the HICFA

 8   forms that you're referring to, contained in Exhibit 107?

 9   A.   10- --

10           THE CLERK:  I'm sorry.

11           THE WITNESS:  That's okay.

12   BY MR. CARDONA:

13   Q.   Let me ask that a different way, since I doubt that you'll

14   find it in the binder.  Were they so voluminous that they were

15   in electronic form?

16   A.   Yes, they were.

17   Q.   And did you go through those and print out the ones that

18   are contained in Exhibit 322?

19   A.   Yes.

20   Q.   The chart that you're referring to, was that a Port

21   Medical chart that you went through?

22   A.   Yes.

23   Q.   And how did you obtain those charts?

24   A.   Some charts were obtained via a search warrant that we

25   executed at both the Long Beach and San Pedro locations.  Some
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    of the charts that we didn't seize at that location because we

2    were working off a specific list of patients, we served the

3    entity with a grand jury subpoena for the physical charts, so

4    some were received by grand jury subpoena.

5            THE COURT:  Okay.  Counsel, we're going to break at

6    this time.

7        Ladies and gentlemen, it is 11:30, so I'm going to break

8    at this time.

9        Remember the admonishment not to discuss the case among

10   yourselves or with anybody else or form or express any opinions

11   until the matter's submitted to you and you retire to the jury

12   room.

13       Have a pleasant lunch.  See you back at -- I didn't say

14   1:30, I said 1:00, didn't I?  It's 11:30 now.  See you back at

15   1:00.  Thank you.

16           THE CLERK:  All rise.

17       *(Lunch recess commenced at 11:30 a.m.)*

18

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, OCTOBER 13, 2016

 2                              1:02 P.M.

 3                              - - - -

 4       (In the presence of the jury:)

 5              THE COURT:  Okay.  The record will reflect that all

 6   the members of the jury are in their respective seats in the

 7   jury box, the witness is on the witness stand.

 8          Like to continue with this witness, or do you want to call

 9   someone out of order?

10              MR. CARDONA:  Your Honor, I'll continue with this

11   witness at this point.

12              THE COURT:  Okay.

13                      DIRECT EXAMINATION (Continued)

14   BY MR. CARDONA:

15   Q.    Special Agent Valle, when we left off, we were talking

16   about Exhibit 322.  Do you still have that in front of you?

17   A.    I do.

18   Q.    And can you just briefly summarize again what's in Exhibit

19   322.

20   A.    It's a SOAP note from the chiropractic chart for Joe

21   Vaifanua for five dates of service.  It's the corresponding

22   HICFA 1500 form that was billed to the insurance for those

23   dates of service.  And it's the actual check that the insurance

24   company paid the provider for those dates of service.

25   Q.    And so with respect to the chart, the SOAP note page, how
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    did you get that?

2    A.    That was retrieved from the actual original chiropractic

3    chart.

4    Q.    And are those the ones you said just before our lunch

5    break were taken either by search warrant or by grand jury

6    subpoena?

7    A.    Yes.

8    Q.    How about the HICF forms?  How did you pull those?

9    A.    We subpoenaed those from the ILWU Health and Welfare Plan.

10   Q.    And are those contained in the extraordinary voluminous

11   Exhibit 107, which is in electronic form?

12   A.    Yes.

13   Q.    And how about the checks?  Where did you get the copies of

14   checks that you pulled?

15   A.    Those particular checks were received from the Chase Bank

16   that the clinic billed -- banked with.

17   Q.    So did you go through the bank records and pull individual

18   checks for particular dates?

19   A.    I did.

20   Q.    Were the dates that you picked for exhibits or the dates

21   that you created Exhibit 322, did that correspond to one of the

22   checks that is charged in the indictment as a particular

23   mailing?

24   A.    Yes.

25              MR. CARDONA:  Your Honor, I would offer Exhibit 322.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                    MR. ULTIMO:  No objection, Your Honor.

 2                    THE COURT:  It will be received.

 3                    MR. CARDONA:  May I display it?

 4                    THE COURT:  In fact, Counsel, it's already been

 5       received earlier.

 6                    MR. CARDONA:  Thank you.

 7                    THE COURT:  Yes, you may display it.

 8       BY MR. CARDONA:

 9       Q.   So going to the first page of Exhibit 322 in particular,

10       blowing up those bottom two, are there entries for November

11       23rd and November 30th of 2010?

12       A.   Yes.

13       Q.   Then going to the next page, is this an HICF form for the

14       date of service November 23rd?

15       A.   Yes.

16       Q.   Going to the next page, is it an HICF form for date of

17       service for November 30th?

18       A.   Yes.

19       Q.   Then going to the final page, is this a check that was

20       pulled from the bank account?

21       A.   Yes.

22       Q.   How did you match the checks from the bank account to the

23       HICF forms?

24       A.   The bill pay history report that was given to us by the

25       insurance company identified the check number that was used by
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    them to pay for those dates of service.
 2    Q.   So you looked through the bank records for that particular
 3    check number?
 4    A.   Yes.
 5    Q.   Now, did you prepare similar compilations of documents
 6    drawn from the charts, the HICF forms, and the checks from the
 7    bank account for check dates corresponding to each of the 20
 8    counts in the indictment?
 9    A.   Yes.
10    Q.   And are those what are marked as Exhibits 311 to 321, the
11    other ones, 311 to 321, and 323 through 330?
12    A.   Yes.
13         MR. CARDONA:  Your Honor, I'd offer each of Exhibits
14    311 to 321 and 323 through 330.
15         THE COURT:  Okay.
16         MR. ULTIMO:  No objection, Your Honor.
17         THE COURT:  They'll be received.
18         (Received in evidence, Trial Exhibits 311 to 321,
19         and 323 through 330.)
20    BY MR. CARDONA:
21    Q.   Now, Agent Valle, could you open one of the binders to
22    Exhibit 273.
23    A.   Okay.
24    Q.   Did you also prepare a chart summarizing checks from
25    various accounts made out to individuals who are identified as
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   patients of Port Medical?

2   A.   Yes.

3   Q.   How did you go about preparing this chart?

4   A.   I went through the various bank accounts, primarily the --

5   the medical management accounts.  That's where much of the

6   disbursements were made out of.  And I reviewed the

7   disbursements going out and identified certain checks that

8   commonly had "sponsorship" on the memo line or just appear to

9   be to someone other than a employee, and then I tried to

10  cross-reference that against the chiropractic charts or the

11  bill pay history to confirm that that payment appeared to be a

12  payment to a Port Medical patient.

13  Q.   And did you prepare a chart summarizing the checks --

14  A.   Yes.

15  Q.   -- that you identified in that way?

16  A.   Yes.

17  Q.   And is that what's contained in the first three pages of

18  Exhibit 273?

19  A.   It is.

20  Q.   Is that an accurate summary of the checks that you

21  identified?

22  A.   Yes.

23       MR. CARDONA:  Your Honor, I'd offer the first three

24  pages of Exhibit 273.

25       THE COURT:  First two pages or three?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                    MR. CARDONA:  Three pages.

 2                    THE COURT:  Three pages.

 3                    MR. ULTIMO:  No objection, Your Honor.

 4                    THE COURT:  Be received.

 5    BY MR. CARDONA:

 6    Q.   I'm going to display the first page for you, Agent Valle.

 7    Going across, can you just tell us what's shown in each of the

 8    columns.

 9    A.   First column is the date of the check, date -- the date

10    the check was written, the account it was drawn off of, the

11    name, the last name of the payee, the first name of the payee,

12    the check number.

13    Q.   And then continuing across.

14    A.   The amount of the check, any comments that may have been

15    on the memo line, and then the signator, whoever signed that

16    check.

17    Q.   And is that just based on what you saw on the check?

18    A.   Yes.

19    Q.   I'd like to draw your attention down here.  You see there

20    are some entries for something called Trackless Train and

21    Clifton Burnley?

22    A.   Yes.

23    Q.   Why did you include entries from Trackless Train?

24    A.   From the endorsement on one of the Trackless Train checks,

25    we discovered that Trackless Train was affiliated with Clifton
```

Burnley.

Q.   And did you identify Clifton Burnley from a chart at Port Medical?

A.   Yes.

Q.   Now, again, the entries that you have in the comments line, are those simply taken from whatever was written on the check?

A.   Yes.

Q.   Now, did you also pull from the bank records each of these checks?

A.   Yes.

Q.   And are those checks what make up the balance of Exhibit 273?

A.   Yes.

        MR. CARDONA:   And Your Honor, at this time I would offer Exhibit 273 in its entirety.

        MR. ULTIMO:   No objection, Your Honor.

        THE COURT:   Be received.

    (Received in evidence, Trial Exhibit 273.)

        MR. CARDONA:   With that, Your Honor, at this time I would have no more questions.  I would reserve the right to call Agent Valle later if, in fact, something becomes relevant that I need to ask about based on later testimony.

        THE COURT:   Okay.

    Counsel, do you want to cross-examine at this time, or do

```
 1    you want to wait until he reappears?  He's going to re-call
 2    him.
 3            MR. CARDONA:  Your Honor, I'm not sure I will re-call.
 4            THE COURT:  Okay.  Then go ahead.
 5            MR. ULTIMO:  Then I will have questions, Your Honor.
 6            THE COURT:  Okay.
 7            MR. ULTIMO:  Thank you.
 8                          CROSS-EXAMINATION
 9    BY MR. ULTIMO:
10    Q.   Good afternoon, Agent Valle.
11         Couple of questions with respect to the bill pay histories
12    that you prepared.  I believe there was a series of them for
13    the patients Joe Vaifanua, Roy Villavisencio, Mr. Gomez, Sergio
14    Amador and the Bumgarner family?
15    A.   Yes.
16    Q.   You familiar with the bill pay history --
17    A.   Yes.
18    Q.   -- of their chart, summary chart?
19         The question I have is, on the chart that you've prepared,
20    does it include payments made by the health insurance fund,
21    health insurance company, to -- with respect to both
22    chiropractic services and the massage services?
23    A.   It includes -- that's indication of services they were
24    billed under Kevin Malone's tax I.D. number.
25    Q.   Correct.  And Kevin Malone billed those services on a
```

```
 1   single HIC, or "hic," form, correct?
 2   A.   Yes.
 3   Q.   And on the HIC form, those services commonly encompass
 4   both chiropractic care and his plan for any therapeutic
 5   massages, if you will?
 6   A.   That's correct.
 7   Q.   Okay.  So your bill pay summary included both patient
 8   visits for -- to see the chiro, and patient visits to see the
 9   massage therapist?
10   A.   Correct.
11   Q.   Okay.  And as they were actually billed and paid?
12   A.   Correct.
13           MR. ULTIMO:  All right.  Thank you.
14           THE COURT:  Okay.  Anything further?
15                     REDIRECT EXAMINATION
16   BY MR. CARDONA:
17   Q.   Did you exclude from the bill pay history any bills for
18   Magdalena Sroka?
19   A.   Yes.
20   Q.   And who was Magdalena Sroka?
21   A.   She was the physician assistant at Port Medical.
22   Q.   And did you also exclude any bills that were sent for the
23   other medical doctors who actually worked there?
24   A.   Yes.
25   Q.   So it was just the chiropractic and massages?
```

```
 1   A.    Right.  We didn't include acupuncture, physical therapy,
 2   none of that.
 3              MR. CARDONA:  Thank you.
 4              THE COURT:  Okay.
 5              MR. ULTIMO:  No further questions.
 6              THE COURT:  Okay.  You may step down.  Thank you.
 7         Next witness, Counsel.
 8              MR. CARDONA:  Your Honor, the government calls Leonard
 9   Linares.
10              THE CLERK:  Good afternoon.  Right here to be sworn,
11   please.  That's fine.  Can you please raise your right hand.
12         Do you solemnly swear the testimony that you are about to
13   give in the matter now before the Court shall be the truth, the
14   whole truth, and nothing but the truth, so help you God?
15              THE WITNESS:  Yes.
16              THE CLERK:  Thank you.  You may be seated.
17         May I please ask that you state your full name for the
18   record and spell your last name.
19              THE WITNESS:  Leonard Richard Linares, L-i-n-a-r-e-s.
20              THE CLERK:  Thank you.
21              THE COURT:  You may inquire.
22              MR. CARDONA:  Thank you, Your Honor.
23   ///
24   ///
25   ///
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**LEONARD LINARES, GOVERNMENT'S WITNESS,**

**DIRECT EXAMINATION**

BY MR. CARDONA:

Q.   Mr. Linares, how are you employed?

A.   I'm a foreman for the Pacific Maritime Association.

Q.   Are you a member of a union?

A.   Yes.  Local 94.

Q.   Of which union?

A.   The foremen's local.

Q.   Is that a part of the ILWU, the International Longshore
and Warehouse Union?

A.   Yes, it is.

Q.   How long have you been a longshoreman?

A.   Close to 30 years.

Q.   And how long have you been a foreman?

A.   About 17 years.

Q.   Now, as a member of Local 94, do you know Chris Rice?

A.   Yes.

Q.   How do you know him?

A.   I met Chris probably 20 -- 20 years ago on the job through
mutual friends.

Q.   Is Chris Rice also a foreman?

A.   Yes.

Q.   Is he also a member of Local 94?

A.   Yes, he is.

Q.   Do you receive your health insurance through the union, the ILWU?

A.   Yes.

Q.   What type of insurance do you have?

A.   They offer two types.  I believe one is Kaiser.  The other is PPO.  And I use PPO.

Q.   Do you have to contribute anything for that insurance?

A.   No.

Q.   Who pays for it?

A.   The employer, Pacific Maritime Association.

Q.   Now, back in approximately 2009, did you hear of a clinic called Port Medical in Long Beach?

A.   Yes, I did.

Q.   How did you hear about Port Medical?

A.   A woman named Michelle Aragon approached me at a sports banquet, and she offered to sponsor my team and asked if we could come in and check out their facility and maybe use -- use the facility.

Q.   Had you known Michelle Aragon before that?

A.   No.

Q.   Did you know what her position was at Port Medical?

A.   No.  She said she was a manager of some sort there.

Q.   What was the name of your softball team?

A.   The Fat Kids.

Q.   Did you agree to the sponsorship?

1    A.   I had to talk to -- talk it over with a couple members of

2    the team, because for years we just kind of paid for everything

3    ourselves, and they agreed.  We met with Michelle, and we

4    started using the facility.

5    Q.   Were there any particular number of visits that you were

6    supposed to go to Port Medical for?

7    A.   No.  No, nothing specific.  I was using another

8    chiropractor at the time that -- for aches and bruises and

9    things like that, and this one was in Long Beach, close to my

10   house, so it was convenient for me to go there.  So when I

11   started there, I had no problem with the doctors or anything

12   like that.

13   Q.   Were there other members of your team that also started

14   using Port Medical?

15   A.   Yeah, we had about four or five members that did.

16   Q.   And when you say four or five members, what do you mean by

17   "members"?

18   A.   Everybody on my team wasn't -- wasn't carded.  They didn't

19   have full benefits.  We had some casuals working.  Casuals are

20   part-time workers.  They're not full-time.  And we only had

21   about six guys that were full-time that could actually use the

22   building, so only a few of us did use them.

23   Q.   Is that when Michelle Aragon wanted -- that it be the

24   fully carded members who had the benefits?

25   A.   Well, the way only to use the facility would be for you to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1    have benefits.  So we couldn't use everyone.

 2    Q.   How many members from your team started going to Port

 3    Medical?

 4    A.   I would say around six.

 5    Q.   Was one of those Jesse Martinez?

 6    A.   Yes.

 7    Q.   Was he a full-time longshoreman?

 8    A.   He's a full-time security Local 26 guard.

 9    Q.   Is that part of the ILWU as well?

10    A.   Yes.

11    Q.   So if I could, I'd like to show you Exhibit 273, page 41.

12    Blow this up for you.  Can you see that now?

13    A.   Yes.

14    Q.   You see that this is made out to Jesse Martinez?

15    A.   Yes.

16    Q.   And down below, there's a reference in the comment line to

17    Fat Kids.  Do you see that?

18    A.   Yes, I do.

19    Q.   Did you see this check when Jesse Martinez picked it up?

20    A.   I remember him picking it up, but I don't think I ever

21    seen the check, no.

22    Q.   Did you talk with Jesse Martinez about it?

23    A.   No.  No.

24    Q.   You know what this was used for?

25    A.   Yeah.  It was probably used for tournament fees, uniforms,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    food at the tournament, anything that the team needed.

 2    Q.   Now, the signature on this, on the bottom right, did you

 3    know a woman named Pandora Hall?

 4    A.   Yes, I did.

 5    Q.   How did you come to meet Pandora Hall?

 6    A.   I met her through Port Medical.

 7    Q.   How did you meet her?

 8    A.   She was a massage therapist, and she was assigned to me

 9    when my regular massage therapist wasn't there.

10    Q.   And was that at Port Medical Long Beach?

11    A.   Yes.

12    Q.   Were there other sponsorship payments that either you or

13    Jesse Martinez received?

14    A.   Usually they were done through -- they actually sponsored

15    us a few years, and they were done through the vendors.  So if

16    we had contacted a vendor for uniforms and the bill was $1300,

17    we'd contact the manager there, and then they would pay it

18    through the Port Medical.  So it was paid through vendors,

19    not -- not -- this was, I think, one time that it was paid

20    directly to us.

21    Q.   Let me show you another check, page 54.  Does this check

22    also appear to be made out to Jesse Martinez?

23    A.   Yes.

24    Q.   And does it also reference "softball sponsorship"?

25    A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   And at this time in August of 2010, was Jesse Martinez

still on your softball team, the Fat Kids?

A.   Yes, he was.

Q.   And this one too appears to be signed by Pandora Hall; is

that correct?

A.   Yes.

Q.   Let me show you page 102.  Does this check also appear to

be made out to Jesse Martinez?

A.   Yes.

Q.   And it says "sponsorship"?

A.   Yes.

Q.   And at this time in July of 2000 -- sorry, June of 2011,

was Jesse Martinez still on your team, the Fat Kids?

A.   I believe so, yes.

Q.   Now, this has a different signature on it.  Did you know a

woman named Eva Razo?

A.   I didn't know her personally.  I know she was a -- a

office manager there.

Q.   Where?

A.   Port Medical.

Q.   In Long Beach or San Pedro?

A.   Long Beach.

Q.   Finally, let me show you page 69.  This check made out to

you?

A.   Yes.

Q.   Says on the memo line, "Sponsorship, Fat Kids."  At this
time, July of 2011, was that still your softball team?

A.   Yes.

Q.   And how did you get this check, if you remember?

A.   I think I went into the office and picked it up.  That was
for the 360s, for the tournament fee.

Q.   How did you make the arrangement to go pick it up, if you
recall?

A.   Maybe through Sergio, maybe said to pick up -- go to the
office and pick it up.

Q.   And by Sergio, who are you referring to?

A.   Sergio was one of the, I believe, owners.

Q.   Do you know who the other owners were?

A.   I just hear who the other owners were.  I didn't know
actually on paper who they were, so --

Q.   And how did you know that Sergio was an owner?

A.   Because Sergio was a contact that I -- that we would
contact through, you know, the various things for the team.

Q.   How about Eva Razo?  Did you contact her to arrange for
things for your team?

A.   Not -- not much, no.

Q.   How about Pandora Hall?

A.   Pandora, no, not too much.

Q.   Now, at some point did you begin dating Pandora Hall?

A.   Yeah, I did.

1    Q.   Did she continue to give you massages?

2    A.   Once she -- she got promoted to office manager, the

3    massages were very few, very few.  She had a lot of

4    responsibility.

5    Q.   Do you recall when that was?

6    A.   No, I don't.

7    Q.   Was that at Long Beach or San Pedro?

8    A.   Long Beach.

9    Q.   Did you ever get massaged by Eva Razo?

10   A.   No.

11        MR. CARDONA:  Your Honor, I'd offer Exhibit 151,

12   Mr. Linares' chiropractic chart from Port Medical.

13        MR. ULTIMO:  No objection, Your Honor.

14        THE COURT:  151, it'll be received.

15        *(Received in evidence, Trial Exhibit 151.)*

16   BY MR. CARDONA:

17   Q.   So I've pulled up the first page of Exhibit 151, and do

18   you see down at the bottom, is that your name and birth date?

19   A.   Yes, it is.

20   Q.   Like to go down to the next page, page 2.  Now, is that

21   also your name and birth date at the top of this?

22   A.   Yes, it is.

23   Q.   Now, there's a reference here to the Coastwise PPO.  Was

24   that your PPO insurance?

25   A.   Yes, it was.

1    Q.   And then there's a reference below that to 10/40.  Was

2    there a limit on the number of chiropractic visits?

3    A.   I believe there's a -- a limit on massages for 40, yes.

4    Q.   Now, did you see this in your chart?

5    A.   I may have.  I don't recall.

6    Q.   Did you write this?

7    A.   No.

8    Q.   Let me go over to page 8.  At the top, this is a form

9    titled "Chiropractic Benefit Claim Form."  Do you see that?

10   A.   Yes.

11   Q.   And down at the bottom, there's some signatures.  Are

12   those your signatures?

13   A.   Yes.

14   Q.   And there's a date, July 28th, 2009.  Do you recall, was

15   that the first date you went to Port Medical?

16   A.   I -- I believe it was.

17   Q.   The first time you went, did you --

18            THE COURT:  July 28 or 20?

19            MR. CARDONA:  July 28th, 2009.

20            THE COURT:  Okay.

21   BY MR. CARDONA:

22   Q.   The first time you went, did you fill out some paperwork?

23   A.   I did.

24   Q.   I'd like to go to page 11.  Is that a copy of your

25   ILWU-PMA insurance card?

              UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Yes, it is.
2    Q.   And was that the insurance that was in place during the
3    time you went to Port Medical?
4    A.   Yes.
5    Q.   Now, when you went to Port Medical, did you see the
6    chiropractor?
7    A.   Yes, I did.
8    Q.   You remember who that was?
9    A.   No, I don't remember his name.
10   Q.   Does the name Kevin Malone sound familiar?
11   A.   Oh, Kevin.  Yes, Kevin.
12   Q.   Was that the chiropractor you saw?
13   A.   Yes.
14   Q.   And what were you going to the chiropractor for?
15   A.   Shoulder pain, back, lower back.  You name it.  I had
16   sore -- soreness.
17   Q.   Is that the result of work, combination of work and
18   softball?
19   A.   Work, softball, yeah.
20   Q.   And what did Kevin Malone do for you?
21   A.   He adjusted me, maybe did a little manual therapy through
22   some massage.
23   Q.   And did you also get massages at Port Medical?
24   A.   Yes, I did.
25   Q.   Do you remember who your regular massage therapist was?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Her name was Jackie.  I don't recall her last name.

2    Q.   And I think you said at times Pandora Hall also gave you

3    massages?

4    A.   Well, I was -- I was going to Jackie for -- for some time,

5    and I believe she transferred over to the other office in

6    San Pedro, and Pandora took over from there.

7    Q.   So I'd like to show you some other pages from your

8    chiropractic chart.  I'm going to turn to page 29, and I'll

9    blow up certain portions of this chart so we can actually see

10   them.  But do you see at the top it's got your name, Leonard

11   Linares?

12   A.   Yes.

13   Q.   And then on the right, there appear to be a series of

14   signature stickers.  Do you see that?

15   A.   Yes.

16   Q.   When you went into Port Medical, were you required to sign

17   in?

18   A.   Yes, we were.

19   Q.   How did that happen?

20   A.   When we check in with the front, girl in the front, we

21   would sign the chart before we saw the doctor.

22   Q.   Going to blow up the top half of the signatures.  Are

23   those your signatures?

24   A.   I believe so.

25   Q.   And I'm going to go to the bottom half.  Are those all

1    your signatures?

2    A.    No.

3    Q.    Which ones do you believe are not your signature?

4    A.    16, 1, 3, 19.  That's it.

5    Q.    Did you authorize anybody else to sign the sign-in

6    stickers for you?

7    A.    No.

8    Q.    Let me go to page 27.  Here there's a set of what appear

9    to be five entries with signatures.  Let me do the top three

10   first.  Do those appear to be your signatures?

11   A.    No.

12   Q.    Which ones don't appear to be your signatures?

13   A.    9 -- all three:  16, 14 and 9.

14   Q.    Now, you see the initials "P.H." there to the left?

15   A.    Yes.

16   Q.    Did you get massaged by Pandora Hall?

17         MR. ULTIMO:  Vague as to time.

18         THE COURT:  Sustained.

19   BY MR. CARDONA:

20   Q.    Were there times when you were massaged by Pandora Hall?

21   A.    Yes.

22   Q.    Do you know whether you were massaged on these three

23   specific occasions?

24   A.    I -- it's so far, I couldn't tell you.

25   Q.    How frequently did you go to Port Medical for massages?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    About once every two weeks, on a Friday.

2    Q.    So on the left, I've pulled up the dates.  There are the

3    dates March 29th, 2010; April 3rd, 2010; April 5th, 2010.  Did

4    you go that frequently?

5    A.    No.

6    Q.    Let me pull up the bottom two entries on this page.  Are

7    those your signatures?

8    A.    No.

9    Q.    Now, do you recall previously having identified signatures

10   9 and 16 as not -- as not yours, but the rest on this page

11   being yours?

12   A.    Well, they're -- they kinda look like mine, but -- but I

13   don't think that they are.

14   Q.    What leads you to believe they're not?

15   A.    Just the way they're signed.  My signature's kind of a

16   scratch like that, but it's more consistent.

17   Q.    Let me go down to page 28.  Does this again appear to be a

18   series of five entries for you?

19   A.    Yes.

20   Q.    Let me take the dates on the left first.  April 12th,

21   2010; April 14th, 2010; April 18th, 2010.  Did you go that

22   frequently?

23   A.    No.

24   Q.    Continuing at the bottom, April 20th, 2010; April 22nd,

25   2010.  Did you go that frequently?

```
1    A.   No.

2    Q.   Signatures on the right, I'll take the top three first.

3    Do those appear to be your signature?

4    A.   I believe number 2 is.  8 and 9, 8 and 11, no.

5    Q.   And again, I believe -- previously did you indicate that

6    11 was likely yours?

7    A.   I don't think it is.  The "L" on the first name is --

8    isn't consistent.

9    Q.   Go down to the bottom two.  Are those yours?

10   A.   I believe 12 is, and 18, no.

11   Q.   I'd like to go to page 23 of your chart.  This time do

12   there appear to be four signature stickers for you?

13   A.   Yes.

14   Q.   So let me go first to the dates on the left.  You see

15   that?

16   A.   Yes.

17   Q.   August 31st, 2010.  Hang on a second, let me blow that up

18   some more.  August 31, 2010; July 6th, 2011; July 11th, 2011;

19   July 28th, 2011.  Did you go that frequently?

20   A.   I -- I could have went on one of the days, but I never was

21   going twice in a week or three times in a week.  It was always

22   every other.

23   Q.   And over on the right, in this entry to the left of the

24   signature block, do you see the initials "E.R."?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   And again, were you ever massaged by Eva Razo?

2    A.   No.

3    Q.   Now, if the number of visits reflected in your chart were

4    49, did you go to Port Medical that often?

5    A.   No.

6    Q.   After you went to Port Medical, did you get Explanation of

7    Benefit forms in the mail?

8    A.   Yeah, I did.

9    Q.   Did you look at those?

10   A.   No, I didn't.

11   Q.   Why not?

12   A.   The patient's never responsible with our -- with our

13   benefits, so there's really no reason to open them up.

14          MR. CARDONA:  Nothing further, Your Honor.

15          THE COURT:  Cross?

16          MR. ULTIMO:  Yes.  Thank you, Your Honor.

17                      **CROSS-EXAMINATION**

18   BY MR. ULTIMO:

19   Q.   Good afternoon, Mr. Linares.  Couple questions for you

20   today.

21          You said you were referred to Port Medical by a Michelle

22   Aragon, right?

23   A.   Yes, sir.

24   Q.   You do not know David Gomez, do you?

25   A.   No, I don't.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

424

1   Q.   So David Gomez never personally offered you money or gifts

2   to go to Port Medical clinic, true?

3   A.   Never.

4   Q.   And David Gomez never paid you any checks to come to Port

5   Medical clinic?

6   A.   No.

7   Q.   That's true, correct?

8   A.   Correct.

9   Q.   Did you ever pick up any checks or cash from Mr. Gomez?

10  A.   No.

11  Q.   Did you ever see David Gomez at Port Medical during your

12  care and treatment?

13  A.   No.

14  Q.   You went to Port Medical for approximately a two-year time

15  span, correct?

16  A.   Yeah.  Two years, maybe more, yeah.

17  Q.   Yeah.  Like 2009 through 2011?

18  A.   Yes.

19  Q.   And you dated Pandora Hall for approximately one year,

20  correct?

21  A.   Right about a year, yes.

22  Q.   Did you ever tell Pandora Hall that she could bill your

23  health insurance for massages that she gave you while you were

24  dating?

25  A.   Never.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Did you know that Pandora Hall was falsifying patient SOAP

2   notes when you dated her?

3   A.   No.

4   Q.   Without getting too detailed into your personal life

5   during that period that you dated Pandora, I want to ask you,

6   did Pandora massage you places outside of Port Medical ever?

7   A.   No.

8   Q.   And you never gave her permission to bill your insurance

9   for massages she was giving you while you dated her?

10  A.   Never.

11  Q.   Did you ever suspect that Pandora had billed your health

12  insurance for massages she gave you while you were dating her?

13  A.   No.

14          MR. CARDONA:  Objection, Your Honor, calls for

15  speculation.

16          THE COURT:  Overruled.  He's indicated no.

17          THE WITNESS:  No.

18          MR. ULTIMO:  Thank you, Mr. Linares.

19          THE COURT:  Redirect?

20          MR. CARDONA:  No, Your Honor, no questions.

21          THE COURT:  You may step down, sir.  Thank you very

22  much for coming in.  You're excused at this time.

23      Next witness.

24          MR. CARDONA:  Your Honor, we call Kevin Malone.

25          THE CLERK:  Good afternoon.  Right here to be sworn.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Can you please raise your right hand.
2        Do you solemnly swear the testimony that you are about to
3   give in the matter now before the Court shall be the truth, the
4   whole truth, and nothing but the truth, so help you God?
5             THE WITNESS:  Yes.
6             THE CLERK:  Thank you.  You may be seated.
7        May I please ask that you state your full name for the
8   record and spell your last name.
9             THE WITNESS:  Kevin John Malone.
10            THE COURT:  Okay.  Thank you.
11       You may inquire.
12                 KEVIN MALONE, GOVERNMENT'S WITNESS,
13                      DIRECT EXAMINATION
14  BY MR. CARDONA:
15  Q.   Mr. Malone, what do you do for a living?
16  A.   I'm a chiropractor.
17  Q.   Now, are you here testifying today pursuant to an immunity
18  agreement with the United States Attorney's Office?
19  A.   Yes.
20  Q.   And does that immunity letter provide that our office
21  cannot use anything you say to prosecute you?
22  A.   I believe so.
23  Q.   Do you understand that you can still be prosecuted for
24  perjury or making false statements?
25  A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    How long have you been a chiropractor?

2    A.    About 23 years.

3    Q.    At one point were you a chiropractor for a clinic in Long

4    Beach called Port Medical?

5    A.    Yes.

6    Q.    How did you get the job as the chiropractor there?

7          MR. ULTIMO:  Assumes facts, Your Honor.

8          THE COURT:  Sorry?

9       Well, how were you hired?  I mean --

10         THE WITNESS:  I believe it was through Michelle

11   Aragon.

12   BY MR. CARDONA:

13   Q.    Did you know Michelle Aragon before you started working at

14   Port Medical?

15   A.    Yes.  I'd worked a day, a day or two at David Rivera's

16   clinic, filling in for him, and she was the manager/front desk/

17   office person.

18   Q.    Did you talk with Michelle Aragon about the job at Port

19   Medical?

20   A.    I believe so, and that's how I got it.

21   Q.    Did she, in effect, interview you?

22   A.    You might say that.  We just talked, and she said, "These

23   guys want to get together and have a clinic, and you'd be

24   perfect for it."

25   Q.    Did you then meet those guys?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.

2    Q.    Who were those guys?

3    A.    David Gomez, Sergio Amador.

4    Q.    And do you see David Gomez here in court next to me?

5    A.    Yes.

6          THE COURT:  Indicating the defendant.

7          MR. CARDONA:  Thank you, Your Honor.

8    Q.    Did you talk with Sergio Amador and David Gomez before you

9    started working at Port Medical?

10   A.    Yes.

11   Q.    Where did you meet them?

12   A.    The location?  Honestly, I don't recall.  It may have been

13   at the location that they were going to open in Long Beach on

14   Atlantic Avenue.  It may have been -- I believe that's where it

15   was.

16   Q.    Did you meet with both of them together?

17   A.    Yes.

18   Q.    What was discussed?

19   A.    That they would open up a chiropractic clinic, they could

20   put -- they would put the money up, and that we could have a

21   chiropractic clinic.  They worked on the docks, and it would be

22   easy to get clients, patients.

23   Q.    Were you responsible or were you going to be responsible

24   for any of the office administration or any of the financial

25   billing?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    No.

2    Q.    What were you responsible for once you were hired?

3    A.    To be the chiropractor, do the documentation and billing.

4    And then Michelle's job was to be the manager, the biller, the

5    scheduler, all the administrative things.

6    Q.    Did you oversee the massage therapists who worked at Port

7    Medical?

8    A.    Not particularly.  I mean, I did -- at that point, I just

9    said make sure that you address the symptoms.

10   Q.    Did you monitor what the massage therapists wrote in the

11   charts?

12   A.    No.  I'd seen some of the notes, but -- I had seen some of

13   the notes, yes, and I did go over, at a certain point, not at

14   that point, but at a certain point in the -- in the -- the

15   period of time that we had the clinic, and I said if you do an

16   area, write down the area, and be very specific with what you

17   write down and what you've done.

18   Q.    So that was instructions that you gave to the various

19   massage therapists?

20   A.    Yes.

21   Q.    What were you paid as a chiropractor at Port Medical?

22   A.    I was paid daily rate.  Originally, $400.

23   Q.    Who did you negotiate that with?

24   A.    Dave and Sergio.

25   Q.    And do you mean Dave Gomez and Sergio Amador?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    Yes.

 2   Q.    Now, in addition to massage therapists and Michelle

 3   Aragon, did Port Medical also have some staff that worked at

 4   the front desk?

 5   A.    Yes.

 6   Q.    Did you oversee their activities?

 7   A.    No.

 8   Q.    Was that Michelle Aragon's responsibility?

 9   A.    Yes.

10         MR. CARDONA:  Your Honor, I'd offer Exhibit 1 at this

11   time.  It's the Articles of Incorporation for Port Medical.

12         MR. ULTIMO:  No objection.

13         THE COURT:  Be received.

14         MR. CARDONA:  My apologies, Your Honor.  I meant

15   Exhibit 2.

16         THE COURT:  Okay.

17         MR. ULTIMO:  No objection.

18         THE COURT:  Be received as Exhibit 2.

19         (Received in evidence, Trial Exhibit 2.)

20   BY MR. CARDONA:

21   Q.    Can you see Exhibit 2 on your screen?

22   A.    Yes.

23   Q.    You see here it's the Articles of Incorporation for Port

24   Medical Associates, Inc.?

25   A.    Right.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Filed April 17th, 2009?

2    A.   Right.

3    Q.   And it lists you as the initial agent for service of

4    process for Port Medical.  Do you remember being set up as the

5    initial agent for service of process of Port Medical?

6    A.   I remember this.  Not precisely this document, but, yes, I

7    do remember this.

8    Q.   How did it come about that you were put in that position?

9    A.   This one, I believe, was on the advice of Roland.

10   Q.   And is that the person listed as the incorporator?

11   A.   Right.

12   Q.   Was there a reason you were the agent for service of

13   process as opposed to Sergio Amador or Dave Gomez?

14   A.   I believe, in fact, that I owned the clinic in the first

15   couple of months.

16   Q.   Why was that, that you owned it?

17   A.   According to my understanding of the law, a chiropractor

18   needs to own a chiropractic clinic.  Somebody else, who is not

19   a medical doctor or chiropractor, cannot.

20   Q.   Did you put up any money for the business?

21   A.   No.

22   Q.   Who did put up the money for the business?

23   A.   I believe it was --

24            MR. ULTIMO:  Strike, speculation.

25            THE COURT:  Sustained.

1    BY MR. CARDONA:

2    Q.    Do you know?

3    A.    Uh --

4    Q.    Let me ask you, did you ever talk with Sergio Amador and

5    Dave Gomez about who was putting up the money?

6    A.    I -- I don't know if I know.  I did speak with him about

7    it, and, you know, my under- --

8            THE COURT:  When you say "him," which one?  He

9    mentioned two --

10           THE WITNESS:  Yeah.  Gomez, Amador.  I don't know that

11   I spoke with all of them, you know, together at a specific

12   time, but I got the impression that it was them.

13           THE COURT:  Okay.

14   BY MR. CARDONA:

15   Q.    Was that based on conversations over time with all of

16   them?

17           MR. ULTIMO:  Move to strike.  Speculation, conjecture.

18           THE COURT:  Sustained.

19   BY MR. CARDONA:

20   Q.    Did you have a taxpayer identification number?

21   A.    I believe so, and it was hooked to this.

22   Q.    And was that used for billing?

23   A.    I imagine so.

24   Q.    Why do you say you imagine so?

25   A.    My Social Security number could have also been used.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Do you know which number was used?

2    A.   No.

3    Q.   Were you involved with the billing?

4    A.   Not directly.  Meaning, I didn't actually do it.  I would

5    write down what I had done and check off, and then it was up to

6    Michelle to make sure that that was followed.

7    Q.   Was there a period of time when checks from the insurance

8    company were deposited into an account in your name?

9    A.   Yes.

10   Q.   What was the name of that account?

11   A.   I don't recall at this time.  I believe it was in my name,

12   Port Medical.

13   Q.   Was it under the name Malone Chiropractic?

14   A.   Yes, it could have been.

15   Q.   Did Michelle Aragon have signature authority over that

16   account?

17   A.   Yes, she did.

18   Q.   Was money transferred from that account to other accounts?

19   A.   I'm not sure.  I didn't monitor it.

20   Q.   Did you allow Michelle Aragon to do that?

21   A.   Yes.  She was the manager.

22   Q.   How often did you see patients at Port Medical at the

23   beginning?

24   A.   Every day that I was there.

25   Q.   How often were you there?
```

```
 1   A.   In the beginning, a couple of days.
 2   Q.   Did that change?
 3   A.   Yes.  I -- yes.  It changed to, I believe, five days.
 4             THE COURT:  Talking about per week?
 5             THE WITNESS:  Yes.
 6             THE COURT:  Okay.  Next question.
 7   BY MR. CARDONA:
 8   Q.   After some period of time, did the ownership of the
 9   clinic, at least the person who was on the Articles of
10   Incorporation, change?
11   A.   I believe that it -- yes.  The answer to that question is
12   yes.
13   Q.   Did it change to someone known as Dr. Correa?
14   A.   Yes.
15   Q.   Did Sergio Amador and David Gomez talk to you about that
16   change?
17   A.   Yes.
18   Q.   What did they tell you?
19   A.   They wanted a medical chiropractic clinic.
20   Q.   Did they want to add medical services as well?
21   A.   I believe that was the intention.
22   Q.   Did that happen?
23   A.   Yes.  Dr. Correa, you know, I -- I signed some document,
24   which I don't have, which gave him the ownership of the clinic.
25   Q.   Now, as a chiropractor, were you a member of the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Chiropractic Health Plan of California, CHPC?

2   A.   Yes.

3   Q.   Was that important for purposes of billing the

4   longshoremen's insurance?

5   A.   Yes.

6   Q.   Why?

7   A.   We accepted their rates, and we were members of their

8   group, so we could bill that group, accepting the exchange I

9   get for those services provided.

10  Q.   Now, at a later point in time, did Port Medical open an

11  office in San Pedro as well?

12  A.   Yes.

13  Q.   Did you do work in San Pedro as well?

14  A.   Yes.

15  Q.   Did you talk with David Gomez about the opening of the

16  San Pedro office?

17  A.   I'm sure I did.

18  Q.   Do you have any recollection of any specific conversation?

19  A.   No.  Actually, yes.  When they were looking for a location

20  and they decided on -- or they got this one, however they got

21  it, and I remember that conversation.

22  Q.   What was that conversation?

23  A.   Oh, they talked about different locations.  There was one

24  on Gaffey and -- and then I guess this one, and so -- and I

25  realized before we moved there that they had this one.  I

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    wasn't familiar with the location exactly.
 2    Q.    Do you recall when you moved to work at Port Medical
 3    San Pedro?
 4    A.    No.  No.
 5    Q.    Did you move exclusively to San Pedro, or did you work in
 6    both places?
 7    A.    I believe I worked in both places.  Two days at one, three
 8    days at another.
 9    Q.    Was there a time after you started at Port Medical in Long
10    Beach when the clinic was shut down for one or two days?
11    A.    Yes.
12    Q.    Why was that?
13    A.    Because we had -- or the business had gotten -- in the
14    early stages, Michelle Aragon's management led us to get behind
15    on all of the billing, all of the paperwork, and patient
16    scheduling was -- it was very, very confusing.  And at that
17    time, literally her desk was -- was stacked with folders that
18    were incomplete at some stage of billing or noting.  They were
19    stacked over her head, all around the reception area.  And so
20    catch up --
21    Q.    So what was the purpose of closing down?  To catch up?
22    A.    Catch up.
23    Q.    Were you called in to help out with that?
24    A.    Yes.
25    Q.    What were you asked to do?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Catch up on the paperwork.

 2   Q.   Did you come in to do that?

 3   A.   Yes.

 4   Q.   Where did you start doing that?

 5   A.   At Port Medical in Long Beach.

 6   Q.   Any particular room?

 7   A.   I can recall the room, but I don't remember exactly.

 8   There was a desk there.

 9   Q.   As you went through the charts, did you notice anything

10   about certain of the charts you had been asked to fill out?

11   A.   Yes.  I wasn't sure that I had seen all these patients.

12   With all the confusion, I -- I -- I know that some of the

13   people I saw, and I just needed to complete the notes, but some

14   of the people I wasn't sure at all, or I was sure I had not

15   seen them.

16   Q.   Did you talk with David Gomez about that?

17   A.   Yes.

18   Q.   Where did that conversation occur?

19   A.   It could have been the same room or another room with a

20   desk in it.  I believe it was another room.

21   Q.   Was anybody else present during that conversation?

22   A.   I don't believe so.  There is a possibility there was.

23   Q.   What's the possibility?

24   A.   The other person that would have been in the room, her

25   name was Yoli, but to my recollection, I believe it was just he
```

1    and I.

2    Q.   What was the conversation?

3    A.   I don't know exactly how he framed it, but he said "We

4    haven't seen all of these patients; they're our friends."

5    Q.   Was that after you told him that you thought you hadn't

6    seen the patients?

7    A.   Yes.

8    Q.   Did you understand what he meant by "friends"?

9    A.   Right.  Yes, I did.

10   Q.   What did you understand on that?

11   A.   I understood that some of his friends may have allowed

12   Port Medical to use their information to bill a visit that they

13   hadn't actually come in or done or service provided that wasn't

14   actually performed.

15   Q.   What happened after he said that, after Mr. Gomez said

16   that?

17   A.   I filled in a few, few chart notes.

18   Q.   For people you hadn't actually seen?

19   A.   Yes.

20   Q.   What did you do with those chart notes after you completed

21   them?

22   A.   Gave them back to Gomez.

23   Q.   David Gomez?

24   A.   Yes.

25   Q.   Do you know who else was in the office at Port Medical

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    during this time period?
 2    A.   You mean in the whole office?
 3    Q.   Yeah.  Were there a number of other people?
 4    A.   There were a number of other people, including Aragon.  I
 5    think Sergio was there.  I know there were other people, I just
 6    can't recall.
 7    Q.   Now, after this, did you continue to work at Port Medical?
 8    A.   Yes.
 9    Q.   At one point were you fired?
10    A.   From Port Medical Long Beach.
11    Q.   Who fired you?
12    A.   Eva.  I don't know her last name.
13    Q.   Does the name Eva Razo sound familiar?
14    A.   Yes.
15    Q.   Why did she fire you?  If you know.
16    A.   I don't know, but I'm not the only one she fired.
17    Q.   When she fired you from Port Medical Long Beach, what did
18    you do?
19    A.   I -- maybe I don't follow you.  I left --
20    Q.   Let me ask the question.  Did you continue to work at Port
21    Medical San Pedro?
22    A.   Yes.
23    Q.   Who was managing Port Medical San Pedro at the time?
24    A.   I believe it was Pandora Hall.
25    Q.   At some point did Pandora leave?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    Did you continue to work at Port Medical San Pedro?

 3    A.    Yes.

 4    Q.    At some point did you also begin working at Port Medical

 5    Long Beach again?

 6    A.    Yes.

 7    Q.    How did that come about?

 8    A.    Eva had left, and, you know, the -- she had effectively

 9    ground that to a halt by mismanagement, personality, not

10    getting along with patients, not getting along with workers.

11    So she had ground that to a halt.   And they wanted to keep it

12    going.   And, you know, I have a lot of experience.   I just --

13    when I was there before, it was successful, so they thought I

14    might help them make it successful again.

15    Q.    Who contacted you to get you to come back?

16    A.    I believe it was David.   David Gomez.

17    Q.    David Gomez?

18    A.    Yes.

19    Q.    Did you go back to Port Medical Long Beach?

20    A.    Yes.   For a couple of afternoons a week.

21    Q.    Now, did you continue to work at both Port Medical Long

22    Beach and Port Medical San Pedro until those facilities were

23    searched by federal agents?

24    A.    Yes.

25    Q.    Were you there when the search occurred?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Not in the building.

2    Q.   Where were you?

3    A.   I was outside.  I walked down the street to get an ice

4    cream, and I was on the street behind it and to the side, and

5    that's where I was.

6    Q.   Did you see the agents come in to do the search?

7    A.   Yes.

8    Q.   Shortly after the search, were you interviewed?

9    A.   Yes.

10   Q.   Did you decline to answer some questions?

11   A.   At some point, yes.

12   Q.   Did you withhold some information during those interviews?

13   A.   I don't believe so.  I don't remember the interview.

14   Q.   Now, shortly after the search, did you call David Gomez

15   and set up a time to meet with him?

16   A.   Yes.

17   Q.   Did you meet with him?

18   A.   Yes.

19   Q.   Where?

20   A.   At Starbucks.

21   Q.   Where was the Starbucks?

22   A.   San Pedro.  25th and Western.

23   Q.   Where did you live at the time?

24   A.   San Pedro, on 8th Street.

25   Q.   When you met with Mr. Gomez, what did you tell him?
```

1    A.    I said, "Look, I don't know what you did, and I don't want

2    to know.   The only thing I did was that night.   You assured me

3    you weren't going to do anything, and now at this point I don't

4    know what you've done, but don't involve me in this, because

5    the only people in that room were you and I.   We're the only

6    people that know that."

7    Q.    And what did he say in response?

8    A.    He said okay.

9    Q.    Now, sometime after that meeting, did Mr. Gomez give your

10   girlfriend something?

11   A.    No.   It was -- sometime -- this meeting occurred at the

12   closure of the Port Medical in San Pedro, which was 2013.   The

13   original incident of me signing off was at the beginning of --

14   the initiation of this business venture, and at that point,

15   that's 2009, when we were done with all of the work and

16   everything -- not just myself; there was a lot of work to

17   opening that -- yes, David Gomez gave my girlfriend a pair of

18   diamond earrings.   He made it very clear that it wasn't for

19   doing anything that was illegal; it was just for doing a good

20   job and helping out and making it work.

21   Q.    Was that after the time that you had falsified the chart

22   entry?

23   A.    Yes.

24   Q.    Did you know, did Mr. Gomez own a pawnshop?

25   A.    I believe at some point he told me he did, he was a part

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   owner of one.

 2             MR. CARDONA:  Nothing further, Your Honor.

 3             THE COURT:  Okay.  Cross-examination.

 4             MR. ULTIMO:  Yes, thank you.

 5                        CROSS-EXAMINATION

 6   BY MR. ULTIMO:

 7   Q.   Dr. Malone, good afternoon.

 8   A.   Good afternoon.

 9   Q.   Dr. Malone, how long have you been a licensed chiropractor

10   in the state of California?

11   A.   About 23 years.

12   Q.   22?  23?

13   A.   About -- yes.  I don't exactly -- I think I graduated '93

14   and got my license in '94.

15   Q.   So you've been a chiropractor a long time.  That's fair to

16   say, right?

17   A.   22 years.

18   Q.   All right.  Now, you said that Michelle Aragon hired you,

19   right?  Then -- she hired you; is that right?

20   A.   I don't know that she hired me.  She introduced me.

21   Q.   Right.  And Michelle Aragon was a signer on your business

22   account, right?  Malone Chiropractic, correct?

23   A.   Right.

24   Q.   And Malone Chiropractic -- and in fact, you had her as the

25   signer on that account signing quite a few checks, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   You're telling me that she signed quite a few.  She was

2   the signer.

3   Q.   Were you aware that she was signing significant checks,

4   large amounts of money, to Port Medical?  I'm sorry, to the

5   management companies, the medical management companies?

6   A.   I didn't keep track of the accounts.  That was her job.  I

7   trusted her to do what needed to be done to run the business.

8   Q.   So you trusted her.  You placed great trust in her, right,

9   to sign your business checks?

10  A.   Right.

11  Q.   In large sums of money?

12  A.   You're telling me they were large sums of money.

13  Q.   I can show you, go through some of the checks.

14  A.   That's okay, I believe you.

15  Q.   Just trying to save court time.  If you want me to show

16  them to you, I will.

17  A.   No, that's all right.

18  Q.   So were you aware that she would pay the money to a

19  medical management company, DCS Medical Management, and then

20  she would have checks written to her from DCS Medical

21  Management?  Were you aware of that?

22  A.   Not exactly, no.

23  Q.   So the money goes from your personal Malone Chiropractic

24  business account, she writes significant sums of money, she

25  writes checks at DCS Medical Management, and then DCS writes a

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  check to her.  Did you know that?

2  A.   No.

3  Q.   Did you know that Michelle Aragon was also a signer on

4  Port Medical's business account?

5  A.   No.

6  Q.   Did you know that not only was Michelle Aragon a signer on

7  Port Medical's business banking account, but that she was also

8  a signer on Port Medical's business banking account along with

9  Eva Razo?  Did you know that?

10  A.   No.

11  Q.   Did you know that Michelle Aragon would write checks to

12  Port Medical's business account from your Malone Chiropractic

13  account?

14         MR. CARDONA:  Objection, Your Honor, beyond the scope.

15         THE COURT:  Overruled up to now.  Overruled.

16         THE WITNESS:  No, I didn't know how the -- all of the

17  accounts were administered or how all the -- all the accounting

18  was done.

19  BY MR. ULTIMO:

20  Q.   That's not true, is it, Dr. Malone?

21         THE COURT:  That's argumentative, Counsel.

22         MR. ULTIMO:  Okay.  I withdraw that.  I'm sorry,

23  Your Honor.

24  Q.   Dr. Malone, you yourself testified moments ago, when you

25  were asked by counsel, you said it's your understanding of the

1  law that a chiropractor has to be the one that owns a medical

2  practice, right?

3  A.   Right.

4  Q.   So no one else -- a nondoctor cannot own a chiropractic

5  practice, true?

6  A.   Okay.

7  Q.   Yes?  Is that your understanding of the law?

8  A.   Yes.

9  Q.   Okay.  Now, and it was for that reason that Port Medical

10  was your business, true?

11  A.   Okay.

12  Q.   Is it a "yes" or "no"?  Is that a "yes" or a "no"?

13  A.   Yes.

14  Q.   Okay.  In fact, one of the reasons it's important that the

15  doctor be the one who owns the practice is because the doctor

16  is the only one that can bill a health insurance company; isn't

17  that true?

18  A.   You asked two questions.  One of the reasons it's

19  important for a doctor to own a clinic is because the doctor is

20  the one that bills the insurance company.  Those are two

21  separate questions.

22  Q.   I can break it down for you if you need me to.

23  A.   You could -- all right, I'm not going to argue with you.

24  Go ahead.  Go one step at a time.  Where are you going?

25            THE COURT:  Why don't we break it down.  Go ahead,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1    Counsel.

 2              MR. ULTIMO:  Certainly.  Thank you, Your Honor.

 3    Q.   Dr. Malone, did you ever see David Gomez submit a health

 4    insurance claim form to the PMA insurance company?

 5    A.   No.

 6    Q.   Okay.  Are you aware of any health insurance claim forms

 7    submitted to the longshoreman's PMA insurance company in his

 8    name?

 9    A.   He got service, so I imagine it was done.  He didn't

10    actually do it, but if he got service as a longshoreman --

11    Q.   Doctor, let me break it down a little bit more.  Maybe I

12    can make it a little bit easier.  Have you ever seen a health

13    insurance claim form before?

14    A.   Yes.

15    Q.   Then you know, then, that a federal taxpayer

16    identification number is on those forms, correct?

17    A.   Right.

18    Q.   And you know that it's right above your name, correct?

19    A.   Right.

20    Q.   So it would say Malone Chiropractic -- in fact, let's take

21    a look at it.  Exhibit 330, page 2, already been admitted into

22    evidence.  You see that on the projector, that monitor in front

23    of you?  Bottom left-hand corner, says Kevin Malone, DC, right?

24    A.   Yes.

25    Q.   Correct?  And that is your federal taxpayer I.D.,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   identification number, just above the signature box?  It
 2   says --
 3   A.   Right.
 4   Q.   -- the number, correct?
 5   A.   Okay.
 6   Q.   And that's because you are the physician, correct?
 7   A.   Yes.
 8   Q.   And then you say, above here, in this box, "Issue check to
 9   clinic, not provider of service."
10        Why did you do that?  Why didn't you just have the
11   insurance company issue the check to Malone Chiropractic?  Why
12   did you ask them to issue it to Port Medical?  And let me show
13   you where it says Port Medical.
14            MR. CARDONA:  Assumes a fact not in evidence, that he
15   asked that.
16            THE COURT:  Why don't you restate the question, then.
17            MR. ULTIMO:  Certainly.
18   Q.   Dr. Malone, do you see the area that I've just zoomed in
19   on, right above box 32?  Says, "Make check" --
20   A.   Right.
21   Q.   -- "to Port Medical, not provider of service"?
22   A.   Right, I see that.
23   Q.   Were you aware of that?
24   A.   No.
25   Q.   You were not aware of that?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    No.   And I can tell you another thing about -- oh, I won't
 2    tell you.   Go ahead.
 3    Q.    Well, there were a lot of health insurance claim forms
 4    submitted to the PMA insurance company because you saw a lot of
 5    patients at Port Medical, correct?
 6    A.    Correct.
 7    Q.    And you didn't provide your services, your chiropractor
 8    services, to patients for free, did you?
 9    A.    No.   Most of the patients, it was paid by insurance.
10    Q.    That's not my question.   My question is, you weren't
11    providing your --
12    A.    You said --
13    Q.    -- chiropractic services --
14          THE REPORTER:   One at a time, please.
15          MR. ULTIMO:   I'm sorry, Madam Reporter.
16          THE COURT:   State the question again.   State the
17    question again.
18    BY MR. ULTIMO:
19    Q.    You were not providing your chiropractic services for
20    free, were you, Doctor?
21    A.    No.
22    Q.    So the money that you billed the PMA health insurance
23    company was earned by you, correct?
24    A.    Yes.
25    Q.    For treatment, care and treatment that you provided to
```

```
 1   patients, true?

 2   A.   Yes.

 3   Q.   And for professionals that you supervised at Port Medical,

 4   correct?

 5   A.   Give me that question again, and with the "and" on it, all

 6   at once.

 7   Q.   Oh, break it down for you.

 8        You're a chiropractor.  You examine patients, true?

 9   A.   Right.

10   Q.   You make a diagnosis, hopefully, correct?

11   A.   Right.

12   Q.   And then you formulate a plan for treatment, true?

13   A.   Okay.

14   Q.   Is that a "yes"?

15   A.   Yes.

16   Q.   Okay.  You don't just have them leave, right?  You

17   generally -- sometimes you may have them leave, but generally

18   you formulate a plan of care, correct?

19   A.   Right.

20   Q.   Either a management plan or a surgical plan, correct?

21   A.   Right.

22   Q.   Okay.  Or a plan for massage therapy, right?

23   A.   Right.

24   Q.   Is that a "yes"?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And when your plan calls for therapeutic massage therapy,

2   you send them down the hall to the massage therapist at Port

3   Medical, correct?

4   A.   Right.

5   Q.   And some point, you prepare a bill for examining the

6   patient, correct?

7        MR. CARDONA:  Objection, Your Honor, assumes a fact

8   not in evidence that this witness actually prepared the bills.

9        THE COURT:  That what, Counsel?

10       MR. CARDONA:  Your Honor, there's no evidence that

11  this witness actually prepared the bill.

12       THE COURT:  That he prepared the bill?

13       MR. CARDONA:  Yes.

14       THE COURT:  Well, he didn't say that.  He was asking

15  the question.

16       MR. ULTIMO:  Thank you.

17       THE COURT:  Were you the one that prepared the bill or

18  did somebody else?

19       THE WITNESS:  Someone else did.

20  BY MR. ULTIMO:

21  Q.   I'm not talking about this particular piece of paper, but

22  this particular piece of paper, it's got your professional

23  credentials on it, correct?  The health insurance claim form.

24       THE COURT:  I'm sorry, Counsel.  You never gave him a

25  chance to answer my question.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ULTIMO:  Oh, certainly.

 2              THE COURT:  Are you the one that prepared the bills?

 3              THE WITNESS:  No.

 4              THE COURT:  Okay.  Go ahead.

 5   BY MR. ULTIMO:

 6   Q.   How does -- how do the billers get the information --

 7   A.   Off a chart.

 8   Q.   -- to bill for your services?

 9   A.   Off of the chart.

10   Q.   Off your chart?

11   A.   Yes.

12   Q.   Okay.  And now we'll go back to what I was saying.  That

13   same chart, is that same chart then taken and passed along to

14   the massage therapists when they perform their massage therapy

15   on the same patient?

16   A.   Yes.

17   Q.   And you testified moments ago, when you were asked by

18   counsel, you testified that you asked the massage therapist to

19   document the SOAP notes and to focus on the area of symptoms,

20   correct?

21   A.   Area of complaint, yes.

22   Q.   Yeah.  Chief complaint.  Patient chief complaint, correct?

23   A.   Right.

24   Q.   My thoracic spine's bothering me, my cervical spine's

25   bothering me, I have a muscle spasm in the scapula.  That kind
```

```
 1   of thing, right?
 2   A.    Right.
 3   Q.    Okay.  And that was -- you saw that as your responsibility
 4   to make sure that your massage therapists were providing
 5   therapeutic massages, true?
 6   A.    Yes.
 7   Q.    And that's what your role was as the chiropractor, to
 8   ensure that that was done, correct?
 9   A.    Yes.
10   Q.    And then that was billed out together with your
11   chiropractic examination to the health insurance company,
12   correct?
13   A.    Yes.
14   Q.    And that's what we're looking at here in Exhibit 330, page
15   2, correct?  The culmination of it.
16   A.    That's what you're telling me.
17   Q.    No, I'm asking you.  Did you send a different bill to the
18   insurance company?
19   A.    I have a problem with this particular one that you're
20   showing me.
21   Q.    I could show you another one.
22   A.    Don't show me any more.  This one doesn't have my
23   signature on it.
24         THE COURT:  So what you're saying is, you don't
25   recognize this.
```

```
 1              THE WITNESS:  I'm telling you that's not my signature.

 2              THE COURT:  Nobody's asking you that.

 3              THE WITNESS:  All right.

 4              THE COURT:  The question is, are you familiar with

 5   this document?  Have you seen it before?

 6              THE WITNESS:  Not with this particular one.

 7              THE COURT:  Okay.  Thank you.

 8   BY MR. ULTIMO:

 9   Q.   Then let's take a look at some more.  I'm going to show

10   you Exhibit 329-2, which has also been admitted into evidence,

11   a similar health insurance claim form.  Is that your signature?

12   A.   No.

13   Q.   And that's because you told Toni Moyer to sign your name

14   on these; isn't that true?

15   A.   That is not true.

16   Q.   Okay.  Well -- okay.  Well, then, rather than me take up

17   all this time and try to explore how this occurred, let me ask

18   you.  Since you got the check -- correct?  This was made to

19   Port Medical, and Port Medical was your clinic, correct?

20   A.   All right.

21   Q.   Is that a "yes"?

22   A.   At this point in time -- let's take a look at the time.

23   Is only for a short period.  This is 2011.  I believe the

24   clinic at that time was owned by Kareem Soliman.

25   Q.   Well, if the clinic was owned by Kareem Soliman,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Dr. Soliman didn't bill for the services on this particular
 2   date.  Your taxpayer I.D. number was used to bill for these
 3   services.  Correct?
 4   A.   Right.
 5   Q.   And the money went into the Port Medical's bank account,
 6   correct?
 7   A.   I don't know where it went.
 8   Q.   Well, you've -- this particular form says, "Issue check to
 9   Port Medical," correct?
10           MR. CARDONA:  Your Honor, he's testified he doesn't
11   know.
12           THE COURT:  Yeah.  The form speaks for itself.  He's
13   not familiar with the form.  He didn't sign it.
14   BY MR. ULTIMO:
15   Q.   Okay.  Did you give any of the billers at Port Medical
16   permission to sign your name on your health insurance claim
17   forms for your patients?
18   A.   No.
19   Q.   Are you saying that Leonard Linares was not your patient?
20           MR. CARDONA:  Objection, Your Honor, it's
21   argumentative.  That's not his testimony.
22           THE COURT:  Sustained.
23       Do you know if Leonard Linares was your patient at one
24   time?
25           THE WITNESS:  I wouldn't know unless I saw him.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE COURT:  Okay.
 2   BY MR. ULTIMO:
 3   Q.   Okay.  I'll take the time and I'll show you the chart.
 4   We'll find out if that's your handwriting.
 5        What about, while I'm -- while I call up those documents,
 6   so I can move things on a little quicker, was Roy Villavisencio
 7   your patient?
 8            THE COURT:  If you remember.
 9            THE WITNESS:  I don't remember.
10   BY MR. ULTIMO:
11   Q.   What about Cierra Villavisencio?
12   A.   I -- I'd have to see the patient.
13   Q.   What about Desiree Villavisencio?
14   A.   I -- I'd have to see the -- I'd have to see the patient.
15   Q.   What about Faith Vaifanua?
16            MR. CARDONA:  Your Honor, objection, asked and
17   answered.  He said he doesn't remember, he would need to see
18   the patients or the charts.
19            MR. ULTIMO:  Your Honor, I'm only trying to save court
20   time.  It's going to take me time.  I can pull up the
21   documents, we'll go through them all.
22            THE COURT:  I don't know if that would be appropriate
23   or not.
24        Do you remember any of your patients?
25            THE WITNESS:  I remember -- yes, but to put a name,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    name and a face together some seven years ago, I'm --
 2              THE COURT:  Well, let me ask you this.  You said yes,
 3    you remember some of them.  Would you be able to remember them
 4    by name?  If he mentioned a name of some of your patients,
 5    would you be able to remember without seeing the person?
 6              THE WITNESS:  I may be able to.  Desiree is a familiar
 7    name, but I would have to see the chart and patient.
 8              THE COURT:  So when he's going through these names,
 9    all we're asking you is, would you remember it without seeing
10    their face?
11              THE WITNESS:  Okay.
12              THE COURT:  You can answer "no" or "I don't know."
13        Go ahead, Counsel.
14    BY MR. ULTIMO:
15    Q.  Well, let me ask you this.  Were you paid by Port Medical
16    for your services?
17    A.  I believe so.  DCS Management?  I don't know what it said
18    on the checks.
19    Q.  Well, there were several different entities, but you did
20    get paid, right?  What did the checks say?  Who were they from
21    that paid you?
22    A.  I remember DCS Management.  There was -- that, I recall.
23    There was another management company, and I don't recall the
24    others.  I didn't --
25    Q.  Okay.  Did you ever get paid from Port Medical's account?
```

```
 1    A.    Possibly.
 2              THE COURT:  So let me just make sure I understand.
 3    You provided services.  The billing went in from somebody else.
 4    You never got paid directly by the insurance companies.  Money
 5    went to the clinic, and they paid you.  Is that correct?
 6              THE WITNESS:  Right.
 7              THE COURT:  Okay.
 8    BY MR. ULTIMO:
 9    Q.    Doctor, you understand that it's important for -- that the
10    insurance company paid a doctor, correct?
11    A.    I -- I don't really know what you're asking me.
12    Q.    Well, we talked about it a moment ago.
13              THE COURT:  I'm not too sure what the question means,
14    either.
15              MR. ULTIMO:  Okay.  Your Honor, I asked the witness,
16    it was important --
17              THE COURT:  You asked if he thought it was important,
18    and that's not relevant, what his thought is on it.
19         Next question.
20    BY MR. ULTIMO:
21    Q.    Doctor, we covered this area.  You have to be a licensed
22    chiropractor to bill a health insurance company, correct?
23              THE COURT:  If you know.
24              THE WITNESS:  Yes.
25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1  BY MR. ULTIMO:
 2  Q.   Okay.  And for the same reason, the health insurance
 3  company wants to pay the doctor, right?  Not a nondoctor,
 4  correct?
 5  A.   All right.  You're telling me that.
 6  Q.   I'm asking.
 7  A.   You're telling me how an insurance company thinks.
 8           THE COURT:  Excuse me.  This is a court of law.
 9  Answer the question as it's asked.  It's a "yes" or "no."  It's
10  not argumentative.  Nobody's asking for what you think other
11  than just "yes" or "no" or just an answer to the question
12  itself.  This isn't an area to debate on either side.  We're
13  getting argumentative from the attorney side, we're getting
14  argumentative from the witness's side, and that's going to
15  stop.
16      Next question.
17  BY MR. ULTIMO:
18  Q.   Doctor, you understand I -- you said you were a doctor for
19  22 years.  I'd just assume that these --
20           MR. CARDONA:  Your Honor, objection.  This is
21  testimony.
22           THE COURT:  Sustained.  Sustained.  Let's just ask the
23  questions.
24  BY MR. ULTIMO:
25  Q.   Okay.  Now, is it your testimony, Doctor, that you were
```

1    not involved in the billing for your patient care?

2    A.   Yes.

3    Q.   Okay.  When you say that you were not involved in the

4    billing for your patient care, you said you're not directly

5    involved in it.  That's -- those were your words, correct?

6    A.   Right.

7    Q.   And what did you mean that you're not directly involved in

8    the billing for patient -- for your patient care?

9    A.   I would do the chart notes, and then it would be sent or

10   moved around the office to the biller, and the biller would

11   check that the chart notes were done and then base their

12   billing off of the chart notes.

13   Q.   Okay.  Now --

14           THE COURT:  Counsel, let me give you a little time to

15   think of the next question, because, ladies and gentlemen, it

16   is 2:30.  Afternoon recess.  So we're going to take a break at

17   this time.

18        Remember the admonishment not to discuss the case among

19   yourselves or with anybody else or form or express any opinions

20   about the matter until it's submitted to you and you retire to

21   the jury room.

22        Before you leave, let me also put out the admonishment to

23   those in the audience or anyplace else:  If you have a cell

24   phone in the courtroom, turn it off.  Otherwise, it's going to

25   be confiscated.  So you gotta make sure your cell phones are

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    off while you're in the courtroom.

 2         Okay.  We'll be in recess.

 3           THE CLERK:  All rise.

 4         (Recess held from 2:30 p.m. to 2:48 p.m.)

 5         (In the presence of the jury:)

 6           THE COURT:  Okay.  The record will reflect that all

 7    the members of the jury are in their respective seats in the

 8    jury box, including the alternate.

 9         Oh, I thought we lost you, No. 12 there.  She was bending

10    over.  I thought your seat was empty.

11           JUROR:  Sorry.

12           THE COURT:  Okay.  I didn't mean to wake you up.

13         Okay.  The witness is on the witness stand, and Counsel,

14    you may continue in the cross.

15           MR. ULTIMO:  Thank you, Your Honor.

16    Q.   Dr. Malone, did David Gomez tell you to treat minor

17    children at all?

18    A.   Minor -- I've treated minor children.

19    Q.   Okay.  And did you ever refuse to treat children because

20    they were too young?

21    A.   I think on one instance, I did.

22    Q.   And what was the age of that child that you thought was

23    too young to provide treatment for?

24    A.   I don't recall.

25    Q.   Is there --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   I believe -- I believe it was less than a year, around a

2    year.  I don't recall.

3    Q.   Okay.  Well, as a chiropractor, what's the youngest age

4    child you've ever -- that you feel professionally you're able

5    to provide care and treatment for?

6    A.   Birth.

7    Q.   I'm sorry?

8    A.   Birth.

9         THE COURT:  From birth.

10   BY MR. ULTIMO:

11   Q.   So --

12   A.   At birth.

13   Q.   Okay.  So you can see children -- in your professional

14   judgment, it's within the standard of care essentially to see

15   children at any age and examine them for chiropractic care or

16   treatment?

17   A.   Yes, it can be.

18   Q.   Okay.  Was David Gomez ever in the treatment room with you

19   while you were examining other patients?

20   A.   I believe he was there when I saw -- he has two daughters.

21   Q.   Okay.

22   A.   And I -- I believe he was there at times.

23   Q.   When you examined his daughters?

24   A.   Examined and/or treated.

25   Q.   Okay.  Now, turning for a moment back to the testimony

1   where you said that you were called into Port Medical in the

2   evening, and was it Michelle Aragon that called you to come in

3   that evening, when -- to fill out charts, they were closed?

4   A.   I don't recall who called me.

5   Q.   Okay.  You don't recall who made the phone call and said

6   come in?

7   A.   No.

8   Q.   But you said that there were charts that were stacked up.

9   How high were they stacked up?

10  A.   Over their heads.  On the desks.  Their shoulders.  It was

11  a mess.

12  Q.   And was that because Port Medical was seeing a lot of

13  patients and was busy at that time or --

14  A.   Right in the beginning, yes.

15  Q.   Okay.  And was that the time frame when this occurred,

16  this meeting, and when these charts were stacked up, when --

17  A.   Yes.

18  Q.   In the beginning, when it was busy?

19  A.   Yes.

20  Q.   And you were called -- what was your understanding as to

21  why you were called in?  Because -- what was your

22  understanding, without me putting words in your mouth.

23  A.   We'd gotten behind on the administrative things that we

24  should have done.

25  Q.   Okay.  And that "we," did that "we" include you?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.

2    Q.    So when you say "we had gotten behind," you as well as

3    others got behind in charting?

4    A.    Administrative, billing.  They got behind in billing.

5    Q.    Okay.  How do you know they got behind in billing?

6    A.    Conversation I had with Michelle as the things piled up.

7    Q.    Did you ask her why they were --

8    A.    I didn't ask her why.

9    Q.    Okay.  But that was your understanding, is that you guys

10   had seen a lot of patients --

11   A.    Right.

12   Q.    -- and didn't chart, and the charts got stacked up?

13   A.    Some -- yeah.

14   Q.    So at some point, someone asked you to come in and

15   complete your charts for patients?

16   A.    Right.

17   Q.    Okay.  And did you do that?

18   A.    Yes.

19   Q.    You went, you found an empty room, and -- is that what you

20   did?

21   A.    Yes.

22   Q.    And you went and proceeded to complete the charts?

23   A.    Yes.

24   Q.    Were you in the room most of the time alone completing

25   charts?
```

1   A.   I believe so.

2   Q.   And were these charts -- you were charting your

3   chiropractic portion of the chart, correct?

4   A.   Yes.

5   Q.   So you weren't charting massages or anything like that?

6   A.   No.

7   Q.   Okay.  So the charts that you completed that day, that

8   evening -- it was the evening, right?

9   A.   Yes.

10  Q.   That was the history and physical for the patients that

11  you took?

12  A.   It may have been, or may have just been the SOAP part of

13  the notes.

14  Q.   Let me put a few of those up and see if we can take a look

15  a little bit.

16       I'd like to take a look at Exhibit 129, page 21, which I

17  believe is already in evidence, patient Josiah Vaifanua.  Is

18  this a history form that's part of your history and physical

19  examination of the patient?

20            THE COURT:  Why don't you blow it up a little bit.

21            MR. ULTIMO:  Yeah.  Thank you, Your Honor.  I will.

22            THE WITNESS:  What's the question again?

23  BY MR. ULTIMO:

24  Q.   Well, I said, first of all, is this history form part

25  of --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.

2    Q.    -- the form that's included as part of your history and

3    physical?

4          There's a series of forms, correct?

5    A.    Yes.  This could have been, yes.

6    Q.    Okay.

7    A.    Yeah.

8    Q.    And the handwriting on top would be from MA, right?  A

9    medical assistant?

10   A.    I believe so, yes.

11   Q.    And the handwriting below the line that says sex, age,

12   date, below that, where it says, "Mid back tight, muscle spasm,

13   tender to palpation," is that your charting or someone else's?

14   A.    I believe it's mine.

15   Q.    Okay.  So this would be an example of -- would this be a

16   SOAP note for you?

17   A.    Yes.  It would be part of it, yes.

18   Q.    Okay.  So this essentially would be your assessment,

19   correct?

20   A.    Yes.

21   Q.    And I don't think it's got your plan there, does it?

22   A.    No.

23   Q.    Okay.  So this would be your assessment of the patient's

24   symptoms or illness or injury, correct?

25   A.    Yes.  Part of the brief exam, yes.

1  Q.   Okay.  So at some point, then, you would, based on your --
2  you'd formulate your assessment, then you would fill out a
3  document that looks like this, I believe.
4       Let me show you Exhibit 135, page 30.  That's the chart
5  note for Desiree Villavisencio.  I believe it's already in
6  evidence.  Do you recognize --
7            MR. CARDONA:  Was there a question there?
8            MR. ULTIMO:  I'm going to make one now.
9            THE COURT:  Okay.
10 BY MR. ULTIMO:
11 Q.   Doctor, do you recognize this document?
12 A.   Yes.
13 Q.   Okay.  And why don't you tell us what this document is.
14 A.   These would be billing codes.
15 Q.   And is this -- this is the ICD-9 diagnosis --
16 A.   Diagnosis.
17 Q.   -- and billing codes?
18      So it would be -- does ICD-9 stand for International
19 Clinical Diagnosis?  Is that what this stands for?
20 A.   I don't remember.
21           THE COURT:  That's already into evidence.
22           MR. ULTIMO:  Okay.  Thank you, Your Honor.
23 Q.   These circles, these are your diagnosis codes, correct --
24 A.   Right.
25 Q.   -- for the patient?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          As a matter of business practice, would it be your job to
 2   circle these ICD-9 codes after examination of the patient?
 3   A.   Right.
 4   Q.   And is this an example of what you would give to the
 5   biller --
 6   A.   Right.
 7   Q.   -- in order to complete the bill?
 8   A.   Yes.
 9   Q.   Okay.  Who would you give this to?
10   A.   Where would this go?  Give it to somebody at the front
11   desk, whoever it -- might -- in this case, it might have been
12   Michelle or it might have been somebody else.
13   Q.   And it would be put in the patient's chart, correct?
14   A.   Yes.
15   Q.   So then what I'd like to do is look at -- I'm going to do
16   a side-by-side on the same exhibit, 135, page 30.  On the
17   right, Exhibit 329, page 2.
18          Now, Doctor, these two documents that I have in front of
19   you on the screen, they're not for the same patient, but the
20   forms are essentially routine forms, are they not?
21   A.   Okay.
22   Q.   Okay.  So the ICD-9 codes that we saw on the left side
23   here, these codes here, correct?
24   A.   Right.
25   Q.   They find their way on the HIC form here, correct, under
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    diagnosis --

2    A.    Diagnosis.

3    Q.    -- and nature of illness, correct?

4    A.    Right.

5    Q.    In box 21 in this case, on Exhibit 329, page 2, correct?

6    A.    Right.

7    Q.    And the biller puts those numbers on the insurance claim

8    form, and she gets that from your billing sheet, which would be

9    the sheet on your left, Exhibit 135 --

10   A.    Right.

11   Q.    -- page 30, correct?

12         Okay.  So without you having to remember the patients, the

13   claim forms that were submitted in this case, do you have any

14   knowledge as to whether these patients -- let's say the

15   Vaifanua children.  Do you -- does that name -- do you recall

16   that name for any of the family members?

17   A.    I don't recall that name.

18   Q.    What about Villavisencio, Roy and his daughters?

19   A.    I vaguely remember that name, yes.

20   Q.    Okay.  What about --

21   A.    I do remember Villavisencio.  I can't put a face to it,

22   but I remember that name.

23   Q.    Okay.  So you did provide care and treatment to

24   Mr. Villa- --

25   A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   -- -visencio --

 2   A.   Yes.

 3   Q.   -- and perhaps his two daughters, right?

 4   A.   Yes.

 5   Q.   So what about -- so if we look at -- if we look at the

 6   health insurance claim form for Mr. Villavisencio, which I'd

 7   like to do right now, I want to see if that's your signature.

 8        Your Honor, may I have a moment to get that?  Thank you.

 9        Okay.  I'd like to show you Exhibit 313, page 2.  It's

10   already been moved into evidence, okay.  Doctor, this is the

11   health insurance claim form for Cierra Villavisencio.  You see

12   that?

13   A.   Okay.

14   Q.   We see the signature, bottom left-hand corner.  Is that

15   your signature?

16   A.   No.

17   Q.   But you do remember treating, as we talked about a moment

18   ago --

19   A.   I remember the name.

20   Q.   As a patient?

21   A.   Yes.

22   Q.   Okay.  And --

23   A.   And I believe I treated his daughter.  If she's a

24   teenager, I think I treated her a couple of times.

25   Q.   Okay.  And so do you have any reason to doubt that this
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  particular bill, this health insurance claim form, Exhibit

2  313-2, is the claim form that was submitted to the PMA

3  insurance company for the services you provided?

4  A.   Do I have reason to doubt that this --

5         MR. CARDONA:  Your Honor, calls for speculation.

6         THE COURT:  Sustained.  It does call for speculation.

7         MR. ULTIMO:  Okay.

8  Q.   Well, Doctor, do you have a custom and habit or a practice

9  to sign your insurance claim forms?

10  A.   Yes.

11  Q.   Okay.  So do you always sign your health insurance claim

12  forms?  Is that your custom and practice?  Is that what you're

13  saying?

14  A.   That's what I do, yes.

15  Q.   In 2009, 2010, and 2011, when you were at Port Medical --

16  A.   They may have had a stamp.  I believe a stamp is

17  sufficient.

18  Q.   Right.  And what about up here?  As the doctor, see where

19  it says, "Signature on file"?

20  A.   All right.

21  Q.   What does that mean?

22  A.   That means that wherever you're sending this document,

23  that they have a copy of my signature in their files.  Is that

24  true?  Is that correct?  You asked me what it said; now I'm

25  telling you.  Is that correct?

```
 1              THE COURT:  Okay.  Next question, Counsel.

 2              MR. ULTIMO:  Thank you.

 3   Q.  And looking at 313, Exhibit 313, page 4, this would be the

 4   check to Port Medical for the health insurance claim form that

 5   we just saw, Exhibit 313, page 2, for Cierra Villavisencio.

 6        Have you ever seen these checks?  What's your practice,

 7   standard?  What's your business routine for processing and

 8   handling of these checks while at Port Medical?

 9   A.  Michelle Aragon took care of the administrative and

10   banking.

11   Q.  Okay.  So she -- did she -- so she took care of the

12   receipt of these checks?

13   A.  Yes.

14   Q.  As they came into Port Medical?

15   A.  Yes.

16   Q.  And she would deposit them?  For you, for your clinic?

17   A.  I imagine.

18              THE COURT:  If you know.

19              THE WITNESS:  I don't know.

20   BY MR. ULTIMO:

21   Q.  Well, I'm asking you about your business practice.

22   A.  Yes.

23   Q.  Yes.  Okay.  And you would give Michelle Aragon directions

24   as to where to deposit the money, correct?

25   A.  Bank?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   That's a "yes"?  I'm asking you, sir.  It's your practice,
 2   not mine.
 3   A.   Right.
 4   Q.   Is that what you would have her do?
 5   A.   Right.
 6   Q.   Yes?
 7   A.   Deposit them in the bank.
 8   Q.   Right.  Now I want to ask you -- and you would give her
 9   directions to do that.  She was your employee.  Correct?
10   A.   She was given instructions to do that, to deposit them in
11   the bank.
12   Q.   And you would do that?  You would give her those
13   instructions?  Is that a "yes" or a "no"?
14   A.   I would.  You mean -- you're asking me as if it's a
15   practice.  Have I done it once?  That was the way she was to do
16   her job.  I didn't have to do it every time checks came in.
17   Q.   That's all I'm asking.
18              THE COURT:  At some time you told her to do that.
19              THE WITNESS:  Yes.
20              MR. ULTIMO:  That's all I'm asking, Doctor.
21              THE COURT:  Next question.
22   BY MR. ULTIMO:
23   Q.   Okay.  So did you instruct her as to, at any time, as to
24   which bank account she is to deposit this check?
25   A.   I imagine we went over it when we -- I believe she was
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    there when I opened the account.  And we may have had to open

2    two, close one and open another one in the beginning, and I

3    believe it was at Chase.

4    Q.    Okay.  Now, Doctor, did Sergio Amador ever direct you to

5    falsify any of your chiropractic charts?

6    A.    No.

7    Q.    Did David Gomez ever ask you to falsify any of your

8    patient charts?

9    A.    That night.

10   Q.    Okay.  Well, let's go back to that night, then.  You said

11   that you were in there completing your charts because the

12   clinic had gotten busy and "we" -- and I asked you if that

13   includes you, and you said it did -- "we got behind in

14   completing our charting."  "Our charting," correct?

15          MR. CARDONA:  Your Honor, asked and answered.

16          THE COURT:  Yeah.  Why don't you go to the question,

17   Counsel.

18   BY MR. ULTIMO:

19   Q.    The question, Doctor, is, why was it that you got behind

20   in charting?  What's your practice in charting?  You chart for

21   the patient each day?

22   A.    There were so many people, that they would -- I'd have

23   patient -- patients were -- it was just so confusing that -- I

24   would have a chart and wouldn't be able to complete it, and the

25   next person was -- was upon me.

1    Q.   Well, as a physician, how many patients did you typically

2    see a day during this time frame, 2009, 2010, 2011?  What was

3    your practice?

4    A.   I don't recall.  We may have seen 50.  We may have seen

5    more.  I --

6    Q.   In a day?  50 in a day?

7    A.   In the course of a day, yeah, we --

8    Q.   You personally, not the whole clinic.

9    A.   Yeah, me personally.  I don't really know.  Could have

10   been between 20 and 40.  It -- it was a lot.

11           THE COURT:  Okay.

12           THE WITNESS:  In the beginning.

13   BY MR. ULTIMO:

14   Q.   And what was your practice as to when you would complete

15   those patient charts?  Would you do it after the patient visit?

16   Would you do --

17   A.   I would try to do it while I was going, but if I couldn't,

18   I'd have enough notes to complete it afterwards.

19   Q.   So you tried to do it while you were in the exam room with

20   the patient?

21   A.   Right.  At the same time or right immediately after.

22   Q.   Okay.  So you would have a clipboard and you would --

23   you'd attempt to complete your chart notes while in the exam

24   room with the patient?

25   A.   Right.

1  Q.   Okay.  So how long were you in that room that night

2  completing charts?

3  A.   Less than 20 minutes.  20 minutes at the most.

4  Q.   And how many charts do you estimate that you completed at

5  that time and within that 20 minutes?

6  A.   I don't really know.

7       THE COURT:  "At that time," you're talking about when

8  they were catching up?

9       MR. ULTIMO:  Yes.  Yes, Your Honor.

10      THE WITNESS:  Five.  Certainly less than ten.

11 BY MR. ULTIMO:

12 Q.   Okay.  And those were -- did that comprise the charting

13 that you say -- that you claim that David Gomez brought to you?

14 A.   Yes.

15 Q.   So when I asked you if David Gomez was in the treatment

16 room with you when you saw patients, you said when his -- when

17 you treated his two daughters.  Remember that?

18 A.   Yes.

19 Q.   But you didn't tell me that David Gomez was in the

20 treatment rooms with you with other patients, correct?

21 A.   Yeah, there may have been other times.

22 Q.   Okay.  Well, what I'm asking you is, why would David Gomez

23 ask -- tell you "We haven't seen all these patients"?  In other

24 words, how would he know which patients you saw each day if you

25 did between 20 and 50 patients a day?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              MR. CARDONA:  Objection, calls for speculation.

2              THE COURT:  Sustained.

3              MR. CARDONA:  Argumentative.

4              THE COURT:  Well, no, it's speculation.

5    BY MR. ULTIMO:

6    Q.   Okay.  So you're claiming that David Gomez asked you to

7    complete -- how many files do you claim Mr. Gomez asked you to

8    complete that were, quote/unquote, friends?

9    A.   Honestly, I don't know.  Five.  Less than ten.  I was

10   there for 20 minutes, and it just -- that's it.  That's my

11   answer.

12             THE COURT:  Your best estimate is about five?

13             THE WITNESS:  Five.  Yeah.  Five, ten.  Certainly less

14   than ten.

15             THE COURT:  Okay.

16   BY MR. ULTIMO:

17   Q.   What did you do with those charts after you completed --

18   well, actually, your testimony is that you false- --

19   A.   I left them there.

20   Q.   You left them there.  Why did you decide to falsify

21   chiropractic chart notes?

22   A.   At the time, which I know to be incorrect now, I thought

23   that they had already committed a crime, and I would pay a

24   fine, go to jail, and lose my license.

25   Q.   Then why did you do it?
```

1  A.   Because I didn't want to pay a fine, go to jail, and lose

2  my license.

3  Q.   But you hadn't done it yet.

4  A.   But it had already been billed.  That was the -- that is

5  what, the time -- at the time, my thought process, when it was

6  thrust upon me, that's how I felt at that time.

7  Q.   You said earlier, when I asked you before the break, you

8  said that they hadn't done their billing.

9  A.   I don't know --

10        MR. CARDONA:  Objection, mischaracterizes the

11  testimony.

12        THE COURT:  Sustained.

13        THE WITNESS:  I don't know where they were at on any

14  of the process.  If they hadn't billed it, then they could have

15  just thrown that stuff out, and that would have been that, and

16  me just catching up on my stuff.

17        THE COURT:  Next question.

18  BY MR. ULTIMO:

19  Q.   Now, you said that you were fired from Port Medical Long

20  Beach; is that right?  And you said Eva Razo fired you, right?

21  A.   Yes.

22  Q.   Doctor, isn't it true that you transferred Port Medical

23  over to Dr. Correa?  Isn't that true?

24  A.   In the -- yes.

25  Q.   So you didn't get fired.  You transferred the clinic over

1    to Dr. Correa.  Isn't that right?

2              MR. CARDONA:  Objection, Your Honor, mischaracterizes

3    the testimony.

4              THE WITNESS:  You have the timing off.

5              THE COURT:  Excuse me.  The testimony so far was, yes,

6    the clinic was transferred over to him, and the testimony was

7    that he was fired.  Those don't necessarily conflict with each

8    other.  One is transferred the clinic over, and the other is

9    whether or not he was fired or not.

10             MR. ULTIMO:  That's what I'm asking the doctor.

11             THE COURT:  Well, I don't want to cover too much, but

12   he's already said yes, he was fired, and yes, he did transfer

13   the clinic over.  So I don't know where you're going on it, but

14   why don't you ask your next question.  In fact, I'll help you

15   on it, maybe.

16        Were you fired at the same time you transferred the clinic

17   over, or was it later, or when?

18             THE WITNESS:  No.  I transferred the clinic in the

19   first couple of months, and I was fired well after that.

20             THE COURT:  That's what I thought.  Okay.

21   BY MR. ULTIMO:

22   Q.   Did you do any charting that night that you were called in

23   to catch up on charting?  Did you do any charting for patients

24   that you had seen?

25   A.   I believe so.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. ULTIMO:  No further questions.

2          THE COURT:  Redirect.

3                    **REDIRECT EXAMINATION**

4    BY MR. CARDONA:

5    Q.   Let me go back for one second and try and clear up some

6    things about what you were asked on cross.

7          When you provided chiropractic services, what types of

8    services did you yourself personally provide?

9    A.   An exam, an adjustment.  I may have done a little bit of

10   stretching and may have done some exercise counseling.

11   Q.   And when you did that --

12   A.   I also did -- excuse me.  I also did -- I put a hot pack,

13   electrotherapy or ultrasound.

14   Q.   And when you provided those services personally, did you

15   then prepare the notes to reflect the services you had

16   provided?

17   A.   Yes.

18   Q.   Now, were there also massage therapists at Port Medical?

19   A.   Yes.

20   Q.   What services did the massage therapists provide?

21   A.   They would give a massage, and they could also do

22   exercises.  They could also show the patient how to do

23   exercises, basically strengthening their core.

24   Q.   And when the massage therapist provided services, did you

25   prepare their SOAP notes?

```
1    A.    No.

2    Q.    Were they supposed to do that?

3    A.    Yes.

4    Q.    Now, we've seen a number of checks and forms.  Just want

5    to clarify.  Am I correct, you didn't do the billing?

6    A.    You are correct.

7    Q.    Were there billers at Port Medical?

8    A.    Yes.

9    Q.    And you were asked a name.  Was one of those billers -- I

10   believe the name was Toni Moyer?

11   A.    Yes.

12   Q.    Was she one of the billers?

13   A.    Yes.

14   Q.    How did the billers prepare the bills?

15             THE COURT:  Well --

16             THE WITNESS:  Off of --

17             THE COURT:  Were you there when they prepared the

18   bills?

19             THE WITNESS:  I was in the building, but I didn't

20   actually see them.

21             THE COURT:  Okay.  So you wouldn't know exactly what

22   they do.

23             THE WITNESS:  No.  They were directed to do the

24   billing --

25             THE COURT:  Okay.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE WITNESS:  -- very clearly from my chart notes.

 2       And Toni did that and only that, because we had several

 3  discussions to do only that.

 4  BY MR. CARDONA:

 5  Q.   And included in your exam forms, as we saw, when you did,

 6  for example, an initial exam and you did a diagnosis, you would

 7  mark an ICD-9 code; is that right?

 8  A.   Yes.

 9  Q.   Or several ICD-9 codes.

10  A.   Yes.

11  Q.   Now, counsel showed you two separate charts, a chart and

12  then a HIC form for a different patient.

13  A.   Right.

14  Q.   Am I correct that the HIC form ICD-9 codes were supposed

15  to match the diagnostic codes on the chart for that patient?

16  A.   Yes.

17  Q.   Now, was there a requirement, to bill the insurance

18  company, that the massages, if massages were given, be

19  medically necessary?

20  A.   Yes.

21  Q.   And was that the purpose, in part, of the ICD-9 codes?

22  A.   Was a purpose of the examination.  The ICD-9 codes just

23  are an encapsulation of your examination.

24  Q.   Now, was there also something called a CPT code on the

25  bill -- on the form that went to the insurance company, the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    HICF form?

2    A.    Yes.

3    Q.    Are you familiar with CPT codes?

4    A.    Somewhat.

5    Q.    And what are those?

6    A.    Those are to bill the services you provided.  As an

7    example, an adjustment.

8    Q.    Now, when massage therapists, not you, but massage

9    therapists, gave massages, were you in the room?

10   A.    No.

11   Q.    Did you check to see whether SOAP notes that massage

12   therapists had written reflected actual massages or had just

13   been fabricated?

14   A.    As a rule, no.  I could see -- if the chart came back to

15   me and it was a patient that came on a regular basis, I could

16   see that they were done.

17   Q.    Okay.  So you were shown Exhibit 129 for Josiah Vaifanua.

18   I'd like to go back to that for a second.  I'm going to go to

19   page 16.  Is this a standard examination form?

20   A.    Right.

21   Q.    And is this something that you, as a chiropractor, would

22   fill out when you did a standard exam?

23   A.    Yes.

24   Q.    And you see here there's a date, October 6th, 2009?

25   A.    All right.

```
1   Q.   Now, was that something that was supposed to be done the
2   first time a patient came in?
3   A.   Yes.
4   Q.   Why was that?
5   A.   Well, then you could -- by doing the exam, you could get a
6   diagnosis and you could get a treatment.  You could see if
7   something else might have been off with the patient.  You would
8   get an indication so that you could proceed or not.
9   Q.   Now, let me turn back to page 14 of this document.  This
10  is a page also for Josiah Vaifanua?
11  A.   All right.
12  Q.   And when you say "all right," do you mean that it says
13  that at the top?
14  A.   Right.
15  Q.   Do you have any personal recollection of this document?
16  A.   No.
17  Q.   Do you have any personal recollection of this patient?
18  A.   I can tell -- no.  I -- I don't think so.  I remember a
19  youngster that I did treat, and this looks like I did the exam,
20  the writing on the form.  If you go back to the exam --
21          THE COURT:  No, wait.
22      We've already covered this, Counsel.  It's been asked and
23  answered several times.
24          THE WITNESS:  Yeah, I don't think so.  Okay.  Okay.
25          THE COURT:  Next question.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                  MR. CARDONA:  Very well.
 2    Q.   Now, do you see here that there's a total of roughly 19
 3    entries here?
 4    A.   Yes.
 5    Q.   And are the majority of these entries for massages?
 6    A.   Yes.  I don't remember -- all of this was internal.  Yeah,
 7    they got an exam -- yes, they were, each -- in addition to
 8    other things, each time that he came, he got a half-hour
 9    massage, seems like.
10    Q.   Now, you see over here the initials "Y.S."?
11    A.   I see that, yes.
12    Q.   Was there someone at Port Medical named Yoli Sierra?
13    A.   I don't remember her last name, but I remember there was a
14    "Yoli" there, yes, I do.
15    Q.   And was she a receptionist?
16    A.   Yes.
17    Q.   Was she a massage therapist?
18    A.   I don't believe so.
19    Q.   Did you check to see whether, in fact, these massages had
20    been provided to Josiah Vaifanua?
21                  THE COURT:  Counsel, I think we're getting outside the
22    area of cross-examination.  I don't recall this --
23                  MR. CARDONA:  That's fine, Your Honor.  I'll stop
24    there.  Nothing further.
25                  THE COURT:  Okay.
```

```
1              MR. ULTIMO:  Nothing further, Your Honor.

2              THE COURT:  You may step down.

3         Okay.  Next witness.

4              MR. CARDONA:  Your Honor, the government calls Robert

5    Zalameda.

6              THE CLERK:  Right here to be sworn, please.  Can you

7    raise your right hand.

8         Do you solemnly swear the testimony that you are about to

9    give in the matter now before the Court shall be the truth, the

10   whole truth, and nothing but the truth, so help you God?

11             THE WITNESS:  Yes.

12             THE CLERK:  You may be seated.  Thank you.

13        May I please ask that you state your full name for the

14   record and spell your last name.

15             THE WITNESS:  Yes.  Robert, N, as in Nancy, Zalameda,

16   Z-a-l-a-m-e-d-a.

17             THE CLERK:  Thank you.

18             THE COURT:  Okay.  You may inquire, Counsel.

19             MR. CARDONA:  And Your Honor, if I could, while I ask

20   the first few questions, could the binder with Exhibits 290

21   through 299 be placed in front of the witness?

22             THE COURT:  Sure.

23        Want to get that?

24        (The clerk assisted with the exhibit binder.)

25   ///
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**ROBERT ZALAMEDA, GOVERNMENT'S WITNESS,**

**DIRECT EXAMINATION**

BY MR. CARDONA:

Q.   And with that, Mr. Zalameda, how are you employed?

A.   With the FBI in Long Beach, California.

Q.   And what do you do for the FBI?

A.   I'm a forensic accountant.

Q.   How long have you been a forensic accountant?

A.   Since 2001 with the FBI.  Prior to that, I was an auditor

with U.S. Customs for about nine years.

Q.   And as a forensic accountant with the FBI, what do you do?

A.   Basically examine financial records, tax returns, mortgage

documents.  Basically assisting the special agents in their

investigations.  It could be white collar, counter-terrorism,

public corruption cases.

Q.   Do you have training as an accountant?

A.   Yes.  I have a bachelor degree from Christopher Newport

University, active CPA in the state of Maryland.

Q.   And did you receive training as a forensic accountant at

the FBI?

A.   Several classes, maybe between one week to two weeks

training.

Q.   Did you review certain bank records in connection with

this case and prepare some summaries of activities in certain

accounts?

```
 1   A.   Yes, I did.

 2   Q.   And if you could -- I think the binder is now in front of

 3   you.

 4   A.   Mm-hmm.

 5   Q.   Can you turn to what's marked as exhibits -- Exhibit 290.

 6   Is Exhibit 290 a printout of a summary that you prepared?

 7   A.   Yes.

 8   Q.   Was this a summary of bank records for an account held by

 9   DCS Medical Management at Chase Bank?

10   A.   Yes.

11   Q.   And in particular, was this for the account ending in the

12   last four digits 3393?

13   A.   Yes.

14   Q.   In preparing this summary, did you review statements for

15   the account?

16   A.   Yes, I did.

17   Q.   Did you review deposit items for the account?

18   A.   Yes, I did.

19   Q.   Did you review checks written on the account?

20   A.   Yes, I did.

21   Q.   Did you review withdrawal items, records of withdrawal

22   items for the account?

23   A.   Yes, I did.

24   Q.   Were all those records obtained from the bank?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   And is Exhibit 290 a summary of activity in that account

2    for the year 2009?

3    A.   Yes.

4    Q.   And is that from the opening of the account?

5    A.   Yes.

6    Q.   And from your review of the records, when was that account

7    opened?

8    A.   I believe it was around March 6, 2009.

9    Q.   So was this a summary of activity in that account for the

10   period -- from the opening through the end of 2009?

11   A.   Yes.

12   Q.   Does this summary that you prepared accurately reflect the

13   records that you saw and summarized?

14   A.   Yes.

15   Q.   Is it a complete summary of those records for this time

16   period?

17   A.   Yes.

18           MR. CARDONA:  Your Honor, I'd offer Exhibit 290.

19           THE COURT:  Okay.

20           MR. ULTIMO:  No objection.

21           THE COURT:  Be received.

22       *(Received in evidence, Trial Exhibit 290.)*

23   BY MR. CARDONA:

24   Q.   Can you turn to Exhibit 291.  Is Exhibit 291 a summary of

25   records for that same account for the year 2010?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Yes.

2    Q.   Is it an accurate summary of those records?

3    A.   Yes.

4    Q.   Is it a complete summary of those records that you

5    reviewed?

6    A.   Yes, for 2010.

7    Q.   And did this account close sometime in 2010?

8    A.   Yes, sir.  Yeah.

9    Q.   When was that?

10   A.   I believe around October 2010.  I'm not sure of the exact

11   date.

12        MR. CARDONA:  Your Honor, I'd offer Exhibit 291 into

13   evidence.

14        THE COURT:  291.

15        MR. ULTIMO:  No objection.

16        THE COURT:  It'd be received.

17        *(Received in evidence, Trial Exhibit 291.)*

18        MR. CARDONA:  Your Honor, may I display the first page

19   of Exhibit 291?

20        THE COURT:  Yes.

21   BY MR. CARDONA:

22   Q.   Now, as an example, can you tell us what's shown in your

23   summary on the first page.

24   A.   We basically got the bank, the account number, the company

25   name, the time period that was reviewed.  We get the statement

1    date, which was reflected from the statement of the -- of

2    JPMorgan Chase.  You can see the next is beginning balance of

3    that statement.  It's by month, by the way.  And then you got

4    all the deposits, and then you got the withdrawals that are in

5    red, and then you have the ending balance.  And that should all

6    reflect on the bank statement for each month.

7    Q.   And here the ending balance for the October period is

8    zero.  Does that reflect that the account closed during that

9    time period?

10   A.   Yes.

11   Q.   Now, moving to page 2, what's shown in page 2?

12   A.   On page 2, you got basically the JPMorgan Chase, the

13   account number, and the name of the company at the top, and

14   then you got the payor, the entities that paid into the

15   accounts for that time period.

16        If you look at the next column, you got the number of

17   transactions.  That's like -- for example, you see, like, 29,

18   that would be like either check or -- or probably a check

19   deposit.

20        Sum of amount is the total of those 29 items.

21        And then the percentage of total, which is the total of --

22   the total of the 41,168.80 into the 325,944.50.

23        So as you can see for the first line there, Port Medical

24   Associates, almost 80 percent of the deposits were coming from

25   Port Medical Associates, 2530 Atlantic Avenue in Long Beach,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    California.

2        And further down you have cash.  You got ten transactions

3    that lists cash deposits totaling 56,233.10, and that is almost

4    14 percent of the total of the 411,168 amount.

5    Q.   Okay.  And we don't need to go through every entry.

6    A.   Right.

7    Q.   But does this reflect a summary of the items that were

8    deposited into the account?

9    A.   Yes, for that time period.

10   Q.   Then turning to the next page, page 3, and this actually

11   runs for several pages.

12   A.   Mm-hmm.

13   Q.   What's shown in these pages, pages 3 through 7?

14   A.   Again you got the bank name, you got the name of the

15   company up top.  You got the account number.  Then again you

16   got -- the first column shows payee, which is the actual

17   recipient of the money being paid out of the account.  The next

18   column, you have number of transactions.  For example, like

19   withdrawals, you have 18 withdrawals.  Column of sum of amounts

20   is the total of the 18 withdrawals.  And percentage of total is

21   almost 16 percent of, again, the total of the -- of the

22   withdrawals.  I do believe it's at the end there, 429,931.05.

23   Q.   So does this section of the summary basically summarize

24   the items that were taken out of the account?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.    Now, moving down from there, were you asked to provide

detail for payments out to certain individuals or entities?

A.    Yes.

Q.    And in particular, on this page, page 8, is this a summary

of the withdrawals from the account?

A.    Yes.

Q.    And what's indicated, for example, in the first row?

A.    The first row would be -- it's all in date order.  So

February is the earliest transaction in that time period.

February 8th, 2010, you have a withdrawal of a thousand

dollars.  I looked at this withdrawal slip, and I could

identify the individual.  It was David Gomez on there.  And so

forth.  There's Chris Rice and there's Sergio Amador.

      And if you go further down, it should -- there's other

withdrawals.  As best I could, I tried to identify who the

recipient of the cash withdrawals were.  If you look further

down here, you'll see March 19th, 2010, ATM withdrawal of $500.

I don't have any -- I don't have -- I don't have any

identifying item who withdrew that money from there, so I left

it as blank.  So under the comment section it's blank in there.

Q.    And the indications under the comment section, that's just

based on your review of the documents, correct?

A.    Right.

Q.    You don't have actual knowledge as to who might have made

that withdrawal?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Well, I do, because I have the withdrawal slip, and it

2    reflects a handwritten name and then the signature on there.

3    Q.   But that's what you're basing it on, just your review of

4    the document?

5    A.   Yes.

6    Q.   You weren't there when the withdrawal was made?

7    A.   Correct.  Correct.

8    Q.   Moving down to the next page.  And again, just as an

9    example, when you pulled out "detail for payments," is that the

10   standard form you use, putting the date, a description, here

11   the check number --

12   A.   Right.

13   Q.   -- who it was made out to, how much it was for, and then

14   anything that was in the comment line?

15   A.   Correct.

16   Q.   So for example, on page 12, did you do the same thing for

17   Pandora Hall?

18   A.   Yes.

19   Q.   And on page 13, did you do the same thing for Kevin

20   Malone?

21   A.   Yes.

22   Q.   Now, starting on page 14 and continuing through the end of

23   the document, what's reflected there?

24   A.   Basically, it starts from date order.  It would be --

25   first transaction is 1/1/2010.  Shows the balance of that time,

```
 1    which was 18,762.25, and it's in date order.  And you got the
 2    second withdrawal -- second transaction on there, D.R., stands
 3    for debit, and it's a withdrawal, and $3500 was withdrawn on
 4    January 4th, 2010.  And it was Sergio Amador withdrew it,
 5    supposedly to purchase a cashier's check; however, I didn't get
 6    the cashier's check, so I put a question mark on there.
 7    Q.    So again, these comment lines, were those just based on
 8    your review of what was on the bank records?
 9    A.    Right.
10    Q.    And so these pages to the end, are they a summary of the
11    activity overall in the account in chronological order?
12    A.    Yes.
13    Q.    Now, did you use this same format in preparing all of the
14    summary charts?
15    A.    Yes, I used a pivot table in Excel.
16    Q.    And did that generate these various printouts?
17    A.    Yes.
18    Q.    Can you turn to Exhibits 292, 293 and 294.  Have you taken
19    a look at Exhibits 292, 293 and 294?
20    A.    Yes.
21    Q.    Did you review bank records for an account held by Chosen
22    Medical Management --
23    A.    Yes.
24    Q.    -- at Chase Bank?
25    A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   And was that a business checking account with the account number ending in 6061?

A.   Yes.

Q.   Again, did you review statements, deposit items, checks and withdrawals?

A.   Yes.

Q.   And did you prepare a summary of the activity in that account?

A.   Yes.

Q.   Is Exhibit 292 your summary of the activity for 2010?

A.   Yes.

Q.   And did this account open approximately March 29th, 2010?

A.   Yes, sir, about that time.

Q.   So is this a summary for the account activity from that time through the end of 2010?

A.   Yes.

Q.   Is it accurate?

A.   Yes.

Q.   Is it complete based on the records you reviewed?

A.   Yes.

Q.   Is Exhibit 293 a summary of activity in that account in the same format we've seen for calendar year 2011?

A.   Yes.

Q.   Is it accurate?

A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   Is it complete for the records you reviewed?

2  A.   Yes.

3  Q.   Is Exhibit 294 a summary of activity in that account for

4  calendar year 2012?

5  A.   Yes.

6  Q.   Is it accurate?

7  A.   Yes.

8  Q.   Is it a complete summary of the records you reviewed?

9  A.   Yes.

10       MR. CARDONA:  Your Honor, I'd offer Exhibits 292, 293

11  and 294.

12       MR. ULTIMO:  No objection, Your Honor.

13       THE COURT:  Be received.

14       (Received in evidence, Trial Exhibits 292, 293 and 294.)

15  BY MR. CARDONA:

16  Q.   Can you turn to Exhibits 295 and 296.

17  A.   I didn't have 295 here.

18  Q.   Let me see if it's a separate binder.

19  A.   This goes to 294.

20       THE COURT:  Is there a second volume?

21       THE WITNESS:  You said 295?

22  BY MR. CARDONA:

23  Q.   Yes.  295 and 296, if you can take a look at both of

24  those.  Are Exhibits 295 and 296 summaries you prepared of

25  activity in a bank account held by Ramport Medical Management

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    at Chase Bank?

2    A.   Yes.

3    Q.   Was that the account number ending in the last four digits

4    6169?

5    A.   Yes.

6    Q.   Again, did you review statements, deposit items, checks

7    and withdrawals?

8    A.   Yes.

9    Q.   Is Exhibit 295 a summary of activity for 2011?

10   A.   Yes.

11   Q.   And was this account opened approximately January 12th,

12   2011?

13   A.   Yes.

14   Q.   So is this a summary of activity for the time from that

15   date forward through 2011?

16   A.   Yes.

17   Q.   Is it accurate?

18   A.   Yes.

19   Q.   Is it a complete summary of the records that you reviewed?

20   A.   Yes.

21   Q.   Is Exhibit 296 a summary of activity in that account for

22   the year 2012?

23   A.   Yes.

24   Q.   Is it accurate?

25   A.   Yes.

1   Q.   Is it a complete summary of the records you reviewed?

2   A.   Yes.

3          MR. CARDONA:  Your Honor, I'd offer Exhibits 295 and

4   296.

5          MR. ULTIMO:  No objection.

6          THE COURT:  They're received.

7       *(Received in evidence, Trial Exhibits 295 and 296.)*

8   BY MR. CARDONA:

9   Q.   Can you turn to Exhibits 297 and 298.  Did you review bank

10  records for an account held at Chase Bank by Ramport Medical

11  Management, a second account, a different account?

12  A.   Yes.

13  Q.   Was this an account with an account number ending in the

14  last four digits 9842?

15  A.   Yes.

16  Q.   Was it opened in approximately August 16th, 2010?

17  A.   Yes.

18  Q.   Is Exhibit 297 a summary of the activity in that account

19  from the time the account was opened through the end of 2010?

20  A.   Yes.

21  Q.   Is it accurate?

22  A.   Yes.

23  Q.   Is it a complete summary of the bank records you reviewed?

24  A.   Yes.

25  Q.   Is Exhibit 298 a summary of the activity for 2011?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    And did this account close in September of 2011?

 3    A.    Yes.

 4    Q.    So is it a summary through the closing date?

 5    A.    Yes.

 6    Q.    Is it accurate?

 7    A.    Yes.

 8    Q.    Is it a complete summary of the records you reviewed?

 9    A.    Yes.

10          MR. CARDONA:  Your Honor, I'd offer Exhibits 297 and

11    298.

12          MR. ULTIMO:  No objection, Your Honor.

13          THE COURT:  Be received.

14      (Received in evidence, Trial Exhibits 297 and 298.)

15    BY MR. CARDONA:

16    Q.    Can you turn to Exhibit 299.  Based on your review of the

17    bank records from all of the accounts we've talked about, is

18    this a summary done of checks to and withdrawals by certain

19    individuals from all four of the accounts?

20    A.    Yes.

21    Q.    And in particular, was there a summary of checks to and

22    withdrawals by Sergio Amador, Arturo Amador, David Gomez and

23    Chris Rice?

24    A.    Yes.

25    Q.    Have you reviewed this summary and checked it against the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    bank records?

2    A.    Yes.

3    Q.    Is it accurate?

4    A.    Yes.

5    Q.    Does it reflect all of the checks and withdrawals for

6    those four individuals from the bank records you reviewed?

7    A.    Yes.

8              MR. CARDONA:  Your Honor, I'd offer Exhibit 299.

9              MR. ULTIMO:  No objection.

10             THE COURT:  Be received.

11        *(Received in evidence, Trial Exhibit 299.)*

12             MR. CARDONA:  May I display Exhibit 299?

13             THE COURT:  Yes.

14   BY MR. CARDONA:

15   Q.    Now, this has a different format, so can you tell us

16   what's shown -- I'll blow that up -- in the first three

17   columns?

18   A.    The first column shows year.  Second column says account,

19   and the -- it's broken up by the account, 3393.  And then you

20   have -- it's further broken up by type, checks and cash

21   withdrawals, and if you look down there, it's for 2009.

22   Q.    Then going across for that particular year, what's shown

23   in the columns that follow?

24   A.    You have the individual's name up there, and then how

25   many -- how much checks he was paid, how much cash withdrawals

```
 1   he was -- received.  For example, Sergio Amador, for 2009,
 2   received 58,500 in both checks and cash withdrawals.  And then
 3   you have Arturo Amador and David Gomez and Chris Rice.
 4   Q.   And again, is this based on your review of the bank
 5   records and the comments that were indicated in those bank
 6   records?
 7   A.   Yes.
 8   Q.   Now, going down, is it similarly broken out by year and
 9   account for each of calendar years 2010, 2011 and 2012?
10   A.   Yes.
11   Q.   And then at the bottom, are the amounts totaled?
12   A.   Yes.
13   Q.   So would that total figure at the bottom reflect the total
14   payments based on the bank records --
15   A.   Yes.
16   Q.   -- each of these four individuals, Sergio Amador, Arturo
17   Amador, David Gomez and Chris Rice, out of these four accounts
18   for this time period, 2009 through 2012?
19   A.   Yes.
20   Q.   And again, that would be based just on your review of the
21   bank records?
22   A.   Right.
23         MR. CARDONA:  Nothing further, Your Honor.
24         THE COURT:  Okay.  Cross-examination.
25         MR. ULTIMO:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                          **CROSS-EXAMINATION**

2     BY MR. ULTIMO:

3     Q.   Mr. Zalameda, good afternoon.

4     A.   Good afternoon.

5     Q.   In looking at the Exhibit 299-1, the exhibit you had just

6     seen --

7     A.   Okay.

8     Q.   -- the totals -- I'll put it on the overhead again.

9          My question is, first of all, you see the totals for three

10    years, right?  2009, 2010, 2011; is that right?

11    A.   Yes.

12    Q.   And you've gotten -- this information that you summarized

13    here on this exhibit, you've gotten the information from the

14    checking accounts, right?  All the bank statements?

15    A.   Right.

16    Q.   And all of the activity that went -- that comprised the

17    bank statements?

18    A.   Right.

19    Q.   And the memo portions of the checks?

20    A.   Mm-hmm.

21    Q.   Or the withdrawal slips or the deposit slips, correct?

22    A.   Right.

23    Q.   Other than that, can you say what the money was used for,

24    from what you've reviewed?

25              THE COURT:  I'm sorry, the money that was withdrawn

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

504

```
1    was used for?

2              MR. ULTIMO:  Correct.

3              THE COURT:  Okay.

4              THE WITNESS:  Yeah, I wouldn't know, because I don't

5    know -- I don't -- I don't even really know these guys, really.

6    I never observed them spending it or whatever --

7    BY MR. ULTIMO:

8    Q.   Right.  So you don't know, for example, any of this was

9    used for construction on the office facilities or anything like

10   that?

11             MR. CARDONA:  Objection, Your Honor, calls for

12   speculation.  He said says he doesn't know.

13             THE COURT:  Overruled.

14        You don't know what these were used for, correct?

15             THE WITNESS:  Correct, I don't know.

16   BY MR. ULTIMO:

17   Q.   So we just know what the totals are in and out.

18   A.   Correct.

19   Q.   Thank you, Mr. Zalameda.

20        Thank you.

21             THE COURT:  Thank you.

22        Before you leave, any redirect?

23             MR. CARDONA:  No, Your Honor.

24             THE COURT:  Okay.  You're free to go.

25             THE WITNESS:  Thank you.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Thank you very much for coming in.
 2         Next witness.
 3              MR. CARDONA:  Your Honor, the government calls Sergio
 4    Amador.
 5              THE COURT:  Okay.
 6              THE CLERK:  Good afternoon.  Right here to be sworn.
 7    Can you please raise your right hand.
 8         Do you solemnly swear the testimony that you are about to
 9    give in the matter now before the Court shall be the truth, the
10    whole truth, and nothing but the truth, so help you God?
11              THE WITNESS:  Yes.
12              THE CLERK:  You may be seated.
13         May I please ask that you state your full name for the
14    record and spell your last name.
15              THE WITNESS:  Sergio Amador, A-m-a-d-o-r.
16              THE CLERK:  Thank you.
17              THE COURT:  Thank you.
18         Counsel, you may inquire.
19              MR. CARDONA:  Thank you, Your Honor.
20              **SERGIO AMADOR, GOVERNMENT'S WITNESS,**
21                      **DIRECT EXAMINATION**
22    BY MR. CARDONA:
23    Q.   Mr. Amador, are you testifying here pursuant to a plea
24    agreement with the government?
25    A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   Did you plead guilty to one count of mail fraud?

A.   Yes, I did.

Q.   Did the government agree to dismiss the rest of the
charges in the indictment against you?

A.   No.

Q.   Are you sure about that?  Is there an agreement that at
sentencing the government will dismiss the remainder of the
counts in the indictment?

A.   The remainder, yes.

Q.   So am I correct that you only pled guilty to one count?

A.   To one count, yes.

Q.   And the government has agreed to dismiss the other 19
counts against you?

A.   Yes.

Q.   Now, did the government agree to recommend a reduction on
your sentence based on early acceptance of responsibility from
your own conduct?

A.   Yes.

Q.   Did you agree to cooperate with the government?

A.   Yes, I did.

Q.   Does that cooperation include your testimony here at
trial?

A.   Yes, it does.

Q.   Are you hoping that, as a result of your cooperation, both
here and elsewhere, that the government would move to reduce

```
 1   your sentence further?

 2   A.   Yes.

 3   Q.   How are you employed?

 4   A.   I'm a longshoreman.  I work at the docks, L.A. and Long

 5   Beach Harbor.

 6   Q.   How long have you been a longshoreman?

 7   A.   Since 1997.

 8   Q.   Are you a member of the ILWU?

 9   A.   Yes, I am.

10   Q.   Which local?

11   A.   Local 13.

12           THE COURT:  Could you bring yourself up -- yeah.

13           THE WITNESS:  Local 13.

14           THE COURT:  Thank you.

15   BY MR. CARDONA:

16   Q.   Do you know the defendant, David Gomez?

17   A.   Yes, I do.

18   Q.   Is he also a longshoreman?

19   A.   Yes, he is.

20   Q.   He also a member of Local 13?

21   A.   Yes, he is.

22   Q.   Do you know Chris Rice?

23   A.   Yes, I do.

24   Q.   How do you know Chris Rice?

25   A.   Working at the docks.  He's a foreman.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Is he a member of Local 94, the foreman's local?

2    A.   The foreman's local, yes.

3    Q.   Have you worked with David Gomez at the docks?

4    A.   Yes.

5    Q.   Have you worked with Chris Rice at the docks?

6    A.   Yes.

7    Q.   Now, at some point in late 2008 or early 2009, were you

8    involved in opening a clinic called Port Medical in Long Beach?

9    A.   Yes.

10   Q.   How did that come about?

11   A.   It was my idea, and from there I invited Mr. Gomez, David

12   Gomez, to -- if he wanted to partner up and open the clinic up.

13   Q.   Why did you invite David Gomez?

14   A.   At the time he owned a restaurant in San Pedro and he had

15   a business on his own, so I -- I thought it would be a good --

16   good partner.

17   Q.   What was the name of that restaurant?

18   A.   Sixth Street Bistro.

19   Q.   And what was the other business he had?

20   A.   He was involved in some gold exchange, I believe.

21   Q.   You know where that was?

22   A.   In L.A. somewhere.

23   Q.   Did you reach an agreement with Mr. Gomez as to how you

24   would found the business, who would put up what?

25   A.   It was vague at the time.  We just -- we were planning on

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    pretty much going 50/50 until we found a partner to put more
 2    money up.
 3    Q.   Did you find that partner?
 4    A.   Yes.
 5    Q.   Who was it?
 6    A.   Mr. Rice.  Chris Rice.
 7    Q.   So at first when you were having these discussions, what
 8    were the first steps you took in setting up Port Medical?
 9    A.   The first step was to find a location.  I found the
10    location in Long Beach.  And then from there, we -- we leased
11    it, David Gomez and I.
12    Q.   At that point had Chris Rice come in?
13    A.   I believe he was mentioned, but at that time his credit
14    wasn't -- wasn't good enough to go on the -- on the lease, but
15    yes.
16    Q.   Now, ultimately, did you invest some money?
17    A.   Yes, we did.
18    Q.   How much did you invest?
19    A.   I believe at that time was probably 40,000, somewhere
20    around there.
21    Q.   Did David Gomez put up money?
22    A.   Yes.  We all did.
23    Q.   How much did David Gomez put up?
24    A.   Probably around the same.
25    Q.   How about Chris Rice?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.

2    Q.    How much did he put up?

3    A.    I believe around 60- at that time.

4    Q.    What was the next step that was taken in opening up Port

5    Medical?

6    A.    We wanted to find, I guess a doctor, to -- to be the

7    coordinator of the clinic, or the owner of the clinic, and then

8    from there we needed a manager to run the facility.

9    Q.    Did you find a doctor?

10   A.    Not really.  We had one, probably was with us for about

11   a -- two weeks, three weeks.  It didn't work out.  So we knew

12   we needed a manager.

13   Q.    Did you find a manager?

14   A.    Yes.

15   Q.    Who was the manager you found?

16   A.    Michelle Aragon.

17   Q.    How did you find her?

18   A.    I think she was recommended by -- by someone at the port.

19   I don't even remember the -- the young lady's name.  Everyone

20   knew -- not everyone, but we were asking if they knew -- we

21   were asking people at the docks if they knew someone that could

22   run a clinic.

23   Q.    Did you get in touch with Michelle Aragon?

24   A.    Yes.  I believe she got in touch with us, and that's

25   how --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   What was she doing at the time?

2    A.   She was working for her cousin as a manager at a

3    chiropractor office.

4    Q.   Do you know the name of that cousin?

5    A.   Yes.  I just went blank.  It'll come back to me, but yes,

6    I do.  I know him.

7    Q.   Does the name David Rivera sound --

8    A.   Rivera, yeah.

9    Q.   Was that who she was working for?

10   A.   I knew him as Mr. Rivera.  I don't know -- I don't recall

11   his first name.

12   Q.   So when Michelle Aragon reached out to you, did you meet

13   with her?

14   A.   Yes.

15   Q.   Was Mr. Gomez there?

16   A.   Yes.

17   Q.   Do you recall where that meeting was?

18   A.   At the restaurant, yes.

19   Q.   At which restaurant?

20   A.   Sixth Street Bistro.

21   Q.   And what did you and Mr. Gomez discuss with Michelle

22   Aragon?

23   A.   That we had an idea of opening up a clinic, we had a

24   location, and we needed help.

25   Q.   Did she agree to help you?

```
1   A.   On the first initial visit, no.

2   Q.   Did you have a subsequent visit?

3   A.   Yes.  She -- she, from there, went ahead and called us

4   back and said she would take the job.

5   Q.   What was the next step in setting up Port Medical?

6   A.   She -- from there, she pretty much took the rein of

7   finding the chiropractor and the massage therapist and our

8   front office, so -- and acupuncture.

9   Q.   Did she find a chiropractor for you?

10  A.   Yes.

11  Q.   Who was that?

12  A.   Mr. Malone.

13  Q.   Is that Kevin Malone?

14  A.   Kevin Malone.

15  Q.   Did she also find massage therapists for you?

16  A.   Yes.

17  Q.   Do you remember any of the names of any of those massage

18  therapists?

19  A.   No, not at this -- no.

20  Q.   Was there also office staff that she found?

21  A.   Yes.

22  Q.   You remember the names of any of the office staff?

23  A.   At the time, no.  It was -- it was so --

24  Q.   So once you had all that in place, you had a location, a

25  manager, a chiropractor, some massage therapists, did she also
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   find you an acupuncturist?
 2   A.   The acupuncturist she found was only with us for probably
 3   three months, and then from there we -- we hired someone else.
 4   Q.   When you say "we," was that you and Mr. Gomez?
 5   A.   Yeah.  We put, I believe, an ad in the paper, right,
 6   something like that.
 7   Q.   Do you recall when it was that Port Medical started
 8   operating?
 9   A.   No.  Not exact date, no.
10   Q.   Was it in 2008, 2009?
11   A.   Somewhere around there.
12   Q.   Was there a company that you and Mr. Gomez set up called
13   DCS Medical Management?
14   A.   Yes.
15   Q.   What was that company for?
16   A.   That was going to be the -- the managing company,
17   meaning -- we were advised by Michelle at that time, that she
18   spoke to an attorney, and we would have a management company to
19   disburse the funds, to pay payroll, the rent, and so forth.
20        MR. CARDONA:  Your Honor, I'd like to offer Exhibit 1
21   at this time.
22        THE COURT:  Okay.  I thought it's already been
23   introduced.
24        MR. CARDONA:  It was introduced by mistake.
25        THE COURT:  Oh, that's right.  It was 2 rather than 1.
```

```
1    My mistake.

2              MR. ULTIMO:  No objection, Your Honor.

3              MR. CARDONA:  My mistake, actually, but --

4              THE COURT:  It will be received.

5         (Received in evidence, Trial Exhibit 1.)

6    BY MR. CARDONA:

7    Q.  So I've put up on the screen what is marked as Exhibit 1.

8    I'll try and blow some things up so they're easier to see, but

9    you see that this is a form for DCS Medical Management, LLC?

10   A.  Yes.

11   Q.  And according to this, it was filed December 29th, 2008.

12   Was that around the time period that you and Mr. Gomez were in

13   the process of getting Port Medical up and running?

14   A.  Yes.  I believe it was -- yes.  It was probably running,

15   and then we opened up that management company.

16   Q.  Then down below here, do you see, "Name of initial agent

17   for service of process, David Gomez"?  Was he put in that

18   position?

19   A.  At the time we didn't really discuss anything, so I'm

20   assuming he -- he went ahead and went on there.  I -- I --

21   Q.  What do you mean you didn't discuss anything?

22   A.  We didn't discuss who -- who was going to go on the

23   paperwork or anything.  It was just, whatever needed to be done

24   at that time, we were -- either he would do it or I would do

25   it.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   Down at the bottom it's signed David Gomez; is that right?

2   A.   Yes, it looks like his signature.

3   Q.   Now, did you --

4        THE COURT:  Counsel, let me interrupt you at this

5   time, because it is 4:00 o'clock.

6        Ladies and gentlemen, I'm going to be excusing you at this

7   time for the evening.

8        Remember the admonishment not to discuss the case among

9   yourselves or with anybody else or form or express any opinions

10  about the matter until it's submitted to you and you retire

11  into the jury room.  Same admonition:  Find something

12  interesting to watch on TV, but don't think about the case.

13       We'll see you back in tomorrow morning.  I don't know, you

14  got a perfect record going so far, so let's see if we can keep

15  it up.  Tomorrow morning at 8 --

16       MULTIPLE JURORS:  -- 15.

17       THE COURT:  Okay.  Great.  You're going to be excused

18  at this time, and if you'd leave quietly, because the Court

19  will still be in session.

20       THE CLERK:  All rise.

21       THE COURT:  You may step down, also.  You're ordered

22  to be back here tomorrow morning at 8:30.

23       THE WITNESS:  8:30?

24       THE COURT:  Yeah.

25       (Outside the presence of the jury:)
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        THE COURT:  Okay.  The record will reflect that all

2   the members of the jury have left the courtroom.

3        Counsel, tomorrow we're going to be starting at 8:30.  I

4   have a list of witnesses that we have from this morning.  Is

5   that still an accurate list as to who will be called tomorrow?

6        MR. CARDONA:  Your Honor, I anticipate that we may

7   actually rest after Mr. Amador's testimony.

8        THE COURT:  Okay.  That means I've gotta work tonight,

9   is that what you're telling me?  It depends how much the

10  defense is, but if there is no more defense, then I'm going to

11  have to do the jury instructions tonight.  So I'll be prepared

12  one way or the other in case we have to.  Okay, that's --

13  answers my question, then.

14       You're pretty sure that you might -- by noontime will be

15  resting?

16       MR. CARDONA:  I mean, depending how long the cross of

17  Mr. Amador is.

18       THE COURT:  I understand.

19       MR. CARDONA:  I anticipate that, yes, unless something

20  happens.

21       THE COURT:  Okay.  Any other questions anybody has?

22       Okay.  I'll see you back in tomorrow morning.  I'm going

23  to ask the attorneys to be in a little bit earlier, like 8:00

24  to 8:15, like you were today, in case there's any problems when

25  we're going through the jury instructions, I can talk to you.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. ULTIMO:  Thank you, Your Honor.

2          MR. CARDONA:  Thank you, Your Honor.

3          THE CLERK:  All rise.

4      Court is adjourned.

5

6          *(Proceedings adjourned at 4:02 p.m.)*

7

8                    *--o0o--*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                           *CERTIFICATE*

2

3        *I hereby certify that pursuant to Section 753, Title 28,*

4   *United States Code, the foregoing is a true and correct*

5   *transcript of the stenographically reported proceedings held in*

6   *the above-entitled matter and that the transcript page format*

7   *is in conformance with the regulations of the*

8   *Judicial Conference of the United States.*

9

10  *Date:  NOVEMBER 20, 2016*

11

12

13

14                          */S/ SANDRA MACNEIL*
                            _____

15                        *Sandra MacNeil, CSR No. 9013*

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA