```
 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3         HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

 4                        - - - -

 5


 6
   UNITED STATES OF AMERICA,        )
 7                                   )
                    PLAINTIFF,       )
 8                                   )
         vs.                         )    No. CR 15-629-RGK-2
 9                                   )
   DAVID GOMEZ,                      )
10                                   )
                    DEFENDANT.       )
11  _____)

12

13

14            REPORTER'S TRANSCRIPT OF JURY TRIAL

15              DAY 4; PAGES 519 - 714

16             FRIDAY, OCTOBER 14, 2016

17                   8:31 A.M.

18             LOS ANGELES, CALIFORNIA

19

20

21

22    _____

23        SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR
          Official Reporter, U.S. District Court
24               255 East Temple Street
                 Los Angeles, CA  90012
25                   213.894.5949
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    **APPEARANCES OF COUNSEL:**

2

3    **FOR PLAINTIFF, UNITED STATES OF AMERICA:**

4            OFFICE OF THE UNITED STATES ATTORNEY
             BY:  GEORGE S. CARDONA
5                  ASSISTANT UNITED STATES ATTORNEY
             312 NORTH SPRING STREET, SUITE 1100
6            LOS ANGELES, CALIFORNIA  90012
             213.894.2434
7

8    **FOR DEFENDANT, DAVID GOMEZ:**

9            ULTIMO LAW FIRM, PC
             BY:  PAUL J. ULTIMO
10                 ATTORNEY AT LAW
             7700 IRVINE CENTER DRIVE, SUITE 800
11           IRVINE, CALIFORNIA  92618-3047
             949.851.0300
12

13   **ALSO PRESENT:**

14           SPECIAL AGENT MARCUS VALLE, DEPARTMENT OF LABOR,
             OFFICE OF THE INSPECTOR GENERAL
15

16           JEANNIE HENSCHEL

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

# I N D E X

***GOVERNMENT'S WITNESS:***                                 ***PAGE***

***SERGIO AMADOR***
   DIRECT EXAMINATION (Continued) BY MR. CARDONA      524
   CROSS-EXAMINATION BY MR. ULTIMO                    547
   REDIRECT EXAMINATION BY MR. CARDONA                580
   RECROSS-EXAMINATION BY MR. ULTIMO                  583


***DEFENSE WITNESSES:***                                    ***PAGE***

***MARCUS VALLE***
   DIRECT EXAMINATION BY MR. ULTIMO                   589
   CROSS-EXAMINATION BY MR. CARDONA                   593

***DAVID GOMEZ***
   DIRECT EXAMINATION BY MR. ULTIMO                   595
   CROSS-EXAMINATION BY MR. CARDONA              632, 642
   REDIRECT EXAMINATION BY MR. ULTIMO                 663


***FURTHER PROCEEDINGS:***                                  ***PAGE***

   Government's closing argument ...................   669

   Defense's closing argument .....................   681

   Government's rebuttal argument .................   688

   Jury Instructions .............................   691

   Verdict .......................................   704

***T R I A L   E X H I B I T S***

***EXHIBIT NUMBER***                    ***RECEIVED IN EVIDENCE***

| Exhibit Number | Received in Evidence |
|---|---|
| 3 | 588 |
| 4 | 588 |
| 5 | 588 |
| 11 | 525 |
| 12, page 167 | 619 |
| 12, page 221 | 621 |
| 12, page 173 | 622 |
| 12, page 1346 | 622 |
| 12, page 1432 | 623 |
| 12, page 30 | 624 |
| 12, page 111 | 645 |
| 12, page 855 | 646 |
| 12, page 918 | 647 |
| 12, page 608 | 648 |
| 21 | 588 |
| 23, page 200 | 643 |
| 23, page 228 | 644 |
| 26 | 588 |
| 36 | 588 |
| 41 | 588 |
| 43 | 588 |
| 51 | 588 |
| 71 | 588 |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

| *T R I A L   E X H I B I T S* (Continued) | |
|---|---|
| **EXHIBIT NUMBER** | **RECEIVED IN EVIDENCE** |
| 71-1 | 580 |
| 74, page 2 | 548 |
| 86 | 588 |
| 87, pages 1, 2 | 584 |
| 116 | 588 |
| 142 | 588 |
| 143 | 588 |
| 144 | 588 |
| 145 | 588 |
| 146 | 588 |
| 162 | 588 |
| 168 | 588 |
| 169 | 588 |
| 171 | 588 |
| 173 | 588 |
| 177 | 655 |
| 178 | 588 |
| 261 | 588 |
| 306 | 588 |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

524

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, OCTOBER 14, 2016

 2                              8:31 A.M.

 3                              - - - -

 4        (In the presence of the jury:)

 5              THE COURT:  Okay.  You did it again.  I'm impressed.

 6    Still got the perfect record going.  Hopefully you had a good

 7    evening last night, didn't think about this case, you're ready

 8    to get in, do the work today.

 9        Record will reflect all the members of the jury are in

10    their respective seats in the jury box, the witness is on the

11    witness stand.

12        Remember, sir, you're still under oath.

13              THE WITNESS:  Yes.

14              THE COURT:  Counsel, you may inquire.

15              MR. CARDONA:  Thank you.

16        SERGIO AMADOR, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

17                   DIRECT EXAMINATION (Continued)

18    BY MR. CARDONA:

19    Q.  Mr. Amador, when we left off last night, we were talking

20    about the opening of Port Medical, and we were talking about

21    the management company called DCS Medical Management.  Do you

22    remember that?

23    A.  Yes.

24              MR. CARDONA:  I'd like to put up on the -- and offer,

25    Your Honor, Exhibit 11.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ULTIMO:  No objection, Your Honor.

 2              THE COURT:  Okay.  Be received.

 3          (Received in evidence, Trial Exhibit 11.)

 4   BY MR. CARDONA:

 5   Q.   Now, in connection with DCS Medical Management, did you

 6   also open a bank account at Chase Bank?

 7   A.   Yes.

 8   Q.   And were you, Mr. Gomez and Mr. Rice all signators on that

 9   account?

10   A.   Yes.

11   Q.   The DCS, what did that stand for?

12   A.   David, Chris, Sergio.

13   Q.   Now, we touched briefly on the staffing of Port Medical.

14   Do you remember a woman named Yolanda Sierra?

15   A.   Yes.

16   Q.   Was she hired at Port Medical?

17   A.   Yes.

18   Q.   How was she hired?

19   A.   She was a -- an employee of the restaurant Sixth Street

20   Bistro.  I believe when the restaurant closed, she was offered

21   a job to work at the clinic.

22   Q.   And what was her job at the clinic?

23   A.   I believe at the front desk.

24   Q.   Now, at some point did you become a partner in the bistro

25   restaurant with Mr. Gomez?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.

2    Q.    Did you also become a partner with him in another medical

3    management company, DS Medical Management?

4    A.    Yes.

5    Q.    Did you and he also have a joint account together at

6    Chase?

7    A.    Yes.

8    Q.    Now, going back to Port Medical and its operations, when

9    it opened, were you involved in recruiting patients?

10   A.    Yes.

11   Q.    Was Mr. Gomez involved in recruiting patients?

12   A.    Yes.

13   Q.    What would you do to recruit patients?

14   A.    At that time we would ask our -- our work partners if they

15   would go and visit the clinic, basically, people that we knew

16   at the -- at work.

17   Q.    Were those members of the ILWU?

18   A.    Yes.

19   Q.    Were they people that had benefits under the ILWU

20   insurance plan?

21   A.    Yes.

22   Q.    Now, were there other medical clinics doing the same

23   thing?

24   A.    Yes.

25   Q.    Were there a large number of medical clinics recruiting

```
 1   members of the ILWU to go to their clinics?

 2   A.   Considerable, yes.

 3   Q.   Were other clinics offering payments to longshoremen?

 4   A.   Yes.

 5   Q.   Now, when you say you were doing that, was Dave Gomez also

 6   doing the same thing, recruiting patients from the

 7   longshoremen?

 8   A.   Yes.

 9   Q.   Now, at first did you pay them?

10   A.   At first it was -- no, it was just word of mouth.  We

11   would ask them if they would show up at first.

12   Q.   At some point did Port Medical start making payments to

13   patients?

14   A.   Yes.

15   Q.   How did that come about?

16   A.   First we started sponsoring teams, basically, the softball

17   teams and basketball teams, soccer teams, and that's how it

18   started off.

19   Q.   And what was the purpose of sponsoring those teams?

20   A.   To have the patient go to -- or the -- the union member go

21   to our clinic.

22   Q.   Did that change at some point?

23   A.   Yes.

24   Q.   How did it change?

25   A.   Other patients started coming, asking for -- for favors,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    also.

2    Q.    What do you mean by "asking for favors"?

3    A.    During two-thousand-, I believe -eight or -nine, there was

4    a recession, so a lot of longshoremen weren't -- they weren't

5    working.  So they would ask us if we could help them out to

6    make their mortgage payment, the car payments and so forth.  So

7    we -- I would -- we would say yes, basically.

8    Q.    What would you -- when you say you would say yes, what

9    would that mean?

10   A.    If they would go and visit the clinic, we would help them

11   out.

12   Q.    And how would you help them out?

13   A.    By paying them.

14   Q.    How did you pay them?

15   A.    Cash.  We would -- it started off, they would go into the

16   clinic, and after that, I would -- I would pay them.

17   Q.    And did Mr. Gomez also do that?

18   A.    I never saw him, actually, give someone cash, but we -- he

19   pretty much knew.  He would call me up or -- or we would talk

20   daily, basically, of what we would do that day.

21   Q.    So did you discuss the various arrangements that each of

22   you had worked out with various patients?

23   A.    Yes.

24   Q.    How did you keep track of these arrangements?

25   A.    At first I -- I didn't have any way of keeping track of

529

1    the patients that needed the favor.  The sponsorships, the

2    actual manager would keep track of the patients that were

3    coming in, the baseball players or the basketball players.  The

4    other members that needed favors, to pay their car note or

5    their mortgage or their rent, I would ask them to keep their --

6    their EOBs, which is their -- their statements of benefits, and

7    with that I would go ahead and pay them.

8    Q.   Let me go back for a second and break this down a little

9    bit.  When you said for the sponsorships the manager would keep

10   track of who came in, was there an arrangement that when you

11   gave a sponsorship, you expected a certain number of visits or

12   a certain number of people to come in?

13   A.   Yes.

14   Q.   How did you figure that out?

15   A.   We pretty much had a basic -- or the minimum amount that

16   we knew that we could bill out for the visit, basically.  So if

17   we gave out a certain amount of money, we figured, for us to

18   get back our money, they had to come in a certain amount of

19   times.

20   Q.   Did you work out those arrangements with teams?

21   A.   Some of them, yes.

22   Q.   Did Mr. Gomez?

23   A.   We were there.  I -- I don't remember him actually telling

24   someone, but we were all there, yeah.

25   Q.   When you say "we were all there," what do you mean?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    When it first started, it was our manager, and she's the

2    one that pretty much knew how to do everything.  So she

3    explained everything the way she was doing at her previous

4    clinic.  So that's the way we -- we knew.

5    Q.    And when you say she explained that, did she explain that

6    to you?

7    A.    To both of us, yeah.

8    Q.    You and Dave Gomez?

9    A.    Yes.

10   Q.    Was that Michelle Aragon?

11   A.    Yes, Michelle Aragon.

12   Q.    And when you said that your manager kept track of who came

13   in and whether they came in for the appropriate number of

14   visits, was that Michelle Aragon you were talking about?

15   A.    Yes, at that time.  And when a previous manager would come

16   in, we'd pretty much let them know how to do it or what to do.

17   Q.    I'll come back to that in a second.  Let me ask you about

18   a particular person.  Do you remember someone known as Joe

19   Vaifanua?

20   A.    Yes.

21   Q.    How do you know him?

22   A.    I believe he approached me from -- at work.

23   Q.    Was he a longshoreman?

24   A.    Yes.

25   Q.    What did he approach you at work for?

1   A.   He needed -- he needed help.

2   Q.   Did you agree to help him?

3   A.   Yes.

4   Q.   Was there an expectation on your part in return for that

5   help?

6   A.   Yes.

7   Q.   What was that?

8   A.   For him to take his family to -- to the clinic.

9   Q.   Did he actually go to the clinic?

10  A.   I was never there to see him physically go into the

11  clinic, so I -- I wouldn't -- no, I've not -- I wouldn't know.

12  Q.   You mentioned that you required the people who you did

13  favors for to show you their EOBs.

14  A.   Yes.

15  Q.   Did you require that of Joe Vaifanua?

16  A.   Yes.

17  Q.   How did that work?

18  A.   Well, at first when I would help him, we didn't know --

19  "we" meaning the clinic, didn't know if we were actually

20  getting paid after I would ask the manager if -- if Joe was

21  coming in or not.  So what I did, I asked Joe if he would

22  please just -- I came up with the idea that if he would show me

23  the Explanation of Benefits, and that's the way I would keep

24  track if he would come in or not.

25  Q.   And then did you pay him?

532

```
 1    A.    Yes.

 2    Q.    So I'd like to show you what's marked as Exhibit 273, page

 3    27.

 4          It's previously been admitted, Your Honor.

 5             THE COURT:  Yes.

 6    BY MR. CARDONA:

 7    Q.    Now, you see this is a check signed by you for $2400 to

 8    Joe Vaifanua; is that right?

 9    A.    Yes.

10    Q.    Is this one of the payments you made to Joe Vaifanua?

11    A.    Yes.

12    Q.    Was he a plumber?

13    A.    No.

14    Q.    Did he do any plumbing services for Port Medical?

15    A.    No.

16             MR. CARDONA:  Your Honor, I'd like to display

17    Exhibit 273, page 75.  It's previously been admitted as well.

18             THE COURT:  Okay.

19    BY MR. CARDONA:

20    Q.    You see this?  This is a $300 check to Joe Vaifanua with a

21    signature, David Gomez; is that right?

22    A.    Yes.

23    Q.    Was this another payment to Joe Vaifanua?

24    A.    It was paid to him, yes.

25    Q.    Was David Gomez aware of your arrangement with Joe
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Vaifanua?

2  A.   Yes.

3  Q.   Were there times when you would sign checks for David

4  Gomez, his arrangements, and he would sign checks for your

5  arrangements?

6  A.   Yes.

7  Q.   Did you sign David Gomez's name on this check?

8  A.   No.

9  Q.   Did you ever sign David Gomez's name on any checks?

10  A.   No.

11  Q.   Were both you and he signators on this account?

12  A.   Yes.

13  Q.   Now, were there times when you had arranged to do favors

14  for longshoremen and they were supposed to come in a number of

15  times, but they didn't actually come in?

16  A.   Yes.

17  Q.   How did the clinic deal with that?

18  A.   At first the players or the managers were bringing in

19  their patients, and after we would sponsor them, give them the

20  check, they -- they pretty much wouldn't show up.  So Michelle

21  thought it would be good if they would sign the sign-in sheet

22  so we would have already their signature on file, so if they

23  didn't make their appointment, she would go ahead and put it

24  down as the patient -- made it seem like he showed up to the --

25  to their chiropractor visit.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Even though they hadn't?

 2   A.   Yes.

 3   Q.   And were those then billed to the insurance company?

 4   A.   Yes.

 5   Q.   Did Michelle tell you about that?

 6   A.   Yes.

 7   Q.   Did she tell David Gomez about that?

 8   A.   Yes.

 9   Q.   Were you there when that happened?

10   A.   Yes.

11   Q.   Now, we saw those two checks to Joe Vaifanua, and you

12   mentioned that they were cash payments.  Were there also checks

13   written to other people who you had similar arrangements with?

14   A.   I'm sure if -- I'm sure there was, yes.

15   Q.   You remember any of the longshoremen with whom you had

16   similar arrangements?

17   A.   Pretty much, yes.

18   Q.   Who were some of them?

19   A.   I would have to see their -- a lot of people had

20   nicknames, so I would have to -- I would have to see a picture.

21   Q.   Does the name John Toavalu --

22   A.   I'm sure the -- yes.

23   Q.   Do you remember the specific names?

24   A.   No.  On some of them, but not -- not John.

25   Q.   Was there a time when there was a fear at Port Medical
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    that there was going to be an audit?

2    A.   Yes.

3    Q.   Do you recall when that was?

4    A.   Yes.  That was probably the first year we were open.  The

5    files were piling up, and we had a girl, she was an accountant,

6    to come in and do an internal -- internal audit.

7    Q.   Who was that?

8    A.   First name, her name was Toni.  I don't remember her last

9    name.

10   Q.   Is that Toni Moyer?

11   A.   Yes.

12   Q.   Did she ultimately start working for you as a biller?

13   A.   Yes.

14   Q.   So what happened in connection with that audit?

15   A.   She informed my partner and I that there was missing

16   paperwork, missing signatures, missing everything, pretty much.

17   It was just files with names and nothing there.

18   Q.   And when you say your partner, who do you mean?

19   A.   David.

20   Q.   Is that David Gomez?

21   A.   David Gomez, yeah.

22   Q.   So what did you do?

23   A.   We -- we were trying to get in contact with the patients,

24   for them to come back and see the doctor or sign whatever

25   paperwork they needed to get signed.

```
 1   Q.   When you say you were in contact with them, who was "you"?
 2   Was it you?
 3   A.   It was pretty much the entire -- everyone at the clinic.
 4   Making phone calls, or if we saw them at work, to let them
 5   know, also.
 6   Q.   And in connection with this, were there times when, rather
 7   than them coming in, you simply had them sign stickers?
 8   A.   Yes.
 9   Q.   What did you do with those stickers?
10   A.   I give them to the manager, Michelle.
11   Q.   To do what?
12   A.   To put them on the -- on the chart, I'm assuming.
13   Q.   Even though the patients hadn't come in?
14   A.   Yes.  Some of the patients actually showed up, but some of
15   the patients didn't.  They never showed up.  So -- and I
16   wouldn't know unless Michelle -- she would -- she would
17   actually know which ones showed up and which ones wouldn't.
18   Q.   Now, during this mini audit, was David Gomez there?
19   A.   Yes.
20   Q.   Was he involved in this collecting -- making the calls and
21   collecting the stickers and giving them to Michelle?
22   A.   I never saw him do it, but we were all -- we were all
23   informed, basically, to bring them in and do what we need to do
24   to bring them -- to get the charts the way they're supposed to
25   be.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Did Michelle Aragon ultimately leave as the manager?

2   A.   Yes.

3   Q.   Do you recall when that was?

4   A.   No, I don't.

5   Q.   Were you concerned that she knew what you were doing at

6   the clinic?

7   A.   No.

8   Q.   Did you have a fear that she might tell others?

9   A.   No.

10  Q.   Now, you mentioned earlier that there was a number of

11  managers who came in after her; is that right?

12  A.   Yes.

13  Q.   Was one of those a woman named Nicole LaBeaud?

14  A.   Yes.

15  Q.   Did you and Mr. Gomez approach her about what Michelle

16  Aragon had been doing with respect to the billing?

17  A.   I'm sure we did, yes, but --

18  Q.   Did she agree to do it?

19  A.   So long ago.  If she was manager, I'm sure she agreed to

20  it, yes.

21  Q.   Did you ultimately fire her?

22  A.   Yes.

23  Q.   Is that because she wouldn't agree to do it?

24  A.   No.

25  Q.   Now, do you know a woman named Pandora Hall?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Yes.

2    Q.   Did she work at Port Medical?

3    A.   Yes.

4    Q.   What was her job at Port Medical initially?

5    A.   She started off as a massage therapist.

6    Q.   Ultimately, did she become a manager?

7    A.   Yes.

8    Q.   Was that after Nicole LaBeaud or at the same time?

9    A.   I believe it was after.

10   Q.   Now, at some point did Pandora Hall start signing the

11   sponsorship checks?

12   A.   Yes.

13        MR. CARDONA:  And Your Honor, at this time I'd ask to

14   display Exhibit 273, page 1.  It's previously been admitted.

15        THE COURT:  You may publish it.

16   BY MR. CARDONA:

17   Q.   So over on the left, do you see an entry with the date

18   May 5th, 2010, then the account, Chosen, and then going across,

19   shows that Pandora Hall signed that check?

20   A.   Yes.

21   Q.   And going down, does it appear that there are a number of

22   checks after that that are signed by Pandora Hall?

23   A.   Yes.

24   Q.   Many of which have comments that say "sponsorship"?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    What was Chosen Medical Management?

2    A.    A different management company was eventually made,

3    because we were told that we couldn't be managers of the -- of

4    the clinic because we were actual patients and also worked at

5    the docks.  So we came up with the different management

6    company.

7    Q.    When you say "we," who do you mean?

8    A.    Our -- David and myself.

9    Q.    How did you set up Chosen Medical Management?

10   A.    We had a gentleman by the name of Ramsey set everything

11   up, and he was going to be the owner of Chosen.

12   Q.    Who was Ramsey?

13   A.    Ramsey was someone I met at the Norwalk filing office.  He

14   was outside with his employee.

15   Q.    Is that Ramsey Muro?

16   A.    Yes.

17   Q.    Now, did both you and David Gomez work with Ramsey Muro to

18   set up Chosen Medical Management?

19   A.    Ramsey pretty much did everything on his own, but he would

20   let us know that everything was done, basically, so yes.

21   Q.    Did you also set up another medical management company

22   called Ramport Medical Management?

23   A.    Yes.

24   Q.    How was that set up?

25   A.    When the other clinic was opened, we had a different

```
 1   medical management company to run that particular clinic.

 2   Q.   And when you say the other clinic, is that Port Medical

 3   San Pedro location?

 4   A.   Yes.

 5   Q.   Who set up Ramport Medical Management?

 6   A.   Ramsey.

 7   Q.   Were you and David Gomez both involved in setting that up?

 8   A.   We both knew about it, yes.

 9   Q.   So going back to Exhibit 273, which we still have up

10   there, a number of checks that Pandora Hall wrote out of Chosen

11   Medical Management.  Who directed her to do that?

12   A.   We did.  David and myself.

13   Q.   Now, when Pandora became a manager, did she take over

14   where Michelle had left off in terms of falsifying charts?

15   A.   Yes.

16   Q.   Did you know she was doing that?

17   A.   Yes.

18   Q.   Did David Gomez know she was doing that?

19   A.   Yes.

20   Q.   Did you have discussions with David Gomez about that?

21   A.   Not really, no.  We just -- we just knew.

22   Q.   How do you know he knew?

23   A.   We would talk about patients not coming in and -- and for

24   us to get paid, basically, we needed to go ahead and -- and

25   bill out.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Let's go to the San Pedro clinic.  Do you recall when that

2   opened?

3   A.   No.

4   Q.   How did it come about that you opened a second clinic in

5   San Pedro?

6   A.   We thought it would be a good idea.  Since most of the

7   longshoremen live in San Pedro, we -- we would open up

8   something in San Pedro.

9   Q.   Did you find a location?

10  A.   Yes.

11  Q.   How was San Pedro going to be set up?  Who was going to

12  staff it?

13  A.   At the time, Michelle was still our manager, so we were --

14  I was assuming she would help us staff it or she would staff

15  it.

16  Q.   Did she leave before you actually opened the clinic?

17  A.   Yes.

18  Q.   Did you run into financial difficulties when you were

19  opening the second clinic?

20  A.   Yes.

21  Q.   What were those?

22  A.   Inspector went ahead and stopped work at the clinic, so

23  we -- we had to rectify everything that he said that needed to

24  be done, so that's when everything -- we had to stop, and kept

25  paying the note on the property, the lease, and -- and fix

1    everything that -- that needed to get fixed on the property.

2    Q.   Now, in connection with that, did you get a new investor?

3    A.   Yes.

4    Q.   Who was that?

5    A.   Actually, it was -- that was Chris.

6    Q.   Chris Rice?

7    A.   Chris Rice was already on board.

8    Q.   So who was the new Chris?

9    A.   Viramontes.

10   Q.   Was he involved in the ILWU?

11   A.   Yes.

12   Q.   Did he have a position within the ILWU?

13   A.   Yes.

14   Q.   What was his position?

15   A.   At that time he was, I believe, a crane operator.

16   Q.   Did he also have a title within the union as a union

17   officer?

18   A.   He later became a secretary.

19   Q.   How did you arrange for Chris Viramontes to invest in

20   San Pedro?

21   A.   We didn't.  David, I guess, knew him personally, so we

22   asked, I believe, a hundred for him to go ahead and put up, and

23   that was --

24   Q.   Did he agree?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   So after you got the new investment, did you complete the San Pedro clinic?

A.   Yes.

Q.   And was it after that that it opened?

A.   Yes.

Q.   Who ultimately moved over to manage the San Pedro clinic?

A.   At that time I believe it was Pandora.

Q.   Did you have a conversation with her and Dave Gomez before she moved to San Pedro?

A.   We would -- we would talk, yes.

Q.   Was there a conversation where she told you that she didn't want to do the false charting at San Pedro?

A.   Yes.

Q.   How did that come about?

A.   We were having dinner, and that's when she pretty much said that she didn't feel comfortable and she didn't want to do it there in San Pedro.

Q.   And who was at that dinner?

A.   David and myself.

Q.   Do you recall where it was?

A.   An Italian restaurant in San Pedro, but I don't remember the name.

Q.   Do you remember a woman named Eva Razo?

A.   Yes.

Q.   Did she become involved at Port Medical?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.

2    Q.    How did that come about?

3    A.    At the time, we didn't know if we were making money, not

4    making money, and we didn't know where the funds were going, so

5    I asked -- I told David I was going to ask my tax accountant,

6    my tax lady, to come in and -- and to see where the money went.

7    Q.    Had Eva Razo been doing your taxes?

8    A.    Yes.

9    Q.    What was her position when she came in?

10   A.    Just as an advisor to come in and do like an audit, I

11   would assume, of the financial statements.

12   Q.    Now, at some point was Eva Razo put on as a signator on

13   various of your accounts?

14   A.    She became the manager, yes.

15   Q.    Which office did she become the manager of?

16   A.    First the Long Beach, and for a while she would oversee

17   the Long Beach and the San Pedro office.

18   Q.    Now, if I could, I'd like to go down to page 2 of Exhibit

19   273.  And over on the left, do you see there's a date,

20   September 17th, 2010?  Goes across, Chosen.  Then goes across,

21   comment regarding a sponsorship, and then over at the right,

22   Eva Razo.

23         Did Eva Razo start signing sponsorship checks?

24   A.    Yes.

25   Q.    Did she do that out of both the Chosen Medical Management

1    and Ramport Medical Management accounts?

2    A.    Yes.

3    Q.    Who directed her to do that?

4    A.    We did.

5    Q.    When you say "we," who do you mean?

6    A.    David and myself.

7    Q.    Did Eva Razo also participate in creating false charts?

8    A.    I never saw her, but I'm sure she -- she had to, yes.

9    Q.    Why do you say she had to?

10   A.    Because we knew patients weren't coming in, so -- and we

11   were still getting -- we were getting paid.

12   Q.    Did you and Eva Razo approach Pandora Hall when she was at

13   San Pedro and offer to pay her to continue to falsify charts?

14   A.    When she was in San Pedro?  No.

15   Q.    Did you approach her and ask her to falsify charts that

16   were in Long Beach?

17   A.    She -- she pretty much did it.  In Long Beach, yes.

18   Q.    Did she continue doing that when she moved to San Pedro?

19   A.    That, I -- I don't know.  Not in San Pedro I don't know.

20   Q.    Do you know if Eva continued to take charts to her from

21   Long Beach?

22   A.    That, I don't know.

23   Q.    At one point -- let me ask you this.  Do you have a

24   brother?

25   A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   What's his name?

2   A.   Arthur.  Arthur Amador.

3   Q.   Does he go by "Arturo" Amador?

4   A.   Arturo Amador.

5   Q.   Was he involved in Port Medical?

6   A.   He was involved because I asked David, my partner, if we

7   could put him as the manager, the owner of the management

8   companies, since we were paying Ramsey, and my brother needed

9   some money at that time, and we both agreed and we would put

10  him on the account.

11  Q.   So did he replace Ramsey Muro as the owner?

12  A.   Yes.

13  Q.   Now, do you recall, was there a search of the Port Medical

14  premises conducted by federal law enforcement?

15  A.   Yes.

16  Q.   Was that in approximately August of 2013?

17  A.   I don't recall the exact date, but yes.

18  Q.   Now, after that search warrant, did you have a

19  conversation with David Gomez about billing?

20  A.   After the search?  We would talk.  I -- I can't remember

21  specific, no.  I --

22  Q.   Were there still claims that hadn't been billed out?

23  A.   Yes.

24  Q.   Did you have a conversation with Mr. Gomez about that?

25  A.   I -- yeah, I wasn't being involved in -- in that part

1    of -- I wasn't involved.

2    Q.   What do you mean you weren't involved?

3    A.   I wasn't billing after the clinic was closed.

4    Q.   Were there still bills that were sent?

5    A.   Yes.

6    Q.   Who sent them?

7    A.   There was a company.  I imagined Mr. Gomez and the -- the

8    biller we had at that time, they set up a small, little

9    company, and they started billing out on their own.

10   Q.   Did you have a conversation with Mr. Gomez about that?

11   A.   Yes.

12   Q.   What was that conversation?

13   A.   One time he reached out.  He said he needed help, if I

14   knew a biller, and we sat down, basically, at dinner, and the

15   biller I introduced him to had said that she didn't want

16   anything to do with it.

17           MR. CARDONA:  Nothing further, Your Honor.

18           THE COURT:  Okay.  Cross.

19           MR. ULTIMO:  Yes.  Thank you, Your Honor.

20                      **CROSS-EXAMINATION**

21   BY MR. ULTIMO:

22   Q.   Good morning, Mr. Amador.

23   A.   Good morning.

24   Q.   Mr. Amador, were you the president of Ramport Medical

25   Management?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    We signed the paperwork.  Whatever the paperwork says,

2    yes.

3               MR. ULTIMO:  I'd like to introduce Exhibit 74, page 2.

4               THE COURT:  Okay.

5               MR. ULTIMO:  Thank you.

6          (Received in evidence, Trial Exhibit 74, page 2.)

7    BY MR. ULTIMO:

8    Q.    Have you seen this document, Mr. Amador?

9    A.    Yes, I see it.

10   Q.    Is that your signature on the bottom left?

11   A.    Yes, I -- yes, I -- I'm assuming it is, yeah.

12   Q.    Well, is this not a signature card from Chase Bank for the

13   Ramport Medical Management bank account?

14   A.    Yes.

15   Q.    Okay.  And did you open this account?

16   A.    I must have been a signee on the account, but --

17   Q.    Was it you --

18   A.    -- whoever --

19   Q.    I'm sorry.  Do you recognize this signature to be your

20   signature?

21   A.    Yes.

22   Q.    And the handwriting beneath it that says "president"?

23   A.    Yes.

24   Q.    You had an employee by the name of Pandora Hall, correct?

25   A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Miss Hall worked at the front desk at Long Beach, true?

2    A.   Yes.

3    Q.   And who hired Pandora Hall?

4    A.   I don't recall who actually hired her.

5    Q.   At the time she was hired, was Miss Hall an independent

6    contractor?

7    A.   She was a massage therapist, and I believe massage

8    therapists were independent contractors, yes.

9    Q.   Were you hiring the massage therapists at that time?

10   A.   No.

11   Q.   So it would have been somebody else?

12   A.   Whoever was the manager, yes.

13   Q.   During the time that Miss Hall was employed at Port

14   Medical Long Beach, who asked her to create false SOAP notes?

15   A.   Either myself, David, or Pandora, one of -- one of -- I

16   don't recall the exact conversation, but I'm sure I knew about

17   it and my partner knew about it.

18            MR. ULTIMO:  Move to strike, speculation, conjecture.

19            THE COURT:  The last part will be stricken.

20   BY MR. ULTIMO:

21   Q.   Who compensated Pandora Hall for creating false SOAP

22   notes?

23   A.   She was on the account, so she would compensate herself.

24   Q.   Did you offer her money for each SOAP note she created?

25   A.   I don't recall a conversation, but I'm sure money was --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  was mentioned, yes.

2  Q.   By you?

3  A.   By myself, yes.

4  Q.   And how long did Miss Hall work at Long Beach?

5  A.   I don't recall.

6  Q.   At any point in time did Miss Hall tell you she wanted to

7  stop falsifying SOAP notes?

8  A.   Yes.

9  Q.   When was that?

10  A.   I don't recall the exact date, but that's when she was

11  ready to go to San Pedro.

12  Q.   Did she tell you she wanted to leave Port Medical because

13  she no longer wanted to create SOAP notes?

14  A.   Yes.

15  Q.   And was that right before the San Pedro office opened,

16  opened up and --

17  A.   Yes.

18  Q.   Did Miss Hall tell you that she would accept the job at

19  San Pedro if she no longer had to falsify SOAP notes?

20  A.   That, I don't remember, no.  We probably offered her more

21  money, so that's -- that's when she accepted.

22  Q.   Well, when you say "we probably," do you, as you sit here

23  today -- is it your testimony that you offered her more money

24  to accept a position in San Pedro?

25  A.   I'm sure we did, yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Why did you want her to move to San Pedro when she was

 2   already working in Long Beach?

 3   A.   At that time she didn't get along with Eva.  Eva was the

 4   accountant.  And she wanted to be closer to the house, I guess.

 5   She lived in San Pedro, and she wanted to work close to home.

 6   Q.   And you said that when this discussion occurred with

 7   Pandora Hall, David Gomez was present when that discussion took

 8   place between you and Pandora Hall; is that right?

 9   A.   We were all there, yes.

10   Q.   Okay.  Did you hear David Gomez tell Pandora Hall that

11   there would no longer be fraud in San Pedro?

12   A.   Repeat the question.

13   Q.   Did you tell Pandora -- did you hear David Gomez tell

14   Pandora that there would be no fraud in San Pedro?

15   A.   Yes.  We both, we said that -- by this time, patients were

16   actually showing up, and the facility in San Pedro was -- it

17   was a beautiful facility, so we figured they would go on their

18   own because of the service now.

19   Q.   So you took a law office in San Pedro and built out a Port

20   Medical San Pedro?

21   A.   Yes.

22   Q.   And that's the construction work, that's the work that was

23   stopped by the inspector?

24   A.   Yes.

25   Q.   So you did hear David Gomez tell her there'd be no fraud
```

```
 1    in San Pedro?

 2    A.   Yes, we told her that.

 3    Q.   But at some point you and Eva reapproached Pandora to

 4    falsify SOAP notes once again; is that right?

 5    A.   I never -- no.  Did Eva do it?  Prob- -- she -- she had to

 6    get her charts straight, so whatever she did.  She was the

 7    manager in Long Beach, so whatever she did, she did it.

 8    Q.   And Eva Razo was on the bank accounts, too, right?

 9    A.   On both, yes.

10    Q.   So Eva Razo had signing authority to withdraw cash,

11    correct?

12    A.   Yes.

13    Q.   And signing authority to write checks to herself, true?

14    A.   Yes.

15    Q.   As you sit here today, do you know whether or not Eva Razo

16    went and reapproached Pandora Hall to continue falsifying

17    notes, SOAP notes, after she left Long Beach and went to

18    San Pedro?

19    A.   No, I don't, I --

20    Q.   Did David Gomez -- well, let me back up.  Do you remember

21    last year you -- you were arrested, correct?

22    A.   Yes.

23    Q.   And you were taken to jail, correct?

24    A.   Yes.

25    Q.   And was there a point in time in the jail cell that you
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   came into contact with Dave Gomez?
 2   A.   Yes.  We ended up in the same cell.
 3   Q.   Did you make any statements to David Gomez?
 4   A.   No.  It was just talking about being getting -- being
 5   arrested.
 6   Q.   Did you tell David Gomez that "I should have listened to
 7   you"?
 8   A.   No.
 9   Q.   "We wouldn't be here.  You told me to stop."  Did you tell
10   David Gomez that --
11   A.   No.
12   Q.   -- when you were both in the jail cells?
13   A.   No.
14   Q.   Did David Gomez ever approach you in Long Beach or
15   San Pedro and asked you to stop falsifying patient charts at
16   Port Medical?
17   A.   We -- yes, we discussed that we -- we should have -- we
18   should stop, yes.  Because at that time patients started
19   showing up on their own, yes.
20   Q.   And he asked you, and he said, "You don't have to do this;
21   Long Beach is doing good," true?
22   A.   We're both owners, yes, so we -- we figured, okay,
23   that's -- that's a good idea, yes.
24   Q.   But what did you tell David when he asked you to stop?
25   A.   I said that's a good idea.
```

1   Q.   Did you tell him that you would stop?

2   A.   Yes.

3   Q.   Now, whose idea was it to falsify SOAP notes?

4   A.   Michelle, who -- Aragon.

5   Q.   And she was your first office manager in Long Beach?

6   A.   Yes.

7   Q.   Did David Gomez bring this fraud scheme to you when you

8   opened up Port Medical with him?

9   A.   We didn't know anything -- no.

10  Q.   Did David Gomez give you the idea to scheme the insurance

11  company?

12  A.   No.

13  Q.   When you sought an investor to start Port Medical, why did

14  you choose David Gomez?

15  A.   He owned a restaurant and gold exchange, and we got along

16  well working, so I approached him and I told him about the

17  idea, and he thought it would be a good idea.

18  Q.   And David Gomez is a likeable guy; is that true?

19  A.   Yes.

20  Q.   People like David Gomez; isn't that true?

21       MR. CARDONA:  Objection, Your Honor, relevance.

22       THE COURT:  Sustained.

23  BY MR. ULTIMO:

24  Q.   Did Kevin Malone get along with David Gomez?

25  A.   That, I don't -- yes, I --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   How would you describe your relationship with Dr. Kevin

2   Malone?

3   A.   Well, there was a period where, Mr. Malone, his charts

4   were piling up so high that I got on the phone and I told him

5   to -- I got upset, and I told him to do his job.  So he got

6   upset, and we -- I told him his license is on the line, to make

7   sure everything was being done right and --

8   Q.   When you told him to do his job, what specifically were

9   you referring to?  What part of his job?

10  A.   The SOAP notes, the seeing patients, the stay awake,

11  basically.

12  Q.   Stay what?

13  A.   Stay awake.

14  Q.   Did he have trouble staying awake?

15  A.   I caught him a couple times sleeping, so --

16  Q.   Was he a cigarette smoker?

17  A.   I don't recall, no.  I'm not sure.  I never saw him smoke.

18  Q.   Did he take long walks during the day that you recall?

19  A.   I -- I don't, no, recall.

20  Q.   Well, you said that his charts -- I don't want to misquote

21  you, but did you say his charts stacked up so high?  Is that

22  what I heard you say?

23  A.   Yes.  The patient charts.  They -- they were just stacking

24  up because he wouldn't complete them, basically.

25  Q.   He what?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   They weren't completed.

2    Q.   Okay.  So when you say they weren't completed, are you

3    saying that he wasn't charting or documenting his examinations

4    of patients in the patient's file?

5    A.   I'm not there.  I -- but I knew the charts weren't done.

6    So if the patients walked in, I'm sure there had to have been

7    some documentation that he had to fill out.

8    Q.   He was seeing the patients?

9    A.   I -- I'm not -- I wasn't there.  I don't --

10   Q.   Well, who created the charts that were stacked up so high

11   that weren't complete?

12   A.   Either him or the staff that was there, the manager,

13   the -- the massage therapists.

14   Q.   How did you determine that he wasn't doing his job as

15   opposed to these charts just being stacked up high because

16   somebody put them there?

17   A.   The biller.  The biller would tell us, "I can't bill out

18   because this chart is missing X, Y and Z."

19   Q.   So it was partially completed by Dr. Malone?

20   A.   Yes.

21   Q.   Okay.  And that's how you determined that he wasn't doing

22   his job, because you came to discover that the charts were

23   partially completed by Dr. Malone but not fully completed?

24   A.   Yes.

25   Q.   And when you told him -- am I talking too loud?  Is --

1    A.    No.

2    Q.    Sorry.  It's right by the mic.

3          THE COURT:  It's better to be too loud than not loud

4    enough, so she can get everything.

5          MR. ULTIMO:  Thank you, Your Honor.  Just want to make

6    sure I'm not too loud.

7          THE COURT:  Not a problem.

8    BY MR. ULTIMO:

9    Q.    You said that Dr. Malone got upset with you.  Can you

10   amplify on that?

11   A.    It was over the phone.  I -- I was the one that was

12   telling him to -- to do his job, so --

13   Q.    And did he tell you he would?

14   A.    Yes.  He said he would.

15   Q.    Would he come in -- well, do you know whether or not he

16   would come in in the evening and fill out his charts?

17   A.    I -- I don't know.

18   Q.    Did you have to fire Dr. Malone from Port Medical?

19   A.    Not that I recall, no.

20   Q.    Do you know who fired Dr. Malone?

21   A.    I -- I don't remember.

22   Q.    Was he fired?

23   A.    I believe so, yes.

24   Q.    Do you know -- do you have any personal knowledge as to

25   why he was fired?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Because he wasn't doing his charts, most likely, yeah.

2    Q.    So is it your understanding that one of the office

3    managers would have fired him?

4    A.    Yes.

5    Q.    And who would that have been at that time?

6    A.    That time, most likely was Eva.

7    Q.    Mr. Amador, were you the medical director for Port

8    Medical?

9    A.    The medical director?

10   Q.    Yes.

11   A.    I'm not a doctor.  No.

12   Q.    Okay.  Why would you need a medical director for Port

13   Medical?

14   A.    To my understanding -- I'm not a doctor, but to my

15   understanding, to be a medical clinic, you need a doctor to be

16   the owner or the director of a clinic.

17   Q.    Was Dr. Malone the medical director for Port Medical or

18   the chiropractic director for Port Medical?

19   A.    The chiropractor, yes.

20   Q.    So he was the chiropractic director for the Port Medical

21   clinic?

22   A.    He worked under the -- whatever doctor we had at that

23   time.

24   Q.    Well, medical was separate from chiropractic, true?

25   A.    Yes, but everything was built out under the medical

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    practice, under the doctor, the M.D.'s license.  So he worked

2    under the M.D.

3    Q.    Well, is that your understanding or --

4    A.    That's my understanding.

5    Q.    Okay.  So if we -- did you -- during your time at Port

6    Medical, did you ever see the health insurance claim forms

7    submitted for billing chiropractic and massage services?

8    A.    I'm sorry?  What --

9    Q.    Did you ever see the health insurance claim forms that

10   said Kevin Malone's name on them for the chiropractic services

11   and massage therapy?

12   A.    I saw some, yes.

13   Q.    So you saw that they had Dr. Kevin Malone and they were

14   billed out under his name, correct?

15   A.    They were billed out under his services, yes, his name.

16   Q.    Okay.  And that was because he was the medical director

17   for chiropractic care, right?

18   A.    No.  No.

19   Q.    Is that because he was providing the services?  Is that

20   right?

21   A.    Yes.

22   Q.    Okay.  And Dr. Malone was providing services, chiropractic

23   services, in two-thousand- -- between 2009 and 2011?

24   A.    I don't know the exact date, but yes, he was there for --

25   Q.    That time?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.   I don't know the exact date, but he was there for a

2    while.

3    Q.    Okay.   Mr. Amador, I think you said that Joe -- patient

4    Joe Vaifanua was someone you recruited to go to Port Medical;

5    is that right?

6    A.    I don't recall if I actually went up to him.   I'm quite

7    sure he came up to me.

8    Q.    Right.   He came up asking for financial assistance to you?

9    A.    Yes.

10   Q.    And you hooked him up, right?

11   A.    Yes, we helped him out.

12   Q.    And put him in your system, right?

13   A.    Yes.

14   Q.    And by that, that meant that you told him that you'd pay

15   him $40 for each Explanation of Benefits insurance statement

16   that he brought to you, correct?

17   A.    Yes.

18   Q.    And you paid him, right?

19   A.    I'm sure I did, yes.

20   Q.    And you also paid him to get pain management shots at a

21   Southgate clinic, right?

22   A.    Yes.

23   Q.    That was three times you paid him?

24   A.    I don't recall how many times.

25   Q.    You remember telling the agents that you paid him three

```
 1    times to get pain injections?
 2    A.    No, I don't recall.  I don't know how many times he went.
 3    I --
 4    Q.    Do you remember, you paid him $500 per pain injection,
 5    right?
 6    A.    I don't recall the exact amount, it was so -- it was so
 7    long ago.  I don't remember.
 8    Q.    What's your best estimate as you sit here today how much
 9    you paid him to get the pain management shots at another
10    Southgate facility?
11    A.    I don't -- $300?  I don't remember the exact amount.
12    Q.    300 each, for each pain injection?
13    A.    I don't know how many pain injections he got.  I don't
14    recall.  But yes, I'm sure I -- if he went there, I'm sure I
15    took care of him.
16    Q.    When you spoke to the agents in this case, were you
17    truthful and accurate when you --
18    A.    I tried to be, yes.
19    Q.    So if -- and when you spoke to the agents, it was in 2013,
20    true?
21    A.    I don't remember the exact date, but yes, I spoke with
22    them.
23    Q.    In 2013, couple years ago?
24    A.    Yes, whatever date.
25    Q.    Okay.  And the events pertaining to Mr. Vaifanua and his
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    pain injections that you referred him for, they were fresh in
 2    your mind in 2013, correct?
 3    A.   Yes.
 4    Q.   So if the agents testify that they -- that you told them
 5    that you received -- that you paid Mr. Vaifanua $500 per pain
 6    injection to go to Southgate, would that be accurate?
 7              MR. CARDONA:  Your Honor, objection.
 8              THE COURT:  Sustained.  Sustained.  Improper question.
 9    BY MR. ULTIMO:
10    Q.   Okay.  Now, you also asked Mr. Vaifanua to sign multiple
11    sign-in stickers, true?
12    A.   The managers did, yes.
13    Q.   And did you tell the managers to obtain the multiple
14    sign-in stickers for Mr. Vaifanua?
15    A.   I'm sure I did, yes.
16    Q.   For himself and his children, correct?
17    A.   I -- I don't recall the kids, but I'm sure I asked.  I
18    didn't know how old the kids were, how many kids, but I knew he
19    had a large family and -- yes, I'm sure I did.
20    Q.   Are you familiar with David Gomez's signature?
21    A.   Yes, I -- I assume, yes.
22    Q.   Well, I don't want you to assume, but would you be able to
23    recognize it if you'd seen it?
24    A.   I think I would, yes.
25    Q.   Again, I don't want you to speculate, but how many times
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    had you seen David Gomez actually sign in front of you?  Over

2    the years.

3    A.   I don't -- I don't know.  Whatever time we went to the

4    bank to sign a signature note or something, but -- I don't

5    remember us comparing signatures or anything.  I don't -- I

6    don't --

7    Q.   So you don't really know?  You wouldn't be able to

8    recognize his signature from a signature that was not his?  Is

9    that what you're saying?

10          THE COURT:  The question was asked earlier, and he

11   says he thinks he might.

12          MR. ULTIMO:  Thinks he might.  I'll just explore on

13   that a little further.  I'm not sure.

14   Q.   You think you might, but do you think --

15          THE COURT:  That's the best you can do, is if he

16   thinks so.

17          MR. ULTIMO:  Okay.

18   Q.   Then I'd like to show you Exhibit 273, page 25.  It's

19   already been admitted into evidence.  I'll ask you if you

20   recognize -- can you tell me, based on your prior experiences

21   seeing David Gomez sign his name, whether or not that is David

22   Gomez's signature?  And if you can't, if you don't know for

23   sure, then just tell me you do not know for sure.

24   A.   I -- I wouldn't know for sure, no.  I'm --

25          THE COURT:  Okay.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ULTIMO:

 2   Q.   Okay.  So any answer would be a guess?

 3           MR. CARDONA:  Objection, Your Honor, asked and

 4   answered.

 5           THE COURT:  Sustained.

 6           MR. ULTIMO:  Withdrawn.

 7           THE COURT:  Sustained.

 8   BY MR. ULTIMO:

 9   Q.   Did you see Mr. Gomez sign that check?

10   A.   No.

11           MR. ULTIMO:  And that was Exhibit 273, page 25, I was

12   referring to.

13           THE COURT:  Thank you.

14   BY MR. ULTIMO:

15   Q.   Now, that check was typed up like on a computer printer of

16   some kind.  Was that -- Pandora prepared the checks using some

17   sort of a printer; is that right?

18   A.   I'm not sure who -- who printed them.

19   Q.   Did you ask Pandora Hall to make checks payable to Joe

20   Vaifanua?

21   A.   I don't recall, no.

22   Q.   Well, I think there was another exhibit of a check, a much

23   longer amount.  I think it was $2,000, and you testified that

24   you paid that to Joe Vaifanua.

25   A.   If my signature's on it, yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Yes.   So did you yourself make that check, or did you ask
 2   one of the clerical staff to make that check on a type -- on a
 3   computer at the time?
 4   A.   I asked the -- whoever the manager was at that time to
 5   make the check.
 6   Q.   And the managers would have been?
 7   A.   Whoever the manager was at that time.  I can't recall.
 8   Q.   Did you give Exhibit 273 -- Exhibit 273, page 25, that
 9   $300 check that has a signature that purports to be David
10   Gomez's, did you give that check to Mr. Vaifanua?
11   A.   I don't recall.  I -- we would sign it.  He would come in
12   and pick it up himself.  I -- whoever was there at the clinic
13   and needed something done, we did it.
14   Q.   And would you tell the person that you asked to type up
15   the check, would you ask them to leave it there, whether at the
16   front desk or in some office there, for the patient to come
17   pick it up?
18   A.   Yes, sometimes we did that, yes.
19   Q.   And who would you -- who did you tell that to?
20   A.   Whoever the manager was at that time.
21   Q.   Do you recall specifically whether it was Eva Razo or
22   Michelle Aragon?
23   A.   Eva, Michelle -- Michelle did everything on her own, so
24   she didn't need us.  Either Pandora, Eva, yeah, one of the two.
25   I don't recall which one.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   So patients would pick up checks from Eva or Pandora; is

2   that right?

3   A.   Yes.

4   Q.   And sometimes you would meet Mr. Vaifanua outside the

5   parking lot of the union hall and pay him cash, true?

6   A.   No, not outside the union hall.

7   Q.   Not in the parking lot?

8   A.   Not outside the union hall.  Outside the clinic or at a

9   liquor store, but not outside the union hall.

10  Q.   Okay.  Now, you had told us earlier that Michelle Aragon

11  taught you and -- I think you said Michelle Aragon taught you

12  and David how to do this insurance scheme.

13  A.   She -- she brought -- yeah.  She brought her, I guess,

14  knowledge of how to run a clinic, and that's the way she was

15  running it where she was working at previous, yeah.

16  Q.   And is that how you learned about it?

17  A.   Pretty much, yes.

18  Q.   You didn't know about it beforehand?  You didn't know how

19  to do it before?

20  A.   Not specifically, but I knew of -- of -- it was -- it was

21  wide range.

22  Q.   And you knew -- you had been to chiropractors before who

23  had billed you for services that you had not received; is that

24  right?

25  A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   And that's how you learned how to institute or begin this insurance, medical insurance fraud scheme?

A.   No, not at that time.  I didn't think about it as being a -- we were going to do it to be fraudulent, no.

Q.   You didn't think about it at that time?

A.   No.

Q.   Well, on August 20th, 2013, you gave a statement to special agents in this case, right?

A.   Yes.

Q.   And the events surrounding Port Medical and your previous history in learning how to do insurance fraud, you communicated that to the agents in August of 2013, true?

A.   I told them how it came about, yes.

Q.   And those events were fresh in your mind in 2013, correct?

A.   Yes.

Q.   And you told them in 2013 that you went to see Dr. Altamirano, correct?

A.   Yes.

Q.   And he was a chiropractic doctor, right?

A.   Yes.

Q.   And you went to see Dr. Altamirano because you had missed two days at work, correct?

A.   No.  No.  It's -- I did need a doctor's note, so he was going to provide it, yeah.

Q.   And he provided you with a doctor's note so you could get

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    your promotion as a longshoreman, right?

2    A.   As the next step, yes.

3    Q.   Because if you miss more than two days, you can't get the

4    promotion, right?

5    A.   No.

6    Q.   Correct?

7    A.   No.

8    Q.   Then why did you get the doctor's note?

9    A.   There's a certain procedure as a longshoreman, the way we

10   get elevated, and it was a 70 percent that we need, we have to

11   meet, and I believe during that time -- I don't know what part

12   we needed.  I needed some days.

13   Q.   But you needed the doctor's note for employment purposes?

14   A.   Yes.

15   Q.   And Dr. Altamirano charged you for that visit, right?

16   A.   Yes.

17   Q.   And that was the only time you'd seen Dr. Altamirano?

18   A.   Yes.

19   Q.   But then two months later, you received three more

20   Explanation of Benefit statements from Dr. Altamirano's office,

21   correct?

22   A.   Yes.

23   Q.   He billed you even though you never went to see him again,

24   correct?

25   A.   He billed my -- my family, yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   And you called him.  You were upset, right?

2    A.   Yes.

3    Q.   And he told you that he could charge whatever he wanted

4    and the insurance company would pay for it, it's on them; is

5    that right?

6    A.   Yes.

7    Q.   And following that conversation, you asked Dr. Altamirano

8    if he wanted to go in business with you; isn't that right?

9    A.   Yes, I -- joking around, I told him, "Why don't we open

10   something up and do the right thing," yes.

11   Q.   A chiropractic clinic?

12   A.   Yes.

13   Q.   And he declined your offer?

14   A.   He said that he had enough patients and he didn't need a

15   partner.

16   Q.   That's when you found David Gomez to go into business

17   with, correct?

18   A.   Yes.

19   Q.   Now, again, during that August 20th, 2013 meeting with

20   federal agents, you answered questions truthfully, true?

21   A.   Yes.

22   Q.   And you told the agents in August of 2013 as much as you

23   could remember about the facts relating to Port Medical and the

24   insurance fraud that occurred there, correct?

25   A.   Pretty much, yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And you tried to give the agents the best information that

2   you could, true?

3   A.   Yes.

4   Q.   And those statements to the federal agents on August 20th,

5   2013, were true and accurate, correct?

6   A.   To my knowledge at that time, yes.

7   Q.   You told federal agents on August 20, 2013, that it was

8   you who brought in all the patients for Port Medical for the

9   first two years; isn't that right?

10  A.   I don't recall the exact words, but whatever I told him.

11  Q.   You told him that, "It's me, I brought in the patients,

12  yes, I did stuff at Port Medical in Long Beach for the first

13  two years," words to that effect, true?

14  A.   Whatever it's written down, yes, that's what I said.

15  Q.   And was that statement true and accurate then, or is it

16  now?

17  A.   Yes.  We brought in -- yeah, I brought in patients.

18  Q.   Mr. Amador, isn't it true that you're responsible for all

19  the fraudulent billing that occurred at Port Medical?

20  A.   I have never done the billing.  I don't know how to do

21  billing.

22  Q.   Well, when I refer to billing, I'm talking about the false

23  SOAP notes that were later used by the biller to bill out for

24  chiropractic services and massage treatments that were never

25  performed.   True?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    No.

 2    Q.    So you're not responsible for that fraudulent billing that

 3    occurred at Port Medical?  Is that what you're telling me?

 4    A.    What I'm trying to tell you is I -- I knew what to do, but

 5    I didn't do it.  I wasn't there physically writing everything.

 6    Am I responsible?  That's why I'm here.  Yeah, I --

 7    Q.    It was you who would pay the girls to continue to falsify

 8    patient charts, true?

 9    A.    No.

10    Q.    Then it was Pandora Hall that would write her own checks,

11    because she was on the account.  Is that what you're saying?

12    A.    Whatever manager was on the account, she was the one that

13    was paying the employees and herself.

14    Q.    You agreed to put Pandora Hall on the account, true?

15    A.    We agreed, yes.

16    Q.    You're saying that -- who's "we"?

17    A.    My partner and I.  Whatever I did, he knew; whatever he

18    did, I knew.

19            THE COURT:  You talking about Mr. Gomez?

20            THE WITNESS:  Yes.

21    BY MR. ULTIMO:

22    Q.    And so he agreed to put Pandora Hall on the account as a

23    signer?

24    A.    Yes.

25    Q.    And Eva Razo falsified patient SOAP notes, true?
```

1    A.    I'm -- I'm sure she did, yes.

2    Q.    Well, you're sure because she was a signer on your

3    personal checking account, correct?

4    A.    My personal checking account?  I -- I don't think so, no.

5    Q.    She withdrew cash from your personal checking account to

6    give to you, correct?

7    A.    My personal checking?

8    Q.    Yes.

9    A.    That, I don't -- I don't recall.

10   Q.    You gave her power of attorney to take to the bank, to use

11   that power of attorney to withdraw cash from your personal

12   account, correct?

13   A.    My -- we're going -- my personal account?

14   Q.    Yeah.

15   A.    I don't recall.

16   Q.    We'll come back to that.  Did you ever ask Eva Razo to

17   withdraw cash for you?

18   A.    I'm sure I did, yes.

19   Q.    And she was the managing -- the manager at -- she was

20   managing Port Medical Long Beach, correct?

21   A.    At one time, Port Medical Long Beach and San Pedro, yes.

22   Q.    And you instructed her to withdraw the cash for you so you

23   could pay patients to come to Port Medical?

24   A.    No.  It could have been anything.  Withdraw the cash

25   because we -- I needed to pay a bill or to pay a patient or we

1    were going out that weekend, something.

2    Q.    Did Pandora insist that she be put on bank signature cards

3    so she could write checks?

4    A.    No.

5    Q.    Do you recall which bank accounts she was a signer on?

6    A.    Whatever clinic she was managing.

7    Q.    Do you know if she was a signer on DCS Medical Management?

8    A.    DCS?   That was only around for a certain amount of months,

9    so I'm sure she wasn't.

10   Q.    Now, your brother, Arturo Amador, is the owner of Chosen

11   Medical Management, true?

12   A.    I'm sorry, once again?

13   Q.    Your brother, Arturo Amador, he was the owner of Chosen

14   Medical Management; is that true?

15   A.    Of both for a while, yes, Chosen and Ramport.

16   Q.    Of Chosen and -- and Port?

17   A.    I believe Ramport, yeah.

18   Q.    And Ramport.   Ramport Medical Management?

19   A.    Yes.

20   Q.    And Ramport Medical Management is also a medical

21   management company that was associated with Port Medical, true?

22   A.    Yes.

23   Q.    How much involvement did your brother Arturo Amador have,

24   or were you acting through him?

25   A.    He had none.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   So is it fair to say that you were the owner of the

2    management companies through the assistance of your brother

3    Arturo Amador?

4    A.   We were, yes.

5    Q.   "We" meaning who?

6    A.   My partner and I.

7    Q.   I'm asking about your brother Arturo and you.  So,

8    essentially, you acted through your brother Arturo Amador,

9    because you told me that Arturo was the owner of Ramport and

10   Chosen, correct?

11   A.   Yes.

12            MR. CARDONA:  Objection, argumentative and compound.

13            THE COURT:  Overruled.

14        But basically you're saying you were acting through your

15   brother, but you also said your partner was also; is that

16   correct?

17            THE WITNESS:  We were both, yes.

18            THE COURT:  Okay.  Go ahead, next question.

19   BY MR. ULTIMO:

20   Q.   Now, Mr. Amador, isn't it true that the only reason you

21   have implicated David Gomez is so you can hopefully obtain a

22   reduced prison sentence?

23   A.   No.

24   Q.   Was there ever a time in Port Medical when Port Medical

25   had to catch up on patient charting shortly after it opened?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.

2    Q.    Can you tell me what the circumstances of that was.

3    A.    The charts were piling up, and we had an internal audit,

4    and Toni -- we had Toni do the internal audit, and right away

5    she informed David and myself that the charts were incomplete.

6    Q.    And the internal audit wasn't something that occurred by

7    way of a government agency, was it?

8    A.    No.

9    Q.    The internal audit was just an internal review, and that

10   was something that you and Mr. Gomez decided to do, correct?

11   A.    Yes.

12   Q.    So something prompted you to hire Toni Moyer to review

13   what was going on at Port Medical at that time, correct?

14   A.    Yes.

15   Q.    And that was so things could be done right, correct?

16   A.    (No audible response.)

17   Q.    Is that a "yes" or a "no"?  I mean, why did you hire Toni

18   Moyer to have this internal review or internal audit of patient

19   files?  What was the reason?  It wasn't for some -- because the

20   federal government asked for an audit, or the IRS or the state

21   of California, correct?

22   A.    We were informed by either a massage therapist or the

23   biller that the files were piling up, the charts were piling

24   up, so that's -- we don't know anything about filling out

25   charts, my partner and I.  We didn't know anything about
```

```
1    billing, so we asked the biller to come in and review.  Because
2    we would ask the manager, and the manager at that time was
3    Michelle.  She would say, "Don't worry, everything's fine,
4    everything's fine."  So we -- we -- I don't -- I don't recall
5    if David or myself found Toni and she came in and --
6    Q.   You thought it was a good idea to have her review what was
7    going on?
8    A.   Yes.
9    Q.   And she -- just to be clear and not repetitive, but whose
10   charts were backing up?  Massage therapists'?  Dr. Malone's?  I
11   me, whose charts?  They weren't your charts.  You don't see
12   patients, correct?
13   A.   I don't see patients.
14   Q.   They weren't David Gomez's charts.  He doesn't see
15   patients, correct?
16   A.   Right.
17   Q.   So whose charts were backed up, were piled up?
18   A.   I was -- I'm assuming the patients'.
19   Q.   Well, the patient doesn't create the chart, right?  Port
20   Medical creates the chart, correct?
21   A.   Correct.
22   Q.   A doctor or a massage therapist charts in the patient's
23   file, correct?
24   A.   A doctor, yes.
25   Q.   Okay.  So which doctor's patient chart was piling up?
```

1    A.   I'm assuming whatever chiropractor was there.  I believe

2    was Kevin Malone.

3    Q.   Now, do you know if anyone asked Dr. Malone to come in one

4    evening in order to complete patient charts?  Do you know?

5    A.   I don't recall.

6    Q.   Were you there one evening when people were catching up on

7    charting back when Port Medical first opened?

8    A.   I'm sure I was, yes.

9    Q.   Well, when you say -- I don't want you to guess.  When you

10   say you're sure you were, I mean, I'm sure you were there one

11   evening as well.  I take that for granted.  But what I'm asking

12   you specifically is, do you remember, as you sit here today,

13   being at Port Medical in the evening when Dr. Malone was asked

14   to catch up on patient charting?

15   A.   I don't recall, but I'm sure I -- I -- I was.

16            THE COURT:  So your answer is you don't recall.

17            THE WITNESS:  I don't recall.

18   BY MR. ULTIMO:

19   Q.   All right.  So you don't recall any such event?

20   A.   With Dr. Malone?  I don't recall.

21   Q.   Okay.  So you have no recollection, so -- that's fair to

22   say, of -- strike that.

23            Did you ever hear Mr. Gomez ask Dr. Malone to prepare

24   charts for patients?

25   A.   No.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   How did you get Pandora Hall to falsify chart notes for
2    you?
3    A.   We didn't.  We just told her what we were doing previous,
4    and she took it from there.
5    Q.   She took the ball and ran with it?
6    A.   Yes.
7    Q.   Did Dr. Kevin Malone know that false billing was occurring
8    on his -- at Port Medical?
9          MR. CARDONA:  Objection, calls for speculation,
10   Your Honor.
11         THE COURT:  Sustained.
12      Do you have any specific knowledge, in talking to him,
13   where he said he knew about it?
14         THE WITNESS:  Me talking to him?  No.
15         THE COURT:  Okay.
16   BY MR. ULTIMO:
17   Q.   Was any fraud done at San Pedro?
18   A.   Not to my knowledge, no.
19   Q.   It was all in Long Beach?
20   A.   Pretty much, the first years, yes.
21   Q.   Do you also go by the name Sergio Aras?  Aras?
22   A.   Yes.
23   Q.   And what is your true name?
24   A.   Sergio Amador.
25   Q.   So your true identity as an individual in the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   United States is Sergio Amador?

 2   A.   Yes.

 3   Q.   Not Sergio Aras?

 4   A.   No.

 5   Q.   Why are you also known as Sergio Aras?

 6   A.   Well, at the time my -- I had a step-dad, and we -- we had

 7   a falling out, basically, so I -- I thought I'll change.

 8   Q.   But do you have a separate Social Security number under

 9   the name Sergio Aras?

10   A.   I'm sure I did, yes.

11   Q.   Why do you have two Social Security numbers?

12   A.   At the time when my mom, I guess, she -- she pulled the

13   social at that time, so --

14   Q.   Pulled two socials for you?

15   A.   At that time, yes.

16   Q.   Using your birth certificate?

17   A.   Yes, for Sergio Amador.  And Sergio Aras, she -- she did

18   it, I guess.  So she always had it there, and when I -- I had a

19   falling out with my dad, that's when I --

20   Q.   So you have two identities, legal identities?

21   A.   Yes.

22   Q.   Now, Mr. Amador, would it be a fair statement to say that

23   you were calling all the shots at Port Medical when it came to

24   the false billing?

25   A.   No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.    Would it be a fair statement to say that you and Eva Razo
 2   were hiring and firing and running Port Medical Long Beach?
 3   A.    At the end, yes.  There was no money coming in.  There
 4   was --
 5              MR. ULTIMO:  No further questions.  Thank you.
 6              THE WITNESS:  Sure.
 7              THE COURT:  Redirect.
 8              MR. CARDONA:  Your Honor, I'd offer Exhibit 71-1, a
 9   signature card.
10              MR. ULTIMO:  What number was that?
11              MR. CARDONA:  71.
12              MR. ULTIMO:  No objection.
13              THE COURT:  Be received.
14         (Received in evidence, Trial Exhibit 71-1.)
15                      REDIRECT EXAMINATION
16   BY MR. CARDONA:
17   Q.    Mr. Amador, I've put up on the screen -- is this a
18   signature card for the account that was opened for Ramport
19   Medical Management?
20   A.    Yes.
21   Q.    And down here, who are identified as the signers?
22   A.    My brother Arthur and Eva.
23   Q.    And over here are signatures.  Did you sign that or did
24   your brother?
25   A.    I -- my brother had to, but it looks -- looks like my
```

1    signature, but my brother had to be there, yeah.

2    Q.    And is this when you set up this company to have Arturo

3    Amador be the person who was running it?

4    A.    Yes.

5    Q.    Was that done with David Gomez's knowledge?

6    A.    Yes.

7    Q.    Did he agree to do that?

8    A.    Yes.

9    Q.    Now, you were asked some questions on cross about a

10   conversation where you talked about that you should stop the

11   fraud at Port Medical.  Do you remember that?

12   A.    Yes.  It was mentioned, yes.

13   Q.    Did the fraud stop?

14   A.    It was already going.  So, no, it didn't.

15   Q.    Was Mr. Gomez aware that it didn't stop?

16   A.    Yes.

17   Q.    Did you continue to discuss what you were doing with him?

18   A.    On a daily basis, yes.

19   Q.    Did he continue to discuss with you what he was doing?

20   A.    Yes.

21   Q.    Now, you were asked about an interview that you gave to

22   law enforcement.  Was the actual date of that interview August

23   14th, the date that the search was performed?  Do you remember

24   the date?

25   A.    I don't recall the date, no.

1    Q.   Was it the same date that the search of Port Medical was

2    done?

3    A.   I believe it was.   I --

4    Q.   Did it take place at a coffee house in Long Beach?

5    A.   Yes.

6    Q.   The It's a Grind coffee house?

7    A.   Don't recall the actual name, but it was -- yes, it was a

8    coffee shop.

9    Q.   Now, on cross you were asked some questions suggesting

10   that you said that you alone did the fraud.   Were you also

11   asked questions as to whether other people were involved in

12   that fraud?

13   A.   Like, I recall him saying you don't -- you don't have to

14   take the blame yourself.   And I kept saying, well, you know,

15   I -- basically, I -- I was doing what I was doing, basically.

16   Q.   Did you tell them during that interview that Chris

17   Viramontes didn't know anything about the fraudulent billing?

18   A.   Yes.

19   Q.   Did you tell them that Chris Rice was unaware of the

20   fraudulent billing?

21   A.   Yes.

22   Q.   But did you tell them that David Gomez was aware of the

23   fraudulent billing?

24   A.   That, I don't recall.

25   Q.   Now, during your testimony on cross, you said, in response

1    to one question, "I knew what he did and he knew what I did."

2    Do you remember that?

3    A.    Yes.

4    Q.    Talking about Mr. Gomez?

5    A.    Yes.

6    Q.    Why was that?  Why did you guys keep up on what each of

7    you were doing?

8    A.    It was just --

9            MR. ULTIMO:  Calls for speculation, Your Honor.

10           THE COURT:  Overruled.

11           THE WITNESS:  We just would call each other up

12   every -- we would see each other or call each other every day

13   to inform each other, basically, what we were doing.

14   BY MR. CARDONA:

15   Q.    Why?

16   A.    As partners, I -- that's what I -- that's what I -- I

17   would think.  But we -- we just did.  We would call each other.

18           MR. CARDONA:  No further, Your Honor.

19           THE COURT:  Okay.  Redirect?  Or excuse me, recross?

20           MR. ULTIMO:  Yes, Your Honor.

21                    **RECROSS—EXAMINATION**

22   BY MR. ULTIMO:

23   Q.    Mr. Amador, a few minutes ago I asked you if Eva Razo was

24   a power of attorney on your personal account.  Do you recall

25   that?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.
 2   Q.   I'd like to show you Exhibit 87, pages 1 and 2.
 3         THE COURT:  Any objection?
 4         MR. CARDONA:  No, Your Honor, but I will advise the
 5   Court, if we go into this, I may ask to also show Exhibit 86.
 6         THE COURT:  Counsel, 87, 1 and 2, will be received.
 7         MR. ULTIMO:  Thank you.
 8        (Received in evidence, Trial Exhibit 87, pages 1 and 2.)
 9   BY MR. ULTIMO:
10   Q.   Mr. Amador, do you see Exhibit 87, page 1, in front of
11   you?
12   A.   Yes.
13   Q.   And do you recognize the signature down at the bottom
14   where it says Eva Razo?
15   A.   Yes.
16   Q.   Do you recall this document that says "Durable Power of
17   Attorney for Deposit Accounts" at the top?
18   A.   I don't recall.
19   Q.   Okay.  I'm going to show you page 2 of this document.
20   Exhibit 87, page 2.  At the top, again, "Durable Power of
21   Attorney for Deposit Accounts."  Says, "Principal name:  Sergio
22   Amador, Long Beach.  Agent name:  Eva Razo, Long Beach."
23        Do you now recall that you placed Eva Razo on your deposit
24   account, your personal account, as your power of attorney to
25   sign and withdraw money on that account?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes, I -- I don't remember, but yes, if it was done.

2    Q.    This your handwriting?

3    A.    No.

4    Q.    Is that your signature?

5    A.    Yes.

6    Q.    And that's Eva Razo's signature above it?

7    A.    Yes.

8              MR. ULTIMO:  No further questions.

9              THE COURT:  You may step down.

10        May this witness be excused?

11             MR. CARDONA:  No objection, Your Honor.

12             THE COURT:  Okay.  You're free to go.  Thank you very

13   much for coming in.

14        Ladies and gentlemen, at this time we're going to take a

15   short break, because it's 10:00 o'clock and it's your morning

16   break.

17        Remember the admonishment not to discuss the case among

18   yourselves or with anybody else or form or express any opinions

19   about the matter until it's submitted to you and you retire

20   into the jury room.

21        If you'd leave quietly.  We're still going to be in

22   session.

23             THE CLERK:  All rise.

24        (Outside the presence of the jury:)

25             THE COURT:  Okay.  The record will reflect that the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    jurors have left the courtroom.

 2         You can all have seats now.

 3         Counsel, there was an indication yesterday, and I don't

 4    know what the status is.  I just want to check with you before

 5    I come back.  Are you going to be resting?

 6              MR. CARDONA:  Yes, Your Honor.  I have some additional

 7    exhibits that I'll need to move in pursuant to the stipulation,

 8    but once that's done, then I would rest.

 9              THE COURT:  Okay.

10         And do you anticipate calling witnesses?

11         MR. ULTIMO:  Yes.  Mr. Gomez.  Possibly, possibly

12    Agent Valle.

13              THE COURT:  Okay.  I just want to find out what the

14    status is.

15         As far as jury instructions, they're pretty simplified,

16    and I think both sides have agreed on the jury instructions.

17    There are a few that I don't think are appropriate.  One is

18    juror number -- or proposed No. 26 on page 32, which talks

19    about activities not charged.  I don't think there's been any

20    testimony that the defendant was involved in any activities

21    other than what was charged, so I would not be giving that one.

22    Other crimes and wrong acts of the defendant, no evidence of

23    that, so I wouldn't be giving that.

24              MR. CARDONA:  Correct.

25              THE COURT:  It seems to me all the others are
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   appropriate.
 2              MR. ULTIMO:  Thank you, Your Honor.
 3              THE COURT:  Okay?  Okay.  We'll see you back in 15
 4   minutes.
 5              THE CLERK:  All rise.
 6         Court is in recess.
 7         (Recess held from 10:02 a.m. to 10:19 a.m.)
 8         (In the presence of the jury:)
 9              THE COURT:  Okay.  The record will reflect that all
10   the members of the jury are in their respective seats in the
11   jury box.
12         Counsel, next witness.
13              MR. CARDONA:  Your Honor, I have no further witnesses.
14   I would offer certain exhibits pursuant to a stipulation
15   between the parties.
16              THE COURT:  Okay.
17              MR. CARDONA:  Your Honor, I'd first offer the
18   stipulation itself, which is Exhibit 306, and then, pursuant to
19   that stipulation, Exhibits 3, 4, 5, 11, 21, 26, 36, 41, 51, 71,
20   86.
21              THE COURT:  And this stipulation is they'd be received
22   into evidence?
23              MR. CARDONA:  Exhibit 306, yes, Your Honor.
24              THE COURT:  Okay.
25         So agreed, Counsel?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

588

```
1              MR. ULTIMO:  I'm sorry?  Yes, it is, Your Honor.

2              THE COURT:  Okay.

3              MR. CARDONA:  I have additional exhibits, Your Honor.

4              THE COURT:  Okay.

5              MR. CARDONA:  43, 116, 142, 143, 144, 145, 146, 162,

6    168, 169, 171, 173, 178 and 261.

7              THE COURT:  Being moved into evidence.

8         Stipulated, Counsel?

9              MR. ULTIMO:  Yes, stipulated.

10             THE COURT:  They'll be received.

11             MR. CARDONA:  With that, Your Honor, the government

12   rests.

13        (Received in evidence, Trial Exhibits 3, 4, 5, 21,

14        26, 36, 41, 51, 71, 86, 43, 116, 142, 143, 144, 145,

15        146, 162, 168, 169, 171, 173, 178, 261 and 306.)

16             THE COURT:  Counsel for defense, you reserved an

17   opening statement.  Did you wish to make an opening or call

18   witnesses?

19             MR. ULTIMO:  No, not necessary, Your Honor.

20             THE COURT:  Okay.  Do you want to call your first

21   witness, then.

22             MR. ULTIMO:  Yes.  Thank you.

23        The defense calls Agent Marcus Valle.

24             THE COURT:  Okay.

25             THE CLERK:  I'll go ahead and place you under oath
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   again.
 2        Do you solemnly swear the testimony that you are about to
 3   give in the matter now before the Court shall be the truth, the
 4   whole truth, and nothing but the truth, so help you God?
 5             THE WITNESS:  I do.
 6             THE CLERK:  Thank you.  You may be seated.
 7        MARCUS VALLE, CALLED AS A WITNESS BY THE DEFENDANT,
 8                        DIRECT EXAMINATION
 9   BY MR. ULTIMO:
10   Q.   Good morning, Agent Valle.
11   A.   Good morning.
12   Q.   Agent Valle, you've been a law enforcement officer with
13   the Department of Labor for several years now, correct?
14   A.   Correct.
15   Q.   And you received special training in writing reports; is
16   that right?
17   A.   Correct.
18   Q.   Not just anyone can write a law enforcement report,
19   correct?
20   A.   Correct.
21   Q.   There are certain requirements and it's gotta be done
22   right; isn't that true?
23   A.   I don't understand the question.  What do you mean by
24   "right"?
25   Q.   Well, it's -- you're taught a certain way to document
```

```
 1   statements from the subjects that you interview, correct?

 2   A.   Correct.

 3   Q.   And that's to ensure that you get an accurate report,

 4   that -- that's to ensure that you get a report that's accurate

 5   to what the statements said, correct?

 6   A.   Correct.

 7   Q.   It doesn't take out -- take it out of context, take the

 8   witnesses or the subject who you've questioned, take their

 9   statements out of context, correct?

10   A.   Correct.

11   Q.   All right.  Now, on August 14, 2013, did you conduct an

12   interview at It's a Grind coffee house with Sergio Amador?

13   A.   I did.

14   Q.   And during that interview, you questioned Sergio Amador

15   about the Port Medical clinic, correct?

16   A.   Yes.

17   Q.   And the fraud investigation, correct?

18   A.   Yes.

19   Q.   And you weren't alone, right?  You had other agents with

20   you, correct?

21   A.   Correct.

22   Q.   So were you the questioning agent, or was there a

23   different agent that --

24   A.   I was primary.

25   Q.   You were primary.  Okay.  So when you asked Sergio Amador
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  who else was involved in the fraudulent billing, is it true

2  that Amador responded, "It's me, I brought in the patients,

3  yes, I did stuff at Port Medical in Long Beach for the first

4  two years"?

5  A.   I think -- with respect to that, I think you're quoting

6  his -- a signed affidavit, to my recollection.  I think that's

7  what you're referring to.

8  Q.   Actually, would you like to see the --

9        Your Honor, may I approach and show the witness the --

10        THE COURT:  To refresh his memory?

11        MR. ULTIMO:  Yes.

12        THE COURT:  Sure.  Hand it to the clerk.

13      Anytime a document is submitted to you to refresh your

14  memory, the procedure -- and some people don't understand, the

15  procedure is, you are to look at the document and see if it

16  refreshes your memory and then put it down.  Nobody's asking

17  you what the document says.

18        THE WITNESS:  Okay.

19        THE COURT:  After refreshing your memory, testify to

20  what your memory is.  Okay?

21      (Witness reviews document.)

22        THE COURT:  And Counsel, the length of the document

23  is?

24        MR. ULTIMO:  Just the first couple sentences in that

25  paragraph, that's all.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  Thank you.
 2              MR. ULTIMO:  He doesn't need to read the whole thing.
 3              THE WITNESS:  Okay.
 4              THE COURT:  Okay.  Pass the document back, and then
 5     he'll ask further questions.
 6        Okay.
 7     BY MR. ULTIMO:
 8     Q.   Agent Valle, have you had sufficient time to recall the
 9     events of this interview with Sergio Amador?
10     A.   Yes.
11     Q.   And does looking at that report refresh your recollection
12     as to what Sergio Amador answered in reply to your question,
13     "Who was involved in the fraudulent billing?"
14     A.   That specific part of the report, yes.
15     Q.   Is this -- was that -- did I quote it accurately, that
16     that's the statement that Sergio Amador made?
17     A.   Yes.
18     Q.   Okay.  Now, at some point during that interview with
19     Sergio Amador, a bathroom break was offered to Mr. Amador,
20     correct?
21     A.   I believe so.
22     Q.   And during that break, did Sergio Amador make the
23     following statement: "I got to admit, it was good while it
24     lasted"?
25     A.   I do recall that.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   And after you advised Mr. Amador that you could see how

 2   someone like him could get dragged into something like this,

 3   did Sergio Amador respond with the following sentence:

 4   "Mi hijo" --

 5        That's Spanish for "my son," correct?

 6   A.   Correct.

 7   Q.   -- "I didn't get dragged into it; I saw an opportunity to

 8   make money, and I went for it"?

 9   A.   I do recall that.

10        MR. ULTIMO:  No further questions for this witness,

11   Your Honor.

12        THE COURT:  Okay.  Cross, Counsel.

13                      CROSS-EXAMINATION

14   BY MR. CARDONA:

15   Q.   Agent Valle, you were asked about a portion of your report

16   on cross.  After Mr. Amador gave the statement you've

17   described, did you follow up about who else was involved?

18   A.   Yes.

19   Q.   Did you ask him about Chris Viramontes?

20   A.   Yes.

21   Q.   And did Mr. Amador say that Chris Viramontes didn't know

22   anything about the fraudulent billing?

23   A.   Yes.

24   Q.   Did you ask him about Chris Rice?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And did he say that Chris Rice was unaware of the

2    fraudulent billing?

3    A.    Yes.

4    Q.    Did you ask him about David Gomez?

5    A.    Yes.

6    Q.    And did he say that David Gomez was aware of the

7    fraudulent billing?

8    A.    Yes.

9              MR. CARDONA:  Nothing further, Your Honor.

10             THE COURT:  Okay.  Anything further of this witness?

11             MR. ULTIMO:  Nothing further of the witness.

12             THE COURT:  You may step down.  Thank you.

13        Okay.  Next witness.

14             MR. ULTIMO:  The defense calls David Gomez.

15             THE COURT:  Okay.

16             THE CLERK:  Right here to be sworn, please.  Please

17   raise your right hand.

18        Do you solemnly swear the testimony that you are about to

19   give in the matter now before the Court shall be the truth, the

20   whole truth, and nothing but the truth, so help you God?

21             THE WITNESS:  I do.

22             THE CLERK:  Thank you.  You may be seated.

23        May I please ask that you state your full name for the

24   record and spell your last name.

25             THE WITNESS:  David Gomez, G-o-m-e-z.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE CLERK:  Thank you.

 2              THE COURT:  You may inquire.

 3      DAVID GOMEZ, THE DEFENDANT HEREIN, CALLED ON HIS OWN BEHALF,

 4                        DIRECT EXAMINATION

 5  BY MR. ULTIMO:

 6  Q.    Good morning, Mr. Gomez.

 7  A.    Good morning.

 8  Q.    Are you nervous?

 9  A.    A little bit.

10  Q.    Have you ever testified before?

11  A.    No, I haven't.

12  Q.    How old are you?

13  A.    52.

14  Q.    In 52 years, have you ever been in trouble?

15  A.    No, I haven't.

16  Q.    Now, I want to ask you some questions, because I think

17  it's important that the jury hear from you.  You understand?

18  A.    Yes.

19  Q.    Okay.  Do your best to think about the questions, answer

20  them truthfully, correct?

21  A.    Yes.

22  Q.    Are you married?

23  A.    Yes.

24  Q.    How long have you been -- how long have you been married?

25  A.    20 years now.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Is your wife present in the audience today?

2   A.   Yes, she is.

3   Q.   With your mother?

4   A.   Yes, she is.

5   Q.   Do you have any children?

6   A.   Yes, I do.

7   Q.   How many children do you have, and what are their names

8   and ages?

9   A.   I have three children.  Vanessa Gomez, she's 19 years old.

10   I have Sophia Gomez, she's 14.  And I have David, Jr.  He's 10.

11   Q.   Are you employed?

12   A.   Yes, I am.

13   Q.   Where are you employed?

14   A.   One of my jobs is I'm a longshoreman.

15   Q.   How long have you been a longshoreman?

16   A.   Just over, full-time, 11 years now.

17   Q.   And do you work full-time longshoring?

18   A.   Yes, I do.

19   Q.   Do you also own another business?

20   A.   Yes, I do.

21   Q.   And what business is that?

22   A.   It's a little store.  I buy and sell gold.

23   Q.   Is that in Los Angeles?

24   A.   Yes, it is.

25   Q.   What's the name of that store?

597

```
 1    A.   It's called The Gold Return.

 2    Q.   Gold Return.  Do you keep hours at The Gold Return?

 3    A.   Yeah.  We're -- we're open Monday through Saturday.  10:00

 4    o'clock to 4:00 o'clock Monday through Friday, and 10:00 to

 5    2:00 on Saturday.  But I have somebody there working for me.

 6    Q.   So you don't spend all that time there, because you're

 7    longshoring on ships in the port, correct?

 8    A.   Yes.

 9    Q.   So you split your time between longshoring and some time

10    at The Gold Return?

11    A.   Yes.

12    Q.   Did you own that business in 2009?

13    A.   Yes, I did.

14    Q.   And you've owned it continuously from 2009 till today?

15    A.   Yes.

16    Q.   Do you have any partners in The Gold Return?

17    A.   Yes.

18    Q.   Is one of the partners Sergio Amador?

19    A.   No, he's not.

20    Q.   Now, at some point you also owned a Sixth Street Bistro in

21    San Pedro; is that right?

22    A.   Yes.

23    Q.   Do you still own that business?

24    A.   No.  No, I don't.

25    Q.   Now, did you own the bistro in 2009?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Yes, I did.

2    Q.   So in 2009, would it be fair to say that you split your

3    time between the bistro, longshoring and The Gold Return and

4    Port Medical?

5    A.   Yes.

6    Q.   Okay.  So what time of day would you go to Port Medical,

7    approximately?

8    A.   Any chance I could.  During my lunch break at -- when I

9    was longshoring, whatever site I was at.  We worked at

10   different berths in Long Beach or San Pedro, so if I was on the

11   other side in Long Beach and I had a lunch break, I would stop

12   in the one in Long Beach.

13   Q.   Did you go to Port Medical every day?

14   A.   No.

15   Q.   What days would you go to Port Medical?

16   A.   It would -- it would vary.

17   Q.   Do you have an estimate?  Or what's your best estimate as

18   to the number of days per week --

19   A.   Oh, number per week?  I would say twice a week, roughly.

20   Maybe three times at the most.

21   Q.   Like every other day, essentially?

22   A.   Yes.

23   Q.   Okay.  And was that -- in 2009, was that a fair estimate

24   of --

25   A.   Yes.  More that time, because it was getting off its feet,

1    yeah.

2    Q.   Oh, so you went to Port Medical more frequently in 2009

3    because it was a start-up company?

4    A.   Yes.

5    Q.   In 2010 and 2011, approximately every other day each week?

6    A.   Not Long Beach as much, because I think 2010's when we

7    started San Pedro, so I was more in San Pedro.

8    Q.   So when did San Pedro open?

9    A.   I believe 2010.  That -- that's what I been hearing.

10   Q.   Does August 2010 sound accurate?

11   A.   I believe so, yes.

12   Q.   And so what happened in August of 2010 when San Pedro

13   opened?  Would you still go to Long Beach or --

14   A.   No, I would spend -- I would -- I would not really go to

15   Long Beach that more -- that often, no.

16   Q.   Did you and Sergio have an office that was specific to

17   you, or he, or you, or how did that work?

18   A.   No, we didn't have offices in locations.

19   Q.   I meant locations.  In other words, did you both attend to

20   each office, or was San Pedro your office and Long Beach his,

21   or how did that work?

22   A.   It was -- it was -- it was told -- we had a mutual

23   agreement that he would overlook Long Beach, because he lived

24   in Downey, and I would overlook San Pedro, because I live in

25   San Pedro.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

600

1   Q.   Okay.  And is that what occurred beginning in August 2010

2   when San Pedro opened?

3   A.   Yes.

4   Q.   And you would go to Port Medical San Pedro every other day

5   in 2010 and 2011; is that fair?

6   A.   When I could, yeah.

7   Q.   When you were there, what would you do?

8   A.   Wasn't really much for me to do.  I was just -- actually,

9   a lot of times I would go there just to work out.

10  Q.   Work out.

11  A.   They had a treadmill there.

12  Q.   Okay.  Well, what -- you said -- you mentioned lunch

13  breaks.  What kind of a lunch break does a longshoreman get?

14  A.    I was -- earlier stage, I was a lasher.  I was one of

15  those -- I had a job where I would go in in the morning and we

16  would catch up on the lash, which is the type of job that they

17  had containers up on the ship and we would have to -- we would

18  be the ones that would tie the containers onto the other

19  containers as they stacked them.

20          THE COURT:  I believe the question was just when was

21  your lunch breaks.

22          THE WITNESS:  It would vary.

23          THE COURT:  I'm sorry?

24          THE WITNESS:  The lunch breaks would vary.  It could

25  range anywhere from 9:00 o'clock in the morning to 3:00 o'clock

1    in the afternoon.

2            THE COURT:  Okay.  Next question.

3    BY MR. ULTIMO:

4    Q.   Okay.  So lunch didn't last from 9:00 to 3:00, did it?

5    A.   We would call it our lunch breaks, but that would be our

6    break sometimes.  We would have breaks in between a day's -- it

7    could be a four-hour break in between a day and then come back

8    and finish up the day.

9    Q.   Okay.  So whenever you got lunch breaks, you would go to

10   Port Medical?

11   A.   Yeah.  Or I would go to my Gold Return.

12   Q.   And when you were at Port Medical, you didn't work out the

13   whole time?

14   A.   No.

15   Q.   What were some of the things that you did?

16   A.    I would -- I would ask them how's the patient -- "How's

17   the patient list going?"

18        They would say, "Ah, we're doing good."

19        I would see if there's anything I could do, like empty out

20   the trash, or is there a light bulb out, or anything that I

21   could help out with to make the girls' day easier, you know,

22   the front desk girl, either the manager or the girl at the

23   front desk.

24   Q.   Who cleaned the restroom?

25   A.   Sometimes it would be me.

1  Q.   Why?

2  A.   Because it was kind of like a dirty job, and I didn't

3  have -- we didn't have a janitor.

4  Q.   So you were sort of the handyman for Port Medical?

5  A.   Yeah.  Yeah, I guess.

6  Q.   Was that one of your roles?

7  A.   Yeah.

8  Q.   You did more than just that, but that was one of the roles

9  that you would do?

10  A.   Yes.

11  Q.   Would you falsify SOAP notes?

12  A.   Absolute- -- no.

13  Q.   Would you submit any false billings for patients?

14  A.   No.

15  Q.   How about for patients that were not seen?

16  A.   No.

17  Q.   Did you prepare any false paperwork at Port Medical?

18  A.   No.

19  Q.   Do you have any medical or chiropractic training?

20  A.   No.

21  Q.   Have you ever been to medical or chiropractic school?

22  A.   No.

23  Q.   Have you ever prepared patient medical records?

24  A.   No.

25  Q.   Have you ever made entries in patient medical records?

```
 1   A.   No.
 2   Q.   Have you ever owned a medical facility prior to you
 3   investing in Port Medical?
 4   A.   No.
 5   Q.   Did you use Port Medical for chiropractic care and
 6   treatment for yourself?
 7   A.   Yes.
 8   Q.   Why?
 9   A.   'Cause I needed it.
10   Q.   Did you see the chiropractor at Port Medical?
11   A.   Yes.
12   Q.   And was it -- was that Dr. Malone?
13   A.   Yes, it was.
14   Q.   Why were you seeking chiropractic care and treatment?
15   A.   Because he was a good adjuster, and I needed my back
16   adjusted.
17   Q.   And did he perform those adjustments to your back?
18   A.   Yes, he did.
19   Q.   To your neck?
20   A.   Yeah, he did.  I didn't like to get my neck cracked, but
21   he did, he cracked it, yes.
22   Q.   Did he refer you for massage therapy?
23   A.   Yes, but I -- I never had the time to get a massage.
24   Q.   Did you go -- so you did not go for any massage therapy at
25   Port Medical?
```

604

1   A.    I -- I -- one time they convinced me to get a massage one

2   time in San Pedro, yes.

3   Q.    And that one time, was it -- the massage was actually

4   performed on you?

5   A.    Yeah.  I was a guinea pig, they call it.

6   Q.    A guinea pig?

7   A.    Well, Yolanda was getting trained to be a massage

8   therapist, and Anna was teaching her how to be -- giving a

9   massage, and I was the guinea pig.  She was showing her how to

10  start a massage, and Anna's a massage therapist, and Yolanda

11  was in the room.

12  Q.    Were you aware that Port Medical was billing your

13  insurance company for massage therapy for you?

14  A.    No, I wasn't.

15  Q.    You get EOBs in the mail, correct?

16  A.    Yes, I do.

17  Q.    Explanation of Benefits from your health insurance

18  company?

19  A.    Yes, we do.

20  Q.    What do you do with them when you get them?

21  A.    I'm sorry to say, like everybody else, I wouldn't -- I

22  wouldn't open them.

23  Q.    Why not?

24  A.    I have the same answer.  We weren't responsible for any of

25  the -- any -- any of the billing.  I wouldn't even have to -- I

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   wouldn't have to pay anything out, so it was no reason for me
 2   to open them.
 3   Q.   Did you do any of the clerical work in Port Medical,
 4   either in the front office or the office area?
 5   A.   No, I didn't.
 6   Q.   Did you open any of the mail at Port Medical?
 7   A.   No, I didn't.
 8   Q.   When you sought and received chiropractic care and
 9   treatment from Dr. Malone at Port Medical, did you go more than
10   once to see him?
11   A.   Yes, I did.
12   Q.   How frequently would you see Dr. Malone?
13   A.   I can't remember.  I -- I'd see him in Long Beach and I'd
14   see him in San Pedro, too.  I can't remember how many times I
15   went.
16   Q.   You have an estimate on how many visits you made with him?
17   A.   Out of the three years, I really can't.
18   Q.   Okay.  So was it -- and did you actually receive care and
19   treatment from Dr. Malone?
20   A.   Yes, I did.
21   Q.   Okay.
22   A.   There was -- we had another chiropractor in Long Beach,
23   too.  I received treatment from him, too.
24   Q.   And were those treatments necessary?
25   A.   Yes, they were.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

606

```
1   Q.   Why were they necessary?

2   A.   Because I had lower back problems from lashing, from my

3   job.

4   Q.   What does lashing involve, briefly?  Does it have to do

5   with --

6   A.   Physical labor.

7   Q.   -- cables?

8   A.   Yeah.  Physical labor, lifting up bars, 40 to 50-pound

9   bars.

10  Q.   Is that a physical job?

11  A.   Yes, it is.

12  Q.   You have to climb to do that job?

13  A.   Not climb, but just a lot of lifting and a lot of bending

14  over.

15  Q.   Steel cables that are thick and fat and heavy?

16  A.   They're -- yeah, they're bars and cables.

17  Q.   Did that cause your back to cause -- did that cause pain

18  symptoms to your back?

19  A.   Yes.  That, and being a little bit overweight doesn't

20  help, either.

21  Q.   Okay.  Is that why you went to see a chiropractor?

22  A.   Yes.

23  Q.   And was it your understanding that chiropractic services

24  was a benefit under your health insurance plan?

25  A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   And that plan was provided to you through your employment?

2  Was that your understanding?

3  A.   Yes.

4  Q.   The massage, you only received one.  Did that help

5  alleviate your symptom of back pain?

6  A.   That massage, no, not really.

7  Q.   So your use of health insurance benefits for chiropractic

8  services was not false; is that right?

9  A.   No, it wasn't.

10  Q.   How about your wife Griselle, who's present in the

11  audience today?  Did she receive chiropractic services and

12  massages at Port Medical?

13  A.   Yes, she did.

14  Q.   To your knowledge, were those chiropractic services and

15  massages to your wife prescribed by the doctor?

16  A.   Yes, they were.

17  Q.   So those chiropractic services and massages were not

18  falsified; is that right?

19  A.   No, they weren't.

20  Q.   She actually received massages?

21  A.   Oh, yes.  She enjoyed the clinic.

22  Q.   And she saw the chiropractor?

23  A.   Yes.

24  Q.   What about your daughter, Sophie?

25  A.   She loved the clinic.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Did she see the chiropractor?

2    A.   Yes.

3    Q.   And what did she see the chiropractor for, to your

4    knowledge, if you know?

5    A.   I know.  I don't know if -- she went to a private school,

6    and she was eight years old, and I don't know if you -- I'm

7    sure you guys know; they used to carry around 50-pound

8    backpacks with, like, four or five books, and they were pretty

9    heavy.  And I complained to the school about that, but she

10   always complained of her back being sore.

11   Q.   Okay.  And so she sought the chiropractic care and

12   treatment for that?

13   A.   Yes.  Not -- and also she enjoyed it.

14   Q.   Okay.  When you say she enjoyed it, did the chiropractor

15   prescribe massage therapy for her?

16   A.   Yes.  Well, that's the part that she enjoyed, the massage.

17   Q.   Okay.  And so she went for massage therapy?

18   A.   Yes.

19   Q.   To your knowledge, do you know whether she actually

20   received those massages?

21   A.   Oh, yes.

22   Q.   Do you know who the massage therapist was?

23   A.   I can't recall.

24   Q.   Did she go frequently for massages?

25   A.   Yes.  She's still going now, as -- as up to now.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Not at Port Medical?

2    A.   No.  Other places, other facilities.

3    Q.   Yesterday Kevin Malone said there was a day when you

4    handed him five or so charts.  You heard that testimony,

5    correct?

6    A.   Yes, I did.

7    Q.   Why did you hand Kevin Malone five or so patient charts

8    that day?

9    A.   This goes back to when we had -- they're calling it an

10   audit of the office, when Michelle Aragon -- when we first

11   opened up and Michelle Aragon was overwhelmed.  He mentioned

12   that the files were stacked up over her head.  And we had -- we

13   closed down for two days.  I didn't think -- we didn't even

14   close down for two days.  I think we did it within a day.  But

15   we had some people to come in to overlook the files.

16        Now, I wasn't there to actually overlook the files,

17   because I can't read SOAP notes, but that day we had Toni Moyer

18   come in to help us.  She's a biller.  She's not an accountant;

19   she's a biller.  And she helped us look at the files, and she

20   said the files weren't complete, and if someone wants to come

21   in -- I don't know how she -- what she put -- I don't know how

22   she put it, but --

23   Q.   Mr. Gomez, could you talk a little slower.

24   A.   Oh.  Toni Moyer, she said that if someone wants to come in

25   and look at those files, you would be shut down, because these

1   files are improper and they're uncompleted.  So we decided to

2   close down for a couple of days and complete the files.  To my

3   understanding, these files were people that came in, but they

4   were just uncompleted.  So that night we called some people in

5   to come help us to look at the files and make sure that we can

6   complete the files, cross the T's and dot the I's.  That's the

7   way I put it.  So Toni helped us.  Who was there was

8   Michelle --

9          THE COURT:  Counsel, next question.  This is turning

10  into a narrative.

11  BY MR. ULTIMO:

12  Q.   Okay.  Did you know any of the patients reflected in those

13  five or so charts that you handed Kevin Malone?

14  A.   No.  I was just told to hand over these files to Kevin.

15  Because I had the better relationship with Kevin.  I didn't

16  know those people.  I was the chosen one --

17  Q.   That's fine.  When you've answered the question, stop.  I

18  appreciate you --

19  A.   Oh.

20  Q.   -- filling in the gaps --

21  A.   No, I did not know those people.

22  Q.   Okay.  Thank you.

23       Did you know that they were longshoremen?

24  A.   No.

25  Q.   How many longshoremen, to your knowledge, are there in and

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   around Los Angeles, Port of Los Angeles and Long Beach area?

2   A.   There's around 10,000 Local 13 longshoremen.  There's

3   another 5,000 Local 63.

4   Q.   That's all around the Port of Los Angeles and Port of Long

5   Beach?

6   A.   Yes.

7   Q.   And South Bay?

8   A.   Yes.  And that's just my count.  I mean, might be more

9   now.

10  Q.   Do you know all of them?

11  A.   No.

12  Q.   When you handed Dr. Malone the five or so patient charts

13  that day, did you have any knowledge whether Kevin Malone had

14  seen those patients?

15  A.   No, I didn't.

16  Q.   Was that the only time that you asked Kevin Malone to sign

17  or complete patient charts?

18  A.   Yes.

19  Q.   Had you ever done that before?

20  A.   No.

21  Q.   Did you instruct Dr. Malone to falsify notes in those

22  charts?

23  A.   No.

24  Q.   Did you tell Dr. Malone that longshoremen were allowing

25  Port Medical to bill for visits that had not actually occurred?

```
1    A.   No.

2    Q.   Were the patients that were reflected in those charts your

3    friends?

4    A.   I never seen who was actually on those charts.

5    Q.   And Toni Moyer asked you to give those to Dr. Malone?

6    A.   I can't -- I can't remember who gave me those charts to

7    give to Kevin.

8    Q.   Now, Pandora Hall, she said -- she testified about a

9    conversation or a meeting, and she said that you made a comment

10   to the effect that "We'll just blame it on Michelle Aragon

11   because she taught us everything."  Do you remember hearing

12   that in court?

13   A.   I don't remember hearing that.

14   Q.   In court, you remember hearing Pandora?

15   A.   Oh, I remember her saying that, yes.

16   Q.   Did you make that comment at a meeting to Pandora Hall?

17   A.   No, I didn't.

18   Q.   Can you explain that comment?  Have you ever heard

19   anything like that at a meeting at Port Medical?

20   A.   No.

21   Q.   Did you know Michelle Aragon?

22   A.   Yes.

23   Q.   Before Port Medical was opened?

24   A.   No, I didn't.

25   Q.   Did Michelle Aragon teach you a system or scheme to
```

1    defraud health insurance?

2    A.    No, she didn't.

3    Q.    Are you an insurance biller?

4    A.    No, I'm not.

5    Q.    Now, Nicole LaBeaud testified, and you were here in court.

6    She testified yesterday.  Do you know Nicole LaBeaud?

7    A.    Yes, I do.

8    Q.    You remember her from Port Medical?

9    A.    Yes.

10   Q.    And how was she -- what role did she play at Port Medical?

11   Was she a massage therapist?  What was she?

12   A.    I actually didn't really remember her until I seen her

13   here in court, but it refresh -- it refreshed my memory.  She

14   was a massage therapist.

15   Q.    Did you promote Nicole LaBeaud from a massage therapist to

16   an office manager?

17   A.    Did I personally, or did the office?

18   Q.    No, you personally.

19   A.    I -- I don't -- I don't think so.

20   Q.    Do you have any -- well, let me ask you this.  Did you run

21   Port Medical, or did the office managers and staff run Port

22   Medical?

23   A.    After we had the people that we hired in their -- in their

24   profession, in their -- after we hired the manager and we had

25   the doctor and we had the massage therapists and we had the

```
1    biller in their right position, there wasn't really a position

2    for us to run anything.  We weren't doctors.  We weren't

3    billers.  We weren't massage therapists.

4               THE COURT:  Okay.  Next question.

5    BY MR. ULTIMO:

6    Q.   Did you ever ask Nicole LaBeaud to falsify chart notes?

7    A.   No, I didn't.

8    Q.   So you personally didn't ask her to become an office

9    manager?

10   A.   No, I didn't.

11   Q.   Was she an office manager?  Do you have any recollection

12   of that?

13   A.   I believe she was.  I believe that she was.  I don't

14   recall, though.

15   Q.   Do you know Sergio Amador?

16   A.   Yes, I do.

17   Q.   How do you know Sergio Amador?

18   A.   I met him down at the waterfront.  Well, on the job.

19   Q.   And how long have you known him?

20   A.   Up to today?

21   Q.   Approximately, yeah.

22   A.   Maybe nine years.

23   Q.   You saw that you were the incorporator for Port Medical

24   Associates.  Why did you incorporate Port Medical?

25   A.   I'm -- I -- I was told to.  I don't know.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Whose idea was it to incorporate Port Medical?

 2   A.   I can't remember.

 3   Q.   Well, was it you who approached Sergio Amador to start

 4   Port Medical, or he that approached you to start Port Medical?

 5   A.   Oh, he had approached me.

 6   Q.   Okay.  And did Sergio Amador tell you, "Hey, we have to

 7   start a corporation," or did you come up with that yourself?

 8   A.   I'm sure -- I'm sure -- I don't think it was even Sergio's

 9   idea.  I think we -- Michelle hired somebody that tell us we

10   have to incorporate.

11   Q.   And you paid someone to incorporate Port Medical?

12   A.   Yes.

13   Q.   And is that how your name got on the articles?

14   A.   Yes.

15   Q.   Did you invest in Port Medical?

16   A.   Yes, I did.

17   Q.   With your own money?

18   A.   Yes.

19   Q.   And how much of your own money did you invest in Port

20   Medical?

21   A.   I -- I think it was $60,000.

22   Q.   And did Sergio Amador invest 60,000 in the clinic?

23   A.   I believe so.

24   Q.   Did Kevin Malone pay Port Medical for the use of the

25   medical facility?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    No, he didn't.

2    Q.    He didn't pay -- did he -- he got the use of the facility

3    and the premises for free?

4    A.    Yes.

5    Q.    He was -- it was his practice, correct?

6    A.    Yes, it was.

7    Q.    But you and Sergio were on the lease for the buildings?

8    A.    Right.

9    Q.    And then you paid -- or either Port Medical or Malone

10   Chiropractic paid one of the management companies so you could

11   pay rent on the buildings, correct?

12   A.    Correct.

13   Q.    So there's going to be -- who employed the massage

14   therapists?

15   A.    I believe the -- the manager.

16   Q.    And as far as you know, whose job was it to supervise the

17   massage therapists?

18   A.    The manager.

19   Q.    Or the doctor?

20   A.    Or the chiro.  Chiro.

21   Q.    Did you ever manage or give instructions to the massage

22   therapists?

23   A.    No.

24   Q.    Did you ever tell the massage therapists what to put in

25   their chart notes or SOAP notes?

```
 1   A.   No.

 2   Q.   As far as your understanding, what was your understanding

 3   as to the agreement with Malone Chiropractic?  What was Malone

 4   Chiropractic supposed to provide to Port Medical?

 5   A.   His chiropractor service.

 6   Q.   Did you ever assist any of the doctors or chiropractors

 7   with patients?

 8   A.   No.

 9   Q.   Now, at some point when Port Medical opened up, it had no

10   patients, correct?

11   A.   Which -- which -- which one?

12   Q.   Well, the first one.  Start with Long Beach.  Because when

13   San Pedro opened up, did it have patients all the sudden?

14   A.   Yeah, San Pedro went really well right off the bat.  Yes.

15   Q.   Why?  Why did San Pedro go really well right off the bat?

16   A.   Because it was a very nice location.

17   Q.    Why was it a nice location?

18   A.   It was right on Harbor Boulevard, which was a really good

19   location for the longshoremen, and it was right across the

20   street from the cruise lines, and it was -- which was, you

21   know, like five minutes from a lot of places where we'd work,

22   and it was a nice facility.

23   Q.   So it was no need -- was there any need to advertise or

24   market for patients when you opened San Pedro?

25   A.   No, not really.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

618

1    Q.   Well, when its predecessor -- actually, when the first

2    location opened up, Long Beach, it had no patients, correct?

3    A.   No.  We had to advertise for that place.

4    Q.   How did you advertise for patients to build what was to

5    become Port Medical?

6    A.   Well, when Michelle -- it was Michelle's idea to sponsor

7    softball teams.

8    Q.   Okay.  And did she do that?

9    A.   Yes, she did.

10   Q.   And was Michelle Aragon a signer on the checking accounts

11   for Port Medical?

12   A.   You know, all that stuff, I wasn't really -- I wasn't

13   really kept up with all that stuff.  I was kind of behind the

14   scenes.  I didn't really pay attention to all that stuff,

15   because I was really busy with everything else.  You guys

16   mentioned --

17          THE COURT:  Next question, Counsel.

18          THE WITNESS:  Yeah, I don't know.

19   BY MR. ULTIMO:

20   Q.   But as far as you know, Michelle Aragon was sponsoring

21   soccer teams, softball teams?

22   A.   Yes.

23   Q.   And do longshoremen have a lot of extracurricular

24   activities, teams and things like that?

25   A.   Oh, yes.

```
1    Q.   Quite a few?

2    A.   Yeah.  We had -- we had an annual tournament every --

3    every year.

4    Q.   And did Port Medical have a booth for that tournament?

5    A.   Yes.  We always contribute, yes.

6    Q.   Now, I'd like to show you -- because you said you weren't

7    involved too much, you were in the back seat -- back scene.

8    Like to show you a few checks.

9    A.   Yes.

10   Q.   First I'd like to show you Exhibit 12, page 167.

11        I believe that's already been admitted, right?

12             THE COURT:  Any objection?

13             MR. CARDONA:  I have no objection.

14             THE COURT:  It will be received.

15        (Received in evidence, Trial Exhibit 12, page 167.)

16   BY MR. ULTIMO:

17   Q.   Do you recognize Exhibit 12, page 167?  Is that your

18   signature?

19   A.   No, it's not.

20   Q.   What I want to do is -- okay, I've got -- I now have

21   Exhibit 12, page 167, on the left side of the screen.  I want

22   to show you, beside it, Exhibit 11, page 1.

23        You know what Exhibit 11, page 1, is?

24   A.   Would it --

25   Q.   It's a bank signature card from Washington Mutual.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    Okay.

 2   Q.    For DCS Medical Management.

 3   A.    Okay.

 4   Q.    That sound correct?

 5   A.    Yes.

 6   Q.    Now, is that your signature on the bottom left-hand

 7   corner --

 8   A.    Yes.

 9   Q.    -- of Exhibit 11?

10   A.    Yes.

11   Q.    Okay.  Now, you see here I've placed the signature from

12   the Washington Mutual signature card, Exhibit 11, on the top.

13   I've zoomed in on it, and I've placed the signature on Exhibit

14   12, page 167, below it, zoomed in.

15         Looking at these two signatures, can you tell us -- first

16   of all, these signatures, are both of these signatures yours,

17   or which one is yours?

18   A.    The top one's my signature.

19   Q.    Do you know who signed your name on the check, Exhibit

20   12-167, beneath it?

21   A.    No, I don't.

22   Q.    Did you give anyone permission to sign your signature on

23   checks at DCS Medical Management?

24   A.    No, I didn't.

25   Q.    Now, I notice the "G" is different.  How do you make your
```

```
 1    "G" when you sign your name?
 2              THE COURT:  Well, I think the documents speak for
 3    themselves, Counsel.
 4              MR. ULTIMO:  Okay.  Thank you.
 5    Q.   And the "z" is also different, correct, in "Gomez"?
 6    A.   Yes.
 7    Q.   And the "D," the first "D," capital "D," looks different.
 8    A.   Yes.
 9    Q.   The top one is looped at the bottom, and the signature
10    beneath it is kind of a straight line; is that right?
11              MR. CARDONA:  Objection, Your Honor, leading.
12              THE COURT:  Sustained.
13              THE WITNESS:  Yes.
14    BY MR. ULTIMO:
15    Q.   Want to show you Exhibit 12, page 221.
16              MR. CARDONA:  No objection.
17              THE COURT:  Okay.
18         (Received in evidence, Trial Exhibit 12, page 221.)
19    BY MR. ULTIMO:
20    Q.   Mr. Gomez, this appears to be a withdrawal slip from a
21    bank.  Is that your signature on this withdrawal slip?
22    A.   Yeah, it looks like my signature.
23    Q.   I want to show you Exhibit 12, page 173.
24              THE COURT:  You may publish it.
25              MR. ULTIMO:  Thank you, Your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        (Received in evidence, Trial Exhibit 12, page 173.)

 2   BY MR. ULTIMO:

 3   Q.   Is that your signature?

 4   A.   No, it's not.

 5   Q.   I want to show you Exhibit 12, page 167.

 6        MR. CARDONA:  No objection, Your Honor.

 7        THE COURT:  You may show it.

 8   BY MR. ULTIMO:

 9   Q.   Is that your signature, Mr. Gomez?

10   A.   No, it doesn't look like my signature.

11   Q.   Did you sign that check?

12   A.   No, I didn't.

13   Q.   I want to show you two more, or actually, three more.

14   Exhibit 12, page 1346.  Yeah, Exhibit 12, page 1346.

15        THE COURT:  You may publish.

16        MR. CARDONA:  No objection.

17        (Received in evidence, Trial Exhibit 12, page 1346.)

18   BY MR. ULTIMO:

19   Q.   This is a check written by Sergio Amador from the same

20   account.  Do you see that?

21   A.   Yes, I do.

22   Q.   You recognize his signature?

23   A.   Yes.

24   Q.   The endorsement on the back, is that your signature?

25   A.   That looks like my signature, yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   And the check is made out to you, correct?

2    A.   Yes.

3    Q.   And it's signed by Sergio?

4    A.   Yes.

5    Q.   You were a signer on this account.  Why do you -- do you

6    know why Sergio was giving you a check when you're a signer on

7    the same account?

8    A.   I'm not sure.  I don't remember.

9    Q.   Okay.  Two more.  Same exhibit, Exhibit 12, page 1432.

10           MR. CARDONA:  No objection, Your Honor.

11           THE COURT:  May be published.

12         (Received in evidence, Trial Exhibit 12, page 1432.)

13   BY MR. ULTIMO:

14   Q.   Same account.  Is that your signature?

15   A.   No, it's not.

16   Q.   And finally, Exhibit 12, page 1431.  Same account again.

17   Is that your signature?

18   A.   No, it's not.

19   Q.   You have any knowledge as to who was signing your name on

20   these checks that I showed you?

21   A.   No.  No, I don't.

22   Q.   I have a different -- I do have a check, one more check I

23   want to show you.  Exhibit 12, page 30.

24           THE COURT:  Okay.

25           MR. CARDONA:  No objection.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  It may be published.

 2          (Received in evidence, Trial Exhibit 12, page 30.)

 3   BY MR. ULTIMO:

 4   Q.   This is from a different account.  This is from your Gold

 5   Return store; is that right?

 6   A.   Yes.

 7   Q.   And you made this check payable to -- first of all, is

 8   that your signature?

 9   A.   Yes.

10   Q.   And that's because that's your account, correct?

11   A.   Yes.

12   Q.   And did you make a check to DCS Medical Management for

13   $5,000?

14   A.   I believe -- yes.

15   Q.   Yeah.  And it says -- what does it say in the memo

16   portion?

17   A.   It says "Loan to DCS."

18   Q.   Did you loan them money?

19   A.   Yes.

20   Q.   Now, last year, when -- at some point you were arrested,

21   correct?

22   A.   Yes, I was.

23   Q.   As part of this case?

24   A.   Yes.

25   Q.   Okay.  You were never arrested before in your life, right?
```

1    A.   No.

2    Q.   So when you were arrested, you were taken to a jail, I

3    take it?

4    A.   Yes, I was.

5    Q.   And did you come into contact with Sergio Amador at any

6    point?

7    A.   Yes, I did.

8    Q.   Did you or he have any -- did you have a discussion with

9    him, Sergio Amador?  Did you guys talk?

10   A.   Yes, we did.

11   Q.   Okay.  And what did he discuss with you?

12   A.   We sat in the jail, and he -- he -- Sergio always had a

13   strange look when he was, like, disappointed, and he sat down

14   and he looked at me and he said, like, "I should have -- I

15   should have took your advice, you know, I should have stopped."

16   And then -- and he -- after that, he didn't really say

17   anything, 'cause he gave me that look, like, look where we're

18   at now.

19         THE COURT:  Okay.  Next question.

20   BY MR. ULTIMO:

21   Q.   How did you respond?

22   A.   I -- I gave him that same -- I gave him that same look,

23   and I told him -- I actually made a joke after -- the way he

24   walked, he was tripping over his chains.  I told him to take

25   short steps.  Because we were both chained from ankle to ankle.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE COURT:  Next question.
 2   BY MR. ULTIMO:
 3   Q.   What was your relationship, your interaction with
 4   Dr. Malone?  Did you and he get along?
 5   A.   Yeah, we got along great.
 6   Q.   What was the relationship like between -- that you've
 7   observed, between Dr. Malone and Sergio Amador?
 8   A.   They were -- they were always bumping heads, because
 9   Sergio always wanted to charge more, and Kevin didn't want to
10   charge that much.
11   Q.   How many employees did Port Medical have?  And you can
12   break it down any way you like, whether San Pedro and Long
13   Beach combined, or, if it's easier for you, how many employees
14   at Long Beach and how many in San Pedro.  But how many
15   employees did it have in 2009, 2010, 2011?  Break it down
16   whatever way it's comfortable for you.
17   A.   Oh, that I can remember -- do you want me to try to name
18   them or --
19   Q.   No, no, no, no, no.
20   A.   Positions?
21   Q.   Just give me a number.  An estimate.  Your best estimate
22   as to number of employees.
23   A.   Maybe at one time 20 to 25 employees in San Pedro, and 20
24   employees in Long Beach.
25   Q.   And was that concurrent?  In other words, is that 25 plus
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    20?

2    A.    Yes.

3    Q.    So, combined, both locations would be approximately 45

4    patients?  I'm sorry.

5    A.    Employees?

6    Q.    Strike that.  45 employees?

7    A.    Yes.  To my -- to my -- best of my knowledge.

8    Q.    That's an estimate?

9    A.    Yes.

10   Q.    Is that your best estimate?

11   A.    I -- I believe so.

12   Q.    Now, whose job was it to pay these employees?

13   A.    The manager.

14   Q.    Now, at some point you were interviewed by law enforcement

15   officers.  You were questioned before you were arrested,

16   correct?

17   A.    Yes.

18   Q.    What did you tell them that your role and/or job duties

19   were at Port Medical?

20   A.    When I was questioned by them, I didn't really -- I was --

21   I was there when I got -- when the San Pedro office got raided,

22   and I believe I didn't really tell them anything.  I was --

23   they were asking me if I was the owner, owner, owner, and I was

24   saying, no, no, no, because, directly, Kevin -- I mean

25   Dr. Soliman was the owner of Port Medical, and the owner of

```
 1   Ramport was a management company.  I was -- I was -- they
 2   weren't -- and I was just the investor.  Later on down the
 3   line, during that same questioning, I told them I was David
 4   Gomez, the investor.
 5   Q.   Did you also tell them that you were David Gomez, the
 6   marketer?
 7   A.   Yes, I believe so.
 8   Q.   Tell me about marketing.  What would you -- what did you
 9   do to market the clinic?
10   A.   Market?  My job was, since I was from -- well, I spent
11   most of my life in San Pedro.  I arrived there when I was three
12   years old, so --
13        THE COURT:  No, no.  Just listen to the question and
14   answer the question, otherwise we're going to be here for the
15   next two weeks.
16        Go ahead.
17        THE WITNESS:  How did I market?  On the job as a
18   longshoreman, I ran into fellow longshoremen, so I would market
19   as, whenever I heard that they had a backache or something like
20   that, I would mention the clinic.
21   BY MR. ULTIMO:
22   Q.   Did you pay patients or longshoremen to go to Port
23   Medical?
24   A.   No.
25   Q.   Did you know that Sergio was paying patients?
```

```
 1   A.   At one time, yes, I found out he was.
 2   Q.   And what action, if any, did you take when you discovered
 3   that he was paying patients or longshoremen to go to Port
 4   Medical?
 5   A.   I told him to stop.
 6   Q.   Were those your exact words?
 7   A.   I told him -- I told him -- my exact words were --
 8   Q.   To the best that you can remember.
 9   A.   I tell him, "What are you doing?  What are you doing?  You
10   gotta stop."  I can't -- to my best of my knowledge, I can't
11   remember my exact words, but I know I told him to stop.
12   Q.   What did he say?
13   A.   I -- he said, "Yes, I will," or something like that.
14   Q.   Did you tell -- now, you've heard from Pandora Hall,
15   correct?
16   A.   Yes, I have.
17   Q.   She was falsifying quite a number of SOAP notes for
18   massage therapists, correct?
19   A.   Mm-hmm.
20   Q.   Did you know that?
21   A.   At one time, yes, I did know that.
22   Q.   And what action, if any, did you take to stop it?
23   A.   I told -- well, when I found out what Sergio was doing,
24   and my job -- after I -- the actions that I took is when I said
25   this ain't gonna happen in San Pedro, when I brought her over
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    to San Pedro.

2    Q.   Okay.  And what action, if any, did you take to stop it

3    and ensure that it wasn't happening again?

4    A.   I -- I -- that's when we -- that's when I hired Toni

5    Moyer, and I specifically told Toni Moyer, our biller, that she

6    has to oversee all our billing and to make sure that if there's

7    any -- there's no fraud going on in San Pedro.

8    Q.   Okay.  Did you believe that the fraud had stopped?

9    A.   There was no fraud in San Pedro to my knowledge.

10   Q.   Did you believe that the fraud had stopped in Long Beach?

11   A.   I -- I believed so, yes.

12   Q.   Were you spending any time in Long Beach when -- after

13   it -- after you had begun overseeing San Pedro?

14   A.   Not as much, no.

15   Q.   Was it your understanding that Sergio Amador had stopped

16   paying patients because he told you he would stop?

17   A.   Yes.

18   Q.   And just to be clear, what participation, if any, did you

19   have with the billing for chiropractic services and/or massage

20   services?

21   A.   I have -- I had no participation.

22   Q.   Who did -- who -- essentially, the bill would -- would the

23   bill -- do you have an understanding as to how the chart notes,

24   the SOAP notes, and the health insurance claim form would

25   proceed and turn into a bill?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Counsel, we've gone over this many times.
 2              MR. ULTIMO:  I'm just asking if he had any
 3    understanding.
 4              THE COURT:  Well, we've already gone over it with him.
 5              MR. ULTIMO:  I'll withdraw the question.
 6    Q.   Did you ever fire anyone at Port Medical?
 7    A.   I don't think so.
 8    Q.   Why not?
 9    A.   I was the guy that -- I couldn't fire anybody.  I'm not
10    that type of person.
11    Q.   Did you have people that were supposed to do the firing?
12    A.   I'm sure the managers did the firing.
13    Q.   And who were the managers?
14    A.   We had several managers.  Would you like me to name them?
15    Q.   Well, certainly, yes.
16    A.   We had Michelle.  We had Pandora.  We had Eva.  I believe
17    we had Nicole.  We had one, I can't remember her name, but that
18    ended up at San Pedro at the very end.  I can't recall her
19    name, though.
20    Q.   Did you trust each of those managers?
21    A.   Yes, we did.  Yes, I did.
22    Q.   Now, I notice you didn't mention Eva Razo.
23    A.   Yes, I did.
24    Q.   You did?
25    A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   I'm sorry, I didn't hear.  Did you trust Eva Razo?
 2   A.   Yes, I did.
 3            MR. ULTIMO:  No further questions.
 4            THE COURT:  Okay.  Cross.
 5                     CROSS-EXAMINATION
 6   BY MR. CARDONA:
 7   Q.   Mr. Gomez, I'm correct, right, that the first facility
 8   that opened was Port Medical Long Beach?  Is that right?
 9   A.   Yes.
10   Q.   Now, you opened Port Medical Long Beach at or around the
11   same time you opened your medical management company, correct?
12   A.   I believe so, yes.
13   Q.   And that medical management company was DCS Medical
14   Management, correct?
15   A.   Yes.
16   Q.   And DCS stood for David, your name, Chris and Sergio,
17   correct?
18   A.   Yes.
19   Q.   Chris for Chris Rice?
20   A.   Yes.
21   Q.   And Sergio for Sergio Amador?
22   A.   Yes.
23   Q.   Now, you also opened, at the time that DCS Medical
24   Management was put in place, a bank account for DCS Medical
25   Management, correct?
```

1   A.   Excuse me?

2   Q.   You opened a bank account for DCS Medical Management.

3   A.   Yes.

4   Q.   And you were one of the signators on that account,

5   correct?

6   A.   I can't -- I don't remember that, but if you want to show

7   me.

8   Q.   Sure.  Let me show you Exhibit 11.  Do you see up here at

9   the top?  I've blown it up.  This is the account for DCS

10  Medical Management, LLC, at Washington Mutual, a division of

11  JPMorgan Chase Bank; is that right?

12  A.   Okay, yes.

13  Q.   Down at the bottom --

14  A.   Oh, yes, okay.

15  Q.   -- three signatures?

16  A.   Yes.

17  Q.   And one of those is you, correct?

18  A.   Right, mm-hmm.

19  Q.   And DCS Medical Management was set up by you, Chris and

20  Sergio to manage Port Medical, correct?

21  A.   It was set up -- I -- from my understanding, it was set up

22  to pay out the employees.

23  Q.   It handled the money for the business, right?

24  A.   Correct.

25  Q.   And when money came in from the insurance company, it

1    didn't go straight into DCS Medical Management, did it?

2    A.    No, it didn't.

3    Q.    In fact, it went into one of two accounts, right?

4    A.    It went into that account, I believe.

5    Q.    Didn't it first go -- when you first started out, didn't

6    money from the insurance company go into an account maintained

7    by Kevin Malone called Malone Chiropractic?

8    A.    Yeah.  He was the owner, so it went to his account, and

9    then it went to distribute to DCS to pay out the bills.

10   Q.    So the money went from Malone Chiropractic to DCS Medical

11   Management account, and then DCS Medical Management used that

12   money to operate the clinic?

13   A.    Correct.

14   Q.    Now, at some point that changed, right?

15   A.    I be- -- yeah.  There were several management companies

16   after that.

17   Q.    Well, let me skip the medical management company, but at

18   some point didn't Port Medical start billing and having the

19   checks go to an account operated by Port Medical?

20   A.    I believe so.

21   Q.    And then the money would be transferred from that account,

22   not Kevin Malone's account, but Port Medical's account, to the

23   DCS Medical Management account, correct?

24   A.    You guys are giving me too much credit.  I don't -- I

25   don't know any of that stuff.  If -- if -- yes, if it's on

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    paperwork and that happened, I believe it did, yes.

2    Q.   Well, you were a signer on the DCS Medical Management

3    account, right?

4    A.   Yeah.

5    Q.   And money got deposited into that account, right?

6    A.   Yes.

7    Q.   And the bulk of that money came from Port Medical

8    Associates, an account that was set up to bill the insurance

9    companies, didn't it?

10   A.   The bulk of that money's from patients being seen, yes.

11   Q.   Now, you wrote checks on the DCS Medical Management

12   account, correct?

13   A.   I wrote some checks, yes.

14   Q.   In fact, you wrote a fairly large number, didn't you?

15   A.   I -- I don't know.

16   Q.   Did you write checks to employees?

17   A.   Can you -- can I see them?  I don't -- which checks did I

18   write the employees?

19   Q.   I'm asking you, do you remember writing checks to

20   employees?

21   A.   No.

22   Q.   You know Yoli Sierra, right?

23   A.   Yes.

24   Q.   She was an employee?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Now, had she worked for you before she started at Port

2    Medical?

3    A.    I believe she worked at the restaurant, yes.

4    Q.    She worked at the Sixth Street Bistro, right?

5    A.    Yes.

6    Q.    And then you brought her over to Port Medical?

7    A.    Yes.

8    Q.    Now, when she came over to Port Medical, she worked at the

9    front desk, right?

10   A.    Yes.

11   Q.    She wasn't a massage therapist?

12   A.    No, she wasn't.

13   Q.    She wasn't certified as a massage therapist?

14   A.    I believe she wasn't, no.

15   Q.    Did you write checks to Yoli?

16   A.    From what account?

17   Q.    From the DCS Medical Management account.

18   A.    I don't remember.

19   Q.    Now, in addition to DCS Medical Management, you were also

20   partners with Sergio on some other accounts, weren't you?

21   A.    I think so, yes.

22         MR. CARDONA:  I'm going to display Exhibit 21, page 1.

23         MR. ULTIMO:  No objection, Your Honor.

24         THE COURT:  Okay.

25   ///

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   BY MR. CARDONA:

2   Q.   Do you see this is a signature card from Washington

3   Mutual, a division of JPMorgan Chase Bank, two customer names,

4   you and Sergio Amador?

5   A.   Yes.

6   Q.   Down below, two names, you and Sergio Amador?

7   A.   Yes.

8   Q.   Dated June 8, 2009; is that right?

9   A.   Mm-hmm.

10  Q.   Is that a "yes"?

11  A.   Yes.

12  Q.   Sorry, I have to ask you so the court reporter can write

13  it down.

14  A.   Yes.  Yes.

15  Q.   Now, this was right around the same time period that Port

16  Medical was getting up and running; is that right?

17  A.   Yes.

18  Q.   And at that point, in June of 2009, Port Medical had

19  already been up and running for four or five months?

20  A.   I believe so.

21  Q.   And you opened this separate account with Sergio Amador?

22  A.   I believe so.  What was the name of this account?  Just --

23  it was just an account?

24  Q.   I will show you at the top right.  It says "Individual

25  Joint Master Account Agreement."
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Okay.

2    Q.    Did you open a joint account with Sergio Amador?

3    A.    Yes.

4          MR. CARDONA:  Your Honor, I'd ask to display Exhibit

5    36, which has been admitted.

6          THE COURT:  Okay.

7          MR. ULTIMO:  No objection.

8          THE COURT:  It may be displayed.

9    BY MR. CARDONA:

10   Q.    I'm showing you another signature card, and this is a

11   signature card from Washington Mutual JPMorgan Chase Bank for

12   Sixth Street Bistro; is that right?

13   A.    Yes.

14   Q.    Now, that was the restaurant you owned before you met

15   Sergio, right?

16   A.    Well, I just didn't own it; there were other partners,

17   yes.

18   Q.    You had other partners, right?

19   A.    Yes.

20   Q.    But Sergio wasn't one of them originally?

21   A.    No.

22   Q.    Now, this account, you see down below there are three

23   signatures, Sergio, you, Joseph Giacco?

24   A.    Yes.

25   Q.    Now, was Joseph Giacco one of your former partners at
```

```
 1    Sixth Street Bistro?

 2    A.   Yes.

 3    Q.   This is dated October 2nd, 2009; is that right?

 4    A.   Yes.

 5    Q.   Now, that was, what, ten months, nine months after Port

 6    Medical had opened?

 7    A.   Yes.

 8    Q.   And you took Sergio on as a partner in the Sixth Street

 9    Bistro?

10    A.   Yes.

11    Q.   And opened this new account for the bistro?

12    A.   Yes.

13         MR. CARDONA:   Your Honor, I'd ask to display Exhibit

14    41, which has previously been admitted.

15    Q.   Now, this is a signature card for an account titled

16    "DS Medical Management"; is that right?

17    A.   Yes.

18    Q.   Down below, two names, you and Sergio Amador; is that

19    right?

20    A.   Yes.

21    Q.   Indicating that you were partners?

22    A.   Yes.

23    Q.   Were you partners with Sergio Amador in DS Medical

24    Management?

25    A.   Yes.
```

1   Q.   And over on the right, two signatures, you and Sergio

2   Amador; is that right?

3   A.   Yes.

4   Q.   This is December 26, 2009, correct?

5   A.   Yes.

6   Q.   Roughly a year after Port Medical had opened?

7   A.   Yes.

8   Q.   You opened a new medical management account with Sergio

9   Amador?

10  A.   Yes.

11  Q.   And opened a new account?

12  A.   Yes.

13  Q.   Now, you wrote checks on these various accounts, didn't

14  you?

15  A.   I can't remember, but if you'd like to show them to me.

16  Q.   Are you saying you don't ever remember writing a check on

17  any of the accounts?

18  A.   No, really, I can't -- honestly, I can't remember, but if

19  you'd like to show them to me to refresh my memory.

20  Q.   The Sixth Street Bistro, you operated that business,

21  right?

22  A.   I operated -- I was one of the owners.  I shook people's

23  hand when they came in.  I wasn't the cook.  I had somebody

24  there managing the place.  I was just, like, the person, like,

25  "hey, he's the owner; hey, come on in."

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And you didn't monitor the finances?

2   A.   No.  I had somebody work at -- doing that for me.

3   Q.   Did you care whether you got money out of it?

4   A.   Actually, it was -- no, I did care.  It was a loss.  We

5   were always taking money out of our pockets.  That didn't

6   really go very well for us.

7   Q.   And with Port Medical, I assume you went into it hoping to

8   make money?

9   A.   Yes, we did.

10  Q.   And you put money up, right?

11  A.   Yes, we did.

12          THE COURT:  We're going to break at this time, ladies

13  and gentlemen.  It's 11:30.  See you back in at 1:00 o'clock.

14      Remember the admonishment not to discuss the case among

15  yourselves or with anybody else or form or express any opinions

16  about the matter until it's submitted to you and you retire to

17  the jury room.

18      Have a pleasant lunch.  See you back in at 1:00 o'clock.

19  We'll finish up at 1:00.

20          THE CLERK:  All rise.

21      Court is in recess.

22      *(Lunch recess commenced at 11:31 a.m.)*

23  ///

24  ///

25  ///

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          LOS ANGELES, CALIFORNIA; FRIDAY, OCTOBER 14, 2016

2                              1:02 P.M.

3                              - - - -

4      *(In the presence of the jury:)*

5          THE COURT:  Okay.  The record will reflect that all

6      the members of the jury are in their respective seats in the

7      jury box, the witness is on the witness stand, and we were in

8      cross-examination.

9          Counsel, you may inquire.

10         MR. CARDONA:  Thank you, Your Honor.

11                   **CROSS-EXAMINATION (Continued)**

12     BY MR. CARDONA:

13     Q.   So, Mr. Gomez, before the break, we had talked about some

14     of the bank accounts that you and Sergio Amador had.  Do you

15     remember that?

16     A.   Yes.

17     Q.   And one of those was a joint account in which he and you

18     were the two signators?

19     A.   Yes.

20     Q.   Now, you transferred money in and out of that account,

21     right?

22     A.   You were telling me that, yes.

23     Q.   Well, you did that, right?

24     A.   I don't remember.

25     Q.   Let me show you a couple of items there.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          Your Honor, I'd offer Exhibit 17, page 200.

2               MR. ULTIMO:  No objection, Your Honor.

3               THE COURT:  Okay.  It may be posted.

4               MR. CARDONA:  My apologies, Your Honor.  May I have

5     one second?  My apologies, Your Honor.  It should be Exhibit

6     23.

7               THE COURT:  Exhibit 17, page 23?

8               MR. CARDONA:  No.  Exhibit 23 --

9               THE COURT:  Oh, 23.

10              MR. CARDONA:  -- page 200.

11              THE CLERK:  Thank you.

12              THE COURT:  Okay.

13              MR. CARDONA:  Hope --

14              THE COURT:  Any objection?

15              MR. ULTIMO:  No objection.

16              THE COURT:  Okay, you may publish it.

17         (Received in evidence, Trial Exhibit 23, page 200.)

18    BY MR. CARDONA:

19    Q.   So this is a deposit into that joint account.  Do you see

20    that this is a check from Malone Chiropractic?

21    A.   Yes.

22    Q.   And was Malone Chiropractic the chiropractic entity that

23    Kevin Malone had?

24    A.   I believe so.

25    Q.   And this is a check to Sergio Amador?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    And do you recognize that signature on the bottom right?

 3    A.    I -- do I recognize it being Sergio's signature?

 4    Q.    Was that Michelle Aragon's signature?

 5    A.    Oh.  I can't tell or not, if that's that and him.  I don't

 6    recognize Michelle's signature.

 7    Q.    Even though she was the manager for you?

 8    A.    I -- Michelle was the manager, yes, but I don't recognize

 9    her signature.

10          MR. CARDONA:  Your Honor, at this time I'd offer

11    Exhibit 228, page 308.

12          THE COURT:  228, 308.

13          MR. CARDONA:  Sorry.  Sorry, Your Honor.  23, page

14    228.  My apologies.  The numbering system is a bit odd.

15          THE COURT:  Okay.  23, page 228?

16          MR. CARDONA:  Yes, Your Honor.

17          THE COURT:  Okay.  Any objection?

18          MR. ULTIMO:  None, Your Honor.

19          THE COURT:  Okay.  It will be received.

20          (Received in evidence, Trial Exhibit 23, page 228.)

21    BY MR. CARDONA:

22    Q.    Before I go there, on the previous document we were

23    looking at, the date was September 8th, 2009; is that right?

24    A.    Yes.

25    Q.    So this page is a check made out on the joint account that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   you had with Mr. Amador?

2   A.   Yes.

3   Q.   Made out to The Gold Return; is that right?

4   A.   Yes.

5   Q.   And that was your business, right?

6   A.   Yes, it is.

7   Q.   And this is signed by you?

8   A.   Yes.

9   Q.   And that was six days after the deposit of the check from

10  Mr. Malone?

11  A.   Okay, yes.

12  Q.   Now, in the DCS Medical Management account, you in fact

13  wrote checks to employees, didn't you?

14  A.   I'm not sure.

15       MR. CARDONA:  Your Honor, may I display Exhibit 12,

16  page 111?

17       THE COURT:  Okay.

18       MR. ULTIMO:  No objection.

19       (Received in evidence, Trial Exhibit 12, page 111.)

20  BY MR. CARDONA:

21  Q.   This is a check signed by you, right?

22  A.   Yes.

23  Q.   Made out to Katie Ludvalla (phonetic)?

24  A.   Yes.

25  Q.   She was a Port Medical employee, wasn't she?

1    A.    I don't specifically remember her, but if she was an

2    employee, that is my signature.

3    Q.    And you wrote this check out of the DCS Medical Management

4    account to her?

5    A.    Yes.

6          MR. CARDONA:    Your Honor, I'd offer Exhibit 12, page

7    855.

8          MR. ULTIMO:    855?    No objection.

9          THE COURT:    Be received.

10         (Received in evidence, Trial Exhibit 12, page 855.)

11   BY MR. CARDONA:

12   Q.    This is a check dated December 7th, 2009, to Magdalena

13   Sroka.  Do you see that?

14   A.    Yes.

15   Q.    Now, she was an employee of Port Medical, wasn't she?

16   A.    Oh, yes.

17   Q.    She was the physician's assistant there?

18   A.    Yes.

19   Q.    And at the bottom, in the memo line, this says "Pay

20   period," correct?

21   A.    Yes.

22   Q.    And this was a check for her pay?

23   A.    Yes.

24   Q.    And it's signed by you?

25   A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

647

```
 1              MR. CARDONA:  Your Honor, I'd ask to display, offer
 2    Exhibit 12, page 918.
 3              THE COURT:  12, page 918.
 4              MR. ULTIMO:  403.  Otherwise, no objection.
 5              THE COURT:  Overruled.
 6         (Received in evidence, Trial Exhibit 12, page 918.)
 7    BY MR. CARDONA:
 8    Q.   This is a check dated the next year, January 4th, 2010,
 9    correct?
10    A.   Yes.
11    Q.   Made out to Griselle Garcia?
12    A.   Yes.
13    Q.   And she was an employee of Port Medical?
14    A.   Yes.
15    Q.   This is a check for her pay?
16    A.   Yes.
17    Q.   Signed by you?
18    A.   Yes.
19    Q.   Now, we had also referenced checks to Yoli Sierra.  You
20    wrote checks to her for her pay, correct?
21    A.   If the -- if I recognize the signature, yes.
22              MR. CARDONA:  My apologies, Your Honor.  I'm just
23    trying to find the page number in the exhibit.
24         So I'd offer Exhibit 12, page 608, Your Honor.
25              MR. ULTIMO:  403.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Okay.  Overruled.

 2          (Received in evidence, Trial Exhibit 12, page 608.)

 3   BY MR. CARDONA:

 4   Q.   So this is a check dated October 26, 2009, to Yolanda

 5   Sierra, right?

 6   A.   Yes.

 7   Q.   And she was an employee, right?

 8   A.   Yes.

 9   Q.   And this is for a pay period of October 13th to October

10   26th?

11   A.   Yes.

12   Q.   And you signed that?

13   A.   That does not look like my signature.

14   Q.   So you didn't sign this payroll check?

15   A.   No.

16   Q.   But you signed all the others?

17   A.   Yes.

18   Q.   Now, when you start -- when Port Medical started out, Port

19   Medical Long Beach, I think you said you were doing marketing;

20   is that right?

21   A.   Yes.

22   Q.   And Port Medical Long Beach wasn't the only chiropractic

23   clinic that catered to longshoremen, was it?

24   A.   No.

25   Q.   There were a number of them?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Several of them.
 2   Q.   And Port Medical Long Beach was not that close to the
 3   port, was it?
 4   A.   No, it wasn't.
 5   Q.   Was that one of the difficulties you had in getting
 6   longshoremen to go there?
 7   A.   Yes.
 8   Q.   Now, a number of other chiropractic clinics were closer to
 9   the ports, right?
10   A.   Yes.
11   Q.   And those other chiropractic clinics also were marketing,
12   right?
13   A.   Yes.
14   Q.   Competing with you for patients?
15   A.   Yes.
16   Q.   Competing with you for patients who were longshoremen and
17   had benefits under the ILWU's plan?
18   A.   Yes.
19   Q.   Now, some of those other clinics were paying patients,
20   weren't they?
21   A.   I believe so.
22   Q.   And you were competing with them?
23   A.   Yes.
24   Q.   Now, you marketed for Port Medical Long Beach.  Port
25   Medical Long Beach opened sometime in early 2009?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    You guys have all the documents.  I'm just going with what

2    you guys are saying.  I believe so.

3    Q.    Is that to the best of your memory?

4    A.    I be- -- yeah, best of my memory.

5    Q.    Now, you marketed for Port Medical Long Beach all the time

6    up until the federal agents came and did the searches of both

7    Long Beach and San Pedro, didn't you?

8    A.    I pretty much marketed for San Pedro after I had -- I went

9    to San Pedro, after San Pedro opened up.

10   Q.    Pretty much or totally?

11   A.    More -- I favored more San Pedro.

12   Q.    But you continued to market for Long Beach?

13   A.    Very little.

14   Q.    And then you also marketed for San Pedro, correct?

15   A.    Yes.

16   Q.    Now, you took money out of the medical management

17   companies, right?

18   A.    Oh, I got paid checks from both places, yes.

19   Q.    And you were paid for your marketing?

20   A.    Of course.

21   Q.    And you were paid for your return of your investment?

22   A.    Yes.

23   Q.    And you got a profit return?

24   A.    Yes.

25   Q.    How did you and Sergio work out who was going to do the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

marketing?

A.   The idea came to us, marketing wise, from Michelle, as far as sponsoring softball teams, and when we split up, he overseed Long Beach and I overseed San Pedro.  When I came across a longshoreman, I marketed San Pedro, and when he came across a longshoreman, he marketed Long Beach.

Q.   Now, do you recall speaking to law enforcement officers on August 14th, 2013?

A.   Exact date, no.

Q.   Was it the same date that the Port Medical Long Beach and Port Medical San Pedro were searched?

A.   I don't know when Long Beach was searched, but I remember San Pedro being searched.  I don't know what date it was, but I was there.

Q.   You were there, right?

A.   Yes.

Q.   And you were interviewed right after the search was done?

A.   During the search.

Q.   And the agent who interviewed you, was that -- were there two of them, a Department of Labor, Office of Inspector General agent, Alfredo Nodal (phonetic)?

A.   I don't remember their names, but there was two of them.

Q.   Now, you told them, didn't you, that you were unsure who originally authorized you to perform marketing services for Port Medical?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    I'm not sure what I told them from the very beginning.
2    I -- I believe I told them that -- they were asking me who was
3    the owner.
4    Q.    Did you tell them that you were unsure who originally
5    authorized you to perform marketing services for Port Medical?
6    A.    I don't recall.
7    Q.    Do you think it would refresh your memory to look at the
8    interview report?
9    A.    I -- I know towards the end of the interview I told them I
10   was a marketer, if that helps.
11   Q.    So I'll ask again.  Do you think it would refresh your
12   memory to look at the interview report?
13   A.    No.  It won't.
14   Q.    Now, I think on direct you said that at some point you
15   spoke with Sergio Amador and -- let me go back for a second.
16         Am I correct that you said on direct that at some point
17   after you found out about the fraud that was going on, you
18   spoke with Sergio Amador?
19   A.    Yes.
20   Q.    Was that when you say you told him to stop?
21   A.    Yes.
22   Q.    When was that?
23   A.    That's -- that's what's cloudy in my mind.  I don't know
24   exactly when that was.
25   Q.    Was it before you moved to San Pedro or after?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   A.   It was right around when we moved to San Pedro.

2   Q.   And when did San Pedro open?

3   A.   You guys -- August '10.  August 2010.

4   Q.   And that's based on what you've seen here in court?

5   A.   That's based what I've heard here in court, yes.

6   Q.   So you talked with Sergio after finding out that the fraud

7   had gone on, and you told him to stop?

8   A.   Yes.

9   Q.   And the fraud that you were telling him to stop was the

10  billing for services that hadn't been done?

11  A.   I'm not sure exactly what was -- what billing was being

12  done.  I just heard that it was hooking up guys.

13  Q.   And by "hooking up," you mean paying people and then

14  billing even though they didn't come in?

15  A.   Paying for their signatures on their massages, yes.

16  Q.   And paying for their signatures so they could bill even

17  though they hadn't come in?

18  A.   I believe so, yes.

19  Q.   And that's what you confronted Sergio about?

20  A.   Yes.

21  Q.   Now, when you were interviewed by law enforcement in

22  San Pedro after the search, that was after that conversation

23  with Sergio, right?

24  A.   Yes.

25  Q.   Didn't you tell the law enforcement agents who interviewed
```

```
 1   you that you were not aware of Port Medical billing for
 2   services not rendered?
 3   A.   Yes.
 4   Q.   Didn't you tell them that you had never heard any rumors
 5   to that effect?
 6   A.   Yes.
 7   Q.   So that wasn't true?
 8   A.   Well, I wasn't gonna tell anything without any
 9   representative.
10   Q.   Okay.  But you talked to the agents?
11   A.   Out -- out of courtesy.
12   Q.   Without a representative?
13   A.   Well, I didn't really -- I mean, they were there.  They
14   were at the place.  I wasn't -- I didn't think I was in
15   trouble.
16   Q.   On direct, you talked about your daughter.  Is it Sophie
17   or Sophia?
18   A.   Sophia.
19   Q.   She went to Port Medical?
20   A.   Yes.
21   Q.   And she liked getting massaged?
22   A.   Yes.
23   Q.   About how many times did she go?
24   A.   Can't really tell you.  A lot of times when I went.  And
25   I'm not sure if her mother took her or not.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Any estimate as to how many times?

2    A.   I couldn't really tell ya.

3    Q.   Who did she get massaged by?

4    A.   I'm not sure.  Couldn't really tell ya.

5    Q.   Even when you went with her?

6    A.   I just told her -- she wasn't really particular who she

7    got a massage from.  I always went to the person who had the

8    less massages, out of courtesy for the girls.

9    Q.   Did Yoli Sierra massage her?

10   A.   I'm not really sure.  Yoli wasn't a massage therapist.

11   I'm sure it wasn't Yoli.

12   Q.   And you didn't get massaged?

13   A.   No.  I really didn't have the time for a massage.  I would

14   like to, but I didn't have the time for the massage.

15   Q.   So you only went and got chiropractic adjustments?

16   A.   Yes.

17         MR. CARDONA:  Your Honor, I'd like to display

18   Exhibit 177, the first page, for the witness, Your Honor.  It's

19   a chiropractic chart.

20         THE COURT:  Yes.

21         MR. ULTIMO:  No objection.

22     (Received in evidence, Trial Exhibit 177.)

23   BY MR. CARDONA:

24   Q.   Mr. Gomez, do you recognize this as an example of the

25   charts that Port Medical kept?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   I believe so, yes.

 2   Q.   And that's your name, right?

 3   A.   Yes.

 4   Q.   And your date of birth?

 5   A.   Yes.

 6   Q.   Going to go to page 4.

 7           MR. ULTIMO:  No objection.

 8           MR. CARDONA:  Well, it's already in evidence, Counsel.

 9           THE COURT:  Okay.

10   BY MR. CARDONA:

11   Q.   See this is a form in which you're acknowledging privacy

12   rights?

13   A.   Yes.

14   Q.   And down below, is that your signature?

15   A.   Yes.

16   Q.   And this was paperwork that you filled out at Port

17   Medical?

18   A.   Yes.

19   Q.   And over here again, that's your date of birth?

20   A.   Yes, it is.

21   Q.   And over here you provided a copy of your PMA card?

22   A.   Yes.

23   Q.   That's the card your employer gives you to get access to

24   the docks?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   And down here, your insurance card, correct?

2    A.   Yes.

3    Q.   You were insured by the ILWU PPO plan?

4    A.   Yes.

5    Q.   Now, I'd like to take you over to, I believe, page 19.

6    See this is an entry for August 22nd, 2012?

7    A.   Yes.

8    Q.   That's your signature on the sticker?

9    A.   I can't see.  It looks like my signature, yes.  The bottom

10   part of it, it's missing, but yes.

11   Q.   And up above there, there are some initials.  Do you see

12   that?

13   A.   I can't make them out.  "W.B." at the end?

14   Q.   Ann-Marie Barry was a massage therapist, wasn't she?

15   A.   Ann-Marie Barry.  Anna?

16   Q.   Anna.

17   A.   Okay.  Yes.

18   Q.   Was she Pandora Hall's mother?

19   A.   I don't think so.

20   Q.   Now, she wasn't a chiropractor?

21   A.   No.

22   Q.   So this is for a massage?

23   A.   Okay.

24   Q.   Is that "yes"?

25   A.   I'm not sure.  I can't -- I don't read documents.

1   Q.   She's not a chiropractor?

2   A.   Right.

3   Q.   Okay.

4   A.   I don't know how that got -- I don't know how that sticker

5   got there.

6           MR. ULTIMO:  No question pending.  Move to strike.

7           THE COURT:  It'll be stricken.

8   BY MR. CARDONA:

9   Q.   Are you saying you have no idea how that got there?

10  A.   No, I never looked at -- I mean, that's my signature.  I

11  have never seen that file before.

12  Q.   And you never got a massage at Port Medical except for the

13  one time you described with Yoli Sierra?

14  A.   Yes.

15  Q.   Let's go to page 21.  Up at the top, an entry, March 31,

16  2011.  Is that your signature on the sticker on the right?

17  A.   Yes.

18  Q.   You see the initials "E.A.C."?

19  A.   Yes.

20  Q.   Evelyn Cahue (phonetic) was a massage therapist, wasn't

21  she?

22  A.   Evelyn.  Yes.

23  Q.   Massage therapist at Port Medical?

24  A.   Yes.

25  Q.   Not a chiropractor?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   Right.

 2    Q.   So this again would be for a massage?

 3    A.   Yes.

 4    Q.   Any idea how this got in your chart?

 5    A.   No.

 6    Q.   March 5th, 2011, another entry.  Is that your signature on

 7    the right?

 8    A.   Yes.

 9    Q.   "E.C.," the initials.  Evelyn -- Emma Cornejo, later Emma

10    Cornejo-Roddy.  Also a massage therapist?

11    A.   Yes.

12    Q.   Not a chiropractor?

13    A.   No.

14    Q.   So this would be for a massage?

15    A.   I believe so.

16    Q.   No idea how that got in your chart?

17    A.   No idea.  Are these out of -- based out of Long Beach?

18         THE COURT:  Excuse me.  There's no question pending.

19         THE WITNESS:  Sorry.

20         THE COURT:  Counsel.

21    BY MR. CARDONA:

22    Q.   Next page, page 22, entry for June 3rd, 2011.  Is that

23    your signature on the right?

24    A.   Yes.

25    Q.   Brenna Esparza.  Another massage therapist?
```

1   A.   Yes.

2   Q.   Not a chiropractor?

3   A.   No.

4   Q.   So this too would be for a massage?

5   A.   Yes.

6   Q.   No idea how this got in your chart?

7   A.   No.

8   Q.   Let me turn to page 24.

9   A.   Can you go back to that page right there?  19's not my

10  signature, 3 is not my signature, and 9 does not look like my

11  signature, either.

12  Q.   Thank you for that.

13  A.   Okay.

14  Q.   Back on page 24 of your chart, full series of entries.

15  See this?

16  A.   Uh-huh.

17  Q.   Full series of signatures.  Those yours?

18  A.   Yes.

19  Q.   But you weren't massaged by Yoli Sierra?

20  A.   No, I wasn't.

21  Q.   Any idea how these got in your chart?

22  A.   No, I don't.

23  Q.   Now, the stickers that you signed in on, those were on a

24  sheet where they could be pulled off, right?

25  A.   Yes.

```
 1    Q.    And then stuck in the chart?

 2    A.    Yes.

 3    Q.    Page 23.  On the right, see there's a sticker --

 4    A.    Yes.

 5    Q.    -- on the top?

 6          Down below that, not stickers, just signatures.

 7    A.    Those look like my signatures.

 8    Q.    Any idea how those got in the chart?

 9    A.    Those look like copies from the -- that had my previous

10    signatures.

11    Q.    Now, you said on direct that you never checked your EOBs.

12    A.    No, I didn't.

13    Q.    Now, unlike many of the longshoremen, you were running a

14    chiropractic clinic.

15    A.    Yes, I was.

16    Q.    And you had confronted Sergio about potential fraud at the

17    clinic?

18    A.    Yes, I did.

19    Q.    But you never checked your EOBs?

20    A.    No, I didn't.

21    Q.    After DCS Medical Management was closed, you and Sergio

22    set up two additional management companies, correct?

23    A.    Yes.

24    Q.    Chosen?

25    A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And Ramport?

2    A.    Yes.

3    Q.    And I think you said Chosen was responsible for Long

4    Beach?

5    A.    Yes, it was.

6    Q.    And Ramport was responsible for San Pedro?

7    A.    Yes.

8    Q.    And you were primarily in San Pedro?

9    A.    Yes.

10   Q.    Didn't you get paid out of both of those management

11   companies?

12   A.    Yes, I did.

13   Q.    And both those management companies collected money that

14   came from the ILWU insurance plan?

15   A.    Yes, they did.

16   Q.    And over the period 2009 to 2012, isn't it correct that

17   Port Medical collected, through the medical management

18   companies, more than $3,700,000 from the ILWU insurance plan?

19   A.    I know we look -- haven't looked at the finances, but if

20   that's what it shows, yes.  We did collect a lot.  We had a lot

21   of overhead, too.

22   Q.    And a lot of money went out to you, right?

23   A.    I -- I only -- like how much?  I received like $5,000 a

24   month.

25   Q.    Didn't you take out a total of about $400,000?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   I don't think so, no.
 2              MR. CARDONA:  Nothing further, Your Honor.
 3              THE COURT:  Redirect.
 4                    REDIRECT EXAMINATION
 5   BY MR. ULTIMO:
 6   Q.   Mr. Gomez.
 7   A.   Yes.
 8   Q.   You were shown a sign-in sheet with -- two sign-in sheets.
 9   One had stickers on it, one appeared to have one sticker, and
10   no stickers at the bottom.  Let me show it to you.
11        Exhibit 177, page 23.  You see your signatures?  Said all
12   of these were your signatures, correct?
13   A.   Yes.
14   Q.   Okay.  Do you know whether these signatures on Exhibit
15   177, page 23, were from massages or for chiropractic services
16   that you went and saw the chiropractor for?
17   A.   I'm not -- those -- those signatures --
18   Q.   I'm not asking you to guess.  I'm just saying, do you know
19   whether this sign-in sheet was for both chiropractic and
20   massage therapy, or one or the other?
21              THE COURT:  If you know.
22              THE WITNESS:  No.  Every time I signed in, it was for
23   chiropractor.
24   BY MR. ULTIMO:
25   Q.   Now, you said that on Exhibit 177, page 22, it contained
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  stickers that were not your signature.  Can you tell us again

2  which of these stickers are not your signature.

3  A.    Three doesn't look like my signature.  19 doesn't look

4  like my signature.

5  Q.    Do you have any idea how those two signature stickers that

6  are not your signature got on this SOAP note?

7  A.    No, I don't.

8  Q.    Do you -- was it your -- did you ever, while you were at

9  Port Medical, review any chart notes for any patients,

10 including yourself, such as the one depicted in Exhibit 177,

11 page 22?

12 A.    No, I didn't.

13 Q.    Whose job was that?

14 A.    To review the charts?

15 Q.    Well, to -- to review the patient charts, obviously, if

16 someone had that job.

17 A.    Before they went to billing, I believe it was the manager.

18 Q.    The manager would review the patient chart --

19 A.    Before they went to billing.

20 Q.    And what would they review the patient chart for?

21 A.    Just to make sure everything was completed.

22 Q.    Okay.  Did anyone at Port Medical ever ask you to sign

23 more than one sticker at a time?

24 A.    I think when I went to San Pedro, I did sign a couple of

25 times.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   And do you have an understanding as to why they asked you

2    to sign a couple of times -- a couple stickers at one sign-in?

3              MR. CARDONA:  Objection, calls for speculation.

4              THE COURT:  Overruled.

5              THE WITNESS:  Do I answer?

6              THE COURT:  If you know, yes.

7              THE WITNESS:  Yeah.  We had multiple -- in San Pedro

8    we had a doctor, we had a physical therapist, we had a

9    nutritionist, we had acupuncturist.  So you would sign multiple

10   times and -- because our names would go in different files.

11   BY MR. ULTIMO:

12   Q.   So can you amplify on that a little bit more without me

13   putting words in your mouth?

14             THE COURT:  That's calling for a narrative.

15             MR. ULTIMO:  I'm sorry?

16             THE COURT:  That's calling for a narrative.  Keep it

17   question/answer.

18             MR. ULTIMO:  I could try.  Thank you, Your Honor.

19   Q.   Mr. Gomez, what I'm asking is, you said acupuncture,

20   physical therapy, nutritionist, medical and chiropractic,

21   right?

22   A.   So at one particular day I would see an acupuncturist and

23   I would sign a sticker, and I would see a chiropractor to get

24   adjusted, and I would sign a sticker on that.

25   Q.   You would see the chiropractor and acupuncturist the same

```
 1   day?

 2   A.    Yes.

 3   Q.    So they would have you sign two stickers that same day?

 4   A.    Yes.

 5   Q.    That was my question.

 6         All right, no further questions.  Thank you.

 7              THE COURT:  Recross.

 8              MR. CARDONA:  Very briefly, Your Honor.  And I promise

 9   it will be.

10         Actually, Your Honor, I don't have any questions.

11              THE COURT:  Okay.  You may step down.

12              THE WITNESS:  Thank you.

13              THE COURT:  Next witness.

14              MR. ULTIMO:  Your Honor, the defense rests.

15              THE COURT:  Any rebuttal?

16              MR. CARDONA:  No, Your Honor.

17              THE COURT:  Okay.  Both sides rest?

18              MR. ULTIMO:  Yes.

19              MR. CARDONA:  Yes.

20              THE COURT:  Okay.  Ladies and gentlemen, we're going

21   to jockey around the schedule a little bit here today.  What

22   we're going to do at this time is, we're going to excuse you

23   for, oh, about 15 or 20 minutes.  Then when you come back,

24   we'll hear opening arguments and instructions.  So you're not

25   going to get a break later on, so take it now.
```

```
 1        So we'll see you back in here at -- why don't you be back

 2   in about 15 minutes.  We may hold you for a little bit more

 3   than that.  Okay?

 4        MR. ULTIMO:  Your Honor?

 5        THE COURT:  Remember the admonishment not to discuss

 6   the case among yourselves --

 7        Yes, Counsel?

 8        MR. ULTIMO:  Your Honor, did Court mean closing

 9   arguments?  I don't want to frighten the jurors.  You said

10   opening.

11        THE COURT:  Yeah, we're going to start all over again.

12   No, closing argument.  Thank you.

13        MR. ULTIMO:  Thank you.

14        THE CLERK:  All rise.

15        THE COURT:  And if you'd leave quietly, because we're

16   going to be in session.

17        (Outside the presence of the jury:)

18        THE COURT:  Okay.  You may have a seat.  The record

19   will reflect the jurors have left the courtroom.

20        Counsel, we'll take about 15, 20 minutes before getting

21   into opening argument -- excuse me, closing argument, defense

22   closing argument, and then rebuttal on it.  I don't know if you

23   have a time estimate or not.  I'm assuming about 30 minutes.

24        MR. ULTIMO:  I think so.

25        THE COURT:  Does that sound about right?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    MR. CARDONA:  I'm hoping I'll be shorter than that.

2    MR. ULTIMO:  I was thinking the same.  I will probably

3  be shorter, but --

4    THE COURT:  I thought so, too, but I wanted to give

5  you enough time on it.  The other thing is, if you'd like me to

6  tell you about five minutes before -- you know, if you go long,

7  and five minutes before the 30 minutes is up, I'll be happy to

8  do that, just to tell you there's five minutes left.

9    MR. CARDONA:  That would be helpful, Your Honor.

10    THE COURT:  And yours would be 30 minutes for both

11  opening and rebuttal.

12    Okay.  Thank you.

13    THE CLERK:  All rise.

14    Court is in recess for 15 minutes.

15    *(Recess held from 1:38 p.m. to 2:06 p.m.)*

16    *(In the presence of the jury:)*

17    THE COURT:  Okay.  The record will reflect that all

18  the jurors are in their respective seats in the jury box,

19  including the alternate.

20    Okay, ladies and gentlemen.  You've heard all the evidence

21  that you are to examine and evaluate in determining what the

22  facts of the case are.  At this time you're going to hear

23  argument from the two attorneys on the case.  Their argument is

24  going to lead you towards what they feel the evidence showed or

25  didn't show, but it's not evidence itself.  You've heard the

1    evidence, and it's what you remember and what you see that

2    controls.  They may say something that differs from the way you

3    remember it.  If they do that -- some people see things

4    different or hear things different.  So you should listen to it

5    and see how much weight it deserves and then decide it on your

6    own memory of what the facts of the case are.  And then when

7    they get through, I'll instruct you on what the law is that

8    applies to the case.

9         You ready?

10        Okay.  Counsel, would you like to make closing argument?

11             MR. CARDONA:  Yes, Your Honor.  Thank you.

12        Ladies and gentlemen, I began my opening statement by

13   talking about Josiah Vaifanua.  Going to begin my closing

14   argument the same way, because you've now seen the evidence.

15        In 2009, in October of 2009, he was four years old, and

16   over the next year, as you've now seen from his chart, Port

17   Medical put in the chart entries for more than 23 or 24

18   separate times that Josiah Vaifanua supposedly came to Port

19   Medical to get massages.  Those were billed, and Port Medical

20   received, from the ILWU insurance, for Josiah Vaifanua's

21   purported massages, more than $4,000.  You'll see that in the

22   bill pay summary.  Those are Exhibits 311 to 330 -- sorry,

23   Exhibits 282 to 288 that have the records for all of the

24   various bill pay history that was done, and we'll show some of

25   those in a second.

1    You now know why that happened.  It didn't happen because

2    Josiah Vaifanua, who was four years old, needed all those

3    massages.  It didn't happen because he got all those massages.

4    He didn't get all those massages.  As you now know, Port

5    Medical staff was fabricating entries in the charts to make it

6    look like those massages were being done, and the insurance

7    company was then being billed for that.

8    You've heard from multiple witnesses, both inside Port

9    Medical and the beneficiaries themselves, Joe Vaifanua, Roy

10   Villavisencio, Ernestine Rubio, the other longshoremen who came

11   in and testified, looking at their charts.  They didn't receive

12   all those massages.  Yoli Sierra, she didn't give all those

13   massages.  Pandora Hall, she didn't give all those massages.

14   She fabricated chart entries.  She took stickers, she created

15   the entries, they were put in the chart, and they were billed.

16   So the evidence is clear that there was a fraud.  And as

17   the Court will instruct you, the elements of mail fraud are the

18   following:

19   The defendant knowingly participated in a scheme or plan

20   to defraud or a scheme or plan to obtain money or property by

21   means of false or fraudulent pretenses.  Element one.

22   Element two, the statements made or facts omitted were

23   material; that is, they had the ability to influence the people

24   to whom they were submitted.  In this case, the insurance

25   company, Port Medical's insurance plan, the ILWU plan.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Third element, the defendant acted with the intent to

2    defraud; that is, the intent to deceive or to cheat.

3    And fourth, the defendant used or caused to be used, to

4    execute the scheme, the mail.

5    So the evidence is clear that here there was a scheme to

6    defraud.  There were false statements submitted to the ILWU-PMA

7    insurance plan.  There were bills submitted that represented

8    that massage services had been provided when they weren't.

9    Were those material?  Obviously.  The insurance plan paid on

10   those bills, assuming that in fact those massages had been

11   given when they weren't.

12   So what's the issue you've got?  The issue before you is,

13   did the defendant, Dave Gomez, know about the fraud and

14   participate in it?  Did he know that they were submitting these

15   false claims to the insurance company?

16   And the evidence shows that he did.  It shows beyond a

17   reasonable doubt, which is our burden of proof, that he did.

18   So let's go back and talk for a second about how Port

19   Medical worked.

20   If you remember, Port Medical was set up, and it was set

21   up as a chiropractic clinic.  And you've heard the defendant

22   admit that he was one of the people who went out to market that

23   clinic, and market that clinic meant finding longshoremen,

24   because the longshoremen had the benefits that would pay up to

25   40 visits a year, finding the longshoremen who would be

1    patients at Port Medical.

2         Port Medical was competing with other chiropractic

3    clinics.  You heard the defendant admit that as well.  And as

4    you've heard, this led to the offering of the sponsorships, the

5    offering of payments to patients, in order to encourage them to

6    go to Port Medical.  And as you heard Sergio Amador describe,

7    arrangements where they would pay either for a team or just

8    straight to a person in return for visits to Port Medical,

9    either by an individual person or by multiple members of the

10   team.

11        Now, you also heard from Leonard Linares, who described a

12   similar arrangement.  His team, the Fat Kids, got sponsored,

13   and in return, the expectation was that he and the other

14   members of his team who had the ILWU insurance, not the casual

15   members who didn't, the ones who wouldn't get those benefits,

16   but the other members of the team, would go to Port Medical.

17   Jesse Martinez was one of those, and you saw checks to Jesse

18   Martinez and Leonard Linares.

19        And if you look at Exhibit 273, which is a summary of

20   those checks, you can see that sponsorships were paid out of

21   all of the management companies that were set up.  First, DCS

22   Medical Management, the company which David was the signator on

23   one of the bank accounts.  David Gomez, the defendant.  Then

24   when they shifted over to Chosen -- Chosen, remember that we've

25   heard, was set up for Long Beach -- they come out of that.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    They also come out of Ramport.  And when you look at Exhibit
 2    273, you'll see that as well.  Ramport Medical Management, the
 3    company that purportedly was set up to handle San Pedro.
 4         So we continue to see these sponsorship payments coming
 5    out.  They're signed originally by David Gomez and Sergio
 6    Amador out of DCS Medical Management, and then once they switch
 7    to Chosen and Ramport, they're signed by a variety of people,
 8    the various managers, Pandora Hall, Eva Razo, and then in 2012,
 9    some other individuals, who were shown on 273, Exhibit 273.  So
10    that continued.  Continued throughout the period from when they
11    first opened Port Medical all the way through 2012 when
12    San Pedro had been opened.
13         Now, you've also heard from witnesses who have described
14    conversations they had with David Gomez about the fraud.  You
15    heard from Pandora Hall.  You heard her talk about what she
16    did, the fabricating of the entries, the conversations she had
17    with both Sergio Amador and David Gomez before she left for
18    San Pedro, where she confronted them about the fraud, told
19    them, "Look, I don't want to do that in San Pedro."
20         Any indication that David Gomez said, "I don't know what
21    you're talking about"?
22         No.  He agreed at that point.  "Okay, we won't do it in
23    San Pedro."
24         Now, as we know, that turned out not to be true, because
25    Pandora Hall was again approached and continued to fabricate
```

1   notes, and sponsorship payments continued to go out.  And as

2   you look through the charts, you'll see that the charts of the

3   patients show that there were fabricated entries and charts by

4   Pandora Hall even after San Pedro opened.  In fact, the

5   majority of the fabricated entries by Pandora Hall that you'll

6   see in the exhibits are ones that occur after San Pedro opens.

7        Now, you also heard from Nicole LaBeaud.  Nicole LaBeaud

8   told you about the conversations she had where she was the

9   office manager.  She'd been a massage therapist.  She becomes

10  an office manager.  She's approached by both Sergio Amador and

11  David Gomez and asked to cooperate with their billing using

12  patient information, Social Security numbers, patient

13  information, even though the patients haven't come in,

14  something that Michelle Aragon was doing for them up to that

15  point in time.  But Michelle was leaving.  They needed to get

16  the new manager on board.  They approached Nicole LaBeaud, and

17  as you heard her say, she said no, and she was fired.

18       Kevin Malone, the chiropractor, describes the conversation

19  when they had the mini audit, when they had the files stacked

20  up, when they're going through, for a number of witnesses

21  testified that that occurred.  It's not just Kevin Malone.

22  Pandora Hall described it, described what was going on in terms

23  of having to get the stickers to put on the charts.  And Kevin

24  Malone describes a conversation that he had with David Gomez in

25  a room alone, where he told David Gomez, "Look, I'm looking

1    through all these charts.  I don't recognize these names.  I

2    don't think I saw these patients."

3         Does David say, "No, let's go talk to Sergio, there must

4    be something weird going on"?  Does he say, "No, let's go talk

5    to Michelle Aragon, there must be something weird going on"?

6         No.  You heard Kevin Malone's testimony.  "They're

7    friends.  Go ahead."  Kevin Malone fills out the false charts,

8    puts them back.

9         You heard about his later conversation, after the search,

10   where he meets David Gomez, talks to him about what Kevin

11   Malone had done.  David agrees to keep quiet, as does Kevin

12   Malone.

13        And finally, you heard from Sergio Amador.  Sergio Amador,

14   who describes himself and David Gomez as partners, and says to

15   you, "Look, yes, Michelle Aragon showed us how to do this, but

16   we were partners.  We talked.  We kept abreast of what each of

17   us was doing."

18        Now, you're going to get an instruction that relates to

19   credibility, and that instruction is going to tell you that

20   certain of these witnesses have agreements with the government,

21   or immunity orders, and that you should view their credibility

22   with caution.  And you should.  But here's the question for

23   you.  Are they telling the truth, or are they all lying?

24   Because if you accept David Gomez's testimony, David Gomez got

25   up on the stand and said, "I knew nothing about it, I didn't do

1   it, I didn't participate in it, until at one point I learned

2   about it, and then I confronted Sergio." Per his testimony,

3   these conversations with Nicole LaBeaud, Kevin Malone, Sergio's

4   testimony, all of that is false. Does that make sense?

5       Think about, in particular, Kevin Malone. He testified

6   pursuant to an immunity agreement. Under that immunity

7   agreement, what he says in court can't be used against him,

8   except if he lies. His statements can be used if they're

9   false. He can be prosecuted for perjury.

10      So what's his incentive here? Why would Kevin Malone make

11  this up, anyway? He's a chiropractor. He's admitting that he

12  falsified charts. Why make that up? And when you think about

13  it and you think about the motivations for what these witnesses

14  said, does it make sense that they're all lying? Does it make

15  sense that Sergio Amador, who founded Port Medical with David

16  Gomez, who put together the companies, put together the

17  management company, DCS Medical Management, put together Port

18  Medical Associates, both invested equally, does it make sense

19  that he would hide from David Gomez what he was doing? Does it

20  make sense that he would do that when he wasn't just partners

21  with David Gomez in DCS Medical Management or Port Medical, but

22  after that had started and after the false billing was going

23  on, is brought in as a partner by David in the Sixth Street

24  Bistro, in another medical management company, and opened a

25  joint account? Is that consistent with a theory that Sergio

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    was hiding everything from David, or, as Sergio Amador said,

2    they were partners, and as partners, they talked and each

3    partner needed to know what the other partner was doing?

4         The latter makes more sense.

5         Now, in addition to that testimony, you can also look at

6    the various charts and some patterns that you'll see.

7         Exhibits 282 to 288 are summaries of the billing and

8    payments for various families.  And let me put one of those up.

9    I'm going to put up Exhibit 288.  Assuming I can get the

10   computer to work.

11        So when you look at these -- and you'll have these back in

12   the jury room.  When you look at these, what you'll see is,

13   across the top, the names of the family members, and then a

14   summary, as you go down, of the various visits that occurred.

15   And remember that this is giving the defendant the benefit of

16   the doubt, because, as you heard, this is taken from the bill

17   pay history of the insurance company, where, on occasion, the

18   bill pay history will only show one date billed when in fact

19   that covers multiple chart entries for which there was billing.

20        So as you go down, you'll see a couple of things here.

21   You'll see that on numerous occasions everybody comes in at the

22   same time.  Now, does that make sense if you're actually going

23   for a medical reason?  Did every kid in the Vaifanua family on

24   multiple days all need this to be done at the same time?

25   You'll see that pattern, and you'll see the totals down at the

1    bottom showing how many billed dates of service there were, the

2    total amounts billed.  And you'll see this for a number of

3    families.  And as you look through here and you look at the

4    bill pay history for the Vaifanua family, the Villavisencio

5    family, the Bumgarner family, you'll see this same pattern

6    repeat.  And as we know, what does that pattern indicate for

7    those families?  You know that it indicates false billings,

8    because you've heard both the family members and Pandora Hall

9    explain those massages didn't really occur.

10       So when you look at that, look also at Exhibit 285.  This

11   is the bill pay history for the Gomez family.  And as you look

12   at this, you'll see a similar pattern as you go down, with

13   totals at the bottom.  And again you know, from the testimony

14   and from looking at the charts, that many of these massages

15   never occurred.  Yoli Sierra's shown as the massage therapist

16   on a huge number of these, and as you've heard from multiple

17   sources, Yoli Sierra wasn't a massage therapist, wasn't giving

18   massages.

19       And note another similarity.  Josiah Vaifanua was four.

20   Sophia Gomez was seven.  Did she really need or get 36 massages

21   over that time period?  Indeed, more than that if you look at

22   her chart, because this is just based on the bill pay history.

23   You'll have her chart back there.  Did she really get those?

24       Now, let's look for a second.  You heard David Gomez say

25   that he doesn't know how the entries in his charts got there,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    and that he always went in for chiropractic services, and that

2    he doesn't know why he would have signed for massages.  But

3    let's look at a couple of entries.  First from his chart, which

4    is Exhibit 177, and you'll see an entry here on the chart,

5    March 17th, 2009, David Gomez's signature.  And you'll note

6    that the column marked "EX" for chiropractic exam is not

7    checked, and you'll note that the initials "Y.S." are next to

8    his name.

9        Now, David tells you he was never massaged by Yoli except

10   on one occasion.  The occasion that Yoli Sierra described, that

11   corroborates Yoli Sierra's testimony that she only massaged him

12   once.  Yet this shows an entry by Yoli Sierra.  David explained

13   that he only signed for chiropractic.  So was this

14   chiropractic?

15       Well, you'll also have the appointment books from Port

16   Medical, and we can look at the appointment book for that date.

17   Exhibit 116, page 36.  See Tuesday the 24th of -- March 24th,

18   2009, the entry right below the March 17th, which is the same.

19       Let me go back one second and show you that entry in more

20   detail.

21       So for March 24th -- as for March 17th, you'll see the

22   same thing:  No check in the "EX" box, "Y.S." initials.  And

23   when you look at the appointment book for that date, March

24   24th, you'll see that there is a column in the appointment book

25   for Dr. Kevin.  Kevin Malone, the chiropractor.  When you look

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    at the entries under Kevin Malone for that day -- and you'll

2    have this back there, you can look and see -- you will not see

3    David Gomez's name.  When you look in the appointment book

4    under Yoli, you will see David Gomez's name.  This was an

5    example of fabricated billing for a massage by Yoli Sierra for

6    Dave Gomez.

7         So what does all this show?  The pattern of the billings,

8    the pattern that extends to Dave Gomez and his family's

9    billings, Sergio Amador's testimony, the conversations that the

10   other witnesses have related, the clear evidence of the fraud.

11        David Gomez knew about the fraud, participated in it, and

12   profited from it.

13        When you look at the summaries of the bank accounts that

14   are in evidence, they're the summary charts that FBI special --

15   FBI forensic accountant, Robert Zalameda, testified to.  When

16   you look at those and you look at the deposits into the various

17   medical management companies, you'll see deposits coming in

18   from Port Medical accounts.  And --

19             THE COURT:  You have about five, ten minutes.

20             MR. CARDONA:  There's more than $3 million that gets

21   deposited into those accounts from billings to the ILWU plan.

22   And where does that money go?  The final summary prepared by

23   forensic accountant Robert Zalameda, a summary of the payments

24   from the medical management companies out to Sergio Amador,

25   Arturo Amador, David Gomez, and Chris Rice.  And if you look

1    down at the bottom, for the time period 2009 to 2012, David

2    Gomez, $405,632.95.

3         He knew about the fraud, he participated in it, and he

4    profited from it.  And for that reason, you should find him

5    guilty of each of the counts of mail fraud based on each of the

6    checks that was mailed to Port Medical.

7              THE COURT:  Okay.

8              MR. CARDONA:  Thank you, Your Honor.

9              THE COURT:  Thank you.

10        Counsel.

11             MR. ULTIMO:  Thank you, Your Honor.

12        Good afternoon, ladies and gentlemen.  Thank you for your

13   time and attention to this matter.

14        Counsel brought up the fact that David Gomez profited from

15   the events that took place over a three-year period at Port

16   Medical.  Remember, the mere fact that David Gomez may have

17   profited is not enough to convict him under the law.  And you

18   must follow the law in this case.

19        The Court is going to instruct you on the law that you are

20   going to apply to the facts of this case.  In those

21   instructions, you'll see that in order for one to be found

22   guilty of mail fraud, there must be an act by one who knowingly

23   participates in a scheme to defraud, with the intent to

24   defraud; that is, the intent to deceive or cheat.

25        To answer that question, you have to ask yourself, what is

1    it that David Gomez did, if anything?  What specific act did

2    David Gomez perform for the purpose of executing the scheme?

3    Did he knowingly participate in the scheme?  Or did he act

4    through ignorance, mistake, or accident?  If he did knowingly

5    participate, was that act or acts proved beyond a reasonable

6    doubt, or was it based purely on speculation?

7         One of the instructions the Court will give you is this

8    instruction on reasonable doubt.  Proof beyond a reasonable

9    doubt is proof that leaves you firmly convinced that the

10   defendant is guilty.

11        Counsel said that does it make sense that all of the

12   prosecution's witnesses are lying?  Well, it surely does make

13   sense.  Sergio Amador testified in the hopes of a reduced

14   prison sentence after his guilty plea.  Pandora Hall testified

15   pursuant to a government cooperation agreement where she would

16   not be prosecuted.  Unless she lied under oath, she would not

17   be convicted.  Dr. Malone testified, again, in exchange for no

18   prosecution.  And Joseph Vaifanua testified with court immunity

19   from the use of his statements against him.  In other words, he

20   can't be prosecuted for anything he said here.  That is more

21   than a little proof that people had sufficient motive to want

22   to please the government, to have to provide something so that

23   they could testify in exchange for no prosecution or a lenient

24   sentence.

25        Now, as far as Joe Vaifanua, medicine is a two-way street.

```
 1    As a parent of six, five of which he brought to Port Medical,
 2    he's responsible for bringing his children to Port Medical.
 3    Medicine is a two-way street.  Doctors provide care and
 4    treatment.  Patients, if they want to bring their children in,
 5    they bring their children in.  He, together with Sergio Amador
 6    and Pandora Hall, bear that responsibility for falsifying
 7    records, for treating minor children, as Dr. Malone apparently
 8    did, and for the parent himself.  Instead of working harder,
 9    working longer, doing whatever he could to get by and support
10    his children, going to the Department of Child Support Services
11    for more child support from the other parent, he chose to sell
12    his insurance to Sergio Amador.
13         Now, all of the parents -- I'm sorry, all of the patients
14    said they'd dealt with Sergio Amador.  Roy Villavisencio, we
15    heard from him.  We heard from Joseph Vaifanua.  We heard from
16    David Bumgarner.  We heard from Leonard Linares.  Roy said he
17    heard about Port Medical from Sergio.  Sergio was Roy's friend.
18    Ernestine, his former wife, said she only met Sergio; she'd
19    seen him down at the waterfront.
20         We heard from David Bumgarner.  Sergio gave -- David
21    Bumgarner said he received a check from Sergio.  Sergio --
22              MR. CARDONA:  Objection, Your Honor, mischaracterizes
23    the testimony.
24              THE COURT:  It's what the jury remembers.
25              MR. ULTIMO:  Sure.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    And my memory may be a little vague on that point, but

2 Sergio gave a check to Roy for $800.  That was the testimony.

3 Roy said Sergio gave him the check.

4    We heard from Joseph Vaifanua.  He dealt with Sergio, who

5 paid him for each of the Explanation of Benefit statements that

6 he showed Sergio.  Sergio also admitted that he paid Vaifanua

7 to receive pain injections at an unrelated Southgate clinic,

8 $300 or $500 per pain injection.

9    We heard from Leonard Linares, who said that David Gomez

10 never gave him -- that David Gomez never gave him checks, gifts

11 or cash.  Leonard said he dealt through Sergio.  Sergio was his

12 contact that was -- that he used for the team, the Fat Boys,

13 the softball team.

14    You heard from Pandora Hall.  She told us that David told

15 her that there would be no fraud in San Pedro.  You heard

16 Pandora Hall tell us that she was later approached by Eva and

17 Sergio to falsify SOAP notes again.

18    We don't want to hold Mr. Gomez criminally accountable for

19 the bad acts of others.  You have to ask yourself, is

20 prosecuting Mr. Gomez for the bad acts of others justice?

21 Because he trusted Sergio Amador, because he trusted Eva Razo,

22 Pandora Hall, Michelle Aragon, to do the right thing.  David is

23 here today because he himself is not guilty of intending to

24 cheat or deceive the health insurance company or to have

25 knowingly participated in the scheme.

1    The government has already apprehended the individuals who
2    are really responsible for defrauding the insurance company in
3    this case.  Exhibit 213-1, Sergio Amador.  Exhibit 216-1,
4    Dr. Malone.  Doctor 217 -- excuse me.  I'm sorry.  Exhibit
5    217-1, Michelle Aragon.  Exhibit 218, page 1, Pandora Hall.
6    Exhibit 219, page 1, Eva Razo.  Exhibit 220, page 1, Yolanda
7    Sierra.  And don't forget Joseph Vaifanua, who we saw in
8    person.  They too all profited from what was going on at Port
9    Medical.
10   Merely profiting is not enough under the law.  And as
11   jurists, I trust that you'll sift through the evidence and
12   follow the law.  There must be an intent to deceive or cheat.
13   There must be a participation in the scheme that's knowing.
14   Not only must it be knowing, it must be participation, an act
15   or acts with the intent to deceive or cheat.
16   You heard Mr. Gomez tell you that he told Sergio to stop
17   doing what he was doing.  You heard Sergio tell you that he
18   said he would.
19   David Gomez was an investor.  Not only did he invest in
20   Port Medical, but he owns other businesses.
21   It will be for you to determine whether David Gomez acted
22   in good faith and therefore did not act with intent to defraud,
23   deceive, or cheat anyone.
24   You heard Agent Valle tell you that when he asked Sergio
25   who else was involved in the fraudulent billing, Sergio Amador

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

responded, "It's me, I brought in the patients, yes, I did

stuff at Port Medical in Long Beach for the first two years."

You heard Agent Valle tell you after Sergio's bathroom

break, he said, "It was good while it lasted."  And he said,

"No one made me do it.  I saw an opportunity, and I took it."

That's what he told Agent Valle.  He didn't tell Agent Valle,

"Me and David Gomez did it."  He didn't say, "Me and David

Gomez saw an opportunity, and we took it."  He told Officer

Valle, "I saw an opportunity, and I took it."  He told Agent

Valle, when asked who else was involved in the fraudulent

billing, "It's me.  I brought in the patients.  Yes, I did

stuff at Port Medical for the first two years."  And he also

told you that 99 percent or 100 percent of it took place in

Long Beach, not San Pedro.

After Mr. Gomez told Sergio Amador to stop, he went on to

work out of the San Pedro office, where he lives, and you heard

Sergio Amador tell you 99 or 100 percent of the fraud occurred

in Long Beach.

Mr. Gomez trusted these people that he had hired to work

with to do the right thing and not to commit fraud when there

was no need for any fraud.  He invested $60,000 of his own

money into this business and got the $60,000 back.  May have

made some profit.  But he had no knowing participation in their

scheme to defraud the insurance company, and he certainly did

not have an intent to cheat or deceive the insurance company.

```
 1    He has no experience in medicine.  He has no experience in

 2    medical or healthcare billing or charting.  He trusted all of

 3    the people that he employed at these locations.

 4        Ladies and gentlemen, I trust that you will do the right

 5    thing after sifting through the evidence and find that the

 6    defendant, David Gomez, is not guilty of mail fraud.

 7        Thank you for your time and attention to this matter.

 8            THE COURT:  Okay.  Thank you very much, Counsel.

 9            MR. ULTIMO:  Excuse me.  One more thing, Your Honor,

10    if I may?

11            THE COURT:  Sure.

12            MR. ULTIMO:  Finally, ladies and gentlemen, you heard

13    two other things.  You heard that Mr. Gomez received $5,000 a

14    month for a three-year period.  That was David Gomez's

15    testimony.  The government wants to show you charts that are

16    about the only thing that's trustworthy in this case, the

17    charts that the FBI analyst did.  $405,632.95 is what they said

18    was taken out in three years to Mr. Gomez.  However, those

19    charts include construction expenses, draws.  There's no

20    separation of what's profit, what's overhead, what's

21    construction costs.  There was no breakdown of any of that.

22        David Gomez was honest.  He told you, "I made $5,000 a

23    month, and that was for 2009, 2010, 2011."  That's not

24    unreasonable for a man who starts a business with $60,000 with

25    his own money and expects to make a profit, as we all do.
```

1    Finally, trustworthiness.  Other than those FBI summary

2  spreadsheets, you can't trust the records.  You heard evidence

3  that they were all created.  So be careful what you look at.

4    Thank you, ladies and gentlemen.

5    THE COURT:  Thank you very much, Counsel.

6    Ladies and gentlemen, because the government has the

7  burden of proof beyond a reasonable doubt, the government

8  always has the opportunity to respond, to have the last closing

9  argument.

10    And that's why, at this time, if you would like to rebut,

11  Counsel.

12    MR. CARDONA:  Thank you, Your Honor.

13    Records at Port Medical, clearly false.  The charts,

14  appointment books, fabricated to make it look as if there were

15  massages when there weren't.  Doesn't seem like there's a

16  dispute about that.  The only issue for you is, did David know

17  about it, did he participate in that fraud, what's the evidence

18  of that?

19    Now, before I get to that, let me just clear up the law a

20  little, because you're also going to get an instruction from

21  the Court, and an instruction from the Court is going to tell

22  you, if you decide that the defendant was a member of a scheme

23  to defraud and the defendant had the intent to defraud, he can

24  be responsible for the actions of other co-schemers during the

25  course of, and in furtherance of, the fraud, even if he didn't

1    know what they were doing, as long as those actions were

2    reasonably foreseeable in furtherance of the fraud.

3        And you don't even have to go that far.  The evidence

4    shows that David Gomez was aware of what was going on.  And

5    let's talk about how we know that.

6        What's the evidence that shows that?  You've heard the

7    defense get up and say essentially what I told you, that the

8    only way that Mr. Gomez's story, the defendant's story, can be

9    true, is if you disbelieve all of the government witnesses.

10       So let's look at their incentives.  You heard the defense

11   themselves say:  Pandora Hall, nonprosecution agreement with

12   the government, only gets in trouble if she lies; Kevin Malone,

13   an immunity agreement, only gets in trouble if he lies; Joe

14   Vaifanua, an immunity order.  Only way his statements can be

15   used against him is if he lies.  Sergio Amador, the same.

16       So what's the incentive of the witnesses there on the

17   stand?  Is it to lie?  No.  If they lie, their statements can

18   be used against them.  If they tell you the truth, they're

19   fine.  So what are their incentives?

20       Then, look at consistency.  Defense made a lot out of

21   Sergio Amador's statement to Special Agent Valle.  But he left

22   out one part of that.  You heard Agent Valle testify.  When

23   they followed up with Sergio Amador about who was involved, who

24   was aware of the fraud, what did he say?  This is the same day

25   the searches are done, August 14th, 2013.  What did he say?

```
1    Not Chris Viramontes, not Chris Rice, but yes, David Gomez was
2    aware of the fraud.  The day of the searches.  Same thing he's
3    saying today.  If he's going to lie and shift the blame to
4    others, why not just shift it to everybody, Chris Viramontes,
5    Chris Rice and David Gomez?  Or does it make more sense that he
6    was telling the truth then:  Not Chris Viramontes, not Chris
7    Rice, but David Gomez was aware?  And he's saying the same
8    thing now.
9         Along those same things, what did David Gomez do?  David
10   Gomez, together with Sergio Amador, directed the fraud, oversaw
11   the fraud, hired the people, talked to the office managers,
12   talked to Nicole LaBeaud and said, "Will you falsify charts?"
13        David Gomez talks to Kevin Malone:  Go ahead and fill out
14   the false charts.  Directed it.
15        Remember Pandora Hall?  Remember that she was
16   cross-examined at length about prior statements, and then we
17   played a prior statement that was consistent.  Going to play
18   that again now.  Remember that in Exhibit 1001B, the first
19   excerpt of that, she's talking about what she does.
20        Your Honor, I'm going to play Exhibit 1001B.
21        My apologies, Your Honor.  Someone unplugged the computer.
22        (Audio exhibit played.)
23        MR. CARDONA:  Pandora Hall on tape.  And remember,
24   she's talking to someone who she thinks is a friend, not a law
25   enforcement agent, not anybody she has an incentive to lie to,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    at a time before she's been confronted by law enforcement,

2    before the searches occur, and she has no incentive to lie to

3    anyone.  And what is she talking about?  Fabricating charts.

4        Next excerpt, same conversation:

5        *(Audio exhibit played.)*

6        MR. CARDONA:  So what was David doing?  He was

7    directing.  And again, lying there?  Not Chris.  David and

8    Sergio.

9        Nothing further, Your Honor.

10       THE COURT:  Okay.

11       Ladies and gentlemen, you've now heard the argument of

12   counsel.  I'm going to instruct you on the law.  Before I do,

13   if you want to stand up and stretch a little, it'll be about,

14   oh, I don't know, about 10 minutes, so it won't be that long.

15   If you want to stand up and stretch.  And if those in the

16   audience want to stay, fine, but I'd like not to have you leave

17   during the instructions, so if you want to leave, leave now.

18   If not, be prepared to stay for about 10 minutes.

19       That doesn't apply to the jury.  You can't leave.

20       JUROR:  Oh.

21       JUROR:  Instructions.

22       THE COURT:  Okay.  Members of the jury, now that you

23   have heard all the evidence, it's my duty to instruct you on

24   the law that applies to this case.  A copy of these

25   instructions will be available in the jury room for you to

consult.

It is your duty to weigh and to evaluate the evidence received in this case, and in that process, to decide the facts.  It is also your duty to apply the law as I give to you to those facts as you find them, whether you agree with the law or not.  You must decide this case solely on the evidence and the law and must not be influenced by any personal likes or dislikes, opinions, prejudice or sympathy.  You will recall that you took an oath promising to do so at the beginning of the case.

You must follow all the instructions and not single out some and ignore others.  They are all equally important. Please do not read into these instructions or into anything that I may have said or done any suggestion as to what the verdict should be that you should return.  That is a matter that is completely up to you.

The indictment in this case is not evidence.  The defendant has pled not guilty to the charges.  The defendant is presumed to be innocent until and unless the government proves the defendant guilty beyond a reasonable doubt.  In addition, the defendant does not have to testify or present any evidence to prove his innocence.  The government has the burden of proving every element of the charge beyond a reasonable doubt.

Now, proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant is guilty.  It is not

1   required that the government prove guilt beyond all possible

2   doubt.  A reasonable doubt is a doubt based on reason and

3   common sense and is not based purely on speculation.  It may

4   arise from the careful and impartial consideration of all the

5   evidence or from the lack thereof.  If, after a careful and

6   impartial consideration of all the evidence, you are not

7   convinced beyond a reasonable doubt that the defendant is

8   guilty, it is your duty to find the defendant not guilty.  On

9   the other hand, if, after a careful and impartial consideration

10  of all the evidence, you are convinced beyond a reasonable

11  doubt that the defendant is guilty, it is your duty to find the

12  defendant guilty.

13       The evidence that you are to consider in deciding the

14  facts consist of:  The sworn testimony of witnesses; the

15  exhibits received into evidence; and any fact to which the

16  parties may have agreed or stipulated.

17       In reaching a verdict, you may consider only the testimony

18  and exhibits received into evidence.  The following things are

19  not evidence and may not be considered by you in determining

20  what the facts are:

21       Number one:  Questions, statements, objections or

22  arguments by the attorneys are not evidence.  The lawyers are

23  not witnesses.  Although you must consider a lawyer's question

24  to understand the answer of the witness, the lawyer's question

25  is not evidence.  Similarly, what the lawyers have said in

their opening statements and closing arguments and at other
times is intended to help you interpret the evidence, but it is
not evidence.  If the facts as you remember differ from the way
the lawyers have stated them, it's your memory that controls.

Any testimony that I have excluded or stricken or
instructions -- or instructed you to disregard is not evidence.

Anything that you may have seen or heard when the Court is
not in session is not evidence.  You are to decide this case
solely on the evidence received in this trial.

Evidence may be either direct or circumstantial.  Direct
evidence is direct proof of a fact, such as the testimony of a
witness about what that witness personally saw or heard or did.
Circumstantial evidence is indirect evidence.  That is, it is
proof of one or more facts from which you can find another fact
to be true.  You are to consider both direct and circumstantial
evidence.  Either can be used to prove any fact.  The law makes
no distinction between the weight to be given to either direct
or circumstantial evidence.  It is for you to decide how much
weight is to be given to any evidence.

In deciding the facts of this case, you may have to decide
which testimony to believe and which testimony not to believe.
You may believe everything a witness says, or part of it, or
none of it.

In considering the witness's testimony, you may take into
consideration:  The witness's opportunity and ability to see or

1    hear or know the things testified to; the witness's memory; the

2    witness's manner while testifying; the witness's interest in

3    the outcome of the case, if any; the witness's bias or

4    prejudice, if any; whether other evidence contradicts a

5    witness's testimony; the reasonableness of the witness's

6    testimony in light of all the other evidence; and any other

7    factor that bears on believability.

8         The weight of the evidence as to any fact does not

9    necessarily depend on the number of witnesses who have

10   testified.  What is important is how believable the witnesses

11   are and how much weight you think the testimony deserves.

12        Now, you have heard witness -- or excuse me, testimony

13   from witnesses who:  A, have received or hope to receive

14   benefits from the government in connection with this case; B,

15   admitted being accomplices to the crimes charged.  An

16   accomplice is one who voluntarily and intentionally joins with

17   another in committing a crime.  Or, C, pled guilty to a crime

18   arising out of the same events for which the defendant is here

19   on trial.

20        Any guilty plea is not evidence against the defendant.  It

21   may be considered by you only in determining the witness's

22   credibility.

23        For these reasons, in evaluating the testimony of those

24   witnesses, you should consider the extent to which or whether

25   their testimony has been influenced in any way by these

1    factors.  In addition, you should examine the testimony of

2    these witnesses with greater caution than other witnesses.

3         In a criminal case, the defendant -- excuse me.  In this

4    case, the defendant has testified.  You should treat that

5    testimony just as you would the testimony of any other witness.

6         Now, the defendant is charged in each count of the

7    indictment -- and there's 20 counts here -- each count of the

8    indictment with mail fraud, in violation of Section 1341 of

9    Title 18 of the United States Code.  In order for the defendant

10   to be found guilty of that charge, the defendant must prove

11   each of the following elements beyond a reasonable doubt:

12        First, that the defendant knowingly participated in a

13   scheme or a plan to defraud, or a scheme or a plan for

14   obtaining money or property by the means of fraud or fraudulent

15   pretenses, representations, or promises;

16        Second, that the statements made or facts omitted as part

17   of the scheme were material, and that means that they were --

18   had a natural tendency to influence, or were capable of

19   influencing, a person to part with money or property.

20        Third, the defendant acted with the intent to defraud;

21   that is, the intent to deceive or cheat.

22        And fourth, the defendant used or caused to be used the

23   mails to carry out the attempt to -- or excuse me, in an

24   attempt to carry out the essential parts of the scheme.

25        In determining whether or not a scheme to defraud exists,

1  you must consider not only the defendant's words and

2  statements, but also the circumstances in which they are used

3  as a whole.

4       A mailing is caused when one knows that the mails will be

5  used in the ordinary course of business or when one can

6  reasonably foresee such use.  It does not matter whether the

7  material mail was itself false or deceptive, so long as the

8  mail was used as part of the scheme, nor does it matter whether

9  or not the scheme or plan was successful or that any money or

10 property was obtained.

11      If you decide the defendant was a member of a scheme to

12 defraud and that the defendant had the intent to defraud, the

13 defendant may be responsible for other co-schemers' actions

14 during the course of and in furtherance of the scheme, even if

15 the defendant did not know what was said or done.

16      For the defendant to be guilty of the offense committed by

17 a co-schemer in furtherance of the scheme, the offense must be

18 one that the defendant could reasonably foresee as necessary

19 and natural consequences of the scheme to defraud.

20      An act is done knowingly if the defendant is aware of the

21 act and does not act through ignorance, mistake, or accident.

22 The government is not required to prove that the defendant knew

23 that his acts were unlawful.  You may consider evidence of the

24 defendant's words, acts or omissions, along with all the other

25 evidence, in deciding whether or not the defendant acted

knowingly.

A separate crime is charged against the defendant in each count.  You must decide each count separately.  Your verdict on one count should not control your verdict on the remaining counts.

Now, when you begin your deliberations, you will elect one of your members of the jury as your foreperson, who will preside over your deliberations and speak for you here in court.  You will then discuss the case with your fellow jurors to reach an agreement if you can do so.

Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide this case for yourselves, but you should do so only after you have considered all the evidence, discussed it fully with all the other jurors, and listened to the views of the other jurors.  Do not be afraid to change your opinion if the discussion persuades you that you should, but do not come to a decision simply because the other jurors think it's right.

It is important that you attempt to reach a unanimous verdict, but of course only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight or the effect of the evidence simply to reach a verdict.

Now, I covered this before, but let me go over it again.

1        Because you must base your verdict only on the evidence

2   received in this case and on these instructions, I remind you

3   that you must not be exposed to any other information about

4   this case or the issues involved in this case.  Except for

5   discussing this case with your fellow jurors during your

6   deliberations, do not communicate with anybody else in any way,

7   and do not let anyone else communicate with you in any way

8   about the merits of this case or anything to do with it.  This

9   includes discussions about this case in person, in writing, by

10  telephone, by electronic means via e-mail, text messaging or

11  any other Internet chat room, blog, website, or other features.

12  This applies to communicating with your family members, your

13  employer, the media or press, and people involved in this

14  trial.  You are asked -- excuse me.  If you are asked or

15  approached in any way about your jury service or anything about

16  this case, you must respond that you have been ordered not to

17  discuss this matter, and to report it immediately to the Court.

18       Do not do any research, such as consulting dictionaries,

19  searching the Internet, or using other reference materials.  Do

20  not make any investigations or in any way try to learn about

21  this case on your own, other than from the evidence here in

22  court.

23       The law requires these restrictions to ensure that the

24  parties have a fair trial based on the same evidence that each

25  party has had an opportunity to address.  A juror who violates

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    these instructions jeopardizes the fairness of the proceedings,

2    and a mistrial could result that would require the entire trial

3    proceedings to start all over.  If any juror is exposed to any

4    outside information, please notify the Court immediately.

5         Now, some of you may have taken notes during the trial.

6    Whether or not you've taken notes, you should rely on your own

7    memory of what was said.  Notes are only to assist your memory.

8    They should not be overly -- they should not be

9    overly influenced -- or you should not be overly influenced by

10   your notes or those of your fellow jurors.

11        As I told you earlier, the punishment provided by law for

12   this crime is for the Court to decide only.  You may not

13   consider punishment in deciding whether or not the government

14   has proved its case against the defendant beyond a reasonable

15   doubt.

16        A verdict form has been prepared for you.  After you have

17   reached a unanimous verdict, or an agreement on the verdict,

18   your foreperson should complete it, the verdict form, according

19   to your deliberations, sign it, date it, and advise the clerk

20   that you have reached a verdict, to return to this courtroom.

21        If it becomes necessary during the deliberations to

22   communicate with me, you may send a note through the clerk,

23   signed by any one or more of you.  No member of the jury should

24   ever attempt to consult or communicate with me except by signed

25   writing, and I will respond to the jury concerning this case

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    only in writing or here in open court.

2        If you send out a question, I will consult with the

3    lawyers before answering it, which may take some time, because

4    we have other matters we are doing, and sometimes it takes half

5    hour or hour or so to get back to you.  You may, during that

6    time, continue your deliberations while waiting for an answer

7    to your question.  Remember that you are not to tell anyone,

8    including me, how the jury stands, numerically or otherwise, on

9    any questions submitted to you, including the question of guilt

10   of the defendant, until you have reached a unanimous verdict or

11   have been discharged by this Court.

12       Okay.  You ready to go back and deliberate?

13           JUROR:  Yes.

14           THE COURT:  Okay.  Why don't you swear in the bailiff,

15   please.

16           THE CLERK:  Okay.  Please come forward.  Right here is

17   fine.

18       Would you please state your full name for the record.

19           THE BAILIFF:  Jimmy Christopher Brown.

20           THE CLERK:  Do you solemnly swear to keep this jury

21   together in some private and convenient place, that you will

22   not permit any person to speak to, communicate with them, nor

23   do so yourself, unless by order of the Court or to ask whether

24   they have agreed upon a verdict, and that you will return them

25   to court when they have so agreed or when ordered by the Court,

```
1    so help you God?
2              THE BAILIFF:  Yes.
3              THE CLERK:  Okay.  All rise.
4         (The jury is escorted to the jury room at 3:07 p.m.)
5         (Outside the presence of the jury:)
6              THE COURT:  Okay.  The record will reflect that the
7    jurors have left the courtroom.  You may have seats.
8         Counsel, I'm going to ask you if you -- I'm sorry.
9    Alternate juror's left now, also.
10        I'm going to ask if you would remain in the courtroom
11   until 4:00 o'clock to see if we get any type of verdict or
12   questions this afternoon.  If they don't, I plan on giving the
13   jury -- I know I promised you something.  That's why I want to
14   check with both of you.  I promised we would not be meeting
15   Monday, that you can make other plans for Monday.  If the jury
16   is just deliberating, I don't mind them coming in and
17   deliberating Monday if there's a way that we can get you down
18   here within 10 or 15 minutes.
19             MR. CARDONA:  Your Honor, I'll be available.
20             THE COURT:  Well, I know you will be.
21             MR. ULTIMO:  I'll be available, too.
22             THE COURT:  Okay.  Well, then I'm going to give the
23   jury that option, Counsel.  Since I promised you, I also
24   promised the jury the same thing, I'm going to give them the
25   option.  If they have not reached a verdict today, I'm going to
```

1   give them the option, if they want, to come back Monday and

2   deliberate Monday, also.  Okay?  And we'll let you know what

3   they say on that.

4           MR. ULTIMO:  Thank you.

5           THE COURT:  Thank you, Counsel.

6           MR. CARDONA:  Your Honor?

7           THE COURT:  Yes?

8           MR. CARDONA:  In terms of the exhibits, may I and

9   counsel take one of the exhibits that's been pulled, the ones

10  that weren't admitted, so that we have a set of what was

11  admitted?

12          THE COURT:  Why don't you talk to the clerk when she

13  gets back.  She'll work that out with you.

14          MR. CARDONA:  Very well.  Thank you, Your Honor.

15          MR. ULTIMO:  Thank you, Your Honor.

16          THE COURT:  Thank you very much.

17      *(Off record.)*

18      *(In the presence of the jury at 4:24 p.m.:)*

19          THE COURT:  Okay.  Ladies and gentlemen, I understand

20  you've elected a foreperson, and that's Juror No. 11.  Is that

21  correct?

22          JURY FOREPERSON:  Yes.

23          THE COURT:  Okay.  And have you been able to reach a

24  verdict?

25          JURY FOREPERSON:  Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

704

```
1          THE COURT:  And have you filled out the verdict form?

2          JURY FOREPERSON:  Yes.

3          THE COURT:  And have you signed the verdict form?

4          JURY FOREPERSON:  Yes.

5          THE COURT:  Then why don't you present it to the

6     bailiff.

7        Thank you very much.

8        Okay.  Would you read the verdict, please.

9          THE CLERK:  Yes.

10     (The clerk read the verdict as follows:)

11            "United States District Court for the

12            Central District of California.

13            "United States of America versus David

14            Gomez, case No. Criminal 15-629-RGK.

15            "Verdict.

16            "With respect to defendant David Gomez, as

17            to each of the counts of the indictment, we the

18            jury hereby unanimously find as follows:

19            "Count 1, dated December 29, 2010, check

20            number 7218695, payable to Port Medical in the

21            amount of $216.18, in payment of a claim for

22            chiropractic services purportedly provided to

23            C.V., E.R.'s daughter, on or about November 16,

24            2010;

25            "Verdict:  Guilty.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              "Count 2, dated December 29, 2010, check

 2       number 7218701, payable to Port Medical in the

 3       amount of $246.23, in payment for a claim of

 4       chiropractic services purportedly provided to

 5       E.R. on or about November 16, 2010;

 6              "Verdict:  Guilty.

 7              "Count 3, December 29, 2010, check number

 8       7218686, payable to Port Medical in the amount

 9       of $432.36, in payment of a claim for

10       chiropractic services purportedly provided to

11       C.V., E.R.'s daughter, on or about November 27th

12       and 30th, 2010;

13              "Verdict:  Guilty.

14              "Count 4, December 29, 2010, check number

15       7218704, payable to Port Medical in the amount

16       of $216.18, in payment of a claim for

17       chiropractic services purportedly provided to

18       E.R. on or about November 30th, 2010;

19              "Verdict:  Guilty.

20              "Count 5, February 1st, 2011, check number

21       7281537, payable to Port Medical in the amount

22       of $429.88, in payment of a claim for

23       chiropractic services purportedly provided to

24       H.V., J.V.'s daughter, on or about November 2nd

25       and 9th, 2010;
```

```
1              "Verdict:  Guilty.

2              "Count 6, dated February 1st, 2011, check

3        number 7281549, payable to Port Medical in the

4        amount of $736.11, in payment of a claim for

5        chiropractic services purportedly provided to

6        J.V. on or about November 2nd, 9th and 16th,

7        2010;

8              "Verdict:  Guilty.

9              "Count 7, dated February 1st, 2011, check

10       number 7281554, payable to Port Medical in the

11       amount of $95.25, in payment of a claim for

12       chiropractic services purportedly provided to

13       J.V.M, J.V.'s son, on or about November 2nd,

14       2010;

15             "Verdict:  Guilty.

16             "Count 8, February 1st, 2011, check number

17       7281560, payable to Port Medical in the amount

18       of $95.25, in payment of a claim for

19       chiropractic services purportedly provided to

20       L.V., J.V.'s daughter, on or about November 2nd,

21       2010;

22             "Verdict:  Guilty.

23             "Count 9, dated February 11 -- I'm sorry,

24       February 1st, 2011, check number 7281562,

25       payable to Port Medical in the amount of $95.25,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        in payment of a claim for chiropractic services

2        purportedly provided to F.V., J.V.'s daughter,

3        on or about November 2nd, 2010;

4            "Verdict:  Guilty.

5            "Count 10, dated February 1st, 2011, check

6        number 7281538, payable to Port Medical in the

7        amount of $285.75, in payment of a claim for

8        chiropractic services purportedly provided to

9        D.V., J.V.'s daughter, on or about November 9,

10       16 and 23, 2010;

11           "Verdict:  Guilty.

12           "Count 11, dated February 1st, 2011, check

13       number 7281548, payable to Port Medical in the

14       amount of $644.82, in payment of a claim for

15       chiropractic services purportedly provided to

16       H.V., J.V.'s daughter, on or about November 16,

17       23 and 30, 2010;

18           "Verdict:  Guilty.

19           "Count 12, dated February 1st, 2011, check

20       number 7281550, payable to Port Medical in the

21       amount of $490.74, in payment of a claim for

22       chiropractic services purportedly provided to

23       J.V. on or about November 23rd and 30th, 2010;

24           "Verdict:  Guilty.

25           "Count 13, dated February 2nd, 2011, check

1    number 7284904, payable to Port Medical in the

2    amount of $95.25, in payment of a claim for

3    chiropractic services purportedly provided to

4    D.V., J.V.'s daughter, on or about November

5    30th, 2010;

6         "Verdict:  Guilty.

7         "Count 14, dated April 27, 2011, check

8    number 7461388, payable to Port Medical in the

9    amount of $312, in payment for a claim of

10   chiropractic services purportedly provided to

11   D.B. on or about January 26, 2011;

12        "Verdict:  Guilty.

13        "Count 15, dated April 27, 2011, check

14   number 7461389, payable to Port Medical in the

15   amount of $312, in payment of a claim for

16   chiropractic services purportedly provided to

17   D.B. on or about February 2nd, 2011;

18        "Verdict:  Guilty.

19        "Count 16, dated April 27, 2011, check

20   number 7461391, payable to Port Medical in the

21   amount of $312, in payment of a claim for

22   chiropractic services purportedly provided to

23   D.B. on or about February 16, 2011;

24        "Verdict:  Guilty.

25        "Count 17, dated April 29, 2011, check

1    number 7464661, payable to Port Medical in the

2    amount of $95.25, in payment of a claim for

3    chiropractic services purportedly provided to

4    D.V., J.V.'s daughter, on or about November 2nd,

5    2010;

6         "Verdict:  Guilty.

7         "Count 18, dated May 26, 2011, check number

8    7521095, payable to Port Medical in the amount

9    of $214.94, in payment of a claim for

10   chiropractic services purportedly provided to

11   J.C. on or about January 2 -- January 22nd,

12   2011;

13        "Verdict:  Guilty.

14        "Count 19, dated August 16, 2011, check

15   number 7660619, payable to Port Medical in the

16   amount of $357.96, in payment of a chiropractic

17   service -- I'm sorry, in payment of a claim for

18   chiropractic services purportedly provided to

19   L.L. on or about July 6, 2011;

20        "Verdict:  Guilt- -- excuse me.  Guilty.

21        "Count 20, dated August 16, 2011, check

22   number 7660620, payable to Port Medical in the

23   amount of $245.37, in payment of a claim for

24   chiropractic services purportedly provided to

25   L.L. on or about July 11, 2011;

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

710

```
1              "Verdict:  Guilty."

2         Dated the 14th day of October, 2016, at Los Angeles,

3    signed by the foreperson.

4              THE COURT:  Okay.  Ladies and gentlemen, anytime we

5    have a jury trial, we always do what we call "polling the

6    jury," and that is just asking each juror -- to make sure it's

7    unanimous, asking each juror whether or not the verdict, as

8    read by the clerk of the court today, reflects your own

9    individual verdict.  So I'm just going to go through by number.

10        Does the verdict, as read, to all 20 counts, by the clerk

11   of the court today, indicate your own personal verdict?

12        Juror No. 1?

13             JUROR NO. 1:  Yes.  Yes.

14             THE COURT:  Juror No. 2?

15             JUROR NO. 2:  Yes.

16             THE COURT:  Juror No. 3?

17             JUROR NO. 3:  Yes.

18             THE COURT:  Juror No. 4?

19             JUROR NO. 4:  Yes.

20             THE COURT:  Juror No. 5?

21             JUROR NO. 5:  Yes.

22             THE COURT:  Juror No. 6?

23             JUROR NO. 6:  Yes.

24             THE COURT:  Juror No. 7?

25             JUROR NO. 7:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  Juror No. 8?

2              JUROR NO. 8:  Yes.

3              THE COURT:  Juror No. 9?

4              JUROR NO. 9:  Yes.

5              THE COURT:  Juror No. 10?

6              JUROR NO. 10:  Yes.

7              THE COURT:  Juror No. 11?

8              JUROR NO. 11:  Yes.

9              THE COURT:  And Juror No. 12?

10             JUROR NO. 12:  Yes.

11             THE COURT:  Okay.  The Court would then order that the

12     verdict be recorded at this time.

13         Ladies and gentlemen, I want to thank you very much for

14     your participation.  You were -- as I said before, you set

15     records as far as being right on time and being conscientious

16     and doing your job.  I'm going to be cutting you loose at this

17     time.  Now you can talk about the case to anybody you want to,

18     so that restriction's no longer on you.

19         Sometimes jurors like to talk to the attorneys afterwards

20     in the hallway to find out weaknesses in the case, whatever.

21     Many times, most jurors just don't want to talk to anybody.

22     They just want to go home.  And the bailiff will make sure

23     that, if you want to go home without talking to anybody, they

24     will escort you that way, so that won't be a problem.

25         But if you do talk to anybody about the case, keep in mind
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

712

```
1    one thing:  What goes on in the jury room is really sacred.

2    It's between the jurors.  So you can comment on what you

3    thought about the case or what you thought was weak or strong,

4    whatever it is, but you can't tell what other jurors thought

5    about the case, because that's confidential communication

6    between you back there in the jury room.  So you should respect

7    the dignity of other jurors that way.

8         With that, is there any questions that you might have?

9    Then if not, I'm going to excuse you at this time and thank you

10   very much for being with us.

11        Jury will be excused.

12             THE CLERK:  All rise.

13        (The jury was excused and exited the courtroom.)

14             THE CLERK:  You may be seated.

15             THE COURT:  Okay.  We're going to need to get a date

16   for sentencing.  Let me get it from the clerk.

17             THE CLERK:  Okay.  Monday, January 9th, 2017, at

18   1:30 p.m.

19             THE COURT:  Is that date agreeable, counsel?  Both

20   counsel?

21             MR. CARDONA:  Yes, Your Honor.

22             MR. ULTIMO:  Yes, Your Honor.

23             THE COURT:  Okay.  We're going to put this over till

24   that date, which is January 9th, 2017, at 1:30 p.m.  Until that

25   time, the defendant will be remanded.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          That'll be the order of the Court.

2     Thank you very much.

3          MR. CARDONA:  Thank you, Your Honor.

4          THE CLERK:  All rise.

5     Court is in recess.

6

7               *(Proceedings concluded at 4:39 p.m.)*

8

9                       *--oOo--*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                         CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753, Title 28,

 4   United States Code, the foregoing is a true and correct

 5   transcript of the stenographically reported proceedings held in

 6   the above-entitled matter and that the transcript page format

 7   is in conformance with the regulations of the

 8   Judicial Conference of the United States.

 9

10   Date:  NOVEMBER 21, 2016

11

12

13

14                          /S/ SANDRA MACNEIL
                           _____

15                         Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA